## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN  DISTRICT OF TEXAS
## SHERMAN  DIVISION

| | | |
|---|---|---|
| **DANIEL CLATE ACKER,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **No. 4:06-cv-00469** |
| | § | |
| **DIRECTOR,** | § | |
| | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | |
| **Respondent.** | § | |
| | § | |

### PETITION FOR WRIT OF HABEAS CORPUS (POST-EXHAUSTION)

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Petitioner Daniel Clate Acker  is currently confined in the Polunsky  Unit of the Texas

Department of Criminal Justice, Livingston, Texas, in the custody of the Respondent, the Director

of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Mr. Acker

is confined  in violation of the Constitution and laws of the United States, and files this  Petition  for

a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254 *et. seq.* in order to secure the reversal of his

capital murder conviction and sentence of death, and for his release from confinement.

In support thereof, Mr. Acker would show the following:

# I.

## JURISDICTION AND PROCEDURAL HISTORY

Mr. Acker ("Petitioner") invokes the jurisdiction of this Court pursuant to 28 U.S.C. §2254 *et. seq.* Petitioner is a citizen of the United States and a resident of the State of Texas, and is incarcerated in the custody of Respondent. Petitioner is indigent,[1] is represented by undersigned counsel of record and is unable to provide funds for any aspect of his representation.

Daniel Clate Acker was indicted and in March of 2001 was convicted by a jury of the offense of capital murder in the 8th District Court of Hopkins County, Texas.[2] The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure article 37.071, and the trial court set punishment at death.[3]

The trial court appointed Mr. Ted Beaty as appellate counsel and Petitioner appealed this conviction and death sentence in cause No. AP-74,109.[4] His direct appeal brief was filed in the Texas Court of Criminal Appeals on September 9, 2002.[5] In that appeal, the following claims were presented:

---

[1] This Court granted Mr. Acker's Motion for Leave to Proceed *In Forma Pauperis* on December 8, 2006 (Docket #5).

[2] *See* Exhibit 1 herein (indictment) and Exhibits 2, 3 and 4 (verdict and judgment). "Exhibits" refers to the exhibits accompanying this petition that were previously filed on November 14, 2007 (Docket Nos. 18, 19, and 20). On November 5, 2008, this Court granted Petitioner's motion to designate these previously-filed exhibits as exhibits in this post-exhaustion petition. (Docket No. 29).

[3] *See* Exhibit 2 (jury instruction and verdict at guilt/innocence phase); Exhibit 3 (jury instructions and verdict at punishment phase).

[4] *See* Exhibit 5 (trial court order appointing Mr. Beaty as appellate counsel).

[5] *See* Exhibit 6 (Brief on Appeal filed by Mr. Beaty).

1) The Texas capital punishment scheme is unconstitutional in that it limits the consideration of mitigating evidence, allows the prosecutor unfettered discretion as to whether to seek the death penalty, does not provide for a sentence of life without parole and allows the admission of unadjudicated extraneous offenses (Point of Error No.1);

2) The Court erred by admitting the re-enactment by Mr. Young, which showed him driving by the scene of the crime viewing somebody removing a body from a pick-up (Point of Error No.2);

3) The Court erred in not admitting a defense exhibit of three pages from the autopsy file which contradicted the medical examiner's opinion that the decedent did not jump from the truck (Point of Error No. 3);

4) The Court erred in denying the defense's request for an instruction on the lesser included offenses of manslaughter and criminally negligent homicide (Point of Error No. 4);

5) The Court erred in excluding the testimony of the defense investigator as to the driver's inability to open the passenger side door and push someone out the passenger door (Point of Error No. 5);

6) The contemptuous conduct of the prosecutor towards defense counsel deprived Applicant of a fair trial.[6]

On November 26, 2003 the Texas Court of Criminal Appeals affirmed his conviction and sentence of death. *Acker v. State,* No. AP-74,109 (Tex. Crim. App. November 26, 2003)(not designated for publication).[7]   Petitioner's counsel did not file a petition for *certiorari.*

Petitioner sought state post-conviction relief and filed an application through counsel Mr. Toby Wilkinson, who was also appointed by the trial court.[8]   The initial state petition for post-conviction relief was filed on July 18, 2003, while the direct appeal was still pending.[9]   *Ex parte Daniel Clate Acker,* No. WR-56,841-01.[10] .[11]   The following claims were presented on state habeas,

---

[6]   *See* Exhibit 6.

[7]   *See* Exhibit 8 (verdict on direct appeal).

[8]   *See* Exhibit 5 (trial court order appointing Mr. Wilkinson on state habeas).

[9]   Mr. Acker also filed a *pro se* application (*see* Exhibit 20) on December 31, 2003.

[10]   *See* Exhibit 9 (state habeas petition filed by Mr. Wilkinson).

[11]   *See* Exhibit 3 (state habeas petition filed by Mr. Wilkinson).

as best as counsel can determine:

> 1) Challenges to the constitutionality of the Texas death statute (Claims 1-4);
> 2) Ineffective assistance of counsel for:
>> a) Attorney McDowell not talking with Applicant sufficiently;
>> b) misleading the jurors and Applicant in various ways;
>> c) failure to object regarding the victim falling out of the truck;
>> d) encouraging Applicant to lie;
>> e) failure to call Applicant as a witness at the change of venue hearing;
>> f) ineffective preparation of the accident reconstruction expert;
>> g) various claims of failure to object and failure to investigate at both phases of the trial;
>> h) ineffective seating arrangement at trial;
>> i) failure to call mitigation witnesses;
>> j) failure to point out inconsistencies and inaccuracies in a video recording offered at trial; k) various instances of ineffectiveness regarding the court-appointed expert Dr. Norton;
>> l) failure to maintain order in the courtroom;
>> m) failure to be present during preparation of the jury charge;
>> n) failure to properly question Applicant when he testified;
>> o) improper editing of the taped interview of Applicant;
>> p) failure to challenge suborning perjury of a witness by the prosecutor;
>> q) various claims of ineffectiveness due to failure to challenge false testimony by the medical examiner;
>> r) ineffectiveness claims concerning the autopsy, time and manner of death of the victim;
>> s) failure to investigate and present a conflict of interest on the part of the grand jury foreman; and
>> t) various claims regarding the victim's brother; failure to challenge false testimony of witness Brodie Young.  Additionally, various claims of prosecutorial misconduct, ineffective assistance of appellate counsel, failure to appoint and fund appropriate experts, and various claims of trial error were also brought.[12]

On November 15, 2006, the Texas Court of Criminal Appeals denied the state post-conviction application for writ of habeas corpus, along with a *pro se* application filed by Petitioner after the deadline provided for the filing of an initial application.  *Ex Parte Daniel Clate Acker,* No. WR-56,841-01 and WR-56,841-03 (Tex. Crim. App. November 15, 2006)(*per curiam*)(not

---

[12]  *See* Exhibit 9.

designated for publication).[13]

On November 20, 2006, undersigned counsel moved to be appointed as Mr. Acker's counsel in this Court in order to pursue federal habeas corpus relief [14] and on November 27, 2006, undersigned was so appointed by Judge Richard A. Schell.[15]

On November 13, 2007, Mr. Acker timely filed his Petition for Writ of Habeas Corpus in this Court. Shortly thereafter, Petitioner moved to stay the case in federal court and hold the proceedings in abeyance in order to exhaust his claims in state court. On December 11, 2007, this court issued an Order granting this Motion and:

a) held Mr. Acker's federal petition for a writ of habeas corpus in abeyance in order to exhaust state remedies;

b) equitably tolled the federal statute of limitations during the time Mr. Acker is pursuing state remedies;

c) ordered undersigned counsel to move for appointment to represent Petitioner within 30 days of the Order; and

d) whether or not undersigned counsel was appointed, Petitioner was ordered to file his successive state petition within 60 days of the filing of the Order.[16]

On January 3, 2008, Petitioner timely filed his Motion for Appointment of Counsel and

---

[13]  *See* Exhibit 13 (order of Texas Court of Criminal Appeals ("CCA") denying state application for writ of habeas corpus). In that Order, the CCA denied both the application filed by Mr. Wilkinson (Exhibit 9) and the *pro se* application (Exhibit 20).

[14]  Docket # 1.

[15]  Docket # 3.

[16]  Docket # 25.

Motion to Proceed *In Forma Pauperis* in the Texas Court of Criminal Appeals and in the trial court and also timely filed his state successor petition on or about February 7, 2008, in the trial court and the Texas Court of Criminal Appeals, in accordance with this Court's order. The trial court forwarded this application and the motions to the Texas Court of Criminal Appeals and took no action on them.

On September 10, 2008, the Texas Court of Criminal Appeals denied Mr. Acker's writ application in the following Order:

> This is a subsequent application for writ of habeas corpus filed pursuant to Texas Code of criminal Procedure, Article 11.071, Section 5.
> Applicant was convicted of murder on March 30, 2001. We affirmed the conviction and sentence on direct appeal. *Acker v. State,* No. AP-74,109 (Tex. Crim. App. November 26, 2003). On July 18, 2003, applicant filed his initial application for writ of habeas corpus pursuant to Article 11.071. When this Court received the record it included *pro se* claims raised by applicant. We denied relief on the initial application and determined the *pro se* claims were untimely and did not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5, and dismissed them. *Ex parte Acker,* No. WR-56,841-01 and WR-56,841-03 (Tex. Crim. App. November 15, 2006). Applicant now brings fifteen more claims. We have reviewed these claims and find that they do not meet the requirements of Article 11.071, Section 5 for consideration of subsequent claims. This application is dismissed as an abuse of the writ.
> IT IS SO ORDERED THIS THE 10TH DAY OF SEPTEMBER, 2008.

*Ex parte Daniel Clate Acker*, No. WR-56,841-04 (Tex. Crim. App. September 10, 2008)(*per curiam*)(not designated for publication).

On September 30, 2008, this Court granted Petitioner's motion for an extension of time to re-file his petition in this Court, and he was given until November 10, 2008 to re-file it. (Docket # 27).

Hence, this petition is timely filed pursuant to this Court's Order of December 11, 2007 (Docket # 25).

## II.

## <u>TIMELINESS</u>

This petition is timely filed, as the initial federal petition was filed within one year of the state court's denial of his habeas application on November 15, 2006.[17]   Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").   The initial state application had been filed on July 18, 2003, while the direct appeal was still pending, hence no portion of the one-year period had previously elapsed in state court.[18]   Since the filing of Mr. Acker's initial petition in this Court, he has complied with all the Court's orders regarding the stay and abeyance of the petition in this court, as detailed *supra*.   This Court ordered that if the current post-exhaustion petition was re-filed in this Court by November 10, 2008, it would be deemed timely.

---

[17]   *See* Exhibit 13 (CCA's denial of state post-conviction application).

[18]   *See* Exhibit 9.

# III.

# FACTUAL BACKGROUND

## A)  Introduction.[19]

Daniel Clate Acker is innocent of the murder of Marquetta George,  his girlfriend and

fiancee, as he has proclaimed from the moment of his arrest.[20]  The State convicted Mr. Acker of

Ms. George's murder on the theory that, while driving his truck at high speeds, "it is likely that the

decedent was strangled and probably dead or near death prior to being dumped from the vehicle."

*Acker v. State,* No. 74,109 (Tex. Crim. App. Nov. 26, 2003)  at *5.[21]  The State's case was based on

the speculative and untenable hypothesis that the victim had been strangled to death while Mr. Acker

was driving his truck at high speeds, a virtually impossible feat.  Due to erroneous evidentiary

rulings by the  trial court, virtually all exculpatory evidence was excluded and never heard by

Petitioner's jury.  Mr. Acker's attorneys were not allowed to present evidence that Ms. George,  just

a few weeks prior to her death,  had attempted to jump from Mr. Acker's truck, precisely his

explanation of what caused her death on March 12, 2000.   The State's wildly speculative and flawed

strangulation theory was presented by a medical examiner-trainee and never effectively challenged

by Mr. Acker's attorneys, at least partly because the trial court obstructed their efforts to do so. None

---

[19]   This factual summary introduction has been compiled from the record and from the appendices and declarations and other documents which accompany this petition attached hereto as exhibits. The factual summary of the trial which follows this introduction has been compiled from the testimony and evidence introduced at trial, and is not intended as an admission by Petitioner of the veracity of any of that testimony or evidence.

[20]   References and evidence supporting all of the assertions in this introduction are contained herein in the discussions of the individual claims.

[21]   Exhibit 8.

of the victim's wounds, as shown in the autopsy and the trial testimony, are normally caused by strangulation and "none of them, either in combination or alone" are found only in strangulation (hemorrhage in crico-hyoid membrane and in thyro-hyoid membrane; fracture of the greater horns of the hyoid bone; patterned contusions on the platysma; contusions or scratch abrasions on the neck).[22]

Defense counsel's requests for forensic experts to counter this evidence and to present Mr. Acker's case for actual innocence were denied on the basis that the defense had been provided with an investigator. But when the defense investigator attempted to present the results of certain tests he had conducted, the court ruled that these tests were inadmissible, holding that they should have been performed by the very experts for which the court had denied funding. Also disturbing is the fact that in a case that focused on the forensic determination of the manner of the victim's death, the defense presented no medical or forensic expert testimony. Nor did the defense present a wealth of mitigating evidence, such as Mr. Acker's problems with drug addiction, alcoholism, and his low intelligence.

The miscarriages of justice did not end at Petitioner's trial. On appeal, the trial court appointed an appellate attorney, Mr. Ted Beaty, who filed a 10-page appeal brief, one of the shortest capital appeals ever filed in Texas.[23] This appeal was so devoid of effort that one of the few claims presented consisted simply of a long list of numbers, purporting to be the volume, page and line of

---

[22]   *See* Exhibit 25 (resume of Dr. Larkin; Exhibit 26, Dr. Larkin's report at 25 (list of the victim's injuries).

[23]   *See* Exhibit 6.

the transcript where alleged prosecutorial misconduct occurred, without specifying what it was.[24] Mr. Beaty was eventually held in contempt by the CCA for his failure to timely file this appeal, after several extensions of time were granted.[25]

Even worse, if possible, were Mr. Acker's state post-conviction proceedings, where the attorney, Mr. Toby C. Wilkinson, was also appointed by the trial court.[26] The vast majority of Mr. Acker's state writ application (the "01" writ) consisted of his own memos and letters, submitted verbatim without even basic editing and sometimes without even changing them from the first person vernacular.[27] To characterize the state habeas petition filed on his behalf as incoherent would be a charitable understatement. The document itself is its own best comment (included herein as Exhibit 9). This woefully incompetent pleading has been the subject of widespread media attention and public incredulity[28] and Mr. Wilkinson is no longer included on the CCA's list of attorneys qualified to handle capital writs.

This writ application is discussed in greater detail in Claim VIII *infra*. But to give just a hint of what was submitted, the following are some highlights of what was submitted by Mr. Wilkinson:

---

[24] Of the 6 short issues in the brief, the State argued that 2 issues were insufficiently briefed. *See* State's Brief on Appeal (Exhibit 7); and *Acker v. State,* No. 74,109 (Tex. Crim. App. Nov. 26, 2003) wherein this is discussed (Exhibit 8).

[25] *See* Exhibits 15, 16, and 17.

[26] *See* Exhibit 5.

[27] *See* Exhibit 9 herein; compare with Exhibit 16, attorney Ted Beaty's response to the CCA's notice to show cause for contempt, where on September 11, 2002, Mr. Beaty attached to his response letters to himself from his client Mr. Acker, which Mr. Wilkinson later copied virtually verbatim into his writ application.

[28] *See* Exhibit 19 (newspaper articles relating to Mr. Wilkinson's state writ application for Mr. Acker).

-10-

The state writ application first sets out, in 14 pages, a "procedural history" of the case (at 3-16), seemingly listing every document filed in the case with no indication of either the relevance of the motion or the Court's ultimate ruling, in run-on sentences, some of which go on for three or four pages (*e.g.,* at 7-11).[29]   The first four claims ( at 18-22) are generic boilerplate challenges to the constitutionality of the Texas death penalty statute, and as to each claim Mr. Wilkinson helpfully states "there are no cases on point."  (at 18, 19, 20, 22).   "Claim No. 5" purports to be a claim of "ineffective assistance of counsel" but no instances of ineffectiveness are cited.  Then a new sub-section numbered "C" appears (there are no "A" and "B" sub-sections) entitled  "trial counsel failed to provide effective assistance of counsel at his trial..."  (at 24).   The claims then mysteriously re-start at Claim 1.  Claim 2 in its entirety reads:

> The trial attorney provided ineffective assistance of counsel because William Howard McDowell misled the jurors by telling them that Markie came out of the truck head first in a downward motion, demonstrating thisa (sic) with his own body falling head first It was never said that Markie came out of the truck head first, therefore McDowell had not right (sic) to say that she did so.
> (at 25).[30]

Claim No. 5: "looking back at applicant's trial and taking into consideration how applicant's trial attorneys allowed the D A to railroad applicant, applicant thinks that McDowell encouraged applicant to lie on record..."  (at 26)

Claim No. 6: "...applicant saw that Ferguson and McDowell were not calling him to the stand and that the judge was reaching for his hammer to give his decision, so applicant stood up...but...the judge stopped him and told him not to speak out unless he was asked..."  (at 27-28)

---

[29]   Exhibit 9, the "01" writ.  All the following page references in this section are to Mr. Wilkinson's state habeas application, at Exhibit 9.

[30]   Virtually none of the sentences in the application have a period at their end.

Claim No. 13: This is simply a statement that "there is no Claim No. 13 included."  (at 30)

Claim No. 16: Here the application shifts into the first person: "Had I known that Sands's testimony would be inadmissible, I would have had my lawyers object..."  (at 32)

Claim No. 22: "Ferguson and McDowell just sat throughout the entire trial pretending to represent applicant while Long railroaded applicant."(at 42)

Claim No. 25: "This makes applicant wonder what else the medical examiner may have used that belonged to somebody else and was put into Markie's autopsy report" (at 45)

Claim No. 29: "Frank Long asked Sabrina ball (sic) if Markie told her that she had tried to jump out of my truck as soon as Markie got to her house to call the police   Ball was just fixing to say yes, and the D A and everyone else could see that Ball was just fixing to say yes, but before she could spit the word "yes" out...It seems awfully, awfully strange to me that out of all these sttached (sic) reports the furors (sic) were not allowed to hear a single one of them... "(at 47-48)

Claim No. 30: There is no claim 30, the application jumps from Claim 29 to Claim 31.

Claim No. 32: "The family had all the inside information they needed to know what all kinds of evidence that they needed to fabricate against me to wrongfully convict me..." (at 49-50)

Claim No. 33: "According to the attached rule that I copied out of an up to date Texas Court Rule Book Ganzalise's (sic) opinion should have been inadmissible..." (at 51)

Claim No. 36: "Here's what they did they pretended to represent me to keep from biting the hand that feeds them and onlyu (sic) put on one boxing glove when they could have put on both gloves and won this case for me I'm not guilty and the facts of the case prove I'm not guilty I'm just about out of carbon paper so before I run out I want to try and list everything that was added to and took from me to convict me on the next page then as soon as I get some more typing supplies I have

-12-

about thirty more errors I want to tell you about and have brought up in my appeal." (at 55)

Appended to the application was a bewildering number of "exhibits" that appear to come directly from Mr. Acker's letters, as apparently Mr. Wilkinson tired of re-typing them at a certain point. If possible, they are even more incoherent than the foregoing and are replete with grammatical errors, misspellings and a mind-boggling morass of claims.

As mentioned *supra*, this incoherent mess was actually copied almost verbatim from letters Mr. Acker had sent Mr. Beaty, his appellate attorney. Mr. Beaty was cited for contempt for failing to file his appellate brief on time, and the CCA issued a Notice to Show cause for Contempt on Mr. Beaty.[31] On September 11, 2002, Mr. Beaty responded to that notice and attached as exhibits copies of Mr. Acker's letters and memos.[32] A comparison of these letters and memos (Exhibit 16) with the application filed by Mr. Wilkinson (Exhibit 9) shows that Mr. Wilkinson copied them almost verbatim, without even changing grammar or spelling errors.

To make matters even worse, at the evidentiary hearing held in the trial court, Mr. Wilkinson did nothing to develop, investigate or even present Mr. Acker's claims, and actually attempted to distance himself from these claims in the petition Mr. Wilkinson purportedly authored. The inescapable impression one forms from reading the transcript of this hearing is of Mr. Wilkinson's embarrassment and annoyance at having to be there at all.[33] The bizarre nature of the writ and its

---

[31]   Exhibit 15.

[32]   Exhibit 16 (letters and memos attached to Mr. Beaty's response).

[33]   Martin Braddy, the Hopkins County District Attorney, inadvertently admitted the total lack of counsel's assistance at the hearing, as he commented on it by stating that "the court went out of its way to let Acker speak for himself during a hearing on his claims, even if, at that hearing, Acker 'just kind of rambled.'" *See* Exhibit 19, "Death sentence upheld despite garbled argument," by Guillermo Contreras, *San Antonio Express News,* Nov. 15, 2006, paraphrasing

slipshod quality was never mentioned by the trial court or the prosecutor.  The hearing rested entirely on Petitioner's shoulders, with predictable results.  It would be difficult to imagine a more pervasive scenario of systemic failure, unfairness and pervasive injustice than that experienced by Mr. Acker in this case.

### B)  Pre-trial proceedings.

Mr. Acker was initially indicted by a grand jury who returned an indictment alleging capital murder.[34]  2 RR 44.[35]  This indictment alleged that Mr. Acker "intentionally and knowingly caused the death [of the victim Markie George] by homicidal violence, to wit, strangulation and blunt force injury."  3 RR 26.[36]  Defense objections to the vagueness of the charging document were overruled. 2 RR 27.

Various pre-trial motions were brought by the parties and an initial hearing on these motions was held on August 10, 2000.   The court granted the prosecution's motion forbidding the defense from impeaching prosecution witnesses by prior criminal conduct unless the crime was a felony or involved moral turpitude.  2 RR 3-4.   A defense motion for arrest records of prosecution witnesses was also granted.  2 RR 58.  The defense was also forbidden to make reference or comment on any innocent person being convicted in the past, make sidebar comments when making objections, and was required to provide the prosecution with witness statements.  2 RR 4-21.

_____

Mr. Braddy.

[34]   Exhibit 1.  However, a  member of this grand jury, Carol Henderson, was related by marriage to the victim Ms. Markie George, as the prosecutor himself admitted.  2 RR 43.

[35]   "RR" refers to the Reporter's Record in this case, with the volume number preceding the page number.  "CT" refers to the Clerk's Transcript.

[36]   *See* Exhibit 1 (original and succeeding indictments).

The defense also moved to set aside the indictment and challenged the constitutionality of the Texas capital punishment scheme on various grounds, such as limiting the consideration of mitigating evidence and the unfettered discretion it gives to prosecutors as to whether to seek the death penalty. 2 RR 28. This motion was also denied. 2 RR 28. The motion was re-urged at a later hearing and was likewise denied again. 4 RR 122, 124.

The court initially allotted one thousand dollars for the defense investigator and fifteen hundred dollars for a polygraph examiner. 2 RR 45. A forensic pathologist was requested by the defense, and the prosecution had no objection to Dr. Linda Norton from Dallas. 2 RR 68. The defense also requested an accident reconstructionist to tell them "whether that woman fell out of the car or she was placed on the ground and ran over." 2 RR 71. Action on this request was deferred at an August, 2000 court hearing. 2 RR 73. At that same hearing, the defense pointed out that the local newspaper had printed an article that said that the victim was dead before she left the truck. 2 RR 61. Mr. Acker was also photographed in prison garb and that photo appeared on the front page of the local newspaper. 2 RR 63-64.

More pre-trial motions were heard at a hearing on December 21, 2000. The defense moved for a continuance because of DNA evidence that had not been presented or made available to them. 4 RR 2. DNA evidence was taken from Mr. Acker and the victim and from some clothing and the defense expert had not yet had an opportunity to examine it. 4 RR 2. Arrest records of the state's witnesses had not yet been provided to the defense and the court ordered those to be submitted prior to the start of voir dire. 4 RR 11. 4 RR 9. The defense objected to the vagueness of the special issue regarding future dangerousness. 4 RR 8. This motion was denied. 4 RR 9.

The defense also moved to instruct the jury that a single "no" vote on a special issue would

result in a life sentence, citing federal constitutional grounds.   4 RR 13.  This motion was also denied.  4 RR 15.  The defense also moved that any bad acts or criminal conduct on the part of the defendant, other than the offense for which he was on trial,  not be used unless the jury believed beyond a reasonable doubt that he had committed them.  4 RR 16.  This motion was also denied. 4 RR 16.

The defense had been denied access to certain forensic evidence, including the victim's clothes and evidence gathered at the scene of the crime.  4 RR 59-60.  Mr. Acker was ordered to submit to an examination by the State's expert as he was going to be evaluated by a defense expert. 4 RR 170-171.

On January 23, 2001 Mr. Acker was newly indicted by a grand jury and arraigned by the Court.  6 RR 2. The new indictment alleged that "on or about the 12th day of March, 2000 [Mr. Acker] then and there intentionally caused the death of ...Marquetta Follis George, by homicidal violence, to-wit, manual strangulation and ligature strangulation with an object, the exact nature of which is unknown to the Grand Jury, and blunt force injury...in the course of committing and attempting to commit the offense of kidnaping..." 7 RR 168-169.[37]

On February 1, 2001 more pre-trial motions were heard.  They were mostly constitutional challenges to the Texas death penalty statute and they were denied.  6 RR 6 *et. seq.*  The defense again asked for a crime scene expert and the Court noted that they had a court-appointed investigator, Mr. John Sands.  6 RR 18.  When the defense stated that he was not qualified as a crime scene expert, but the prosecution stipulated that he is such an expert. 6 RR 19.  A Mr. Pipkin was also appointed  and the Court ruled that the defense had two such experts and denied the motion for the

---

[37]   *See* Exhibit 1.

appointment of a crime scene expert.  6 RR 20.

### C) The State's case at the guilt/innocence phase of the trial.

Testimony at Mr. Acker's trial began on March 26, 2001, in the 8th Judicial District Court, Sulphur Springs, Hopkins County, Texas, Judge Robert Newsom presiding. Attorneys for Mr. Acker were Roland Ferguson and William McDowell, both of Sulphur Springs.  Appearing for the state were district attorneys J. Frank Long and Timothy S. Linden.

Mr. Acker pled not guilty and his trial was by jury.  19 RR 6.

The prosecution's opening statement summarized the State's case against Mr. Acker.  19 RR 11-17.  The prosecutor claimed that Mr. Acker and the victim Markie George had been living together in a trailer house in the Mount Sterling community. 19 RR 11.   On the evening of March 11, 2000, Mr. Acker and Ms. George were at a club in Sulphur Springs named "Bustin Loose."  19 RR 11.  There was an altercation between them, and allegedly threats were made by Mr. Acker that he would kill her. 19 RR 12.  Mr. Acker was removed from the club at about 1 a.m. 19 RR 12.  He was met by his sister, who dropped him off where his pickup was parked near a veterinarian clinic. 19 RR 12.  Allegedly, another threat was made against Markie George.  19 RR 12.  Ms. George had left the club with someone else and didn't return to their trailer house residence that night.  19 RR 12.   That night, Mr. Acker had switched to another vehicle which he used for work, tried to park it behind the trailer and got stuck.  19 RR 13.

In the morning, Markie George returned to the trailer with someone else.  19 RR 14. Shortly after that person left, Ms. George ran to her neighbors and asked them to call the police, fearing that she would be assaulted by Mr. Acker.  19 RR 14.  Mr. Acker came up and grabbed her and forced her into the truck.  19 RR 15.  Someone later allegedly saw Mr. Acker drag a woman's body away

from the truck.  19 RR 17.

The defense, in their opening statement,  stated that Ms. George had on previous occasions twice tried to jump from the truck when Mr. Acker was driving it, but had been pulled back by him. 19 RR 20.  But tragically she succeeded in jumping from the truck on the day of her death. 19 RR 21.

**Mary Peugh,** the state's first witness, testified that she knew  the victim Markie George and had met Mr. Acker once at a local bar and nightclub called "Bustin Loose." 19 RR 22. On March 11, 2000, she was at the club with about twelve co-workers, including  Kristi Seely and Danny Williams. 19 RR 24, 27.   Ms. George entered the club by herself shortly after Ms. Peugh arrived.  19 RR 29. Ms. George came up to their table and was then joined by Mr. Acker.  19 RR 24, 27.  They got into an argument and Mr. Acker said "I'm going to kill that bitch." 19 RR 25, 30.[38]  But Ms. Peugh did not take this as a serious statement and hence did not warn Ms. George.  19 RR 26.   Later that night, Mr. Acker became involved in an altercation with another man and was asked to leave the club.  19 RR 26.  The bouncer removed both men.  19 RR 27, 34.  A bouncer at the club named Robert McKee, known as "Calico", gave Ms. George a ride home.  19 RR 27, 35.

**Timothy Mason** testified that he had known Mr. Acker for fourteen years.  19 RR 38.  On the evening of March 11, 2000, he went to "Bustin Loose" with friends and saw Mr. Acker there, alone at the bar.  19 RR 39, 44.  Mr. Acker pointed out Ms. George as his girlfriend and allegedly said that he was going to kill her.  19 RR 40-41.  Mr. Acker asked Mr. Mason to tell Mrs. George that he was going to kill her.  19 RR 41, 46.  Mr. Mason did this, but there was not much of a

---

[38]   The witness admitted that she could not tell what they were arguing about nor was she sure Mr. Acker  was referring to Ms. George, but she thought this was who he was talking about. 19 RR 32-33, 36.

reaction, and he left soon because he did not want to be around.  19 RR 42, 49.   The witness admitted that he had a past disagreement with Mr. Acker.  19 RR 45.

The next day, when Mr. Mason heard that Ms. George had been killed, he did not go to the police.  19 RR 47.  The first time he gave a statement was about a month or a month-and-a-half before the trial.  19 RR 48.

**Krista Dillon** testified that she knew both the victim Ms. George and Mr. Acker.  19 RR 51. On the evening of March 11, 2000, Ms. Dillon went to "Bustin Loose" where she saw Ms. George in the restroom.  19 RR 53.  As a result of their conversation, Ms. Dillon went to Mr. Acker to cheer him up.  19 RR 54-55.  When Ms. Dillon next saw the victim, she was limping.  19 RR 55.  After the club closed, Ms. Dillon saw Mr. Acker at Burton's Restaurant, when she was eating breakfast. 19 RR 55.  He was trying to find Ms. George, was asking persistently, and seemed angry.  19 RR 56. The victim's mother was Ms. Dillon's boss at work.  19 RR 57.  Ms. Dillon could not tell whether Mr. Acker was drunk or not that night.  19 RR 58.

**Dorcas Dodd Vititow,** Mr. Acker's older sister, testified that she was at "Bustin Loose" on the evening of March 11 of 2000. 19 RR 61.  She saw her brother and Ms. George there.  19 RR 62. Mr. Acker was acting as if he was getting jealous and Ms. Vititow asked him to stay out of trouble. 19 RR 63.  Later, she was asked by a bouncer to assist in having her brother leave the club.  19 RR 64, 77.  Ms. Vititow advised him to go to their mother's house, which was closer to the club than his residence.  19 RR 65.  She did not see him get into any altercation with Ms. George, another man or the bouncer.  19 RR 80. Mr. Acker said he would leave, but he returned twice.  19 RR 66.

As the club was closing at 1 a.m., she saw Mr. Acker in the parking lot and gave him a ride to where his truck was parked near a veterinarian clinic.  19 RR 67.  Later, Mr. Acker came by the

witness's house, but she did not answer the door.  19 RR 68.  Earlier, at the club, she had taken a

pocketknife belonging to Ms. George from him.  19 RR 70, 78.[39]  As she was leaving the vet clinic,

Mr. Acker, while holding an axe, said "If I was going to hurt someone I wouldn't need a knife."  19

RR 71.[40]

      The next morning, Mr. Acker came by the witness's house again, and he was crying and

angry and still looking for Ms. George.  19 RR 73.  He said he was going to beat them when he

found them, that no one was going to make a fool out of him.  19 RR 74.[41]  At this time, Mr. Acker

was not driving his truck, but a truck belonging to his employer, Bentley Electric.  19 RR 74.

      **Lila Seawright,** the victim's mother, testified that her daughter had known Mr. Acker two

to three weeks before she moved into the trailer house.  19 RR 88. Ms. George paid the rent and her

daughter and son also lived there.  19 RR 89.  Ms. George had not been working, as she lost her job

around the beginning of the year, but she received money from child support and unemployment.

19 RR 104.  Before moving in with Mr. Acker, she had lived with Randy Lee.  19 RR 105.  She also

lived with Larry Murray for a short time in January of 2000.  19 RR 106.

      On the morning of Sunday, March 12, 2000, at about 9:15 a.m., Mr. Acker showed up still

looking for Ms. George.   19 RR 91.  Mr. Acker said they had gone to the rodeo Saturday night,

where Ms. George went to the restroom and was gone longer than usual.  19 RR 92, 102-103.  Then

they went to "Bustin Loose." 19 RR 92.  A bouncer asked him to leave just because he put his hand

---

[39]  Mr. Acker was not threatening anyone with the knife at the club.  19 RR 78.

[40]  The witness also testified that she had given an earlier statement that Mr. Acker said "I don't need that knife.  If I find her with another man they will pay."  19 RR 72.

[41]  However, this statement and the statement about the axe were only made in her second statement but not the first.  19 RR 82-83.

on Ms. George's shoulder.  19 RR 92.  Mr. Acker said he had been up all night looking for her, and also said that "she's the one that's going to break my heart."  19 RR 93.

Then Mr. Acker had a Coke and then said he didn't know what he would do if he lost Ms. George and that "if I find out she was with anybody...I'm going to kill 'em."  19 RR 95, 115.  Ms. Seawright said that it wasn't worth going to the penitentiary. 19 RR 96.[42]

Mr. Acker left with the intention to return some rented video tapes Ms. George had rented earlier.  19 RR 100, 103.  Ms. Seawright told him Ms. George would return, as her children were due back soon.  19 RR 100.  The witness told Mr. Acker to bring the children to her if they returned before Ms. George did.  19 RR 101.   At this time, Mr. Acker was in control and not upset.  19 RR 103.

Mr. Acker was possessive of Ms. George, but Ms. Seawright never saw him hurt, beat or threaten her, and never saw them fight.   19 RR 108, 114, 117.   This witness managed the Veterans of Foreign Wars club, and the Tuesday before her death, Ms. George had been in an altercation with her mother at the VFW.  19 RR 111.

**Michael Bentley,** the owner of Bentley Electric, testified that Mr. Acker worked for him. 19 RR 118.  Mr. Bentley owned several work trucks and he would normally let the employees use them if they asked, but on the weekend of March 11 and 12, Mr. Acker did not indicate that he needed to borrow a truck.  19 RR 119.  The use of the truck that weekend was without  permission. 19 RR 120.  But it was not unusual for employees to borrow the trucks.  19 RR 124.

---

[42]   Outside the presence of the jury, the defense argued that this witness should not be allowed to say that Mr. Acker responded by saying that penitentiary life was not that bad, as it would imply that he had been in the penitentiary, which the jury should not know.  However, the Court allowed the statement to be heard by the jury.  19 RR 97-99.

On March 12, Mr. Bentley was told by the Sheriff's Department  that they had his truck.  19 RR 125.  When he got it back, it was not damaged or in a different condition.  19 RR 126.

**Clayton McGraw,** the Foreman of the Grand Jury of Hopkins County, stated that the grand jury was unable to determine what object was used to strangle the victim Markie George.  19 RR 128. They were also not able to determine if it was done manually or with a rope or ligature.  19 RR 128.

**Thomas William Smiddy** testified that he was the caretaker of the trailer rented by Markie George.  19 RR 136.   When she rented it, she was accompanied by Mr. Acker.  19 RR 136.   The trailer she rented was next door to Mr. Smiddy's.  19 RR 137.  On the morning of March 12, 2000, Mr. Acker, driving a white utility truck,  returned to his trailer.  19 RR 138, 152.   He pulled in to the back of the trailer and got stuck because the ground was soft.  19 RR 140. There was a propane gas line that ran from the tank to the trailer that could have been damaged if Mr. Acker had gone further.  19 RR 153.   Mr. Smiddy, who had been working underneath a vehicle, along with  the owner of the trailers, Dalby Debord, helped pull Mr. Acker out.  19 RR 140.   They first tried with a four-wheel vehicle and when that failed, they succeeded with a tractor.  19 RR 157-158.   The witness had never seen Mr. Acker park in back of the trailer before.  19 RR 144.

Markie George arrived a little before 11 a.m., accompanied by a man.  19 RR 144.  Then Ms. George went into the trailer and the man left.  19 RR 145.[43]  They were not arguing.  19 RR 145. At this time, Mr. Acker's truck was parked in front, in the driveway.  19 RR 160.

After about half an hour, Ms. George ran to Mr. Smiddy's house and hollered at him to call

---

[43]   Shortly after she entered the trailer, she came back out and was talking to the man that had brought her home before he left.  19 RR 161.

the sheriff.  19 RR 146, 162.   She appeared to be afraid of Mr. Acker, and hid behind Mr. Smiddy's wife.  19 RR 146.  Ms. George also said "He's not going to whup me this time."  19 RR 163.  Mr. Acker than came and picked her up and walked off with her.  19 RR 147.[44]  She was hitting him as she was carried away.  19 RR 165.  He placed her in the driver's side of the truck.  19 RR 147, 151. It appeared that she was resisting.  19 RR 175.  At this point, Mr. Smiddy heard something that sounded like someone being hit.  19 RR 165, 175.   The witness looked away for an instant and then Ms. George was not visible in the truck.  19 RR 148.

He then saw Mr. Acker's truck pulling out of the driveway and swerving from side to side in the road.  19 RR 149.   It was going slowly.  19 RR 176.   At one point, the truck veered into the ditch and came back onto the road.  19 RR 169.  The truck went towards Farm to Market Road 1537. 19 RR 170.  Mr. Smiddy then called the police when he saw which way the truck was going.  19 RR 149, 170. This was at about 11:45 a.m.  19 RR 171.   The truck was swerving on the county road and then  turned left onto the Farm to Market Road.  19 RR 171-172, 176.

**Alicia Smiddy,** Thomas Smiddy's wife, testified that she lived with her husband at the trailer houses north of Sulphur Springs, one of which was rented by Markie George.  19 RR 178.  Mrs. Smiddy recalled Markie George running out of her trailer, yelling that someone should call the sheriff, and hiding behind the witness.  19 RR 179.  She seemed scared.  19 RR 180.  Mr. Acker came over, picked her up, and carried her to a truck where he tried to put her in it.  19 RR 179.  She heard a slap sound and then she went in the truck.  19 RR 181.[45]  They drove off swerving from side

---

[44]   He was not wearing a shirt when he picked the victim up and put her across his back. 19 RR 164.

[45]   It was not clear to this witness who was the recipient of the slap.  19 RR 184.

-23-

to side on the road.  19 RR 179-180.  As he drove away, it seemed as if he was leaning over towards

the middle of the seat.  19 RR 182.  Mr. Acker could have been trying to keep her from jumping out.

19 RR 187.  Mrs. Smiddy did not see her in the truck as it drove away.  19 RR 191-194.

The sheriff's deputies arrived about fifteen minutes later.  19 RR 183.  Although at trial she

stated that Ms. George did not attempt to exit the truck after they drove away, on the day of the

incident she gave a statement to the deputies that said "she was trying to get out of the car as it spun

out through the ditch."  19 RR 186. This was an assumption on her part.  19 RR 186, 191.

**Brodie Young** testified that he lived on County Road 3504 in Mahoney, Texas.  19 RR 195.

His house was about two-and-a-half miles to three miles from the North Liberty Church on Road

1537.  19 RR 196.  On March 12, 2000, at around noon, he was heading toward Sulphur Springs on

Road 3519 heading north.  19 RR 199.  As he turned onto the road, he saw a white utility truck

parked part of the way in the road.   19 RR 201. As he approached the truck, driving fairly slowly,

he saw one person on the driver's side.  19 RR 204.  Mr. Young slowed down as he came up to the

truck, and went into the ditch as the truck was partly blocking the road, and as he passed it he saw

a person who looked like he was talking to himself.  19 RR 205, 220.

When he passed it, he looked in the rearview mirror and saw a person get out of the truck and

open the passenger door and pull a lady out.  19 RR 206-207.[46]   The lady was wearing a green or

---

[46]   Mr. Young gave conflicting reports about what he had seen, admitting that in his first
statement he said he saw two people fighting in the truck.  19 RR 225-226.   Additionally, the
witness testified that he looked back when he was about twenty-five to seventy-five feet past the
truck.  19 RR 215, 222.  Mr. Young said he was watching the truck while he drove about fifty
feet. 19 RR 223.  He claimed to be driving about ten to fifteen miles an hour at the time, and
during the time he drove the fifty feet, the man had come around to the other side and pulled the
lady out, closed the door and stepped back and laid her by the road.  19 RR 223-225.  (Fifteen
miles per hour is the equivalent of 22 feet per second).

yellow, bright-colored jogging suit.  19 RR 207.  The man was wearing jeans and a shirt.  19 RR

207.  He pulled her out of the truck and took a few steps backward and then laid her on the side of

the road and got back in his truck and took off.  19 RR 208.  The truck headed south until it turned

on Road 3504.  19 RR 210.  It did not run over the woman.  19 RR 231.

Mr. Young went directly to the sheriff's office, driving faster now. 19 RR 208.  The

dispatcher was talking about the incident when he arrived.  19 RR 209.  There was no other traffic

on the road.  19 RR 209. The witness did not know Mr. Acker or the victim.  19 RR 210.

The witness admitted that on the day of the incident, he talked to Officer Wright and told him

that he saw a man and a lady fighting in the truck.  19 RR 225-226.  "I retracted that later on because

I realized that was a false statement...after I thought about it."  19 RR 226.  He admitted retracting

the statement after talking to Officer Wright, and that he didn't see a man and a woman fighting in

the truck, but he initially told the officer that he did.  19 RR 226.   In all, he gave three statements

about the incident.  19 RR 227.  In the initial statement given on March 12, he said he saw a parked

truck and inside it, a man and a woman who appeared to be fighting. 19 RR 228.  The witness

admitted "exaggerating some." 19 RR 228.  In a second statement given at Officer Wright's office,

he said the person in the truck was about thirty years old and he appeared to be talking to himself.

19 RR 229-230.  In the statement he said that the man had her underneath her arms and pulled her

*out of the truck*, holding her like someone who has gone to sleep.  19 RR 230.

Mr. Young also gave a statement to defense counsel.  19 RR 234.  The witness claimed the

only thing he "retracted out of the statement is the first time I said I saw a man arguing with a lady

or fighting with a lady.  Later on, I retracted that and said I just saw a man sitting in the truck."  19

RR 237.   On the first statement, "I was exaggerating on that and I changed it later."  19 RR 238.

Mr. Young claimed that the only time he saw the lady is when she was pulled out of the truck.  19 RR 238.

**Sedill Ferrell,** the owner of a dairy in Hopkins County, located on Road 3519, testified that on March 12, 2000, he went to the dairy to do some work.  19 RR 240-241. He got on a tractor and drove toward some hay.  19 RR 242.  He did not see a white utility truck parked by the road.  19 RR 245.  He put out a bale of hay, which took ten to twelve minutes,  and when he came back, he saw a body.  19 RR 245.  The body was that of a woman wearing blue pants, a white blouse and white socks.  19 RR 246.  He then went and got another bale of hay.  19 RR 246.  When he came back, he got off the tractor and walked toward her, observed her for about two minutes  and saw that she was not breathing.  19 RR 247.  Mr. Ferrell then ran to a trailer house and called the officers.  19 RR 247.  He then went back and stayed by the body.  19 RR 249.   This took about five or six minutes.  19 RR 253.

This witness also gave a statement to the officers on March 12.  19 RR 254.   In that statement, he told Officer Anglin that his milk hands come to milk the cows around 11:20 a.m. to 11:35 a.m. Mr. Ferrell did not hear any brakes or tires spinning during this time.  19 RR 256.  Nor had his dairy hands seen any automobiles or heard anything.  19 RR 256.

**Carl Nix,** a pert-time firefighter for Hopkins County, testified that on March 12, 2000, he responded to radio traffic about a body being found.  19 RR 259.  He parked the fire truck by the road, near a trailer house, saw the body and checked for a pulse.  19 RR 260-261.  He determined that the person was dead by taking her pulse.  19 RR 261, 264, 272.   Mr. Nix did not place any electrodes on the body, as were depicted in a photo exhibit, nor did he move the body.  19 RR 263, 273.   Nor did he walk on the grass, and he stayed on the road.  19 RR 265.   The witness denied

-26-

having asked another person on the fire truck, Les Jones, to check her pulse, but when shown his statement, he remembered that he did ask him to check it. 19 RR 267.   When the paramedics arrived, they also checked her pulse. 19 RR 268.  They put the electrodes on her. 19 RR 268.  There was blood around the body and another spot on the road.  19 RR 270.

**Christopher Hill**, a Hopkins County Sheriff's Deputy, testified that on March 12, 2000, he responded to a report of a female lying in the road on Road 3519.  20 RR 7-8.  He was the first officer to arrive at the scene.  20 RR 26.[47]  The body was lying face up on the west side of the roadway.  20 RR 9.  Blood was in evidence near the body, a large red spot on the ground.   20 RR 21, 40.  There was no sign of a pulse or a response that she was alive.  20 RR 10, 26.   The man that had called the police was there.  20 RR 11.  Officer Hill's superior, Corporal Anglin, then arrived.  20 RR 11.  Then the fire truck and medical personnel arrived.  20 RR 12.  The scene was taped off and other vehicles did not run over the body. 20 RR 13.  The medical team hooked up the body with electrodes but did not move the body.  20 RR 14.  A roadblock was set up and crime scene tape was used.  20 RR 15.  The fire department vehicle never came inside the crime scene tape.  20 RR 53.  But two of them may have walked up to the victim and checked for a pulse.  20 RR 55.  Two EMS people also walked around the body inside the crime scene.  20 RR 56.  One of this officer's jobs was to keep the crime scene from being contaminated.  20 RR 54, 57.  One of the photos showed footprints around the body.  20 RR 58.  It was impossible to tell whose footprint it was because several persons were allowed within the crime scene tape.  20 RR 58-60.  The defense was not allowed to inquire about the policy of the Sheriff regarding the securing of crime scenes.  20 RR 62.

---

[47]   The officer initially stopped at the first residence on the road, where some people were outside, but determined that these were not the same people who had called the police.  20 RR 65.  He did not know if they were ever talked to as possible witnesses. 20 RR 66-67.

Officer Hill was later dispatched to another location to secure the suspect vehicle, a Ford utility truck, one ton or larger.  20 RR 17.  The truck was towed to the Sheriff's Office and secured. 20 RR 17.  The officer also secured and impounded Mr. Acker's personal vehicle at Bentley Electric. 20 RR 18.  The defense offered some photos of the crime scene for the witness to identify. 20 RR 25-35.  There were some tire marks near the body depicted in these photos.  20 RR 37.  The witness did not recall whether or not he saw a blood spot near the body, or whether there were drops of blood in the dirt.  20 RR 46.   Officer Hill did not open or enter the suspect's vehicle that was towed.  20 RR 51.  This truck looked like it had been in the ditch and it had mud on the tires and the wheels. 20 RR 52.  The blood spot was in line with some tire tracks as shown in the photos.  20 RR 72-73.

**Natasha Bologna,** a chemist with the Texas Department of Public Safety Crime Lab in Garland, Texas, testified that she went to Sulphur Springs on March 13, 2000 to look over a vehicle. 20 RR 76.  It was a Ford F-350 truck.  20 RR 77.   She recovered two hairs from the vehicle, one along the window edging and one from the mudflap behind the passenger side rear tire.  20 RR 78., 86-87.  There was one blood stain inside the truck, on the driver's seat back.  20 RR 79.  No damage was seen on the truck.  20 RR 82.

**Tony Hurley,** the Chief Investigator of the Hopkins County Sheriff's Office, testified that he investigated the death of Markie George and was the officer in charge of that investigation.  20 RR 91-92.  The only item of clothing not attached to the body was a sock found nearby.  20 RR 95. There was a blood spot near the body and   a trail of spots that lead up to the body.  20 RR 97.  There were tire marks in the grass and a tire mark north and a little east of the body.  20 RR 100. The witness's opinion was that the tire tracks were in line with a blood spot that was just north of the victim's body.  20 RR 103, 112.  The blood spot was six feet three inches from her head.  20 RR

113.   There were lengthy skid marks to the north of the body.  20 RR 103.

The investigator was also involved with the impounding of Mr. Acker's truck.  20 RR 105.
Mr. Acker was found at a location on Highway 2174, about ten miles from the body.  20 RR 106,
108.   There was also a footprint by the body.  20 RR 115.  The EMS people were there before
Officer Hurley, so he did not know who may have made the footprints or the tire marks.  20 RR 116.
No shoes from the victim were recovered, but her socks were.  20 RR 118.

The investigator conducted several interviews with Mr. Acker after he returned to the
Sheriff's Office.  20 RR 123.  The interviews were recorded.  20 RR 126.

**Donnie Willingham,** a sergeant with the Texas Highway Patrol, testified that he received
a call from a crime scene that needed a CAD scale drawing of the scene.  20 RR 140.  He made such
a drawing from a machine.  20 RR 147.  But some of the drawing was made by the investigator and
not solely by the machine.  20 RR 147.   The red blood spot depicted in the drawing was in the road
towards the middle.  20 RR 141.

**David Walker Spence**, a supervisor of the Texas Evidence Section of the Southwestern
Institute of Forensic Sciences in Dallas, testified that he was asked to examine some clothing from
the deceased in this case.  20 RR 157.  He did not find any paint chips on the decedent's clothing.
20 RR 159.

**Dr. Tim Kalafut,** a forensic DNA analyst at the Southwestern Institute of Forensic Sciences,
testified that he was trained in DNA analysis.  20 RR 160-163.  He was asked to examine certain
evidence in this case.  From a vaginal swab, he obtained a profile that matched Mr. Acker.  20 RR
169.  A DNA profile from the blue jeans mated the victim.  20 RR 169.  A hair recovered from the
truck matched the victim as did a  blood sample from inside the truck.  20 RR 170.   All of the

profiles had a high probability of being from the identified person. 20 RR 171-173. Hair that was found in the mud flap was not Ms. George's hair, and swabs from her panties and vaginal and anal swabs also came up negative. 20 RR 176-177. It was only when they were put on smears and examined under a microscope that they saw semen from the vaginal smear. 20 RR 177. This could mean that some period of time elapsed from the sexual contact to the taking of the smear. 20 RR 178. It was a safe assumption that Ms. George had not had sex within an hour of her death, but she did have sex with Mr. Acker within a day or two of her death. 20 RR 178. There was one male donor of the spermatozoa found on the vaginal smear. 20 RR 179. However, there was no way to show if she had sex with another person shortly before her death, but if she did, no DNA was left behind. 20 RR 180.

Dr. Kalafut testified, in camera, that fingernail clippings had been submitted but no testing had been done on them. 20 RR 186. Often, if a person were being strangled, one would expect them to try to pull the hands off. 20 RR 187. The witness was never asked to test the fingernail clippings 20 RR 191. They might have indicated whether or not there was a struggle at the time of a strangulation. 20 RR 191.

**Michael Shackelford,** an investigator with the Hopkins County Sheriff's Office, testified that he took pictures of the crime scene. 20 RR 193. The body was turned over so the photos could be taken. 20 RR 194.

**Dr. Maria Gonsoulin,** the assistant medical examiner with the Harris County Medical Examiner's Office, performed the autopsy on Ms. George. 20 RR 200.[48] The State's case for Mr.

---

[48] *See* Exhibit 32, autopsy of the victim Marquetta George performed at the Southwestern Institute of Forensic Sciences, March 13, 2000.

Acker's guilt rested to a great degree on her testimony, although, even at the time of the trial, she was still an intern and hadn't completed all of the requirements to be a medical examiner. 20 RR 273.[49] Dr. Gonsoulin testified that there were several blunt force injuries to the body, particularly the head and the neck. 20 RR 201. There were contusions to the chest and a hip abrasion, and a large laceration on the leg. 20 RR 201. Several of the injuries appeared to be postmortem. 20 RR 201. There were several internal injuries, including wounds to the heart and a chest artery. 20 RR 202. There were lung and liver lacerations, rib fractures, and internal injuries to the trunk. 20 RR 202. Many of these injuries were postmortem, including an abrasion of the skin, and a laceration of the leg. 20 RR 204. There were also likely postmortem injuries to the cheek and chin. 20 RR 206-207. There was also a skull fracture and the head was crushed, consistent with being struck with a blunt instrument. 20 RR 208. The victim had a .07 blood alcohol content at the time of her death. 20 RR 266.

The neck and internal injuries were not likely postmortem, and they included hemorrhage to the neck muscles, and contusions or bruises to the thyroid. 20 RR 209. These injuries indicate that there was a lot of pressure around the neck while the decedent was still alive. 20 RR 209. There was some hemorrhage associated with the carotid and jugular arteries. 20 RR 212. There would not be such hemorrhage if the injury occurred after death. 20 RR 213. There was bruising from pressure being placed on the neck, thyroid and windpipe areas. 20 RR 214.

The external injuries were consistent with motor vehicle injuries. 20 RR 215. The neck injuries indicate that there was a lot of force applied when she was alive. 20 RR 215. It was more from being constricted than from a fall. 20 RR 216. There were also small hemorrhages in the blood

---

[49]   An analysis of Dr. Gonsoulin's autopsy is in Claim I *infra.*

vessels of the eye that were consistent with strangulation injuries.  20 RR 217.   The injuries she observed were allegedly consistent with strangulation.  20 RR 218.  There was not enough evidence to tell whether it was manual or ligature strangulation.  20 RR 218-219.  The exterior blunt force injuries were, in the witness's opinion, caused either at or near death or postmortem and occurred after the strangulation injuries.  20 RR 219.  Either of these categories of injuries could have caused death. 20 RR 220.[50]  Ms. Gonsoulin's  opinion was that Ms. George died as a result of homicidal violence, including strangulation and hence the manner of death was homicide.  20 RR 221.  There was some alcohol found in the body.  20 RR 222.  There was no information as to how the cut on her leg occurred.  20 RR 224.  The exterior injuries were consistent with being hit by great force.  20 RR 226.  As for the blood spot, the impact could have been there, as blood vessels in the head could have caused it, and the body could have been dragged or moved after the impact.  20 RR 226.  Considering the impact to the skull, one would expect a large amount of blood to be spilled.  20 RR 226.  If the victim had been alive at the impact, one would have expected more blood to have been found.  20 RR 227.

This witness admitted that she relied on information from investigators that was contained in supplemental reports.  20 RR 229.  The witness could not tell how long prior to her death the strangulation marks may have been made.  20 RR 230.  The marks could have been made several hours prior to her death. 20 RR 231, 261.   Thus, it was impossible to say that the victim died from strangulation alone.  20 RR 233.  Death by strangulation can take several minutes.  20 RR 232.  The

---

[50]   The witness stated that the injuries compatible with strangulation did not necessarily cause death, as these injuries could have been inflicted well before the victim's death. 20 RR 230-231.  Thus, it was not certain that the victim's death was caused by strangulation.  20 RR 233. *See* analysis of this testimony and the autopsy in Claim I, *infra.*

blunt force injuries were sufficient to cause her death.  20 RR 233.

        The victim had road rash.  20 RR 235.  This is consistent with jumping out of a vehicle.  20

RR 235.  The victim's injuries included massive fracturing in the brain and of the atlas vertebra.  20

RR 239.  The victim's ribs were broken and there were extensive facial injuries.  20 RR 247.  The

bones were broken enough to cause fragmentation.  20 RR 248.  The heart had ben lacerated.  20 RR

255.  The heart had been lacerated so that it stopped bleeding and the blood pressure was stopped.

20 RR 257.   Thus, there would have been no more extensive bleeding after the heart damage.  20

RR 257.  There would also have been no bleeding after the brain stem was broken.  20 RR 264.

        There was a brush burn to the victim's hip which was the same injury called "road rash."  20

RR 263-264.  There was no petechiae in the brain or larynx which would normally be caused by an

increase in pressure through strangulation.  20 RR 266-267.  After the strangulation injuries the

victim had suffered, it is likely she would have been incapacitated. 20 RR 269.

        At the time the report was signed by this witness, she was still an intern and hadn't completed

all of the requirements to be a medical examiner.  20 RR 273.

        The State then rested its case.  21 RR 1.

        The defense made a motion to dismiss based on the fact that there was insufficient evidence

of a deliberate killing and insufficient evidence of intent.  21 RR 2.  The motion was denied.  21 RR

3.

        **D)  The defense case at the guilt/innocence stage of the trial.**

        **Sabrina Ball**, who lived near petitioner's mother Nancy Acker, testified that she met Markie

George one time, on the night of February 26, 2000.  21 RR 8.[51]  Outside the presence of the jury,

_____

        [51]   *See* Exhibit 30 for witness Sabrina Ball's statement.

-33-

the witness stated that Ms. George came to her door at about 10:30 p.m.. 21 RR 10.  She was down on her hands and knees crying and saying "Help me, help me."  21 RR 11.  She was brought inside and said that Daniel was going to kill her, that he was crazy.  21 RR 11.  Then she called the Sheriff's Department.  21 RR 12.  Ms. George said that she had been at "Bustin Loose" with Mr. Acker and a fight had started and they had left.  21 RR 13.  In the truck, Mr. Acker took her head and tried to beat it against the dash and she tried to jump out  and he grabbed her by the hair and dragged her back in.  21 RR 13.  The fight had continued at Mr. Acker's mother's house and she had fled to the witness's house.  21 RR 13.  At the Acker house, the phone cord was ripped out, a window was broken and Mr. Acker's mother was thrown on the couch.  21 RR 16.  This caused Ms. George to flee to Ms. Ball's  house.  21 RR 20.

The statement was offered under the excited utterance exception to the hearsay rule.  21 RR 14.  The witness did not know how long they were at Mrs. Acker's house.  21 RR 18.  When Ms. George first showed up, she was hysterical but gradually calmed down once she was inside and made the call to the police.  21 RR 22-23.  But she was more concerned about the fight in the truck than the fight in the house and that's what she mentioned first.  21 RR 25.  The court said that a spontaneous utterance must be a spontaneous reaction to an exciting event.  21 RR 29.  The court ruled that only the first part of the victim's statement, about Mr. Acker being crazy, would be admissible, and the latter part about jumping out of the truck was not because it was not an excited utterance, because she was being questioned about the events.  21 RR 30.[52]

The Court later ruled that no testimony from this witness was to be considered by the jury.

---

[52]   *Id.*  The witness's statement indicates that there was no logical reason to term part of it an "excited utterance" and part not such an utterance.

21 RR 65.  Thus, the jury never heard this crucial evidence about Ms. George's prior attempt to jump

from petitioner's truck.

**William Brandon Anderson,** of the Hopkins County Sheriff's Office, testified *in camera*

that he was working on February 26, 2000, and responded to a call at Mrs. Ball's home.  21 RR 37.

Markie George was there and she was shaking and crying.  21 RR 38.  She said that she had been

in a verbal argument with Mr. Acker.  21 RR 38.  She said she was at "Bustin Loose" and left and

during an argument in the truck, she had attempted to exit the vehicle while it was driving down the

road, and Mr. Acker had grabbed her by the arm to keep her from getting out.  21 RR 39.  She also

said that they continued arguing when they returned to Mrs. Acker's residence, she stepped between

them and Mr. Acker picked up his mother and threw her on the couch.  21 RR 40.  Ms. George said

she was going to call the police and Mr. Acker ran through the sliding glass window to try to get

away.  21 RR 40.  Ms. George left the Acker house at that time.  21 RR 40.

The defense offered this evidence and the Court sustained an objection to it.  21 RR 41.  Here

again, Mr. Acker's jury was prevented from hearing important evidence that pointed to his

innocence.

**Walter Allen Story,** a 9-1-1 communications supervisor in Hopkins County, testified *in

camera* that he received a call from Mr. Thomas Smiddy at 11:45 a..m. on March 12th.  21 RR 44.

The first call that said a body had been found came in at 11:47 a.m., from Mr. Sedill Ferrell.  21 RR

51.[53]  Officer Hill arrived on the scene at 11:51 a.m.  21 RR 51.  The call log showed that the first

call actually came in at 11:40 a.m.  21 RR 56.  The radio log was offered as a record of when the

---

[53]  These times are important as they show that the victim was seen alive only a few
minutes before her death and, given the location of the body several miles away,  there would not
have been time for Mr. Acker to have stopped the truck and strangled her.

calls came in.  21 RR 61.  They actually received the call at 11:45 a.m. 21 RR 62.

     **Mr. Story** then testified in front of the jury.  21 RR 67.  The 9-1-1 radio log recorded a call from Mr. Smiddy at 11:45 a.m. and a call from Mr. Ferrell at 11:47 a.m.  21 RR 69, 72.   Officer Hill arrived at the location at 11:51 a.m.  21 RR 69.   At 11:53 a.m. the officer called in to say there was no pulse.  21 RR 75.

     **Nancy Acker,** Mr. Acker's mother, testified *in camera* that on March 12 she saw her son shortly before  noon at Bentley Electric.  21 RR 81.  He didn't have his shirt on and his jeans were streaked with what could have been blood.  21 RR 82.  He was very upset and said that he had to get help for Markie and then said that Markie was dead.  21 RR 82, 85-86.  He said that she had jumped out of the truck and was dead.  21 RR 83.  Mrs. Acker told him to go to his sister Dorcas's house.  21 RR 83.  Both Mr. Acker and his mother went to Dorcas's house and told her that Markie had jumped from the truck on the road by their house.  21 RR 84.

     Mrs. Acker had been looking for her son because she had been to Dorcas's house earlier and she said Mr. Acker had been drinking and was trying to locate Markie.  21 RR 88.  She went to the trailer house and then back to town.  21 RR 89.  She saw him at Bentley Electric, standing by the truck in the parking lot.   21 RR 91-94.  Mrs. Acker pulled up to him in her car.  21 RR 95.  Mr. Acker was just standing by the truck.  21 RR 100-101.  He wasn't talking to himself.  21 RR 103.

     The court ruled that this was not an excited utterance and was inadmissible hearsay. 21 RR 104.

     The defense also had available another witness, **Kenny Baxter**, who was also told by Mr. Acker that Ms. George had jumped from the truck. 21 RR 105. Here again, the jury did not hear this evidence.

In front of the jury, **Nancy Acker** testified that she saw her son on March 12, 2000 at Bentley Electric after looking for him at various locations.  21 RR 109, 112-115.   He was very emotional and excited.  21 RR 111.  In response to the conversation, they went to Dorcas's house and then went to find Ms. George.  21 RR 112.

Petitioner **Daniel Clate Acker** testified *in camera* he understood the consequences of testifying on his on behalf and that he wanted to so testify.  21 RR 118-121.  Shortly thereafter, the defense stated that they believed he "might have had a change of heart as to whether or not he wants to testify."  21 RR 123.  Then, the defense stated that he did not wish to testify.  21 RR 125-126.

**John Riley Sands,** the defense investigator,  testified *in camera* that he had conducted some experiments relating to the distance from the petitioner's home to the crime scene and the time it took to drive there.  21 RR 129.  Mr. Sands stated that he obtained the times by driving within the posted speed limits.  21 RR 130-132. Mr. Sands was also asked to see if he could open the door from the driver's seat of the truck.  21 RR 134.  Defense counsel pointed to testimony of "road rash" which indicated the victim hit the ground when the vehicle was moving.  21 RR 134.

Mr. Sands also performed tests on the truck.  He obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that he was not able to open the door from the driver's seat without extending himself quite a bit so that he could still see above the dashboard.  21 RR 142.  He could not have opened the door and pushed someone out of the vehicle while driving on the road.  21 RR 142.  An objection to this evidence was sustained.  21 RR 143.  The trial court had earlier denied funds for a defense forensic expert because they had this investigator, but then refused to let him testify as to these forensic matters.

**Daniel Clate Acker,** the petitioner, changed his mind and decided to testify on his own

-37-

behalf. 21 RR 144.  He testified that he lived with Ms. George and her two children for about one month. 21 RR 146.  Mr. Acker met her at "Bustin Loose" in January. 21 RR 147.  They had a good relationship as long as neither of them were drinking, but they argued when they drank and they usually drank on the weekends. 21 RR 152-153. They were both looking for a place to live and decided to rent the trailer together.  21 RR 153.  He would give Ms. George money out of his paycheck for the rent.  21 RR 154.

Mr. Acker was an electrician's helper, working on his journeyman's license.  21 RR 154. On weekdays, he would do outside activities such as fishing.  21 RR 154.

The defense asked him about an incident on February 26, 2000 when Ms. George attempted to jump out of the truck.  21 RR 155.  The Court sustained an objection to this evidence.  21 RR 159.

Both Mr. Acker and Ms. George would often drink on weekends.  21 RR 161.[54]  She would sometimes try to fight with other people and that would cause arguments between them.  21 RR 161. Once, Ms. George bit Mr. Acker on the chin during such an argument.  21 RR 162.

On March 11, 2000, Mr. Acker worked for two hours and returned home and Ms. George was asleep. 21 RR 165. He was working at "Manny's" Mexican food restaurant. 21 RR 166.  Mr. Acker and Ms. George went to a liquor store in Commerce and bought a half gallon of whiskey, and then ate at a restaurant.  21 RR 167.  They then went to Cooper to visit Mr. Acker's grandmother and aunt.  21 RR 168.  Before they arrived in Cooper, they started drinking and  then drove around looking at deer and wildlife, while continuing to drink.  21 RR 169.  They then returned to the mobile home and had sex.  21 RR 170.  They got dressed and went to Wal-Mart and then they went

---

[54]  Ms. George had a conviction for driving while intoxicated in the year 2000 in Hopkins County.  5 RR 7.

to see Larry Watson in Riley Springs, to see about his mule and ask if he wanted to go to the rodeo with them. 21 RR 172. They then went to Mr. Acker's mother's house and ate and then to another store and then to the rodeo. 21 RR 174-175. Ms. George wanted to leave to go to "Bustin Loose" but Mr. Acker did not want to go there, as it was on the other side of town from his house and he had already had a lot to drink. 21 RR 176.

They arrived at "Bustin Loose" around 10 p.m. 21 RR 176. Mr. Acker was at first reluctant to go in, but he did and decided to stick to drinking beer. 21 RR 177. They played pool for awhile. 21 RR 177. Ms. George started complaining that Mr. Acker wasn't any good and he poured his beer into her drink. 21 RR 177. She became angry and Mr. Acker gave her twenty dollars to buy another drink. 21 RR 178. The bartender set up two drinks and she only wanted to pay for one and Mr. Acker paid for them. 21 RR 179. Mr. Acker started talking to a woman, Anna Lisa Worley, of whom Ms. George was jealous, and Ms. George said she was going to jump on her. 21 RR 181. Ms. George walked to the bathroom and Mr. Acker grabbed her shirt and turned her around. 21 RR 181. She acted as if she was going to jump on Ms. Worley and Mr. Acker tried to stop her. 21 RR 182. Then the bouncer told Mr. Acker that he had to leave, so he went outside and then soon after reentered the club. 21 RR 183; 22 RR 37-38. He looked for her but did not find her and then went outside again. 21 RR 184. He gave his sister a folding knife that belonged to Markie. 21 RR 184. Ms. George had seen it earlier and wanted it back, but Mr. Acker did not want her to have it. 21 RR 186. Mr. Acker's sister told him to go to his mother's house, but he went back inside the club, spotted Ms. George and then was again asked to leave. 21 RR 187; 22 RR 40. He then moved his truck to the veterinarian clinic as the owner of the club said they were going to call the police if he didn't leave. 21 RR 188; 22 RR 30-31. Mr. Acker walked back to the club and waited in the

parking lot for Ms. George to leave.  21 RR 188.  His sister saw him and gave him a ride back to his

truck, and kept the pocketknife after Mr. Acker asked for it.  21 RR 189.  There was a small axe in

the back of the truck, and Mr. Acker held it up and told his sister that if he was going to hurt anyone

he wouldn't need the pocketknife.  21 RR 190.  About half of the half-gallon of whiskey was left.

21 RR 191.  At the club, he did not make any threats against Ms. George, and he did not remember

talking to Tim Mason. 21 RR 192.

Mr. Acker then went to Burton's and looked for Ms. George.  21 RR 192; 22 RR 41.  He left

that club, stopped for gas, and then returned to Burton's, then left again and returned home.  21 RR

194.  He put the axe and the whiskey in a storage room and then continued to look for Ms. George.

21 RR 194.  He went to his sister's house, but she did not answer the door, and then he went to

various motels in Sulphur Springs thinking that she may have rented a room.  21 RR 195; 22 RR 45.

 Then he returned to his house and laid down, but did not sleep.  21 RR 196.

At daylight, Mr. Acker went to get the company truck because he needed to hang a ceiling

fan.  21 RR 197.  He drove to Bentley Electric and picked up the truck, went to see a friend and then

went to his sister Dorcas's house.  21 RR 198.  Mr. Acker was upset and crying when he talked with

her, and then he went to Ms. George's mother, Lila Seawright's house.  21 RR 202.  At this time,

he was still drinking alcohol.  21 RR 202.  They talked about horses, and then Mr. Acker poured

himself another drink. 21 RR 205.  There were some rental movies that had to be returned and Mrs.

Seawright said that if Ms. George had not returned, she would take care of her children.  21 RR 207.

Mr. Acker was going to pick up his eleven year old son at noon.  21 RR 207.

He returned home and circled the house, looking for some boards he needed for the

installation of the fan, but they were not there and he did not stop and left the house area.  21 RR

209.  He turned around and then went back again, and this second time he got stuck in the back.  21 RR 209-210.  Mr. Acker walked over to Mr. Smiddy's house where he was working on his truck and asked if he had a chain.  21 RR 211.

As they were looking, Ms. George and Robert McGee, whose nickname is "Calico," pulled into the driveway.  21 RR 211.  Mr. Acker was glad to see her and kissed and hugged her.  21 RR 216.  They both got out and Mr. McGee said that he had taken Ms. George to her father's house last night.  21 RR 212.  Mr. Acker said that he had been to her father's house but she wasn't there.  21 RR 212.  She then went into the house.  21 RR 212.  Mr. Acker asked Mr. McGee why he was bringing her home when her father had a car.  21 RR 213.  Ms. George then came out of the house and made a comment.  21 RR 216.

Mr. Acker went to the rear of the house where Mr. Smiddy and Mr. Debord were trying to pull Mr. Acker's truck out.  21 RR 217.  Part of a drink spilled on the floorboard as he was in the cab of the truck.  21 RR 217.  They could not start a Dodge truck that was to be used to pull Mr. Acker's truck, and finally they started a tractor and pulled the truck out.  21 RR 219.

Then, Mr. Acker went back inside the house and found out that Ms. George had spent the night with Calico.  21 RR 221.  She admitted to sleeping with Calico.  21 RR 222.  Mr. Acker pushed her down on the couch and shook her and told her "just because you're not my wife doesn't mean I don't love you."  21 RR 223.  He did not strangle her but shook her fairly hard.  21 RR 225.  He then slapped her and asked her where Calico lived.  21 RR 225.  Ms. George told him and Mr. Acker got dressed so that he could go to Calico's house.  21 RR 226.

Then Ms. George ran out the door to the Smiddys' house.  21 RR 227.  Mr. Acker ran out behind her, went to the Smiddys' and picked her up.  21 RR 228.  He carried her to the truck and

tried to put her in.  21 RR 230.  Mr. Acker then got in and started the truck.  21 RR 231; 22 RR 66.

As they were pulling out of the driveway, Ms. George opened the door and tried to jump out of the

truck and Mr. Acker caught her and pulled her back.  21 RR 233; 22 RR 66.  As he leaned way over

to grab her, the truck went over into the ditch.  21 RR 234.  He corrected and then went into the ditch

on the other side.  21 RR 234.  He turned onto Road 1537 and asked Ms. George which way he

needed to go.  21 RR 236.  Then he turned off onto Road 3519.  21 RR 237.  During this time, he

was driving between fifty and sixty-five miles an hour.  21 RR 237.  Ms. George attempted to jump

again, and Mr. Acker slapped her.  21 RR 238; 22 RR 77.  Ms. George's nose began to bleed.  21

RR 240.  Mr. Acker tried to talk to her but she wouldn't respond.  21 RR 240.

On a one-lane road, a car approached and he pulled to the side and then she jumped from the

pickup.  21 RR 241.  Mr. Acker tried to stop her but could not catch her, and she jumped. 21 RR 242.

He stopped the truck and backed up.  21 RR 242.[55]  Another car came down the road and passed him,

and then he jumped out and went to Ms. George.  21 RR 242.  He dragged her to the truck, opened

the door to put her back in the truck but had to put her back down when he realized that there were

fluorescent light bulbs on the seat.  21 RR 244.  When he picked her up again, her head fell back and,

realizing that she was dead,   he laid her back down, ran around to the front of the truck and left.  21

RR 244.  He panicked and went into shock.  21 RR 244.

Mr. Acker then drove to Bentley Electric to use the phone.  21 RR 245; 22 RR 80-81.  When

he arrived, his mother pulled up and he walked over to her and told her what had happened.  21 RR

245.  He told his mother that Ms. George was dead and she told him to go to his sister's house.  21

---

[55]   He did not run over her as he backed up, and denied ever running over her.  21 RR
253.

RR 246; 22 RR 84.   No one was there when he arrived and he then went to his mother's house.  21

RR 247.  Then he became scared and went to his friend Kenny Baxter's house.  21 RR 248; 22 RR

86.  Mr. Acker then went to his mother's house.  21 RR 249.  When he was there, a highway petrol

car passed by, and Mr. Acker went out and waived his arms and told the officer what had happened.

21 RR 250.  He was then placed under arrest.  21 RR 250.  At the Sheriff's Office, the patrolman Bill

Reece interviewed him.  21 RR 251.

In 1992, Mr. Acker admitted to a residential burglary.  21 RR 255.  He also was convicted

on a theft charge.  21 RR 256.  He was sent to a substance abuse program and given ten years

probation and was on probation at the time of the trial.  22 RR 12.  Mr. Acker admitted to driving

while intoxicated on the day of the victim's death, and the victim was also drinking.  22 RR 14-21.

Mr. Acker admitted that he was not entirely honest in his interviews with Investigator Hurley.

22 RR 4.  The blood spot looked to be in a different place in Exhibit 32 than he remembered it.  22

RR 5.  Mr. Acker stated that Ms. George was not strangled.  22 RR 7.

Mr. Acker was extensively questioned about his knowledge of a defense expert's findings

as to strangulation, in contravention of his right to attorney-client confidentiality;  due process rights

and rights to a confidential defense expert.   22 RR 7-11. He denied ever seeing Tim Mason at the

club and stated he had never met Mary Singleton or Mary Peugh.  22 RR 25.   Mr. Acker denied that

he had strangled Ms. George and disputed the doctor's opinion.  22 RR 91.

The prosecution asked about Mr. Acker's history of violence with past wives.  22 RR 91-92.

The prosecution proposed to offer Mr. Acker's 1990 arrest for family violence; two 1991 arrests for

family violence and a 1992 arrest with his wife at the time, Susan Acker Terry.  22 RR 95.  The

prosecution admitted that "its very clear" that prior extraneous offenses are generally not admissible.

-43-

22 RR 95.  But they claimed that an exception was to rebut a false impression.  22 RR 96.  The

defense argued that the offenses were more prejudicial than probative and he had never been found

guilty of the offenses beyond a reasonable doubt.  22 RR 99.  "If you were to put this in before the

jury now you would create a false impression that he is guilty of this offense when it's never been

proven."  22 RR 99.

The Court ruled that the prosecution could only "repair or correct a false impression but I

don't think you can go much further than that."  22 RR 100.  The prosecution urged the Court to

limit the jury's consideration of the evidence.  22 RR 102.

Mr. Acker was asked whether, on December 24, 1990, more than ten years prior to the

offense he was on trial for, he was charged with the offense of assault by his then-wife, Susan Acker.

22 RR 104. Mr. Acker did not recall the charge.  He was also asked whether he was also charged

with assault on May 5, 1991 against Susan Acker.  22 RR 104.  Mr. Acker said he could not recall

but he may have been sent to jail for it but was not found guilty.  22 RR 104.  Mr. Acker admitted

that he was charged on August 6, 1991 and August 7, 1992, with family violence/assault against

Susan Acker.  22 RR 105.  He was in prison from October of 1992 to October of 1995 on a burglary

charge.  22 RR 106.

The defense motion for a directed verdict was denied.  22 RR 108.  The defense rested.  22

RR 109.

In argument the defense pointed out that the injuries of the victim were consistent with her

jumping out of the car; the defendant had no scratches which he would have had if he had tried to

strangle her; her thin necklace was not broken which would have happened if she was strangled; the

times the calls were placed meant there was not enough time to drive to the location and strangle her;

-44-

the florescent tubes in the truck were not broken, which they would have been if there had been a struggle; and he couldn't have pushed her out while driving as it was a large truck. 23 RR 7-17.

The prosecution argued that the victim was strangled when he was driving out onto the road: "That's why he was all over the ditch because he had her right then strangling her." 23 RR 27.

After deliberations, the jury found Mr. Acker guilty of capital murder as charged in the indictment. 23 RR 39.

**E) The punishment phase of the trial.**

**i) The state's case at the punishment phase**

**Charles "Butch" Adams,** Sheriff of Hopkins County, Texas, testified that he has known Mr. Acker for ten to eleven years and that his reputation in the community as a peaceful and law-abiding citizen was bad. 23 RR 45. He also showed photos of contraband found in the defendant's cell. 23 RR 46. The contraband consisted of razor blades and pens and he never acted in a violent manner in the jail or used the contraband in a violent manner. 23 RR 48-49.

**Benny Fisher,** the Sheriff of Delta County, also testified that the reputation of Mr. Acker as a peaceful and law-abiding citizen was bad. 23 RR 53. The witness had been to the Acker house to arrest Mr. Acker's father. 23 RR 55. He admitted he could not account for much of Mr. Acker's life. 23 RR 57.

**Rusty Stillwagoner,** of the Sulphur Springs Police Department, testified that he had arrested Mr. Acker and his reputation in the community was bad. 23 RR 60.

**Marcus Antwone Young,** another Sulphur Springs police officer, also testified that Mr. Acker's reputation in the community was bad. 23 RR 64. Once, he filed charges against Mr. Acker for assault on a peace officer. 23 RR 64.

-45-

**Shirley Acker,** Mr. Acker's former wife, testified that she married Mr. Acker when he was in the Hopkins County jail and never lived with him after they married, as they divorced when he was incarcerated. 23 RR 69. When they lived together before they married, there was an incident when Mr. Acker grabbed her by the hair, put her in a car and slapped her. 23 RR 69. He would also record telephone conversations and spy on her. 23 RR 70-72. Mr. Acker also threw his mother to the floor once. 23 RR 72. She believed he would be dangerous to people and she was scared of him. 23 RR 73, 77. But Mr. Acker was good to her when they were together, cooked for her and she loved him. 23 RR 74.

**Susan Ball** was also formerly married to Mr. Acker, for four years. 23 RR 79. On several occasions, he physically abused her and she filed charges on him. 23 RR 79. In the last fight they had, her child was hurt and she decided to divorce him. 23 RR 81. Once in a car, she had to hit Mr. Acker's mother to prevent her being taken to a lake against her will. 23 RR 84. They were pulled over and Mr. Acker went to prison. 23 RR 86. Although she denied loving him after he went to prison, the defense impeached her with several letters she had written to him after his incarceration which stated she did love him. 23 RR 87. She also said he was a great father, further contradicting her earlier testimony. 23 RR 89. She had asked the parole department that Mr. Acker not be allowed in Oklahoma because she was scared of him. 23 RR 92.

The State rested. 23 RR 94.

**ii)  The defense case at the punishment phase.**

**Dr. Antoinette Cicerello,** a forensic psychologist, testified that as a defense expert she was paid the standard rate, $150.00 per hour. 23 RR 96. She performed a risk assessment for Mr. Acker. 23 RR 96. She reviewed the investigative reports and interviewed Mr. Acker twice and performed

a mental status examination.  23 RR 99.

She conducted a specific risk assessment to determine levels of risk of violence in the future. 23 RR 100.  She reviewed Hopkins County jail records, legal records of Mr. Acker's father, records from Glen Oaks Hospital pertaining to an admission when he was an adolescent, Gateway Foundation treatment records for December of 1992 to February of 1993, a Texas Department of Criminal Justice report and Hopkins County Memorial Hospital records and witness reports from the incident in February of 2000.[56]  23 RR 101.  As to the level of risk Mr. Acker posed in prison and the level of risk should he be released after 40 years, the level for both was low.  23 RR 102.  She used base rates: a 1996 study of the rate of violence in Missouri State Prisons; a base rate for assaults in the Texas Department of Criminal Justice for 1997 and 1998.  23 RR 102-103.  The prosecution objected at this point, as the date did not necessarily pertain to capital murder inmates.  23 RR 103-104.  The court sustained the objection.  23 RR 105.  The witness was then asked only two more questions.  She said there was a very weak relationship between the offense someone has committed and violent offenses in prison.  23 RR 105.  The witness also stated that as an individual ages, the likelihood they will engage in active violence decreases significantly so that after the age of sixty-five there are relatively no incidents of violent acts.  23 RR 106.

On one of the interviews the witness had with Mr. Acker, he had a razor in the file which he used to cut papers to insert photographs.  23 RR 110.

On re-direct, the witness stated that Mr. Acker would be a low risk for violence as he would be about seventy when he could first be released.  23 RR 116.  He also had trustee status when he

---

[56]   Glen Oaks records are at Exhibit 27; school records are at Exhibit 31; and Dr. Cicerello's psychological evaluation is at Exhibit 28.

was last in prison.  23 RR 116.  He was never in a gang and he responded well to the structure and was allowed to work on a community crew with supervision.  23 RR 117.

On re-cross, the witness was asked how much she was paid, and she answered $5100.00 and more for her testimony, for a total of $6300.00.  23 RR 118-119.  This was the court-approved standard fee.  23 RR 119.

**Sherry Walker,** Mr. Acker's sister, testified that she was a year and nine months older than him.  23 RR 123.  Growing up, they played together and Mr. Acker was not violent.  23 RR 124.  He was an animal lover and they had many pets.  23 RR 124.  Mr. Acker helped her buy groceries with his food stamps.  23 RR 127.  She did not feel her brother was a danger to society.  23 RR 128.

**Dorcas Dodd Vititow,** Mr. Acker's other sister, was eight years older than him.  23 RR 129.  She helped raise her brother and he was not violent.  23 RR 131.  Mr. Acker loves his mother.  23 RR 131.  He would not be a danger in prison or society.  23 RR 132.  He was good with animals and children.  23 RR 132.  Mr. Acker has an alcohol and drug problem that created a lot of his problems.  23 RR 133.  This caused problems in their relationship.  23 RR 134.  Since he was released from prison the last time, drugs were not a problem but alcohol was.  23 RR 134.

**Nancy Acker,** Mr. Acker's mother, testified that her husband, Mr. Acker's father was not at home much, never provided support for the children, and as a result, Mrs. Acker had to work two or three jobs at a time to support the family. 23 RR 137.  Daniel was not a problem child when he was growing up.  23 RR 138.  Starting in the sixth grade, he did not want to attend school.  23 RR 139.  She started to say the reason he dropped out of school was that he was sexually abused, but there was an objection on hearsay grounds that was sustained.  23 RR 140.  The family moved to get away from the child abuser and then Daniel went back to school.  23 RR 141.

-48-

She testified that Daniel never hurt or assaulted her, he only pushed her once.  23 RR 141-142.  She had a good relationship with her son and would allow him to move in with her.  23 RR 142.  Mrs. Acker did not want her son to receive a death sentence.  23 RR 143.

The Court then asked Mr. Acker if he wanted to testify and he said he didn't.  23 RR 144. The defense then rested.  23 RR 145.

At sentencing, Mr. Acker stated that he did not receive a fair trial.  23 RR 159.

The court then asked the trial attorneys if they wanted to accept the appointment for the direct appeal.  23 RR 161.  Attorney Ted Beaty was appointed to handle this appeal.

**F) Post-conviction proceedings.**

On May 19, 2004 a hearing on the state writ of habeas corpus was held in the 8th Judicial District Court, Hon. Robert E. Newsom presiding.

Counsel for the State noted that in addition to an application filed by Mr. Toby Wilkinson Mr. Acker had also filed a *pro se* application.  HT 3.[57]  The first writ by Mr. Wilkinson was timely filed on July 18, 2003 and Mr. Acker's was filed on December 31, 2003.  HT 3.  Only the first application was considered at the hearing.  HT 4.

**Daniel Clate Acker,** represented by Mr. Wilkinson at the hearing, was called to testify at the hearing.  Mr. Acker's testimony was rambling, disjointed and verbose as his attorney simply went rapidly from one issue to the next asking only general questions such as "what about this point."

Mr. Acker was first asked by Mr. Wilkinson why he made the claim that trial counsel William McDowell only visited him once and did not have a firm understanding of the case.  HT 8. Mr. Acker stated, in rambling and somewhat non-responsive fashion,  that trial counsel misled the

---

[57]  "HT" stands for the transcript of the hearing on the writ of habeas corpus.

-49-

jury by telling them that the victim came out of the truck head first, when she actually hit the utility bed that stuck out from the side of the truck.  HT 8.

Mr. Acker gave additional reasons why he felt trial counsel was unprepared, mostly forensic details about the truck. HT 9-10. Mr. Acker testified that the victim hit the utility bed as she jumped, and this utility bed stuck out from the side of the truck about one foot. HT 13. As a car passed, Mr. Acker turned to the left to make sure the car did not hit the utility bed and then the passenger door opened and Ms. George jumped out. HT 13. Mr. Acker grabbed her, she turned to the left, her warm-ups caught on the door latch. HT 14. As she foot hit the road, the bottom corner of the utility bed caught her, she flipped upside down, and her head hit the road as the rest of her body came down, causing force on her head and neck. HT 16. Mr. Acker stopped the truck and put it in reverse. HT 17. Then he saw a truck coming and he waved trying to get it to stop. HT 17. This was Brody Young's truck, and it did not stop. *Id.* Mr. Acker ran around and picked up Ms. George and then laid her back by the side of the road. HT 17. Realizing she is dead, Mr. Acker panicked, drove away to find his mother and then waved down a passing DPS officer. HT 18.

Mr. Acker testified that he wanted to demonstrate this to trial attorney Mr. Ferguson but Mr. McDowell did not visit him. HT 21. He said that the forensics witness was wrong, that the truck did hit her and that he did not place her under the truck and run over her. HT 21-22. The jury was never told about how the victim actually hit the utility bed and was not run over by the truck. HT 22. Mr. Young saw the victim being laid down by the side of the road, but Mr. Acker did not pull her out of the truck. HT 23. Mr. Acker stated that one of his attorneys had trouble hearing him at trial. HT 31, 111-112.

The petitioner also complained about his attorneys not calling him at the change of venue

hearing regarding a threatening letter he had received in jail.  HT 23-25, 104-108.   He was also never visited by the accident reconstructionist while he was awaiting trial and that would have been essential for presenting his case for actual innocence.   HT 26. The trial attorneys failed to present several  family and friends at the punishment phase who could have given valuable mitigating evidence.  HT 32, 115-118.   Mr. Acker testified that defense investigator Mr. Sands was to be a large-truck expert, a private investigator and a criminologist but when he was called to testify his testimony was not allowed.  HT 34.  A big-truck expert was necessary to testify regarding tire marks and the utility bed and that it would have been impossible to strangle someone in the truck while driving it.  HT 35-36.  Mr. Acker wanted testimony from Mr. Sands that Mr. Young might have missed some of the action because he was looking through a rear view mirror.  HT 42.  When Mr. Young thought he saw Acker removing the victim from the truck, what he actually saw was Acker, after attempting to put her back in the truck (which Young did not see), removing her and her leaving her on the side of the road when he panicked.  HT 42, 77.

Mr. Acker also complained about various inaccuracies and inconsistencies in the video.  HT 44-46, 47-49.  Mr. Acker admitted that after he realized that Ms. George was dead, he panicked and waived down a DPS officer, who was not called as a witness at the trial.  HT 46.

As for the court-appointed medical examiner Linda Norton, the district attorney issued subpoenas for her records and she wanted to leave the case.  HT 50.  Mr. Acker attempted to have her remain on the case but she resigned and would not testify for him.  HT 51.  Mr. Acker testified that his attorneys were incompetent for not having her make a report in time and in not having her testify about the strangulation, which she could have shown was impossible, and in not having her talk to him about the case.   HT 53, 118-119.

Mr. Acker also alleged that there were police officers in the courtroom (HT 54), that he was not allowed to attend the jury charge (HT 56-57), that the arresting officer deceived him regarding the law (HT 57-58), that the 911 tape was erased but it contained information that would have been helpful (HT 58-59, 66-67), and that there were discrepancies in the autopsy. HT 60-63, 73. He also brought up the fact that two weeks prior to the death of the victim, she had similarly tried to jump from the truck and this evidence was relevant and was wrongly excluded as hearsay and his attorneys did not try hard enough in having it admitted. HT 63-65, 67-70, 74, 123-124. He also claimed that the foreman of the grand jury was a friend of the victim. HT 71-72. Mr. Acker also covered other points in the writ, such as the victim's necklace (HT 75-76), the attorneys' failure to cross-examine Mr. Young about what he saw (HT 76-81), the failure of his attorneys to contact people at the scene of the crime (HT 82-83). He also complained that the foremen of the jury, Bill Sharber, was a person with whom he had an altercation (HT 84), that he had an altercation with Tim Mason, a witness (HT 85-88), and that the jail contraband was not his (HT 90). Mr. Acker also testified the judge commenting on the tire track evidence (HT 91-92), more discrepancies in the autopsy (HT 92-93), and that he was convicted based on false impressions (HT 93-97).

On cross-examination, Mr. Acker testified that Mr. Ferguson visited him in jail (HT 100), and that Mr. McDowell knew the victim didn't come out of the truck head first but told Mr. Acker that was what he wanted the jury to think (HT 103). Mr. Acker also testified that his attorneys said they had a "lot of ammunition" but they never promised they would win. HT 125.

Mr. Acker's sister, **Dorcas Vititow** also testified at the hearing. HT 131. She said that she was a State's witness at the trial. HT 132. Before she testified at the trial, some of the witnesses were talking about the case as they waited to be called. HT 133. She did not remember exactly what

-52-

they said.  HT 134-138.  She did not report it to the judge and she did not make it up.  HT 138-143.

The defense then rested.  HT 144.

The State called **Ted Beaty**, Mr. Acker's appellate attorney.  HT 144.[58]  Mr. Beaty testified that he obtained a copy of the transcript and reviewed issues for the appeal.  HT 145.  Mr. Beaty testified that he thought it was his job as an appellate attorney to brief only those issues that would prevail on appeal so as not to lose the "golden hay needle in the whole stack."  HT 146.[59]   Mr. Wilkinson questioned Mr. Beaty briefly on an error regarding a bloodstain and a picture of the tire tracks.  HT 149-153.

Lead trial counsel **Ron Ferguson, Jr.** was also called by the State at the hearing.  Mr. McDowell handled the expert witnesses and Mr. Ferguson handled the fact witnesses.  HT 154.  Mr. Ferguson testified he visited Mr. Acker frequently in prison (HT 155-157), did not always object to everything that was possibly objectionable at trial (HT 157-161), never told Mr. Acker to lie (HT 161), and did not think that the hate letter received by Mr. Acker rose to the level of a conspiracy against him.  HT 162-163.  He also testified that some experts never visited petitioner in jail (HT 164-165), that he could hear Mr. Acker during the trial (HT 165-169), and that he called all the mitigating witnesses who he felt were appropriate.  HT 169-172.  Mr. Ferguson stated that "we asked for a criminologist; we were told to use Mr. Sands.  We tried to use Mr. Sands, and we were unable to get that in."  HT 173.[60]  He also interviewed Mr. Brody Young and in that interview Mr. Young contradicted almost everything in his statement.  HT 173.  Mr. Ferguson admitted that he never tried

---

[58]   Mr. Beaty's brief on direct appeal is at Exhibit 6.

[59]   The prosecutor's words.

[60]   Referring to tests as to how much force it would take to open the truck door.

to directly impeach Mr. Young on these contradictions even though Mr. Sands had been present during the interview.  HT 174.

Mr. Ferguson testified that he objected to the "video re-enactment" of the crime scene that was made by an officer.  HT 176.  The video was not a fair depiction of what happened.  HT 176. Mr. Ferguson also denied the merits of various other claims in the habeas petition.  HT 177-191. He thought the medical examiner was sloppy as she left out a scar that the victim had.  HT 185.  Mr. Ferguson also admitted he did not have an expert examine the videotape of Mr. Acker's interview. HT 195.  There was also testimony regarding Mr. Acker's positioning at the counsel table at trial. HT 196-198.

The State also called **William McDowell,** Mr. Acker's other trial counsel.  HT 200.  Mr. McDowell stated he spent sufficient time with Mr. Acker.  HT 202.  As for how the victim exited the vehicle, she could have gone head first or feet first and then flipped.  HT 205.  Mr. Acker was never asked to change his testimony.  HT 206.

He testified that he did not call the accident reconstructionist at trial because he conclusion was that the front tire ran over her head.  HT 210.[61] He also said that their medical examiner did not testify because her conclusions were consistent with the autopsy.  HT 211.[62]  At some point before trial the prosecutor subpoenaed all the defense expert witnesses, and their medical examiner, Dr. Linda Norton,  was very upset.  HT 213.  There was a hearing to attempt to "get what they knew." HT 214.  There was no actual hearing, but the medical examiner was upset and did not want to be called.  HT 214.  Mr. McDowell also testified as to other claims in the state habeas petition.  HT

---

[61]  Unsurprisingly, there was no hearsay objection to this testimony from Mr. Wilkinson.

[62]  Nor was there any hearsay objection to this statement.

215-221.  He did not point out that the victim's injuries conformed to the shape of the utility bed because he did not have evidence to support it.  HT 224.  He did not feel that saying the victim came out head first contradicted or impeached his client's version of events.  HT 226.  Mr. McDowell denied that he impeached his client by saying that the victim left the truck head-first when his client said she left it feet-first.  HT 235.  He denied ever telling his experts that the victim came out head-first.  HT 236.  Mr. McDowell also testified that he did not want Mr. Acker to take the stand.  HT 239-243.

**IV.**

**THE STANDARD OF REVIEW UNDER §2254(d)(1) OF THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996**.

This Court, in ruling on Mr. Acker's  Petition for Writ of Habeas Corpus, will be faced with the task of interpreting and applying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   Since the passage of the AEDPA, the Supreme Court has issued a number of crucial decisions interpreting and clarifying the standard of review, in particular the cases of *Williams(Terry) v. Taylor*, 120 S. Ct. 1495 (2000) (*Williams I*)  and *Williams (Michael) v. Taylor,* 120 S. Ct. 1479 (2000) (*Williams II*).   This section of Mr. Acker's writ application deals with the standard of review under the AEDPA in light of the two *Williams* cases.

**A.  The standard of review under Section 2254(d)**

Because this case was filed after AEDPA's effective date, it will help to review the relevant statutory language. Section 2254(d)(1) states:

> (d)      An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings

-55-

unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Because Justice O'Connor, who authored *Williams I,* concluded that the "contrary to" and "unreasonable application" clauses each have "independent meaning," petitioner will address the two provisions separately. 120 S. Ct. at 1519.[63]

    1. *"Contrary to" clearly establish federal law.*

Justice O'Connor first stated that "a state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* at 1519.   As an example of such an error, Justice O'Connor posited that a state court decision which interpreted the *Strickland v. Washington* [466 U.S. 668 (1984)] prejudice inquiry as requiring the prisoner to demonstrate by a preponderance of the evidence that the result would have been different would be "contrary to" *Strickland,* since pursuant to *Strickland* a prisoner need only demonstrate a reasonable possibility that the result of the proceeding would have been different." 120 S. Ct. at 1519.   Additionally, according to Justice O'Connor, a "state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at

---

[63]    The Court did note that, in some cases, the line between "contrary to" and "unreasonable application" will be difficult to draw.  120 S. Ct. at 1519-21.  And, in some cases, a state court decision will be both "contrary to" and an "unreasonable application" of federal law. *Williams* I was such a case.  Justice O'Connor's opinion and Justice Stevens' opinion agreed that the Virginia Supreme Court's decision rejecting Terry Williams' ineffective assistance of counsel claim was contrary to the Court's decision *Strickland v. Washington* and an unreasonable application of *Strickland v. Washington*.  *Id*. at 1516.

a result different from out precedent." *Id.* at 1520.[64]

The *Williams* Court determined that the state court decision was contrary to *Strickland* because an examination of the opinion revealed that the Virginia Supreme Court believed that *Lockhart v. Fretwell,* 506 U.S. 364 (1993), "somehow modified or supplanted the rule set forth in Strickland" and thus held that "a focus on outcome determination was insufficient standing alone." 120 S. Ct at 1524.  While agreeing with the dissent that the state court did also discuss whether "Williams had demonstrated a reasonable probability that, but for his trial counsel's unprofessional errors, the result of the proceeding would have been different, . . . [i]t is impossible to determine, however, the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice."  *Id.*

   *2. Unreasonable application of clearly established federal law.*

As for the unreasonable application clause, Justice O'Connor first concluded that a state court decision which "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would be a decision involving an unreasonable application of... clearly established Federal law."' 120 S. Ct. at 1520.  Justice O'Connor went on to say that a federal habeas court making the unreasonable application inquiry "should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 1521. Justice O'Connor made clear however that the reviewing court should not transform the inquiry into a subjective one by "resting its determination on the simple fact that at least one of the nation's jurists has applied the relevant federal law in the same manner that the state court did in the habeas

---

[64]   Justice O'Connor did state that a "run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to clause."  120 S.Ct. at 1520.

petitioner's case." 120 S. Ct. at 1522.[65]  In doing so, the Court specifically stated that the Fifth

Circuit had committed precisely this "subjective manner" error in its decisions applying §2254(d)

when it applied the *Drinkard* standard.  While the Court noted that the term "'unreasonable' is no

doubt difficult to define," *id.* at 1522, it believed that it was a term with which federal judges were

familiar.  The Court did state that an unreasonable application of federal law is different from an

incorrect application of federal law.  *Id.*

   Justice O'Connor's explanation of why the Virginia Supreme Court's decision was an

unreasonable application of federal law is also instructive.  First, the state court decision revealed

"an obvious failure to consider the totality of the omitted mitigation evidence." *Id.* at 1525.  Echoing

Justice Stevens' holding, the state court decision was also deemed unreasonable in failing to

"entertain the possibility" that "[m]itigating evidence unrelated to dangerousness may alter the jury's

selection of penalty, even if it does not undermine or rebut the prosecution's death eligibility case."

120 S. Ct. at 1516.[66]  Finally, for the same reason the state court decision was "contrary to"

*Strickland* – its conclusion that a "mere difference in outcome not sufficient to establish

constitutionally ineffective assistance of counsel" – it was also an "'unreasonable application of' the

clear  law as established by this Court."  120 S. Ct. at 1515.

---

[65] Justice Stevens made this same point in his opinion for four members of the Court:
"The statue says nothing about 'reasonable judges,' presumably because this in retrospect may be
characterized a 'unreasonable.'"

[66] Justice Stevens noted that the state court failed "even to mention the sole argument in
mitigation that trial counsel did advance," that Williams turned himself in, cooperated with the
police and was remorseful.  120 S. Ct. at 1515.  Justice Stevens reasoned that this argument
coupled with the prison records and guard testimony may not have overcome a finding of future
dangerousness, "the graphic description of Williams' childhood, filled with abuse and privation,
or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's
appraisal of his moral culpability."  *Id.*

*3.   Clearly established Federal Law.*

Justice O'Connor's opinion also held that "clearly established Federal Law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of this Court's decisions." 120 S. Ct. at 1523.   Her opinion also reveals that the relevant time frame is the law as it existed "as of the time of the relevant state-court decision." *Id.* The inquiry is different from the Court's prior focus in its nonretroactivity/*Teague* decisions, which surveyed  the legal landscape at the time the case was final on direct review. *Id.* Section 2254(d)'s focus in on the law at the time the state court actually decided the case. But Justice O'Connor did make clear that "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute clearly established Federal Law." *Id.* The only caveat is that §2254(d)(1) "restricts the source of clearly established law to this Court's jurisprudence." *Id.*

*4.   Unreasonable determination of the facts.*

Section 2254(d)(2) holds that an application for a writ of habeas corpus shall not be granted unless it "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   Mr. Acker herein abundantly shows that his conviction was based on a flawed and erroneous theory advanced by the State, and he was denied the basic tools to show his innocence of the crime.

**B.**   **The *Williams v. Taylor* Decisions Reaffirm the Vital Role of Federal Habeas Corpus in Cases Involving Colorable Claims of Constitutional Error.**

**i.  Overview**.

The Supreme Court has spoken in an unambiguous voice: the AEDPA did not vitiate meaningful federal review of a state prisoner's federal constitutional claims. Federal habeas corpus

remains a powerful remedy whose "most basic traditions and purposes" are "to protect individuals from unconstitutional convictions and to help guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." *O'Neal v. McAnnich,* 513 U.S. 432,442 (1995)*.* In a series of decisions beginning with *Felker v. Turpin,* 518 U.S. 651(1996) the United States Supreme Court has  rebuffed the contentions of various state's Attorneys General that AEDPA – for all practical purposes -- eliminated federal review. *See, e.g, Felker* (rejecting state's argument that AEDPA removed the Supreme Court's jurisdiction to entertain original habeas petitions); *Lindh v. Murphy,* 117 S. Ct. 2059 (1997) (rejecting the state's argument that AEDPA applies to cases already pending in federal court at time of its enactment); *Stewart v. Martinez-Villareal,* 118 S. Ct. 1618, 1621 (1998) (rejecting the state's interpretation of AEDPA's provision governing second or successive petitions as having "far reaching and seemingly perverse" implications for habeas practice); *Hohn v. United States,* 524 U.S. 236,  118 S. Ct. 1969 (1998) (rejecting government's argument that AEDPA eliminated the Court's jurisdiction to review denials of application for certificates of appealability by a circuit judge); *Slack v. McDaniel,* 120 S. Ct. 1595 (2000) (rejecting the state's argument that a habeas petition refiled in federal court after being dismissed without prejudice as a "mixed" petition was a second or successive petition). Any unresolved questions about the vitality of the "Great Writ's" role as "the best and only sufficient defense of personal freedom," *Lonchar v.Thomas,* 517 U.S. 314, 324(1996), were definitively answered by the Court's recent decisions in the two *Williams v. Taylor* cases. *See (Terry) Williams v. Taylor,* 120 S. Ct. 1495 (2000) *(Williams I)*; *(Michael) Williams v. Taylor,* 120 S. Ct.1479 (2000) *(Williams II)*.

In *Williams I,* the Court was confronted with several questions regarding the meaning and scope of §2254(d) of Section 2254(d)(1) of AEDPA, widely considered to be its key provision.  That

section provides that a writ of habeas corpus shall not be granted with respect to a claim "adjudicated on the merits in State Court proceedings" unless "the adjudication" "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In construing §2254(d), the Court rejected the Fourth Circuit's view that habeas relief could be granted only if "state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." 120 S. Ct. at 1521. The Court deemed the reference to reasonable jurists to be of "little assistance" to federal courts reviewing habeas claims, and, in fact, could be "mislead[ing]." *Id.* [67] The Court held "[t]he placement of this additional overlay on the 'unreasonable application' clause was erroneous." *Id.*

### ii. The Supreme Court in *Williams I* specifically overruled the subjective standard of review.

*Williams I* specifically overruled the Fifth Circuit's subjective "reasonable jurist" interpretation of AEDPA as enunciated in *Drinkard v. Johnson,* 97 F.3d 751 (5th Cir. 1996). As discussed above, the Court rejected the "unreasonable jurist" overlay on the "unreasonable application" language of the statute:

Defining an 'unreasonable application' by reference to a 'reasonable jurist,' however, is of

---

[67] The Court also rejected Virginia's view of §2254(d), which was even narrower than the Fourth Circuit's interpretation of the statutory provision. Virginia argued that 2254(d) established a general rule prohibiting federal relief if the state courts addressed the issue. The state viewed §2254(d) as a modified *res judicata* rule which could be overcome only if the petitioner satisfied two very narrow exceptions. *Id.* at 1504 n. 8. "The first "contrary to" exception, in his [Virginia's] view, applies only to "starkly unreasonable" errors of law...The second exception likewise replaces the 'de novo' standard of reviewing mixed questions of law and fact with the standard of 'objective reasonableness' as formulated by the Court of Appeals." *Id.* No member of the Court adopted this draconian view of §2254(d): "We are convinced that that interpretation of the amendment is incorrect." *Id.* at 1504.

little assistance to the courts that must apply 2254(d)(1) and, in fact, may be misleading. Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.  The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case.  The 'all reasonable jurists' standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one.

*Williams I,* at 1521-22.

### iii.  The Supreme Court granted relief in the *Williams* cases.

As is often true, it is important to look not only at what the Court said §2254(d) meant, but to examine what the Court actually did. In Terry Williams' case, the Court concluded that Mr. Williams was entitled to a new capital sentencing trial because of his attorney's incompetent and prejudicial "failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances." 120 S. Ct. at 1524**.**  Furthermore, the Supreme Court determined that the Virginia Supreme Court's decision rejecting Mr. Williams' ineffective assistance of counsel claim was both "contrary to" and an "unreasonable application of" clearly established federal law. *Id.* at 1525.

In *Williams II,* the Court was faced with several issues regarding the proper interpretation of AEDPA's evidentiary hearing provision, §2254(e)*.* Section 2254(e) states that a federal court shall not hold an evidentiary hearing, subject to two narrow exceptions, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." In concluding that Michael Williams was entitled to a federal evidentiary hearing in connection with several claims of juror and prosecutorial misconduct  claims raised for the first time in federal court— the Court unanimously rejected the State's "no-fault reading of the statute," 120 S. Ct. at 1487, holding instead that

§2254(e)'s general rule against evidentiary hearings only comes into play if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 1489. The Court stated: "The 'failed to develop' language does not bear this [no-fault] harsh reading which would attribute to Congress a purpose or design to bar evidentiary hearings for diligent prisoners with meritorious claims just because the prosecution's conduct went undetected in state court." *Id.* The Court remanded Michael Williams' case to the district court for proceedings consistent with its opinion.

In sum, the Supreme Court's post-AEDPA decisions have uniformly rejected the arguments of the various states maintaining that AEDPA eviscerated meaningful federal review of state prisoner's constitutional claims. Federal courts are not mere "rubber stamps" for the state courts, and federal habeas corpus still performs its vital function as "a remedy designed to interpose the federal courts between the States and the people, as guardians of the people's federal rights. *Reed v. Ross,* 468 U.S. 1, 10 (1984).

### C. Qualifying State Court Decisions.

While the Supreme Court was not confronted with this issue in *Williams I*, the clear language of §2254(d) reveals that it does not apply in all cases, but is instead reserved for claims "adjudicated on the merits in State court proceedings." *See Williams II*, 120 S. Ct. at 1487 ("We start, as always, with the language of the statute). To satisfy this "adjudication" requirement, a state court's resolution of a claim must both decide the claim on the merits, and do so via a "decision" articulating a basis in federal law with sufficient clarity that the federal habeas court can ascertain and review it. As the Fifth Circuit has recently held, "In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive

as opposed to procedural." *Neal v. Puckett,* 286 F.3d 230, 235 (5th Cir. 2002) (*per curiam*).

Thus, claims erroneously rejected by the state courts through application of state procedural rules subsequently determined by the federal court not to be adequate, independent, clearly established, or consistently and regularly applied, are not subject to §2254(d)'s standard of review.[68] Similarly, procedurally defaulted claims for which the petitioner establishes "cause and prejudice"[69] or a "miscarriage of justice"[70] excusing the default likewise fall outside the purview of §2254(d).

In the successive writ application, the CCA denied relief as to all of Petitioner's claims on procedural grounds only.  As we have seen, that Court simply denied all of Acker's claims on the ground that they did not meet the requirements for subsequent writ applications:

> Applicant now brings fifteen more claims.  We have reviewed these claims and find that they do not meet the requirements of Article 11.071, Section 5 for consideration of subsequent claims.  This application is dismissed as an abuse of the writ.
> IT IS SO ORDERED THIS THE 10TH DAY OF SEPTEMBER, 2008.

*Ex parte Daniel Clate Acker*, No. WR-56,841-04 (Tex. Crim. App. September 10, 2008)(*per curiam*)(not designated for publication).

The Fifth Circuit has held that "section 2254(d) [amended under the AEDPA] **applies only**

---

[68]    *See, e.g.*, *Weeks v. Angelone*, 176 F.3d 249, 258-260 (4th Cir. 1999) ("[w]hen a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim, . . . our review of questions of law and mixed questions of law and fact is *de novo*"); *Fisher v. Texas*, 169 F.3d 295, 299-300 (5th Cir. 1999) (state court's denial of relief on ground petitioner violated contemporaneous objection rule not an "adjudication on the merits"); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (§2254(d) inapplicable where state appellate court erroneously relied on procedural default to deny petitioner's claims); *Mainiero v. Jordan*, 105 F.3d 361, 365 n.5 (7th Cir. 1997) (because state "appellate court did not adjudicate this second issue on the merits, the amendments to section 2254 mentioned above (. . .) are not applicable").

[69]    *See e.g., Strickler v. Greene,* 119 S. Ct. 27 (1998).

[70]    *See, e.g. Schlup v. Delo,* 513 U.S. 298, 321-22 (1995).

**to issues that have been adjudicated on the merits in state court."** *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000)(emphasis added).  The court in *Miller* added that "[i]n the context of federal habeas proceedings, a resolution (or adjudication)   on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Id.* at 281.  As these claims were denied on procedural grounds, arguably the standard of review under section 2254(d) does not apply.[71]

Additionally, even when a claim does appear to have been decided on the merits by the state court, the face of the state court's decision still must fairly afford the federal habeas court some insight into the state court's federal constitutional basis for rejecting the claim. *See*, *e.g.*, *Delgado v. Lewis*, 181 F.3d 1087, 1091 (9th Cir. 1999) ("when a state court does not articulate the rationale for its determination, a review of that court's 'application' of clearly established federal law is not possible").  At a minimum, the state court's decision must identify the Supreme Court precedent upon which it relied, and give some indication as to how it applied the law to the facts. *See Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997) (expressing "some reservation about applying the more stringent AEDPA standards" where "not convinced that the state habeas court sufficiently addressed" petitioner's claim under governing federal law).

Although the requirement that a decision reveal something about the way in which the state court went about rejecting a petitioner's claim was not directly addressed in *Williams I*, the method by which the Court analyzed the merits of Terry Williams' ineffective assistance of counsel claim

_____

[71]    *See also Blankenship v. Johnson,* 106 F.3d 1202, 1204 (5th Cir.), *superseded,* 118 F.3d 312 (5th Cir. 1997) ("when faced with a silent or ambiguous state habeas decision, we 'look through' to the last clear state decision," and adopting additional rule that "[w]here, as here, there is no clear state decision, we determine, on a case-by-case basis, whether the adjudication was 'on the merits'").

-65-

underscores the necessity of an explanatory state court decision to the proper application of §2254(d).  Unlike some lower federal courts in pre-*Williams* cases,[72] the Court in *Williams* looked as closely at the *way* in which the Virginia Supreme Court rejected Terry Williams' claim as it did at the *outcome* of the state court's decisional process.[73]  *See Williams I*, 120 S. Ct. at 1512 (state court "erred in holding that our decision in *Lockhart v. Fretwell*, . . . modified or in some way supplanted the rule set down in *Strickland*"); *id.* at 1513 (condemning state court's "separate inquiry into fundamental fairness even when [petitioner] is able to [satisfy *Strickland*]").  Indeed, the Court's conclusion that the state court's rejection of petitioner's claim was both "contrary to" and an "unreasonable application of" clearly established federal law drew heavily from – and would have been impossible without – the explanation set forth in the state court's opinion. *See Williams I*, 120 S. Ct. at 1515 (state court's decision was "contrary to" federal law because it "turned on [the] erroneous view that a 'mere' difference in outcome is not sufficient to establish constitutionally ineffective assistance of counsel"); *id.* (state court's decision was "unreasonable" because it: "mischaracterized at best the appropriate rule . . . for determining whether counsel's assistance was

---

[72]  *See, e.g.*, *Wright v. Angelone*, 151 F.3d 151, 156 (4th Cir. 1998); *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

[73]  The Fifth Circuit, in *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (*per curiam*) has held that the focus of the review is only on the state court's ultimate legal conclusion, and not the reasoning used to reach that conclusion:  "our focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal,* 286 F.3d at 246.  This decision seems to conflict with the Supreme Court's analysis in *Williams,* as it would not seem possible for a federal court to apply the "contrary to" standard, as the Supreme Court itself did in *Williams,* if it is "authorized by section 2254(d) to review only a state court's 'decision' and not the written opinion explaining that decision."  Additionally, without reviewing the opinion, it is impossible to know even whether a state court applied the correct legal standards.  Therefore, the discussion herein will focus on both the state court's ultimate conclusions and on their reasoning.

effective"; "relied on the inapplicable exception recognized in *Lockhart*"; and "failed to evaluate the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation").[74]

That the "adjudicated on the merits" clause limits the application of §2254(d)'s more state-friendly standard of review to explanatory state court decisions is completely consistent with the AEDPA's core policy of making state court resolution of federal constitutional claims more meaningful. In any sensible system, heightening the respect owed by one court to the decisions of another court is not automatic or blind, but is instead a two-way street: if the state court takes its duty to protect federal constitutional rights seriously, then the decision should be treated with respect; if, on the other hand, the state court elects to summarily reject constitutional claims, then federal habeas review should not – and under the "adjudicated on the merits" clause and the example set by *Williams I* is not – constrained by §2254(d)'s limitations on the availability of habeas relief.

Thus, Petitioner argues that even if the AEDPA standard of review does apply to his case, that standard does not preclude relief.

---

[74]    Even prior to *Williams*, some federal courts of appeals were applying a similar approach. *See Delgado, supra; Paxton v. Ward*, 199 F.3d 1197, 1218 (10th Cir. 1999) (state court's decision "not entitled to deference" where court did not apply correct constitutional standard and disregarded relevant facts); *Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (state court so misapplied *Beck v. Alabama* as to render its opinion incapable of qualifying as an "adjudication on the merits").*See* the prior note regarding the Fifth Circuit's approach in *Neal v. Puckett*.

**V.**

## PROCEDURAL DEFAULT, "CAUSE AND PREJUDICE," AND "FUNDAMENTAL MISCARRIAGE OF JUSTICE."

As procedural default is an affirmative defense that must be pled by Respondent, Petitioner has no way of knowing whether or in what manner Respondent may assert any procedural defenses that may be available.  Therefore, this section is only a short overview of the foreseeable arguments that may be made by Respondent.  A full discussion will be appropriate only in the reply brief, after Respondent's answer.

**A) Introduction.**

Mr. Acker met the standards for subsequent habeas corpus applications under Tex. Code Crim. Proc. Art. 11.071 § 5(a) which provides:

> If an initial application for a writ of habeas corpus is untimely or if a subsequent application is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent or untimely initial application unless the application contains specific facts establishing that:
> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues.

Questions of procedural default and cause and prejudice are not relevant until a federal court first determines that the state procedural rule relied upon for the default is adequate and independent.

*See Coleman v. Thompson*, 501 U.S. 722 (1991).

Acker has presented facts and arguments herein that provide the requisite "sufficient specific facts establishing" (art. 11.071, sec. 5 (a)) his claims that (1) he is innocent" of capital murder because 1) the death of Ms. George was due to her jumping from the truck and, thus, it was not a homicide and 2) the state's theory that Petitioner strangled her while driving was multiply and fatally flawed.   In other words, Acker presented to the CCA facts and argument that prove (1) "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt," as required by art. 11.071 section 5(a)(2), *and* (2) "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under  Article 37.071 or 37.0711" as required by art. 11.071, section 5 (a)(3).

The primary underlying constitutional violation of the majority of Acker's constitutional claims is a Sixth Amendment violation due to the trial court's interference with the defense, false testimony presented at the trial,  and the resulting inability of his trial counsel to present his claim of actual innocence.[75]

**B) The Texas statute was inadequate to support a procedural default.**

*Wainwright v. Sykes*, 433 U.S. 72 (1977), requires a finding of procedural default before a habeas petitioner need present cause and prejudice arguments. Under *Sykes*, the interests of comity and federalism require that a federal court respect the "adequate and independent state ground" upon which a state court relied in rejecting a federal claim. *Id*. at 78-79. A procedural default occurs only if the state proves the default by asserting it in a timely manner, by establishing that the state actually

---

[75]   Claim I.

has an "adequate" and "independent" procedural rule the prisoner violated, and by demonstrating that the state courts actually relied upon the rule to deny the petitioner relief. *James v. Kentucky*, 466 U.S. 341, 348-351 (1984). Only then does a federal court consider whether a petitioner can prove cause and prejudice for the procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)

There is also the question of the adequacy of the Texas statute to support a procedural default.

**C)  There is no adequate and independent state rule to support a procedural default.**

A federal court must first determine if a state rule is firmly established and regularly applied before it can find that a habeas claim is procedurally defaulted. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).   It is true that a litigant commits a procedural default if a state court so holds and that a prisoner may forfeit later state-court opportunities to litigate claims because of that default. However, procedural defaults and resulting forfeiture sanctions do not constitute grounds that are adequate, as a matter of federal law, to bar habeas review unless a federal court determines that the state procedural rule is adequate, independent, firmly established and consistently applied. *See James v. Kentucky*, 466 U.S. 341, 348-351 (1984).

**D) Petitioner has established "cause and prejudice" for any alleged procedural default because his state-appointed counsel was responsible for the default, if any, and counsel's actions may properly be "imputed to the state."**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

"Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails."

*Coleman v. Thompson,* 501 U.S. 722, 754 (1991)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Mr. Acker was denied meaningful access to courts and due process of law in state post-conviction proceedings by unconstitutional state action.

**(i)   The Texas Court of Criminal Appeals refused to comply with its binding statutory obligation to ensure that death row inmates received "competent" representation in state post-conviction proceedings.**

Any "procedural default" suffered by Acker  stems from the failure of his state habeas counsel to raise the issues in his state writ.  This failure was the direct result of action by the State of Texas and, in particular, the trial court: the appointment of incompetent state habeas counsel.  His actions in not raising Acker's meritorious claims must therefore be imputed to the State, or else he will forever be deprived of any forum whatsoever for the presentation and adjudication of his federal constitutional claims.

The result of the state's failure was that Mr. Acker did not receive the "competent" representation to which he was entitled by Texas law. Mr. Acker state habeas attorney, Mr. Toby Wilkinson, submitted one of the most ludicrously inept state petitions in the history of the Texas death penalty.  Many of the meritorious claims, including his evidence of actual innocence detailed in this writ were never presented to the state courts.  This led to the denial of Mr. Acker's application by the state courts.

This failure, in conjunction with the trial court's actions to stifle his actual innocence evidence means that this federal habeas application is the first time any court has examined significant aspects of the crime and crucial questions regarding the fairness of his trial and sentence of death.

Because the facts were not investigated, they could not be presented or incorporated into the state writ application in any coherent manner. These extra-record facts were not known to state habeas counsel because he simply plagiarized his own client's incoherent letters and memos.

### (ii) Petitioner was prejudiced as a result of this failure.

State habeas counsel's representation fell well below a minimal standard of competence in the following ways: failure to adequately and coherently brief claims; failure to conduct his own investigation of extra-record evidence, even though that is the primary purpose of post-conviction proceedings; failure to perform research sufficient to understand basic principles of post-conviction practice; failure to present proper post-conviction claims; and failure to adequately communicate with the client. Mr. Acker was prejudiced by this ineffective performance, because, as his petition demonstrates, viable challenges to his conviction and death sentence could have been, but were not, raised during state post-conviction proceedings.

Performing an investigation to determine the existence of cognizable constitutional violations is a fundamental component of adequate state post-conviction representation:

> Accordingly, where necessary to assure the full and fair adjudication of the client's federal claims, post-conviction counsel should request that the state post-conviction case be conducted, and should be prepared to conduct it, as a civil trial proceeding, initiated by her on behalf of the client, complete with frequent and productive interaction with the client; comprehensive pre-filing and pretrial documentary, field, and legal investigation to identify and prepare to litigate the appropriate causes of action; careful pleadings; motions practice; evidentiary hearings; briefing; and any other procedures that counsel might use in civil litigation on a plaintiff's behalf.

1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRAC. & PROC. § 7.1a, at 274-75 (3ʳᵈ ed. 1998) (LIEBMAN & HERTZ) (footnotes omitted). In order to zealously represent the client and preserve an appropriate record for later federal review, state post-conviction counsel is under a

binding professional and ethical obligation to determine the avenues of investigation which may prove fruitful and request the resources necessary to pursue them, if such a request is necessary:

> At the outset of state post-conviction proceedings, counsel should identify the procedures and resources necessary to investigate the case fully and fairly; discover meritorious claims; ascertain the expert and other analyses, evidence, and testimony that effective litigation of those claims will require; and present that information in a meaningful manner, whether by way of an evidentiary hearing or some other procedure. Thereafter, counsel should request, formally and in writing, each of the necessary procedures and resources and explain with specificity why each is essential, what claim it relates to, what evidence is likely to be generated thereby, and, generally, how the "full and fair" litigation of one or more claims in the petition requires the requested procedure or resource.

*Id*. at 279 (footnote omitted). This is not an unreasonable or extraordinary burden to place on a lawyer whose client faces execution by lethal injection. Indeed, it is nothing more or less than what the State of Texas guaranteed to death row inmates by passing Article 11.071 of the Code of Criminal Procedure. That guarantee has failed.

State habeas counsel failed to perform any of these tasks. There were viable claims of constitutional error affecting Mr. Acker's trial and direct appeal proceedings. Had state habeas counsel performed any investigation into the case, he would have determined that there was a strong claim of actual innocence at the guilt/innocence phase, but was not put before his jury. Had state habeas counsel utilized any expert assistance in state writ proceedings, he would have determined that a strong case could have been made for Mr. Acker's actual innocence, and that there were many reasons to doubt the fairness of his trial and the adequacy of his trial counsel's preparation.

**(iii) The right to effective assistance of counsel applies to the "trial-court" phase of state post-conviction proceedings, and was violated in this case, thus prejudicing the petitioner and establishing "cause and prejudice" for any alleged procedural default.**

In *Coleman v. Thompson*, 501 U.S. 722 (1991)*,* a question presented by this case was specifically left undecided.  *Coleman* noted that (1) the Supreme  Court has guaranteed indigent appellants constitutionally effective counsel during the "one and only appeal" to which they were entitled by state law, even though the appeal itself was not required by the Federal Constitution, *Evitts*, 469 U.S. at 396 (citing *Douglas v. California*, 372 U.S. 353, 357 (1963)); and  (2) Virginia allowed defendants to attack the effectiveness of their trial counsel only in post-conviction proceedings.  *Coleman*, 501 U.S. at 755.   Thus, *Coleman* asserted, there must be a guarantee of effective assistance of counsel in "the first forum in which a federal claim can be raised" in state court.  *Id*.  The Supreme  Court found it unnecessary to "answer this question broadly, however, for one state court has addressed Coleman's claims: the state habeas trial court."  *Id*.  Coleman

> has had his 'one and only appeal,' if that is what a state collateral proceeding may be considered; the Buchanan County Circuit Court, after a 2-day evidentiary hearing, addressed Coleman's claims of trial error, including his ineffective assistance of counsel claims.  What Coleman requires here is a right to counsel *on appeal* from that determination.  Our case law will not support it.

*Id*. at 756 (emphasis added).  Thus, it would "defy logic for us to hold that Coleman had a right to counsel *to appeal* a state collateral determination of his claims of trial error."   *Id*. at 756-57 (emphasis added).

In any event, *Coleman* does not control this case.  Texas, like Virginia and virtually all other jurisdictions, recognizes that claim of actual innocence that rely on extra-record evidence and ineffective assistance of trial counsel claims such as the one pled in Acker's petition usually cannot be adequately aired until post-conviction proceedings.  Another distinction can be made: Coleman did not challenge the adequacy of his trial-court-level habeas representation, *Coleman*, 501 U.S. at

-74-

755.  Mr. Acker presents this  challenge here.


**E.     Art. 11.071 is arbitrary, violates due process and is not "regularly and consistently" followed, and therefore cannot be an "adequate" state procedural rule to support the alleged default.**

                    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims"

*Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)

                    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Even when a petitioner is found to have violated a state procedural rule, the procedural default doctrine does not bar federal habeas relief unless the state procedural rule is both "adequate" to support the state court judgment and "independent" of federal law.  *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 729-32, 735 (1991) (under procedural default rule, which is derived from the "independent and adequate state grounds" rule applied on direct review, federal habeas corpus court may not review state court decision that "clearly and expressly rel[ied] on an independent *and* adequate state ground" (emphasis added).  The  state procedural rule,  art. 11.071 sec. 5(a), is inadequate, and hence does not bar federal relief, because the state procedural rule is arbitrary, violated due process, and was not "regularly and consistently" followed at the time of the alleged default.

Article 11.071 became effective on September 1, 1995,  before Acker's conviction and sentence of death.  Until that date, the controlling statute, Article 11.07, did not impose any deadlines for the filing of state habeas applications.  Article 11.071, in contrast, includes time limits for almost every step of the process, including the filing of writ applications, with substantial penalties for

applicants who fail to file on time.  Article 11.071 also changed the Texas procedure for capital

habeas by promising, through the Court of Criminal Appeals, "competent counsel" for death row

inmates for the state habeas process, and "reasonable compensation" of appointed counsel.

Furthermore, Article 11.071 requires the state habeas remedy and the direct appeal to be pursued

simultaneously, rather than allowing the state habeas process to start after the direct appeal was

concluded as was the practice under 11.07.  Perhaps most significant to Acker's case, under former

Article 11.07, there were no restrictions on the amendment of applications.  Article 11.071 now

imposes time limits on the filing of such amendments.  If amendments or supplements to writ

applications are filed out of time, the facts and issues contained in them may be waived and lost to

the inmate for the balance of the state and federal habeas process.

The statute was amended, effective September 1, 1999, before Acker was convicted  in the

state court.  It permitted  inmates whose attorneys had not made timely filings of the state habeas

application, and who would otherwise be barred by the earlier version of sec. 11.071, to return to the

state courts for another round of state habeas proceedings.  Another amendment effective on the

same date transferred the power of appointment of counsel for death row inmates  from the Texas

Court of Criminal Appeals to the convicting district courts in which the applications would be filed.

Thus, the state procedural rule here (before the proposed 2003 amendments discussed above),

art. 11.071, gives a new round of state habeas to those applicants who filed *untimely,* but does not

give any explicit remedy to those who, through  no fault of their own, were appointed counsel who

failed to bring their clients' claims before the state court in a minimally competent manner.  Such

an arbitrary distinction, between untimely applicants and those who had incompetent attorneys,

results in a deprivation of due process, and is not a state rule that is "adequate" to support a finding

of procedural default.  The Supreme Court  has counseled that "State courts may not avoid deciding federal issues by invoking  procedural rules that they do not apply evenhandedly to all similar claims." *Hathorn v. Lovorn,* 457 U.S. 255,  263 (1982).  *See also  Dobbs v. Zant,* 506 U.S. 357, 359 91993) (*per curiam*) (petitioner permitted to rely on transcript not previously discovered or asserted as basis for relief because "delay [in discovery of transcript] resulted substantially from the State's own erroneous assertions that closing arguments had not been transcribed" and because petitioner properly relied on state's assertions); *Moore v. Reynolds,* 153 F.3d 1086, 1096-97 (10th Cir. 1998), *cert. denied,* 119 S. Ct. 1266 (1999) (state law requirement that ineffective assistance of counsel claim be raised on direct appeal is inadequate state ground); *Reynolds v. Berry,* 146 F.3d 345, 349-50 (6th Cir. 1998) (state procedural bar to successive postconviction motions, when applied to petitioner on novel theory that initial motion for resentencing was the sole opportunity to raise all postconviction claims, was not "adequate" state ground); *Gosier v. Welborn,* 175 F.3d 504, 507 (7th Cir. 1999) (state procedural rule was inadequate to bar federal habeas corpus review because state courts applied it inconsistently in "incompatible lines of authority, [and in] cases that do not cite each other, let alone establish a rule-and-exception framework").

Additionally, at the time of the purported default, the state statute creating bars on successive petitions had not been in existence long enough for this Court to make a determination that it was a rule that was "regularly and consistently" followed.  The Supreme Court has long "stress[ed] that a state procedural ground is not "adequate" unless the procedural rule is 'strictly or regularly followed.'" *Hathorn v. Lovorn,* 457 U.S. 255, 262-63 (1982), quoting *Barr v. City of Columbia,* 378 U.S. 146, 149 (1964).  *See also Ford v. Georgia,* 498 U.S. 411, 424 (1991) (state supreme court's application of procedural rule "does not even remotely satisfy the requirement ...that an adequate and

independent state procedural bar to the entertainment of constitutional claims must have been 'firmly established and regularly followed' by the time as of which it is to be applied"); *Dugger v. Adams,* 489 U.S. 401, 410-11 n.6 (1989) (state procedural default rule that is not "consistently or regularly applied" by state courts is "not [an] adequate" state ground and may not supply basis for denying federal habeas corpus relief; rule held to apply to circumstances of case); *James v. Kentucky,* 466 U.S. 341, 348 (1984) (only state procedures that are "firmly established and regularly followed...can prevent implementation of federal constitutional rights").

Before the current  version of 11.071 became effective on September 1, 1999, there was a move to also amend the statute to truly provide for competent counsel, and to also give those inmates, like Acker, whose attorneys had filed on time, but who had filed applications that were inadequate to protect the constitutional claims available to their clients for review in federal court. The original statute set out no rules or standards defining what constitutes "competent" counsel.  The Court of Criminal Appeals did not adopt any written "rules or standards," regarding the qualifications necessary to be considered for an appointment under Article 11.071.  In early 1997, because time-lines set by federal and state habeas reform required capital habeas appeals to be filed quickly in order to "toll" the federal statute of limitations under the AEDPA, the Court of Criminal Appeals began to appoint criminal defense lawyers to take habeas cases regardless of whether they had volunteered to take such appointments.  Due to the pressing need to recruit a large number of attorneys in a short period of time, many of the attorneys appointed by the Court of Criminal Appeals in this period apparently lacked any death penalty or habeas corpus experience.

**F.      Petitioner has also established "prejudice" for the "cause and prejudice" exception to the procedural default doctrine.**

As discussed in the prior sections, Acker has shown  that the Texas statute is not an "adequate" state procedural ground on which to base a procedural default.  He also has shown "cause" for any alleged default.  A petitioner is barred from raising a defaulted claim as a basis for federal habeas corpus relief unless he can "excuse" the default by "demonstrat[ing] ...cause for the default and actual prejudice as a result of the alleged violation of federal law."  *Coleman v. Thompson,* 510 U.S. 722, 750 (1991).  *See also, e.g., Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).  This section will show how Acker has also met the closely related concept of "prejudice" to excuse any default.

The Supreme Court has not yet provided a precise definition of the "prejudice" half of the "cause and prejudice" exception to the procedural default doctrine. *See, e.g., Amadeo v. Zant,* 486 U.S. 214, 221 (1988) (Court's "decisions...have not attempted to establish conclusively the contours of the [cause and prejudice] standard," leaving "open" 'for resolution in future decisions the precise definition of the ...standard'" (quoting *Wainwright v. Sykes, supra,* 433 U.S. at 87 (1977); *United States v. Frady,* 456 U.S. 152, 168 (1982) (declining to define "import of the term ['prejudice'] in ...situations" other than the one before the Court).   In *Strickler v. Greene,* 119 S. Ct. 1936 (1999), the Court resolved the issue–whether the petitioner, in a *Brady* claim, suffered prejudice sufficient to excuse his procedural default–without announcing a broad-based definition of "prejudice."   It concluded that the nature of the defaulted *Brady* claim, involving prosecutorial suppression of evidence, rendered the "prejudice" analysis of the procedural default doctrine coterminous with the assessment of "materiality" under the substantive *Brady* rule.  At least for some purposes, therefore,

"prejudice" is established by a showing that, but for the default, there is a reasonable probability that the outcome of the relevant proceeding would have been different. The 'relevant proceeding' includes both stages of the trial, and the Supreme Court in *Strickler* exhaustively analyzed the facts of the case and the possible effects of the prosecutor's conduct on both the guilt/innocence and penalty phases of the capital trial. *Id.* at 1952-55. The Court emphasized the inevitable complexity of such an analysis of "prejudice." *Id.* at 1952.

In *Strickler,* the Court stated that "[t]he differing judgments of the District Court and the Court of Appeals attest to the difficulty of resolving the issue of prejudice." *Id. at* 1952. "[Petitioner] must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id.* at 1952. The Court concluded that, "[a]s we made clear in [*Kyles v. Whitley,* 514 U.S. 419 (1995)], the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions...Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 1952. (Citations omitted).

The Supreme Court has said, however, that prejudice requires more than a "possibility of prejudice," *United States v. Frady, supra,* 456 U.S. at 170, and that the error must have "worked to [the petitioner's] *actual* and substantial disadvantage." *Id.* These admonitions offer little guidance, however, because "actual prejudice" is a term of art meaning only that some kind of prejudice is found and not merely a presumption of prejudice. *United States v. Olano,* 507 U.S. 725, 734-35, 736, 739-41 (1993). It is clear, however, that to excuse a default under the "cause and prejudice"

doctrine, a habeas petitioner must either show some "structural" error as to which prejudice is always present or presumed, or demonstrate some specific type of prejudice produced by the otherwise defaulted error.

Mr. Acker shows herein the existence of the deprivation of "structural" constitutional rights that are "so basic to a fair trial that their infraction can never be treated as harmless error," or as so prone to prejudice, when violated, that prejudice should be presumed.

Additionally, a strong showing on cause, such as here, has been held to go a long way toward establishing prejudice. *See, e.g., Wainwright v. Sykes,* 433 U.S. 72, 95-96 (1977) (Stevens, J., concurring); *Clay v. Director,* 749 F.2d 427, 434 (7th Cir. 1984), *cert. denied,* 471 U.S. 1108 (1985) ("if prejudice is high, cause will be more easily found"); *Huffman v. Wainwright,* 651 F.2d 347, 351 (5th Cir. 1981) (reviewing court may "view cause...with an eye to the possible resulting prejudice"); *Bridge v. Lynaugh,* 856 F.2d 712, 714 (5th Cir. 1988)(procedural default overcome in part by "highly prejudicial" quality of petitioner's claim).

If Respondent raises a procedural default issue, a hearing must be held on controlling and controverted factual issues surrounding the default and any excuses for it, as the state courts have not fully and fairly addressed the factual issues. *See* 28 U.S.C.A. §2254(e); *Wainwright v. Sykes,* 433 U.S. 72, 80 (1977); *Townsend v. Sain,* 372 U.S. 293, 312-18 (1963); *Brown v. Allen,* 344 U.S. 443 (1953); *Williams v. Turpin,* 87 F.3d 1204, 1211 (11th Cir. 1996) (district court erred in refusing to hold evidentiary hearing to assess sufficiency of petitioner's allegations of "cause" and "prejudice" for default).

The failure of the state court to address Acker's issues in either his first or subsequent applications emphasizes the need for a federal hearing to adjudicate these factual issues. *See, e.g.,*

*Jenkins v. Anderson,* 447 U.S. 231, 234-35 n.1 (1980) ("application of the 'cause' and 'prejudice' standard may turn on factual findings that should be made by a district court"); *Humphrey v. Cady,* 405 U.S. 504, 517 (1972); *Barnard v. Collins,* 13 F.3d 871, 878 (5th Cir. 1994)(district court's finding of absence of "cause" was "premature in the absence of an evidentiary hearing or other appropriate proceeding to determine exactly when Barnard's counsel could have discovered [the claim] through reasonable diligence and investigation"); *Ratliff v. United States,* 999 F.2d 1023, 1026 (6th Cir. 1993); *Preston v. Maggio,* 705 F.2d 113, 115 (5th Cir. 1983), *cert. denied,* 471 U.S. 1104 (1985); *Walton v. Stewart,* 1999 WL 57427, at *9-*11 (9th Cir. Feb. 5, 1999) (district court erred in denying petitioner's request for evidentiary hearing to prove "cause" and "prejudice"); *Holleman v. Duckworth,* 155 F.3d 906, 909-12 (7th Cir. 1998)(holding, in writ-abuse context, that district court erred in summarily rejecting petitioner's claim of "cause" based on newly acquired facts, and remanding to district court for evidentiary hearing on issue); *Porter v. Singletary,* 49 F.3d 1483, 1489-90 & n.13 (11th Cir. 1995)(*per curiam*) (petitioner was entitled to evidentiary hearing to show "cause" for procedural default on ground that he did not know and could not reasonably have known factual predicate for claim at time of default); *Huffamn v. Wainwright,* 651 F.2d 347, 353 (5th Cir. 1981).

## G.    Fundamental miscarriage of justice.

Should this Court find that Acker has failed to establish cause and prejudice to excuse any procedural default, this Court may nonetheless consider the merits of any defaulted claims if failure to do so would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  As with cause and prejudice, the Supreme Court has not defined precisely what

constitutes a fundamental miscarriage of justice.  At the very least, the incarceration of one who is actually innocent of the crime for which he was committed would constitute a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995).  Thus, a petitioner who shows that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt absent the constitutional violation demonstrates a fundamental miscarriage of justice sufficient to overcome a procedural default.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).

The Ninth Circuit has explained that the "actual innocence" showing necessary to establish a fundamental miscarriage of justice to excuse a procedural default is less demanding than the showing necessary to prevail on a "freestanding" claim of actual innocence.  To establish a freestanding claim of actual innocence in federal court, the petitioner must "go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (citing *Herrera v. Collins*, 506 U.S. 390, 442-44 (1993) (Blackmun, J., dissenting)), *cert. denied*, 523 U.S. 1133 (1998).  However, to demonstrate a fundamental miscarriage of justice sufficient to excuse a procedural default, the petitioner must demonstrate only that "in light of all the evidence, including new evidence, `it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Carriger*, 132 F.3d at 478 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

In *Carriger*, the Ninth Circuit found a fundamental miscarriage of justice where "[a]lthough Carriger has not affirmatively proved his actual innocence sufficiently to satisfy *Herrera*," he showed "sufficient doubt about the validity of his conviction to satisfy *Schlup*" because it was more likely than not that no reasonable juror hearing all of the available evidence would have voted to

convict Carriger beyond a reasonable doubt.  132 F.3d at 478.  *See also Paradis v. Arave*, 130 F.3d 385, 396 (9th Cir. 1997) ("[I]t may be more likely than not that no reasonable juror would have found Paradis guilty beyond a reasonable doubt . . . .").

A petitioner likewise demonstrates a fundamental miscarriage of justice when he shows that the constitutional violation probably resulted in the imposition of a death sentence upon one who is "actually innocent" of the death penalty.  *Sawyer v. Whitley*, 505 U.S. 333, 340-47 (1992).  Innocence of the death penalty means the petitioner was not death-eligible.  *Id*. at 345.  A petitioner who shows by clear and convincing evidence that, but for the constitutional violation, he would not have been eligible for the death penalty, demonstrates a fundamental miscarriage of justice sufficient to excuse procedural default.  *Id*. at 347-48.[76]  Aside from actual innocence and innocence of the death penalty, the Supreme Court has not determined what other circumstances constitute a fundamental miscarriage of justice sufficient to overcome a procedural default.  But clearly, Mr. Acker's strong claim of actual innocence meets the standards discussed *supra.*

---

[76] The standard for establishing innocence of the death penalty is not as stringent as the standard for establishing constitutional insufficiency of the evidence under *Jackson v. Virginia*, 443 US. 307 (1979) – that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  *Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995).

# VI.

## CLAIMS FOR RELIEF

### CLAIM I: MR. ACKER IS ACTUALLY INNOCENT OF CAPITAL MURDER.

Petitioner's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because he is actually innocent of the murder of Marquetta George.

The state court's holding on habeas "resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under Section 2254(d)(1) of AEDPA.  Petitioner hereby incorporates by reference the statement of facts, *supra.*

**Facts in support.**

Mr. Acker has continually insisted that he is innocent of the murder of Marquetta George and has consistently stated that she met her death because she jumped from the truck while it was traveling at a high rate of speed.  Yet the State convicted Mr. Acker of the murder based on a wildly speculative theory that she was first strangled by Mr. Acker and then her body was run over by him to make it appear as if it was an accident.  At trial, Mr. Acker's attorneys attempted to challenge the State's forensics but were largely thwarted in their efforts, as the trial judge disallowed virtually all evidence that would have bolstered the case for Mr. Acker's innocence.  Thus, the only evidence of strangulation, the core of the State's case, was presented by a medical examiner trainee who was not effectively challenged by the defense.  After Mr. Acker's conviction, the trial court appointed almost unbelievably incompetent appellate and post-conviction attorneys who did nothing to effectively

challenge Mr. Acker's conviction.

Mr. Acker presents herein, his first opportunity to do so, compelling evidence that he is actually innocent of the murder and that the victim was indeed killed when she attempted to jump from the truck.

**a) The trial.**

As discussed in more detail in Claim II *infra,* the trial court went to great lengths to stifle Mr. Acker's claim of innocence. Petitioner herein incorporates by reference the Statement of Facts relating to the trial, *supra,* and Claim II, *infra.*

**b) Dr. Larkin's report.**

Included herein as Exhibit 26 is the "Medical Legal Report" of Dr. G. M. Larkin, M.D.   Dr. Larkin is a well-known forensics expert.  He received his medical degree at the Catholic University of Louvain, in Belgium, and has spent his career as a medical examiner since 1966.[77]  He did several residencies in pathology in North Carolina and Massachusetts, and then served in the U.S. Army from 1969 to 1971 in the medical corps.  *Id.*  After his army service, Dr. Larkin held a fellowship in forensic pathology for two and a half years at Baptist Memorial Hospital in Memphis Tennessee, and then did a one-year fellowship in forensic pathology at the Allegheny County Coroner's office in Pittsburgh, Pennsylvania.  *Id.*  In 1974-1975, he was a staff pathologist at that office, and later was a research associate in the same coroner's office until 1975.  *Id.*  After a four year stint in general medicine, Dr. Larkin returned to pathology as a medical examiner and regional pathologist in Mecklenburg County, North Carolina.  *Id.*   From 1979 to 1982, Dr. Larkin was a consulting pathologist at The Podiatry Hospital of Pittsburgh.  *Id.*   He was appointed the Chief Forensic

---

[77]   *See* Curriculum Vitae of Dr. Glenn M. Larkin MD, Exhibit 25 herein.

Pathologist and Chief Deputy Coroner at the Allegheny County Coroner's office in 1981 and performed forensic consulting through 1982.  *Id.*  From 1982 to 1984 he was the Deputy Coroner and forensic pathologist of Lafayette, Louisiana. From 1985 until the present, Dr. Larkin has been in the private practice of consultative forensic pathology and from 1979 until 1990 he was an associate of Cyril H. Wecht and Associates, well-known forensic consultants. *Id.*

For his report, Dr. Larkin had access to and reviewed the full extent of materials available on this matter, including the autopsy report ("Protocol") dated march 13, 2000;[78] twenty-two color photographs of the crime scene and the autopsy; multiple color photographs of the scene and the truck; the transcript of the testimony by Dr. Gonsoulin (90 pages); the transcript of telephone conversations with Dr. Norton; a letter from Mr. Acker about what happened; 14 witness statements; the "911" emergency line with internal time line; telephone conversations with investigator Tina Church; the sheriff's log for March 13, 2000; and all available police reports, including those of Chris Hill, J. Anglin, and B. Reese.[79]

**i) The autopsy and its errors and omissions.**

Dr. Larkin examined the autopsy report in detail.  The autopsy was performed by Dr. Morna Gonsoulin on March 13, 2000, the day after the victim's death.[80]  As Dr. Larkin notes, "[s]he [Dr. Gonsoulin] mentions many injuries without actually describing them in detail.  She seems to have a predetermined gestalt that George was strangled, and then attempted to prove this conclusion."[81]

---

[78]   Exhibit 32.

[79]   *See* Report of Dr. G.M. Larkin, Exhibit No. 26 herein.

[80]   *Id.* at 4.  *See also* Exhibit 32 at 7.

[81]   *Id.*

Examining the autopsy report, Dr. Larkin looks at the long list of injuries noted by Dr. Gonsoulin.  Many of these are analyzed by Dr. Larkin:[82]

1) Blunt force injuries are noted in the autopsy report, with faint blue contusion of the lower half of the neck, prominent hemorrhage of the anterior, superficial and deep soft tissues of the neck.[83]

*Dr. Larkin noted that the faint blue contusions are not seen in the photographs.*[84]

2) Conjunctival petechiae are also noted in the autopsy report.[85]

*Dr. Larkin notes that, "[a]s is known to all physicians, petechiae or small blood ruptures in the skin, and on mucosal surfaces can be caused by many (non-violent) changes in venous and capillary blood pressure including cardiac arrest whatever its cause.   It is by no means pathogomonic for strangulation."*[86]

Yet the prosecutor misled the jury and argued that "you have petechiae when you have strangulation, but you could also have it when there's pressure that's greater than that."  23 RR 20.

3) In the autopsy report, "abrasions and contusions on prominent areas of the right hand are noted."[87]

*Dr. Larkin notes that "[t]hese are a result of the hand scraping the road surface."* [88]

---

[82]   *See also* Exhibit 26 at 25 (list of all injuries of the victim).

[83]   Exhibit 32 at 2. *See also* Exhibit 26 at 28 (face shows asymmetry, lack of any signs of strangulation).

[84]   Exhibit 26 at 4, 28-29 (photos show pristine neck).

[85]   Exhibit 32 at 2.

[86]   Exhibit 26 at 4.

[87]   Exhibit 32 at 2.

[88]   Exhibit  at 5.

-88-

4) The autopsy says that "[t]here are bilateral periorbital contusions.  Petechiae are present on the bulbar and lower palpebal conjunctiva of the left eye."[89]

*Dr. Larkin points out that, to a reasonable degree of certainty, "the left orbital area contacted the window lever which caused the open orbital fracture, and the injuries around it...."[90]*

5) The autopsy report states that "a small hemorrhage is present in the lateral bulbar conjunctiva of the right eye."[91]

*Dr. Larkin states that "this is due no doubt to sudden cardiac arrest, following the ponto-medullary laceration or the destruction of the thalamus."[92]*

...

7) The autopsy report states that "[t]here are multiple red-purple contusions of the right earlobe and posterior auricular region ranging from ½ to 1 inches, including a 1 inch red-purple contusion of the left mastoid ion."[93]

*Dr. Larkin points out that the "left side of the face: this definitely exhibits a depressed cheek area, suggestive of a Lefort type two or three fracture.  It would require a force of 200 G to fracture the frontal bone above the eye, 50 G to fracture the maxillary's zygomatic process, and 100 G to fracture the maxillary bone's body[94]...A photograph of George as received at the morgue exhibits*

---

[89]   Exhibit 32 at 2.

[90]   Exhibit 26 at 5.

[91]   Exhibit 32 at 2.

[92]   Exhibit 26 at 5.

[93]   Exhibit 32 at 2.

[94]   Exhibit 26 at 24 (diagram of G forces).

*her head flipped one way, [and] the other way ...none of these [autopsy] photos exhibit any contusions on the neck."*[95]

8 and 9) Contusions and lacerations are alleged to the auricular and lower lip regions in the autopsy.[96]

*Dr. Larkin notes that these cannot be observed from the photos.*[97]

10) The autopsy report notes a "1-1-2 inch patchy, dried brown abrasion of the left cheek and a 3-inch area of patchy dry red-brown abrasion of the chin."[98]

*Dr. Larkin notes that the autopsy refers to these as "old" and therefore not relevant to the cause of death.*[99]

11) The autopsy notes "diffuse subscalpular hemorrhage."[100]

*Dr. Larkin notes that this is not visible in the photos.  But "its relative location may be important."* [101]

12) The autopsy notes an "open fracture of the left supraorbital margin of the frontal bone."[102]

*Dr. Larkin notes this "corresponds to the head hitting the window opening lever on the*

---

[95]   Exhibit 26 at 5.

[96]   Exhibit 32 at 2.

[97]   Exhibit 26 at 5-6.

[98]   Exhibit 32 at 2.

[99]   Exhibit 26 at 6.

[100]   Exhibit 32 at 2.

[101]   Exhibit 26 at 6.

[102]   Exhibit 32 at 2.

*door...*"[103]

...

14) The autopsy notes that "[t]here is pulpeified brain parenchyma in the infero-temporal lobe, and structures in the mid-line in the region of the thalamus.  There are no contusions or intra-ventricular hemorrhage identified.  The brain stem is lacerated in the region of the pontomedulliary junction."[104]

...

16) "Hemorrhages of the superficial and deep musculature ...more pronounced on the left side with contusions of the interior left lobe and superior right lobe of the thyroid."[105]

*Dr. Larkin notes that this can be caused by means other than strangulation, such as hyperextension of the neck.  He later notes that "George's neck was hyper-extended over the flat bed extension" when she jumped from the truck.  (See No. 30 at 9)*[106]

...

22) There is a 13 inch reddish parchment like confluent "brush burn" abrasion of the right hip."[107]

*Dr. Larkin notes that this  probably "occurred when George impacted the road."*[108]

---

[103]   Exhibit 26 at 6.

[104]   Exhibit 32 at 3.

[105]   Exhibit 32 at 3.

[106]   Exhibit 26  at 7; 36 (photo of truck).

[107]   Exhibit 32 at 3.

[108]   Exhibit 26 at 8.

...

26) "The right atrium is contused and lacerated at the insertion of the inferior vena cava and the left atrium is lacerated at the pulmonary artery outlets."[109]

*Dr. Larkin notes that "[t]his is again a crush injury at the moment of impact with the swing car door."[110]*

...

39) "...there is a 10 inch almost circumferential laceration with exposure of the deep soft tissues of the right lower leg..."[111]

*Dr. Larkin ascribes this to "the right calf [being...caught underneath the passenger seat and most likely caught on the seat's undercarriage."[112]*

**ii) The fatal flaws and errors in the conclusions Dr. Gonsoulin drew from the autopsy.**

Dr. Gonsoulin concludes that

It is our opinion that Marquetta George died as a result of homicidal violence including strangulation.  Several of the injuries identified could be consistent with blunt force injury resulting from an impact with or being ejected from a motor vehicle.  Some injuries (particularly those of the neck and the perineum) are not consistent with ejection from or impact with a vehicle; the injuries observed in the neck are more consistent with the lack of associated hemorrhage of the laceration of the right leg, the paucity of hemorrhage in the brain and the amount of body cavity hemorrhage in relation to the severity of the injuries indicate that these injuries were sustained postmortem or perimortem.  Given these findings, it is likely that the decedent was strangled and probably dead or near death prior to being

---

[109]   Exhibit 32 at 3.

[110]   Exhibit 26 at 8.

[111]   Exhibit 32 at 4.

[112]   Exhibit 26 at 10.

dumped from the vehicle.[113]

Yet virtually all of these conclusions fail to stand up on closer scrutiny.  As Dr. Larkin points out, there are serious flaws in Dr. Gonsoulin's conclusions from the autopsy:

1) The language used, "are not consistent with" and "are more consistent with" are "the lowest level of certainty, a level that would include a reasonable doubt.[114]

2) The conclusion that injuries to the neck were caused postmortem or perimortem is flawed because the"ponto-meduliary rent could have caused instant death.[115]

3) The forces involved were too great to have been caused by strangulation.[116]

4) The failure to specify postmortem or perimortem (at about the same time as) "makes all the difference here."[117]  It renders many of Dr. Gonsoulin's conclusions meaningless.

5) The victim's clothing was not examined by the coroner, which would be atypical in a case where the cause of death is to be determined.  "This [the clothing] was either not examined or the negative results were not reported.  It is common practice in some jurisdictions to ignore evidence unfavorable to the prosecution."[118]

This is indeed a serious flaw, as the clothing would have had obvious clues that could have supported or discredited the strangulation hypothesis as well as the other conclusions used by the

---

[113]   Exhibit 32 at 7.

[114]   Exhibit 26 at 11.

[115]   *Id.*

[116]   *Id.*

[117]   *Id.*

[118]   *Id.* at 12.

prosecution to sentence Mr. Acker to death.

6) "Small lacerations on the labia majora and fourchette may be stretch lacerations due to rolling on the ground."  They may not be due to pre-mortem violence.[119]

7) Numerous injuries of the  head, torso and extremities are identified without any attempt to find causality. The coroner seems to start with a pre-conceived notion of strangulation and does not try to fit this conclusion to the injuries in terms of causation.[120]

8) It would have been impossible for Mr. Acker to strangle the victim for several minutes while driving his truck at 40 miles per hour.  It would also have been impossible, given the distance the body was found from the starting point of the abduction, for him to have stopped and then strangled her, due to the short time interval between when she was seen alive and then seen dead.[121]

9) Dr. Gonsoulin ignores the tremendous amount of force that would have been required to cause the facial fractures.  As Dr. Larkin observes, it would require 200 G of energy (200 times the force of gravity) to fracture some of the facial bones, for instance the left supra-orbital fracture.[122]  This would not have been possible through just manual strangulation.[123]

10) Conveniently for the prosecution, and atypically for an autopsy in which there were fractures, no x-rays were taken, which would have shed more light on the nature and cause of the facial bone fractures.  Even though Dr. Gonsoulin herself diagnosed a fracture, an x-ray could have

---

[119]   *Id.*

[120]   *Id.*

[121]   *Id.*

[122]   *Id.* at 24 (diagram of G forces).

[123]   *Id.* at 12.

determined the extent of the damage.[124]

11) Dr. Gonsoulin fails to fully describe the fracture or fractures of the first cervical vertebra, which is central to her conclusions. She mentions but does not describe the "ponto-meduliarry rent" which "is the fatal injury."  "This injury is THE instant fatal injury, and it is not fully described by Dr. Gonsoulin nor Dr. McClain.  Going through this laundry list is not a proper forensic autopsy."[125]

12)  As Dr. Larkin notes, "this was extreme injury to the anterior and jugular veins, as well as bi-lateral laceration of both the common carotid arteries, and the internal jugular veins, caused by far more energy than can be caused by strangulation.  The anterior and transverse jugular veins, along with the vagus nerves and recurrent larngeal nerve are not identified in the photographs at all." [126]

13) An explanation consistent with these injuries, unlike that of Dr. Gonsoulin's, is that they "were caused by a fortuitous impact by George's head and neck junction...against the steel brace at the junction between the front and top surfaces of the flat bed extension...The head rotated over the extension with the dens axis as a fulcrum, stretching the spinal cord and brain stem in two directions."[127]

14) "There was sufficient energy to shatter the atlas, push it upward toward the occipital, cause a ring fracture of the occipital and stretch the brain stem to cause a 'rent' at the ponto-medulliary junction, and liquefy the pituitary gland.  This 'rent' would stop circulation instantly, as well as respiration and turn George into a flip-flopping rag doll, with a total flaccid paralysis, and

---

[124] *Id.*

[125] *Id.* at 13.

[126] *Id. See also* photo at 34.

[127] *Id.*

causing leakage of blood—not hemorrhage."[128]

15) The coroner's findings that are based on a lack of bleeding are also flawed.  "The sudden circulatory arrest would stop active bleeding.  The sudden forceful hyperextension would also cause laceration of the major blood vessels in the neck by stretching, hemorrhage into the sternocleidomastoid muscles...as well as fracturing the right clavicle by sudden rotation and displacement upward...the other injuries can also be explained by this mechanism...Dr. Gonsoulin did not describe the dislocation of the atlas nor the torn ligaments that of necessity must have been associated with the fracture."[129]

**iii) The flaws and errors in the trial testimony of Dr. Gonsoulin.**

As a result of Dr. Gonsoulin's preconceived notion that the death of the victim was due to strangulation and the many errors and omissions described above, her trial testimony was obviously flawed.  Dr. Larkin's report highlights some of these flaws:

1) At 20 RR 204, Dr. Gonsoulin fails to distinguish between "postmortem" and "perimortem" which really is the crux of the issue.  She simply describes some skin abrasions as "perimortem" or "postmortem."  If the injuries were "perimortem" and caused at or around the time of death, they would be consistent with the victim jumping out of the truck.  If these injuries were "postmortem" they could be seen as the result of being run over after death, as the State claimed.  In essence, this testimony only served to confuse the jury.[130]

2) At 20 RR 207 the witness describes a "significant injury" above the victim's left eye as

---

[128]   *Id.*

[129]   *Id.*

[130]   *Id.* at 14.

"postmortem" that is not, for the reasons described *supra.* This fracture could have been caused by contact with the window handle.[131]

3) At 20 RR 208 there is misleading and vague testimony about the victim's skull being struck with "some blunt instrument" which is never specified. Dr. Larkin shows how this was most likely the door, which would lend support to the victim jumping and being hit by the door.[132]

4) At 20 RR 209 she admits that the body was received clothed but there is no testimony about the clothes and no indication the clothes were ever examined.[133] As Dr. Larkin observes, the clothing would likely have indications of tire impressions if she had been run over or overrun. "Dr. Gonsoulin and Dr. McClean apparently did not examine clothing. In any case it is not mentioned in protocol or testimony."[134]

This absence is extremely significant and suspicious in that the clothing could easily have buttressed the State's theory that the victim was run over deliberately after being strangled by Mr. Acker. The absence of such testing, and the failure of the defense to probe the issue, is one of but many disturbing questions in this case.

5) The witness testified to "hemorrhage, what we call superficial and deep musculature, of the neck, the strap muscle of the neck, which means that there was enough blood pressure to produce bleeding when the neck was injured." 20 RR 209.

---

[131]  *Id.*

[132]  *Id.* .

[133]  *Id.* at 27 (showing clothed body).

[134]  *Id.* at 14. *See also Id.* at  27 (clothes show no tears or tire imprints).

Dr. Larkin points out that this alleged hemorrhage is not evident in the photos.[135]

6) The witness testified that "[t]hese injuries indicate that there was a significant amount of pressure around the neck, usually constriction, that was introduced while the decedent was still alive." 20 RR 209.

This testimony was central to the State's strangulation theory. The "significant amount of pressure," in Dr. Gonsoulin's own words(20 RR 209),  has been shown by Dr. Larkin to be much too "significant" to have been applied by petitioner while driving the truck, as it required 200 G force to produce the associated fractures. *See* analysis *supra.*[136] This pressure could, however, have been caused, as discussed by Dr. Larkin *supra,* by "a fortuitous impact by George's head and neck junction...against the steel brace at the junction between the front and top surfaces of the flat bed extension...The head rotated over the extension with the dens axis as a fulcrum, stretching the spinal cord and brain stem in two directions."[137]

7) Dr. Gonsoulin misidentifies the "sterno-cleido-mastoid" as a strap muscle. 20 RR 211-212. As Dr. Larkin notes, "any injury that would cause carotid artery laceration would injure these muscles severely, as well as the crico-hyoid and thyro-hyoid ligaments." Yet the photographs show no injury.[138]

8) The small amount of hemorrhage in the abdomen is not measured or quantified by Dr.

---

[135]   *Id. See also* Exhibit 26 at 28, 29, 31 (photos show no signs of strangulation on neck).

[136]   Exhibit 26 at 24 (diagram of G forces).

[137]   *Id.* at 13.

[138]   *Id.* at 15.

Gonsoulin. 20 RR 212.[139]

9) Dr. Gonsoulin makes reference to a non-existent "jugular artery."[140]

10) Dr. Gonsoulin's central conclusion that the victim was strangled, is seen by Dr. Larkin as "pure gobble de gook."[141]  Key testimony at 20 RR 215, lines 19-25 is flawed.  The conclusion of strangulation is "made of thin air."[142]  She testified, in conclusory form,  that "[t]he injuries that we saw on the neck, the hemorrhages and the fact that the hemorrhages were in very specific places, indicates that there was a significant amount of force applied around the neck and that it occurred while she was alive." 20 RR 215.  As discussed herein, this is not a tenable thesis, as it would have been impossible for Mr. Acker to apply such significant pressure to the victim's neck for several minutes, all the while driving the truck at speeds of 40 miles an hour or so.[143]

11) One of Dr. Gonsoulin's key findings, that "petechiae" (small hemorrhages) in the eye are determinative of strangulation: "And a variety of different conditions can cause that, but they are frequently associated with strangulation injuries." 20 RR 216-217.  As Dr. Larkin states, "petechiae is not diagnostic of strangulation, but of acute circulatory arrest mostly by venous damming of blood, not cutting off the airway."[144]  As Dr. Larkin states in no uncertain terms, "Strangulation is not consistent with [the] cause of death as described in the autopsy protocol.  In the presence of other

---

[139]  *Id.*

[140]  *Id.  See also* photo at 35.

[141]  *Id.*

[142]  *Id.*

[143]  *Id.* at 24 (diagram of G forces).

[144]  *Id.* at 15.

severe injury, there is no evidence of strangulation!"[145]

12) Again in her testimony, in discussing the blunt force injuries,  Dr. Gonsoulin fails to make the crucial distinction between peri- and post-mortem injuries.  20 RR 218.

13) The foregoing errors resulted in Dr. Gonsoulin's faulty conclusion regarding the death of the victim as a result of strangulation.  20 RR 220.  Dr. Larkin points out that, in a complicated case where the cause and manner of the victim's death is central to guilt or innocence, the failure of the defense to offer their own medical expert was "appalling."[146]

14) Accordingly, Dr. Larkin finds it equally appalling that the defense accepted the theory of death as a result of strangulation: Q. {McDowell] In other words you don't know if something...if she was being strangled immediately prior to her death?...Or if she was strangled six hours prior to her death?" 20 RR 230.[147]  Dr. Larkin points out that the defense completely missed this opportunity to discredit the State's case, as since the State's expert could not tell when the strangulation occurred, then that expert could not properly ascribe strangulation as the proximate cause of death.

15) Astonishingly, Dr. Gonsoulin herself admitted that she "could not say she died because of the strangulation and the strangulation alone" and "I can't say whether that [strangulation] was an injury that would have ultimately resulted in her death, but she also had blunt force injuries which were severe enough to cause her death."  20 RR 233.

16) The State's case was actually "demolished", in Dr. Larkin's words, by Dr. Gonsoulin's own testimony.  She stated that the "ponto-medulliary rent" causes instantaneous death.  20 RR 240.

---

[145]   *Id.*

[146]   *Id.*

[147]   *Id.* at 16.

In other words, the "pons, which is our brain stem which controls a lot of our basic functions such as breath, and the medulla, which also has a lot of the nerves which control breathing and basic functions, was torn [at] the base of the skull." 20 RR 239-240.  The medulla oblongata controls the heart beat and the respiratory center.  20 RR 240.  And Dr. Gonsoulin agreed that "instantaneous death occurs when your pons medulla is torn and the heart stops receiving any more instructions to beat."  *Id.*  This was the injury that the victim had.  *Id.*

 **iv) Dr. Larkin's analysis and conclusion that Ms. George was not strangled.**

 The State's case for capital murder rested on the theory that Ms. George was strangled prior to her death.  As Dr. Larkin points out, and as the defense either did not point out at trial or was prevented from pointing out, there are many serious flaws in this theory:

 1) "There is no evidence that George died a 'reflex strangulation' death."[148]

 2) It would have been almost impossible for petitioner to have strangled her with his left hand while driving as "he would have had to have rotated his body at least 90 degrees–taking his hands off the steering wheel, his eyes off the road and his feet off the accelerator for at least 4 minutes.  He would not have been able to maintain speed and direction for enough time to strangle George."[149]

 3) It would also have been impossible for petitioner to have strangled her with his right hand, as he "could not have enough force to strangle George for sufficient time...."[150]

---

[148] *Id.* at 17.

[149] *Id.*

[150] *Id.*

4) George would have had sufficient strength to resist as she was not incapacitated.[151]

5) As the Slidell farm, where George jumped out, was about 1.64 miles away from his starting point, Mr. Acker would not have had enough time to strangle her even if all his time was devoted to that activity.[152]

As Dr. Larkin concludes, "It is nearly impossible to strangle a person while seated in a truck driving, and at the same time keep on the road at an average of 40 mph for the time required to finish the strangulation—especially in a conscious person."[153]

Dr. Larkin lists the injuries suffered by Ms. George:

**1) A ponto-medulliary rent (i.e., transection?) is not caused by strangulation.**

**2) An occipital 'ring fracture' is not caused by strangulation.**

**3) A fracture of the atlas (first cervical vertebra) is not caused by manual strangulation.**

**4) Skull fractures are not caused by manual strangulation.**

**5)  Multiple face fractures are not caused by manual strangulation.**

**6) Bilateral common carotid artery tears are not caused by strangulation.[154]**

**7) Bilateral internal jugular vein tears are not caused by strangulation.[155]**

The signs that suggest strangulation are such that "none of them, either in combination or

---

[151]   Mrs. Smiddy testified that on the day of the incident she gave a statement to the deputies that said that after the car left the trailer park,  "she [Ms. George] was trying to get out of the car as it spun out through the ditch."  19 RR 186.

[152]   Exhibit 26, Dr. Larkin's report at 18.

[153]   *Id.* at 18.

[154]   *Id.* at 34 (photo and notes by Dr. Larkin)

[155]   *Id.* at 18.  *See also* photos at 28 (lack of any sign of strangulation); 29 (neck pristine).

alone" are found only in strangulation (hemorrhage in crico-hyoid membrane and in thyro-hyoid membrane; fracture of the greater horns of the hyoid bone; patterned contusions on the platysma; contusions or scratch abrasions on the neck).[156]

Dr. Larkin suggests a much more plausible scenario and one that is compatible with the facts of the case, unlike strangulation.  Ms. George jumped out of the truck but the jump went awry. When she jumped, the truck was moving at sufficient speed to cause the supro-orbital fractures. George pushed off the bed with her left hand and her left foot and pivoted to the right.  Her right leg, "trapped under the seat, flexed and rotated" received  the nearly circumferential laceration and then her head and thorax rotated downward.  Ms. George had flung open the door and it reached full extension and slammed back at her, causing the facial injuries.  She  struck her head against the window handle, and hit the door handle, and now that her acceleration has been slowed dramatically or halted, she hit the bed extension of the utility truck at a high speed, causing the fatal injuries.[157]

**Analysis.**

As we have seen, the CCA simply denied this issue, and all the others, on the procedural basis that it did not meet the requirements for a subsequent writ. There was no "merits" ruling on this claim.

There are two types of claims advanced in federal habeas corpus proceedings.  "Merits" claims are those claims upon which a federal court may grant relief. "Gateway" claims are those

---

[156]  *Id.  See also id.* at 25 (list of the victim's injuries).

[157]  Exhibit 26 at 19-20.  *See also* Exhibit 26 at 36 (picture of truck and protruding utility bed) with explanation by Dr. Larkin.

claims which are used to explain why otherwise procedurally barred constitutional claims should be considered on the merits.

Mr. Acker has shown *supra* a compelling case of freestanding innocence as well as innocence of the death penalty.  Additionally, at the very least  he has also shown sufficient prejudice for him to meet the *Strickland* standards for ineffectiveness of counsel for failure to effectively present his case for actual innocence.

The procedural default doctrine is not applicable to gateway claims for two reasons. First, a federal court may not grant relief from a state court judgment based **purely** upon a gateway claim; the favorable resolution of a gateway claim merely permits a federal court to consider an otherwise defaulted merit claim. Thus, a state's interest in finality is not compelling at the gate-keeping stage because the petitioner is merely seeking authorization from the court to apply for the writ. Second, the question  of procedural default is a purely federal inquiry. Federal courts decide which merit claims should be reviewed, and while a state's disposition of a case on procedural grounds is a relevant consideration with respect to merit claims, a state may not preemptively determine the scope of a federal court's discretion.

In  *Herrera v. Collins*, 506 U.S. 390 (1993), and *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court defined the difference between merit claims and gateway claims.  *Herrera* and *Schlup*  explain that merit claims and gateway claims serve distinct purposes.

In  *Herrera,* the habeas petitioner alleged that he was actually innocent of the crime for which he was convicted and sentenced to death, but he did not allege a constitutional, trial error. Without an accompanying constitutional claim, a plurality of the Supreme Court held, his claim of actual innocence was irrelevant. "A claim of 'actual innocence' is not itself a constitutional claim, but

instead a gateway through which a habeas petitioner must pass to  have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404.[158]

Herrera's claim of actual innocence was of no import because Herrera did not seek to excuse a procedural error so that he might bring an independent constitutional claim challenging his conviction or sentence. *Id.* The gateway claim of actual innocence would only be relevant if "the prisoner supplements his constitutional claim with a colorable showing of actual innocence." *Id.* at 404 (emphasis in original) citing *Kuhlman v. Wilson*, 477 U.S. 436, 454 (1986).  In other words, had Herrera presented a separate merit claim -- one amounting to a denial of a federal constitutional right -- Herrera could have asserted actual innocence as his gateway claim to excuse the default of his merit claim.

The situation was different in  *Schlup v. Delo*, 513 U.S. 298 (1995) where Schlup filed a second federal habeas corpus petition asserting that he was actually innocent and that he was denied the effective assistance of trial counsel. Schlup's ineffectiveness claim was procedurally defaulted; nevertheless, the Supreme Court remanded his case for further proceedings to determine if he could demonstrate sufficient evidence of his actual innocence so that the procedural default of his ineffectiveness claim could be excused. *Schlup*, 513 U.S. at 332.

In *Schlup,*  the Supreme Court again noted the fundamental distinction between gateway claims and merit claims. Gateway claims, that Court held, are procedural rather than substantive. 513 U.S. at 314. Because no relief can be granted on claims that are purely procedural, a state has no interest in blocking a federal court's review of that claim; therefore, the federal courts were not

---

[158]   While *Herrera* was a plurality opinion, all nine Justices of the Supreme Court agreed that Herrera's actual innocence claim could serve as a gateway to another constitutional claim.

restrained by the fact that much of Schlup's evidence of actual innocence was presented for the first

time in a successor habeas petition. *Id.* Rather, the Supreme  Court characterized Schlup's case as

resting, in the final analysis, on his underlying merit claim, which could only be addressed if Schlup

proved his gateway claim. *Id.* at 316.

Recently, in *House v. Bell,* 126 S. Ct. 2064 (2006)  the Supreme Court answered the

following  two questions which are important in determining the question of procedural default in

Mr. Acker's case:

> 1.  Did the majority below err in applying this Court's decision in *Schlup v. Delo* [513 U.S.
> 298 (1995] to hold that Petitioner's compelling new evidence, though presenting at the very
> least a colorable claim of actual innocence, was as a matter of law insufficient to excuse his
> failure to present that evidence before the state courts–merely because he had failed to negate
> each and every item of circumstantial evidence that had been offered against him at the
> original trial?

> 2.  What constitutes a "truly persuasive showing of actual innocence" pursuant to  *Herrera
> v. Collins* [506 U.S. 390 (1993)] sufficient to warrant freestanding habeas relief?

In *House,* the Supreme Court held that "the habeas court must consider 'all the evidence,'

old and new, incriminating and exculpatory, without regard to whether it would necessarily be

admitted..." *House,* at 2077, *quoting Schlup* at 327-328.  The Court emphasized that

> the *Schlup* standard does not require absolute certainty about the petitioner's guilt or
> innocence.  A petitioner's burden at the gateway stage is to demonstrate that, more likely
> than not, in light of the new evidence, no reasonable juror would find him guilty beyond a
> reasonable doubt—or, to remove the double negative, that more likely than not any
> reasonable juror would have reasonable doubt."
> *House,* at 2077.

The *House* court added that "[b]ecause a *Schlup* claim involves evidence the trial jury did

not have before it, the inquiry requires the federal court to assess how reasonable jurors would react

to the overall, newly supplemented record." *House, id*.  Although "deference" is given to the trial

court's assessment of the evidence, "the *Schlup* inquiry, we repeat, requires a holistic judgment about 'all the evidence.'" *House, id*.  While House had an evidentiary hearing regarding his new evidence of innocence, including newly-discovered DNA evidence, Mr. Acker's hearing was a farce in which his counsel actually worked against his interests and failed to develop the evidence supporting innocence.

While *Herrera*, *Schlup* and *House* all deal with the fundamental-miscarriage-of- justice exception to procedural default, they teach that all claims advanced in federal habeas proceedings and, indeed, all arguments advanced in support of them, need not be constrained by the doctrines of exhaustion and procedural default. *See  Vasquez v. Hillery*, 474 U.S. 254, 257-58 (1986) ("We have never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts"); *House,* at 2068 ("In certain exceptional cases involving a compelling case of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition," *citing Schlup* at 319-322.

Federal courts unquestionably owe a great degree of respect to state-court judgments, but not at the expense of an Article III Court's discretion to determine, in the first instance, if merit claims should be reviewed. *See Reed v. Ross*, 468 U.S. 1, 15 (1984) ("This Court has never held, however, that finality, standing alone, provides a sufficient reason for federal courts to compromise their protection of constitutional rights under Sec. 2254"). Comity requires more than protecting the states' interests; those interests must be weighed against the federal courts' authority to remedy fundamental wrongs committed by the states. *See House v. Bell*  at 2076 ("the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a

fundamentally unjust incarceration" *quoting Murray v. Carrier,* 477 U.S.. 478, 495 (1986).

Thus, this Court is not obliged to give any "deference" to the state court's holding as to this claim and can consider it on its merits, and as a "gateway" claim that excuses any procedural default. *Schlup v. Delo*, 513 U.S. 298 (1995).

## CLAIM II: THE TRIAL COURT WAS BIASED AGAINST PETITIONER AND COMMITTED MANY ERRORS WHICH PREVENTED HIM FROM PRESENTING HIS CASE FOR INNOCENCE AND DEPRIVED HIM OF DUE PROCESS AND A FAIR TRIAL.

Petitioner's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because he was denied a fair and impartial tribunal due to the many errors committed by the trial judge.  The trial judge was also biased against petitioner.

The Sixth Amendment guarantees the accused the right to trial by an impartial trial.  When a trial is biased against a defendant, the Fourteenth Amendment Due Process Clause requirement of an impartial and disinterested tribunal is violated and reversal is automatic.  *See Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir. 1995) (evidence that "the judge had a fixed predisposition to sentence this particular defendant to death if he were convicted" warrants relief); *see also Arizona v. Fulminante,* 111 S. Ct. 1246, 1265 (1991); *Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980). The trial court's bias against the defense made a mockery of the adversarial system of justice, whose proper functioning is the most essential principle informing our notions of what "process" is "due" under the Constitution.  *See Faretta v. California*, 422 U.S. 806, 818 (1975) (the protections in the Bill of Rights are "basic to our adversary system of criminal justice [and thus] part of 'due process of law' [as] guaranteed by the Fourteenth Amendment"); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir.  1987) (adversary system serves the principles of due process).

-108-

The adversary system has been recognized as particularly critical to our system of criminal justice.[159]  *See Thompson*, 827 F.2d at 1258 ("The right of a criminal defendant to an adversarial proceeding is fundamental") (citations omitted); *see also Rock v. Arkansas*, 483 U.S. 44, 51 n.8 (1987).  Two key elements in such an adversarial system are the firm neutrality of an "unbiased judge," *cf. Johnson v. Mississippi*, 403 U.S. 212, 216 (1971), and the minimal requirements of procedural due process, namely, "notice and opportunity to be heard."  *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  Both fundamental requirements were subverted during Mr. Acker's trial when the trial court repeatedly displayed bias against the defendant and his attorneys.  The trial Court stifled the defense's evidence of innocence through erroneous rulings that kept from the jury evidence that Ms. George had previously attempted to jump from the truck and prevented forensic demonstrations that would have shown the flaws in the State's case.  This bias extended to the appeal and State post-conviction proceedings, where this same trial court appointed two of the most ineffective attorneys imaginable, which allowed this Court's conduct to escape appellate and post-conviction scrutiny.  The cumulative effect of the many trial errors was that Mr. Acker was deprived of a fair trial.

**Claim II(a): The trial court erroneously allowed the jury to hear evidence that Mr. Acker had been in the penitentiary.**

At the guilt/innocence phase of the trial, the prosecution called witness Lila Seawright, the victim's mother.  19 RR 86.  Ms. Seawright testified that Mr. Acker was upset on the day of Ms.

---

[159]   Indeed, most of the fundamental protections afforded in criminal cases by the Bill of Rights indirectly or directly relate to the adversarial process.  *See* U.S. Const., Amendment V (Self-Incrimination Clause); Amendment VI (Impartial Jury Clause; Notice-of-Nature-and-Cause-and-Accusation Clause; Confrontation Clause; Compulsory Process Clause; Assistance of Counsel Clause).

George's death, saying that he did not know what he would do of "if he ever lost Markie." 19 RR

95.  Mr. Acker was upset because he thought she had spent the night with someone else.  *Id.*  Ms.

Seawright said, "my God, Daniel, there's not anybody worth killing and going to the pen for."  19

RR 95.  Outside the presence of the jury, the defense argued that this witness should not be allowed

to say that Mr. Acker's  response was that penitentiary life was not that bad, as it would imply that

he had been in the penitentiary, which the jury should not know.  19 RR 95-96.  The defense argued

that this would be more prejudicial than probative.  *Id.  In camera,* Ms. Seawright told the court that

Mr. Acker had responded by saying "pen life ain't nothing...there's nothing to pen life, and just kind

of shrugged his shoulders."  19 RR 97.  The defense also argued that the statement was irrelevant.

19 RR 98.  However, the Court allowed the statement to be heard by the jury.  19 RR 99.  Ms.

Seawright testified before the jury that Mr. Acker said, "Pen life ain't nothing.  Ain't nothing to it."

19 RR 99.

The unnecessary and irrelevant mention of the prior penitentiary sentence prejudiced the jury

against Mr. Acker.

**Claim II(b):** **The trial court stifled the defense's case for actual innocence by erroneously disallowing impeachment testimony.**

In one of many instances where the trial court virtually shut down the defense's case for Mr.

Acker's actual innocence, defense counsel wished to ask Chris Hill of the Hopkins County Sheriff's

Office about a dispatch report that the officer had received.  The report stated that the complainant,

Mr. or Mrs. Smiddy, had said that a male suspect forced the female into a truck and then they drove

off, and while driving off  "the female subject tried to exit the vehicle and the male subject jerked

her back in."  10 RR 42.  The purpose of this was to impeach the Smiddys, who had testified

differently.  20 RR 43.  The Court sustained the prosecution's hearsay objection. 20 RR 45.

Further, as to each and every question the defense asked of Officer Hill, the prosecution objected and the Court sustained the objections.  20 RR 45.

The prejudice was obvious.  The probative value of an on-the-scene report that the victim had been trying to jump for the truck only moments before her death, which was the defense's theory of the case, would have been enormous.  The fat that the jury was not allowed to hear this evidence substantially contributed to the unfairness of his trial.

**Claim II(c):  Trial court error in denying a mistrial.**

Hopkins County Sheriff's Officer investigator Tony Hurley was being questioned about a crime scene photograph and testified that "And I'm assuming whatever vehicle run over this body made these tracks."  20 RR 101.  It was non-responsive to the question, and it was stricken, but the court denied the defense's motion for a mistrial.  20 RR 101.

It made an unwarranted assumption based on facts that were not in evidence, that the victim was struck by a vehicle. 20 RR 102.

**Claim II(d):  Trial error in disallowing crucial testimony from the medical examiner.**

The court did not allow a hypothetical question to be asked of the medical examiner Morna Gonsoulin regarding injuries that would be sustained if a person had jumped from a moving vehicle. 20 RR 257-258.  The questioning was as follows:

Q.  (Defense counsel) So if the medulla oblongata, the brain stem, was torn because of a fall from a vehicle...

Mr. Long: Again I'm going to object.  There's been no evidence of a fall from the vehicle.

The Court: Sustained.

20 RR 258.

The defense responded that it was entitled to ask a hypothetical question, which it then did:

Q.  Let me ask you a hypothetical.  If someone falls from a vehicle going forty miles an hour and breaks or tears the medulla oblongata there's going to be instantaneous death, isn't that right?

*Id.*

The Court stated that it was not based on the evidence and sustained the objection.  20 RR259-260.

The question was actually  based on a reasonable conjecture about the evidence and could not have been any more "based" on it than it was.  The question was a reasonable inference from evidence that had been presented through the medical examiner and the question was proper.  As this was the defense's theory of the case, it greatly hindered and prejudiced the defendant.  Again, the trial court showed a disturbing propensity to exclude any evidence that would have bolstered the defense's case for actual innocence.

**Claim II(e)**:  **The trial court erroneously excluded testimony that was highly probative of petitioner's actual innocence.**

 The Court erroneously sustained an objection to witnesses that were highly probative to petitioner's case of actual innocence. In essence, the trial court gutted the defense's case at the guilt/innocence phase by disallowing probative evidence that the victim had previously tried to jump from the truck while Mr. Acker was driving it.

**i) Erroneous exclusion of witness Sabrina Ball's testimony.**

Ms. Ball, who lived near petitioner's mother Nancy Acker, testified that she met Markie

George one time, on the night of February 26, 2000, only a few weeks before her death.  21 RR 8.[160]

Outside the presence of the jury, Ms. Ball stated that Ms. George came to her door at about 10:30 p.m. 21 RR 10.  She was down on her hands and knees crying and saying "Help me, help me."  21 RR 11.  She was brought inside and said that Daniel was going to kill her, that he was crazy.  21 RR 11.  Then she called the Sheriff's Department.  21 RR 12.  Ms. George said that she had been at "Bustin Loose" with Mr. Acker and a fight had started and they had left.  21 RR 13.  In the truck, Mr. Acker took her head and tried to beat it against the dash and she tried to jump out  and he grabbed her by the hair and dragged her back in.  21 RR 13.  The fight had continued at Mr. Acker's mother's house and she had then fled to the witness's house.  21 RR 13, 20.

The statement was offered by the defense under the excited utterance exception to the hearsay rule.  21 RR 14.  The witness testified that she did not know how long they were at Mrs. Acker's house.  21 RR 18.  When Ms. George first showed up, she was hysterical but gradually calmed down once she was inside and made the call to the police.  21 RR 22-23.  But she was more concerned about the fight in the truck than the fight in the house and the fight in the truck, when she attempted to jump, was mentioned first by Ms. George.  21 RR 25.[161]

The court went to absurd lengths to keep out this important evidence of prior jumping by the victim.  It first ruled that a spontaneous utterance must be a spontaneous reaction to an exciting event.  21 RR 29.  It then analyzed whether the entire statement was an excited utterance:

> The Court: Then she said five minutes had passed by then.  And that's my question is we've gone probably five to seven minutes so far.  There reaches a point where the excited utterance is no more and then it becomes hearsay.

---

[160]  *See also* Exhibit 31, Ms. Ball's original statement to the police investigators.

[161]  *See also* Exhibit 31, her original statement.

-113-

21 RR 28.

Even though the court itself held that "this is a close call", it then ruled that only the "first" part of the victim's statement, about Mr. Acker being crazy and threatening to kill her, would be admissible, and the "latter" part about jumping out of the truck was not because it was not an excited utterance, because she was being questioned about the events.  21 RR 30.  Thus, the court adopted a strained definition of "excited utterance" to keep out any part of the conversation that would have been probative to the petitioner's actual innocence and allowed in only remarks that would have been harmful.  The court's ruling flew in the face of the actual testimony as the witness had testified that Ms. George at first was more concerned with the fight in the truck, when she had attempted to jump, than with the later fight at the house, where the alleged threats were made by Mr. Acker.  21 RR 25.  There was also no clear indication that although some later statements were made about the truck incident under questioning, that these were not also made spontaneously at first.[162]  The bifurcation of this conversation into "excited" and "non excited" was clearly erroneous and shows the lengths the court went to in order to suppress the defense claims of actual innocence.  The prejudice suffered by petitioner was considerable, as the jury was unable to hear that the victim had previously jumped from the truck just a few weeks before the incident that led to her death.

**ii) Erroneous exclusion of witness William Brandon Anderson and Lewis Tatum's testimony.**

Mr. Anderson**,** of the Hopkins County Sheriff's Office, testified *in camera* that he was working on the night of the incident observed by Ms. Ball, February 26, 2000.  21 RR 37.  That night he responded to a call at Mrs. Ball's home.  21 RR 37.  Markie George was there and she was

---

[162]  *See also* Exhibit 31.

-114-

shaking and crying.  21 RR 38.  She said that she had been in a verbal argument with Mr. Acker. 21 RR 38.  She said she was at "Bustin Loose" and left and during an argument in the truck, she had attempted to exit the vehicle while it was driving down the road, and Mr. Acker had grabbed her by the arm to keep her from getting out.  21 RR 39.  She also said that they continued arguing when they returned to Mrs. Acker's residence, she stepped between them and Mr. Acker picked up his mother and threw her on the couch.  21 RR 40.  Ms. George said she was going to call the police and Mr. Acker ran through the sliding glass window to try to get away.  21 RR 40.  Ms. George left the Acker house at that time.  21 RR 40.

Mr. Lewis Tatum, also of the Hopkins County Sheriff's office, had been issued a subpoena but was not called as a witness.  21 RR 41.  His testimony would have been the same as Mr. Anderson's and the court ruled that it too would be excluded.  21 RR 41.

The defense offered this evidence and the Court sustained an objection to it.  21 RR 41. Again, the court excluded very probative testimony that the victim had attempted to jump from the truck just a few weeks before her death. The exclusion of this testimony on hearsay grounds was clearly erroneous, as the victim was no longer available, her utterances were excited and spontaneous, and would have established prior consistent conduct.

**iii) Erroneous exclusion of the testimony of defense investigator John Riley Sands.**

 Mr. Sands, the defense investigator, testified *in camera* that he had conducted some experiments relating to the distance from the petitioner's home to the crime scene and the time it took to drive there.  21 RR 129.  Mr. Sands stated that he obtained the times by driving within the posted speed limits.  21 RR 130-132. Mr. Sands was also asked to see if he could open the door from the driver's seat of the truck.  21 RR 134.

-115-

Mr. Sands also performed tests on the truck.  He obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that he was not able to open the door from the driver's seat without extending himself quite a bit so that he could still see above the dashboard.  21 RR 142.  He told the court that he could not have opened the door and pushed someone out of the vehicle while driving on the road.  21 RR 142.  An objection to this evidence was sustained.  21 RR 143.  The trial court had earlier denied funds for a defense forensic expert because they had this investigator, but then refused to let him testify as to these forensic matters.  As Mr. Ferguson testified at the trial court habeas hearing,  "we asked for a criminologist; we were told to use Mr. Sands.  We tried to use Mr. Sands, and we were unable to get that [the truck tests]  in."  HT 173.

Again, the court showed an eagerness  to exclude any evidence that could have pointed to Mr. Acker's innocence.  Even though they apparently did have a Mr. Pickton appointed (6 RR 20) this person never testified at trial and the court did refuse to appoint a crime scene expert (6 RR 18-20) who could have performed these tests.  Even if there was an expert so appointed, the court's ruling was in error because no special level of expertise was required  for these tests.  The first test simply involved driving times and distance and the second a casual empirical observation about the width of the truck that could have been accurately conveyed by a lay witness, let alone a trained investigator.  Additionally, seemingly forgotten by the trial court, was the fact that the prosecution had previously stipulated that Mr. Sands was a crime scene expert. 6 RR 19. As such, the ruling was erroneous and highly prejudicial.

## <u>Claim II(f)</u>: The court erred in forcing petitioner to make a prejudicial and irrelevant demonstration in front of the jury.

The trial court committed very serious prejudicial error in forcing petitioner to perform an

utterly irrelevant and prejudicial demonstration that bore no relation to the facts of the case, the prior

testimony, or the evidence in front of the jury.  The prosecutor was questioning Mr. Acker about the

events

> Q.  What did you do?  Show the jury.  Stand up right there and show the jury what you did.
> A.  Well, she was walking..
> Q.  Stand up and show the jury what you did.
> A.  I can't stand up and...
> Q.  Stand up and show the jury what you did.
> Mr. Ferguson: Objection, your Honor.  Argumentative.  He said he could tell the jury what he did.
> Mr. Long: I'm asking him to demonstrate, Judge.
> The Court: Overrule that objection.
> Q.  Stand up right there and show the jury what you did.
> 22 RR 33.

This was clearly improper.  The prosecutor has no right to force the defendant to make this

demonstration.  But the forced demonstrations became more irrelevant later in Mr. Acker's cross-

examination:

> Q.  [by the prosecutor]  And you shook her not gently.  You shook her pretty hard?
> A.  Part of that's correct.
> A.  Show us how hard.
> A.  There's no way I could show you how.
> Q.  Sure there is.  Show us.
> A.  I can't show you.
> Q.  Get your hands up there and show us how hard you shook her.
> 22 RR 51.

The defendant had stated twice he could not do this.  It would have been impossible for the

witness to demonstrate "how hard" they shook someone, as the "hardness" of the shaking could not

have been demonstrated visually.  However, the Court failed to intervene and the defense failed to

object.  This questioning of Mr. Acker continued in a similar vein and became even more irrelevant

and prejudicial:

Q. [by the prosecutor] How hard?
A.  Pretty hard.
Q.  Show us.
A.  I shook her like I was talking.  That's about the only way I can show you.
Q.  And that's as hard as you were pushing her?
A.  Well no.  I mean...
Q.  Show us how hard you were pushing her.
A.  I can't.  All I can do is demonstrate with my hands like that.
Q.  That's right, and show us how you were pushing her.
A.  I can't show you how much energy or strength by doing that.
Q.  (Indicating).
A.  Pretty hard.
Q.  Was it that hard?
A.  Mr. Ferguson: Objection, your Honor.  That calls for speculation.  He doesn't know how hard he hit the table.
The Court: Overruled.
Mr. Long: He's the person that did it.
The Court: Overruled.
Go ahead.
Q.  Was it that hard? (Indicating)
A.  I would say so, yes.
22 RR 52-53.

Again, the demonstration was basically designed to prejudice the jury as any pushing or shaking of the victim could not have been realistically replicated by the defendant in a visual re-enactment nor could it be replicated by hitting a table.  Nor could the defendant guage how hard the prosecutor was hitting, as defense counsel pointed out.  The prosecutor then continued with this completely irrelevant demonstration regarding defendant's testimony that he shook the victim, and tried to analogize it to hitting a table.  22 RR 53 st. seq.  The court repeatedly failed to halt this prejudicial and irrelevant demonstration:

Q. [prosecutor hitting table]
Just...because...you're...not...my...wife...doesn't...mean...I...don't...love...you. (Indicating).
That hard?
Mr. Ferguson: Objection, your Honor.  That's a demonstration that we have no record of if he hit that hard or what.
The Witness: Seems like you got a little harder...

-118-

The Court: Overruled.

The Witness...as you talked.

The Court: Just a minute.

Mr. Long: You do it for us.

The Court: For the record, just a minute.  Let's stop.

There's been an objection.  Overruled.

The defendant said or the witness said that it was like that or similar to that.[163]  Overrule your objection. You may ask your next question.

22 RR 54.

The demonstration continued:

Q.  If I did it too hard you do it for us.

A.  It was more or less like the first you did it.

Q.  Show us.  Show us.

A.  There's no way I can hit this here table and...

A.  Are you afraid you're going to hurt your hand?

A.  No.  It's just...

Q.  Show us.

Mr. Ferguson: Your Honor..

The Witness: Hitting a table don't have nothing to do with shaking somebody.

The Court: Just a minute.

Objection?

Mr. Ferguson: Your Honor, he said he shook her, he didn't say he hit the table.

The Court: What's your legal objection?

Mr. Ferguson: The demonstrations are not similar.  They are not substantially the same; and, therefore, he can't stand here and hit the podium and show how he shook someone.

The Court: What's your...

Mr. Long: I'm asking him to show the amount of force that he used when he shook her.

Mr. Ferguson: He's asking for a demonstration in the courtroom, your Honor, that's not substantially similar as to the event that occurred.

The Court: You may take him on voir dire about that.

Mr. Ferguson: Mr. Acker, did you hit her when you were shaking her, or were you shaking her?

The Witness: I guess I was shaking her.

Mr. Ferguson: Did you take your hands off of her body when you shook her or were you just shaking her?

The Witness: I was shaking her.

Mr. Ferguson: Now, when you were shaking her on the couch was the couch giving underneath your hands and underneath her body when you were shaking her on the couch?

The Witness: She was kind of in the corner of the couch.

---

[163]   Actually the defendant said nothing of the sort.

-119-

Mr. Ferguson: Can you show the Court or the jury from where you're sitting today how hard you shook her?
The Witness: No, sir.
Mr. Ferguson: You can't do it, can you?
The Witness: No.
Mr. Ferguson: Pass the witness, your Honor.
The Court: I'm going to overrule the objection because you said earlier that it was similar to one of the demonstrations.[164]
The Witness: That ain't the way it was.
The Court: Just a minute.  Answer the next question.  Go ahead.
Q.  If you don't agree with the way I showed the jury and demonstrated it, you show us.
A.  I can't think of any way to show you.
Q.  You thought of a way to show Markie, didn't you?
Mr. Ferguson: Objection, your Honor.  Argumentative.
The Court: Sustained.
(A motion for a mistrial was denied)
22 RR 53-57.

There could hardly have been a more irrelevant and prejudicial display than the prosecutor's attempts to analogize hitting a table to shaking someone on a couch and forcing the defendant to demonstrate it when he said he could not.   The court's evidentiary rulings here should be compared to its extreme sensitivity and willingness to exclude any evidence favorable to the defense where the evidentiary foundations were far more solid.   Claim II(d), *supra*, discussed the court's exclusion of a highly probative and proper hypothetical cross-examination question of the medical examiner that was more fact-based than the prosecutor's table-banging spectacle.   No leeway was given despite the nature of the question as a hypothetical.  In Claim II(e), *supra,* we saw that  the court went to great lengths to exclude statements that allegedly were not an "excited utterance" yet allowed in statements from the very same conversation that were harmful to petitioner.   The table-banging

---

[164]   This directly contradicted the record, in which Mr. Acker had just said he could not show how he shook her by comparing it to hitting a table, and had explicitly pointed that problem out to the court several times.

demonstration should have been terminated immediately when Mr. Acker told the court that he was

incapable of showing what was asked of him.   The table-hitting theatrics were clearly designed to

inflame the prejudices of the jury who would not in all likelihood have been able to discern its total

lack of evidentiary value.

**Claim II(g): Trial court error in admitting prior extraneous offenses.**

The prosecution asked Mr. Acker about his  history of violence with past wives.  22 RR 91-

92.  It then proposed to offer Mr. Acker's 1990 arrest for family violence; two 1991 arrests for family

violence and a 1992 arrest with his wife at the time, Susan Acker Terry.  22 RR 95.  The prosecution

admitted that "its very clear" that prior extraneous offenses are generally not admissible. 22 RR 95.

But they claimed an exception to rebut a false impression that Mr. Acker had given the jury.  22 RR

96. However, Mr. Acker's testimony was that he had never been formally charged, but he did admit

to being arrested.  22 RR 98.   The defense also argued that the offenses were more prejudicial than

probative and he had never been found guilty of the offenses beyond a reasonable doubt:  "If you

were to put this in before the jury now you would create a false impression that he is guilty of this

offense when it's never been proven."  22 RR 99.

The Court ruled that the prosecution could only "repair or correct a false impression but I

don't think you can go much further than that."  22 RR 100.  The prosecution urged the Court to

limit the jury's consideration of the evidence.  22 RR 102.

Mr. Acker was then asked whether, on December 24, 1990, more than ten years prior to the

offense he was on trial for, he was charged with the offense of assault by his then-wife, Susan Acker.

22 RR 104. Mr. Acker did not recall the charge.  He was also asked whether he was also charged

with assault on May 5, 1991 against Susan Acker.  22 RR 104.  Mr. Acker said he could not recall

Case 4:06-cv-00469-RAS   Document 30   Filed 11/10/08   Page 122 of 282 PageID #:  1225

but he may have been sent to jail for it but was not found guilty.  22 RR 104.  Mr. Acker admitted

that he was charged on August 6, 1991 and August 7, 1992, with family violence/assault against

Susan Acker.  22 RR 105.  He was in prison from October of 1992 to October of 1995 on a burglary

charge.  22 RR 106.

Thus, these prior offenses were admitted and they were clearly beyond the agreed scope of

their reception, which was to clear up a false impression or to impeach Mr. Acker.

**Claim II(h)**: Trial court bias at jury deliberations.

 When the jury was deliberating at the guilt/innocence phase, the court was repeatedly

intimidated by the prosecutor's insistence as to what should be sent in to the jury to respond to their

requests for information.  The jury had never been told that they could view the exhibits and were

apparently deliberating without these exhibits.  23 RR 30.  The defense pointed this out and

requested that the exhibits be sent back to them.  The court said "An idea I have is I could send a

little note back to them saying, if you'd like to see the exhibits you may.  Just simply request them.

23 RR 30.  However the prosecutor vigorously objected to this request: "I'd object to doing anything,

Judge, that's not required by law."  23 RR 31.

The jury then sent a note back requesting witness Brodie Young's  testimony and part of the

evidence, a photo introduced as Defendant's Exhibit 1.  23 RR 31.  This photo did not describe what

the jury thought it did (a truck on the road in front of the dairy).   Then followed a ludicrous

exchange in which the judge repeatedly states it wanted to send all the exhibits back but was

somehow held back from doing this by the prosecutor:

"I'm just going to give them all of the evidence, if I give them any.  My thought is just give

them everything."  23 RR 31.  The prosecutor responds: "I think you give them what they ask for."

-122-

23 RR 31.

Then again: The Court: "Now my thought is they may not remember which is which.  I suggest that we just send everything in."  23 RR 32.

Then despite the jury request for a photo, Defense Exhibit No. 1, the prosecution baldly stated that the jury was actually asking only for the prosecution's video of the crime scene, which is all they want sent in.  23 RR 32.

The Court yet again stated, "I just want to send everything."  23 RR 33.  The Court appeared anxious not to do anything that the prosecutor did not want: "Are you asking me, Mr. Long, to send in a note saying that Defendant's Exhibit No. 1 does not show the truck on the road in front of the dairy?  I feel like I'd be commenting if I don't be careful there because it's not in front of the dairy."  23 RR 35.   Yet again, the Court states "That's why I was just going to send in everything and just let them decide for themselves."  23 RR 35.  After more discussion, the Court was still eager to do the prosecution's bidding, despite it having no relation whatsoever to the jury's request: "How can we send in the video?"  23 RR 36.  The defense pointed out the obvious, that the jury "clearly did not ask for a video."  23 RR 36.  Once more, however, the Court stated "I'm going to send it all in."  23 RR 37.   Apparently, all of the exhibits were eventually sent in to the jury, with an instruction as to the photo.  23 RR 36-37.  The defense had no objections to this.  23 RR 37.

This exchange, among many others, shows how the Court bent over backward to accommodate even the flimsiest of the prosecution's interpretations of the evidence, even when they lacked any basis in fact or logic.  Petitioner was prejudiced because the jury was sent all the exhibits, not the only one they had requested,  a defense exhibit.

-123-

**Claim II(i)**: **Trial error in denying adequate funding to the defense and refusing to appoint a criminologist**.

The defense had asked for a criminologist but the request was denied.  21 RR 137.  As the

defense attorney stated:

> We asked for a different criminologist because he's our defense investigator and you said, no, you're going to use Mr. Sands.  Okay.  Now we've had to use Mr. Sands for our investigation purposes and that's what they are going through now.  Now that is outside the purpose of him being called here today.
> 21 RR 137.

The defense tried to put Mr. Sands on for the results of his experiments, one as to driving

times between locations and two, as to whether the driver could reach across the truck and open the

door, both tests that should have been performed by a criminologist, 21 RR 137.  The court denied

the offer to put Mr. Sands on, as it would be "putting facts in evidence that the jury doesn't have

before it." 21 RR 139.[165]  The court also ruled that it would be irrelevant.  21 RR 140.  As to the

second issue, that of reaching across the truck, Mr. Sands also performed tests on the truck.  He

obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that he was not able

to open the door from the driver's seat without extending himself quite a bit so that he could still see

above the dashboard.  21 RR 142.  He could not have opened the door and pushed someone out of

the vehicle while driving on the road.  21 RR 142.   The prosecution argued that as the defense had

an accident reconstructionist, a Mr. Pickton,  appointed, and that person could have tested the

vehicle.  21 RR 143.  An objection to this evidence was sustained.  21 RR 143.

Thus, by refusing to appoint a criminologist as the defense requested, and then excluding the

testimony that would have been offered by this criminologist, the court denied Mr. Acker due

---

[165]   As any expert demonstration would have the effect of putting "new facts" in
evidence, this statement was in essence nonsensical.

process in stifling his case for actual innocence.

**Claim II(j):  Trial court error in excluding petitioner's testimony regarding the victim's past act in attempting to jump from the truck.**

In yet another unwarranted suppression of evidence favorable to the defense's theory that the victim had jumped from the truck, when Mr. Acker was on the stand defense counsel asked him about an incident on February 26, 2000 when Ms. George attempted to jump out of the truck.  21 RR 155.  The prosecution objected on the grounds that it was irrelevant.  21 RR 155.  The defense countered that it showed the nature of their relationship and that it simply showed "what she had done in the past during those fights." 21 RR 156.  The defense also argued that her attempt to jump was part of their interactions in the past.  21 RR 158.  The Court sustained an objection to this evidence.  21 RR 159.

Here again, the defense was prevented from presenting any evidence as to the victim's past propensities to jump from the truck.

**Claim II(k)**:  **Trial error in refusing to give an instruction that they must acquit if they believed the victim had jumped from the truck.**

It was obvious that if the jury believed that Ms. George had jumped from the vehicle, then Mr. Acker was not guilty of capital murder because he did not intend her death.  Yet the court refused to grant such an instruction.

At the end of the guilt/innocence phase, the defense offered as Defendant's requested Instruction No. 1 the following:

> If you find from the evidence that the deceased,  Marquette Follis George, came to her death from an injury inflicted by her own action, jumping from a moving vehicle, or if you have a reasonable doubt thereof, you will acquit the defendant.
> 22 RR 112.

The Prosecutor objected to this instruction, stating "It's a comment on the evidence. It's asking the jury to consider something that is not allowed by the law, accident. There is included in the charge a charge on voluntariness, which is what the law of the State of Texas is regarding actions as far as accident. There is no charge or no law of accident." 22 RR 112-113. The court, without any discussion, refused to grant Instruction No. 1. 22 RR 113.

This was erroneous because the so-called "charge on voluntariness" did not cover the accident situation and could have been misunderstood by the jury. The voluntariness charge was as follows:

> You are instructed that a person commits an offense only if he voluntarily engages in conduct, including an act, omission, or possession. Conduct is not rendered involuntary merely because the person did not intend the results of his conduct.
> 4 CT 593.

Actually, this language did not cover the accidental death situation at all and only increased the chance that the jury misunderstood that Mr. Acker could be convicted of capital murder for an accidental death. The first sentence speaks only to "voluntary conduct", which could have been interpreted as the abduction of the victim. Language in the charge immediately preceding the "charge on voluntariness" concentrated on the kidnaping, heightening this possibility. The second sentence only made matters worse, as the jury could well have interpreted it to mean that even if Mr. Acker did not intend that the victim die, he was still responsible for capital murder. The jury would have seen the death of the victim as the "results of his conduct" referred to in this sentence, thereby interpreting his "conduct" as voluntary. There was nothing in the wording of this charge that would address an accidental death.

The likelihood of such an error was magnified because of an additional factor. Prior

language in the charge stated that:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it his (sic) conscious objective or desire to cause the result.
>
> The following definition of "intentionally or knowingly" applies to the portion of the application paragraph that requires you to determine whether the defendant was acting in the course of committing or attempting to commit the offense of kidnaping when he committed the murder of the complainant, if he did:
>
> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
>
> 4 CT 590.

Thus, the trial court erred in not giving the jury an explicit instruction that Mr. Acker was not guilty of capital murder if the victim jumped, as the defense had requested.  (4 CT 587).

**Claim II(l)**:  **Trial error in refusing to extract language in the guilt/innocence instruction that conflicted with the definition of intentional acts.**

As discussed above, the instruction included language that read as follows:

Conduct is not rendered involuntary merely because the person did not intend the results of his conduct.  4 CT 593.

This conflicted with the definition of intentional acts.  22 RR 113.  This definition was:

A person acts intentionally, or with intent, with respect to a result of his conduct, when it is his conscious objective or desire to cause the result. 4 CT 590.

As the defense pointed out, this also conflicted with the next instruction about acting intentionally.  ("A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." 4 CT 590.

The Court denied the defense request to take the language out of the charge.  22 RR 114.

**Claim II(m):  Trial error in refusing  the defense request for instruction on lesser included offenses.**

Adding to the instructional confusion, the court refused to the lesser included offense of attempted kidnaping and unlawful restraint. 22 RR 119.

The Court also refused the defense request for a lesser included offense of manslaughter and criminally negligent homicide. 22 RR 119-120.  The evidence argued that  the issue of manslaughter had been raised for not stopping the vehicle when Ms. George was attempting to get out. 22 RR 120. But the Court stated that the evidence did not show that.  22 RR 121.

The court also denied an instruction on criminally negligent homicide which read as follows:

A person acts reckless, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct, when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.
22 RR 123.

The court denied this requested charge.  22 RR 123.

**Claim II(n): Trial error in commenting on the evidence.**

The court committed error when it commented on the evidence.  The prosecution was arguing a crucial part of their theory of the case at the guilt/innocence phase:

And to cover up the strangulation, because he doesn't know about medical science, he thinks he can run over her and get away with it.  He puts her head in front of that wheel.  I don't know if it was the front or the back, but I believe it was the front wheel.  And he starts off and you can see the acceleration marks.  They are visible.  They are little short black marks. In fact, they are visible right here, their picture.  The acceleration marks where he takes off where Brodie Young says he has to go around him on this side of the ditch.
Mr. McDowell: Your Honor, we'd object.  That's facts not in evidence.  Those are not acceleration marks.  Nobody testified that those are acceleration marks.

-128-

Mr. Long: Are we going to argue now?
Mr. McDowell: Its not a six wheel drive.
The Court: Well, a reasonable deduction from the evidence and he's looking at the evidence.
I'll overrule the objection.
23 RR 22-23.

The defense then approached the bench and stated "I believe the Court's comment just now that that was a reasonable inference from the evidence is a comment by the Court on the weight of the evidence."  23 RR 23.  The court then tried to defend itself by stating You didn't...you waited" (23 RR 23) despite the fact that the defense objected as soon as the court made the comment.   A defense motion for a retrial was denied.  23 RR 24.

By this comment, the court characterized the prosecution's theory as a  "reasonable deduction" and hence put its seal of approval on the prosecution's argument.  This would have had great influence on the jury, as they could well have taken it to mean that they were bound to accept the prosecution's argument that Mr. Acker placed the victim beneath the truck and that the marks were acceleration marks.

**Claim II(o): Trial court error in limiting mitigating evidence.**

1)  Dorcas Vititow testified that when they were growing up, she was his second mother.  When asked how that relationship came about, the prosecutor objected, and the Court sustained the objection as not relevant:

Mr. Long: I don't see how the relationship came about is relevant.

The Court: That's what I'm saying.  Sustain the objection.  Be more specific.

23 RR 130.

2) The Court again limited mitigating evidence.  The defense asked Mrs. Acker about why Daniel dropped out of school in the sixth grade.  She started to say because he was sexually abused

-129-

but there was a prosecutorial objection on hearsay grounds. 23 RR 139. The Court held that it was

hearsay unless she had personal knowledge of the abuse. 23 RR 140. This was extremely prejudicial

as it did not allow the defense to show why Mr. Acker had dropped out of school.

**Claim II(p): Trial error in forcing disclosure of privileged attorney-client information.**

The trial court allowed the prosecution to force the disclosure of privileged information from

Mr. Acker about defense expert Dr. Linda Norton. This information was protected from disclosure

under the attorney-client privilege.

Pursuant to a motion in limine that had previously been filed, the defense requested that the

prosecutor not be allowed to ask about witnesses that were not called. 22 RR 2-3. The Court ruled

that it would have to be taken up "question by question." 22 RR 3. The prosecutor delved into this

in detail, forcing revelation of privileged attorney-client communications from Mr. Acker and

divulging the fact that there was such an expert:

> Q. [Prosecutor] Do you know who Dr. Norton is?
> A. [Mr. Acker] The lady that came to court, I believe said (sic) she didn't know.
> Q. Dr. Norton is your doctor.
> Mr. Ferguson: Objection, your Honor.
> The Court: What's your objection?
> Mr. Ferguson: It's outside the...talking about a witness that's present and hasn't testified.
> He's testifying for someone else.
> Mr. Long: I'm not testifying for her. I'm asking who she is.
> The Court: You can answer that question if you have personal knowledge.
> A. I'm not aware of who she is. I thought she was the lady but her name was Gonzales, I
> believe.
> The Court: I'm going to allow the witness to answer the question if he can do it from his
> personal knowledge.
> The Witness: I don't know who you're talking about.
> Q. You're aware that you had a medical doctor to review our records, arn't you?
> A. I never spoke to one.
> Q. I didn't ask you if you spoke to her. I asked you if you are aware that you had a medical
> doctor to review these records?
> A. I thought I was supposed to have. I don't know whether or not I did or not.

-130-

Q.  Well, you got Dr. Norton listed as an expert witness in this case.
Mr. Ferguson: Argumentative, Judge.
The Court: Overruled.
Q.  And you know that you've got a doctor, don't you?
A.  I don't know that I do, no.
A.  You've never been told by your attorneys that you had a doctor appointed to review the medical evidence?
Mr. Ferguson: Objection, your Honor.  That goes to attorney-client privilege.
Mr. Long: He's on the stand, Judge.
Mr. Ferguson: What we told him, your Honor, is privileged information.
The Court: Let me see the attorneys.  How is that material?
Mr. Long: It's a public record.
Mr. Ferguson: Did you not grant a motion in limine that Mr. McDowell made?
The Court: The Court denied that because I was going to take it question by question.  But is that not in the records as well?
Mr. Ferguson: Yes.
The Court: Overruled.
Q.  You're aware of that, arn't you Mr. Acker?
A.  I was aware that there was a doctor appointed to me at one time.  And I don't...it's my understanding she requested more money and the Court didn't want to give it to her.
Q.  I believe the actual fact is the Court gave her all the money she wanted.  We can check the records to see.
A.  I don't know what happened.
Q.  Do you want to check and see?  We can look.  It's right these in the records.
Mr. Ferguson: It's argumentative, your Honor.
The Court: Overruled.
Mr. Long: If he says that he believes that the court didn't pay her what she asked for I'd ask that the record of payment be marked and admitted before this jury.
The Witness: I never kept up with what she was paid or if y'all paid her or not, but I remember hearing something about she requested more money.
22 RR 7-11.

The prosecutor's further remarks about the witness being paid were objected to and the objection was sustained, and the jury  was instructed to disregard those remarks.   22 RR 11.  But by this time, the damage had been done, as the jury knew that the defense had an expert and that she did not testify at trial.   The court erred in not granting the defense motion in limine to exclude references to witnesses not called at trial.  If Mr. Acker had the funds to hire a private expert, these disclosures would not have been made, and it was error for the court to go as far as it did before

cutting off the inquiry, the sole purpose of which was to generate speculation as to why this defense expert did not testify.

**Claim II(q): Trial court error in appointing ineffective appellate and post-conviction attorneys.**

The foregoing list of extensive errors and rulings that decimated the defense case for innocence would ordinarily figure prominently on appeal and in state habeas, providing even minimally competent attorneys were appointed. This was not the case, and the trial court's actions insulated itself from these attacks.

First, the trial court offered the direct appeal to the trial attorneys themselves, which would have meant that no claims of ineffective assistance of counsel would have been brought. 23 RR 161. The trial court then appointed both Mr. Ted Beaty for the appeal and Mr. Toby Wilkinson for the state habeas proceedings.[166] Neither attorney brought claims that effectively challenged the trial court's many errors and bias and both attorneys' efforts were remarkably inept.

The fact that the trial court itself made these appointments is in itself an inherent conflict of interest, as by appointing such ineffective attorneys, the numerous trial errors escaped scrutiny and the chances of a reversal were minimized to virtually nothing.

**Claim II(r): Cumulative trial error.**

Even if no single one of these many errors deprived Mr. Acker of a fair trial, their cumulative impact was devastating. His only defense was completely removed from the table, his expert evidence was disallowed, and virtually every crucial evidentiary ruling went against the defense. The bias of the trial judge deprived Mr. Acker of his constitutional rights to due process and a fair trial.

---

[166] *See* Exhibit 5.

**Argument and harmless error analysis.**[167]

The State has a burden to prove that a trial court violation of a constitutional right was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18 (1967). Under *Chapman,* it was held that a conviction must be reversed unless it can be said beyond a reasonable doubt that the *jurors did not give any weight* to any of the tainted evidence. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1991) ("Harmless-error review [under *Chapman*] looks...to the basis on which the jury *actually rested* its verdict...The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict surely would have been rendered, but whether the guilty verdict in *this* trial was surely unattributable to the error." (emphasis in original; citations and internal quotation marks omitted).

Under *Chapman,* reversal is required unless the state can show beyond a reasonable doubt that the constitutional violation had no effect on the judgment. *Arizona v. Fulminante,* 111 S. Ct. 1246, 1258 (1991). The *Chapman* standard has been applied to many constitutional violations, including admission of improperly obtained confessions and other "trial error...error which occurred during the presentation of the case to the jury." *Id.* at 1263-64. *Chapman* is an exacting standard of review—the state must prove that the error "did not contribute to [the petitioner's] conviction." *Id.* at 1257.

In *Brecht v. Abrahamson,* 113 S. Ct. 1710 (1993), the Supreme Court held that a different, more deferential standard of review should govern federal habeas courts' treatment of state court constitutional violations. In *Brecht,* the Court ruled that a new harmless error test would apply in

---

[167] This analysis is applicable not just to this claim, but to any claim in which harmless error analysis may be thought appropriate.

federal habeas corpus proceedings with respect to claims heretofore subject to the *Chapman* standard. In *Brecht,* the Court held that "the standard for determining whether habeas relief must be granted is whether...the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* 113 S. Ct. at 1713-14 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946). Petitioner contends that ***Brecht is not applicable  to any of his claims***, including this one, for the following reasons:

1)   Although a claim which was previously raised and rejected on direct appeal may not be cognizable on habeas corpus, *Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984), this doctrine "should not be applied where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding." *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).

All of Petitioner's claims involve the violation of his federal constitutional rights. In this situation, even if some claims were raised and denied on appeal, they also may be considered on federal habeas, because of their constitutional dimension. Those claims not raised on direct appeal, with  federal constitutional considerations,  should have been considered by the state habeas court, but were not. Both petitioner's direct appeal and state habeas actions were nothing short of a farce and this is his first opportunity to raise these claims, as a result of State action in appointing ineffective counsel.

2) The Fifth Circuit and other circuits  have  held that the correct standard is *Chapman* and not *Brecht.*   The *Brecht* majority premised their ruling on an assumption that a finding of harmlessness by the state courts under the more stringent *Chapman* rule will always precede habeas

corpus review of the harmlessness question under the less stringent *Brecht* rule.  The Fifth Circuit

has adopted this interpretation of *Brecht*.  *See Barber v. Johnson,* 145 F.3d 234, 238 (5th Cir.), *cert.*

*denied,* 119 S. Ct. 518 (1998) (Dennis, J., concurring) (*Chapman,* not *Brecht,* standard governs

"when state courts on direct review have disregarded their constitutional duty to apply the rigorous

'beyond a reasonable doubt' standard to constitutional error;' circuit's contrary rule in *Hogue v.*

*Johnson,* 131 F.3d 466 (5th Cir. 1997) is "inconsistent with the Supreme Court's underlying

reasoning").  *See also Seiler v. Thalacker,* 101 F.3d 536, 539 (8th Cir. 1996), *cert. denied,* 117 S. Ct.

1447 (1997) ("When a state court has not reviewed on direct appeal whether a constitutional error

was harmless, this court examines the error to determine whether it 'was harmless beyond a

reasonable doubt'...The record is reviewed *de novo*, and the issue is 'whether there is a reasonable

possibility' the error contributed to the conviction."; *Fields v. Leapley,* 30 F.3d 986, 991 (8th Cir.

1994); *Starr v. Lockhart,* 23 F.3d 1280, 1291-92 (8th Cir. 1993); *Orndorff v. Lockhart,* 998 F.2d 1426

(8th Cir. 1993), *cert. denied,* 511 U.S. 1060 (1994) (federal courts should apply harmless error rules

*de novo,* giving no deference to state court determinations).  As there was no such application, or any

harmless error review at all by the state courts, *Brecht* does not apply.[168]

3) *Brecht* does  not apply to capital cases, as it was a noncapital case, and it did not present,

and the Court did not address, the applicability of its new rule to capital cases.  *See, e.g., Barber v.*

*Johnson, supra,* 145 F.3d 234, 238 (5th Cir.) (Dennis, J., concurring), *cert. denied,* 119 S. Ct. 518

(1998) ("*Brecht* was a non-capital case; it did not present, and the Court did not address, the

---

[168]   The Supreme Court, in *O'Neal v. McAninch,* 513 U.S. 432 (1995) effectively
assigned the burden of proof on harmlessness to the state, and made clear that it is legal error to
"say [ ] that the habeas petitioner must bear the 'burden of establishing' whether the error was
prejudicial."  *O'Neal*, at 436.

-135-

applicability of its rule to capital cases.)

4) There are some constitutional violations as to which "there is no need for...harmless error review" because the error "could not be treated as harmless." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995). Examples are the kind of all-pervasive errors and prosecutorial misconduct analyzed in this claim and others herein. This exception was announced in Justice Stevens concurring opinion in *Brecht:*

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not"substantially influence" the jury's verdict. *Cf. Greer v. Miller,* 483 U.S. 756, 769 (Stevens, J., concurring in judgment) *Brecht,* 507 U.S. at 638 n.9.

As Justice Stevens explained in his concurrence in *Greer v. Miller,* "there may be extraordinary cases in which the...error is so egregious, or is combined with other errors or incidents of prosecutorial misconduct, that the integrity of the proceeding is called into question." *Greer,* at 768-69.

Thus, the *Brecht* standard is not proper here, and, if the Court engages in harmless error analysis, *Chapman* is the proper standard. Whether this Court believes that the remaining evidence is sufficient to support the guilty verdict is irrelevant under *Chapman. See id.* Here, petitioner had a strong case for actual innocence, yet was prevented by the trial court from presenting exculpatory evidence. Thus, under *Chapman,* this court should reverse Petitioner's conviction.

<u>**CLAIM III**</u>**: THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION FOR A CHANGE OF VENUE AND DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR TRIAL.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because of the trial court's error in denying the defense motion for a change of venue.

**A. Facts in support.**

A change of venue motion was heard by the trial court on September 13, 2000.  3 RR 2.[169] The defense called as a witness **Jimmy Rogers,** the news director for local radio and television.  3 RR 6.  He ran six to eight stories about Mr. Acker.  3 RR 9.  **David Kirkpatrick,** a news director for a local radio station based in Sulphur Springs, testified he had run eight to ten stories about Mr. Acker's case which had run about 50 times and their average number of listeners was 38,000, the top-rated station in Hopkins County.  3 RR 15, 18.  Most of their information came from the sheriff and the district attorney and the victim's mother.  3 RR 16.  They broadcast that the cause of death was by homicidal means including strangulation and that the defendant maintained that the cause of death was accidental.  3 RR 17, 23.  Neither news person had an opinion as to whether Mr. Acker could obtain a fair trial in the county.  3 RR 12, 22.

The defense also called **Robert Alsobrook,** the city editor at the Sulphur Springs News-

---

[169]   *See* Exhibit 18, Motion for Change of Venue.

Telegram.  3 RR 24.  He had run about ten stories about the case in the last six months.  3 RR 24.[170]
The circulation of the paper was about 7,000.  3 RR 29.  Most of the information came from the
sheriff's office.  3 RR 25. An article on June 13, 2000 was headlined "Autopsy Confirms Homicide.
March death of area woman said due to strangulation."  3 RR 30.[171]   The articles stated that most
of the victim's injuries were sustained postmortem. 3 RR 33.[172]  On June 24-25, a story stated that
investigators were told that "Acker was seen forcing George to get into the truck."  3 RR 34.  The
story also stated that the majority of the victim's wounds and abrasions came after her death.  3 RR
35.[173]  The stories also had references to statements by Mr. Acker that the victim had jumped out of
the truck.  3 RR 38.  This witness also had no opinion as to whether or not Mr. Acker could have a
fair trial in the county.  3 RR 40.  The defense also called **Neva Shook,** a local resident, who testified
that she did not feel that Mr. Acker could have a fair trial in Hopkins County, because the newspaper
stories rehashed the autopsy reports to make it appear as if Mr. Acker was guilty.  3 RR 43, 48.
People in the town had "already sentenced him."  3 RR 44.  It would be hard to find people in the
county who had not heard about the case.  3 RR 56. [174]  **Cecil Dodd,** a resident of Hopkins County
since 1959, and a teacher in the Sulphur Springs school system and a pastor, testified that it would
be difficult to find jurors in the county who could be fair and impartial.  3 RR 59.[175]  Based on what

---

[170]   *See* Exhibit 19, local newspaper articles on the Acker case.

[171]   *Id.*

[172]   *Id.*

[173]   *Id.*

[174]   *See* Exhibit 18 for her affidavit in support.

[175]   *Id.*

he had heard at different locales in the county, including a restaurant, the barber shop and a church, he felt that it would be hard to find an impartial jury in the county.  3 RR 72.   Various members of his church had also signed affidavits stating that they believed Mr. Acker could not have a fair trial in Hopkins County. 3 RR 65.  Although Mr. Dodd could set aside what he had read in the paper and heard on the local media, he felt that it might not be easy to find others in the community who could do likewise.  3 RR 69.

**Nathaniel Dodd,** a resident of Kilgore who grew up in Sulphur Springs, testified he had seen about three newspaper articles on the case and he felt that Mr Acker could not have a fair trial in Hopkins County.  3 RR 74-75. On one occasion he had heard people talking as if Mr. Acker had already been found guilty.  3 RR 77.  There were recent murders in Longview that were on peoples' minds.  3 RR 79.   Mr. Dodd talked to people who had made up their mind about the case and believed Mr. Acker was guilty.  3 RR 85.[176]

**Dorcas Dodd,** Mr. Acker's sister, testified that she lived in Sulphur Springs and she too believed that he could not have a fair trial in the county. 3 RR 93.[177]  She had also talked to other people about the case who had already made up their minds.  3 RR 94. The newspaper articles also made it appear as if Mr. Acker was guilty.  3 RR 100.

The state called no witnesses.  3 RR 102.  Yet the court denied the motion for change of venue without citing any reasons for so doing and without any countervailing evidence by the State. 3 RR 102.

At voir dire, the court questioned the prospective jurors about how many had heard of the

---

[176]   *Id.*

[177]   *Id.*

-139-

case, and the court observed, "quite a few of you have."  7 RR 139.  "Quite a few people" on the

panel knew the district attorney and the defense attorney  7 RR 145-150.  Many of the prospective

jurors also knew family members of the defendant and the accused.  7 RR 150-160.

### B. Legal standard.

Pre-trial publicity, *see Sheppard v. Maxwell,* 384 U.S. 333 (1966), may make the trial process

inherently unfair and violate due process of law.   "Where a petitioner adduces evidence of

inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render

virtually impossible a fair trial by an impartial jury drawn from that community, prejudice is

presumed and there is no further duty to establish bias."  *Mayola v. Alabama,* 623 F.2d 992, 997 (5th

Cir. 1980).

### C. Analysis of the Claim.

The due process clause of the Fourteenth Amendment guarantees the right of state criminal

defendants to be tried by an impartial jury.  The Fourteenth Amendment incorporates the essence of

the Sixth amendment right to be tried "by a panel of impartial 'indifferent' jurors [whose] verdict

must be based upon the evidence developed at the trial."  *Irwin v. Dowd,* 366 U.S. 717 (1961).  As

Chief Justice Earl Warren noted in his concurrence in *Estes v. Texas,* 381 U.S. 532, 552 (1965)

(Warren, C.J., concurring) due process requires the courts to safeguard against "the intrusion of

factors into the trial process that tend to subvert its purpose." *Id.* at 560. Specifically, the courts must

guard against 'the atmosphere in and around the courtroom [becoming] so hostile as to interfere with

the trial process, even though...all the forms of trial conformed to the requirements of law..."  *Id.* at

561; *Woods v. Dugger,* 923 F.2d 1454, 1456-57 (11th Cir. 1991).

As the leading case of *Sheppard v. Maxwell* observed, "legal trials are not like elections, to

be won through the use of the meeting-hall, the radio, and the newspaper." *Sheppard,* at 350, quoting

*Bridges v. State of California,* 314 U.S. 252, 271 (1941).   A defendant is entitled to a fair trial "in

a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Id.*   There is the

requirement that "the jury's verdict be based on evidence received in open court, not from outside

sources", *Sheppard,* at 351, and the "prejudice from such material 'may indeed be greater' than

when it is part of the prosecution's evidence 'for then it is not tempered by protective procedures'"

*Id.,* quoting *Marshall v. United States,* 360 U.S. 310, 313 (1959).   Juror statements "that [they]

would not be influenced by the news articles, that [they] could decide the case only on the evidence

of record, and that [they] felt no prejudice against petitioner as a result of the articles" are not

considered dispositive.   *Sheppard,* at 351.

In *Estes v. State of Texas,* 381 U.S. 532 (1965), the Supreme Court set aside a conviction

despite the absence of any showing of prejudice.   As the Court said in *Estes:*

> [i]t is true that in most cases involving claims of due process deprivations we
> require a showing of identifiable prejudice to the accused.   Nevertheless, at
> times a procedure employed by the State involves such a probability that
> prejudice will result that it is deemed inherently lacking in due process.
> *Id.,* at 542-43.

The procedure in question in *Estes,* as in Mr. Acker's case, was the denial of a change of

venue "to a locale away from where the publicity originated..." *Sheppard,* at 352-53.

Similarly, *Rideau v. Louisiana*, 373 U.S. 723 (1963) dealt with the trial court's refusal to

grant a change of venue motion.   In *Rideau,* there was a single broadcast of a videotaped confession.

The Supreme Court held that, "for anyone who has ever watched television the conclusion cannot

be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real

sense was Rideau's trial...Any subsequent court proceedings in a community so pervasively exposed

-141-

to such a spectacle could be but a hollow formality." *Rideau,* at 726.  Due process of law, the Court

held, "required a trial before a jury drawn from a community of people who had not seen and heard"

[the interview].   *Id.* at 727, and this same due process, "preserved for all by our Constitution,

commands that no such practice as that disclosed by this record shall send any accused to his death."

*Rideau, id.,* quoting *Chambers v. Florida,* 309 U.S. 227 (1940).

### D.  Bias and prejudice

Normally, a showing of either actual or inherent prejudice is required in order to prevail on

a claim of denial of a fair trial.  *Holbrook v. Flynn,* 475 U.S. 560 (1986); *Irvin v. Dowd,* 366 U.S.

717 (1961); *Woods v. Dugger,* 923 F.2d 1454, 1457 (11th Cir. 1991).  The test for inherent prejudice

is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather

whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook*

*v. Flynn,* 475 U.S. at 570, quoting *Estelle v. Williams,* 425 U.S. 501 (1976).

But, as *Rideau* held, prejudice is presumed when the record demonstrates that the community

where the trial was held was saturated with prejudicial and inflammatory media publicity about the

crime.  *Rideau,* 726-27; *see also Sheppard v. Maxwell,* 384 U.S. 333, 352-55 (1966).  Under such

circumstances, it is not necessary to demonstrate actual bias.  *Estes,* 381 U.S. at 542-43; *Mayola v.*

*Alabama,* 623 F.2d 992, 997 (5th Cir. 1980), *cert. denied,* 451 U.S. 913 (1981).  As shown above,

the record in Mr. Acker's case shows that the relevant community, the small town of Sulphur Springs

and Hopkins County, had seen highly prejudicial and inflammatory publicity that assumed his guilt

and served to create a hostile atmosphere in which a fair trial was impossible.  Thus, "prejudice is

presumed, and there is no further duty to establish bias.  *Mayola v. Alabama,* 623 F.2d 992, 997 (5th

Cir. 1980). Of note is the fact that the prosecution presented absolutely no evidence at all to rebut

-142-

the presumption of unfairness created by the defense's presentation.  Nor did they even deign to

argue their position.  As such, the defense's evidence was uncontroverted and the trial court erred

in denying the motion.

Thus, even if a showing of bias were required in Mr. Acker's case, he can meet that burden.


**CLAIM IV: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PRE-TRIAL PORTION OF THE PROCEEDINGS.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained

in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury,

the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of

counsel, due process of law, and reliable guilt and penalty determinations, because  trial counsel

failed adequately to prepare for trial**.**

**A. Standard of review and legal analysis for ineffective assistance of counsel claims in general.**[178]

\*\*\*\*\*\*\*\*\*\*\*\*

> We hope, of course, that the defendant whose life is at risk will be
> represented by competent counsel -- someone who is inspired by the
> awareness that a less-than-vigorous defense truly could have fatal
> consequences for the defendant.  We hope that the attorney will
> investigate all aspects of the case, follow all evidentiary and
> procedural rules, and appear before a judge who is still committed to
> the protection of defendants' rights.

\*\*\*\*\*\*\*\*\*\*\*\*\*

*Callins v. Collins*, 114 S. Ct. 1127 (1994) (J. Blackmun, dissenting).  Unfortunately, for the indigent

---

[178]   This analysis applies to all three ineffective assistance of counsel claims: Claim IV
(pre-trial ineffectiveness; Claim V (guilt/innocence phase ineffectiveness and Claim VI
(punishment phase ineffectiveness) and is incorporated herein as to these claims.

accused of a capital crime, it is the rare case indeed where competent counsel is appointed.  *See* Stephen Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime, But for the Worst Lawyer*, 103 YALE L.J. 1832 (1995).  Mr. Acker is a perfect example of a man who was denied a fair trial because he had the misfortune to be represented by counsel who put on a "less than vigorous" defense, did not effectively investigate and present a compelling case for actual innocence of the murder of Ms. George, did not diligently investigate readily available mitigating evidence, were not aware of significant facts concerning the background of their client, and did not present an accurate picture of him to the jury.

1.      **The Legal Standard under *Strickland v. Washington***

The Sixth Amendment to the United States Constitution guarantees criminal defendants the fundamental right to effective assistance of counsel.  *McMann v. Richardson,* 397 U.S. 759, 771, n.14 (1970) ("[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel.")[179] As the Court in *McMann* explained, the existence of a right to *effective* assistance of counsel follows logically and necessarily from the existence of the Sixth Amendment basic right to the assistance of counsel: "[I]f the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel." *McMann,* at 771.  Our adversary system of criminal justice, and the concept of counsel contemplated by the Sixth Amendment assumes, at a minimum, that counsel will act as an *advocate* for the accused.  *Anders v. California,* 386 U.S. 738, 87 S. Ct. 1396 (1967); *United States v. Cronic,* 466 U.S. 648, 104 S.

_____

[179]  *See also Avery v. Alabama,* 308 U.S. 444, 446 (1940); *Glasser v. United States,* 315 U.S. 60, 69-70 (1942); *Reece v. Georgia,* 350 U.S. 85, 90 (1955);  *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir. 1974) (a criminal defendant has the right to be represented by counsel "reasonably likely to render and rendering reasonably effective assistance.")

Ct. 2039 (1984).  The Sixth Amendment also demands that counsel be able to provide the "guiding

hand" necessary to adequately prepare and present a defense, and not simply the physical presence

of one who is licensed to practice law.  *Powell v. Alabama,* 287 U.S. 45, 68-69 (1932).

In the 1984 decision of *United States v. Cronic,* 466 U.S. 648 (1984), the Supreme Court

reiterated the logical connection between the existence of a constitutional right to effective assistance

of counsel and the text of the Sixth Amendment, reasoning that

> [t]he special value of the right to the assistance of counsel explains why "[i]t has long been
> recognized that the right to counsel is the right to affective assistance of counsel."....The text
> of the Sixth Amendment itself suggests as much.  The Amendment requires not merely the
> provision of counsel for the accused, but "Assistance", which is to be "for his defense."
> Thus, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the
> accused was confronted with both the intricacies of the law and the advocacy of the public
> prosecutor."...If no actual "Assistance" "for" the accused's "defense" is provided, then the
> constitutional guarantee has been violated.[180]

*Cronic,* at 654 (footnote and citations omitted).

The constitutional standard for judging the effectiveness of counsel under the Sixth

Amendment is a two-prong test, requiring that the petitioner show: (I) counsel's performance was

so "deficient" that counsel did not provide "reasonably effective assistance," and (ii) that counsel's

errors "prejudiced" the defense by depriving the defendant of a fair trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668 (1984) An attorney is ineffective if his or her performance

"fell below an objective standard of reasonableness."  *Id*. at 688. "Prejudice" is established if, but

for counsel's errors, there is a "reasonable probability" that the result of the proceeding would have

been different.  "A reasonable probability is a probability sufficient to **undermine confidence** in the

outcome." *Strickland*, 466 U.S. at 694 (emphasis added).  The *Strickland* test is the proper standard

---

[180]   *See also Strickland v. Washington,* 466 U.S. 668, 686 (1984).

to gauge the effectiveness of counsel at the guilt/innocence phase of a non-capital trial and at the guilt/innocence and punishment phases of a capital trial. *Livingston v. Johnson,* 107 F.3d 297, 304-05 (5th Cir. 1997).

## 2. Standard for Deficient Performance.

Counsel owes the accused a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980). Although the effectiveness of counsel must be determined on a case-by-case basis, *Strickland v. Washington, supra* at 688-89 (1984), Courts are entitled to look to objective standards and to the appropriate case law to determine what constitutes "reasonably competent counsel" in a particular death penalty case.

### a.  Case Law

When "counsel's performance as a whole," *United States v.Cronic,* 466 U.S. 648, 657 n.20, 104 S. Ct. 2039, 2046 (1984), or through individual errors, *Strickland, supra,* 104 S. Ct. at 2064,[181] falls below an objective standard of reasonableness, deficient performance is established.  The writ will issue if the failings amount to counsel being functionally absent[182] **or** if prejudice is shown such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland, supra.  See Williams v. Washington,* 59 F.3d 673 (7th Cir. 1995) (counsel ineffective in investigating and presenting defense); *Antwine v. Delo,* 54

---

[181] *See also Curry v. Zant,* 371 S.E.2d 647, 649 (Ga. 1988) (notwithstanding an otherwise reasonable performance by counsel, the single error of failing to obtain "an independent psychiatric evaluation of [the defendant] deprived his client of the protection of counsel.")

[182] *See Holloway v. Arkansas,* 435 U.S. 475,  98 S. Ct. 1173, 1181 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee").

F.3d 1357 (8th Cir. 1995) (counsel ineffective for failing to investigate and present available evidence of bipolar disorder); *Baxter v. Thomas,* 45 F.3d 1501 (11th Cir. 1995) (trial counsel ineffective during penalty phase of capital trial for failing to adequately investigate and present mitigation evidence); *Bryant v. Scott,* 28 F.3d 1411 (5th Cir. 1994) (counsel ineffective for failure to interview alibi witnesses); *Hill v. Lockhart,* 28 F.3d 832 (8th Cir. 1994) (trial counsel ineffective at penalty phase for failing to prepare and present evidence of defendant's mental state at the time of the offenses); *Loyd v. Whitley,* 977 F.2d 149 (5th Cir. 1992) (counsel ineffective in sentencing phase for failing to obtain an independent mental health evaluation when funds were available); *Griffin v. Warden,* 970 F.2d 1355 (4th Cir. 1992) (trial counsel ineffective for failure to contact alibi witnesses); *Harris v. Reed,* 894 F.2d 871 (7th Cir. 1990) (counsel ineffective for failure to interview eyewitnesses); *Blake v. Kemp,* 758 F.2d 523, 531 (11th Cir. 1985) ("[T]he courts have 'long recognized a particularly critical relationship between expert psychiatric assistance and minimally effective assistance of counsel.'") (citations omitted).

### b.  Objective Standards

This Court is entitled to refer to guidelines such as the *ABA Standards for Criminal Justice* to determine what level of performance is required by reasonably competent counsel in a capital sentencing trial.  As the Supreme Court stated in *Strickland*:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e. g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable....

466 U.S. at 687.

The need to investigate is an essential part of the duty of competent representation and is set

forth in the ABA's *Standards*:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

American Bar Association, *Standards for Criminal Justice: The Defense Function, Standard 4-4.1,*

*Duty to Investigate,* at 4-53 (2d ed. 1980)(emphasis added).

> Counsel's duty to investigate in preparation for sentencing is even more critical:
> The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the Court at sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense. **Investigation is essential to the fulfillment of these functions.**

American Bar Association, *Standards for Criminal Justice: The Defense Function,* Standard 4-4.1,

Commentary, at 4-55 (2d ed. 1980)(emphasis added).

### c. Sentencing Phase Ineffectiveness and the *Wiggins* case.

This standard, regarding the duty to investigate, applies acutely to a capital sentencing trial

because the Constitution requires that the sentencer be provided with and must consider "any aspects

of the defendant's background and record" that may be "proffer[ed] as a basis for a sentence less than

death." *Lockett v. Ohio,* 438 U.S. 586, 604 (1977). The standard of performance in a capital case

is, and must be, higher than in a non-capital case since "death is different." *See, e.g., Gardner v.*

*Florida*, 430 U.S. 349, 357-358 (1977)(plurality opinion). Courts, therefore, have given particular

attention to capital cases where little or no mitigating evidence is presented in support of a life

-148-

sentence.  *See, e.g., Harris v. Dugger,* 874 F.2d 756 (11th Cir. 1989);  *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989); *Cook v. Lynaugh*, 821 F.2d 1072 (5th Cir. 1987)[183].

Courts have long considered evidence  of mental illness,  emotional disturbance, the defendant's and victim's background, character, and childhood abuse to be types of mitigating evidence that juries should be allowed to hear.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S. Ct. 869, 68 L.Ed.2d 378 (1982); *Franklin v. Lynaugh*, 487 U.S. 164, 108 S. Ct. 2320, 101 L.Ed.2d 2320 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

Independent investigation of the facts and circumstances of a case in preparation for trial is one of the cornerstones of the Sixth Amendment right to effective assistance of counsel.  Seventy-five years ago, in the landmark case of *Powell v. Alabama,* 287 U.S. 45 (1932), the Supreme Court recognized that thorough factual investigation is at the heart of effective representation:

> It is not enough that defense counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation.  Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts.
> *Powell*, 287 U.S. at 58.  *See also Strickland,* 466 U.S. at 668, 691 (reiterating the primacy of counsel's duty to investigate client's available defenses at both phases of trial).[184]

---

[183]  The Seventh Circuit reasoned that trial counsel's failure had produced "`a breakdown in the adversarial process that our system counts on to produce just results.'"  *Id.* at 369 (quoting *Strickland v. Washington*, 466 U.S. 688 (1984)).  The Court of Appeals further found that by not presenting mitigating evidence "no effort was made to present Kubat to the jury as a human being." *Id*. at 368.

[184]  The Fifth Circuit has repeatedly recognized the vital importance of meaningful investigation.  *See, e.g., Bell v. Watkins,* 692 F.2d 999, 1009 (5th Cir. 1982), *cert. denied sub nom Bell v. Thigpen,* 464 U.S. 843 (1983); *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984) (unless counsel undertakes "a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived," he cannot provide effective assistance).

The Supreme Court's directives on this subject have been clear.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances[.]" *Strickland v. Washington*, 466 U.S. at 691 (1984).  *See also Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("[a]t the heart of effective representation is the independent duty to investigate and prepare.").

In *Baxter v. Thomas*, 45 F.3d 1501, (11th Cir., 1995), trial counsel was found ineffective where he conducted some limited investigation into the client's background, but failed to discover evidence of mental deficiency.  *See also Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), *cert. denied,* 116 S. Ct. 753 (1996).

In *Blanco v. Singletary*, 943 F.2d 1477, 1502 (11th Cir. 1991), *cert. denied,* 504 U.S. 943 (1992), the court held that because counsel "failed to discover and present any of the available mitigating evidence....the errors committed by Blanco's counsel fell below an objective standard of reasonable representation " *Id.*  This case involved a situation where the defense attorneys' only attempt to procure witnesses to testify at the penalty phase was to leave messages for them and wait for them to call back. The court rejected the explanations offered by counsel for their failure to call the witnesses, including the fact that the defendant himself instructed them not to present evidence. In this case, the court concluded that no adequate investigation had been conducted:

> The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsel's eagerness to latch onto Blanco's statements that he did not want any witnesses called...From these facts, we do not see that counsel conducted a reasonable investigation into the availability of mitigation evidence, or that there was a strategic reason for not presenting such evidence.

> *Id.* at 1503.

When an attorney fails to collect medical records, interview family members or conduct any other investigation into the defendant's background, his decision cannot be considered a "tactical" one.  "An attorney's trial decisions must be based on a proper exercise of judgment based on adequate knowledge" of the facts and relevant law.  *United States v. Cronic*, 839 F.2d 1401, 1404 (10th Cir. 1988); *see also McDougall v. Dixon*, 921 F.2d 518, 537 (4th Cir. 1991) (a "strategic" choice by counsel is one "made with **full knowledge** of the facts and the law, and the options available to him"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("`[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary.'"); *Baxter v. Thomas*, 45 F.3d 1501, (11th Cir. 1995) ("An attorney's decision to limit his [mitigation] investigation must `flow from an informed judgment.'")

Any deference that courts must afford trial counsel under *Strickland* in judging whether such failures were constitutionally deficient, as opposed to "tactical" or "strategic" trial decisions, presupposes that an attorney's trial decisions are fully informed and reasonable exercises of professional judgment. "Judges wisely defer to true tactical choices -- that is to say, to choices between alternatives that each have the potential for both benefit and loss." *Profitt v. Waldren,* 831 F.2d 1245, 1249 (5th Cir. 1987).  Moreover, "`[t]his measure of deference ... must not be watered down into a disguised form of acquiescence.'"  *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (quoting *Profitt v. Waldren*, *Supra* at 1248).

Any choice that flows "from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel."  *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir. 1991), *cert. denied sub nom Deleo v. Kentucky,* 112 S. Ct. 431 (1991).  As the *Kenley* court stated:

> We will not fault a reasonable strategy not to investigate further if it is based on sound assumptions.  Here it was not a reasonable strategy that led counsel not to investigate, but lack of thoroughness and preparation.  "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."

*Id.* at 1308 (quoting *Chambers v. Armontrout,* 907 F.2d 825, 835 (8th Cir. 1990) (en banc)*, cert. denied,* 111 S. Ct. 369 (1990).[185]

Courts have not characterized omissions by trial counsel as "strategic" based merely on counsel's assertion that they were.  For instance, *in Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998), the petitioner challenged the adequacy of his trial counsel's investigation of the medical evidence, specifically his failure to interview and call as witnesses two doctors and  introduce a report prepared by one of them.  The trial attorney justified his failure to contact the physicians and introduce the records based on his view that there was nothing to be gained by doing so, as there was no medical evidence to substantiate the alleged crime of molestation. *Id.,* at 1387.  The trial attorney also stated that he feared that  some harmful evidence may have surfaced had he called the doctors to the stand. *Id.*

The Eleventh Circuit Court of Appeals found this unpersuasive.  *Id.*, at 1388.  If the doctors had been interviewed, a decision not to call them as witnesses at trial may well have fallen  within the "wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. But

> [h]aving conducted no investigation into the significance of the lack of medical evidence...counsel could not have made an informed tactical decision that the

---

[185]  *See also Wilson v. Butler,* 813 F.2d 664, 672 (5th Cir. 1987), *cert. denied,* 484 U.S. 1079 (1988).

risk...outweighed 'what potential benefit might come from [their testimony].'  Because counsel never actually spoke with the physicians, he remained entirely unaware...of whether and to what extent their testimony might have helped Holsomback's case.   In these circumstances, we cannot say that counsel's decision not even to contact the physicians as part of his pre-trial investigation was professionally reasonable...[W]e are also persuaded that counsel's failure to conduct an adequate pre-trial investigation satisfies the prejudice prong of *Strickland.*

*Holsomback*, at 1388.

Thus, adequate  performance of counsel in a capital case requires that counsel undertake an independent investigation to unearth any potential mitigating circumstances or evidence that may be offered during the sentencing phase.  This objective standard may be established by either national performance guidelines such as the *ABA Standards for Criminal Justice* or by reference to relevant case law.  Based upon either standard, trial counsels' performance in this case fell below that of a "reasonably competent attorney" defending a capital case during the penalty phase trial.  In Mr. Acker's case, his counsels' decision to forego expert medical and forensic testimony, to fail to secure experts who could have challenged the State's case, and to fail to develop significant mitigating evidence fell below widely accepted professional norms.[186]  This decision was, therefore, not a strategic or tactical decision nor was it a reasonable one.

In *Wiggins v. Smith*, 123 S. Ct. 2527 (2003) , the Supreme Court, in an important recent decision,  addressed the standards for ineffective assistance of counsel at the punishment phase of a capital trial under *Strickland*  and *Williams.*  Specifically, that Court held that Wiggins' counsel rendered ineffective assistance of counsel at the punishment phase of his capital trial by their failure to perform an adequate investigation of his background, which included evidence of his

---

[186]    As discussed herein, trial counsel was to a certain extent hamstrung by the trial court's actions in thwarting the presentation of petitioner's case for actual innocence.  However, that does not excuse the failures discussed herein in Claims IV, V, and VI.

dysfunctional family background and physical and sexual abuse.  The Supreme Court held that trial counsel's punishment-phase strategy of disputing Wiggins' direct responsibility for the murder was not owed the deference usually accorded trial strategy, because it was not the product of a professionally reasonable investigation into other potential mitigation themes.  Wiggins' trial counsel's performance was held deficient under the standards of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

*Strickland, Williams* and *Wiggins* are the definitive triad of holdings on ineffectiveness of counsel, and the Supreme Court has made clear they are to be read together: *Strickland* "established the legal principles that govern claims of ineffective assistance of counsel" (*Wiggins* at 2535), and *Williams* "is illustrative of the proper application of these standards" (*Id.*).[187]  *Wiggins* specifically addresses the scope of background investigation  *Strickland* requires in a capital case in order to make a reasonably informed strategic judgment concerning the  mitigation presentation.

**i.  Extent of background investigation**.

Crucially,  the investigation deemed inadequate in *Wiggins* was fairly substantial.  Wiggins' counsel:

- arranged for a psychologist to conduct a number of tests on their client, in which he was found to have "an IQ of 79, had difficulty coping with demanding situations and exhibited features of a personality disorder." *Wiggins* at 2536;

- hired a criminologist who interviewed Wiggins and testified he would adjust adequately to life in prison (*Id.* at 2538, 2547);

---

[187]   The Supreme Court "made no new law in resolving Williams' ineffectiveness claims" (*Wiggins* at 2535) and likewise no new law was made in *Wiggins.*

- secured access to Wiggins' PSI report, which included an account of his disadvantaged and, in his own words "disgusting" youth; and

- "'tracked down' records kept by the Baltimore City Department of Social Services (DSS) documenting petitioner's various placement in the State's foster care system." (*Id.* at 2536).

Trial counsel in *Wiggins* were held ineffective for abandoning a mitigation investigation that should have been completed; here, counsel simply never began it.

**ii. Presentation of a  "half-hearted mitigation case"  crippled by lack of adequate preparation and investigation**.

The Supreme Court noted that Wiggins' attorneys "put on a halfhearted mitigation case" (*Wiggins* at 2538).

**iii.  Reliance on dubious and unconvincing strategic justification for failure to perform adequate investigation**.

The Supreme Court in *Wiggins* emphasized that "our principal concern...is not whether counsel should have presented a mitigation case.  Rather we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*" *Wiggins,* at 2536 (emphasis in original).  In *Wiggins,* the trial attorneys had  much more credible reasons  for their failure than here: "trial counsel made 'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder." *Wiggins* at 2533, quoting *Wiggins v. State,*  724 A.2d 1, 15 (1999).[188]

*Wiggins* elaborates on the *Strickland* standard:

---

[188]   Additionally,  Wiggins' "counsel likely knew further investigation 'would have resulted in more sordid details surfacing'" (*Wiggins v. Corcoran,* 288 F.3d 629, 641-42 (4th Cir. 2002) and  "conflicting medical testimony with respect to the time of death, the absence of direct evidence against Wiggins, and unexplained forensic evidence at the crime scene supported counsel's strategy."  *Id.* at  641, quoted in *Wiggins* at 2534.

"[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [the attorneys] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."
*Wiggins* at 2538.

Even  with Wiggins' attorneys' explanations of their strategic reasons, the Supreme Court found their performance deficient. Counsel for Wiggins

sought, until the day before sentencing, to have the proceedings bifurcated into a retrial of guilt and a mitigation stage... On the eve of sentencing, counsel represented to the court that they were prepared to come forward with mitigating evidence...and that they intended to present such evidence in the event the court granted their motion to bifurcate.

*Wiggins* at 2537.  The motion was, of course, not granted.  Mr. Acker's  trial record trial  shows the same inattentiveness seen in *Wiggins*.

### iv.  Performance shown deficient under prevailing professional standards.

The Supreme Court held in *Wiggins* that counsels' investigation "fell short of the professional standards prevailing in Maryland in 1989." *Wiggins* at 2536.   Texas lawyers routinely performed more thorough mitigation investigations than performed by petitioner's counsel, *and* made conscious strategic decisions to put evidence of their clients' troubled backgrounds and mental problems before Texas sentencing juries.[189]  It should further be noted that this formidable collection of cases does

---

[189]    *See, e.g.,  Jurek v. Estelle,* 593 F.2d 672, 675 (5th Cir. 1979) (verbal IQ of 66, possible brain damage, and inability to recite alphabet, give change or say how many weeks in a year); *Riles v. McCotter,* 799 F.2d 947, 952 (5th Cir. 1986)(history of mental illness as possible mitigating factor); *Wicker v. McCotter,* 783 F.2d 487, 496 (5th Cir. 1986)(physicians called to establish psychiatric disease and drug and alcohol abuse); *Brock v. McCotter,* 781 F.2d 1152, 1160 (5th Cir. 1986)(troubled childhood and heavy drug abuse); *Williams v. Lynaugh,* 809 F.2d 1063, 1065 (5th Cir. 1987)(defendant hit by automobile at age six, slow learner, headaches, borderline mentally retarded); *Elliason v. State,* 815 S.W.2d 656, 663 (Tex. Crim. App.

not, of course, include capital cases in which Texas death penalty lawyers *avoided a death sentence* by the presentation of compelling mitigation evidence.[190]

The *Wiggins* case provides additional powerful confirmation that Mr. Acker has met the *Strickland* standards on this issue.

### d) *Rompilla v. Beard*.

Recently, in *Rompilla v. Beard,* 125 S. Ct. 2456 (2005), the Supreme Court reaffirmed the *Williams-Wiggins* high standards for effective assistance of counsel at the punishment phase of a capital trial.  In this case, the Court held that Rompilla was entitled to sentencing phase relief on the ground that his trial counsel had been ineffective in failing to obtain and review a readily available court file which, had it been reviewed, would have led to a range of mitigating evidence.  As the

---

1991)(drug addiction, intense paranoia); *Ex parte Patrick Rogers,* 819 S.W.2d 533, 534-37 (Tex. Crim. App. 1991)(habitual drug use, youth, remorse); *Ex parte Jewel Richard McGee, Jr.,* 817 S.W.2d 77, 79-80 (Tex. Crim. App. 1991)(mental retardation, abandonment, severe child abuse); *Ex parte David Ray Harris,* 825 S.W.2d 120, 121 (Tex. Crim. App. 1991)(alcoholism); *Joiner v. State,* 825 S.W.2d 701, 706 (1992)(emotional problems, suicide attempts, no prior criminal record); *Ex parte Carl Kelly,* 832 S.W.2d 44, 45 (Tex. Crim. App. 1992)(difficulty in school, drug use, youth, good work ethic); *Nobles v. State,* 843 S.W.2d 503, 505-06 (Tex. Crim. App. 1992)(drug use, severe child abuse and neglect); *Ex parte Toby Lynn Williams,* 833 S.W.2d 150, 151-52 (Tex. Crim. App. 1992)(mental retardation and child abuse); *Kemp v. State,* 846 S.W.2d 289, 309 (1992)(positive character traits, religious devotion, poor parenting, youth); *Nelson v. State,* 848 S.W.2d 126, 136-37 (19920(drug use, molestation, child abuse, youth); *Gunter v. State,* 858 S.W.2d 430, 446 (Tex. Crim. App. 1993)(childhood physical and sexual abuse, abandonment, emotional problems, etc.); *Richardson v. State,* 879 S.W.2d 874, 883 (Tex. Crim. App. 1993)(parental neglect, starvation, learning disabilities); *Emery v. State,* 881 S.W.2d 702, 711 (Tex. Crim. App. 1994)(unstable and abusive upbringing, parental neglect); *Ex parte Henry Lee Lucas,* 877 S.W.2d 315, 317 (Tex. Crim. App. 1994)(physical and emotional abuse, poor parenting, low IQ).

[190] See, e.g. Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 300-01 (1983) (describing extremely aggravated capital murder case tried in Harris County, Texas during the 1970s in which the jury spared the defendant's life after hearing an extensive mitigation presentation).

Court held, "[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 125 S. Ct. at 2460.  Even though trial counsel took efforts to interview various family members and presented testimony from five of them at trial, and consulted with three mental health experts, this was held insufficient.  The Court noted that petitioner's own contributions to any mitigation case were minimal" as he was uninterested in helping counsel and at times "even actively obstructive."  125 S. Ct. at 2462.

The Court described the ABA Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as "well recognized."  The state court decision to the contrary that "defense counsel's efforts were enough to free them from any obligation to enquire further" was held to be objectively unreasonable. 125 S. Ct. at 2467.  These lapses were found prejudicial under the second prong of *Strickland,* as "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury...the undiscovered 'mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal of [Rompilla's] culpability,' and the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome..'" 125 S. Ct. at 2469.

**e) Fifth Circuit holdings on sentencing phase ineffectiveness.**

The Supreme Court's holdings in *Williams, Wiggins* and *Rompilla* show unmistakably that Courts cannot pay lip-service to trial counsel's invocation of "strategic" reasons for their failures, and these decisions have echoed in recent holdings of the Fifth Circuit.  In *Smith v. Dretke*, 417 F.3d 438 (5th Cir. 2005) that Court held counsel ineffective in a murder case for failing to adequately

-158-

prepare and present evidence of self-defense, close to the situation here, where the defense of accidental death was not effectively presented.  Although petitioner identified four witnesses for counsel, counsel did not interview them or call them to testify to corroborate the petitioner's testimony concerning the victim's history of violence.  Counsel did not do so because of his erroneous belief that the testimony of these witnesses was inadmissible and that only evidence known to the defendant was permitted. Prejudice was found because petitioner's only plausible defense was that he acted in self-defense and he testified to that affect but his testimony was easily discounted and disparaged by the prosecutor in argument without corroboration.  "[A]n objectively reasonable court could not conclude otherwise." *Id.* at 444.

In *Tenny v. Dretke*, 416 F.3d 404 (5th Cir. 2005), a similar case, the Fifth Circuit held counsel ineffective in murder case for failing to adequately prepare and present evidence of self-defense. Prejudice was found because the evidence counsel failed to prepare and present included evidence that the victim, the defendant's live-in girlfriend, had threatened to kill him in the days prior to her death and even on that day, she had stabbed him within the week before, she had threatened to burn the house down, she had violent tendencies and would have "insane rages," and she was strong enough to throw almost any grown man to the ground.  Under the AEDPA standards, the state court's and the district court's upholding of it were  unreasonable.

Based upon the above standards, Petitioner's trial counsel rendered ineffective assistance of counsel at the sentencing trial in this case. *See* Claim VI *infra.*

### f) Standard for meeting the  "prejudice" prong.

In order to demonstrate prejudice under *Strickland*, the defendant must show that it is **reasonably likely** that the jury would have reached a different decision absent counsel's

unprofessional errors.  *Strickland,* 466 U.S. at 696.  This showing must be sufficient to undermine confidence in the outcome of the proceeding.  466 U.S. at 693.  Importantly, *Strickland* does not require Mr. Acker to prove the errors of counsel were outcome-determinative.  Indeed, the Court in *Strickland* expressly considered and rejected such a test:

> [W]e believe that a defendant need not show that counsel's conduct more likely than not altered the outcome in the case...The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

> 466 U.S. at 693-94.[191]

In assessing whether confidence is undermined in the punishment trial verdict (and thus whether *Strickland* "prejudice" has been established), this Court must look at trial counsel's deficiencies both individually **and cumulatively** during the course of the penalty trial.[192]  *See Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir. 1992); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989).

---

[191]   The Fifth Circuit, in *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990), observed that the prejudice prong imposes "a lower burden of proof than the preponderance standard." Even when "the evidence arguably supports a different result under a preponderance standard", the court can still be "confident that it meets the 'reasonable probability' standard." *Id.* at 595. As demonstrated herein, the evidence available to counsel in this case establishes a "reasonable probability" that the result of the proceeding would have been different but for counsel's unprofessional performance.

[192]   As a constitutional matter, the punishment phase trial in Texas is a full-blown trial in and of itself and thus entitled to the same due process rights, including the right to the effective assistance of counsel, as the guilt-innocence phase trial. *See, e.g., Barclay v. Florida*, 463 U.S. 939, 952-954 (1983); *Bullington v. Missouri*, 451 U.S. 430 (1981). "A capital sentencing proceeding ...is sufficiently like a trial in its adversarial format and in the existence of standards for decision...that counsel's role in the proceeding is comparable to counsel's role at trial -- to ensure that the adversarial testing process works to produce a just result under the standards governing decision.  For purposes of describing counsel's duties, therefore...[a]... capital sentencing proceeding need not be distinguished from an ordinary trial." *Strickland*, 466 U.S. at 684. Thus, the proper application of the cumulative assessment of the constitutional ineffectiveness of Petitioner's trial counsel on the issue before this Court is whether counsel was ineffective considering all of their performance during the penalty trial.

*See also Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir. 1995), *cert. denied,* 116 S. Ct. 1335 (1996) (trial counsel held ineffective for failing to prepare and present mitigation evidence even though a defense expert was called; although the jury was given some lay evidence in mitigation, it was given no guidance of how to connect the facts and expert testimony about background to the mitigating factors; and the "quantum of prejudice the case law seems to require for deficient penalty phase performance is relatively low").

Because a single hold-out juror during the punishment phase would have resulted in a life sentence, *see* Tex. Code Crim. Pro. Art. 37.071(e) (Vernon 1983), this Court's "prejudice" analysis regarding errors in the **sentencing** phase must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel performed effectively.  *See Mak v. Blodgett*, 970 F.2d 614, 619-21 (9th Cir. 1992) (considering the Washington death penalty statute's "single holdout juror" provision in analyzing a *Strickland* claim); *Cf. Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death.").

In *Moore v. Johnson,* 185 F.3d 244 (5th Cir. 1999) the Fifth Circuit held that trial counsel's performance was constitutionally insufficient and prejudicial to the outcome of the penalty phase.  Counsel in Moore failed to investigate potentially mitigating evidence, including an abusive and deprived childhood, impaired mental functioning and an early release from prison on a prior conviction.  At an evidentiary hearing in state court, counsel for Moore admitted that he was cognizant of some elements of Moore's turbulent childhood but failed to engage in investigation of potentially mitigating evidence because it was "per se inconsistent with an alibi defense." *Id.,* at 271.

The Fifth Circuit  rejected counsel's explanation stating:

> Moore maintains that counsel's failure to present mitigating evidence is not entitled to a presumption of reasonableness because it was neither informed by a reasonable investigation nor supported by any logical position that such failure would benefit Moore's defense.  We agree.

*Moore* at 273.  The Fifth Circuit characterized counsel's view as "over broad and insufficient alone, without any reference to why that justification would apply in this case, to justify counsel's complete failure to investigate for the purpose of making an informed decision and failure to offer any mitigating evidence."  *Moore* at 275.  The Court went on to clarify that:

> To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Moore's trial.  The fact that distinguishes this case from those cases in which we have rejected similar claims because the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a potential backlash effect on the defense.

*Moore* at 274.  Finally, the Fifth Circuit  substantially based its conclusion that counsel's failures were harmful "upon the fact that counsel also failed to use what limited mitigating evidence was readily available."  *Moore* at 278.

Counsel's ineffective performance was more egregious, and the resulting prejudice more harmful to Mr. Acker than the circumstances in *Moore, supra*.  As in *Moore*, trial counsel failed to investigate or present much of the potentially favorable character or background evidence.  As in *Moore,* there was in Mr. Acker's case  "no logical or factual support and no conceivable strategic purpose" in failing to present this potentially mitigating evidence.

In *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) the Fifth Circuit granted penalty phase relief, reversing the district court, for failure to conduct an adequate penalty phase investigation.  After an evidentiary hearing, the magistrate judge found that counsel attempted to speak with family members

about Lewis' abusive background, but that they were "not forthcoming."  This "mere modicum of evidence" was held insufficient to support the district court's conclusion that counsel's very limited presentation of Lewis' childhood abuse was reasonable.  To assess counsel's performance in preparing for the sentencing phase of trial, the proper focus is not whether counsel should have presented a mitigation case, but "whether the investigation supporting counsel's decision not to introduce mitigation evidence … *was itself reasonable*."  (citing *Wiggins v. Smith*, 539 U.S. 510 (2003) (emphasis in original)).  "It is axiomatic – particularly since *Wiggins* – that [a decision not to present mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."

Three of Lewis' sisters could have provided detailed testimony about the severe abuse suffered by Lewis at the hands of his father.  These sisters attended Lewis' trial but counsel never asked them to testify.  Though counsel did present testimony from Lewis' grandmother, "her conclusional testimony contained none of the details provided by Lewis' siblings at the habeas hearing, which could have been truly beneficial.  [The grandmother's] skeletal testimony concerning the abuse of her grandson was wholly inadequate to present to the jury a true picture of the tortured childhood experienced by Lewis."  Furthermore, the sisters' testimony could have been corroborated by abundant records documenting numerous hospital visits and domestic disturbance calls.

_____The district court's reasons for finding that Lewis was not prejudiced by the failure to present detailed evidence of his childhood abuse were held to be flawed.  The district court held that the amount of time elapsed between the alleged child abuse and the commission of the crime, and Lewis' intervening criminal convictions, diminished the weight that could be given to the omitted

mitigation.  The circuit court, however, noted that in both *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins*, the time that elapsed between the abuse and commission crime were greater than in Lewis' case, and that the defendant in *Williams* had many intervening criminal convictions.  "It is obvious to us that the level of abuse to which Lewis was exposed mandates the conclusion that, had this evidence been produced, it is quite likely that it would have affected the sentencing decision of at least one juror."

All of these cases are consistent with the Supreme Court's directives on this subject. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances[.]"  *Strickland v. Washington*, 466 U.S. at 691 (1984).  *See also Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("[a]t the heart of effective representation is the independent duty to investigate and prepare.").

Similarly, it has been held that "...a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but must instead make a reasonable investigation." *Becton v. Barnett,* 920 F.2d 1190, 1192 (4th Cir. 1990).  After all, "the fact that a person is intelligent does not represent proof that he is free from mental illness." *United States v. Tate*, 419 F.2d 131, 132 (6th Cir. 1969).

Trial counsel were at least bound to conduct more than a bare-bones investigation  into Petitioner's background and life history.  *See, e.g., Strickland,* 466 U.S. 688, 706 (1984) (Brennan, J., concurring in part and dissenting in part); *Gray v. Lucas*, 677 F.2d 1086, 1093-94 (5th Cir. 1982); *cert. denied*, 461 U.S. 910 (1983); *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983), *cert. denied*, 469 U.S. 1028 (1984); *Thompson v. Wainwright*, 787 F.2d 1447, 1451, 1452 (11th Cir.

-164-

1986); *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982).  The most minimal investigation of this sort would have revealed the information that is set forth in detail below.

The *Wiggins* case also reiterates the *Strickland* standard for showing prejudice:

...to establish prejudice, a 'defendant must show that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins* at 2542.

The *Wiggins* court, echoing *Williams,* twice stressed that in assessing prejudice, the mitigating evidence must be evaluated  as a *totality* (*Wiggins* at 2542 and 2543) and without reference to its constitutional or trial-based dimensions.

Finally, *Wiggins* confirms that a court should find prejudice and grant punishment-phase relief upon a finding that " there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins* at 2543. That standard was met in *Wiggins, Williams*, and *Rompilla* and is met here as well.

**Claim IV(a):** **Ineffective  assistance  of  counsel  for  failure  to  challenge  biased  grand  jury proceedings.**

A  member of the  grand jury that indicted petitioner, Carol Henderson, was related by marriage to the victim Ms. Markie George, as the prosecutor himself admitted.  2 RR 43. Additionally, the foreman of the grand jury, Clayton McGraw, was a friend of the victim. HT 71-72.

Defense counsel failed to challenge the grand jury proceedings on these bases.

**Claim IV(b): Ineffective assistance of counsel for failure to complete DNA testing prior to trial.**

On the first day of trial, March 26, 2001, the defense requested a continuance based on the fact that there were fingernail clippings that had not been tested by their DNA expert.  19 RR2.  The

DNA expert had been provided a month prior, but the defense failed to request additional testing. 19 RR 3.  The motion for a continuance was denied. *Id.*  When given the opportunity to make a bill of exception, they did not, and hence waived the issue.  19 RR 4.

**Claim IV(c)**: **Failure to properly investigate and prepare defense witnesses**.

Defense counsel failed to properly prepare their witnesses for trial.  Nancy Acker, petitioner's mother, states that "[b]efore the trial of my son, I was not prepared by either of Daniel's trial attorneys.  I believe that had I been prepared my testimony would have been beneficial for Daniel."[193] As to the prejudice prong, what she could have said had she been properly interviewed, Ms. Acker states that "I would have certainly said that Daniel would not be a future threat to society, as Daniel has always been a very loving wonderful son, and brother to his sisters, and loved animals very much."[194]  Ms. Acker also relates an incident when petitioner was sexually molested by a teacher; that petitioner's mother divorced his father when he was six years old and his father never financially supported his son or the family; that petitioner's father was physically abusive to petitioner and had broken his jaw on one occasion; that due to the sexual abuse, petitioner spent 69 days at the Glen oaks Hospital for panic attacks and other problems; and that petitioner had a history of sleepwalking, one instance of which landed him in trouble.[195]

Likewise, Sherry Walker states that "[prior to trial I was never prepared by Daniel's attorneys, and I believe that if I would have been prepared properly my testimony may have helped

---

[193]   Exhibit 22, Declaration of Nancy Acker.

[194]   *Id.*

[195]   *Id.*

in Daniel's trial in both guilt and innocence phases."[196]  As examples of mitigating evidence that she could have presented had she been properly prepared, Ms. Walker cites the fact that petitioner's father was the town drunk; that he was abusive to petitioner and once broke his jaw; that petitioner's mother and father divorced when he was six and his father never supported the family financially; that they were a very close-knit religious family; that Daniel was sexually molested and as a result had some mental problems, such as sleep walking and panic attacks; that petitioner was kind to animals; that the victim Markie George had attempted to jump out of moving vehicles in the past when she became upset; and that the victim used drugs and alcohol.[197]

Similarly, Dorcas Vittatoe, petitioner's sister, states that petitioner's attorneys "never prepared me for trial."[198]  As examples of what she would have testified to had she been properly prepared, Ms. Vittatoe states that she could have provided much positive character evidence and told the jury that he would not have been a future threat to society.[199]

## CLAIM V: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT/INNOCENCE PORTION OF THE TRIAL.

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of

---

[196]   Exhibit 23, Declaration of Sherry Walker.

[197]   *Id.*

[198]   Exhibit 24, Declaration of Dorcas Vittatoe.

[199]   *Id.*

counsel, due process of law, and reliable guilt and penalty determinations, because trial counsel rendered ineffective assistance of counsel at the guilt/innocence phase of the trial.

Petitioner herein incorporates by reference the legal analysis of ineffective assistance of counsel claims, presented *supra* in Claim IV.

**Claim V(a): Trial counsel rendered ineffective assistance of counsel in failing to effectively present petitioner's case for actual innocence through expert testimony.**

As discussed *supra* in Claim I, petitioner has a strong claim of actual innocence. Petitioner incorporates by reference the facts and argument from Claim I herein.

Even though the trial court severely stifled the defense case, the case for innocence could still have been presented by the defense and the trial court's errors and bias do not excuse the defense's multiple failures:

**i) Ineffective assistance for failure to present expert medical testimony.**

Defense counsel were ineffective for failing to present expert medical opinion testimony to rebut Dr. Gonsoulin's highly speculative strangulation theory.

The court did provide funds for a medical expert, Dr. Linda Norton. 2 RR 68. Dr. Norton was paid by the court as a defense expert, yet she never showed up at the trial and her absence was used against petitioner as evidence that her opinion would have been unfavorable. *See, e.g.,* 22 RR 7-11. The prosecutor argued "I asked y'all to think about where Dr. Norton was. He didn't answer that, did he? Because Dr. Norton's opinion is the same. Don't you know that Dr. Norton..." 23 RR 21. The defense objected but the Court overruled the objection. 23 RR 21. The prosecution then continued: "It's reasonable to assume that if his doctor had a difference of opinion she would have been here telling you about it. I forgot to see her, I guess, because I missed her testimony. She's not

here." 23 RR 21-22.

This case centered around the forensic opinion of the medical examiner, Dr. Gonsoulin. Without her opinion that the victim had been strangled prior to her death, there would have been no capital murder case against Mr. Acker.  Dr. Gonsoulin presented very tendentious and speculative testimony regarding her interpretation of the autopsy, and this testimony would have been discredited rather easily, as the autopsy photos did not bear out her theories.[200]  Additionally, the virtual physical impossibility of strangling the victim while driving the truck could have been attacked through expert testimony.[201]  The prosecution attempted to thwart the defense's case when they issued subpoenas for all the defense's witnesses, and  this caused Dr. Norton to back out of the case, as she would have been required to sit throughout the trial. *See, e.g.,* HT 37-38, 50, 213.

In any case, regardless of the cause of this failure,  the defense had an obligation to at least present some expert medial evidence to discredit the State's case.

### ii) Ineffective assistance for failure to present an accident reconstructionist.

Given the centrality of the circumstances of the victim's death, an expert in accident reconstruction was a vital necessity.  The court apparently did appoint and provide funds for a Mr. Pipkin as an accident reconstructionist.  6 RR 20.  However, as with Dr. Norton, Mr. Pipkin never showed up as a witness at the trial.  All defense witnesses were issued subpoenas by the State, so it is possible that he too was "scared off" by this tactic, although the record does not indicate the reason for the failure of either of these witnesses to testify.

Prior to trial, the defense had asked for a crime scene expert and the Court noted that they

---

[200]   *See* Exhibit 26.

[201]   *Id.*

had a court-appointed investigator, Mr. John Sands. 6 RR 18.  When the defense stated that he was

not qualified as a crime scene expert, but the prosecution stipulated that he is such an expert. 6 RR

19.

Mr. Sands performed tests on the truck.  He obtained a similar truck, a Ford 350 one-ton

truck, and he testified *in camera* that he was not able to open the door from the driver's seat without

extending himself quite a bit so that he could still see above the dashboard.  21 RR 142.  He could

not have opened the door and pushed someone out of the vehicle while driving on the road.  21 RR

142.  An objection to this evidence was sustained.  21 RR 143.  The trial court had earlier denied

funds for a defense forensic expert because they had this investigator, but then refused to let him

testify as to these forensic matters.  The defense was doubly ineffective: for failing to have this

testimony presented by their appointed expert and for failing to point out that the prosecution had

previously stipulated that Mr. Sands was a crime scene expert.  Had that stipulation been noted, the

court would hardly have been in a position to rule out this evidence.

## <u>Claim V(b)</u>: Ineffective assistance of counsel for overreaching and labeling an exhibit a "lie."

Defense attorney McDowell elicited from witness Sergeant Willingham the fact that the CAD

drawing he made was not entirely a product of a machine that assisted in making such drawings.  20

RR 147-149.  From that testimony, the defense attorney stated that "We object to this drawing being

in evidence.  It's improper.  The proper predicate that's been laid was a lie."  20 RR 149.  As a result,

the court had to admonish the defense regarding the statement, as there was obviously no deception

involved or intended.  The court stated that "the word lie is a serious, very serious word."  20 RR

151.  The prosecutor on redirect told the witness that "I want to apologize for you being called a liar

here or that this was a lie.  That's not a lie, is it?  A.  No sir, it's not."  20 RR 153.  The defense

thereby undermined both their case and credibility by this intemperate statement.

The court had to admonish Mr. McDowell outside the presence of the jury: "And we're going

to have to watch ourselves because there is a certain responsibility to the law and to justice that all

of us owe.  And one of the things I'm concerned about is when we lose our composure, lose our

tempers during the course of the trial, I don't think this is proper....I really feel that based on what

the Court heard you might have been a bit expressive using the word that you used, the word lie...I

think that's not right to the field of justice..."  20 RR 154.

This was obviously prejudicial, in that the prosecutor was allowed to apologize to the witness

in front of the jury for defense counsel's comments.  Additionally, it would have weakened the jury's

perception of the defense and lessened their credibility.

**Claim V(c)**: **Ineffective assistance of counsel for introducing prejudicial evidence**.

Many of the photographs introduced by the defense as defendants exhibits were relied upon

by the prosecution to prove their case.  *E.g.*, 20 RR 129, Defendant's Exhibit 4 through 9, offered

and Defendant's 4 used to show where the hair was found (20 RR 86); Defendant's 6 and 7 used by

the prosecutor to show where they found the blood stain in the seat back (20 RR 87); Defendant's

9, used by the prosecutor to show liquid spill in the truck (20 RR 87-88); Defendant's Exhibit 3, (20

RR 129) used to show location of the blood spot.

**Claim V(d): Ineffective assistance of counsel for failing to object  to the testimony by Tony
Hurley.**

At the guilt/innocence phase, witness Tony Hurley testified that there were tire marks in the

grass and a tire mark north and a little east of the body.  20 RR 100. The witness's opinion was that

the tire tracks were in line with a blood spot that was just north of the victim's body.  20 RR 103.

However, there was no testimony that the spot was actually blood.  The defense's failure to object

prejudiced petitioner.

**Claim V(e): Ineffective assistance of counsel at argument for contradicting his client's version of events.**

The State forensic expert David Spence testified that when  a victim has made impact with

a vehicle, sometimes there are paint chip residue and other times there are not.  20 RR 159.  Defense

counsel Mr. McDowell verified this on cross-examination: "Q. [by Mr. McDowell] You don't

always have paint chips transfer to clothing, is that right?  A.  That is correct, yes." *Id.*  Yet at final

arguments in the guilt/innocence phase, the same counsel Mr. McDowell argued as follows:

> You may hear after the D.A. the gets (sic) back up...that the car hit her.  How do we know
> that the car didn't hit her?  The forensic man came and said they took samples of the paint
> of the vehicle.  And then they inspected her clothes microscopically and they found no paint
> chips from the truck.  The truck did not hit her.  There would have been paint transfer.
> 23 RR 12.

This seriously undermined the defendant's testimony and his case.  First, it contradicted the

State's expert who said exactly the opposite, that the victim could well have been hit by the door

without any paint chips adhering to her clothing.  Secondly, Mr. Acker's testimony regarding the

victim jumping from the truck would have been fully consistent with her being hit by the door when

she jumped, as the truck was going at a relatively fast speed, around forty miles an hour.  Defense

counsel thus undermined his own case by failing to have his facts straight.

**CLAIM VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF THE TRIAL.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because  trial counsel rendered ineffective assistance of counsel at the penalty phase of the trial.

Petitioner herein incorporates by reference the legal analysis of ineffective assistance of counsel claims, presented *supra* in Claim IV.

**Claim VI(a): Ineffective assistance for failure to present mitigating evidence.**

As discussed *supra* in Claim IV(c)(ineffective assistance for failure to properly investigate and prepare witnesses for trial), defense counsel failed to properly prepare their witnesses for trial. While Claim IV(c) looked at this as a pre-trial failure, the result was a bare-bones penalty phase presentation which covered only about fifty pages of trial transcript, or less than one hour.  23 RR 96-145.  The only witnesses called were Dr. Cicarello, Sherry Walker, Dorcas Vittatow, and Nancy Acker.  *Id.*

Nancy Acker, petitioner's mother, states that "[b]efore the trial of my son, I was not prepared by either of Daniel's trial attorneys.  I believe that had I been prepared my testimony would have been beneficial for Daniel."[202] As to the prejudice prong, what she could have said had she been properly interviewed, Ms. Acker states that "I would have certainly said that Daniel would not be a future threat to society, as Daniel has always been a very loving wonderful son, and brother to his

---

[202]   Exhibit 22, Declaration of Nancy Acker.

sisters, and loved animals very much."[203]  Ms. Acker also relates an incident when petitioner was sexually molested by a teacher;  that petitioner's mother divorced his father when he was six years old and his father never financially supported his son or the family; that petitioner's father was physically abusive to petitioner and had broken his jaw on one occasion; that due to the sexual abuse, petitioner spent 69 days at the Glen Oaks Hospital for panic attacks and other problems; and that petitioner had a history of sleepwalking, one instance of which landed him in trouble.[204]

Likewise, Sherry Walker states that "[prior to trial I was never prepared by Daniel's attorneys, and I believe that if I would have been prepared properly my testimony may have helped in Daniel's trial in both guilt and innocence phases."[205]  As examples of mitigating evidence that she could have presented had she been properly prepared, Ms. Walker cites the fact that petitioner's father was the town drunk; that he was abusive to petitioner and once broke his jaw; that petitioner's mother and father divorced when he was six and his father never supported the family financially; that they were a very close-knit religious family; that Daniel was sexually molested and as a result had some mental problems, such as sleep walking and panic attacks; that petitioner was kind to animals; that the victim Markie George had attempted to jump out of moving vehicles in the past when she became upset; and that the victim used drugs and alcohol.[206]

Similarly, Dorcas Vittatoe, petitioner's sister, states that petitioner's attorneys "never

---

[203]  *Id.*

[204]  *Id.*

[205]  Exhibit 23, Declaration of Sherry Walker.

[206]  *Id.*

-174-

prepared me for trial."[207]   As examples of what she would have testified to had she been properly

prepared, Ms. Vittatoe states that she could have provided much positive character evidence and told

the jury that he would not have been a future threat to society.[208]

   The other penalty phase witness was Dr. Antoinette Cicerello an expert on the "future

dangerousness" special issue.  23 RR 96-145.[209] The presentation of this witness was extremely

ineffective in that numerous helpful factors and a wealth of mitigating evidence were never

mentioned, even though this witness could have presented much of it.  The fact that Mr. Acker's

jealousy and possessiveness around women would not be a factor in prison was not mentioned.  The

fact that the unique circumstances that led to the death of the victim could not be repeated in prison

were not mentioned.    The fact that Mr. Acker had a strong and supportive family was not

mentioned.  The fact of alcohol abuse and long-time substance abuse by both petitioner and the

victim as a contributing factor was not mentioned.[210]  The fact of Mr. Acker's low intelligence and

borderline I.Q. and the fact that he was an eighth grade drop-out were never mentioned by this

witness.[211]   His record of psychiatric problems, sleep walking, panic attacks, and his treatment at

---

[207] Exhibit 24, Declaration of Dorcas Vittatoe.

[208] *Id.*

[209] Dr. Cicerello's "Psychological Evaluation and Risk Assessment" of March 16, 2001 is at Exhibit 28.

[210] Dr. Cicerello's report mentions this.  Exhibit 28 at 7.

[211] *See* Exhibit 27 at page 2 of January 30, 1987 "Confidential Report" by Dr. Steven E. Ball, Ph.D., at Glen Oaks Hospital, where Mr. Acker's full scale IQ is measured at 79; Exhibit 28, Dr. Cicerello's "Psychological Evaluation and Risk Assessment" of March 16, 2001, at page 7, where his intellectual functioning is estimated to be in "the borderline range...His ability to abstract and engage in problem solving falls in the low average range, while his verbal skills fall in the moderately impaired range";  Exhibit 29, Texas Department of Criminal Justice "Case

Glen Oaks Hospital were not mentioned.[212]   Mr. Acker's history of childhood abuse was not

mentioned.  The circumstances of Mr. Acker's molestation by a teacher were not mentioned.[213]  Mr.

Acker's prior bouts of depression, dependent personality,

     The very short testimony of this witness was not oriented to the facts of Mr. Acker's case,

with the exception of a brief reference to his age when possibly released, which in itself was

prejudicial as it gave the jury the unrealistic impression that Mr. Acker might be released in the not-

too-distant future.  No effort was made to tie in the specifics of Mr. Acker's life history to the crime

and to present it as an out-of-character act that was not likely to be replicated.   Even though the

witness claimed to have read petitioner's case history, it was never incorporated into her risk

assessment.  Thus, when the studies upon which she used for base rates of violence were ruled

inadmissable, the defense was left with nothing for this witness to present.

     Dr. Cicerello's report mentions much of this information, albeit in somewhat truncated

form.[214]  This is strong evidence that the abrupt termination of this witness's testimony was the fault

of trial counsel and their unfamiliarity with petitioner's mitigating evidence.   Had they continued

with their questioning, even though the base rates for future dangerousness had been ruled

inadmissable, there was much mitigating evidence that still could have been introduced through Dr.

---

Summary" report, with an interview date of May 12, 1993, which indicates that Mr. Acker's IQ
is 80.

   [212]   *See* Exhibit 27, assorted records of Mr. Acker's stay at Glen Oaks Hospital, which
detail his sleep walking and panic attacks.  The defense made no effort to link this behavior to a
triggering event over which he had no control: his molestation by a teacher.

   [213]   *See* Exhibits 27, 28.

   [214]   *See* Exhibit 28.

Cicerello.

**Claim VI(b): Ineffective assistance regarding the future dangerousness special issue.**

As discussed *supra* in Claim VI(a), at the penalty phase of the trial, Dr. Antoinette Cicerello**,** a forensic psychologist, testified as a defense expert, primarily on the issue of "future dangerousness." 23 RR 96.[215]   Her analysis was both truncated and ineffective and her testimony so brief (about 20 pages of transcript) that it could not have made any impact on the jury.

She conducted a specific risk assessment to determine levels of risk of violence in the future. 23 RR 100.  As to the level of risk Mr. Acker posed in prison and the level of risk should he be released after 40 years, the level for both was low.  23 RR 102.

The first error regarding her testimony about future dangerousness was that trial counsel allowed her to use base rates  for the prediction of future violence that were based on  a  1996 study of the rate of violence in Missouri State Prisons; a base rate for assaults in the Texas Department of Criminal Justice for 1997 and 1998.  23 RR 102-103.  The prosecution objected at this point, as the date did not necessarily pertain to capital murder inmates.  23 RR 103-104.  The court sustained the objection. 23 RR 105.  This objection basically nullified all Dr. Cicerello's conclusions, rendering her testimony worthless. There were readily available studies that were based on statistics of capital murderers only, and the defense's failure to use these studies gutted their presentation as to the crucial issue of "future dangerousness."

After this, the witness was then asked only two more questions.  She said there was a very weak relationship between the offense someone has committed and violent offenses in prison.  23 RR 105.  The witness also stated that as an individual ages, the likelihood they will engage in active

---

[215]   Dr. Cicerello's psychological evaluation is at Exhibit 28.

violence decreases significantly so that after the age of sixty-five there are relatively no incidents of violent acts.  23 RR 106.  The defense erred here again, by failing to have any statistical evidence to back up this testimony, as the studies relied upon by the witness were ruled inadmissable.  On re-direct, the witness stated that Mr. Acker would be a low risk for violence as he would be about seventy when he could first be released.  23 RR 116.

An important failure with this witness was the failure of the defense to present the special issue of future dangerousness with reference to the specifics of petitioner's background and the offense.  Instead, only general base rates were presented, which were ultimately ruled inadmissable.  Had defense counsel at least tried to tie in the specifics of Mr. Acker's mitigating evidence, as discussed in Claim VI(a) *supra,* to the issue of future dangerousness, they would have had a good chance of a different result at the punishment phase.

The State's aggravating evidence was noticeably weak.  It consisted only of four law enforcement officers in the Hopkins County area who briefly stated that petitioner's reputation as a peaceful and law-abiding citizen was "bad" and two ex-wives who testified that petitioner had been violent with them.  Thus it cannot be said that the error in failing to present this testimony was harmless.

**Claim VI(c): Ineffective assistance for failure to present evidence of petitioner's low intelligence.**

There were multiple record available indicating that petitioner is borderline mentally retarded.  Petitioner dropped out of school in 1987, in the ninth grade, at the age of 16, after receiving poor grades.[216]   In 1987, petitioner was sent to Glen Oaks Hospital for a psychiatric

---

[216]   Exhibit 31, selected school records of petitioner, showing withdrawal from school in the ninth grade.

evaluation as a result of an incident when he was sleep walking and went to a neighbor's house and dragged a women out of her house.[217]   In a January 30, 1987 "Confidential Report" by Dr. Steven E. Ball, Ph.D., at Glen Oaks Hospital, Mr. Acker's full scale IQ is measured at 79.[218]   In Dr. Cicerello's "Psychological Evaluation and Risk Assessment" of March 16, 2001, at page 7, his intellectual functioning is estimated to be in "the borderline range...His ability to abstract and engage in problem solving falls in the low average range, while his verbal skills fall in the moderately impaired range."[219]   A Texas Department of Criminal Justice "Case Summary" report, with an interview date of May 12, 1993, indicates that Mr. Acker's IQ is 80.[220]

Mental retardation and sub-average intellectual functioning have been widely recognized as mitigating evidence.  In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court declared that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation.[221]   The decision in *Atkins* relies upon three related rationales: The empirically established consensus against executing the mentally retarded; the Court's independent determination that retaining the death penalty for the mentally retarded would not further any interest in retribution or deterrence; and the fact that the nature of the impairment of mental retardation leads to an unacceptable risk of wrongful executions.   All three

---

[217]   *See* Exhibit 27, Glen Oaks Hospital records.

[218]   *Id.*

[219]   Exhibit 28 at 7.

[220]   Exhibit 29 at 1.

[221]   *Atkins* specifically overruled the Supreme Court's contrary decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*)

of these rationales apply equally to persons such as Mr. Acker.  Even of Mr. Acker does not meet the traditional criteria for mental retardation, his sub-average functioning would have been seen as having mitigating value, as it was a disability that he suffers through no fault of his own.

**Claim VI(d): Ineffective assistance for failure to present petitioner's history of drug and alcohol abuse.**

Failure of counsel to introduce and develop evidence of petitioner's past history of drug and alcohol abuse.  The trial was replete with evidence that both the victim and petitioner had been drinking heavily in the time immediately preceding the victim's death.[222]  The record also indicates that Mr. Acker had long-standing problems with alcohol and drug addiction.[223]   However, this evidence was never effectively presented at trial. This would also have been useful at the guilt/innocence phase, in terms of diminished capacity on the part of Mr. Acker.  The victim's level of alcohol was detectable and relatively high even the next morning, long after she had stopped drinking[224] and this would have explained her impulsive jump from the truck.

**Claim VI(e): Ineffective assistance at penalty phase argument**.

The penalty phase final argument given by Mr. Ferguson was totally inadequate.  It is less than three pages of transcript, probably less than three minutes in length. 23 RR 147-150.   It provided an inadequate analysis, was sketchy on the facts, and was basically a plea for mercy.  23

---

[222]   *See* Factual Summary, *supra.*

[223]   *See* Exhibit 27 (Glen Oaks Hospital records); Exhibit 28 (Dr. Cicerello's evaluation); Exhibit 29 (TDCJ records, at 3)("Subject admits to inhaling and smoking cocaine at age 20 until present incarceration.  Subject admits to inhaling and smoking an unknown amount of powder and rock cocaine daily.  Subject admits to being addicted to cocaine at age 20.  Subject admits to supporting his drug habits through employment." Acker also admitted spending over  $100 per week on cocaine (at 6)).

[224]   Exhibit 32 at 7 (blood alcohol .04% ethanol; vitreous, .07% ethanol)

-180-

RR 147-150. It is strong evidence that counsel Mr. Ferguson was  basically unfamiliar with much of petitioner's mitigating evidence because it fails to mention it.  The jury would have concluded that if that was all that could be said for Mr. Acker,  that death was the proper penalty.

## CLAIM VII: APPELLATE COUNSEL RENDERED  INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner's right to due process of law, equal protection of the laws, and a reliable sentence, trial by jury, and by an impartial sentencer, was violated by his failure to receive effective assistance of appellate counsel, through state court action.  U.S. Const. Amends. V, VI, VIII, XIV.

### A.  Facts in Support.

The trial court appointed attorney Ted Beaty as petitioner's appellate counsel.[225]  The "appeal" filed by Mr. Beaty was virtually as dismal as the state post-conviction application filed by Mr. Wilkinson and just as useless.[226]  Aside from the cover sheet, index and table of authorities, it is nine wide-margin pages long.  Within that minuscule compass, Mr. Beaty manages to list the issued presented (one page) and restate these issues again (more than a page).  The actual argument is **four and one-third pages,** perhaps an all-time record for conciseness, and if not surely close to it.[227]

Within those four pages, Point of Error No. 1 is a boilerplate attack on the constitutionality of the Texas death penalty statute.  As the CCA held on direct appeal,

---

[225]  Exhibit 5.

[226]  Exhibits 7 and 9.

[227]  Exhibit 7.

Appellant doe not explain how the current scheme limits the jury's consideration of the special issues or why such limitation violates the constitution.  He does not explain how the current scheme prevents the jury from considering and giving effect to all mitigating circumstances.  Nor does he explain how the current scheme affects the defendant's ability to present relevant mitigating evidence.  He does not explain how a prosecutor's unfettered discretion to seek the death penalty violates the constitution, nor does he explain why the absence of a life-without-parole option guarantees a death sentence.  Nor does he explain how the admission of unadjudicated offenses at punishment violates the "heightened reliability" requirement or the Equal protection Clause of the United States Constitution. His claims under this point are essentially pro forma, and as such, are inadequately briefed. Opinion on Appeal at 16-17.[228]

Point of Error No. 2 is a six-and-a-half line "attack" on the admissibility of the videotaped re-enactment of the crime, as "[n]o one testified as to the circumstances involved in programming and establishing of the re-enactment," whatever that might mean.[229]   As the CCA ruled, "Appellant does not explain how the videotape differs from Young's description of events."  Opinion on Appeal at 8.[230]

Point of Error No. 3 was eight lines attacking the apparent failure of the court to introduce part of the autopsy report, but details of the court's actions are lacking.  As the CCA ruled on appeal,

> Appellant fails to give record references to the trial court's ruling refusing to admit the notes or as to appellant's objection to that ruling.  Also, appellant does not say how these notes explain the autopsy report or why they are necessary for a full understanding of the report or to avoid a false impression...he does not specify which statements [contradict the conclusion of the autopsy report] nor does he say why they contradict the report...this point of error is inadequately briefed...
> Opinion on Appeal at 9.[231]

Point of Error No. 4 is an attack on the exclusion of Officer Anderson's testimony regarding

---

[228]   Exhibit 8.

[229]   Exhibit 7.

[230]   Exhibit 8.

[231]   Exhibit 8.

a prior attempt of the victim to jump from the truck (*see* Claim II(e) *supra*) and the court's refusal

to submit two requested charges on lesser included offenses of manslaughter and criminally

negligent homicide.   Point of Error No. 5 is a similar attack on the exclusion of the testimony from

the defense investigator (*see* Claim II(e) *supra*).   Point of Error No. 6 is simply ludicrous.   It is a

listing, solely in numbers, of the volume, page,  and line where alleged prosecutorial misconduct

occurred but not stating what the misconduct was!  As the CCA put it, "[t]his argument is followed

by a list of forty-eight record citations.  Appellant does not say he objected to these alleged instances

of prosecutorial misconduct.  He also does not state exactly what is improper about each of these

instances, and he does not explain how he was harmed...If some of the later citations do involve

preserved error, it was appellant's responsibility to point out which ones.  Moreover, if appellant is

attempting to claim fundamental error that needs no objection, he has failed to allege that

fundamental error is involved, has failed to argue why it is fundamental, and has failed to cite any

leal authority for why fundamental error would be involved....Appellant has failed to adequately brief

this point of error."  Opinion on Appeal at 15-16.[232]

Although the appellate brief was due by July 23, 2002, it was not filed until September 9,

2002.[233]  On September 16, 2002, the Texas Court of Criminal Appeals held Mr. Beaty in contempt

and fined him $500.00.[234]   Despite the lateness of the brief and its shockingly shoddy quality, the

trial court paid Mr. Beaty the full $8,800.00 he requested for his time, allegedly 88 hours for about

ten pages of briefing.  This worked out to about one thousand dollars per printed page, most of which

---

[232]   Exhibit 8.

[233]   *See* Exhibit 14, Mr. Beaty's motions for extensions of time to file brief on appeal.

[234]   Exhibit 17.

was either boilerplate or non-substantive indices, summaries or restatements.  It was also about two

thousand dollars per "substantive" page.

After filing this travesty,  the State called Mr. Beaty as a witness at the hearing held on the

state habeas writ on May 19, 2004.  The following almost surrealistic exchange occurred at that

hearing:

> Q. [prosecutor]  What's your opinion as to whether you should raise every potential or possible legal issue that may be raised on appeal?
> A. [Beaty] Well, I don't really believe it's based on my opinion, but I believe it's actually part of the Rules that you don't appeal every error; you don't appeal every objection that's overruled or denied.  But my obligation is to, you know, research and conduct appropriate legal research of points that I feel would be justifiable to raise on appeal, that the appellate court could use for a reversal, because every error is not going to get a reversal....
> Q. Is there an appellate strategy that you usually formulate as an appellate attorney in dealing with these cases?
> A. Well, certainly, and, again, it's my understanding that, for appeals, you know, you've just got to concentrate on those errors that you feel would justify a reversal.  You certainly are not...even the Courts are going to tell you, you know, 'Don't bring up every error that's committed in the trial.  Do your work, do your review, do your research and bring us errors that would...in your opinion, you know, would legitimately constitute a reversal.'
> Q.  In other words, don't hide your good stuff in the middle of a lot of very questionable things, a lot of small things?
> A.  Oh, exactly, yes, sir.
> Q. You could lose the golden hay needle in the whole stack...
> A.  Well, certainly, yeah...
> HT 146-147.

Certainly there was no risk here of any "golden hay needle" getting lost in Mr. Beaty's

meager haystack.  As the piece de resistance, Mr. Beaty was asked

> Q. Just generally speaking, Mr. Beaty, do you feel like you raised the appropriate issues that needed to be raised with the trial and within your...your experience as an attorney and with your background and experience and knowledge of the law with regards to appellate law and criminal appellate law?  Do you feel like you did everything in your power to raise the appropriate issues and to bring those to the Court's attention so that they could rule on those appropriately?
> A.  Yes, sir, I did.
> HT 149.

As for what claims should have been raised in the appeal, petitioner hereby incorporates by reference all the record-based claims in this petition.   Those few that were "raised" in the four and one third pages of argument were insufficiently briefed.   All record-based claims briefed and discussed herein could and should have been raised on direct appeal.   These omissions are the prejudice suffered by petitioner.

## B.  Governing legal standard.

The deficient performance of  Petitioner's appellate counsel rendered him functionally absent, and reversal is automatic.  *Strickland v. Washington,* 466 U.S. 668, 691-692 (1984) ("In certain Sixth Amendment contexts, prejudice is presumed.")  Actual or constructive denial of the assistance of counsel is legally presumed to result in prejudice.  In any event, with but for appellate counsel's actions, or lack thereof, the result in the case on appeal would have been different.

## C.     Argument.

Every criminal defendant has a right to effective assistance of counsel on his first direct appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision at all -- much less a favorable decision -- on the merits of the case." *Evitts*, 469 U.S. at 394.  Appellate counsel must make "a conscientious examination" of the record to identify all of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967).  Therefore, appellate counsel "must have a firm command of the facts of the case as well as governing

law before [they] can render reasonably effective assistance of counsel."

In reaching its conclusion in *Evitts,* the Supreme Court rejected the state's argument that the Due Process Clause did not apply to state appeals because the state did not have to grant appeals as of right at all.  The Court stated, "[i]n short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts,* at 401.  *See also Goeke v. Branch,* 514 U.S. 115, 119-20 (1995).

> The Supreme Court in *Evitts* concluded that "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney... In short, the promise...that a criminal defendant has a right to counsel on appeal—like the promise...that a criminal defendant has a right to counsel at trial—would be a futile gesture unless it comprehended the right to the effective assistance of counsel.
> *Evitts,* at 396-97.  *See also Goeke v. Branch,* 514 U.S. 115, 120 (1995).

In the absence of clear Supreme Court guidance on the standards for appellate ineffective assistance of counsel claims, the federal courts have turned to *Strickland* and *Cronic* to provide a framework for analyzing these appeals.

Direct appeal counsel's performance was unreasonable under the prevailing professional norms and there is a reasonable probability that, but for appellate counsels' errors,  Petitioner's conviction or sentence would have been reversed on direct appeal.  *See Duhamel v. Collins*, 955 F.2d 962, 966 (5th Cir. 1993); *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).  The two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel likewise applies to the ineffectiveness of direct appeal counsel.  *Evitts,* 469 U.S. 387. Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success would be sufficient to make the showing of deficient performance.  *Duhamel*, 955 F.2d at

-186-

966-67.

Petitioner submits that although he had counsel on appeal, that counsel did not provide the representation mandated by the Constitution.  *Evitts v. Lucy,* 469 U.S. 387, 396 (1985) ("To be sure, counsel did have nominal representation when he brought this appeal.  But nominal representation on an appeal as of right – like nominal representation at trial – does not suffice to render the proceeding constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position that one who has no counsel at all."

Courts have frequently reversed for a finding of appellate ineffective assistance of counsel. In *Brown v. United States*, 167 F.3d 109 (2nd Cir. 1999) (appellate counsel ineffective  for failing to raise an issue on appeal concerning an obviously deficient instruction on reasonable doubt);  *Lucas v. O'Dea*, 169 F.3d 1028 (6th Cir. 1999) (in a murder case, fatal variance between the indictment and the conviction not raised on direct appeal, and procedurally defaulted; default excused due to counsel's error); *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) (appellate counsel  held  ineffective for failing to request plain error review of erroneous first degree murder instruction); *Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995) (appellate counsel  ineffective for failing to raise a  Brady claim or, in the alternative, an ineffective assistance of counsel  claim when trial counsel had failed to challenge the prosecution's failure to disclose exculpatory material); *Claudio v. Scully*, 982 F.2d 798 (2nd Cir. 1992), *cert. denied*, 508 U.S. 912 (1993); *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1991), (appellate counsel ineffective in failing to raise issue of whether prosecutor improperly commented on defendant's failure to testify during closing argument)

**D.  Application of the law to  the claim**.

The record-based claims discussed herein could have been raised on direct appeal because

the basis for them was present in the record itself.   Petitioner raises them here in his petition, and

submits that they are properly before the Court.    But, alternatively, if some of these claims are

argued by Respondent to not  properly be  before the Court due to the failure to raise them on direct

appeal, then Petitioner would assert that  the ineffective assistance of appellate counsel issue cures

this.

**CLAIM VIII:  MR. ACKER  WAS DENIED MEANINGFUL ACCESS TO THE COURTS AND DUE PROCESS OF LAW IN STATE POST-CONVICTION PROCEEDINGS BY THE APPOINTMENT OF INEFFECTIVE STATE POST-CONVICTION COUNSEL.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained

in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury,

the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of

counsel, due process of law, and reliable guilt and penalty determinations, because petitioner was

denied due process by the appointment of ineffective state post-conviction counsel.

**Facts in support.**

The trial court, Hon. Robert Newsom presiding, appointed Toby Wilkinson as state post-

conviction counsel.[235]   Petitioner hereby incorporates by reference Claim I (petitioner's actual

innocence), Claim II (trial court's bias and errors), Claim III (trial court error in denying change of

venue), and Claim VII (trial court conspired to appoint ineffective appellate counsel).

The state application filed by Mr. Toby Wilkinson is shocking in its shoddiness and virtual

---

[235]  *See* Exhibit 5, order appointing both attorneys.

incomprehensibility.[236]   This application shows that Mr. Wilkinson failed to research issues outside the record, failed to research the applicable law, and committed a fraud on the court by plagiarizing and copying his own client's letters and memos virtually verbatim, even though they contained rambling, incomprehensible statements, are in the first person, and cite virtually no applicable legal precedents.   As reporter Chuck Lindell of the *Austin American-Statesman* comments, this writ application "reads as if it were written by someone with an eighth grade education.  In fact, most of it was."  The document itself is the best evidence that Mr. Acker in fact received no state post-conviction review worthy of the name and that in fact Mr. Wilkinson so abdicated his responsibilities to his client that Mr. Acker actually had no counsel acting on his behalf, through no fault of his own and against his wishes.

### a. The state writ application.

The state writ application filed by Mr. Toby Wilkinson begins with short sections on custody and jurisdiction (at 1-2)[237] and then sets out, in 14 pages, a "procedural history" of the case (at 3-16). This bizarre procedural history lists seemingly every document filed in the case, in strict chronological order, with no indication of either the relevance of the motion or the Court's ultimate ruling, in run-on sentences, some of which go on for three or four pages (*e.g.,* at 7-11).[238]

Then, in Section IV ("Statement of the Case") the claims are set out. (at 17 *et. seq.*).  The first

---

[236]   Exhibit 9.

[237]   Exhibit 9.  The habeas record that undersigned counsel received from the trial court is un-paginated, with the exception of the transcript of the evidentiary hearing ("HT"), so page references will of necessity be to the document itself.

[238]   *Id.*  All the following page references in this section are to Mr. Wilkinson's state habeas application, at Exhibit 9.

four claims ( at 18-22) are generic boilerplate challenges to the constitutionality of the Texas death penalty statute, and as to each claim Mr. Wilkinson helpfully states "there are no cases on point." (at 18, 19, 20, 22).

After this spectacularly unpromising start, matters deteriorate even further. "Claim No. 5" purports to be a claim of "ineffective assistance of counsel" but no instances of ineffectiveness are cited, just a single citation to *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984) (at 23-24). Then a new section appears which is entitled "facts which entitle applicant Daniel Clate Acker to Relief" and a new sub-section numbered "C" (there are no "A" and "B" sub-sections) entitled "trial counsel failed to provide effective assistance of counsel at his trial..." (at 24).

The claims then mysteriously re-start at Claim 1, which complains that defense attorney McDowell only visited Mr. Acker once in jail. (at 24-25).   Claim 2 in its entirety reads:

> The trial attorney provided ineffective assistance of counsel because William Howard McDowell misled the jurors by telling them that Markie came out of the truck head first in a downward motion, demonstrating thisa (sic) with his own body falling head first It was never said that Markie came out of the truck head first, therefore McDowell had not right (sic) to say that she did so.
> (at 25).[239]

This was actually one of the more coherent claims.   Other highlights of the application include the following:

Claim No. 5: "looking back at applicant's trial and taking into consideration how applicant's trial attorneys allowed the D A to railroad applicant, applicant thinks that McDowell encouraged applicant to lie on record..." (at 26)

Claim No. 6: "The D A said that it takes two legs to make a change of venue stand   pretrial

---

[239]   Virtually none of the sentenced in the application have a period at their end.

publicity and, applicant can't remember Long's exact words, but the hate letter would have stood

for the second leg....Anyway, applicant saw that Ferguson and McDowell were not calling him to

the stand and that the judge was reaching for his hammer to give his decision, so applicant stood

up...but...the judge stopped him and told him not to speak out unless he was asked..."  (at 27-28)

Claim No. 9: "Applicant personally doesn't think that the warm-ups Long held up to the

jurors were the warm-ups that Markie was wearing at the time of her death, because applicant could

not see any blood on them or holes in them [Applicant claims to have very good eyesight]  (at 29)

Claim No. 13: This claim is simply a statement that "there is no Claim No. 13 included."  (at

30)

Claim No. 16: Here the application shifts into the first person: "Had I known that Sands's

testimony would be inadmissible, I would have had my lawyers object to the D A's showing the

jurors a picture of the cut on Markie's right calf, because seeing the cut with no explanation as to

how it got there only inflamed the jury's minds."  (at 32)

Claim No. 18: "Then, perhaps two days before trial, Ferguson came back to the county jail

to see me, and I asked him if he got the answers to Norton.  Ferguson told applicant no, that Norton

was wanting off the case, or three thousand dollars more to sit through the trial..."(at 37-38)

Claim No. 21: "The trial attorney provided ineffective assistance of counsel because it was

almost lunch time when the State and the applicant's attorneys both rested their cases, and the judge

made applicant's attorneys and the D A stay and work through dinner preparing the jury charge..."

(at 40)

Claim No. 22: "Ferguson and McDowell just sat throughout the entire trial pretending to

represent applicant while Long railroaded applicant."(at 42)

Claim No. 23: "For instance, applicant begged to go to Markie's funeral, and they wouldn't let him go Hurley pretended to be reading out of a 19 02 TPC hand book telling applicant that 'if you're fighting somebody on a two-story porch or arguing with a person on a two story porch and that person jumps off that porch to get away from you and falls to his/her death, you have committed murder in the first degree" (at 43)

Claim No. 25: "This makes applicant wonder what else the medical examiner may have used that belonged to somebody else and was put into Markie's autopsy report" (at 45)

Claim No. 27: [in its entirety] "The trial attorney provided ineffective assistance of counsel because applicant showed Ferguson the autopsy's conclusion on page seven showing how a cut on Markie's calf was used to help them form their opinion, saying there was a lack of associated hemorrhage of the laceration on the right leg   Then applicant showed Ferguson why Marcie's brain stem was lacerated at the first joint out of her skull, and then applicant showed Ferguson a picture of Joe Anglin, a Hopkins County Deputy, pulling Markie's cotton warm-ups into the leg laceration, soaking up what little blood bled from the laceration See attached picture" (at 45-46)

Claim No. 29: "Frank Long asked Sabrina ball if Markie told her that she had tried to jump out of my truck as soon as Markie got to her house to call the police   Ball was just fixing to say yes, and the D A and everyone else could see that Ball was just fixing to say yes, but before she could spit the word "yes" out, Long quickly stopped her and said to her, 'Now I called you on the phone last night and talked to you about this' Ball shook her head yes and then answered his question no after Long reminded her of their conversation of the night before Apparently and evidently Long called her and told her to not make Markie's statement sound like an excited utterance or the jurors will get to hear the fact that she tried to jump out of a pick up and I stopped her then he'll lose his trumped

up bogus case Read the highlighted area's (sic) of these six attached statements and notice Sabrina

Ball wrote 'Whe (sic) told me she tried to jump out of the truck her face was just a few inches from

the pavement and he grabbed my arm and pulled me back in...It seems awfully, awfully strange to

me that out of all these sttached (sic) reports the furors (sic) were not allowed to hear a single one

of them... "(at 47-48)

Claim No. 30: There is no claim 30, the application jumps from Claim 29 to Claim 31.

Claim No. 32: "The family had all the inside information they needed to know what all kinds

of evidence that they needed to fabricate against me to wrongfully convict me..." (at 49-50)

Claim No. 33: "According to the attached rule that I copied out of an up to date Texas Court

Rule Book Ganzalise's (sic) opinion should have been inadmissible due to the fact that she said she

used the attached notes to form her opinion..." (at 51)

Claim No. 36: "Here's what they did they pretended to represent me to keep from biting the

hand that feeds them and onlyu (sic) put on one boxing glove when they could have put on both

gloves and won this case for me I'm not guilty and the facts of the case prove I'm not guilty I'm just

about out of carbon paper so before I run out I want to try and list everything that was added to and

took from me to convict me on the next page then as soon as I get some more typing supplies I have

about thirty more errors I want to tell you about and have brought up in my appeal." (at 55)

Appended to the application was a bewildering number of "exhibits" that appear to come

directly from Mr. Acker's letters, as apparently Mr. Wilkinson tired of re-typing them at a certain

point.  If possible, they are even more incoherent than the foregoing (e.g. 'The other day I sent you

a copy of Jace Anglins police report concerning Markies death I forgot to point out...) And are

replete with grammatical errors, misspellings and a mind-boggling morass of claims.

-193-

This incoherent mess was actually copied almost verbatim from letters Mr. Acker had sent Mr. Beaty, his appellate attorney.  Mr. Beaty was cited for contempt for failing to file his appellate brief on time, and the Texas Court of Criminal Appeals issued a Notice to Show cause for Contempt on Mr. Beaty.[240]  On September 11, 2002, Mr. Beaty responded to that notice and attached as exhibits copies of Mr. Acker's letters and memos.[241]  A comparison of these letters and memos (Exhibit 16) with the application filed by Mr. Wilkinson (Exhibit 9) shows that Mr. Wilkinson copied them almost verbatim, without even changing grammar or spelling errors.

### b.  "Sublime journeys" and "execution by "gibberish"

Eventually, in 2006, when one of Mr. Acker's former clients was executed, various Texas reporters discovered this travesty and a series of articles were published in newspapers across the state.[242]  The research by various independent sources discovered that Mr. Wilkinson had repeatedly delivered slip-shod, virtually unintelligible habeas writs in six capital cases, many of which were copied verbatim from each other, had never been  reprimanded by the courts, and was still on the list

---

[240]   Exhibit 15.

[241]   Exhibit 16 (letters and memos attached to Mr. Beaty's response).

[242]   *See* Exhibit 21, newspaper articles on Mr. Wilkinson's state habeas writs. *See, e.g.,* Maro Robbins, *"Convict's odds today may rest on gibberish,"* San Antonio Express-News, August 24, 2006 (describing Justin Fuller and Mr. Acker's appeals); Editorial, "*Shoddy legal work matter of life, death,"*  San Antonio Express-News, September 7, 2006 (editorial urging that Acker's state writ attorney be removed from the list of attorneys approved by the CCA for capital writs); Chuck Lindell*, "Attorney cuts, pastes client's letter*," Austin American-Statesman, October 29, 2006, at A11(discussing Mr. Acker's state petition); Chuck Lindell, *"Sloppy lawyers failing clients on death row,"* Austin American-Statesman, October 29, 2006("attorney Toby Wilkinson, for example, filed a nearly incoherent collection of statements lifted almost verbatim from his death row client's letters...");  Guillermo Contreras, "*Death sentence upheld despite garbled argument*,"San Antonio Express-News, Nov. 15, 2006;  Rick Casey*, "Bad lawyers out; clients out of luck,"* Houston Chronicle, Dec. 14, 2006 ("spectacularly substandard proficiency").

of attorneys eligible to receive capital habeas appointments.   A petition submitted on behalf of one

of Mr. Wilkinson's clients, Justin Fuller, had language copied verbatim from another client's writ,

that of Henry Dunn.[243]   Mr. Fuller was executed in 2006.   Reporter Maro Robbins of the San

Antonio Express-News comments:

> Wilkinson's legal brief spends 13 pages naming seemingly every document filed in the case. It then makes five claims that are almost word-for-word identical to claims in Fuller's case. The next 24 pages seem copied from his client's letters, so that they seldom if ever cite case law and occasionally lapse into first person narrative.

Mr. Robbins cites Claim No. 36, *supra,* where Acker complains of running out of carbon

paper and legal supplies.[244]   Reporter Chuck Lindell of the Austin American-Statesman writes:

> The appeal that Greenville attorney Toby Wilkinson filed for death row inmate Daniel Acker in 2003 reads as if it were written by someone with an eighth-grade education.
> In fact, most of it was.
> Wilkinson lifted 90 per cent of the arguments in his writ of habeas corpus from a letter Acker wrote from death row.   In it Acker, a high school dropout accused of killing his Hopkins County girlfriend, listed three dozen mistakes he believed his trial lawyers made.   Riddled with misspellings, bad grammar and first-person rants, the writ features such turns of phrase as 'trumped up bogus case,' and 'applicant had to just sit quietly and let the D.A. railroad him.
> Wilkinson, a 26-year lawyer, even referred to the judge's gavel as a hammer, because that's how Acker's letter read.
> Wilkinson's writ, which is still awaiting a ruling by the Court of Criminal Appeals, cited little precedent to bolster its arguments.  Even the date of Acker's indictment was wrong...
> Wilkinson has submitted six habeas writs in death penalty cases since 1999, each taking the reader on its own sublime journey.   Sentences are abandoned in midthought; claims are misnumbered; sections promising analysis, facts and law are left blank.  Arguments promised in the index are never mentioned again...

---

[243]   Exhibit 21, Maro Robbins, *"Convict's odds today may rest on gibberish,"* San Antonio Express-News, August 24, 2006 (describing Justin Fuller and Mr. Acker's appeals); Editorial, *"Shoddy legal work matter of life, death,"* San Antonio Express-News, September 7, 2006 (editorial urging that Acker's state writ attorney be removed from the list of attorneys approved by the CCA for capital writs)

[244]   Exhibit 21, Maro Robbins, *"Convict's odds today may rest on gibberish,"* San Antonio Express-News, August 24, 2006 (describing Justin Fuller and Mr. Acker's appeals)

State taxpayers paid $25,000 for the Acker writ.[245]

It is ironic that the print media was the first to expose this travesty, and not  the trial courts, who appointed Mr. Wilkinson and reviewed his pleadings, nor the Court of Criminal Appeals, who also had abundant evidence of the problem.  It is very telling that at the trial court evidentiary hearing, not one word was spoken by the trial judge in criticism of either Mr. Wilkinson's shoddy writ or Mr. Beaty's shoddy appeal.  Nor was Mr. Wilkinson's shoddy work mentioned in the CCA's order denying his state writ.[246]  As Mr. Wilkinson's writ in this matter was among his latter appointments, perhaps the last one, it is hard to believe that no  judicial authority was aware of his work, but instead of moving to correct it, Mr. Wilkinson just received more capital writ appointments.

### c.  The habeas evidentiary hearing.

The matter was forwarded to the Texas Court of Criminal Appeals and on August 19, 2003 that court sent it back as it failed to contain "the State's answer, an order determining whether previously unresolved factual issues material to the legality of applicant's confinement exist, proposed findings of fact and conclusions of law from the parties and...from the trial court."[247]  The trial court, probably prompted by this letter as there were certainly unresolved factual issues,  then

---

[245]   Exhibit 21, Chuck Lindell*, "Attorney cuts, pastes client's letter*," Austin American-Statesman, October 29, 2006, at A11(discussing Mr. Acker's state petition).  Apparently $3,730 went to a private investigator and medical expert, but there is no evidence of their work in Mr. Wilkinson's writ.

[246]   Exhibit

[247]   *See* Exhibit 10 herein.

held an evidentiary hearing.[248]

The transcript of this hearing is a profoundly depressing and disturbing document. It reveals once again the absolute and complete abdication by Mr. Wilkinson of his client's interests, which he had already shown in the ludicrous writ he submitted to the court.  It is nothing more than an attorney reluctantly going through the paces, all the while wishing he was somewhere else, as well he might given the writ he had filed.   At the hearing, Mr. Wilkinson led his client in rote fashion through each claim in the state writ.  Without comment by the court, Mr. Wilkinson repeatedly refers to the habeas claims as "your" claims (Mr. Acker's) as if Mr. Wilkinson had nothing to do with them, as indeed he did not.[249]   The questions by Mr. Wilkinson were of the nature of "Anything else about that before we proceed to claim five?" (HT 11); "is there anything else you want to add about your first four claims?"  (*Id.*); " Let's go on to the next claim, Mr. Acker" (HT 24);  "Well we need to move on to the next one, and that would be claim number seven" (HT 26).  Often, Mr. Wilkinson totally dissociates himself from the claims in the writ he purportedly authored. *E.g.,*  "Mr. Acker's contention is..."  (HT 233).   Sometimes the answers by Mr. Acker go on for five pages of transcript without a break or question (HT 13-18) in rambling and disjointed form.  At the hearing, Mr. Acker attempts to present the forensic details that show his innocence without any help from the person who should be conducting this presentation, his attorney.  As Mr. Acker lacked legal training and has only an eight grade education, he becomes lost in detail and failed to present his case coherently, a task that his counsel should have performed.  Petitioner merely read from various disjointed papers and memos of the sort that were included in his state habeas application. Even the prosecution had

---

[248]   *See* Exhibit 11, trail court order setting evidentiary hearing.

[249]   *E.g.,* "In your ninth point, you claim that..."  HT 28.

-197-

to step in occasionally to help out:

     MR. BRADDY: You know, its an ineffective assistance claim, and, really, all he needs to do is say whether or not he explained that to his lawyers and maybe his lawyers didn't bring that out properly...

HT 20.

     Mr. Wilkinson was in such a hurry to have the hearing over with, he rushed through Mr. Acker's points as quickly as possible: "Q.  In your ninth point, you claim that....A.  Excuse me a second. Q.  I'm sorry.  A.  I'm not quite through" (HT 28); "What...what...are you trying to skip over (point) 12?"  (HT 33); Q.  Moving on to 34...A.  No, you're...you're moving me a little bit too fast." HT 73.

     A convoluted issue regarding the presentation of the victim's warm-ups was presented dead-pan by Mr. Acker with his attorney's full acquiescence.  HT 30.  Although Mr. Acker testified at the hearing from notes he had made himself (HT 109) Mr. Wilkinson had never seen those notes before the hearing.  (*Id.*)  Similarly, Mr. Wilkinson admitted he had never seen a 60-page report that Mr. Acker wanted admitted into evidence that he had written himself.  (HT 97).  Mr. Wilkinson summarily dealt with this as follows: Q. (By Mr. Wilkinson) Is it just a re-hash of what your testimony is?  A.  Well, it's kind of a break-down of my trial.  Mr. Wilkinson: I'll pass the witness at this time, Judge."  HT 98.  Even though Mr. Wilkinson admitted he had never seen this 60 page report, he stated, after the prosecutor said he had no objections to it, he stated "[t]hen we'd ask that the Court go ahead and admit it."  HT 98.  Even later in the hearing, he admitted that he had still not read it but  "I've just skimmed it briefly."  HT 128.  The court eventually did not admit the report. HT 129.

In yet one more startling indication that state habeas counsel did nothing for his client, as late as the hearing itself, May 19, 2004, Mr. Wilkinson had to ask his client for permission to talk with Mr. Acker's mother and sisters about the case.  HT 129-130.   This was a full three years after Mr. Wilkinson had been appointed as state habeas counsel by trial judge Robert Newsom on May 2, 2001!  Even worse, Mr. Wilkinson had to ask his client for this permission under oath on the record, at what he called a "hearing on release of information" during the evidentiary hearing.  HT 128-129. This was felt to be necessary because Mr. Wilkinson proposed to call them as witnesses at this hearing and had apparently never talked to them prior to this.

At the hearing, Mr. Wilkinson let his client testify as to many issues that had no merit, and so totally abdicated his responsibility that the prosecutor had to occasionally educate Mr. Acker as to the viability of his issues:

A. [Mr. Acker] But when people's testimony is contradicting, and you're trying to get these things pointed out...

Q. [prosecutor] That's still not a legal objection.  Do you see how it wouldn't have benefitted you at all to be able to get him to object to those things that didn't need to be objected to anyway? You understand that, right?

HT 113.

And similarly: Q. [prosecutor] It could make it even worse for you.  You understand that, don't you?"  HT 118.

As to the issues that had merit, Mr. Wilkinson was missing in action.  At the trial court habeas hearing, presented with an opportunity to cross-examine Mr. Beaty regarding the inadequacy of the appellate brief, this was left untouched, for obvious reasons.  The encounter has the aspect of

two individuals in glass houses afraid to throw stones at each other.  The most Mr. Wilkinson could muster was, "In death penalty cases, Mr. Acker facing the death penalty, wouldn't it have been more prudent to try everything possible?  A.  Prudency would be in the eyes of the appellate court, and that's to whom I'm looking, as to what would...what would be prudent to them."  HT 150-151.  Mr. Wilkinson was actually eager to help out the prosecution.  For instance, in questioning as to whether there was attorney-client privilege regarding the attorneys' reasons for not calling the accident reconstructionist, instead of trying to defend the privilege, Mr. Wilkinson agreed with the prosecutor that there was no privilege: "Case law is clear as to that issue."  HT 209.

There were  no objections made by Mr. Wilkinson at the entire 244-page hearing.  Many opportunities for such objections were available however.   For instance, the prosecutor asked Mr. McDowell whether "both the accident reconstructionist and the medical examiner formed the opinion that he was not, in fact, telling the truth about it?  It would be safe to say that, wouldn't it?"  Mr. McDowell was allowed to answer this purely speculative question as to the expert's state of mind without objection.  HT 237.

Mr. Wilkinson's abdication of his responsibilities to his client was inadvertently admitted by the prosecutor.  Martin Braddy, the Hopkins County district attorney, commented on Mr. Wilkinson's writ by stating that "the court went out of its way to let Acker speak for himself during a hearing on his claims, even if, at that hearing, Acker 'just kind of rambled.'"[250]  It could hardly be clearer that Mr. Acker had no attorney at that hearing but was actually involuntarily *in pro per.* He was doing the speaking, not Mr. Wilkinson, who had been appointed to do it.

---

[250]   Exhibit 21, "Death sentence upheld despite garbled argument," by Guillermo Contreras, *San Antonio Express News,* Nov. 15, 2006, paraphrasing  Mr. Braddy.

-200-

This habeas evidentiary hearing, as much as the habeas writ itself, clearly shows that in fact Mr. Acker had no counsel acting on his behalf and was in effect acting *in pro per.*

**Analysis and argument.**

**A.  The applicable provisions of Article 11.071 and how they apply to Mr. Acker's state habeas application.**

By appointing a state habeas lawyer who completely failed to present even the rudiments of state habeas review, abdicated his responsibility as an attorney in plagiarizing his own semi-literate clients's letters, who did nothing on behalf of his client at the evidentiary hearing, and who committed a fraud upon the courts in billing for work he did not perform, the trial court and the Texas Court of Criminal Appeals (hereinafter, "CCA") refused to comply with their binding statutory obligation to ensure that death row inmates received "competent" representation in state post-conviction proceedings.

The Texas statute enacted for the legislative purpose of "provid[ing] for the routine and regular appointment of competent counsel to represent indigent, death-sentenced inmates in state collateral review,"[251] is codified at Article 11.071 of the Texas Code of Criminal Procedure, and took effect on September 1, 1995. This statutory scheme ordered the CCA "under rules and standards adopted by the court, [to] appoint competent counsel" for indigent death row inmates for state post-

---

[251]    In 1995, as Congress debated legislation that would eventually be enacted as the AEDPA, a legislative compromise emerged by which the States would become entitled to invoke strict timelines in federal habeas proceedings in return for appointing competent counsel according to established standards and paying reasonable litigation expenses in state post-conviction proceedings. *See* 28 U.S.C. §§ 2261-2266; *Calderon v. Ashmus*, 118 S. Ct. 1694, 1696 (1998) (describing "opt-in" scheme). Then Texas' Attorney General, Dan Morales, testified in favor of the AEDPA before the Senate Committee of the Judiciary. *See Federal Habeas Corpus Reform: Eliminating Prisoners' Abuse of the Judicial Process, 1995: Hearings on S. 3 Before the Comm. on the Judiciary*, 104th Congress, 1st Sess. (1995) (statement of Dan Morales at 2).

conviction appeals.  TEX. CODE CRIM. PROC. Art. 11.071 § 2(d).  Such counsel, the statute provided,

"shall investigate expeditiously...the factual and legal grounds for the filing of an application for a

writ of habeas corpus." *Id*. § 3(a).

Section 2 of article 11.071 guarantees a capital habeas applicant that "competent counsel"

will be appointed to represent him or her.  Section 2(a).  Section 3 mandates that appointed counsel

"shall investigate, expeditiously, before and after the appellate record is filed in the court of criminal

appeals, the factual and legal grounds for the filing of an application for writ of habeas corpus."

Section (3) (a).  Section 3 goes on to outline the procedure appointed counsel must follow in order

to obtain funding for such an investigation.  Mr. Acker's state habeas attorney did not provide the

representation envisaged by the statute because he filed a ridiculous and ludicrous "writ" of which

he was not even the principal author.

**B.  *Ex parte Graves* and the right to effective state post-conviction counsel.**

As discussed *supra, i*n 1995, Tex. Code of Crim. Pro. Art. 11.071 created a right to counsel

in initial capital habeas corpus matters.  In 2002, the Texas Court of Criminal Appeals considered

the question of whether an applicant under art. 11.071 had the right to effective assistance of state

post-conviction counsel.  *Ex parte Graves,* 70 S.W.3d 103 (Tex. Crim.App. 2002).  In *Graves,* the

CCA held that art. 11.071, sec. 2(a)'s provision that "[a]n applicant shall be represented by

competent counsel" does not mean effective counsel within the meaning of *Strickland, supra,* but

is only entitled to "qualified" counsel.  *Graves,* 70 S.W.3d at 114.  *Graves* concentrated on the

phrase "competent counsel" and held that "competent counsel" only means an attorney who is

competent at the time they are appointed.

*Graves* seems to hold that there is no constitutional right to effective assistance of counsel

-202-

on habeas corpus.  However, there is also no constitutional right to appeal.  *McKane v. Durston,* 153 U.S. 684 (1894).  The courts have long held that if the state provides a convicted person with a right to appeal, "the procedures used in deciding appeals must comport with the demands of the Due process and Equal Protection Clauses of the Constitution."  *Evitts v. Lucy,* 469 U.S. 387 (1985).  In reaching its conclusion in *Evitts,* the Supreme Court rejected the state's argument that the Due Process Clause did not apply to state appeals because the state did not have to grant appeals as of right at all.  The Court stated, "[i]n short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause."  *Evitts,* at 401.  *See also Goeke v. Branch,* 514 U.S. 115, 119-20 (1995).   In other words, one a state has provided the right to counsel on appeal, a state has to provide "effective" counsel.[252]

As the Supreme Court stated in *Evitts* and *Avery v. Alabama,* 308 U.S. 444 (1940), "the guarantee of counsel cannot be satisfied by mere formal appointment."  When there is a right to counsel, there is a right to effective assistance of that counsel.  'The special value of the right to the assistance to counsel explains why 'it has long been recognized that the right to counsel is the right to effective assistance of counsel.'  *McMann v. Richardson,* 379 U.S. 759, 771, n. 14 (1970); *United States v. Cronic,* 466 U.S. 648, 654 (1984).

The appointment of incompetent counsel violated Mr. Acker's  right to due process under the law as guaranteed by Fourteenth Amendment of the United States Constitution.  The federal courts have long recognized a right to due process in Texas post-conviction proceedings.  In *Welch v. Beto,* the Fifth Circuit plainly stated this right, holding, "Having invoked Texas statutes granting

---

[252]  *See also* discussion at Claim VII  *infra.*

post- conviction hearings, Welch had the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment." *Welch v. Beto,* 355 F.2d 1016, 1020 (5th Cir. 1966).  In *Welch*, a death-sentenced inmate requested a hearing regarding his sanity to proceed on appeal, pursuant to then TEX. CODE CRIM. P. art. 932 (b)§ 3.  *See id*. at 1018.  The Texas statute allowed for the empanelment of a jury and a hearing on sanity during a criminal defendant's appeal of a conviction if the judge of the convicting court found a reasonable doubt as to the sanity of the defendant.  *See id*. at 1018 n. 2.

Welch requested a hearing pursuant to the statute and presented, in affidavit form, the evidence of his insanity which had been presented to the jury at trial.[253] *Id*. at 1018.  The state presented no evidence to refute Welch's affidavit, but merely contended that the evidence was the same as that which the jury rejected at trial.  *Id*.  The trial court refused to hold a hearing before a jury.  *Id*.

Although the Fifth Circuit recognized that no new evidence of the inmate's insanity had been produced, the Court held that the judge's failure to hold a hearing in the absence of any evidence presented by the state was a violation of the statute and therefore a violation of due process.  The *Welch* Court did not consider whether a new hearing would have been likely to produce a different result, but rather based its grant of relief solely on the denial of  process.  *Id*.

The United States Supreme Court has also stated that the right to due process extends to state post-conviction proceedings such as Mr. Acker's.  In *Case v. Nebraska*, 381 U.S. 336, 337 (1965), the Court granted review in a Nebraska case where an inmate challenged his guilty plea and the State

---

[253] A jury considered Mr. Welch's sanity at his original trial. *Id*.  A psychiatrist testified that Mr. Welch was insane.  The state then presented the testimony of the local medical doctor as well as two lay witnesses who expressed their view that Mr. Welch was sane.  The jury found him sane and he was convicted and sentenced to death. *Id*.

of Nebraska's post-conviction remedy did not apply to his case.  The Court granted certiorari "to decide whether the Fourteenth Amendment requires that the States afford prisoners some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees." *Id*.  Although the Court never reached the issue because of an intervening change in the Nebraska statute, the Court's action was a clear recognition of a right to some form of due process.

In *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998), the Supreme Court discussed a post-conviction right to due process in the context of clemency proceedings.  A plurality of the Court held that there is, at least, a minimal right to due process of law in executive clemency proceedings.[254]  *Id*. at 289.  Justice O'Connor's concurrence in the case explains that, "although it is true that pardon and commutation decisions have not traditionally been the business of the Courts . . . some minimal procedural safeguards apply to clemency proceedings." *Id*. at 289 (internal citations omitted).  The obvious implication of this statement is that matters such as post-conviction habeas proceedings, which are traditionally within the purview of the courts, require a significantly greater attention to due process.  Even Justice Rehnquist's opinion announcing the judgment, but joined by only two members of the Court, distinguished clemency from other features of the criminal justice process:

> Clemency proceedings are not part of the trial or even the adjudicatory process.  They do not determine guilt or innocence, and are not intended primarily to enhance the reliability of the trial process.  They are conducted by the Executive Branch, *independent of direct appeal and collateral relief proceedings*.

*Id*. at 284 (emphasis added).  Justice Stevens addressed the question head on in his dissenting

---

[254] Five justices of the United States Supreme Court held that a right to due process in clemency proceedings exists.  *See Id*. (J. O'Connor concurring joined by J. Souter, J. Ginsberg, and J. Breyer) (J. Stevens dissenting).

opinion stating:

> If there could be any question whether state postconviction proceedings are subject
> to due process protections, our unanimous opinion in Yates v. Aiken, 484 U.S. 211,
> 217-218, 108 S.Ct. 534, 538, 98 L.Ed.2d 546 (1988), makes clear that they are.

*Id*. at 293.[255]  This review of cases demonstrates the courts' longstanding recognition of a robust right

to due process in state post-conviction proceedings.

In Mr. Acker's case, as in *Welch*, the violation of due process is clear. The application filed

on Mr. Acker's behalf by his appointed counsel was totally inadequate. For Texas now to deny him

adequate state habeas review violates his Fourteenth Amendment right to due process under the law.

*See Evitts*, 469 U.S. at 401; *Welch*, 355 F.2d at 1018.

### C. The result of the trial court and the CCA's failure to appoint competent counsel.

Mr. Acker alleges the following claims concerning state habeas counsel's performance, all

of which are supported by the record and by a review of state post-conviction counsel's files:

### 1. Mr. Acker was effectively deprived of state habeas counsel.

The "writ" filed by Mr. Wilkinson is essentially devoid of evidence of his input.  Besides the

initial nonsensical listing of every motion filed in the case, without specifying either the outcome of

the relevance of the motion,  and several generic boilerplate claims, the rest of the chaotic mess is

composed entirely of Mr. Acker's own input.  This is clearly not what was envisioned by the statute.

The statute did not envision that the petitioner himself would write the writ, yet that is essentially

what happened here.  As such, Mr. Acker actually had no state post-conviction counsel.

### 2. State post-conviction counsel committed a fraud on the courts and his client.

---

[255] In *Yates v. Aiken*, the Court reversed the decision of the South Carolina Supreme Court
refusing to apply the United States Supreme Court's interpretation on remand for that Court.  The
court held that, [s]ince [the South Carolina Supreme Court] has considerd the merits of the
federal claim, it has a duty to grant the relief that the federal law requires." 484 U.S. at 218.

Mr. Wilkinson charged the state $22,270 for copying his client's letters.[256]   Clearly this charge did not reflect the amount of actual work done on the writ.  Mr. Wilkinson committed a fraud on the courts, the public and his own client.

### 3.  State habeas counsel failed to personally investigate extra-record evidence.

State habeas counsel either was unaware, chose not to, or was unable to  investigate and develop  extra-record evidence in his writ application.   There is no evidence that any trial or family witnesses were interviewed.  Many meritorious claims detailed in this writ were never presented to the state courts.

### 4.      State habeas counsel performed no  extra-record investigation into the circumstances of Mr. Acker's  conviction and death sentence.

As is apparent from the state habeas record,  no investigation was performed, although apparently funds were obtained for an investigator and medical expert.[257]   This failure, in conjunction with the shutting down of Mr. Acker's claim of actual innocence by the trial court and the failure of Mr. Acker's  trial attorneys to oppose the trial court's actions,  meant that this federal writ application is the first time any court has examined significant aspects of the crime, mitigating evidence that should have been presented at the punishment phase, and crucial questions regarding the fairness of Petitioner's trial and sentence of death.

### D.  Petitioner was prejudiced as a result of the CCA's failure to comply with section 2 and appoint competent counsel.

---

[256]   Exhibit 21, newspaper articles on Mr. Wilkinson's writ, Chuck Lindell, *"Attorney cuts, pastes client's letter*," Austin American-Statesman, October 29, 2006, at A11(discussing Mr. Acker's state petition);  "Sloppy lawyers failing clients on death row," *Austin American-Statesman,* by Chuck Lindell, Oct. 29, 2006.

[257]   Exhibit 21, Chuck Lindell, *"Attorney cuts, pastes client's letter*," Austin American-Statesman, October 29, 2006, at A11(discussing Mr. Acker's state petition).

The Petitioner alleges that state habeas counsel's representation fell below a minimal standard of competence in the following ways: failure to argue his client's actual innocence in any coherent manner; failure to adequately brief claims; failure to investigate and present extra-record evidence, even though that is the primary purpose of post-conviction proceedings; failure to perform research sufficient to understand basic principles of post-conviction practice; failure to present proper post-conviction claims. Mr. Acker was prejudiced by this ineffective performance, because, as this Petition demonstrates, viable challenges to his conviction and death sentence could have been, but were not, raised during state post-conviction proceedings.

The purpose of habeas corpus proceedings in Texas, as in other states, is to permit the introduction of new, **extra-record** evidence bolstering a claim that the defendant's constitutional rights were violated. *See, e.g.*, *Ex Parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) (defendant not entitled to relief on claim in habeas which could have been litigated on direct appeal because he proffered no additional factual development to back it up); *Ex Parte Torres*, 943 S.W.2d 469, 474 (Tex. Crim. App. 1997) (habeas corpus remedies designed for situations "where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question" and claim must be "substantiated through additional evidence gathering in a habeas corpus proceeding"). The *Torres* court also recognized that, except in rare circumstances, claims of ineffective assistance of counsel must be litigated in post-conviction proceedings because the trial record does not provide an adequate basis for determining the claim. *Id.* (observing that motion for new trial may provide means of introducing extra-record evidence during direct appeal, but "mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion"). Performing an investigation to determine the

existence of cognizable constitutional violations is a fundamental component of adequate state post-conviction representation:

> Accordingly, where necessary to assure the full and fair adjudication of the client's federal claims, postconviction counsel should request that the state postconviction case be conducted, and should be prepared to conduct it, as a civil trial proceeding, initiated by her on behalf of the client, complete with frequent and productive interaction with the client; comprehensive prefiling and pretrial documentary, field, and legal investigation to identify and prepare to litigate the appropriate causes of action; careful pleadings; motions practice; evidentiary hearings; briefing; and any other procedures that counsel might use in civil litigation on a plaintiff's behalf.

1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRAC. & PROC. § 7.1a, at 274-75 (3rd ed. 1998) (LIEBMAN & HERTZ) (footnotes omitted).  In order to zealously represent the client and preserve an appropriate record for later federal review, state postconviction counsel is under a binding professional and ethical obligation to determine the avenues of investigation which may prove fruitful and request the resources necessary to pursue them, if such a request is necessary:

> At the outset of state postconviction proceedings, counsel should identify the procedures and resources necessary to investigate the case fully and fairly; discover meritorious claims; ascertain the expert and other analyses, evidence, and testimony that effective litigation of those claims will require; and present that information in a meaningful manner, whether by way of an evidentiary hearing or some other procedure.  Thereafter, counsel should request, formally and in writing, each of the necessary procedures and resources and explain with specificity why each is essential, what claim it relates to, what evidence is likely to be generated thereby, and, generally, how the "full and fair" litigation of one or more claims in the petition requires the requested procedure or resource.

*Id*. at 279 (footnote omitted).  This is not an unreasonable or extraordinary burden to place on a lawyer whose client faces execution by lethal injection.  Indeed, it is nothing more or less than what the State of Texas guaranteed to death row inmates by passing Article 11.071 of the Code of Criminal Procedure.

State habeas counsel failed to perform any of these tasks.  As this petition demonstrates, there

were viable claims of constitutional error affecting Mr. Acker's trial and direct appeal proceedings. Had state habeas counsel performed any investigation into the case, he would have determined that there was significant ineffective assistance of counsel at both the guilt innocence phase and the sentencing phase of the trial.   For the sake of brevity, Petitioner incorporates by reference all of the claims in this petition as factual support for what competent state habeas counsel would have discovered.

### E. The right to effective assistance of counsel applies to the "trial court" phase of state post-conviction proceedings, and was violated in this case, thus prejudicing the petitioner.

*Coleman v. Thompson*, 501 U.S. 722 (1991)  held that, because an inmate has no right to the effective assistance of counsel in post-conviction proceedings, counsel's ineffective performance in such proceedings could not constitute "cause and prejudice" for procedural defaults caused by a post-conviction attorney's late filing of an appeal from a habeas corpus trial-court disposition. *Id*. at 750. However, in *Coleman,* one question -- a question presented by this case -- was specifically left undecided.  Coleman noted that (1) this Court had guaranteed indigent appellants constitutionally effective counsel during the "one and only appeal" to which they were entitled by state law, even though the appeal itself was not required by the Federal Constitution, *Evitts*, 469 U.S. at 396 (citing *Douglas v. California*, 372 U.S. 353, 357 (1963)); and that (2) Virginia allowed defendants to attack the effectiveness of their trial counsel only in postconviction proceedings.  *Coleman*, 501 U.S. at 755.  Thus, *Coleman* asserted, there must be a guarantee of effective assistance of counsel in "the first forum in which a federal claim can be raised" in state court.  *Id*.  The Supreme  Court found it unnecessary to "answer this question broadly, however, for one state court has addressed Coleman's claims: the state habeas trial court." *Id*.  Coleman

has had his 'one and only appeal,' if that is what a state collateral proceeding may be considered; the Buchanan County Circuit Court, after a 2-day evidentiary hearing, addressed Coleman's claims of trial error, including his ineffective assistance of counsel claims.  What Coleman requires here is a right to counsel *on appeal* from that determination.  Our case law will not support it.

*Id*. at 756 (emphasis added).  Thus, it would "defy logic for us to hold that Coleman had a right to

counsel *to appeal* a state collateral determination of his claims of trial error."  *Id*. at 756-57

(emphasis added).

    Lower federal courts, including the Fifth Circuit, have generally declined to extend the

protection of the Sixth Amendment to the area left open by the *Coleman* exception, although not

without some controversy.[258]  The Ninth Circuit court provided the fullest rationale for its decision:

The actual impact of [a *Coleman*] exception would be the likelihood of an infinite continuum of litigation in many criminal cases.  If a Applicant has a Sixth Amendment right to competent counsel in his or her first state postconviction proceeding because that is the first forum in which the ineffectiveness of trial counsel can be alleged, it follows that the Applicant has a Sixth Amendment right to counsel in the second state postconviction proceeding, for that is the first forum in which he or she can raise a challenge based on counsel's performance in the first state postconviction proceeding.

*Bonin v. Vasquez*, 999 F.2d 425, 429 (9th Cir. 1993).  *Bonin*'s reasoning is unpersuasive in several

ways.  First, several states have guaranteed effective assistance of postconviction counsel without

---

[258]  *See, e.g. Mackall v. Angelone*, 131 F.3d 442, 448-49 (4th Cir. 1997) (en banc), *cert. denied*, 118 S. Ct. 907 (1998) ("*Mackall II*"); *Hill v. Jones*, 81 F.3d 1015, 1025-26 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 967 (1997); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). *Mackall II* vacated the prior opinion of a three-judge panel excusing Mackall's procedural default based on the *Coleman* exception.  *See Mackall v. Murray*, 109 F.3d 957 (4th Cir. 1997) ("*Mackall I*").  Two judges dissented from the *en banc* court's decision on the *Coleman* issue, reasoning that Mackall should be allowed, under the exception "recognized and reserved" in *Coleman*, to mount an "attack on the competency of his trial and appellate counsel in the only forum available to him -- a habeas corpus proceeding."  *Mackall II*, 131 F.3d at 451-52 (Butzner, J., dissenting, joined by Murnaghan, J.).

-211-

inflicting an "infinite continuum of litigation" on their courts.[259]  Second, even if the *Bonin* court's

analysis was accurate in 1993, the later enactment of state and federal bars on successive petitions

makes *Bonin*'s prediction unlikely indeed.[260]  Further, the postconviction attorneys in *Bonin*,

*Mackall*, and *Jones* apparently managed to properly present cognizable claims to the postconviction

court.[261]

       In any event, *Coleman* does not control this case.  Texas, like Virginia and virtually all other

jurisdictions, recognizes that ineffective assistance of trial counsel claims such as the ones pled in

this petition usually cannot be adequately aired until post-conviction proceedings.[262]  This case

presents the question left open by *Coleman* because  Coleman at least received *some* effectual

representation.  Coleman had a chance to prove his claims and gain relief from his conviction and

death sentence in the evidentiary hearing held in Buchanan County.  This was the "main event" of

his state post-conviction proceedings, and the appeal from the state hearing to the Virginia Supreme

---

[259]  In *Commonwealth v. Priovolos*, 715 A.2d 420 (Pa. 1998) the court "recognized that appointed [postconviction] counsel must discharge the responsibilities under [Pennsylvania's postconviction] rule and that a remedy may be fashioned where counsel fails to do so."  *Id.* at 422.  If an Applicant meets the rigorous standard of proof that the assistance of his postconviction counsel was ineffective, his case will be remanded for representation by different counsel.  *Id.*  In *Rothering v. McCaughtry*, 556 N.W.2d 136, 137-38 (Wis. Ct. App. 1996), *review denied*, 560 N.W.2d 277 (1997), the court found that an Applicant who had received ineffective assistance of postconviction counsel could raise that issue with the trial court.

[260]  Both the state successor bar codified at Art. 11.071 § 5(a) and the federal successor bar found at 28 U.S.C. § 2244(b) have survived constitutional challenges.  *See Felker v. Turpin*, 518 U.S. 651 (1996); *Ex Parte Davis*, 947 S.W.2d 216 (Tex. Crim. App. 1996).

[261]  *See Hill*, 81 F.3d at 1019; *Mackall I*, 109 F.3d at 957;  *Bonin*, 999 F.2d at 426.

[262]  *Ex Parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) ("In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim.").

Court would have involved only the most basic scrutiny of what occurred below.[263]

Here, State habeas counsel failed to perform any investigation into the case, and thus never learned that such investigation could have supported an ineffective assistance of trial counsel claim.

Another distinction can be made: Coleman did not challenge the adequacy of his trial-court-level representation, *Coleman*, 501 U.S. at 755.   Mr. Acker  presents this  challenge here. *See* Claims III, IV, V, *supra.*

### F.  Mr. Acker's right to meaningful access to the state courts was denied by the CCA's violation of its statutory obligation to afford him competent state habeas counsel.

In  *Murray v. Giarratano*, 492 U.S. 1 (1989) a four-member plurality held that the Federal Constitution did not guarantee indigent death-sentenced inmates counsel in state-court post-conviction appeals. *See id.* at 12 (Rehnquist, J., joined by Scalia, White, and O'Connor, JJ.).  Justice Kennedy, who did not join the plurality, wrote in a concurring opinion that "[i]t cannot be denied that collateral relief proceedings are a central part of  the review process for prisoners sentenced to death." *Id.* at 14.  He also acknowledged the dissenters' point that "a substantial proportion of [death row] prisoners succeed in having their death sentences vacated in habeas corpus proceedings" *Id.* The Court's decision in *Bounds v. Smith*, 430 U.S. 817 (1977), Justice Kennedy observed, required that indigent death row inmates be afforded "meaningful access" to the courts.  "The complexity of our jurisprudence in this area, moreover, makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law." *Id.*

---

[263]In fact, the order entered on appeal in Coleman's case was itself cursory and ambiguous. *Coleman*, 501 U.S. at 727-28.  The state-court practice of reviewing lower-court postconviction decisions with cursory "formulary" orders is so widespread that this Court has developed a doctrine specifically tailored to such situations. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804-05 (1991).

Nevertheless, Justice Kennedy cautioned, states must be permitted "wide discretion" in implementing such access, and the Court may only evaluate the facts of "the case before us." *Id*. Justice Kennedy reasoned that there was no justification for striking down Virginia's entire system of post-conviction assistance, because "no prisoner on death row in Virginia has been unable to obtain counsel to represent him in post-conviction proceedings, and Virginia's prison system is staffed with institutional lawyers to assist in preparing petitions for postconviction relief." *Id*. at 14-15.   Therefore, "[o]n the facts and record of this case," Justice Kennedy joined the majority's result.

Justice Kennedy's *Giarratano* concurrence is the law.[264]   Thus, indigent death row inmates' right of meaningful access to the courts may, in certain specific cases, require the assistance of persons "learned in the law."   Under the reasoning in Justice Kennedy's *Giarratano* concurrence, Mr. Acker has been denied meaningful access to the courts.   Mr. Acker has only  an eighth grade education and was obviously not capable of investigating, researching, and briefing an adequate application for post-conviction relief, *from the confines of Texas's death row*.   Mr. Acker was induced to place his trust in the state's guarantee that it would secure "competent" counsel for him. He relied on state-appointed counsel to investigate, research, and present his claims to the state court. The lawyer instead admittedly failed to investigate the case and simply copied Mr. Acker's own letters and memos.

The "exhaustion" doctrine requires inmates to give state courts a chance to remedy federal

---

[264]   *Marks v. United States*, 430 U.S. 188, 193 (1978) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting  *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

violations before invoking their right to federal review of the claims.  *See, e.g.*, *Ex Parte Royall*, 117 U.S. 241 (1886);  *Ex Parte Hawk*, 321 U.S. 114, 117-18 (1944); *see also* 28 U.S.C. § 2254(b)(1) (1996) (codifying exhaustion doctrine).  The exhaustion requirement is meaningless, however, if the state court either provides no forum for the litigation of federal claims or provides an obviously inadequate forum.  *Young v. Ragen*, 337 U.S. 235, 238 (1949) ("The doctrine of exhaustion of state remedies, to which the Supreme Court has required the scrupulous adherence of all federal courts, presupposes that some adequate state remedy exists.") (citation omitted).

In *Case v. Nebraska*, 381 U.S. 336 (1965) (*per curiam*), the Court granted certiorari "to decide whether the Fourteenth Amendment requires that the States afford state prisoners some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees."  *Id*. at 336.[265]  Justices Clark and Brennan wrote separately to urge the creation of simple, fair postconviction forums in which prisoners could exhaust their federal constitutional claims.    *See id*. at 336 (declaring that the "wide variety" of then-current postconviction techniques had proven "entirely inadequate" to vindicate federal rights, leading to a "tremendous increase" in federal habeas filings) (Clark, J., concurring); *id.* at 346 (remarking that adequate state procedures were "all too scarce" and that states "should provide a postconviction process at least as broad in scope as existing Federal statutes.") (Brennan, J., concurring).  Soon after *Case*, most American states revised their post-conviction procedures to provide an adequate forum for the consideration of extra-record claims.  *See* Note, *State Post-Conviction Remedies and Federal Habeas Corpus*, 12 WM. & MARY L. REV. 149, 170 (Table 2, listing effective date of revisions of

---

[265] Nebraska's intervening update of its postconviction procedures rendered the question moot, and the Court remanded so that the Applicants could take advantage of the new procedures.  *Id*. at 338.

state postconviction statutes).

The factors that induced the *Case* court to refrain from deciding the ultimate issue presented by the petition are absent here. First, Nebraska's enactment of a comprehensive habeas scheme opened an opportunity for Case of which he had yet to take advantage. Second, the *Case* court knew that later federal review would likely provide Case with at least one forum for consideration of his federal claims. *Case*, 381 U.S. at 346 (Brennan, J., concurring); *see also Woods v. Nierstheimer*, 328 U.S. 211, 216 (1946) ("[I]f the State of Illinois should . . . deny all remedies to individuals imprisoned within the state in violation of the Constitution of the United States, the federal courts would be available to provide a remedy to correct such wrongs."). Finally, the fact that this is a death penalty proceeding strengthens the rationale for ensuring fundamental fairness. The Supreme Court recently reaffirmed the mandate that "capital proceedings be policed *at all stages* by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Monge v. California*, 118 S. Ct. 2246, 2252 (1998) (citing *Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part)) (emphasis added). The constraints on habeas corpus are familiar, but the Supreme Court has never wavered from the principle that one full and fair opportunity to seek habeas relief is an important part of ensuring fairness in capital proceedings.[266]

---

[266]   *E.g. McFarland v. Scott*, 512 U.S. 849, 858, 859 (1994) ("[Q]uality legal representation is necessary in capital habeas corpus proceedings [which have] a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty."); *Murray v. Giarratano*, 492 U.S. 1, 14 (1989) ("It cannot be denied that collateral relief proceedings are a central part of the review process for prisoners sentenced to death.") (Kennedy, J., concurring); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("The role of federal habeas proceedings [] is important in assuring that constitutional rights are observed."); 135 Cong. Rec. S13483 (1989) (reprinting JUDICIAL CONFERENCE OF THE UNITED STATES, AD HOC COMMITTEE ON FEDERAL HABEAS CORPUS IN CAPITAL CASES (Powell, J., presiding) (Aug. 23, 1989)) ("In habeas corpus proceedings fairness requires that a defendant be provided a searching

**G. The trial court's and the CCA's decision violates due process by denying access to meaningful appellate remedies without any showing of wrongdoing on Mr. Acker's part.**

Mr. Acker's state habeas corpus petition was totally inadequate.   The state trial court -- not Mr. Acker – chose the lawyer who represented him, and did so pursuant to a scheme which promised competent counsel.  Mr. Acker has paid for the State's failure to live up to its commitment by being forced to present unexhausted claims to the federal district court and being dismissed from federal court without prejudice to exhaust those claims through a subsequent application that was not even examined on the merits.

An attorney acts as his client's agent, and that client must normally be bound by the attorney's mistakes.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991).   However, the consequences of the blind application of this doctrine in this case are so utterly detached from any wrongdoing on the part of the *only* person who must suffer them, that they offend basic principles of ordered liberty.  Legal fictions, such as the fiction which reflexively punishes Mr. Acker for the mistakes of an incompetent and ineffective state habeas attorney he did not choose, must yield when their application would offend basic principles of fairness and proportionality.[267]

Mr. Acker was denied a meaningful opportunity to investigate, research, and present post-conviction claims in the state courts.  The forfeiture of appellate review for appellants who escape

---

and impartial examination of his claims.").

[267]   *See, e.g.*, *Austin v. United States*, 509 U.S. 602, 618 (1993) (legal fiction identifying drug asset forfeitures as "in rem" proceedings against property itself cannot hide fact that forfeiture is actually a criminal punishment of the property's owner reviewable under the Excessive Fines Clause); *Kennedy v. Mendoza-Shields*, 372 U.S. 144, 165-66 (1963) (rejecting legal fiction that forfeiture-of-citizenship proceedings not subject to constitutional safeguards because they are "civil" in nature).

during their appeals, as an unambiguous "punishment" or "sanction" for their misconduct, has consistently been upheld by the Supreme Court against constitutional challenges. *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239-41 (1993) (citing cases).  However, in such cases, punishment is justified by the fact that the  appellants have intentionally engaged in misconduct "reasonably calculated to disrupt the very appellate process which they themselves have set in motion." *Estelle v. Dorrough*, 420 U.S. 534, 540 (1975) (per curiam).

The denial of the meaningful representation promised by law to Mr. Acker is punishment, just as surely as asset forfeitures, citizenship revocations, and appellate dismissals are punishments. This recognition triggers the fundamental due process requirement that adverse government action be at least roughly calibrated to the degree to which its target has intentionally done wrong.[268]  With evidence in the record that appointed counsel's performance was not competent but was ineffective the forfeiture imposed on Mr. Acker was grossly disproportionate punishment for his attorney's mistake.

1.      **The State violated Mr. Acker's due process rights by inviting his reasonable reliance on its promise to provide him with competent counsel, then punishing him when that promise was broken.**

When a State enacts a procedure that benefits a particular class of persons, a member of that class can claim a "substantial and legitimate expectation" that the State will apply the procedure to him. *Hicks v. Oklahoma*, 447 U.S. 343, 345 (1980).  This expectation is rooted in due process

---

[268] *See, e.g.*, *Southwestern Telegraph & Telephone Co. v. Danaher*, 238 U.S. 482, 490 (1915) ("[F]undamental principles of justice embraced in the recognized conception of due process of law" prevent punishment of one who committed "no intentional wrongdoing, no departure from any  prescribed or known standard of action, and no reckless conduct"); *cf. United States v. Bajakajian*, 118 S. Ct. 2028, 2039 (1998) (rejecting seizure of $357,144 from defendant under Excessive Fines Clause as punishment for violating reporting requirement because punishment "grossly disproportionate" to defendant's wrongdoing).

principles which apply even when the state-law benefit at issue is not of federal constitutional dimension.[269] Had Mr. Acker been informed that his counsel might render inadequate assistance which would render ineffectual his right to state post-conviction review and jeopardize his opportunity for federal review, *and* that Texas courts would do nothing to palliate the effect of that error, Mr. Acker might have made an informed decision to at least try to proceed *pro se* or to find counsel willing to represent him on a *pro bono* basis.  Instead, he was forced into a *de facto pro se* representation when only his own memos were presented in state habeas and at the state evidentiary hearing, his appointed counsel did nothing to prepare for the hearing or to effectively present his claims at the hearing.

As it is, he relied on the State's assurances to his detriment.  The Supreme Court recently reaffirmed that the reasonable reliance interests of state officials should be respected in death penalty proceedings.  *Thompson v. Calderon*, 118 S. Ct. 1489, 1499 (1998) (criticizing lower federal court for suddenly reopening seemingly concluded federal habeas proceedings even though "the executive branch of California's government took extensive action in reliance on the mandate denying relief").  Mr. Acker's reliance interests deserve equal respect: just as California's executive officials were wronged by the federal court's unwarranted decision to delay execution of an exhaustively-reviewed death sentence, Mr. Acker was wronged by Texas' unwarranted refusal to remedy the consequences of its broken promise to afford him a competent lawyer.

---

[269]  *Id.*; *see also Heckler v. Mathews*, 465 U.S. 728, 746 (1984) (appropriate to consider protection of "reasonable reliance interests" in evaluating government action); *Knox v. Collins*, 928 F.2d 657, 660 (5th Cir. 1991) (although right to exercise peremptory challenges not guaranteed by Constitution, judge's violation of promise to give particular jury instruction violated "essential demands of fairness" when defendant showed that he had relied extensively on promised instruction in determining whom to strike with peremptory challenges).

**2.   The trial court and the  CCA's decision denied Mr. Acker the equal protection of the law.**

State-court proceedings not mandated by the federal constitution are nevertheless subject to minimal equal-protection standards requiring a "rational basis" to justify differential treatment of similarly-situated individuals. *Dorrough*, 420 U.S. at 568.  Members of the Supreme Court have observed that the minimal guarantees of equal protection which apply to clemency proceedings would be violated by "a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Ohio Adult Parole Auth. v. Woodard*, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J., concurring, joined by Souter, Ginsburg, & Breyer, JJ.).  Mr. Acker has been denied any meaningful access to the state postconviction process -- a denial which may affect these proceedings.

What "rational basis" would subject Mr. Acker to these deprivations while other indigent death row inmates receive "one full and fair round" of habeas review?  Evidence of his intentional attempts to sabotage the legal process would certainly qualify.  Naturally, different standards, and different outcomes, may be imposed on those who have manipulated or flouted processes designed to safeguard their rights.[270]  No such abuse has happened here.  The only distinction between Mr. Acker and other Texas death row inmates is that the State, in his case, violated its own obligation to appoint him competent counsel, whereas it fulfilled that obligation as to other inmates.

---

[270]   *See, e.g.*, *Dorrough*, 420 U.S. at 568 (forfeiting appeal rights of those who violate bail during pendency of appellate proceedings); *Cantu-Tzin v. Johnson,* 162 F.3d 295 (5th Cir. 1998) (death row inmate's "flouting" of state court procedures and passing up of the opportunity to pursue habeas relief on the merits does not entitle him to appointment of federal counsel to address the merits of time-barred habeas petition);  *United States v. Dunnigan*, 507 U.S. 87, 96 (1993) (enhancing defendant's sentence based on her perjury during trial); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) (denying review of claims to Applicants who cause "severe . . . disruptions" by filing piecemeal, successive habeas writs).

-220-

The very importance of the right at stake here illustrates the Supreme Court's recognition that equal protection and due process principles can sometimes "converge." *M.L.B. v. S.L.J.*, 117 S. Ct. 555, 556 (1996). In cases dealing with the right of access to courts in proceedings not required by the Constitution, the proper equal protection analysis balances "the character and intensity of the individual interest at stake, on the one hand, and the State's justification for its exaction, on the other." *Id.* (citing *Bearden v. Georgia*, 461 U.S. 660, 666-67 (1983)).[271] Mr. Acker's interest in receiving full and fair scrutiny of his conviction and death sentence is unquestionably substantial and legitimate.

The trial court's and the CCA's justifications for its actions are not in the record. Indeed, it is difficult to think of a legitimate reason for the CCA to ignore its clear statutory duty to ensure competent representation by failing to ensure the appointment of competent counsel *ex ante* or, at least by affording relief in cases where it has become clear that appointed counsel performed below the standard required by 11.071.

Federal courts' respect for the State's sovereign power has always assumed that the state itself has shown reciprocal respect for federal rights by affording adequate review to indigents. *See*, *e.g.*, *Thompson*, 118 S. Ct. at 1501. (observing that state court had considered and rejected challenges to inmates sentence four times, that the Governor had reviewed the death sentence "in a comprehensive and public decision"); *Murray v. Carrier*, 477 U.S. 478, 487 (1986) (deference owed to states' "good-faith attempts to honor constitutional rights"). Here, the State's own conduct

---

[271] Another factor in determining whether appellate equal protection or due process rights have been violated is the likelihood that the determination being appealed is correct. *Id.* As five members of the Supreme Court acknowledged, "a substantial proportion of [death row] prisoners succeed in having their death sentences vacated in habeas corpus proceedings." *Murray v. Giarratano*, 492 U.S. 1, 14 (Kennedy, J., concurring) (citing *id.* at 25 n.13 (Stevens, J., dissenting, joined by Marshall, Brennan and Blackmun, JJ.)).

undermined its ability to claim respect for its judgments in federal court.

## CLAIM IX: THE TRIAL COURT ERRED IN DENYING THE DEFENSE CONFIDENTIAL EXPERTS UNDER *AKE V. OKLAHOMA*.[272]

**Facts in support.**

Mr. Acker's case presented a very obvious and critical need for experts, as much of the defense case centered around his claim of innocence of the crime, and forensic experts were needed to present this evidence.  Yet the trial court failed to provide key experts and then did not allow crucial elements of the case to be presented because it was not supported by the same expert testimony for which that court had denied funding.  If Mr. Acker had sufficient means, he would have been able to hire these defense experts on his own, out of public and prosecutorial scrutiny, and their findings would not have been subject to pre-trial subpoena as they were in this case.  Simply because Mr. Acker lacked the means to do this does not mean that

At some point before trial the prosecutor subpoenaed all the defense expert witnesses, and their medical examiner was very upset.  HT 213.  There was a hearing to attempt to "get what they knew."  HT 214.  There was no actual hearing, but the medical examiner was upset and did not want to be called.  HT 214.

## Claim IX(a): The trial court failed to provide confidential crime scene investigator for the defense.

As discussed *supra,* Mr. Sands, the defense investigator, testified *in camera* that he had conducted some experiments relating to the distance from the petitioner's home to the crime scene and the time it took to drive there.  21 RR 129.  Mr. Sands stated that he obtained the times by

---

[272]    470 U.S. 71 (1985).

driving within the posted speed limits.  21 RR 130-132. Mr. Sands was also asked to see if he could open the door from the driver's seat of the truck.  21 RR 134.

Mr. Sands also performed tests on the truck.  He obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that he was not able to open the door from the driver's seat without extending himself quite a bit so that he could still see above the dashboard.  21 RR 142.  He told the court that he could not have opened the door and pushed someone out of the vehicle while driving on the road.  21 RR 142.  An objection to this evidence was sustained.  21 RR 143.  The trial court had earlier denied funds for a defense forensic expert because they had this investigator, but then refused to let him testify as to these forensic matters.  As Mr. Ferguson testified at the trial court habeas hearing,  "we asked for a criminologist; we were told to use Mr. Sands.  We tried to use Mr. Sands, and we were unable to get that [the truck tests]  in."  HT 173.  Additionally, seemingly forgotten by the trial court, was the fact that the prosecution had previously stipulated that Mr. Sands was a crime scene expert. 6 RR 19. As such, the ruling was erroneous and highly prejudicial.

**Claim IX(b): The trial court violated the confidentiality of the defense experts by allowing the prosecutor to comment on their fees and their absence from the trial.**

As discussed *supra* in Claim II(p) and in Claim X *infra*, the trial court erred in admitting extensive testimony regarding the fact that the defense had a medical examiner expert appointed. The defense had filed a motion in limine to exclude references to witnesses not called at trial, and during Mr. Acker's testimony they renewed the motion and requested that the prosecutor not be allowed to ask about witnesses that were not called.  22 RR 2-3.  The Court ruled that it would have to be taken up "question by question."  22 RR 3.  Yet the prosecutor delved into this in detail, forcing revelation of privileged attorney-client communications:

Q. [Prosecutor] Do you know who Dr. Norton is?

A. [Mr. Acker]  The lady that came to court, I believe said (sic) she didn't know.

Q. Dr. Norton is your doctor.

Mr. Ferguson: Objection, your Honor.

The Court: What's your objection?

Mr. Ferguson: It's outside the...talking about a witness that's present and hasn't testified. He's testifying for someone else.

Mr. Long: I'm not testifying for her.  I'm asking who she is.

The Court: You can answer that question if you have personal knowledge.

A. I'm not aware of who she is.  I thought she was the lady but her name was Gonzales, I believe.

The Court: I'm going to allow the witness to answer the question if he can do it from his personal knowledge.

The Witness: I don't know who you're talking about.

Q. You're aware that you had a medical doctor to review our records, arn't you?

A. I never spoke to one.

Q. I didn't ask you if you spoke to her.  I asked you if you are aware that you had a medical doctor to review these records?

A. I thought I was supposed to have.  I don't know whether or not I did or not.

Q. Well, you got Dr. Norton listed as an expert witness in this case.

Mr. Ferguson: Argumentative, Judge.

The Court: Overruled.

Q. And you know that you've got a doctor, don't you?

A. I don't know that I do, no.

A. You've never been told by your attorneys that you had a doctor appointed to review the medical evidence?

Mr. Ferguson: Objection, your Honor.  That goes to attorney-client privilege.

Mr. Long: He's on the stand, Judge.

Mr. Ferguson: What we told him, your Honor, is privileged information.

The Court: Let me see the attorneys.  How is that material?

Mr. Long: It's a public record.

Mr. Ferguson: Did you not grant a motion in limine that Mr. McDowell made?

The Court: The Court denied that because I was going to take it question by question.  But is that not in the records as well?

Mr. Ferguson: Yes.

The Court: Overruled.

Q. You're aware of that, arn't you Mr. Acker?

A. I was aware that there was a doctor appointed to me at one time.  And I don't...it's my understanding she requested more money and the Court didn't want to give it to her.

Q. I believe the actual fact is the Court gave her all the money she wanted.  We can check the records to see.

A. I don't know what happened.

Q. Do you want to check and see?  We can look.  It's right these in the records.

Mr. Ferguson: It's argumentative, your Honor.

The Court: Overruled.

Mr. Long: If he says that he believes that the court didn't pay her what she asked for I'd ask that the record of payment be marked and admitted before this jury.

The Witness: I never kept up with what she was paid or if y'all paid her or not, but I remember hearing something about she requested more money.

Q. I believe I did too. And I believe that the court paid her. We've got the records. And I'm asking that they be marked and admitted in evidence.

Mr. Ferguson: Objection, your Honor. What's the relevance of whether or not we had an expert.

The Court : Sustained. Sustained.

Mr. Long: Well the relevance, your Honor...

Mr. Ferguson: Your Honor, at this point I'd ask that the jury be instructed to disregard the last remarks.

The Court : Disregard the last statement and don't consider it for any purpose.

Mr. Ferguson: I'd move for a mistrial.

The Court: denied.

22 RR 7-11.

However, the damage had been done by now. The jury was left with the impression not only that the defense expert Dr. Norton had rendered an opinion that supported strangulation, but that Mr. Acker was dissembling when he claimed not to know about this opinion. The records should never have been public and available to the defense as they were entitled to a confidential expert under *Ake v. Oklahoma*, 470 U.S. 71 (1985). This severely disadvantaged Mr. Acker, as had he had sufficient funds, he could have hired such an expert to render a confidential report. The prosecutor's conduct in delving into this area was improper.

Yet again, when Mr. Acker was being cross-examined, the prosecution again referred to the court-appointed doctor, highlighting her failure to testify:

Q. Now you're a doctor?
A. No, but that's common sense.
Q. Or did your doctor tell you that?
22 RR 91.

The prosecutor asked Mr. Acker about Dr. Norton: argued "I asked y'all to think about where Dr. Norton was. He didn't answer that, did he? Because Dr. Norton's opinion is the same.

Don't you know that Dr. Norton..."  23 RR 21.

The defense objected but the Court overruled the objection.  23 RR 21.

The prosecution continued: "It's reasonable to assume that if his doctor had a difference of opinion she would have been here telling you about it.  I forgot to see her, I guess, because I missed her testimony.  She's not here."  23 RR 21-22.

**Legal analysis.**

In *Ake v. Oklahoma,* 470 U.S. 71 (1985), the Supreme Court recognized that indigent defendants are entitled to independent  experts when their assistance "may well be crucial to the defendant's ability to marshal a defense." *Ake,* at 80.  The Court conducted a Fourteenth Amendment due process analysis and held that without independent experts, defendants could be denied "meaningful access to justice."  *Id.* at 76-77.  This was because, while  jurors may disregard a defendant's testimony or a lawyer's argument, experts "assist lay jurors, who generally have no training in" scientific or medical matters, to make a "sensible and educated determination about" the contested issues.  *Id.* at 81.  "By organizing...[data], interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the [expert] **for each party** enable[s] the jury to make its most accurate determination of the issue before them." *Id.* at 81.  Because jurors do listen to, are influenced by, and will rely upon the testimony of such experts, a trial may be fundamentally unfair when a party is left without expert assistance.

The Supreme Court in *Ake* did not address the question of prejudice.  Because an element of the constitutional violation is that independent expert assistance is crucial, most courts which have addressed *Ake* error reverse if the error is found, without conducting a harmless error analysis.  *See, e.g., Cowley v. Stricklin,* 929 F.2d 640 (11th Cir. 1991); *Kordenbrock v. Scroggy,* 919 F.2d 1091 (6th

Cir.)(en banc), *cert. denied,* 499 U.S. 970 (1991); *Smith v. McCormick,* 914 F.2d 1153 (9th Cir. 1990).  The Texas Court of Criminal Appeals has held that failure to provide defense counsel with expert assistance as required by due process under *Ake* is a structural error not subject to harm analysis.  *Rey v. State,* 897 S.W.2d 333, 347-48 (Tex. Crim. App. 1995)

As a result of the failure of the defense experts at the guilt phase, Mr. Acker was denied due process and equal protection of the law because he did not receive the kind of expert assistance promised in *Ake.*

The *Ake* requirement is not satisfied merely when an expert is appointed for the defendant. Under *Ake,* "the State must, at a minimum, assure the defendant access to a **competent** psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense."  *Ake, supra,* 470 U.S. at 83 (emphasis added).

Other courts have similarly recognized that the right to expert assistance under *Ake* extends to testimony at trial.  In *Castro v. State,* 71 F.3d 1502, 1515 (10th Cir. 1995) the court held that the mere appointment of a psychiatric expert did not satisfy the dictates of *Ake* when that expert was unwilling to testify at trial, as "the expert's role included taking the stand." Similarly, in *Buttrum v. Black,* 721 F.Supp. 1268, 1312 (N.D.Ga. 1989), *aff'd,* 908 F.2d 695 (11th Cir. 1990), *reh. denied,* 916 F.2d 719 (11th Cir. 1990), the court reversed a capital conviction because the defendant was not provided with a psychiatrist whose assistance met the scope of *Ake*, testifying if necessary and responding to state testimony regarding future dangerousness.

Texas courts have held that, under *Ake,* a defendant is entitled to an "adversarial" expert and not just a neutral one.[273]  In *DeFreece v. State*, 848 S.W.2d 150, 159 (Tex. Crim. App. 1993) the

---

[273] "An expert appointed pursuant to *Ake*...is an agent of defense counsel for purposes of the work product doctrine."  *Skinner v. State,* ___S.W.2d___, No. 72,131 (Tex. Crim. App. May

court held that *Ake* requires

> The appointment of a psychiatrist to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and identify weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts.
> `We recognize that the accused is not entitled to a psychiatrist of his choice, or even one who believes the accused was insane at the time of the offense. *Ake* makes that much clear.  But even a psychiatrist who ultimately believes the accused was sane can prove invaluable by pointing out contrary indicators and exposing flaws in the diagnoses of the state's witnesses.

*DeFreece,* at 159.[274] The *DeFreece* case applies to an *Ake* expert in any subject, including future dangerousness. *Rey v. State,* 897 S.W.2d 333 (Tex. Crim. App. 1995).[275]

---

21, 1997), slip op. 6.  The contours of Texas law are important to determine the entitlement of Mr. Acker  to such an adversarial expert, as a component of the claim of a violation of his federal constitutional rights, and not as a claim that Texas law was violated. ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law'", *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998).

[274]   The Ninth Circuit, in *Smith v. McCormick,* 914 F.2d 1153 (9th  Cir. 1990), has given a detailed explanation of the difference between a neutral psychiatrist and the kind of "adversarial" expert that a defendant is entitled to under *Ake.*  A neutral psychiatrist only performs the scientific test or examination that the court ordered, discloses her opinion to the lawyers for both sides and the judge and testifies for any party who calls her.  An adversarial psychiatrist recommends the scientific test or examination that is most likely to assist the defendant, reviews evidence and interviews witnesses under counsel's direction; discloses her opinion to defense counsel only; helps counsel to determine whether her testimony will be of any value to the defense; advises counsel about how to expose any weaknesses in the opinion of the state's doctor even if she agrees with it; refuses to discuss the case with the prosecutor outside of the courtroom; helps counsel to prepare her direct testimony, if any, and cross-examination of the state's expert; and advises counsel about how to explain the scientific evidence to the jury in summation. 914 F.2d at 1157.

[275]   "[O]nce he established that cause of death was likely to be a significant factor at trial, appellant was entitled to more than an expert to testify on his behalf---he was also entitled to 'technical assistance...to help evaluate the strength of [that] defense,...and to identify the weaknesses in the State's case, if any, by...preparing counsel to cross-examine opposing experts." *Rey,* 897 S.W.2d at 343 (Tex. Crim. App. 1995).

Petitioner does **not** claim that he had the right to have his experts testify favorably for him. Rather, he does claim that the "assistance" rendered by the court-appointed experts in this case was really  no assistance at all, since they were unable or unwilling to convey to the jury the minimal assistance envisioned in *Ake*.   Hence Mr. Acker  was deprived of his opportunity to present to the jury compelling evidence that he was not actually guilty of the murder and he is entitled to relief on this claim.

## CLAIM  X:  MR. ACKER WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW BY THE PERSISTENT MISCONDUCT OF THE PROSECUTOR.

During Mr. Acker's trial, numerous and repeated  improper and prejudicial statements by the prosecutor so infected the proceedings as to make the trial and sentencing phase of that trial fundamentally unfair.   These comments and argument denied Mr. Acker due process of law as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

**A. Facts in support.**

**Claim X(a): Prosecutorial misconduct in prejudicially inflaming the passions of the jury.**

The prosecutor deliberately inflamed the passions of the jury by asking the victim's mother, after she testified that she and the victim had an argument shortly before her death, "By the way, did you ever get a chance to make up for that?"  19 RR 90.  Objected to by the defense, the court sustained the objection and instructed the jury to ignore it.  19 RR 91.  A mistrial was denied.  *Id.*

**Claim X(b):  Prosecutorial misconduct in asking obviously improper questions.**

The prosecutor persisted in asking obviously improper questions throughout the course of the trial.  Most of these questions were improper and prejudicial because of extraneous side-bar comments designed to either prejudice the jury or inflame their passions against the defendant. For

instance, prosecutor Frank Long asked the following of witness Natasha Bologna, a chemist with the

Texas Department of Public Safety who testified about gathering evidence from the truck.  20 RR

75-90:

> Q.  Have you ever investigated a case where somebody was strangled?
> A.  Not to my knowledge.  A lot of times we don't know what we're investigating.
> Q.  People don't bleed when they are strangled, do they?
> 20 RR 90.

An objection to this was sustained by the court.  20 RR 90.  There was no evidence of a

strangling at this point and it was obviously outside of this witness's area of expertise, as she was

a chemist who was collecting evidence at the crime scene and she had testified that she had never

investigated a case where the victim had been strangled.  *Id.*

**Claim X(c):   Prosecutorial misconduct in making prejudicial remarks in front of the jury.**

The prosecutor continually made  prejudicial remarks in front of the jury, designed to

denigrate petitioner or his witnesses.  For instance, when Mr. Acker testified that Ms. George's

driving licence had been suspended, the prosecutor remarked, "That's real nice.  Now we can talk

about her DWI."  21 RR 164.   And again:  Q.  "Then I guess Marcie knew but she (sic)  was dead,

wasn't she?"  22 RR 7.  An objection to this question was sustained.  22 RR 7.

Other instances of such comments:

> Q. [Prosecutor] Her tire was flat because somebody slit it?
> A. [Mr. Acker] No, it's not
> A.  Yeah, it is.
> A.  No, it wasn't
> A.  We'll see.
> 22 RR 23.

An objection to this as argumentative was sustained and a motion for a mistrial was also

denied.  22 RR 23.

Sometimes the prosecutor did not even bother to frame the extraneous side-bar remarks in the form of a question:

> Q. [Prosecutor]   You know, it might be kind of easy to say that the mother of the victim might have a motive to lie, maybe a guy you got in a fight with fifteen years ago or so, but then there's somebody who doesn't even have a clue who you are other than that night seeing you, and your own sister.
> 22 RR 28.

A defense objection to this as argumentative and not in the form of a question was sustained 22 RR 28.

Sometimes the prosecutor attempted to prejudice the jury by putting in the question facts not in evidence:

> Q.  You don't remember telling him that it don't matter.  It will all be over in a little while.
> 22 RR 48.

There was nothing in the record to indicate that Mr. Acker had made this remark to Calico when he returned with Ms. George in the morning.   The prejudicial effect was great, as it would show that the murder was premeditated.   Another instance:

> Q. [Prosecutor] She knew what was going to happen when she came out of the house yelling to the Smiddys, he's not going to just whip me this time?
> Mr. Ferguson: Objection, your Honor.  Assuming facts not in evidence.  That's not been testified to.
> The Court: All right.  Sustained.  Let's make your quotation correct if you're going to use one.
> 22 RR 63.

**Claim X(d):  Prosecutorial misconduct in violation of attorney-client confidentiality.**

As discussed *supra* in Claim II(p), the trial court erred in admitting extensive testimony regarding the fact that the defense had a medical examiner expert appointed.   The defense had filed

a motion in limine to exclude references to witnesses not called at trial, and during Mr. Acker's

testimony they renewed the motion and requested that the prosecutor not be allowed to ask about

witnesses that were not called.  22 RR 2-3.  The Court ruled that it would have to be taken up

"question by question."  22 RR 3.  Yet the prosecutor delved into this in detail, forcing revelation

of privileged attorney-client communications:

> Q. [Prosecutor] Do you know who Dr. Norton is?
> A. [Mr. Acker]  The lady that came to court, I believe said (sic) she didn't know.
> Q. Dr. Norton is your doctor.
> Mr. Ferguson: Objection, your Honor.
> The Court: What's your objection?
> Mr. Ferguson: It's outside the...talking about a witness that's present and hasn't testified.
> He's testifying for someone else.
> Mr. Long: I'm not testifying for her.  I'm asking who she is.
> The Court: You can answer that question if you have personal knowledge.
> A.  I'm not aware of who she is.  I thought she was the lady but her name was Gonzales, I
> believe.
> The Court: I'm going to allow the witness to answer the question if he can do it from his
> personal knowledge.
> The Witness: I don't know who you're talking about.
> Q. You're aware that you had a medical doctor to review our records, arn't you?
> A.  I never spoke to one.
> Q. I didn't ask you if you spoke to her.  I asked you if you are aware that you had a medical
> doctor to review these records?
> A.  I thought I was supposed to have.  I don't know whether or not I did or not.
> Q. Well, you got Dr. Norton listed as an expert witness in this case.
> Mr. Ferguson: Argumentative, Judge.
> The Court: Overruled.
> Q. And you know that you've got a doctor, don't you?
> A.  I don't know that I do, no.
> A.  You've never been told by your attorneys that you had a doctor appointed to review the
> medical evidence?
> Mr. Ferguson: Objection, your Honor.  That goes to attorney-client privilege.
> Mr. Long: He's on the stand, Judge.
> Mr. Ferguson: What we told him, your Honor, is privileged information.
> The Court: Let me see the attorneys.  How is that material?
> Mr. Long: It's a public record.
> Mr. Ferguson: Did you not grant a motion in limine that Mr. McDowell made?
> The Court: The Court denied that because I was going to take it question by question.  But
> is that not in the records as well?

Mr. Ferguson: Yes.

The Court: Overruled.

Q.  You're aware of that, arn't you Mr. Acker?

A.  I was aware that there was a doctor appointed to me at one time.  And I don't...it's my understanding she requested more money and the Court didn't want to give it to her.

Q.  I believe the actual fact is the Court gave her all the money she wanted.  We can check the records to see.

A.  I don't know what happened.

Q.  Do you want to check and see?  We can look.  It's right these in the records.

Mr. Ferguson: It's argumentative, your Honor.

The Court: Overruled.

Mr. Long: If he says that he believes that the court didn't pay her what she asked for I'd ask that the record of payment be marked and admitted before this jury.

The Witness: I never kept up with what she was paid or if y'all paid her or not, but I remember hearing something about she requested more money.

Q.  I believe I did too.  And I believe that the court paid her.  We've got the records.  And I'm asking that they be marked and admitted in evidence.

Mr. Ferguson: Objection, your Honor.  What's the relevance of whether or not we had an expert.

The Court : Sustained.  Sustained.

Mr. Long: Well the relevance, your Honor...

Mr. Ferguson: Your Honor, at this point I'd ask that the jury be instructed to disregard the last remarks.

The Court : Disregard the last statement and don't consider it for any purpose.

Mr. Ferguson: I'd move for a mistrial.

The Court: denied.

22 RR 7-11.

However, the damage had been done by now.  The jury was left with the impression not only that the defense expert Dr. Norton had rendered an opinion that supported strangulation, but that Mr. Acker was dissembling when he claimed not to know about this opinion.  The records should never have been public and available to the defense as they were entitled to a confidential expert under *Ake v. Oklahoma*.  This severely disadvantaged Mr. Acker, as had he had sufficient funds, he could have hired such an expert to render a confidential report.   The prosecutor's conduct in delving into this area was improper.

Yet again, when Mr. Acker was being cross-examined, the prosecution again referred to the

court-appointed doctor, highlighting her failure to testify:

> Q. Now you're a doctor?
> A. No, but that's common sense.
> Q. Or did your doctor tell you that?
> 22 RR 91.

**Claim X(e):  Prosecutorial misconduct in deliberately prejudicing the jury by asking them to improperly speculate as to the reasons for the absence of a defense expert.**

i) In a similar vein, at final argument in the guilt/innocence phase, the prosecutor argued "I asked y'all to think about where Dr. Norton was.  He didn't answer that, did he?  Because Dr. Norton's opinion is the same.  Don't you know that Dr. Norton..." 23 RR 21. The defense objected but the Court overruled the objection.  23 RR 21.

The prosecution continued: "It's reasonable to assume that if his doctor had a difference of opinion she would have been here telling you about it.  I forgot to see her, I guess, because I missed her testimony.  She's not here."  23 RR 21-22.

This was tremendously prejudicial for the defense.  As seen in the prior claim, the references to this court-appointed witness were improper.  Under *Ake v. Oklahoma,* this should not have been divulged.  But this argument raised the prejudice to a higher level, as now the jury was being asked to speculate as to the reasons for her absence.  The inference was made that she agreed with the prosecution's theory of the case.  Had the court acted properly and disallowed  all references to this uncalled witness, as *Ake* dictates, the defendant would have received the truly confidential expert to whom he was entitled. He would not have suffered this prejudice if he had the funds to hire such a confidential expert.

ii) The prosecutor made another reference to a missing expert:  "It's reasonable to believe that if it was an accident that there would have been an accident reconstructionist get on that stand

-234-

and tell you how it happened.  But there wasn't.  Why?  Because there's no accident here.  23 RR

22.

Here again, the improper reference prejudiced the defendant.

**Claim X (f): Prosecutorial misconduct for misstating the evidence.**

The prosecutor frequently misstated the evidence.

i)  At the guilt/innocence phase final argument, Mr. Long stated  "She's picked up while

she's screaming to call the police because he's not going to just whip me this time."  23 RR 26.  The

defense objected and pointed out that the evidence was "he's not going to whip me."  23 RR 26.  Yet

the Court overruled the objection.

ii) Again at  final argument the prosecutor blatantly misstated the evidence:

"You can look on the outside of her body and you can't tell she's been strangled.  There's
no fingerprints there.  There's no cord cut in her neck.  It looks like an accident.  And he
starts lying.  He starts lying right then to the police.  He's telling them that he's guilty.  He's
telling y'all he's guilty.  He's lied...
Mr. McDowell: We object, your Honor.  That's not in evidence.  He never told the police he
was guilty.
Mr. Long: Is that an objection?
Mr. McDowell: That is an objection.  It's outside the evidence.  There is no evidence of that.
The Court : What is your objection?
Mr. McDowell: My objection is he's arguing outside the record.  There's no evidence of that.
The Court: What's your response?
Mr. Long: My response is, Judge, I said that because he's lying to the police he's telling these
folks on the jury that he's guilty.  I believe that's a reasonable inference from the evidence.
The Court: Overruled.
23 RR 29.

**Claim X(g): Prosecutorial misconduct in asking defense witnesses how much they were paid.**

On re-cross, the witness was asked how much she was paid, and she answered $5100.00 and

more for her testimony, for a total of $6300.00.  23 RR 118-119.  This should have been confidential,

as it would have been had Mr. Acker the funds to hire a confidential expert. This was a Sixth

Amendment violation.

**Claim X(h):    Prosecutorial misconduct for commenting on the veracity of a witness in front of the jury.**

The prosecutor made the following comments when Mrs. Acker was testifying:

A.  Yes sir. He was sexually...
Mr. Long: The school records are in, your Honor.  Anything else would be hearsay.
The Court: Sustained, unless she has personal knowledge.
Mr. Ferguson: I believe she has personal knowledge, your Honor, and I'll ask her.
Mr. Long: I really find that hard to believe, Judge.  I think we need to talk about that at the bench.
23 RR 139.

**Claim X(i):    Prosecutorial misconduct in limiting mitigating evidence.**

The prosecutor limited mitigating evidence by telling the jury in final argument that they

could not take sympathy into account:

But yet we want to sit here and Mr. Ferguson wants to get up here and beg you, don't take his life.  It's a play on your sympathy.  You read this charge here and see if it says anything about sympathy in it.
23 RR 154.

**Claim X(j): Prosecutorial misconduct for commenting on petitioner's right to remain silent.**

At final argument, the prosecutor commented on petitioner's right to remain silent:

Have y'all seen any remorse in this case?  Any remorse for Marcie?  I didn't hear it in the punishment phase.  I didn't hear his mother say, I'm sorry about Marcie.  I didn't hear his sister say, I'm sorry about Marcie.  I didn't hear his other sister say it.  I didn't hear it in the guilt-innocence part of the trial, I'm sorry about Marcie.  There is no remorse here.  There's stopping and buying cigarettes as you're making your getaway."
23 RR 154.

**Claim X(k):    The cumulative effect of these errors "infected the trial with unfairness."**

These instances of prosecutorial misconduct do not individually have to have risen to the

standard of a denial of due process or an unfair trial, but they should be seen in the aggregate as having "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986).

### B. The Standard of Review.

Decisions concerning penalty phase prosecutorial misconduct, like those regarding other aspects of a capital trial, have been predicated by the maxim that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida,* 430 U.S. 349, 357 (1977).   This difference has required the courts to ensure, by means of procedural safeguards and a heightened degree of judicial scrutiny under this super due process standard, that the death penalty is not the product of arbitrariness or caprice.  "To pass constitutional scrutiny under this heightened standard, the death penalty must not be applied in an arbitrary or capricious manner. Rather, there must be 'an individualized determination whether the defendant in question should be executed, based on the character of the individual and the circumstances of the crime.'" *Adamson v. Ricketts,* 865 F.2d 1011, 1021 (9th Cir. 1988) (*en banc*).

It  has long been recognized that misconduct by a prosecutor in closing argument may be grounds for reversing a conviction.  *Berber v. United States,* 295 U.S. 78, 85-88 (1934).  Part of this recognition stems from a systematic belief that a prosecutor, while an advocate, is also a public servant "whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.,* at 88.

It is the responsibility of the trial court to ensure that final argument is kept within proper and accepted bounds.  *United States v. Young,* 470 U.S. 1, 6-11 (1985).  That responsibility must be discharged with full awareness that "the prosecutorial mantle of authority can intensify the effect on the jury of any misconduct."  *Brooks v. Kemp,* 762 F.2d 1383, 1399 (11th Cir. 1985) (*en banc*).

Consequently, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law." *Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir. 1986).  The avoidance of arbitrariness in the jury's exercise of its discretion also requires that jurors be "confronted with the truly awesome responsibility of decreeing death for a fellow human..." *Lockett v. Ohio,* 438 U.S. 586, 598 (1978).

The United States Supreme Court has made it quite clear that the prosecutor may not "attach the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens,* 462 U.S. 862, 885 (1983).  It has also been held that it is "clearly improper for a prosecutor to urge the imposition of death because of the race, religion, sex, or social status of the victim." *Brooks v. Kemp,* 762 F.2d 1383, 1409 (11th Cir. 1985) (*en banc*). *See also Derden v. Wainwright*, 477 U.S. 168, 181-82 (1986) ("the prosecutor's argument may not manipulate or misstate the evidence, or implicate other specific rights of the accused such as the right to counsel or the right to remain silent").

A prosecutor's improper closing argument violates the due process clause of the Fourteenth Amendment if it was so prejudicial that it "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  Whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify is reviewed *de novo. United States v. Johnston*, 127 F.3d 380, 396 (5th Cir. 1997);  *United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998).

**C. The Petitioner was prejudiced by these improper comments.**

The improper questioning here was particularly prejudicial because it played to the atmosphere of hostility to petitioner that permeated his trial.  The trial court did nothing to rein in the prosecutor and prevent his egregious comments.  The cumulative effect of these errors were that they "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  Thus, even if this Court holds that any one of the errors alone was not sufficient to create this fundamental unfairness, the proper framework for the analysis is to examine the argument as a whole, as the jury heard it, and not simply to test the individual claims separately.

## CLAIM XI: LETHAL INJECTION – AS IT IS CURRENTLY ADMINISTERED IN TEXAS – PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death.  *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); *Fierro v. Gomez*, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous.  Death is not extremely rapid or within a matter of seconds.  Rather . . . inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains . . . acute anxiety, and struggling to breath"), *aff'd,* 77 F.3d 301, 308 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996).  Further, "[p]unishments are

-239-

cruel when they involve . . . a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890).  A punishment is particularly constitutionally offensive if it involves the *foreseeable* infliction of suffering.  *Furman v. Georgia*, 408 U.S. 238, 273 (1973), citing *Resweber*, *supra* (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

It is not only foreseeable, it is predictable that death by lethal injection as it is currently practiced in Texas – using a paralytic agent in combination with a sedative – will produce unnecessary pain, torture, and lingering death.  Evidence has existed for at least fifty years that the "drugs used in lethal injections pose a substantial threat of torturous pain to persons being executed." *Chaney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), *overturned on other grounds*, *Heckler v. Chaney*, 470 U.S. 821 (1985) (citing ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 REPORT (1953)).  The Court of Appeals found that

> Appellants have presented substantial and uncontroverted evidence to support their claim that execution by lethal injection poses a serious risk of cruel, protracted death.   See ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 REPORT (1953), Exhibit 1 to Letter to the Secretary, supra, JA 34-40.   Even a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation.
> *Id*. at 1191.

Further, an employee of the Texas Department of Criminal Justice has admitted that the Texas lethal injection protocol has not changed since it was first used in 1982. *Judge Denies Stays of Three Executions*, HOUSTON CHRONICLE, Dec. 9, 2003, at A29 (quoting a TDCJ official who acknowledges that no changes have been made to the procedure in place since 1982).

What has changed over the last two decades, however, is that numerous states, most recently the State of Texas, have enacted statutes regulating the euthanasia of animals which preclude using

the same combination of drugs currently administered to human beings during executions.[276]   If evolving standards of decency, as reflected by legislative action and professional association of veterinarians, preclude the use of these particular drugs when killing a dog or a cat, then certainly those same standards of decency would require a more humane, readily available version of the lethal injection for human beings as well.  "'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man . . . .  The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Atkins v. Virginia*, 311-312 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101(1958)).

A.     **The combination of chemicals used to execute inmates in Texas creates a strong probability of unnecessary suffering and torture**.

The State of Texas proposes to execute Mr. Acker by poisoning him with a lethal combination of three chemical substances: Sodium Thiopental, or Sodium Pentothal (an ultrashort-acting barbiturate); Pancuronium Bromide, or Pavulon (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the person's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).[277]   While each of these chemicals individually creates concern about their use in the execution process, in combination they cannot pass constitutional muster.  Far from producing a rapid and sustained loss of consciousness and humane death, this particular combination of chemicals often causes the inmate to consciously suffer an excruciatingly painful and protracted death.

---

[276]   *See* Vernon's Tex. Health & S. §821.052 and 821.055 and related statutes forbidding for animal euthanasia the combination of drugs used to execute humans in Texas.

[277]   From TDCJ website "Death Row Facts" at p. 2.

1.      **Sodium Thiopental**

Sodium thiopental, or sodium pentothal, is a short-acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on their own power if any complications arise in inserting a breathing tube pre-surgery.  Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process.  Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee, recently explained:

> Sodium thiopental is not a proper anesthetic for use in lethal injection.  Indeed, the American Veterinary Medical Association standards for euthanasia indicate that the ideal barbituric acid derivative for animal euthanasia should be potent, long acting, stable in solution, and inexpensive.  Sodium pentobarbital (not sodium thiopental) best fits these criteria.  Sodium thiopental is a potent barbituric acid derivative but very short acting with one therapeutic dose.

(Affidavit of Dr. Dennis Geiser, in the case of *Texas v. Jesus Flores*, No. 877,994A).

Due to the chemical combination used in the Texas execution process, there is also a probability that the sedative effect of the sodium thiopental is neutralized by the second chemical, pancuronium bromide.  As Dr. Mark Heath, Assistant Professor of Clinical Anesthesia at Columbia University states:

> Sodium thiopental is an ultra short-acting barbiturate.  It would not be used to maintain a patient in a surgical plane of anesthesia for purposes of performing surgical procedures.  It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure.  If the solution of sodium thiopental comes into contact with another chemical, such as pancuronium bromide, the mixture of the two will cause the sodium thiopental immediately to precipitate or crystallize.  These factors are significant in the risk of the inmate not being properly anesthetized, especially since no-one checks that the inmate is unconscious before the second drug is administered.

(Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).

Concerns about using sodium thiopental are heightened by the lack of medical personnel, the

lack of proper monitoring of the inmate during the process and the lack of inmate-specific dosing

of the barbiturate.  According to Dr. Geiser:

> [T]he dosage of thiopental sodium must be measured with some degree of precision, and the administration of the proper amount of the dosage will depend on the concentration of the drug and the size and condition of the subject.  Additionally, the drug must be administered properly so that the full amount of the dosage will directly enter the subject's blood stream at the proper rate.  If the dosage is not correct, or if the drug is not properly administered, then *it will not adequately anaesthetize the subject, and the subject may experience the untoward effects of the neuromuscular blocking agent. . .*
>
> Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted on other grounds*, 122 S .Ct. 1463 (U.S. April 8, 2002) (No. 01-9094).(emphasis supplied).[278]

Moreover, drug manufacturers warn that without careful medical supervision of dosage and

administration, sedatives  can cause "paradoxical excitement" and can heighten sensitivity to pain.

*See* Physicians Desk Reference, 50th Ed. (1996) at 438-440.   Manufacturers warn against

administration by intravenous injection unless a patient is unconscious or out of control.  *Id.*

## 2.        Pancuronium Bromide

The second chemical involved in the lethal injection process, pancuronium bromide, or

Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  If, as is probable in

the Texas execution process, the sedative effect of the sodium thiopental is ineffective or neutralized,

the pancuronium bromide would serve only to mask the excruciating pain of the condemned inmate.

> Pancuronium bromide makes the patient look serene because of its paralytic effect on the muscles.  The face muscles cannot move or contract to show pain and suffering.  It therefore provides a 'chemical veil' over the proceedings.  By completely paralyzing the inmate,

---

[278]   The problems inherent in Texas' use of sodium thiopental and pancuronium bromide cannot be directly discounted because of TDCJ's sudden administrative decision in 1989 to cease conducting autopsies of executed individuals.  Texas' failure to collect any post-mortem data precludes the State from presenting any direct evidence to argue that the dosage of sodium pentothal injected into the veins of Texas condemned inmates still provides therapeutic levels of sodium pentothal: the terrible specter of inadequate anesthesia can never be ruled out for any Texas condemned inmate.

pancuronium bromide masks the normal physical parameters that an anesthesiologist or surgeon would rely upon to determine if a patient is completely unconscious and within a proper surgical plane of anesthesia.  Because pancuronium bromide is an invisible chemical veil and not a physical veil like a blanket or hood that is easily identifiable, the use of pancuronium bromide in lethal injection creates a double veil.  It disguises the fact that there is a disguise over the process.

 (Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).

In *Abdur' Rahman v. Bell*, Dr. Geiser asserted that while Pavulon paralyzes skeletal muscles, including the diaphragm, it has *no effect on consciousness or the perception of pain or suffering*. Administration of Pavulon is "*like being tied to a tree, having darts thrown at you, and feeling the pain without any ability to respond."*  Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted* on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis added).  This assertion is corroborated by the experience of eye surgery patient, Carol Weihrer.  During Ms. Weihrer's surgery the sedative she received was ineffectual and Ms. Weihrer was conscious of the entire surgery.  Due to the administration of a neuromuscular blocking agent like pancuronium bromide, however, she was unable to indicate her consciousness to doctors:

I experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move.  It burnt like the fires of hell.  It was the most terrifying, torturous experience you can imagine.  The experience was worse than death.
(Affidavit of Carol Weihrer, in the case of *Texas v. Jesus Flores*, No. 877,994A)

In short, the second chemical, pancuronium bromide, or Pavulon, in the lethal injection protocol serves no purpose other than to guarantee that the condemned inmate will be forced into a total chemical straightjacket and gag while he consciously experiences the potassium chloride ravaging his internal organs.  Persons viewing the lethal injection procedure and the public will never realize that a cruel fraud is being perpetrated upon them: instead of witnessing an inmate quiet and

motionless while being "put to sleep," they are in fact witnessing the cover-up of a deliberate act of excruciating torture for which only the inmate is fully conscious.[279]

### 3.    Potassium Chloride

Finally, the use of potassium chloride itself raises important Eighth Amendment concerns. James J. Ramsey, a certified perfusionist and currently the Program Director in the Program in Cardiovascular Perfusion at Vanderbilt Medical Center, Nashville, Tennessee, gave a lengthy statement in Abdur Rahman's case regarding the use of potassium chloride in lethal injections. Perfusion involves the study of medicine related to the artificial circulation technologies, including but not limited to the operation of the heart-lung machine, a medical device commonly used during open-heart surgeries of all kinds.  The arena involving the chemical arrest of the heart lies uniquely within the practice of the clinical perfusionist.

Regarding the administration and efficacy of potassium chloride in the lethal injection context, Ramsey stated that:

> It is my understanding that during the performance of lethal injection as carried out during the death penalty, potassium (and other agents) are administered intravenously to the defendant.  Such administration is, in my professional opinion based upon my knowledge, training, and experience, and within a reasonable degree of medical certainty, *entirely inadequate in order to achieve reasonable cardiac standstill*.  Since the agents are introduced intravenously, there will occur an immediate dilution of the solution, weakening any potential effect it may have.  By illustration an 80 kilogram person would have a blood volume of approximately 5.5 to 6 liters.  An administration of 100 milli-equivalents of potassium intravenously to the 80 kilogram person would result in a blood concentration of <u>only</u> 16.6 meq/L.  Such a dose is according to scientific literature… and as evidenced in my practice, inadequate to achieve cardiac standstill.
>
> Furthermore, it must be remembered that [in contrast to the administration of potassium chloride in the surgical context] such administration is: (1) NOT DIRECTED INTO THE CORONARY ARTERIES; (2) DIRECTED ONLY IN AN ANTEGRADE FASHION; AND

---

[279]    *See also* "Critics Say Execution Drug May Hide Suffering" by Adam Liptak, New York Times, Oct. 7, 2003.

(3) IS AT MORMOTHERMIA (37 degrees Celsius, NOT at five degrees Celsius).  Without reasonable data regarding any one person's anatomic and pathologic state as to their myocardial function prior to administration of the potassium, there can be no reasonable certainty that the potassium solution intended to arrest the heart would be distributed in a fashion that would arrest the heart.  Thus, the very orchestrated and methodical methods used in surgery should not be thought of as optimizing the arrest of the heart, but should be considered to be necessary as the only reasonable means of ensuring that the heart is arrested. If the heart could be arrested by intravenous objections, cardiac surgery today would be a very different animal-science and research tell us that mere intravenous injection of potassium is not sufficient.

...

Additionally, in my professional opinion and within a reasonable degree of medical certainty, barring an effective cardiac arrest, it is entirely possible that a lethal injection as I understand it will serve ONLY to arrest the function of the pulmonary system, thereby causing a state of ischemia to the entire body (no oxygen delivery), which, in turn, will ultimately arrest the heart as well (with no oxygen delivery to it.)  *As a result, the defendant is simply suffocated due to lack of oxygen*.

Affidavit of James J. Ramsey, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696

(6th Cir. 2000), cert. granted. on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094)

(emphasis supplied).

> **B.      The danger of lethal injection creating unnecessary suffering and torture is greatly increased by the lack of physician involvement in the execution process**.

The risk of inflicting severe and unnecessary pain and suffering upon Mr. Acker in the lethal

injection process is particularly grave in Texas because the meager procedures and protocols

designed by TDCJ fail to include safeguards regarding the manner in which the execution is to be

carried out, fail to establish the minimum qualifications and expertise required of the personnel

performing the critical tasks in the lethal injection procedure, and fail to establish appropriate criteria

and standards that these personnel must rely upon in exercising their discretion during the lethal

injection procedures.  For instance, TDCJ execution protocols do not explain what to do in case an

IV port cannot be established.  The experience of other states teaches that, in such a case, a medically

trained person must perform a "cut down" to expose a deeply buried vein, or perform an

infraclavicular catheterization, or other invasive medical procedure to facilitate the subsequent lethal injection such as an attempt to establish a port through the carotid enclosure in the neck.  In Texas, the physician's services are limited to his or her pronouncing death.

There are no directions and no standards for the necessary training, education, or expertise of the personnel who will be exercising this critical discretion and performing these tasks and duties. TDCJ guidelines totally fail to articulate the criteria or standards that such personnel must rely upon in exercising this discretion.[280]  The consequences of this failure will likely result in the unnecessary and wanton infliction of severe pain and suffering.

Perhaps most importantly, there are no apparent  answers to  critical questions governing a number of crucial tasks and procedures in the lethal injection procedure such as

(a)     the minimum qualifications and expertise required for the different personnel performing the tasks involved in the lethal injection procedure after the catheter is inserted;

(b)     the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

(c)     the manner in which the IV tubing, three-way valve, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(d)     the manner in which the heart monitoring system shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

---

[280]     The protocols also fail to provide any direction regarding how TDCJ  is to obtain these controlled substances in a manner that insures the drugs are effective, how to store the drugs in a manner to keep them effective, how to "mix" the drugs, or how to store and label the drugs once they have been prepared and transported to the execution chamber.

(e)     the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required of the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned and the cut down procedure begun, and the criteria that shall be used in exercising this discretion;[281]

(f)     the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next procedure would not inflict severe and unnecessary pain and suffering on the condemned prisoner;

(g)     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the condemned prisoner, and the criteria that shall be used in exercising this discretion; and

(h)     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to insure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection procedure, and the criteria that shall be used in exercising this discretion.

This disturbing lack of outlined medical procedure and personnel in Texas contributes in part to the numerous execution errors in Texas. *See e.g.* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 111 (February 2002) (quoting Fred Leuchter, "the highly

---

[281]    *See* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 106, n. 303 (February 2002) (citing Thomas O. Finks, Lethal Injection: An Uneasy Alliance of Law and Medicine, 4 J. Legal Med. 383, 397 (1983) (explaining that "(l)ethal injections may not work effectively on diabetics, drug users, and people with heavily pigmented skins"); Harold L. Hirsh, Physicians as Executioners, Legal Aspects of Med. Prac., Mar. 1984, at 1 (noting that "if a person is nervous or fearful, his veins become constricted"); *On Lethal Injections and the Death Penally*, 12 Hastings Center Rep. 2, 2 (Oct. 1982) (explaining that lethal injections are particularly difficult to administer "to people with heavily pigmented skins . . . and to diabetics and drug users"); Jacob Weisberg, *This is Your Death: Capital Punishment: What Really Happens, New Republic,* July 1, 1991, at 23 (describing the 45 minutes required for technicians to find a serviceable vein in a former heroin addict); Another U.S. Execution Amid Criticism Abroad, N.Y. Times Apr. 24, 1992, at B7 (reporting that the difficulty in executing Billy Wayne White was due to his history as a heroin user).)

controversial and later-discredited creator of much, if not most, of the execution equipment in this country," as admitting that "'about eighty percent' of the lethal injections in Texas "have had one problem or another.").

Some of the previous errors in Texas executions include:[282]

- **Stephen Peter Morin** -- March 13, 1985 – "Technicians" punctured him repeatedly in both arms and legs for 45 minutes before they found a suitable vein.

- **Randy Woolls** – August 20, 1986 – A drug addict, Woolls had to help the executioner technicians find a good vein for the execution.

- **Elliot Johnson** – June 24, 1987 – Executioners struggled for 35 minutes to insert the catheter into his veins.

- **Raymond Landry** -- December 13, 1988 – Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms.  Two minutes into the killing, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward the witnesses.  The execution team had to reinsert the catheter into the vein.  The curtain was drawn for 14 minutes so witnesses could not see the intermission.

- **Stephen McCoy** -- May 24, 1989 – Had such a violent physical reaction to the drugs (heaving chest, gasping, choking, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness.  Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought that the fainting would catalyze a chain reaction.  The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."

- **Billy Wayne White** – April 23, 1992 – It took 47 minutes for authorities to find a suitable vein, and White eventually had to help.

- **Justin Lee May** – May 7, 1992 – May had an unusually violent reaction to the lethal drugs.  According to Robert Wernsman, a reporter for the Item (Huntsville), Mr. May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze . . ."  Associated Press reporter Michael Graczyk wrote, "He went into coughing spasms, groaned and gasped, lifted his head from the death

---

[282] Sources for this information include: Michael Radelet, "On Botched Executions" Peter Hodgkinson and William Schabas (eds.), *Capital Punishment: Strategies for Abolition* (Cambridge University Press, 2001) and Stephen Trombley, *The Execution Protocol*, (1992).

chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing his eyes and mouth remained open."

- **Joseph Cannon** – April 22, 1998 – After his final statement, the execution commenced.  A vein in Cannon's arm collapsed and the needle popped out.  Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone."  Officials then pulled a curtain to block the view of witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and execution process resumed.

C. **Euthanasia Practices that Include the Use of a Sedative in Conjunction with a Neuromuscular Blocking Agent Violate Evolving Standards of Decency.**

Recent legislative changes regarding pet euthanasia cast serious doubt as to whether the Texas execution protocol passes constitutional muster.  Since 1981, at least nineteen states, including Texas, have passed laws that preclude the use of a sedative in conjunction with a neuromuscular blocking agent.[283]  Moreover, in the year 2000, the leading professional association of veterinarians promulgated guidelines for euthanasia that preclude the practice.  Those guidelines specifically state that "[a] combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent."  Appendix 5 (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 Journal of the American Veterinary Medical Association, 669, 681 (2001)) at 680.  A euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well, especially in light of the fact that the State may easily accomplish the same result with a more humane combination of chemicals.  Given the consistency in the statutory regulation of euthanasia, the method currently practiced by the State of Texas is outside the bounds of evolving standards of decency.

Texas recently passed legislation mandating inhumane methods of euthanizing animals which

---

[283]   As has Texas.  *See* Vernon's Tex. Health & S. §821.052 and 821.055 and related statutes forbidding for animal euthanasia the combination of drugs used to execute humans in Texas.

precludes the use of neuromuscular blocking agents such as pancuronium bromide.  TEX. HEALTH & SAFETY CODE ANN. § 821.052(a), (b) (Vernon 2003) (specifically prescribing the methods of euthanasia for cats and dogs in the custody of animal shelters and requiring that shelters euthanize all other animals "only in accordance with the applicable methods, recommendations, and procedures set forth in the 2000 Report of the American Veterinary Medical Association Panel on Euthanasia . . . .").[284]  With this legislation, Texas has joined numerous states with laws recognizing that use of these chemicals would be inhumane in the euthanasia of dogs and cats.  *See* Florida, Fla. Stat. §§ 828.058 and 828.065 (enacted in 1984); Georgia, Ga. Code Ann. § 4-11-5.1 (enacted in 1990); Maine, Me.Rev.Stat. Ann., Tit. 17, § 1044 (enacted in 1987); Maryland, Md.Code Ann., Criminal Law, § 10-611 (enacted in 2002); Massachusetts, Mass.Gen.Laws § 140:151A (enacted in 1985); New Jersey, N.J.S.A. 4:22-19.3 (enacted in 1987); New York, N.Y.Agric. & Mkts § 374 (enacted in 1987); Oklahoma, Okla. Stat., Tit. 4, § 501 (enacted in 1981); Tennessee, Tenn.Code Ann. § 44-17-303 (enacted in 2001).  Other States have implicitly banned such practices.  *See* Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34, Connecticut, Conn. Gen.Stat. § 22-344a; Delaware, Del.Code Ann., Tit. 3, § 8001; Kentucky, Ky.Rev.Stat. Ann. § 321.181(17) and 201 KAR 16:090, § 5(1); South Carolina, S.C.Code Ann. § 47-3-420.

In addition to explicitly forbidding the use of sedative with a neuromuscular blocking agent, the American Veterinary Medical Association stressed that only personnel trained and knowledgeable in anesthetic techniques should administer potassium chloride (the third drug in Texas' lethal injection) in conjunction with any anesthesia:

---

[284]  *Id.*

[i]t is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously.  Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.

(*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218

Journal of the American Veterinary Medical Association, 669, 681 (2001)).   The statutes in at least

five other states, in addition to Texas, expressly reference the AVMA guidelines when delimiting

humane methods of animal euthanasia.  Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09; Kansas, Kan.

Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5);

Rhode Island, R.I. Gen. Laws § 4-1-34.

"A claim that punishment is excessive is judged not by the standards that prevailed in 1685

when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but

rather by those that currently prevail." *Atkins*, 536 U.S. at 311.  The scope of the substantive

protections afforded by the Eighth Amendment, as the *Atkins* Court reiterated, is defined by

"evolving standards of decency that mark the progress of a maturing society." *Id.* at 312 (quoting

*Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  The *Atkins* Court re-emphasized that evolving standards

of decency are best reflected in the various relevant laws enacted throughout the country:

Proportionality review under those evolving standards should be informed by "'objective factors to the maximum possible extent,'" *see Harmelin,* 501 U.S., at 1000, 111 S.Ct. 2680 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274-275, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)).  We have pinpointed that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Penry,* 492 U.S., at 331, 109 S.Ct. 2934.

*Id.*  Moreover, "[i]t is not so much the number of these States that is significant, but the consistency

of the direction of change."  *Id.* at 315.

The unmistakable trend over the past two decades of condemning the use of neuromuscular

blocking agents, such as pancuronium bromide, in euthanasia is clear evidence that the practice

violates the Eighth Amendment ban on cruel and unusual punishment.  These recent alterations of

euthanasia protocols for pets underscore the inhumanity of the chemicals currently used in Texas.

It can hardly be disputed that if certain euthanasia techniques are banned as overly cruel to animals,

those same practices must violate our current standards of decency regarding the execution of

humans.


**CLAIM XII**:  **THE SECOND SPECIAL ISSUE  IS UNCONSTITUTIONAL BECAUSE IT OMITS A BURDEN OF PROOF AND MAKES IMPOSSIBLE ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S DETERMINATION.**

**A.  Facts in Support.**

Petitioner's counsel submitted written pretrial motions alleging that on its face, the mitigation

special issue in Art. 37.071, Sec. 2(e), V.A.C.C.P., is infirm as a matter of federal Eighth

Amendment law because it omits any burden of proof placing no burden upon the State to prove

aggravating factors, remaining silent as to any standard of proof on either party (1CR  150) and

provided no opportunity for a meaningful appellate review of the mitigation verdict. The trial court

denied all three propositions. 1 CR 153.

After the trial court overruled these objections to the constitutionality of the mitigation

special issue, the jury received the statutory instruction found in Art. 37.071, Sec. 2(e), V.A.C.C.P.,

telling them they were to proceed to answer the following question:

Special Issue No 2
Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Daniel Clate Acker, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? 2 CR  459.

The court gave the following abstract instructions concerning mitigation:

This jury in another portion of the instruction was given the definition that limited mitigating evidence on Special Issue No.2 to "evidence that a juror might regard as reducing the defendant's moral blameworthiness . . . " (2 CR  453).

In determining your answers to the questions, or special issues, submitted to you, you shall consider all the evidence submitted to you in this whole trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the defendant, and this punishment phase of the trial wherein you are now called upon to determine the answers to special issues submitted to you by the Court. 2 CR. 450.

* * *

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there is a mitigating circumstance or circumstances in this case, you must decide how much weight it/they deserve, if any, and thereafter, give effect and consideration to it/them in assessing the defendant's personal culpability at the time you answer the special issue.

You are instructed that mitigating evidence, if any, may be considered by you in answering either or both of the special issues under consideration. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response, let you answers to the special issues reflect that. 2 CR 451.

The State must prove Special Issue No.1 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "YES" or "NO" on Special Issue No.1.

In deliberating on Special Issue No. I you shall consider all the evidence admitted at the guilt or innocence stage and the punishment stage of trial, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. 2 CR 452.

In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that mitigates against the imposition of the death penalty. (2 CR 453).

## B. Argument.

Petitioner's argument is that the state courts have a federal constitutional duty to review for "sufficiency" the jury's negative answer to the mitigation special issue. What has become apparent is that the Texas death penalty scheme is <u>functioning</u> like the schemes in "weighing" states, even

though on its face it is framed in "non-weighing" terms.   It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from <u>any</u> possibility of review for sufficiency.

There are certainly other states which provide the meaningful appellate review the Supreme Court required in *Clemons v. Mississippi*, 494 U.S. 738 (1990)  by considering whether the mitigating evidence was outweighed by aggravating evidence. In Texas, however, the result of the code's failure to assign a burden or proof and a standard of proof regarding mitigation is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised by "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

Why should the reviewing court simply defer to the jury's conclusion "that the evidence was not sufficient to warrant a life sentence" without at the same time asking whether it is fair for such a state of affairs to exist?

In *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995) the dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could

say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The capital jury's mitigation verdict is normative only to the extent that it is informed by subjective analysis of the evidence. Every time a state court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not select some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

After all, the Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency to prove the continuing threat issue. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states.

As for the statutory requirement of review of sufficiency to support a negative mitigation verdict, under Art. 44.251(s), V.A.C.C.P., Petitioner argues that the Legislature having been once burned (by *Penry)* was twice shy, and realistically anticipated that some reviewing court might one day decide that the U. S. Constitution required some kind of sufficiency review of the mitigation special issue. That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of

evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors," the mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

**i. Omission of Burden of Proof**.

As to this mitigating issue, the code is silent as to which party has the burden of production or persuasion. The CCA has held that the defendant, as the only supposed "beneficiary" of the mitigation special issue, bears the burden of production on that issue, and has specifically declined to review the jury's subjective "normative" weighing of mitigation evidence. *McFarland v. State*, *supra,* 928 S.W.2d at 499.

Acknowledging the Court's *McFarland* opinion, Petitioner respectfully disagrees with its result on this issue, presenting the following arguments which he believes were not advanced in *McFarland* and not addressed by the Court in that case or in any later case. *E.g.*, *Baker v. State*, *supra* ; *Eldridge v. State*, 940 S.W.2d 646, 652 (Tex. Crim. App. 1996).

The Texas Court of Criminal Appeals has wavered as to whether or not it has a constitutional duty to review for sufficiency the jury's negative answer to the mitigation special issue submitted under Sec. 2(e). Judge Baird has issued a dissenting opinion in which he states, "I joined the majority in *Lawton*, supra and *Broussard v. State*, 910 S.W.2d 952 (Tex. Crim. App. 1995). However, for the reasons stated infra, I now believe my doing so was erroneous." Judge Overstreet, who had joined Judge Clinton in finding review of the mitigation verdict impossible in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995), joined Judge Baird in his opinion, some two years later, that such review was possible and was constitutionally mandated. *Moms v. State*, ___ S.W.2d ___, (Tex. Crim.

App. No.71,799, delivered September 11, 1996) (Baird, J., joined by Overstreet, J., dissenting).

That the dissenting opinion has failed to gain any additional converts is apparent from subsequent opinions.[285] However, what is also apparent is that mitigation counts for nothing in the sufficiency review that is provided under the Texas scheme. In *Soria v. State*, 933 S.W.2d 46 (Tex. Crim.App. 1996), the majority granted the State's motion for rehearing and reversed its original opinion, in which it had reformed the death sentence to life based upon the insufficiency of evidence to prove future dangerousness. In its changed view, the majority adjusted its original assessment of the evidence and found the same evidence sufficient, once all mitigation evidence was disregarded.[286]

Thus, it is clear that in Texas the reviewing court will not balance or weigh mitigating evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those

---

[285]   *Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996); *Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996), cert. denied 117 S. Ct. 2487; *Bell v. State*, 938 S.W.2d 35 (Tex. Crim. App. 1996); *Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996); *Anderson v. State*, 932 S.W.2d 502 (Tex. Crim. App. 1996), cert. denied, 117 S. Ct. 2517

[286]   The defense psychiatrist, who had personally examined the defendant, testified that he did not present a continuing threat. "However," the majority noted, "because we view the evidence in a light most favorable to the verdict, we do not factor that opinion into our analysis or weigh his testimony against the testimony of (the State psychiatrist)." Id. at 47, n.2.

found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from any possibility of review for sufficiency.

Judge Baird lists, in his *Morris* opinion, other states which provide the meaningful appellate review he maintains the Supreme Court required in *Clemons v. Mississippi,* 494 U.S. 738,749, 1105 S. Ct. 1441 (1990) by considering whether the mitigating evidence was outweighed by aggravating evidence: *State v. Breton*, 663 A.2d 1026, 1039 (Conn. 1995); *State v. Richardson*, 462 S.E.2d 492 (N.C. 1995); *Sheridan v. State*, 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez*, 562 N.E.2d 219 (111. App. 2 Dist. 1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989) and *Fisher v. State*, 736 P.2d 1003 (Okl.Cr. 1987). *Morris*, supra, (slip opinion at 11 of opinion of Baird, J., joined by Overstreet, J., dissenting).

The result of the code's failure to assign a burden of proof and a standard of proof regarding mitigation, even after the CCA  has assigned a burden of production, with no possibility of review for the defense, is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised of "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., *Walton v. Arizona*, 497 U.S. 639, 650 (1990) (State's method of allocating the burdens of proof during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory *Penry*  special issue, rather than solely to the

aggravating factors under the other special issues, this Court should recognize that this special issue is a conduit for aggravating factors (victim impact evidence for example) as well as mitigating factors. By asking jurors to determine whether there are "sufficient ... mitigating circumstances," Art. 37.071, Sec. 2(e), V.A.C.C.P., the statutory special issue in effect tells jurors to consider any possible aggravating factors present in all the evidence, including the circumstances of the case, that may outweigh the mitigating factors. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute, and that is how the state argues the issue. Cf. *Johnson v. Texas*, 113 S. Ct. 2658 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).

In *Walton v. Arizona*, *supra,* four members of the Supreme Court found constitutionally permissible the Arizona scheme that placed upon capital defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency in spite of the fact that the State had established (by what standard, the opinion did not say) the existence of one or more of ten statutorily defined aggravating factors:[287] "So long

---

[287]   It is clear from a reading of *Walton* and also from the CCA's opinions cited below in the brief that the State if it bears any burden at all under the mitigation special issue bears only the burden of proving the existence of facts which it may argue are aggravating (or which are defined by statute as aggravating, under the Arizona scheme) while the defendant bears the burden of producing the existence of facts sufficient to warrant a sentence of life rather than death or to call for leniency in the face of aggravating facts.

In fact the CCA held in *McFarland* that the State bears no burden to prove aggravating factors because there is no burden of proof to assign regarding aggravating factors outside the other special issues in the Court's view, ". . . the special issue under Sec. 2(e) does not involve consideration of aggravating factors."  *McFarland*, *supra*, slip opinion at 84. (Yet a plurality of the Court in *Ford*, infra, found victim impact evidence, which is clearly an aggravating factor, to he relevant to the issue of moral blameworthiness under Sec. 2(e). These two positions cannot he resolved without correcting one situation or the other.)

as a State's method of allocating the burdens of proof does not lessen the State's burden to prove ....

the existence of aggravating circumstances, a defendant's constitutional rights are not violated by

placing on him the burden of proving mitigating circumstances sufficiently substantial to call for

leniency." *Walton*, supra, 497 U.S. 639,650 (1990).

   The Texas statutory scheme <u>does</u> lessen the State's burden to prove the existence of

aggravating factors that fall outside the scope of the special issues that preceded the mitigation

special issue. (Again, victim impact evidence, which can only pertain to the mitigation special issue,

is the most significant aggravating factor.) If the defendant had to establish mitigating evidence

sufficient to overcome or outweigh <u>only</u> the statutorily-defined aggravating circumstances, then the

process would be similar to Arizona's -<u>and</u> the defendant could obtain review of the question just

as the Arizona defendant did. The syllabus of the *Walton* opinion states that the Arizona Supreme

Court "in an independent review" concluded not only that the evidence was sufficient to prove the

existence of both aggravating factors found by the trial court but also "<u>agreed</u> that there were no

mitigating factors sufficient to call for leniency..." *Walton*, *supra,* Syllabus at 111 L. Ed.2d 511, 519

(1990); 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989).

   The Texas defendant, however, as the statute is now interpreted, may obtain review of the

sufficiency of the evidence to prove only the aggravating factors upon which the State is assigned

the burden of proof. He may <u>not</u>, however, obtain the CCA's  review of his proffered mitigation

evidence to see if the Court agrees that it was not sufficient to call for a life sentence. See,

*McFarland*, *supra.*

   The reality is that in Texas, the State submits in argument many aggravating factors that are

not set out in the statute (factors upon which it has no independent burden of proof at guilt or at

punishment) for the jury to weigh against the defense's mitigating evidence.

The mitigation special issue in Texas, by omitting a burden of proof entirely, opens up the range of aggravating factors to include whatever the prosecution wishes to argue from the evidence, yet places no burden of proof on the State with respect to those factors; it prevents a reviewing court from evaluating the sufficiency of evidence to prove those extra-statutory aggravating factors[288] and it prevents a rational, meaningful review of the sufficiency of mitigating evidence (even if the sufficiency issue is more precisely a determination whether the jury's answer was against the great weight and preponderance of evidence).

**ii. Impossibility of Reviewing Mitigation under Texas Statute**.

Petitioner notes that members of the CCA recently expressed the opinion in dictum (and have now specifically held, in *McFarland*, supra) that the mitigation special issues <u>does</u> impose, at least by implication, a burden of proof and a standard of proof on the capital defendant: he must establish sufficient mitigating facts to overcome the jury's prior answers to the special issue or issues by a preponderance of evidence. He may argue on appeal only that the jury's verdict was against the great weight and preponderance of evidence, yet he may not obtain review as to whether he met his burden. Petitioner cites the following excerpts from the dissenting opinion of Judge Clinton, joined by Judge Overstreet, in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995):

> Appellant nakedly contends that the mitigating evidence was so compelling that we should reform his sentence to life imprisonment. Whether this is a "sufficiency" review appellant thus requests, as the majority characterizes it (slip op. at 16), or a claim that the verdict is against the great weight and preponderance of the evidence, depends upon who carries the

---

[288]   For instance in deciding that the Arizona "heinous and depraved" aggravating factor was not unconstitutionally vague and overbroad, the Supreme Court noted that the State court had <u>not</u> considered as aggravating the fact that the victim had not died for some time from his head wound, that he had floundered, blind in the desert for days before dying of dehydration, starvation and pneumonia. *Walton v. Arizona*, supra, 497 U.S. at 654 111 L.Ed.2d at 529 (1990).

burden of proof under Article 37.071, '2(e), supra. We have yet to resolve this question.

We came closest in *Barnes v. State,* 876 S.W.2d 316 (Tex.Cr.App. 1994), where we commented on the question in passing. *Barnes* had argued that the trial court erred not to instruct the jury at the punishment phase of his capital murder trial that the State had a burden to negate evidence proffered in mitigation of the death penalty. This Court held that the trial court had not erred because neither the Eighth Amendment, nor any state provision implementing it, had assigned such a burden to the State. In a footnote we remarked:

"Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection ©) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection ©) implicitly assigns the burden to the beneficiary of a finding of 'sufficient mitigating circumstances to warrant that a sentence of life . . . be imposed. Cf. *Arnold v. State,* 786 S.W.2d 295, at 298 (Tex.Cr.App. 1990) (State has burden of proof to establish harmless error under Tex.R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant."

Id., at n.17.

I agree with the *Barnes* footnote that Article 37.071, '2(e) assigns at least a burden of production to the defendant. Before a capital jury can even reach the '2(e) issue, it must have affirmatively found the existence of aggravating facts under Article 37.071, '2(b), for which the State expressly shoulders the burden of proof under '2©). Once these facts have been established to the jury's satisfaction to a level of confidence beyond a reasonable doubt, the jury proceeds to the '2(e) special issue, viz: "whether. . . there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." (Emphasis added.) If there are not sufficient mitigating circumstances, the default position is that a sentence of death will be imposed. This means that it is the capital defendant who stands to benefit from the presentation of mitigating evidence.

Because appellant is, thus, the beneficiary of mitigating evidence, the burden of production falls to him. *Arnold v. State,* supra. Therefore, if the jury verdict is against him, Petitioner can only argue on appeal that the verdict was against the greater weight and preponderance of the evidence. *Cf., Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Cr.App. 1990) (defendant has burden to prove affirmative defense of insanity, and appellate review of a verdict against him inquires whether verdict as against the great weight and preponderance of the evidence); *Bigby v. State,* 892 S.W.2d 864, at 875 (Tex.Cr.App. 1994) (same). Strictly speaking, the majority errs to characterize Petitioner's contention as a claim that the evidence is not "sufficient."

In any event the majority is correct that we cannot review the claim on appeal, however we characterize it. Subsection 2(f)(4) of Article 37.071 defines as mitigating anything "that a juror might regard as reducing the defendant's moral blameworthiness." (Emphasis added.) Thus the statute assigns exclusively to the jury the task of evaluating what evidence proffered in mitigation of the death penalty is sufficient and what is not. We cannot

say that evidence was mitigating as a matter of law any more than we can say, in a non-capital case, that the evidence is insufficient to support a twenty year sentence, or that the greater weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated. There is simply no way for an appellate court to review the jury's normative judgment "that the evidence was not sufficient to warrant a sentence of life imprisonment." Slip op. at 16. Though it should not have reached this sub-contention in appellant's fifth point of error, the majority correctly disposes of it on the merits.
*Colella v. State*, supra, (Clinton, J., dissenting, joined by Overstreet, J.) (Emphasis in Opinion).

The majority opinion in *Colella* began its answer to the Petitioner's sufficiency argument on mitigation by stating that no burden of proof exists for either the State or the defendant "to disprove or prove the mitigation evidence." *Colella v. State*, *supra*, slip opinion at 16. Noting that there is no evidence that is per se mitigating, i.e., that a juror must view as reducing a defendant's moral blameworthiness under the Texas definition of mitigation, the majority declined to review the evidence on that issue to see if it supported the jurors' subjective determination that it did not warrant a life sentence. *Id.*

Petitioner submits that if a listing of aggravating and mitigating factors, together with an assignment of a burden of proof and a requirement of special findings as to those factors, permits appellate review like the review in *Walton*, supra, and the Texas scheme with its lack of specific factors and its omission of burdens of proof forecloses appellate review, then the Texas procedure is unconstitutional on its face.

It is rare, certainly, for the defense to ask for a burden of proof. Nevertheless, if the defense could at the same time require the State to shoulder a burden it should bear (in proving extra-statutory aggravating circumstances it offers in opposition to the mitigating circumstances) and thereby obtain review of the mitigation verdict similar to the kind of review available in Arizona, then he should welcome the burden. He could then obtain review of the State's evidence offered as

-264-

aggravating on the mitigation special issue as well, just as in *Walton* the reviewing courts assessed and approved the narrow application of the "heinousness" aggravating factor to the facts of the case.

The Texas appellate courts now sit routinely as a "thirteenth juror" on review of factual sufficiency when the Petitioner claims he met his burden of proving some defensive issue; the appellate courts determine whether the verdict was so against the great weight and preponderance of evidence as to be manifestly unjust. E.g., *Meraz v. State*, supra, cited in the *Colella* dissent.

The *Colella* dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The CCA does, after all, review the jury's "subjective" and "normative" judgment that the evidence was sufficient to prove the defendant's future dangerousness. After all, the answer is based upon evidence that any juror might regard as increasing the likelihood, to the required degree, that the defendant will be a continuing threat. In the face of longstanding defense arguments that such a prediction is too subjective and too abstract to be proven or reviewed, the Court has taken on and performed the task of reviewing the sufficiency of evidence on that issue. The Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states. This Court could do it by its opinions, as it has on the future dangerousness issue, or it could hold that the

present statute as framed does not permit a fair review and is therefore unconstitutional, leaving the Texas Legislature to formulate a structure that will permit review.

The CCA's review of "sufficiency" under a preponderance standard would not be similar to the setting aside of a term of years and assigning a different term of years as the dissent stated in *Colella*. Neither the State nor the defense bears any burden of proving the proper term of punishment in a non-capital case. The capital jury's mitigation verdict is "normative" only to the extent that it is informed by subjective analysis of the evidence. Every time a State court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not choose some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

### iii.  Statute Requires Sufficiency Review of Mitigation Verdict.

Article 44.251(a) of the Code of Criminal Procedure requires that a State court shall reform a sentence of death to a sentence of life imprisonment if the Court finds there is insufficient evidence to support "a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071 of the Code. Appellants have argued in the past that the statute mandates a sufficiency review of a negative ' 2(e) answer. The CCA has answered by finding, essentially, that the Legislature in adding the mitigation-review was attempting to avoid a loophole by which an appellant who successfully challenged sufficiency under 2(e) could gain an entirely new trial, when in fact the intent of the statute when first passed was to avoid retrial. By providing this "remedy" for a possible unwarranted mitigation verdict, the CCA has held the Legislature did not mean to create any additional scope for review or relief for a capital defendant. See, e.g., *McFarland*, supra, (concurring opinion of Keller,

J.).

Petitioner can hardly argue that the Legislature ever intended to enlarge upon the opportunities for a capital Petitioner to gain review of any issue that would result in a life sentence where a death sentence had been pronounced. He does argue that the Legislature having been once burned (by *Penry)* was twice shy, and realistically anticipated that some reviewing court (the CCA or the Supreme Court) might one day decide that the Constitution required some kind of sufficiency review of the mitigation special issue.

That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors."*McFarland, supra,* 928 S.W.2d at 520. The mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

Petitioner submits that as a consequence the Court should either grant habeas relief and reform his sentence to life imprisonment or remand his case to the state courts for retrial of the punishment issue pursuant to a scheme that permits the proper assignment of the burden of production (if not proof) the proper introduction of evidence pursuant to that scheme followed by the meaningful review of the mitigation answer if it is negative.

**CLAIM XIII: THE DEATH PENALTY, AT LEAST AS PRESENTLY ADMINISTERED IN TEXAS, IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A.      **Evolving Standards of Decency Dictate That Capital Punishment Violates the Eighth Amendment**.

In *Trope v. Dulles*, 356 U.S. 86, 101 (1958) the Supreme Court stated that the Eighth Amendment draws its meaning from evolving standards of decency that mark the progress of a maturing society. *Id*. at 101. The constitutional prohibition against cruel and unusual punishment encompasses contemporary standards of decency, which may be reflected in the actions of legislatures and juries as well as in society's history and traditions. *See Gregg v. Georgia*, 428 U.S. 153 (1976). It is these evolving standards of decency which dictate that the death penalty, as presently administered in the State of Texas, constitutes punishment which is both cruel and unusual and therefore violative of the Eighth and Fourteenth Amendments to the United States Constitution and the Texas Constitution.

In March 1997, the American Bar Association issued a Resolution calling for a moratorium against carrying out the death penalty because of the failure of the post-*Furman* "justice" system to alleviate the constitutional infirmities described in that case. The ABA's decree places that association in harmony with many of the Western industrial nations, and in opposition to such despotic regimes as Nigeria, Iraq and Saudi Arabia. South Africa, long a repressive state under apartheid, has abolished the death penalty. Ironically, the basis for abolition stemmed from their assessment of America's death penalty as a failure and the inequity of the application of capital punishment based on race and economic status.

The Supreme Court has assessed the appropriateness of the death penalty in light of international mores. In *Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988) the Supreme Court

examined the issue of executing juveniles in light of the almost total international bar against the

practice.  *Id.* ; *See also, Gregg v. Georgia*, 428 U.S. at 174-5 n.19.

The United Nations General Assembly has adopted the Second Optional Protocol to the

International Covenant on Civil and Political Rights, obligating representative members to take all

necessary steps to abolish the death penalty in their jurisdictions.  The 1983 Protocol Six to the

European Convention on Human Rights deemed desirable the abolition of the death penalty in times

of peace on the basis that capital punishment was inhuman and degrading.  Finally, despite strong

American dissent, the 1984 Protocol to the American Convention on Human Rights to Abolish the

Death Penalty resolved, in accordance with the spirit of Article 4 of that Convention and the

universal trend to eliminate the death penalty, to call on all countries in the Americas to abolish it.

**B.**      **The Dual Requirements of the Eighth Amendment -- the Elimination of Arbitrary Jury Decisions and the Need for Individualized Sentencing-- Cannot Be Met and Therefore the Current System of Capital Punishment in Texas Violates the Mandate of *Furman*.**

Petitioner herein adopts the cogent arguments of Justice Harry Blackmun, which were

recently made in his dissent from denial of certiorari in the Texas capital case of *Callins v. Collins*,

114 S. Ct. 1127 (1994).  Justice Blackmun, who dissented in *Furman* and who voted in the majority

in the 1976 cases affirming various states' post-*Furman* death penalty statutes, *see, e.g., Jurek v.*

*Texas*, 428 U.S. 262 (1976), did not condemn capital punishment in the abstract as a cruel and

unusual method of punishment that offends "evolving standard of decency."  *Cf. Gregg v. Georgia*,

428 U.S. 153, 227-41 (1976) (Brennan & Marshall, JJ., dissenting).  Rather, Justice Blackmun

contended, *inter alia*, that capital sentencing procedures employed in the post-*Furman* era are *per*

*se* unconstitutional because they are the product of paradoxical constitutional commands: on the one

hand, jurors must be free to consider any and all types of constitutionally relevant mitigating

-269-

evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by *Furman. See Callins*, 114 S. Ct. at 1127-38 ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death ... can never be achieved without compromising and an equally essential component of fundamental fairness -- individualized sentencing.").

Former U.S. Supreme Court Justice Marshall clearly documented his opposition to the death penalty: 'I continue to adhere to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments." *Zant v. Stephens,* 462 U.S. 862, 906, 103 S. Ct. 2733, 2757-58 (1983) (Marshall, J., dissenting).  Former Justice Brennan agreed and joined Justice Marshall in his dissent in *Zant*:

> Death is today a cruel and unusual punishment prohibited by the Clause. 'Justice of this kind is obviously no less shocking than the crime itself, and the new 'official' murder, far from offering redress for the offense committed against society, adds instead a second defilement to the first.'
> *Gregg v. Georgia,* 428 U.S. 227, 231, 96 S. Ct. 2971, 2973 (1973) (Brennan, J., dissenting).

Justice Brennan also wrote:

> The fatal constitutional infirmity in the punishment of death is that it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded. (It is) thus inconsistent with the fundamental premise of the Clause that even the vilest criminal remains a human being possessed of common human dignity.'
> *Gregg,* 428 U.S. at 231, 96 S. Ct. at 2972.

Justice Blackmun in *Callins* discussed the failure to reconcile the two conflicting requirements of consistency and individualized sentencing.  He also discussed the apparent discrimination that still exists in assessing death, that those of certain races and those that are poor are more likely to be sentenced to death.  Systematic racism continues to plague the Texas death penalty, particularly regarding racial discrimination based on the race of the victim.  Numerous

studies of the Texas death penalty have shown that a capital murderer of a white person is as much as five times more likely to receive a death sentence than a person who murders a black.  *See, e.g.*, William J. Bowers & Glenn L. Pierce, *Arbitrariness and Discrimination under Post-Furman Capital Statutes*, 26 CRIME & DELINQ. 563, 596 (1980) (study based on Texas homicide data from 1973-78); Sheldon Eckland-Olson, *Structured Discretion, Racial Bias, and the Texas Death Penalty*, 69 POL. SCI. Q. 853 (1988) (study based on Texas capital murder statistics from 1974-88); Jonathen R. Sorensen & James Marquart, *Prosecutorial and Jury Decision-Making in Post-Furman Texas Capital Cases*, 18 N.Y.U. REV. L. & SOC. CH. 743 (1990-91) (study based on Texas capital murder statistics from 1980-86); *see generally* James Marquart et al., THE ROPE, THE CHAIR, AND THE NEEDLE: CAPITAL PUNISHMENT IN TEXAS, 1923-1990 163-75 (1994).

Reports confirm the factor that race plays in capital sentencing:

> The race of the victim plays a crucial role in determining whether the murderer will die. Although more than half of all murder victims are from ethnic minorities, 88 per cent of those executed were convicted for the murder of a white.  Racial minorities are also over-represented on Texas' death row, particularly among juvenile offenders: of the 25 juveniles on death row, 23 are from ethnic minorities—an astounding 92 per cent.  Death sentences also fall disproportionately on the poorest members of society.
> USA: The Legal Lottery of Execution in Texas (Amnesty International News release, 6 April 1998).

Justice Blackmun further noted the federal courts' lessening role in scrutinizing the constitutionality of death sentences.  He concluded that, although the death penalty in the abstract is allowed by the U.S. Constitution, our justice system is unable to fairly administer it.  He concluded it must be abolished.  *Callins,* 114 S. Ct. at 1138.

In addition to the above noted Supreme Court justices who oppose the death penalty, Federal District Court Judge Lynn Hughes has expressed the following misgivings about it:

> The government's use of the death penalty is both popular and controversial.  Both

the popularity and controversy are misguided.  Aside from vengeful retribution and insipid moralism, no rule can be sound jurisprudentially if it generates a complex, convoluted, lengthy, and expensive process.

The death penalty has three principal defects.  First, the State probably ought not be allowed to do things it cannot undo because it is at least as error prone as other human organizations.  Second, the State spends scarce resources on capital punishment that are badly needed elsewhere; Texas spends about $20 million a year more in accomplishing death sentences than it would cost to convict and maintain them for life without parole....Third, the death penalty attracts the attention of law enforcement, prosecution, courts and the public to gruesome, sensational, but largely irrational, episodic murders, deflecting that attention from the routine crimes that actually destroy the quality of life generally.

Beyond those practical factors, reasonable people question whether the infliction of death does not undermine our society's humanity much more than it deters the beasts among us.  It is bad policy, and it may be immoral, but it is constitutional.

*Davis v. Johnson,* 8 F. Supp.2d 897, 907 (S.D. Tex. 1998).

Judge Hughes presented a thoughtful analysis of the problems inherent in our capital sentencing scheme.  However, Petitioner respectfully urges that Judge Hughes came to the wrong conclusion. If, as he asserted, all these problems exist with the administration and infliction of death, then the death penalty must be a cruel and/or unusual punishment.

Petitioner  was indigent at the time of his trial.  If, as the studies suggest, discrimination still occurs in sentencing capital defendants, Petitioner clearly  would have been a capital defendant that faced such discrimination.  Bias and prejudice cannot play a part in deciding whether a person lives or dies, at least not in a civilized society.

This  scheme of race-based prosecution and death-sentencing  violates the mandate of *Furman* and renders the death penalty, at least as it is presently being administered in Texas, *per se* unconstitutional under the Eighth and Fourteenth Amendments.  Accordingly, this Court should reverse Petitioner's death sentence and order a new trial.

**CLAIM XIV: PETITIONER'S DEATH SENTENCE VIOLATES INTERNATIONAL LAW, WHICH IS BINDING ON THIS COURT, AS WELL AS THE EIGHTH AMENDMENT**

A few years ago, the Supreme Court of Canada placed the use of the death penalty in the United States for ordinary crimes into an international context:

> Amnesty International reports that in 1948, the year in which the Universal Declaration of Human Rights was adopted, only eight countries were abolitionist.  In January 1998, the Secretary-General of the United Nations, in a report submitted to the Commission on Human Rights (U.N. Doc. E/CN.4/1998/82), noted that 90 countries retained the death penalty, while 61 were totally abolitionist, 14 (including Canada at the time) were classified as abolitionist for ordinary crimes and 27 were considered to be abolitionist *de facto* (no executions for the past 10 years) for a total of 102 abolitionist countries.  At the present time, it appears that the death penalty is now abolished (apart from exceptional offences such as treason) in 108 countries.  These general statistics mask the important point that abolitionist states include all of the major democracies except some of the United States, India and Japan … According to statistics filed by Amnesty International on this appeal, 85 percent of the world's executions in 1999 were accounted for by only five countries:  the United States, China, the Congo, Saudi Arabia and Iran.

(*Minister of Justice v. Burns* (2001) 1 S.C.R. 283 [2001 SCC 7], ¶ 91.)  The California death penalty scheme violates the provisions of international treaties and the fundamental precepts of international human rights.  Because international treaties ratified by the United States are binding on state courts, the imposition of the death penalty is unlawful.  To the extent that international legal norms are incorporated into the Eighth Amendment determination of evolving standards of decency, Appellant raises this argument  under the Eighth Amendment as well.  (*See Atkins v. Virginia* (2002) 536 U.S. 304, 316, fn. 21; *Stanford v. Kentucky* (1989) 492 U.S. 361, 389-390 (Brennan, J., dissenting.).)

**A.     International Law**

Article VII of the International Covenant of Civil and Political Rights ("ICCPR") prohibits "cruel, inhuman or degrading treatment or punishment."  Article VI, section 1 of the ICCPR prohibits the arbitrary deprivation of life, providing that "[e]very human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of life."

The ICCPR was ratified by the United States in 1992, and applies to the states under the Supremacy Clause of the federal Constitution.  (U.S. CONST., art. VI, § 1, cl. 2.)  Consequently, this Court is bound by the ICCPR.[289]  The United States Court of Appeals for the Eleventh Circuit has held that when the United States Senate ratified the ICCPR "the treaty became, coexistent with the United States Constitution and federal statutes, the supreme law of the land" and must be applied as written.  (*United States v. Duarte-Acero* (11th Cir. 2000) 208 F.3d 1282, 1284; *but see Beazley v. Johnson* (5th Cir. 2001) 242 F.3d 248, 267-268.)

Mr. Acker's death sentence violates the ICCPR.  Because of the improprieties of the capital sentencing process challenged in this appeal, the imposition of the death penalty on him constitutes "cruel, inhuman or degrading treatment or punishment" in violation of Article VII of the ICCPR. There is a growing recognition that international human rights norms in general, and the ICCPR in particular, should be applied to the United States.  (*See United States v. Duarte-Acero*, *supra*, 208 F.3d at 1284; *McKenzie v. Daye* (9th Cir. 1995) 57 F.3d 1461, 1487 (Norris, J., dissenting).)  Thus, Petitioner requests that the Court reconsider and, in the context of this case, find his death sentence violates international law.  (*See Smith v. Murray* (1986) 477 U.S. 527 [holding that even issues settled under state law must be reasserted to preserve the issue for federal habeas corpus review].)

---

[289]  The Senate attempted to place reservations on the language of the ICCPR, including a declaration that the covenant was not self-executing.  (*See* 138 Cong. Rec. S4784, § III(1).) These qualifications do not preclude Appellant's reliance on the treaty because, inter alia, (1) the treaty is self-executing under the factors set forth in *Frolova v. U.S.S.R.* (7th Cir. 1985) 761 F.2d 370, 373; (2) the declaration impermissibly conflicts with the object and purpose of the treaty, which is to protect the individual's rights  enumerated therein (*see* RIESENFELD & ABBOT, *The Scope of the U.S. Senate Control Over the Conclusion and Operation of Treaties*  (1991) 68 Chi.-Kent L. Rev. 571, 608); and (3) the legislative history indicates that the Senate only intended to prohibit private and independent causes of action (*see* 138 Cong. Rec. S4784) and did not intend to prevent defensive use of the treaty (*see* Quigley, *Human Rights Defenses in U.S. Courts* (1998) 20 Hum. Rts. Q. 555, 581-582).

### B.        The Eighth Amendment

As noted above, the abolition of the death penalty, or its limitation to exceptional crimes such as treason – as opposed to its use as a regular punishment for ordinary crimes – is particularly uniform in the nations of Western Europe.  (*See, e.g.*, *Stanford v. Kentucky* (1989) 492 U.S. 361, 389 (Brennan, J., dissenting.); *Thompson v. Oklahoma*, *supra*, 487 U.S. at 830 (Stevens, J., plurality opinion)).  Indeed, *all* nations of Western Europe – plus Canada, Australia, and New Zealand – have abolished the death penalty.  (Amnesty International, "The Death Penalty:  List of Abolitionist and Retentionist Countries" (as of August 2002) at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)[290]

This consistent view is especially important in considering the constitutionality of the death penalty under the Eighth Amendment because our Founding Fathers looked to the nations of Western Europe for the "law of nations" as models on which the laws of civilized nations were founded and for the meaning of terms in the Constitution.  "When the United States became an independent nation, they became, to use the language of Chancellor Kent, 'subject to that system of rules which reason, morality, and custom had established among the civilized nations of Europe as their public law.'"  (*Miller v. United States* (1870) 78 U.S. 268, 315 (Field, J., dissenting), quoting 1 Kent's Commentaries 1; *Hilton v. Guyot* (1895) 159 U.S. 113, 163, 227; *Sabariego v. Maverick* (1888) 124 U.S. 261, 291-292.)  Thus, for example, Congress's power to prosecute war is, as a matter of constitutional law, limited by the law of nations; what civilized Europe forbade, such as using poison weapons or selling prisoners of war into slavery, was constitutionally forbidden here.  (*Miller v.*

---

[290]  Many other countries including almost all Eastern European, Central American, and South American nations also have abolished the death penalty either completely or for ordinary crimes.  (*See* Amnesty International's  "List of Abolitionist and Retentionist Countries," *supra,* at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)

*United States*, *supra*, 78 U.S. at 315-316, fn. 57 (Field, J., dissenting).)

      "Cruel and unusual punishment" as defined in the Constitution is not limited to whatever violated the standards of decency that existed within the civilized nations of Europe in the 18th century.  The Eighth Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."  (*Trop v. Dulles* (1958) 356 U.S. 86, 100.)  And if the standards of decency as perceived by the civilized nations of Europe to which our Framers looked as models have evolved, the Eighth Amendment requires that we evolve with them.  The Eighth Amendment thus prohibits the use of forms of punishment not recognized by several of our states and the civilized nations of Europe, or used by only a handful of countries throughout the world – including totalitarian regimes whose own "standards of decency" are supposed to be antithetical to our own. (*See Atkins v. Virginia*, *supra*, 536 U.S. at 316, fn. 21 [basing determination that executing mentally retarded persons violated Eighth Amendment in part on disapproval in "the world community"]; *Thompson v. Oklahoma*, *supra*, 487 U.S. at  830, fn. 31 ["We have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual"].)

      Assuming *arguendo* that capital punishment itself is not contrary to international norms of human decency, its use as regular punishment for substantial numbers of crimes – as opposed to extraordinary punishment for extraordinary crimes – is contrary to those norms.  Nations in the Western world no longer accept the death penalty, and the Eighth Amendment does not permit jurisdictions in this nation to lag so far behind.  (*See Hilton v. Guyot*, *supra*, 159 U.S. 113; *see also Jecker, Torre & Co. v. Montgomery* (1855) 59 U.S. 110, 112 [municipal jurisdictions of every country are subject to law of nations principle that citizens of warring nations are enemies].)  Thus,

Texas's use of death as a regular punishment, as in this case, violates the Eighth and Fourteenth

Amendments, and Petitioner's death sentence should be set aside.

## CLAIM XV:   THE CUMULATIVE EFFECT OF THE ERRORS AT MR. ACKER'S TRIAL DENIED HIM OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.[291]

In his presentation of the above claims, Petitioner  has shown how each  individually merits

relief as a denial of his  constitutional rights or a violation of federal  law.  However, there are

situations in which a petitioner alleges several constitutional errors or violations of federal law, each

of which is found harmless by the court, or none of which is found to be a constitutional violation,

but which, in the aggregate, deny the petitioner  a fair trial.  Hence, this claim is presented in the

alternative to the analysis of Mr. Acker's other  claims contained in this writ,  not as a comment on

their individual merits.

In *Taylor v. Kentucky,* 436 U.S. 478 (1978), the Supreme Court accepted the notion that

several errors, none of which individually rise to constitutional dimensions, may have the cumulative

effect of denying a defendant a fair trial.  In *Taylor,* the Court did not assess each  error to determine

whether it was individually harmless.  Nor did the Court concern itself only with errors which

individually were of constitutional dimension.  Instead, the Court evaluated the circumstances

surrounding the defendant's trial to determine that the state had denied the defendant fundamental

fairness as guaranteed by the Due Process Clause of the Fourteenth Amendment.  As the Fifth Circuit

has held, a trial is fundamentally unfair if "there is a reasonable probability that the verdict might

have been different had the trial been properly conducted."  *Kirkpatrick v. Blackburn,* 777 F.2d 272,

---

[291]  This claim is argued in the alternative to the above claims, each of which merits relief individually.

-277-

278-79 (5th Cir. 1985), *cert. denied,* 476 U.S. 1178 (1986).

The Fifth Circuit, in *Derden v. McNeel,* 978 F.2d 1453 (5th Cir. 1992)(en banc), *cert. denied,* 113 S. Ct. 2928 (1993)*,* recognized that, "[w]ith one exception, however, our sister circuits have held in dicta that federal habeas relief may issue if a defendant was denied fourteenth amendment  due process by the cumulative effect of errors committed in a state trial, which together deny fundamental fairness." *Id.,* at 1456.  Adopting a "particularly cautious approach to granting habeas relief for cumulative errors", the *Derden* court articulated a four-prong test delineating the types of errors the court will consider:

> First, any cumulative error theory must refer only to errors committed in the state trial  court. A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors...
> Second, the error complained of must not have been procedurally barred from habeas corpus review...Beyond the notion of procedural bar, it is important that a defendant objected to errors to demonstrate that they were believed at the time of trial to have had an adverse effect on the defense...
> Third, errors of state law, including evidentiary errors, are not cognizable in [federal] habeas corpus as such... Errors of state law rise to constitutional dimension only if they "so infused the trial with unfairness as to deny due process of law...
> Fourth, the federal court must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict.
> *Derden,* at 1457-58.

The Fifth Circuit's approach in *Derden* imposed three limitations that are not part of cumulative error analysis in federal criminal cases or in direct appeal cases.  Once federal courts recognize the concept of cumulative error analysis, as they have overwhelmingly done, the next question is whether courts should apply a different analysis depending on whether the claim is raised in a direct appeal or in a habeas corpus petition.

In *Derden,* the Fifth Circuit justified the more limited standard for cumulative error on habeas review for several reasons.  First, "[t]he standard for reversal on direct appeal of a criminal conviction...should logically be more flexible than that available on collateral review." *Id.* at 1457.

But the opinion, by Judge Jones, failed to explain why this should "logically" be so.  Rather, the Court pointed to Supreme Court opinions that limited the application of the  Due Process Clause, and that "the category of infractions that violate 'fundamental fairness' [has been defined] very narrowly." *Id.,* quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990).  Therefore, courts must exercise caution, the *Derden* court held,  in holding that an error which does not amount to a constitutional error "by itself might suddenly, when aggregated with other non-constitutional errors, become worthy of habeas relief." *Id.*

However, the Supreme Court has not imposed a different standard for fundamental fairness in habeas corpus cases.  The Court has never developed or implemented different standards for other constitutional rights when a habeas petitioner has alleged a violation. An allegation that a defendant has been deprived of a fair trial is a constitutional claim.  Cumulative error analysis usually centers on the fairness of the trial, and thus constitutes a claim that the petitioner has been denied due process under the Fourteenth Amendment. The Fifth Circuit's four-pronged test is therefore too restrictive because it eliminates errors which, although individually are "non-constitutional", excludes the possibility that several individually non-constitutional errors might operate in the aggregate to deprive a defendant of a fair trial.  In *Taylor v. Kentucky,* 436 U.S. 478 (1978) the Supreme Court held that several non-constitutional errors cumulatively deprived the defendant of a fair trial. *Id.* at 487-88.  A similar approach should be taken to an analysis of Mr. Acker's claim of cumulative error.

## VII.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Acker  prays that this Honorable Court:

A.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

B. Conduct a hearing at which evidence and argument may be offered concerning the allegations of his petition;

C. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition;

D.  Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;

E.  Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new trial and sentencing hearing,  and

F.  Grant such other relief as may be necessary and appropriate

Respectfully submitted,

/s/ A. Richard Ellis
_____

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue

-280-

Mill Valley, CA 94941
Attorney for petitioner

Dated: November 9, 2008.

## VERIFICATION

I, A. Richard Ellis, am  the attorney for Daniel Clate Acker, the  petitioner in the foregoing

Petition for Writ of Habeas Corpus.  I have read the petition and am familiar with its contents.  On

behalf of Daniel Clate Acker  and upon information and belief, I hereby verify, under penalty of

perjury, that the factual matters stated in the petition are true and correct.

DATED: November 9, 2008.

/s/ A. Richard Ellis

_____

A. RICHARD ELLIS
Attorney for petitioner

-281-

## CERTIFICATE OF SERVICE

I, A. Richard Ellis, counsel of record for Petitioner, do hereby certify that I electronically

filed the above and foregoing pleading "Petition for Writ of Habeas Corpus" with the Clerk of the

Court for the United States District Court for the Eastern District of Texas, using the electronic case

filing system of the Court on November 9, 2008.  The electronic case filing system sent a "Notice

of Electronic Filing" to the following attorney of record who have consented in writing to accept this

Notice as service of this document by electronic means:

> Ms. Fredericka Sargent
> Assistant Attorney General
> Postconviction Litigation Division
> Office of the Attorney General, State of Texas
> P.O. Box 12548, Capitol Station
> Austin, Texas 78711
> Fredericka.sargent@oag.state.tx.us


/s/ A. Richard Ellis
_____
A.  RICHARD ELLIS
COUNSEL FOR PETITIONER