IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DANIEL CLATE ACKER, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 4:06-cv-00469-RAS |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER TO ACKER'S
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Daniel Clate Acker was properly convicted and sentenced to death for the brutal murder of his girlfriend Marquette ("Markie") Markie, committed during the course of a kidnaping. He now challenges his conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. Summary judgment should be granted and the petition denied because Acker has not demonstrated that he is entitled to federal habeas relief.

## PETITIONER'S ALLEGATIONS

The Director understands Acker to raise the following grounds for federal habeas relief:

1.    Acker is actually innocent of capital murder;

1

2. The numerous errors committed by the trial court in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights deprived him of a fair and impartial tribunal;

3. The trial court deprived Acker of a fair trial by refusing to grant his motion to transfer venue;

4. Acker was denied his Sixth Amendment right to effective assistance of counsel during the pre-trial phase of the proceedings as a result of his attorney's:

   a. failure to challenge the fairness of the grand jury proceedings;

   b. failure to complete DNA testing prior to trial;

   c. failure to investigate and prepare defense witnesses for trial;

5. Acker was denied his Sixth Amendment right to effective assistance of counsel during the guilt-innocence phase of trial as a result of his attorney's:

   a. failure to adequately present evidence of Acker's innocence;

   b. reference to an exhibit as a "lie;"

   c. introduction of prejudicial evidence;

   d. failure to object to the testimony of Tony Hurley;

   e. offering evidence that contradicted Acker's version of events;

6. Acker's was denied his Sixth Amendment right to effective assistance of counsel during the punishment phase of trial as a result of his attorney's:

   a. failure to present available mitigating evidence;

   b. failure to adequately refute the State's evidence of future dangerousness;

2

    c.     failure to present evidence of Acker's low IQ;

    d.     failure to present evidence of Acker's history of drug and alcohol abuse;

    e.     failure to present an adequate closing argument to the jury;

7.    Acker was denied his Sixth Amendment right to effective assistance of counsel on appeal;

8.    The ineffectiveness of state habeas counsel deprived Acker of his Fourteenth Amendment right to meaningful access to courts;

9.    The trial court violated *Ake v. Oklahoma*[1], by refusing Acker's request for the appointment of a crime scene investigator and by violating the confidentiality of his experts;

10.    Acker was denied his Fourteenth Amendment right to due process as a result of numerous acts of misconduct by the prosecutors during his trial;

11.    Death by lethal injection constitutes cruel and unusual punishment in violation of Acker's rights under the Eighth Amendment;

12.    Texas's failure to assign a burden of proof to the mitigation special issue deprived Acker of meaningful appellate review in violation of the Eighth Amendment;

13.    Texas's capital sentencing statute violates Acker's rights under the Fifth, Eighth, and Fourteenth Amendments;

14.    Acker's death sentence violates international law and the Eighth Amendment;

15.    The cumulative effect of the constitutional errors alleged in his petition deprived Acker of his Sixth Amendment right to a fair trial.

---

[1]    470 U.S. 68 (1985)

None of the claims raised by Acker in his petition provide an adequate basis for federal habeas relief.  As an initial matter, the Director denies all allegations of fact except those supported by the record and those specifically admitted herein. Further, with the exception of subpart (a) to claim four, Acker procedurally defaulted the claims presented here.  Regardless, they lack merit.  Acker's non-defaulted claim does not warrant relief because he fails to establish that the state court's adjudications are contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, this Court should grant summary judgment and deny relief.

## STATEMENT OF THE CASE

In January 2001, Acker was indicted in Hopkins County, Texas for capital murder. 1 CR 1.[2]  A jury convicted Acker, and after a separate punishment hearing, he was sentenced to death.  4 CR 604-05.  The Texas Court of Criminal Appeals affirmed both the conviction and sentence in an unpublished opinion. *Ackers v. State*, No. 74,109 slip op. (Tex.Crim.App. Nov. 26, 2003) (unpublished). Acker did not petition the Supreme Court for certiorari review.

---

[2]     "RR" refers to the Reporter's  Record of transcribed trial proceedings, preceded by volume number and followed by page number; "CR" refers to the Clerk's Records of pleadings and documents filed with the court during trial, followed by page number; "SHR" refers to the State Habeas Record, preceded by volume number and followed by page number.  "SHE" refers to the transcript of the state habeas evidentiary hearing, followed by page number.  "2SHR" refers to the State Habeas Record of Acker's second successive writ application.

While his direct appeal was pending, Acker filed his initial application for writ of habeas corpus in the state trial court through his attorney.   Several months later, Acker filed a pro se petition for relief.   Following a hearing, the trial court entered findings of fact and conclusions of law recommending that Acker's initial application be denied.   The Court of Criminal Appeals accepted these findings and denied relief on the claims raised in Acker's initial application.   *Ex parte Acker*, Nos. 56,841-01 & -03, slip op. at 2 (Tex. Crim. App. Nov. 15, 2006).   The Court dismissed Acker's pro se application as an abuse of writ.   *Id.*

Acker then timely filed his petition for federal habeas relief on November 14, 2007.   On Acker's motion, this Court abated the federal proceedings in order to allow Acker to exhaust all his federal claims.   DE 25[3].   Acker returned to state court and filed his third application for habeas relief in the trial court.   The Court of Criminal Appeals dismissed that application as an abuse of writ.   *Ex parte Acker*, No. WR-56,841-04 (Tex. Crim. App. Sept. 10, 2008).   Acker subsequently re-filed his petition in this Court on November 10, 2008.

---

[3]      "DE" refers to the docket entry of pleadings and orders filed in this cause, followed by number.

## STATEMENT OF FACTS

### I.  Facts of the Crime

The Court of Criminal Appeals set out the facts supporting Acker's capital

murder conviction in its opinion on direct appeal:

> The victim, Marquette ("Markie") Markie, was [Acker]'s girlfriend,
> but they had a stormy relationship. On the evening of March 11,
> 2000, they were with friends and a relative at the Bustin' Loose
> nightclub. From a distance, Mary Peugh observed the two of them
> arguing. After the argument, [Acker] walked back to Peugh's table
> and remarked, "I'm going to kill that bitch." Pointing to the victim,
> [Acker] later told Timothy Mason to tell Markie that [Acker] was
> going to kill her. Dorcus Vittitow [sic], [Acker]'s older sister, testified
> that [Acker] acted very jealous and was eventuall

y kicked out of the nightclub for his behavior. [Acker] returned several times,
inquiring about Markie's whereabouts, and at least one of those times Vititow
told him to stay out of the club. Vititow and [Acker] left the premises together
when the club closed at 1:00 in the morning.

> Earlier that night, Vititow had taken a knife away from [Acker], and
> [Acker] later asked for the knife to be returned.[4]  When [Acker]
> asked for the knife to be returned, Vititow claimed (falsely) that she
> did not have it.[5]  Holding up an axe, [Acker] responded, "I don't need
> that knife. If I find her with another man, they will pay." Later that
> morning, [Acker] was still looking for the victim. He believed that
> she had spent the night with another man, and he said that, when
> he found them, he would beat them and make an example out of
> them, because no one was going to make a fool out of him.

---

[4]    During direct examination by the State, Vititow was reluctant to testify about
the details of the incident, but the State treated her as a hostile witness and elicited
those details with leading questions and the help of earlier statements.

[5]    When asked by the State why she refused to give back the knife, Vititow claimed
that she refused to do so because the knife actually belonged to Markie.

At around 9:15 a.m., [Acker] appeared at the victim's parents' house and asked about the victim's whereabouts. The victim's mother, Lila Seawright, told [Acker] that she had not seen her. [Acker] told Seawright that he did not know what he was going to do without Markie. He further told her that, if Markie had stayed away by herself that night, then everything was fine, but "if I find out she was with anybody, I'm going to kill 'em." Shocked, Seawright replied that "there's not anybody worth killing and going to the pen for." Shrugging his shoulders, [Acker] responded, "Pen life ain't nothing. Ain't nothing to it."

Thomas Smiddy testified that the victim lived in a mobile home within a mobile home park. Smiddy was one of her neighbors. Between 10:45 and 11:00 a.m., the victim arrived at her home with a man who was not [Acker]. This man dropped her off and left. [Acker] came out of the home to meet her, and the two went inside. Twenty to thirty minutes later, Markie ran out of the home and over to Smiddy's place. She hid behind Smiddy's wife and yelled for them to call the sheriff. [Acker] followed and caught the victim. He picked her up, slung her over his shoulder, and carried her to his pickup truck. He then forced the victim into the truck-an episode Smiddy described as "like putting a cat in a bathtub." [Acker] drove away, his truck swerving in and out of a ditch as he did so. Smiddy called the sheriff.[6]

Sometime between 11:00 and 11:30 a.m., Brodie Young, a sixty-five-year-old man, was driving on County Road 3519, passing by Sedill Ferrell's dairy, when he saw a man pull a woman by her arms out of the passenger side of a pickup truck and place her on the ground. Young went to the sheriff's office to report the incident, but someone had already reported it.

Sedill Ferrell found the victim's body lying on the ground. He went to a phone, called law enforcement, came back to the body, and waited until the authorities arrived. Toney Hurley, the Chief Investigator for the Hopkins County Sheriff's Office, testified that

---

[6]   Smiddy's wife, Alicia Smiddy, subsequently gave similar testimony.

[Acker] was found on a road about ten miles away from the victim's body's location.

Dr. Morna Gonsoulin, a medical examiner, conducted an autopsy. She testified that she found injuries around the neck that showed a significant hemorrhage of blood. The left eye contained petechiae— small hemorrhages in the capillaries lining the eye. Both injuries were a sign of strangulation. She also found blunt force injuries to the body: The head was crushed, with broken bones in the face. The base of the skull was shattered on all sides. There were rib fractures and a clavicle fracture, internal injuries to the trunk, lacerations and gaping wounds to the heart, lacerations of the lung and liver, and a deep laceration in the lower right leg. The sac around the heart was torn open, a segment of the main artery was torn in two pieces, and there was blood in the chest and abdominal cavities. There were also abrasions on the body, including the cheek and chin. This testimony was consistent with the autopsy report,[7] which came to the following conclusion:

> It is our opinion that Marquette Markie, a 33-year-old white woman, died as the result of homicidal violence including strangulation. Several of the injuries identified could be consistent with blunt force injury resulting from an impact with or being ejected from a motor vehicle. Some injuries (particularly those of the neck and the perineum) are not consistent with ejection from or impact with a vehicle; the injuries observed in the neck are more consistent with strangulation. Further, the dry parchment-like appearance of several abrasions, the lack of associated hemorrhage of the laceration of the right leg, the paucity of hemorrhage in the brain and the amount of body cavity hemorrhage in relation to the severity of the injuries indicate that these injuries were sustained postmortem or perimortem. Given these findings, it is likely that the

---

[7]    Although Gonsoulin was in charge of conducting the autopsy, several other doctors also signed the report.

decedent was strangled and probably dead or near death prior to being dumped from the vehicle.

On cross-examination, Gonsoulin admitted that crushing the brain stem-which occurred here-was an injury of the type that would cause instantaneous death by stopping the heart from beating, and thus could explain the lack of hemorrhaging in other parts of the body. The medical examiner also testified that it was possible for one to receive the neck injuries observed and survive. On redirect, however, the medical examiner testified that the neck injuries were so severe that a person suffering from them would have been incapacitated and might be brain dead, even if the heart were still beating. Gonsoulin also testified that the neck injuries occurred within hours of the victim's death.

[Acker] testified at trial. He denied strangling the victim and denied squeezing or gripping her neck. He admitted that he carried the victim to the truck but claimed that she crawled in when he opened the driver's side door. He further testified that, when he started the truck and began to pull out, the victim attempted to jump out, but he pulled her back. Later, the victim attempted to jump out a second time but was prevented from doing so. [Acker] testified that the victim finally succeeded on the third attempt to jump out:

Q. What happened then?

A. At the same time the car passed me she jumped from the pickup.

Q. What happened? What did you do when she jumped?

A. Well, I did three different things pretty much at the same time.

Q. What were those things?

A. I leaned way over and tried to grab her. I barely touched her. I never got a hold to her. I hollered her name. I hollered Markie as I was trying to grab her and I stomped the brake with my left foot. As I stomped the brake with my left foot it

9

throwed me down into the seat of the truck. I raised back up.
I took my left foot and pushed the clutch in and stopped as
fast as I could stop.

Q. What happened then?

A. I had to come pretty much to a complete stop to get the
truck in reverse.

Q. What happened then?

A. You know any car, I guess, you have to come to a complete
stop to get in reverse.

Q. What did you do?

A. I backed up as fast as I could back up.

[Acker] further testified that he navigated back to where the victim
lay and found her face down on the ground. He testified that he did
not run over her with his truck.

*Acker v. State*, No. 74,109, slip op .at 2-6 (footnotes in original).

## ANSWER

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), a federal court "may not issue a writ of habeas corpus for a defendant

convicted under a state judgment unless the adjudication of the claim by the

state court '(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence

presented in the State Court proceeding.'" *Riddle v. Cockrell,* 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

The Supreme Court has explained that a state-court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11. Rather, federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002); *Williams,* 529 U.S. at 411. As the Court has explained,

> the range of reasonable judgment can depend in part on the nature
> of the relevant rule.  If a legal rule is specific, the range may be

> narrow.  Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").  Further, reasonableness does not require citation or even awareness of any particular Supreme Court precedent, so long as the result of the state-court decision does not contradict that precedent. *Early v. Packer,* 537 U.S. 3, 8 (2002).

Finally, AEDPA provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are

necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## I.    Acker is Procedurally Barred From Obtaining Federal Habeas Relief on the Claims Raised in His Federal Habeas Petition.

Each of the fifteen claims asserted here by Acker are procedurally barred from federal review. These claims were raised for the first time in a subsequent application for habeas relief in the state court and dismissed by the Court of Criminal Appeals as an abuse of the writ under Texas Code of Criminal Procedure article 11.071 § 5. Because this is an independent and adequate state procedural bar, Acker's claims are foreclosed here. Furthermore, Acker fails to establish "cause and prejudice" or a miscarriage of justice to excuse the default. This Court should, therefore, summarily dismiss the petition.

### A.    The Court of Criminal Appeals's dismissal of Acker's claims as an abuse of the writ constitutes and independent and adequate state procedural bar resulting in the default of these claims in federal court.

None of the claims Acker asserted in his original federal petition for habeas corpus relief had been presented to the state court for review.[8] Consequently, this Court ordered a stay and abated the proceedings to allow Acker the opportunity to exhaust his claims. DE 25. He returned to the state

---

[8]    It does appear that subpart (a) of claim four – alleging ineffective assistance of counsel for failing to challenge the grand jury proceedings – was arguably presented in Acker's first state application for habeas relief.

court to file a third application for state habeas relief.  That application included all of the claims now before this Court.  2SHR 6-250.  The Court of Criminal Appeals dismissed each of these claims under 11.071 § 5  as an abuse of writ.  *See Ex parte Acker*, WR-No. 56,841-04 (Tex. Crim. App. 2008).

Circuit precedent has consistently recognized that claims dismissed by the Court of Criminal Appeals as an abuse of the writ are defaulted in federal court. Recently, in *Hughes v. Quarterman*, the Court explained the procedural bar arising from a state court's independent and adequate dismissal of a claim on state procedural grounds:

> A federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim. *Coleman v. Thompson*, 501 U.S. 722, 729-32 [ ](1991). To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed" by the state courts. *Ford v. Georgia*, 498 U.S. 411, 423-24 [ ] (1991) (internal quotation marks and citations omitted). There is a presumption "that there is no independent and adequate state ground for a state court decision when the decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the [state court] opinion." *Coleman*, 501 U.S. at 735 [ ] (internal quotation marks and citation omitted).

530 F.3d 336, 341 (5th Cir. 2008).

Texas's abuse-of-the-writ doctrine has been consistently applied as a procedural bar since 1994 and, thus, is an independent and adequate state

14

ground supporting the imposition of a procedural bar in federal court. *Hughes*, 530 F.3d at 342; *see also Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.1995) (holding that Texas common law abuse of the writ doctrine has been strictly and regularly applied since 1994 and is an independent and adequate procedural bar); *Emery v. Johnson*, 139 F.3d 191, 195-96 (5th Cir.1997) (holding that the Texas statutory abuse of the writ rule, Article 11.071, section 5, is an adequate and independent procedural bar); *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998)(finding that Texas' abuse of writ doctrine was firmly established and regularly followed in May 1994). Consequently, all of the claims dismissed by the Court of Criminal Appeals as an abuse of writ are procedurally barred in this Court.

### B. Acker fails to demonstrate "cause and prejudice" to excuse the procedural default.

An exception to procedural default exists where the petitioner is able to show "cause and actual prejudice." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006). To show cause, Acker must establish that an external factor objectively impeded his ability to comply with Texas's procedural rule. *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) (citing *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)). "Examples of external impediments include active governmental interference or the reasonable unavailability of the factual or legal basis for the claim." *Hughes*, 530 F.3d at 341 (quoting *Rodriguez v. Johnson*, 104

F.3d 694, 697 (5th Cir.1997).  "Actual prejudice" requires Ackers to demonstrate "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore*, 534 F.3d at 463 (citing *United States v. Frady*, 456 U.S. 152, 170 (1982); *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir.2008)).

Acker's attempt to circumvent the procedural bar by pointing to state habeas counsel's inadequacy cannot succeed.  The Fifth Circuit has repeatedly emphasized that ineffectiveness of state habeas counsel provides no basis for cause to excuse a procedural default.  *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009); *Ries v. Quarterman*, 522 F.3d 517, 526 n.5 (5th Cir. 2008); *Elizande v. Dretke*, 326 F.3d 323, 330 (5th Cir. 2004); *In re Goff*, 250 F.3d 273, 276 (5th Cir. 2001).  This is because "[t]here is no constitutional right to an attorney in state post-conviction proceedings," and the petitioner "bear[s] the risk of attorney error that results in a procedural default." *Coleman*, 501 U.S. at 752-53; *Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir.2001).

Acker's assertion that "cause" exists because his right to "competent" post-conviction counsel under article 11.071 § (2)(a) of the Texas Code of Criminal Procedure entitles him to adequate representation by habeas counsel changes nothing.  The Fifth Circuit has already rejected this argument, reasoning that,

16

". . .neither the Supreme Court, nor this court, has ever recognized that a state created obligation to provide effective assistance of counsel would make the State rather than the petitioner responsible for a procedural default, as might be the case if a federal constitutional right existed." *Elizande*, 362 F3d at 330. Furthermore, Texas law does not provide a right to effective representation by state habeas counsel. *Id.* (citing *Ex parte Graves*, 70 S.W.3d 103, 113-16 (Tex.Crim.App. 2002)). State post-conviction counsel need only be "competent" at the time of appointment, in terms of qualifications, experience, and abilities. *Reis*, 522 F.3d at 526 (citing *Ex parte Graves*, 70 S.W.3d at 14). Competence refers only to the initial appointment "rather than the final product of representation." *Id.* (quoting *Ex parte Graves*, 70 S.W.3d at 14).

Acker's insistence that state habeas counsel's deficiency constitutes cause because he is constitutionally entitled to effective representation to raise his extra record claims, ie. actual innocence and ineffective assistance of counsel, is also unavailing. The Fifth Circuit addressed this argument in *Martinez v. Johnson*, 255 F.3d 229, 240 (5th Cir. 2001). Like Acker, the petitioner in *Martinez* argued that the Supreme Court in *Coleman* left open the question regarding whether a petitioner as entitled to constitutionally effective representation in his first state habeas corpus proceeding so that he could raise his claims of ineffective assistance of counsel." *Id.* The Fifth Circuit agreed that

17

this question went unanswered in *Coleman*, but declined to recognize a right to state habeas counsel in such a circumstance observing that "[t]his court is foreclosed by precedent from considering whether an exception exists under the Coleman rule." *Id.* at 241.  The Court refused to "reevaluate" its precedent, noting that it "may not undertake such a reevaluation, as it is bound by controlling precedent." *Id.* (citing  *Beazley v. Johnson*, 242 F.3d 248, 256 (5th Cir. 2001); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999); *Callins v. Johnson*, 89 F.3d 210, 212 (5th Cir. 1996).  The Court reaffirmed its position in *Elizande* several years later.  362 F.3d at 330 ("We continue to be bound by that precedent, thus there is no need to revisit this issue.").

Even if there were sufficient cause to avoid the procedural bar of his claims, Acker cannot demonstrate that he is prejudiced by the default.  His contention that prejudice is evident in the allegations raised in the instant petition fall short because Acker has not established that a violation of his constitutional rights occurred in this case.  The possibility of prejudice is not enough. *Moore*, 543 F.3d at 463.  Rather, the errors alleged by Acker must have "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Smith*, 515 F.3d at 403 (quoting *Murray v. Carrier*, 477 U.S. 478, 493 (1986)).  For the reasons set out, herein, this is not so.

18

C.    **Furthermore, the procedural default of Acker's claims will not result in a fundamental miscarriage of justice.**

An exception to the cause requirement of the procedural default doctrine exists in cases where the application of the bar will result in a fundamental miscarriage of justice.  *Ruiz*, 460 F.3d at 643.  This exception is limited to cases in which the petitioner can show that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting Murray, 477 U.S. at 496).  In the capital sentencing context, the petitioner can also show "'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting Sawyer v. Whitley, 505 U.S. 333, 336 (1992)).

The Fifth Circuit has described the reservation with which it applies this exception:

> We are necessarily chary of allowing fundamental miscarriage claims to overcome state procedural bars, both because of our federalist view that state proceedings and rules should normally be free from federal intervention and because our precedent confirms that the mountain that a petitioner must scale in order to prove a fundamental miscarriage claim is daunting indeed.

*Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (internal quotations and citations omitted).  Similarly, the Supreme Court in discussing the "gateway" claim recognized in *Schlup v. Delo*, 513 U.S. 298, 321 (1995), emphasized that

the standard for proving innocence to overcome a procedural bar is "demanding," and review is permitted "only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 537 (2006).

It is with this conservative perspective the Court considers Acker's contention that the procedural default of his claim should be excused because he is innocent of both capital murder and the death penalty. The evidence Acker submits to prove his innocence is neither compelling nor exonerating. *See* Section II(B), *supra*. At most this evidence constitutes impeachment of the State's case against Acker at trial, but this is not enough to prove actual innocence. *See Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998) (holding that newly discovered evidence demonstrating actual innocence must be "material, not merely cumulative or impeaching"). Accordingly, Acker fails to show that the procedural default of his claims results in a fundamental miscarriage of justice, and they should be dismissed by this Court.

## II.   Acker is Not Entitled to Federal Habeas Relief on His Claim that He is Actually Innocent of Capital Murder. (CLAIM ONE)

Free standing claims of actual innocence do not state a valid basis upon which federal habeas relief may be granted. Even if they did, this claim would be procedurally barred. Furthermore, Acker's "gateway" innocence claim lacks merit. The "new" evidence he provides is insufficient to meet the stringent

standard required to overcome the procedural default of his federal claims.  This Court should deny relief.

## A. Actual innocence, standing alone, does not state a valid basis for federal habeas relief.

The Fifth Circuit has consistently failed to recognize free standing claims of actual innocence brought by federal habeas petitioners.  *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 741-42 (5th Cir. 2000); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999), *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998); *Jacobs v. Scott*, 31 F.3d 1319, 1324-25 (5th Cir. 1994).  The Supreme Court explained in *Herrera* that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id.* at 399.

Furthermore, nothing in the Supreme Court's decision in *House v. Bell*, *supra,* alters the validity of this precedent.  There, the petitioner raised actual innocence as a procedural gateway claim and as a stand-alone claim. *House*, 547 U.S. at 520, 522.  The Court found that there was sufficient evidence of House's innocence to allow him review of his otherwise procedurally barred claim, but

21

declined to resolve whether the free standing claim provided a basis for federal habeas relief. *Id.* at 555. Because *House* did not change the law to recognize free standing claims like the one presented by Acker in the present case, this Court must follow existing circuit precedent on this issue and deny relief. *See Foster v. Quarterman*, 466 F.3d 359, 368-68 (5th Cir. 2006) (rejecting a free standing actual innocence claim because absent an en banc or intervening Supreme Court decision one panel of the Court may not overrule a prior panel's decision).

**B.    Even if Acker's actual innocence claim was cognizable on federal habeas review, it is procedurally defaulted here.**

Acker presented this claim to the state court for the first time in a successive application for habeas relief. 2SHR 69. It was dismissed by the Court of Criminal Appeals as an abuse of the writ. *Ex parte Acker*, No. WR-56,841-04 (Tex. Crim. App. 2008). As set out previously in section I, *supra*, the state court's decision to procedurally bar this claim results in a default of Acker's federal claim. *See Hughes*, 503 F.3d at 342 (explaining that the Texas abuse-of-writ doctrine has been consistently applied as a procedural bar since 1994 and, thus, is an independent and adequate state ground supporting the imposition of a procedural bar in federal court). Furthermore, Acker failed to prove "cause and prejudice" to excuse the default, or that the bar would result in a fundamental miscarriage of justice. *See* Section I(B)-(C), *supra*.

22

**C.     Additionally, Acker's "gateway" claims fails because the evidence provided fails to establish his innocence.**

In *House v. Bell*, the Supreme Court recently reiterated the *Schlup* standard for proving actual innocence:

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have a reasonable doubt.

547 U.S. at 538.   To be credible, an actual innocence claim requires the petitioner to support his allegations with new,  reliable evidence that was not presented at trial.  *Schlup*, 513 U.S. at 865.  Further,

> [T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

*House*, 547 U.S. at 537-38.  Notably, "[i]f new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Id.* The Supreme Court has described this standard is "demanding" and stated that it  "permits review only in the 'extraordinary' case."  *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).

Acker maintains here, as he did at trial, that Markie's death resulted when she jumped from his truck while traveling at a high rate of speed.   To

support this claim, he submits a report from Dr. Glenn M. Larkin attacking the validity of the medical examiner's conclusion that the victim death was the result of homicidal violence, including strangulation.   Acker also points to testimony excluded at trial asserting  (1) that the victim had jumped from Acker's truck in the past; and (2) that it was impossible for Acker to have pushed Markie from the truck while he was driving.   This evidence, however, does not establish his innocence.

> **1.     To prove his innocence Acker must establish no rational jury would find him guilty of killing Markie by strangulation, causing blunt force injuries, or a combination of the two.**

The indictment returned by the grand jury against Acker charged that he had:

> "intentionally cause[d] the death of . . . Markie by homicidal violence to wit: manual strangulation and ligature strangulation with an objection, the exact nature of which is unknown to the grand jury, and blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury . . ."

CR 1.

The State then presented testimony from Dr. Morna Gonsoulin, a pathologist with the Dallas County Medical Examiner's Office, to support both causes of death.  The autopsy report signed by Dr. Gonsoulin and several Dallas County medical examiners, including the deputy chief and chief medical examiner, stated:

> It is our opinion that Marquette Markie, a 33 -year-old white woman, died as the result of homicidal violence including strangulation.  Several of the injuries identified could be consistent with blunt force injury resulting from an impact with or being

24

ejected from a motor vehicle.  Some injuries (particularly those of the neck and the perineum) are not consistent with ejection from or impact with a vehicle; the injuries observed in the neck are more consistent with strangulation.  Further the dry parchment-like appearance of several abrasions, the lack of associated hemorrhage of the laceration of the right leg, the paucity of hemorrhage in the brain and the amount of body cavity hemorrhage in relation to the severity of the injuries indicate that these injuries were sustained postmortem or perimortem.  Given these findings, it is likely that the decedent was strangled and probably dead or near death prior to being dumped from the truck.

*Id.* at 5.

Based on Dr. Gonsoulin's testimony and the autopsy report, the prosecutor asserted the following closing argument concerning the medical evidence and possible causes of death:

And then we went on and on about other possible causes.  Ya'll remember the last thing I asked the doctor.  You do this for a living, doctor.  You consider all these possibilities, possibilities.  You have to make your decision based upon medical science.  What is your opinion and what are these other doctors' opinion?  She died from strangulation and blunt force trauma.

We don't know the particular object.  The reason for that, they can't say if it was fingers, a towel, a shirt or whatever.  That's the reason for the manual compression or a ligature.  We don't know whether a tire ran over her head or she bounced underneath the truck or she hit the road because the road mashed her into the road.  We can't say.

. . . When I get back up here I'm going to ask you folks to return a verdict of guilty of capital murder.  There's different ways that you can find that he committed this offense: By strangulation; by blunt force injuries, the trauma injuries; or, by a combination of the both.  It doesn't matter which one because the law covers all three.

23 RR 6-7.

The jury instructions later submitted to the jury by the trial court charged multiple theories of the offense.  First the jury was instructed:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of March 2000, in Hopkins County that the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis Markie, intentionally caused the death of Marquetta Follis Markie by strangling Marquetta Follis Markie by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty or capital murder as changed in the indictment, and so say by your verdict.

CR 591.  Alternatively, the jury was charged that it could find Acker guilty of capital murder if they found that he, while in the course of committing or attempting to commit kidnaping,

> intentionally caused the death of Marquetta Follis Markie by blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

CR 591.  The jury was also given a third option, and instructed that it could return a verdict of capital murder if it found that Acker, while in the course of committing or attempting to commit kidnaping,

> intentionally caused the death of Marquetta Follis Markie by strangling Marquetta Follis Markie by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury *and* blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

CR 592 (emphasis added).

Accordingly, in order for Acker to demonstrate actual innocence sufficient to overcome the instant procedural default, he must establish that no rational juror would find that he either (1) strangled Markie to death; (2) caused her to impact a blunt object resulting in blunt force injuries; or (3) strangled her and caused her to impact a blunt object. Acker spends significant effort attempting to dispel the prosecutor's theory that Markie died as a result of strangulation. But, even if the evidence he presents can refute this theory of how Markie was murdered, it does not conclusively rebut the other cause of death alleged in the indictment and charged to the jury.

### 2.  Acker's evidence is insufficient to establish that no rational juror would find him guilty of strangling Markie.

The State's medical examiner testified that there was significant evidence indicating that Markie had been strangled.  Specifically, Dr. Gonsoulin pointed to the injuries to Markie's neck, including hermorrhaging in the superficial and deep musculature, as well as contusions on each side of the trachea (or windpipe).  20 RR 209.  According to Dr. Gonsoulin, the localized hemorrhaging and contusions indicated that a significant amount of force was applied around the neck while she was still alive.  20 RR 215.  She further stated that these injuries were not consistent with falling or being hit.  2 RR 215-16.  "[The injury] was more of being constricted rather than blunt force received from falling from a vehicle."  2 RR 216.  Dr. Gonsoulin testified that the petechiae, or small

hemorrhages, found in the left eye were also evidence of strangulation.[9]  Finally, Dr. Gonsoulin opined that the strangulation – absent the other injuries – would be sufficient in itself to cause Markie's death.  20 RR 220.

Despite this testimony, Acker contends that there is no viable evidence of strangulation.  He insists that Dr. Larkin's report proves that it was impossible for him to have strangled Markie.  *See* Petitioner's Exhibit 26.  But, a reasonable juror could reject Dr. Larkin's opinion that Markie was not strangled.  Dr. Larkin offers very little medical support for the basis of his opinion, urging only that the injuries sustained to Markie's neck "are suggestive, but not pathogomonic for strangulation" and could have been caused by other factors.  Petitioner's Exhibit 26 at 18.  Instead, Dr. Larkin rests his opinion on his belief that it was physically impossible for Acker to strangle Markie while he was driving the truck in the time frame given.  Petitioner's Exhibit 26 at 17.

Dr. Larkin claims that Acker could not have choked Markie with his right hand because "he would have to have rotated his arm (extreme pronation) and forearm so that his thumb would be in contact with the left side of Markie's neck and fingers to the right side, [h]e could not have enough force to strangle Markie for sufficient time to strangled her."  Petitioner's Exhibit 26 at 17.  This conclusion presupposes that Markie is sitting up in the truck facing forward while Acker was attempting to strangle her.  No "extreme pronation" would be required if Markie was laying face up on the seat next to Acker while he was

---

[9]     Dr. Gonsoulin testified that, though a "variety of different conditions can cause" the petechiae, they are "frequently associated with strangulation injuries."  20 RR 216-17.

driving, a scenario reasonable under the circumstances.   Thomas Smiddy
testified at trial that after Acker forced Markie into the truck, "I heard what
sounded like a hit.  We don't know if it was him hitting her or her hitting him or
what it was.  But, you know, we looked away for a second and when we looked
back she was out of sight."  19 RR 148.  According to both Smiddy and his wife,
after that point Markie was not visible in the truck window.  19 RR 148, 179.
Clearly, Markie was not sitting on the seat facing forward as Acker drove away
with her.  Dr. Larkin does not even consider the possibility that Acker hit
Markie and knocked her out before strangling her.  His conclusion is incomplete
and easily impeachable.

The reliability of Dr. Larkin's conclusion if further undermined by the fact
that he relies upon facts not established at trial to support it.  First, he assumes
a scenario where Acker strangles Markie with his hands.  There is absolutely no
evidence supporting the fact that Acker used his hands.  Indeed, the medical
examiner at trial testified that it was impossible to determine what was used in
the strangulation.  20 RR 218.  Second, he claims that it was impossible for
Acker to have strangled Markie because she was not incapacitated and would
have been struggling against him.  He specifically states in his report that,
"Markie was screaming, clawing kicking and resisting Acker" and  "there is no
evidence that Acker slugged Markie in the truck."  Petitioner's Exhibit 26 at 17.
While it is not known for certain whether Markie was incapacitated after Acker
drove away with her in his truck, there is certain evidence suggesting the
possibility of such.  As set out earlier, the testimony of Thomas and Alicia
Smiddy intimates that Markie might very well have been incapacitated by Acker

29

before she was killed.  Third, Dr. Larkin claims in his report that Acker was driving 40 miles an hour as he left, when in fact Acker's speed was never determined.  *See* 21 RR 131-133.

It is readily apparent that the credibility Dr. Larkin's report and opinion are susceptible to attack.  At best, the evidence provides weak impeachment of the medical evidence introduced by the State at trial proving that Markie was strangled.  Impeachment evidence is not competent evidence of actual innocence. *See Vega,* 149 F.3d at 364 (holding that newly discovered evidence demonstrating actual innocence must be "material, not merely cumulative or impeaching).

Acker's reliance on Dr. Larkin's opinion to prove actual innocence is further unavailing because the essence of Dr. Larkin's opinion was put before the jury during trial.  During closing argument, counsel for Acker argued,

> They want you to believe that he strangled her in that truck while he was driving.  They've got a 9-1-1 call.  We've got an officer's log. It's in evidence.  And it shows you that the first call came in at 11:45 from Smiddy.  Mr. Smiddy said that he's on the phone that he seen them pull away.  The second call from Mr. Ferrell comes in at 11:47, two minutes later.  Two point three miles between the two locations. There's not enough time to drive there and to stop and strangle somebody.  We can't strangle somebody and continue to drive and shift gears.  You're going to strangle them or you're going to drive which one was is it?

23 RR 15.  Cumulative evidence, like impeachment evidence, is not enough to establish Acker's actual innocence.  *See Vega, supra.*

### 3. Acker's evidence is also insufficient to show that no rational juror would find him guilty of causing blunt force injuries that resulted in Markie's death.

There is no dispute in this case that Markie suffered severe blunt force injuries capable of causing her death. Both the medical examiner and Acker's expert, Dr. Larkin, agree on this point. The only point in contention is whether those injuries were the result of an accident or homicidal violence. Because a reasonable juror could find that Acker intentionally caused Markie to suffer these injuries, he cannot prove his actual innocence.

Dr. Larkin concludes in his report that Markie's "manner of death is accident," and "[t]he mechanism of death is her voluntarily jumping out of Acker's truck. The jump went awry." Petitioner's Exhibit 26 at 22. Dr. Larkin has no actual medical evidence to support his theory. Instead, he offers what he terms "a plausible alternate scenario" wherein Markie "was sitting on the bench seat in Acker's truck when she attempted to jump out of the moving truck at an estimated 40 miles per hour." Petitioner's Exhibit 26 at 19. "Markie pushed off with her left hand and left foot, pivoting to the right," but "her right leg, trapped under the seat...gets a nearly total circumferential laceration." Petitioner's Exhibit 26 at 19. As she continues her jump from the truck, Markie jumps out with her head down and receives the trauma to her left eye when it "impact against door handle at 40 mph." Petitioner's Exhibit 26 at 19. Next, "[t]he partially rotated head then struck the door, causing the contusion-abrasion on the left cheek." The chest and rib injuries are also sustained from an impact with the truck door. Petitioner's Exhibit 26 at 19. Finally, as she exits the

vehicle, her body strikes the truck's protruding extension, whereupon her brain stem is torn and instantaneous death result.

This opinion by Dr. Larkin is little more than conjecture wholly unsupported by facts actually in evidence in this case. As stated earlier, there is no documentation regarding how fast Acker was driving when he left with Markie in his truck. 21 RR 131-33. Neither is there evidence that Markie was actually "sitting on the bench seat." In fact, the witnesses who saw Acker and Markie as they drove off testified Markie could not be seen sitting in the truck. 19 RR 148, 179. Further, there is absolutely no evidence to support Dr. Larkin's assumption that Markie sustained the deep laceration to her calf because she caught her leg under the seat while trying to jump. Dr. Larkin's report offers no insight as to how Markie's leg got caught under the seat or why such an unlikely scenario is even plausible considering the circumstances. It is absolutely incredible to believe that Markie's leg was caught under the seat to such an extent that it cut her leg to the bone, yet she continued to try to jump out of the truck and suffers the majority of her blunt force injuries from impacting the car door on her way out. A reasonable juror would likely reject such an implausible explanation for Markie's injuries, finding the State's assertion that Markie received her blunt force injuries as a result of being pushed from the truck or run over by it, more credible.

This is especially true considering that Acker's own testimony at trial conflicts with his expert's report. In relaying his version of the incident to the jury, Acker simply stated that Markie "jumped from the pickup" at the same time that a car passed by. 21 RR 241. There was no mention her leg getting

stuck under the seat or the devastating injury that Dr. Larkin's claims ensued. Acker also did not mention the fact that while jumping out, Markie was hit twice by the door.   The absence of these details from his testimony is compelling impeachment of Dr. Larkin's opinion regarding how Markie received her blunt force injuries.

Additionally, Dr. Larkin's insistence that there is no evidence that Markie was run over by the truck is unconvincing.  He bases his opinion on the fact that there are no visible tire tracks found on the victim and "no internal or deep injury underneath the skin."  This is clearly refuted by the medical evidence in this case.   Dr. Gonsoulin testified that there were extensive, deep internal injuries unaccompanied by external trauma.  20 RR 202, 256.  Interestingly, the accuracy of Dr. Larkin's conclusion is further undermined by the fact that the accident reconstructionist appointed to assist Acker at trial, concluded the opposite.  During the state habeas hearing, Acker's attorney testified he did not call A.L. Pipkin to testify at trial because "[t]he ultimate conclusion that he gave us was that the front tire ran over the lady's head."  SHR 210.

Furthermore, despite Acker's contention the testimony excluded by the trial court would have made little difference.  First, Sands's testimony regarding his "experiment" was entirely irrelevant as a result of Acker's failure to demonstrate relevant similarities between himself and Sands.[10]  The fact that Sands could not reach the passenger side door while driving does not mean that

---

[10]        Acker attempted to introduce testimony from Sands that he had rented a truck similar to the defendants in order to determine whether he could open the door while driving down the road.  21 RR 134.

Acker could not do so.   There is no evidence in the record showing that the two were of similar height or had similar arm length.  Sands reported that he could not reach the passenger door and open it while driving on the road.   The testimony at trial indicates that Acker was not driving "on the road," but was "swerving back and forth across the road" and into the ditch.  19 RR 149, 179. Second, evidence establishing that Markie jumped from his truck in the past does not prove that she did so in instance.  Again, this evidence merely provides impeachment of the State's case, and is insufficient to prove actual innocence. *See Vega, supra*.

Finally, Acker's evidence is not considered in isolation.  Rather, this Court must review "all the evidence, old and new, incriminating and exculpatory." *House*, 547 U.S. at 537.  Thus, in determining whether Markie's blunt force injuries were the result of an accident or murder, this court must consider that the jury heard testimony from several different people that Acker stated his violent intention prior to Markie's death.  Mary Peugh testified that she heard Acker state that he was "going to kill that bitch."  19 RR 25.  The same night, in a separate incident, Acker told Tim Mason that he was going to kill Markie.  19 RR 41.  That same evening, Acker told his sister that he would make her "pay"if he found her with another man.  19 RR 71.  He made this statement while holding up an axe.  19 RR 71.  Acker made a similar comment to Markie's mother the next morning.  He told her that if he found out that Markie had spent the night with someone, he was going to kill them.  19 RR 95.  The Court must also consider that Acker spent the night sneaking back into a club more than once, and then visiting every motel in the area to find Markie. 21 RR 195.

34

When he finally caught up with her the next morning, and learned that another man had dropped her off at their home, they got into a verbal and physical altercation, during which he forced her into his truck and drove off.  21 RR 221-231.

Even more damning for Acker is his actions following Markie's death. Acker testified that after Markie jumped from the truck, he stopped, picked her up and carried her back to the truck, but left her on the ground after he realized there were fluorescent light bulbs on the seat.  21 RR 244.  He did not attempt to wave down passing cars, to seek aid.  22 RR 80.  Instead, he deliberately left her laying by the side of the road.  21 RR 244.  After leaving the scene, Acker claims that he drove to Bentley Electric to use the phone.  21 RR 245.  On his way there, he passed by the fire station and the sheriff's office.  According to Acker, it didn't occur to him to stop by the fire station to seek help, and though he thought of the sheriff's office, he decided against it because he didn't want to be arrested for DWI.  22 RR 83.  When he arrived at Bentley Electric his mother was there, and instead of calling someone, he drove to his sister's house as she directed.  21 RR 246, 22 RR 84.  When he saw that his sister wasn't home, Acker headed to his mother's house, stopping by a convenience store to purchase cigarette's on the way.  22 RR 84-85.  Once he arrived at his mother's house, he packed some clothes and drove to the home of his friend Kenny Baxter.  22 RR 85-86.  After talking to Baxter about the incident, Acker returned to his mother's house, where he finally waived down a police officer to tell them what happened.  21 RR 249-251.  A reasonable juror could believe that these were not the actions

of a man whose girlfriend just died an accidental death by jumping from his truck.

Considering all the evidence, it is clear that Acker has not established that he is actually innocent of capital murder. This Court should deny relief.

## III.   Acker is Not Entitled to Federal Habeas Relief on His Claim that the Trial Court was Biased Against Him. (CLAIM THREE)

Initially, this claim is defaulted here because it was dismissed by the state court dismissed it as an abuse of the writ, an independent and adequate state procedural ground. *See* section I, *supra*. Nevertheless, Acker fails to establish that the trial court's rulings demonstrate bias, or that the cumulative effect of the alleged errors deprived him of his right to a fair trial. Thus, this Court should deny relief.

"The cornerstone of the American judicial system is the right to a fair and impartial process." *Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005) (citing *Bracy v. Gramley*, 520 U.S. 899 (1997). "Therefore, any judicial officer incapable of presiding in such a manner violates the due process rights of the party who suffers the resulting effects of that judicial officer's bias." *Id.* The constitutional guarantee of a "fair trial in a fair tribunal" demands that a trial judge be free of actual bias against the defendant and without interest in the outcome of his particular case. *Id.* (citing *Bracy*, 520 U.S. at 905).

Courts have recognized two kinds of judicial bias: actual bias and presumptive bias. *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("[V]arious situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable."); *Bigby v. Dretke*, 402 F.3d 551, 560 (5th Cir.2005) (evaluating a judicial bias claim and noting that because there was no presumption of bias from the defendant's attack on the judge, it was necessary to "examine the record for indications of actual bias on the part of the trial judge")).

Presumptive bias exists where (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints. *Buntion*, 524 F.3d at 372. Acker does not allege any of these circumstances, nor are they present in the instant case. Instead, Acker maintains that the trial court's actual bias against him is evident in the number of erroneous rulings made during trial.

Acker's allegation of actual bias, however, is not easily proven because it is ordinarily presumed that public officials have properly discharged their official duties. *Bigby* 402 F.3d at 558 (citing *Bracy*, 520 U.S. at 909).

37

Consequently, to be successful here, Acker has the burden of overcoming "two strong presumptions." *Id.* The first is the presumption of honesty and integrity of the adjudicators. *Id.* The second is the presumption that those making decisions affecting the public are doing so in the public interest. *Id.*

"[A] mounting display of an unfavorable personal attitude toward [the] petitioner" may result in a due process violation. *Taylor v. Hayes*, 418 U.S. 488, 501 (1974). But, judicial opinions and remarks will only support an actual bias claim "if they reveal favoritism or antagonism such that fair judgment is impossible." *Buntion*, 524 F.3d at 673. The trial court's rulings in this case do not, as Acker suggests, demonstrate bias against him.

### A. Acker fails to demonstrate that any of the challenged rulings by the trial court actually constitute error under federal or state law.

A vast majority of the rulings complained of here by Acker are evidentiary matters that do not implicate his federal constitutional rights and under state law are left to the sound discretion of the trial court. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App.1997)("trial courts have broad discretion in their evidentiary rulings and ... are usually in the best position to make the call on whether certain evidence should be admitted or excluded"). In reviewing the contested rulings, this Court should keep in mind a trial court's determination on admissibility of evidence will not be disturbed on appeal unless there is a clear abuse of discretion, and it falls outside the "zone of reasonable

disagreement." *Werner v. State*, 711 S.W.2d 639, 643 (Tex. Crim. App.1986);

*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App.1990).

Furthermore, there is a noticeable absence of legal citations and
authorities to support a finding of error.  Aside from the heading and setting out
the fact relevant to each allegation, little else is offered.  As such, this claim
should be deemed waived in these proceedings for failure to adequately brief.
*See Trevino v. Johnson*, 168 F.3d 173, 181, n.3 (5th Cir. 1999), *Pyles v. Johnson*,
136 F.3d 986, 996, n.9 (5th Cir. 1998); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th
Cir. 1994) ("A party who inadequately briefs an issue is considered to have
abandoned the claim").    Nevertheless, the Director responds to what he
anticipates are the legal issues raised by Acker.

### 1.    The trial court did not abuse its discretion in allowing the jury to hear evidence concerning Acker's reference to "pen time."

Acker maintains that the trial court erred by allowing George's mother,
Lila Seawright, to testify to a statement he made referencing his prior
penitentiary sentence.  Over the defense's objection, Seawright was allowed to
tell the jury that Acker, in response to her urging that "there's not anybody
worth killing and going to the pen for," stated, "Pen life ain't nothing.  Ain't
nothing to it."  19 RR 99.  Acker maintains that "the unnecessary and irrelevant
mention of the prior penitentiary sentence prejudiced the jury against [him]."

Petition at 110.   However, as argued by the prosecutor in response to Acker's trial objection,

> [I]t's relevant in that it shows that [Acker] has no fear of the consequences of his acts.  It does not directly infer that he had been to the penitentiary before, and its in response to a statement made by the witness to him, that you don't want to go to the penitentiary . . . It in no way infers that he's been there.  He could have heard it from some other source, and she'd not going to go into how he would know about pen life not being that bad.

19 RR 98-99.   Because this comment, by itself, did not reveal that Acker has previously served time in the penitentiary the prejudice, if any, did not outweigh its probative value.   *See* Tex. R. Evid. 403.   Acker cannot demonstrate that the trial court erred here, or that this ruling demonstrated bias.   *See Powell v. State*, 189 S.W. 3d 285, 288 (Tex. Crim. App. 2006) (A trial judge is given "very substantial discretion in balancing the probative value on the one hand and unfair prejudice on the other, and . . . should not be reversed simply because the appellate court believes that it would have decided the matter otherwise.") (internal quotations omitted).

### 2.   The trial court did not abuse its discretion in excluding hearsay statements concerning the fact that George tried to jump from Acker's truck on the morning of the murder.

During the testimony of Officer Chris Hill, Acker attempted to introduce a copy of his police report documenting the information relayed to Hill by the radio dispatcher.  20 RR 2-3.  In particular, Acker wanted Hill to testify that the

dispatcher advised Hill that Thomas Smiddy, in his 9-1-1 call, stated that the female subject (George) tried to exit the vehicle and the male subject (Acker) jerked her back in.  20 RR 42.  Acker wanted to use this testimony to impeach Thomas and Alicia Smiddy who both of whom denied seeing George attempt to exit the truck.  10 RR 173, 191.

The prosecutor objected to the introduction of Hill's police report or to Hill's testimony regarding what he was told by the dispatcher as hearsay.  20 RR 2-3, 41-45.  The trial court sustained the prosecutor's objection and refused to allow the report or testimony regarding the contents of the report.  20 RR 45. The trial court correctly held that Officer's Hill's police report was inadmissible hearsay. *See Cole v. State*, 839 S.W.2d 798, 811 (Tex. Crim. App. 1990) (holding that police reports are inadmissible under the business record exception to the hearsay rule).

Furthermore, Smiddy's statement to the dispatcher was not admissible through Officer Hill to impeach Smiddy.  Under Rule 803, a prior inconsistent statement may be introduced only where "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement."  Tex. R. Evid. 801(e)(1)(A).  Because Smiddy's statement to the 9-1-1 operator was not given under oath, or subjected to cross-examination, it is not admissible under this rule.

41

Impeachment of Smiddy's testimony must comply with Rule 613(a), which provides:

> In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted. This provision does not apply to admissions of a party-opponent as defined in Rule 801(e)(2).

Tex.R. Evid. 613(a).

### 3. The trial court did not abuse its discretion in refusing Acker's request for a mistrial.

While being questioned by the prosecutor regarding a crime scene photograph, Officer Tony Hurley stated, "...I am assuming that whatever vehicle run over this body made these tracks." 20 RR 101. Acker objected, urging that this statement was non-responsive. 20 RR 101. The court sustained the objection, but refused to grant a mistrial. 20 RR 101. Acker contends that the trial court erred in doing so.

Under Texas law, a mistrial is appropriate for "highly prejudicial and incurable errors." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex.Crim.App.2003). The trial court's denial of a motion for mistrial is reviewed under an abuse of

discretion standard. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App.2004). When considering whether a trial court abused its discretion in denying a mistrial, we look to: (1) the severity of the misconduct (the magnitude of the prejudicial effect); (2) the measures adopted to cure the misconduct (the effectiveness of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct. *Id.*

First, because there was other evidence in the record supporting the fact that George's body was run over, including testimony from the medical examiner, Officer Hurley's statement did not create "an extreme circumstance of incurable prejudice" *See Hawkins*, 135 S.W.3d at 77.  Further, the trial court immediately struck the statement from the record and instructed the jury to disregard it and not consider it for any purpose.  20 RR 101.  Finally, there is very little likelihood that this comment contributed to Acker's conviction.  The evidence against Acker was overwhelming.  Several witnesses heard Acker threaten to kill George if he found her with another man.  Acker was seen forcing George into his truck minutes before her body was discovered along the road.  The medical examiner testified that George died as a result of homicidal violence.  Acker's own actions following George's death were not consistent with an accidental death.  The trial court was clearly withing its discretion to deny

Acker's request for a mistrial.  This ruling in no way suggests that the court was biased against Acker.

### 4. The trial court did not abuse its discretion in excluding hypothetical testimony from the medical examiner.

During Acker's cross-examination of medical examiner Dr. Gonsoulin, he sought to ask her the following hypothetical: "If someone falls from a vehicle going forty miles an hour and breaks or tears the medulla oblongata there's going to be instantaneous death, is that right?"  19 RR 258.  The prosecutor objected, asserting that the hypothetical was not based on the evidence. Specifically, he urged, "There has to be facts before something becomes relevant. You've got to put on some evidence that somebody fell from a truck and that truck was traveling forty miles an hour before you can make it relevant."  19 RR 259.  The trial court sustained the State's objection.  19 RR 259.

Under Texas law, an expert witness may give testimony based upon hypothetical questions posed to her during trial. *Jordan v. State*, 928 S.W.2d 550, 556 n. 8 (Tex.Crim.App.1996); *McBride v. State*, 862 S.W.2d 600, 610 (Tex.Crim.App.1993).  The hypothetical questions must be based upon facts in evidence, facts within the personal knowledge of the witness, or facts assumed from common or judicial knowledge. *McBride*, 862 S.W.2d at 610; *Pyles v. State*, 755 S.W.2d 98, 118 (Tex.Crim.App.1988).

The decision to sustain the State's objection was based on the trial court's determination that the hypothetical assumed facts not yet in evidence. Accordingly, the trial court did not abuse its discretion in refusing to allow the defense to pose this hypothetical.  But, even if the court were wrong, Acker has not demonstrated that the ruling was in any way motivated by bias against him.

> 5. **There is no indication that the trial court deliberately excluded evidence proving Acker's innocence, rather, the trial court was within its discretion to exclude hearsay and irrelevant evidence.**

Acker attempted to introduce testimony through three separate witnesses concerning an incident prior to the murder where George attempted to jump from Acker's truck because he tried to beat her head against the dash board.  21 RR 13; 39.  The first witness Sabrina Ball would have testified that, a few weeks before George's murder, George returned home after Acker threatened to kill her.  21 RR 11-12.  George told Ball and Acker's mother that Acker had tried to beat her head against the dash board of the truck, and that she tried to jump out of the truck but Acker pulled her back in.  21 RR 13.  Acker also sought to introduce the testimony of Officers William Anderson and Lewis Tatum, who responded to the incident after receiving a call from the Ball residence.  21 RR 37-39, 41.

In response to the State's hearsay objection, Acker argued that the statements George made regarding her attempt to jump from the truck were

admissible under the excited utterance exception to the hearsay rule.  21 RR 29-31; 36-37.  The trial court sustained the state's objection, but noted that with regard to the testimony by Ball, it was "a close call."   The court ruled that the first part of George's statement was an excited utterance, but the second part regarding the fact that she tried to jump out of the truck was not.  21 RR 29-31. The court also sustained the state's objection to the testimony of officers Anderson and Tatum.  21 RR 40-41.  These officer would have testified that George made similar statements to them after they responded to a call from the Ball residence about the incident.  21 RR 37-41.

To determine whether a statement is an excited utterance, trial courts should determine "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition" when the statement is made. *Apolinar v. State*, 155 S.W.3d 184, 186-87 (Tex. Crim. App. 2005).  Factors considered should include the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving.  *Id.*

The trial court considered the length of time between the occurrence and the statement.  Specifically, concerning George's statements to Ball, the court stated, "Now, I don't know the time frame.  If it was thirty minutes – it sounds like there was some time, at least, down at the Acker home.  If that were the

case there were apparently some other events that happened that caused her to run to the home." 21 RR 27-28.  Later, the court commented, "Then [Ball] said five minutes had passed by then.  And that's my question is we've gone into five to seven minutes so far.  There reaches a point where the excited utterance is no more and then it becomes hearsay." 21 RR 28.  The court also considered the fact that George's statement regarding the fact that she jumped from the truck was made in response to a question. 21 RR 28-29.  The Court observed that by the time that George made these statements,  she was responding to questions by Ball about what had happened.  This fact, according to the court, "takes the spontaneity" out of it. 21 RR 30.  The Court's ruling was clearly not an abuse of discretion.

Acker further contends that the trial court's decision to exclude testimony by his investigator John Sands also demonstrated his bias.  But, the Texas Court of Criminal Appeals considered on direct appeal whether this decision by the constituted error. *Acker v. State*, Slip op. No. 74,109 at 13-14.  Mr. Sands testified *in camera* that he conducted an experiment in a truck similar to that driven by Acker, and found that he could not reach the passenger door and open it while driving the vehicle. The state argued the evidence should be excluded because Acker offered no evidence "comparing the height, weight, arm length, strength, age, and physical condition of the investigator and appellant." *Id.*

While the court did not agree that every characteristic had to be in evidence, they did conclude that "some evidence of similar physical characteristics would be required for the evidence to be relevant." *Id.* Accordingly, Acker cannot claim that the trial court ruled in error or that the ruling is evidence of bias.

### 6. The trial court did not force the petitioner to make a prejudicial, irrelevant demonstration in front of the jury.

The prosecution asked Acker to demonstrate how hard he had shaken George in the events leading up to her murder. The court did not abuse its discretion in allowing this demonstration. *See Moore v. State*, 154 S.W.3d 703, 708–09 (Tex. App.—Fort Worth 2004, pet. ref'd) (court did not abuse discretion in allowing state on cross of defendant to have defendant demonstrate how hard he shook baby with doll). Acker contends that this was error because the court allowed the prosecutor to push Acker into demonstrating the force he used by slapping the table. However, Acker continued to refuse, stating that he could not demonstrate how much force he used, and the prosecutor. Eventually dropped the line of questioning. 22 RR 53-57. Clearly, there is no error here and nothing to prove bias.

### 7. The trial court did not err in allowing the State to introduce evidence of Acker's prior offenses.

Acker testified at the guilt-innocence phase of trial that he had never been formally charged for any incidents of violence. In order to rebut this false

statement, the prosecution wished to offer Acker's prior convictions.  22 RR 96.
The court ruled the prosecution could only "repair or correct a false impression
but I don't think you can go much further than that."   22 RR 100

The prosecution then asked Acker if he was charged with the crime of
assault of his ex-wife, Susan Acker. Mr. Acker did not recall the charge.  22 RR
104.  He was asked if he was charged with a second assault of his ex-wife, to
which he answered he could not recall, but that he may have been sent to jail,
not found guilty. 22 RR 104.  Acker admitted to two other incidents of family
violence/assault against Susan Acker.  22 RR 105.  He also admitted to serving
prison time for burglary from October 1992 to October of 1995.  22 RR 106.

The admission of this evidence is consistent with Texas law as set out by
the Court of Criminal Appeals in *Winegarner v. State*, 235 S.W.3d 787 (Tex.
Crim. App. 2007).  There, the court explained,

> [w]hen a witness, on direct examination, makes a blanket assertion
> of fact and thereby leaves a false impression with respect to his
> prior behavior or the extent of his prior troubles with the law, he
> opens the door on his otherwise irrelevant past criminal history and
> opposing counsel may impeach him by exposing the falsehood.

*Id.* at 790–91(internal brackets/quotes omitted).  The trial court's ruling is not
error, nor is it evidence of bias against Acker.

8.   **The trial court did not err in sending all of the exhibits to the jury during its deliberations.**

During the jury's deliberations at the guilt-innocence phase of trial, the jury sent a note to the trial court requesting to see Defendant's Exhibit 1 and the testimony of Brodie Young. 23 RR 32.  After some discussion it was determined that the requested exhibit, Defense Exhibit 1, did not match the description of the exhibit requested, "truck on road in front of dairy." 23 RR 33.  In light of the confusion, Acker requested and the trial court agreed, that the best way to resolve the situation was to send all of the exhibits back to the jury. 23 RR 30-37. The state vehemently opposed this suggestion.  23 RR 30-37.  After much discussion, however, the trial court ultimately sent all of the exhibits back to the jury with an instruction as to the original photo requested.  23 RR 37.  The Director is baffled as to how the trial court's compliance with Acker's suggestion demonstrates error or that the trial court was biased against him.

9.   **The trial court did not err in refusing to appoint a criminologist.**

This claim is discussed *infra* in section X.  The trial court did deny Acker access to expert assistance necessary for his defense.  Both Acker and the State agreed that two of the experts already appointed to help Acker were experts  also qualified in crime scene investigation —  John Sands, the investigator and the accident reconstructionist, A.L. Pipkin.  The Court simply refused to appoint a

third expert to do what the other two were qualified and capable of doing. Acker's complaint concerning the fact that the trial court later excluded Sand's testimony is unfounded because the trial court excluded this testimony after finding it irrelevant, not because Sand's wasn't a qualified expert. This ruling is not error, nor does it demonstrate bias.

### 10. The trial court did not err in excluding Acker's testimony regarding George's prior attempt to jump from his truck.

Acker attempted to testify during trial that George had, on a previous occasion, attempted to jump from his truck. 21 RR 155. Clearly, Acker wanted to use this evidence to convince the jury that George's prior actions were evidence supporting Acker's contention he did not kill her, but that she jumped to her death. The introduction of this type of evidence is prohibited under the Texas Rules of Evidence, which provides that "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Tex. R. Evid. 404(b).

Furthermore, even if this evidence were relevant to prove — as Acker urged at trial — the nature of his relationship with George, Rule 403 of the Texas Rules of Evidence prohibits the admission of, evidence, though relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice." Tex.R. Evid. Rule 403. Here, the relevance of this evidence, if any, was minimal in comparison to the prejudice it might have, suggesting that

evidence showing that Acker jumped before is proof that she did so in this case.

Clearly, the trial court did not err in excluding this evidence.  There is also no

evidence of bias here.

> **11.  The trial court did not err in refusing to instruct the jury that they must acquit Acker if they believe that George had jumped voluntarily from the truck.**

The Court of Criminal Appeals has held that:

> [G]enerally speaking, neither the defendant nor the State is entitled to a special instruction relating to a statutory offense or defense if that instruction (1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or defense.

*Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007). The court in

*Walters* addressed the defendant's request for an instruction on alibi defense,

and held that an alibi merely negates an element of the offense that must be

proven by the State, and is not an affirmative defense that has to be proven by

the defense. *Id.* at 209.   The court reasoned that an alibi is already embraced

within a charge that instructs the jury they must find the defendant guilty

beyond a reasonable doubt. *Id.* at 210. In fact, a "special instruction for the issue

of alibi would needlessly draw a jury's attention to the evidence which raised

alibi . . . . [and] would constitute an unwarranted comment on the weight of the

evidence by the trial court." *Id.* Under this reasoning, the Court has also held the

defendant is not entitled to a special instruction on "accident" or "suicide."

*Williams v. State*, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982) (accident); *Ortiz v. State*, 93 S.W.3d 79, 92 (Tex. Crim. App. 2002) (suicide). Therefore, the trial court's decision to deny the requested jury instruction that Acker should be acquitted if the jury believed George "came to her death from an injury inflicted by her own action, jumping from a moving a vehicle . . ." was soundly based in Texas law on requested jury instructions. The requested instruction consisted of actions that could be considered suicide or accident, and therefore did not require special instruction under Texas law.

### 12. The trial court did not err in refusing to sustain counsel's objection to the jury charge.

The jury charge included the following instruction regarding intentional acts: "Conduct is not rendered involuntary merely because the person did not intend the results of his conduct." Acker alleges this conflicts with the definition of intentional acts. However, "[t]he statutory definitions of intentional or knowing culpability with respect to the result of conduct . . . require the defendant to have the conscious objective or desire to cause the result, or to be aware that his conduct is reasonably certain to cause the result." *Roberts v. State*, 273 S.W.3d 322, 328 (Tex. Crim. App. 2008). Under the accepted definition of intentional or knowing culpability by the Texas Court of Criminal Appeals, the jury charge is not incorrect for stating that "conduct is not rendered

involuntary merely because the person did not intend the results of his conduct." Acker still could have acted voluntarily and knowingly if he was "aware that his conduct [was] reasonably certain to cause the result." *See Roberts*, 273 S.W.3d at 328. The trial court's ruling here was not incorrect, nor does it establish bias.

### 13. The trial court did not err in refusing Acker's request for a lesser-included offense instruction.

The trial court submitted lesser included offense instructions for the offenses of murder and kidnaping, but refused to submit instructions for the offenses of attempted kidnaping, unlawful restraint, manslaughter, and criminally negligent homicide.

The Supreme Court announced in *Beck v. Alabama* that a death sentence could not be imposed "after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of a lesser-included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. 447, 627 (1981). Under the rationale of *Beck*, a "capital defendant is constitutionally entitled to instruction on a lesser-included offense only if he has demonstrated that the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Jones v. Johnson*, 171 F.3d 270, 275 (5th Cir. 1999). "This necessarily requires a showing that the facts of the case and the law of the State warrant such an instruction. " *Andrews v. Collins*, 21 F.3d 612, 629 (5th Cir. 1994) (citation omitted).

In order to merit relief based upon the failure to submit a lesser-included offense instruction, a petitioner must demonstrate that "the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Jones v. Johnson*, 171 F.3d 270, 274 (5th  Cir. 1999).  Mere speculation that the jury may have disbelieved some of the State's evidence tending to prove the elements of capital murder is insufficient to establish a *Beck* claim.  *Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir. 2000).  Instead, "there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted." *Id.* (internal citation omitted); *see also Reddix v. Thigpen*, 805 F.2d 506, 511 n.1 (5th Cir. 1986)("Most sets of facts can be rearranged to support lesser-included offenses if the troublesome pieces of evidence can simply be ignored.").

Acker wholly fails to brief the basis for his claim that a lesser-included offense instruction on attempted kidnaping, unlawful restraint, or criminally negligent homicide was justified.  Consequently, Acker has waived this claim. *See Trevino*, *supra* (noting that inadequately briefed claims are waived on federal habeas review).

Furthermore, the evidence does not support a lesser-included offense instruction for manslaughter.  Acker contends that the evidence was sufficient

to raise this issue because the jury could have believed that he should have stopped the vehicle when George was trying to jump out of the car. But, there was absolutely no mention by either party to the fact that Acker should have stopped the car when George tried to jump. This does not constitute "evidence directly germane to a lesser-included offense." Acker has not demonstrated that the trial court erred, or that its decision was the result of bias.[11]

### 14. The trial court did not impermissibly comment on the evidence.

During the State's closing arguments at the guilt-innocence phase, Acker objected to the prosecutor's assertion that acceleration marks where visible at the scene. 22 RR 22. Acker asserted that there were no facts in evidence proving there were acceleration marks. 22 RR 22. The trial court overruled the objection stating, "Well [it is] a reasonable deduction from the evidence and he's looking at the evidence." 22 RR 23. Acker maintains that in overruling his objection, the trial court impermissibly commented on the evidence.

"In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether it is admissible. . . ." Tex. Crim. Proc. Code Ann. § 38.05;

---

[11] Regardless, even if this Court were to find error here, the Court of Criminal Appeals determined on direct appeal, that any error in the trial court's refusal to grant the lesser-included offense instructions was harmless. *Acker v. State*, No. 74, 109, slip op. at 10-13.

*Barnes v. State*, 503 S.W.2d 267, 270 (Tex. Crim. App. 1974). However, "to constitute reversible error in violation of Article 38.05 . . . the comment of the court must be such that it is reasonably calculated to prejudice the appellant's rights by injuring him or by benefitting the State." *Barnes*, 503 S.W.2d at 270.

In stating that the prosecution's statement was a reasonable deduction from the evidence, the trial judge in this case was merely responding to Acker's contention that there were no facts in evidence proving the marks were acceleration marks. Explaining the reason overruling Acker's objection in this case was not "reasonably calculated to prejudice the appellant's rights." *See Barnes v. State*, 503 S.W.2d at 270.

### 15. The trial court did not limit the jury's consideration of mitigating evidence.

Acker contends that the trial court prevented him from presenting testimony from his sister concerning the fact that she was his "second mother" growing up. Specifically, counsel asked Vittatoe, Acker's sister, how it came about that she was his second mother. 23 RR 129. The prosecutor objected to the relevance of this information. The trial court sustained the objection, stating that the court had been lenient in letting counsel ask the witness about their relationship, but how it came about "is totally irrelevant and immaterial" 23 RR 130. Counsel responded, "Your Honor, how it came about is relevant to whether or not the relationship he's got here; the relationship he's going to have in the

57

future. That's where I am going with this." 23 RR 130. The Court then stated, "That's kind of a vague and broad question. It's an open-ended question. . . .Be more specific." 23 RR 130.

The trial court cannot preclude the jury from considering "any relevant mitigating evidence" that the defendant proffers in support of a life sentence. *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). "[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Id.*

Contrary to Acker's assertion, however, the trial court did not preclude Acker from presenting evidence concerning the nature of his relationship with his sister, rather the Court instructed counsel to be more specific with his questions. Following the Court's ruling, counsel asked Vittatoe specific, pointed questions that ultimately revealed how, in fact, she became Acker's "second mother." She testified that their father was not home very often and their mother had to work. 23 RR 130. That left Vittatoe home alone to raise Acker and her younger sister. 23 RR 131.

Acker also claims that the trial court denied him the opportunity to present evidence concerning his sexual abuse. Specifically, he points to the fact that the trial court's sustained the prosecutor's hearsay objection to his mother's testimony regarding the abuse. 23 RR 139-40. The trial court did not refuse to

allow Acker to present this testimony.   The court simply sustained the prosecutor's objection to the hearsay statements contained in the testimony of Acker's mother concerning the abuse.   This ruling does not offend the Constitution. *See Valle v. Quarterman*, No. 08-70005, 2008 WL 4656945, at *4 (5 th Cir. 2008) (slip op.) (Finding no error in the exclusion of hearsay evidence of child abuse during the punishment phase where the evidence did not fall within a clear exception to the rule of hearsay).   The rule in *Eddings* addresses the admissibility of mitigating evidence on *relevance* grounds, where as the hearsay rules address the reliability and trustworthiness of evidence.   Acker fails to demonstrate error, much less bias in the trial court's ruling here.

### 16.   The trial court did not force disclosure of privilege information.

This claim is more fully discussed in section X, *infra*.   The trial court did not err in allowing the prosecutor to question Acker regarding what he knew about his expert Dr. Norton.   The questions asked by the prosecutor were limited to matters that were already public record.   Thus, the trial court's ruling was not improper, and does not support Acker's bias claim.

### 17.   The trial court did not appoint incompetent counsel to represent Acker on direct appeal and in the state habeas proceedings.

Acker contends that the trial court deliberately appointed two incompetent attorneys to represent him on direct appeal and in his post-conviction

proceedings in order to escape scrutiny and reduce the chance of being reversed on appeal.  This baseless allegation is wholly unsupported by the record.  First, as discussed in section VIII, *infra*, counsel on direct appeal was not ineffective.  But even if both Acker's direct appeal and state habeas counsel were deficient in their representation of him, there is absolutely no evidence that the trial court purposefully appointed attorneys that he knew to be incompetent.  This allegation clearly does not demonstrate bias by the trial court.

**B.    Regardless, even if Acker could demonstrate that the Court ruled in error, this does not establish bias.**

The Fifth Circuit considered in *Richardson* that a number of Circuit Courts have agreed the mere appearance of bias is not enough to warrant reversal. *Richardson*, 537 F.3d at 478; *see, e.g., Welch v. Sirmons*, 451 F.3d 675, 700 (10th Cir. 2006) (holding that the Supreme Court has never expressed that the mere appearance of bias violates the Due Process Clause); *Johnson v. Carroll*, 369 F.3d 253, 263 (3d Cir. 2004) (holding that "the Supreme Court's case law has not held, not even in dicta, let alone 'clearly established,' that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause"); *United States v. Lowe*, 106 F.3d 1498, 1504 (10th Cir. 1997) ("To state a due process claim that a judge was biased, defendant must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias.").

Acker has failed to point to any articulable reasons why the trial court's evidentiary decisions constituted bias. This Court has only given serious attention to bias claims where specific extrajudicial influential sources or bizarre court room circumstances raise an issue of necessary recusal. Such conditions do not exist here. Acker's claim of judicial bias is unexhausted and completely without merit.

### C. To the extent that Acker would argue cumulative error independent of his bias claim, this claim does not provide a basis for relief.

Cumulative error analysis is only proper where there is error to accumulate. *Derden v. McNeel*, 938 F.2d 605, 609 (5th Cir. 1991). Events at trial that are not constitutional error cannot be compiled to create reversible error on a collateral appeal. *See Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir. 1992) (en banc). The Fifth Circuit has held that few defendants succeed in demonstrating on collateral review that cumulative error violated the guarantees of fundamental fairness. *Id.*

> Cumulative error is an infinitely expandable concept that, allowed to run amok, could easily swallow the jurisprudence construing the specific guarantees of the Bill of Rights and determining minimum standards of procedural due process. Under its aegis, an error that would not have risen to constitutional dimension by itself might suddenly, when aggregated with other non-constitutional errors, become worthy of habeas relief. The legal certainty afforded by rules drawn from the specific Bill of Rights provisions related to criminal law could then yield to the subjectivity of fundamental fairness determinations. Worse yet, a free floating fundamental fairness rule

> subverts the uniformity of results that is the basic goal of an organized legal system . . . .

*Id.* at 1457–58. As discussed in the preceding sections, Acker has failed to demonstrate his trial was infected by error.

But, even if he could establish error, federal habeas relief would still not be warranted. The 5th Circuit adheres to a strict analysis when dealing with cumulative error claims. Habeas corpus relief may only be granted for cumulative errors where (1) the errors were of a constitutional nature and were not mere violations of state law; (2) the errors are not procedurally barred for habeas consideration; (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden*, 978 F.2d at 1454 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). For the reasons stated previously, Acker cannot demonstrate that he meets this criteria. This court should deny relief.

## IV. Acker is Not Entitled to Federal Habeas Relief on His Claim That the Trial Court Deprived Him of His Sixth Amendment Right to a Fair Trial by Refusing to Grant His Motion to Change Venue. (CLAIM THREE)

Because this claim was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ, it is defaulted here. *See* section I, *supra*. Regardless, Acker fails to demonstrate that the trial court violated his right to a fair trial when it denied his motion to transfer to another county. This Court should deny relief.

Due process requires that a defendant receive a trial by an impartial jury that is free from outside influence. *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the trial court should grant a continuance until the threat abates, or transfer the case to another venue not so permeated with publicity. *Id.* at 362-63. Generally, a petitioner seeking federal habeas relief based on prejudicial pre-trial publicity, must demonstrate "an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity." *Moore v. Johnson*, 225 F.3d 495, 504 (5th Cir. 2000) (quoting *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1986). But, in *Rideau v. Louisiana*, the Supreme Court recognized an exception where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community. 373 U.S. 723, 725-26 (1963). In those cases, jury prejudice is presumed and the petitioner has no further duty to establish bias. *Id.*

Prior to trial, Acker moved the trial court to transfer his case out of Hopkins County. At the hearing on this motion, Acker presented testimony from several witnesses in an attempt to show that the pretrial publicity was overwhelming and prejudicial. Three witnesses testified regarding the number

of stories aired by local television and radio stations, as well as those run in the local newspapers.  Four other witness from the community testified that in their opinion the media coverage precluded Acker from receiving a fair trial in Hopkins County.

First, Acker offered the testimony of Jimmy Rogers, the news director for KSST Radio and Channel 18 Television.  3 RR 7.  Rogers testified that he had run approximately six different stories about Markie's murder, and that these stories aired three times a day on television and eight times on radio.  3 RR 8.  Acker's next witness, David Kirkpatrick, was the News Director for East Texas Broadcasting.  3 RR 14.  He stated that his stations ran between eight and ten different stories pertaining to the murder that aired four or five times per day.  3 RR 15, 16.  Kirkpatrick further stated that according to the latest Arbitron polls for East Texas Broadcasting for Franklin, Hopkins, and Titus counties, the average number of listeners was thirty-eight thousand.  3 RR 16.  The last media witness, Robert Alsobrook, edited the Sulphur Springs News-Telegram.  3 RR 24.  He indicated that the newspaper ran at least ten different stories about Markie's case, and that the paper reached approximately six thousand people — either by subscription or through rack sales.  3 RR 30.  The stories that ran in the media included reports that the medical examiner had ruled Markie's death a homicide and that Acker was suspected of the murder.  3 RR 18-19, 31-32.

Neva Nell Shook, testified that, based on her conversation with her neighbor and some of the members of her church, she did not believe that Acker could get a fair trial. 3 RR 44-45. She stated, "I don't know where you are going to find a jury that hadn't heard about it." 3 RR 45. Cecil Dodd testified that it might be possible to find some jurors who could be fair and impartial, but it would be difficult. 3 RR 60. Nathaniel Dodd testified that based on his conversations with people he had in the community, he did not believe that Acker could receive a fair trial. 3 RR 70. Finally, Dorcas Acker Dodd stated she had spoken with nine or ten different people in the community, and it was evident that they had already made up their minds about Acker's guilt. 3 RR 93.

After hearing this evidence, the trial court denied relief on Acker's motion to transfer venue to a different county. The court explained, ". . . the evidence is just not there . . . there really isn't enough evidence that we can't find twenty fair and impartial jurors in the county." 2 RR 102. Acker now challenges this ruling, asserting that the trial court's decision deprived him of his constitutional right to a fair trial and impartial jury. He does not allege actual prejudice in this case, but argues instead that the pretrial publicity was highly prejudicial and inflammatory such that prejudice should be presumed under *Rideau.* This claim, however, is insupportable.

"[T]he *Rideau* principle of presumptive prejudice is only rarely applicable and is confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Busby v. Dretke*, 359 F.3d 708, 725-26 (5th Cir. 2004).  The prosecutor demonstrated during the hearing on the motion to transfer venue that the pretrial publicity in this case was neither pervasive, nor prejudicial.

Rogers, testified that while his radio and television station ran between eight and ten news stories about Markie's murder, those stories ran over the span of a six month period, beginning from the date of the offense through the start of trial.  3 RR 10-11.  Roger's further stated that news about the case "hasn't been a predominant thing that I've heard," and that he did not have an opinion as to whether Acker could receive a fair trial in the county.  3 RR 13. When asked about possible prejudice against Acker, Roger's stated that  he attempted to report "only the facts, no opinions."  3 RR 10.

Kirkpatrick, similarly testified that the stories on his radio stations ran over a period of six months dating back to March 2000.  2 RR 22.  When pressed about the frequency of the news stories, Kirkpatrick responded, "In other words, it was reported on the news when there was a development, not just over and over the same thing everyday."  3 RR 21-22.  He also indicated that he believed

the stories were balanced and fair, and did not simply contain references to information indicating a homicide, but also Acker's assertion that Markie's death was an accident.  3 RR 18-19, 20.

Alsobrook, the local newspaper editor testified during cross -examination that he did not know whether Acker could receive a fair trial in Hopkins County, "As I said earlier, I really haven't talked to other people about it."  3 RR 41. Based on his interaction in the community during the months following the offense, he did not perceive the case to be a topic of general conversation.  3 RR 41.  Alsobrook additionally testified that the new stories reported in the paper contained information concerning Acker's insistence that he tried to prevent Markie from jumping to her death.  3 RR 39.

The prosecutor's cross examination of the remaining witnesses — who actually testified that they did not believe Acker's could receive a fair trial in Hopkins County — revealed that most of them were friends or family of Acker. Neva Shook testified that she has "known [Acker] all his life.  I know his mother. The whole family."  3 RR46.  Cecil Dodd, ex-husband to Acker's sister, admitted that, "[Acker's] mother goes to my church and I've known Daniel since he was a small boy."  3 RR 62. 65.  Clearly, this evidence is not comparable to the evidence in *Rideau* where the Supreme Court reversed the conviction "without pausing to examine a particularized transcript of the voir dire examination of

the members of the jury" to determine prejudice.  373 U.S. at 727.  The media coverage in *Rideau* was both pervasive and extremely prejudicial.  There, a local television station broadcast on three straight days a twenty-minute film of the defendant's jailhouse interrogation, in which he admitted in detail to the bank robbery, kidnaping, and murder with which he was charged.  *Id.* at 724.  The parish had a population of 150,000, and the three broadcasts were seen by 24,000, 53,000, and 29,000 of the parish's residents, respectively. *Id.*  Here, there were only a handful of different stories broadcast over several months that presented both incriminating and exculpatory information.

Consequently, even if this claim were not procedurally barred, the trial court's refusal to grant Acker's motion for a change of venue does not provide a basis for relief.  Acker does not attempt to prove actual prejudice resulting from the pre-trial media coverage, and he fails to establish that prejudice should be presumed in this instance.  This Court should deny relief.

## V.   Acker is Not Entitled to Federal Habeas Relief on His Claim That Counsel was Ineffective During Pre-Trail Proceedings (CLAIM FOUR).

Acker's three allegations concerning counsel's performance during pre-trial proceedings are all procedurally barred as a result of the state court's decision to dismiss these claims as an abuse of the writ. *See* section I, *supra*.  Regardless, they lack merit.  Acker fails to demonstrate that counsel's performance was deficient or that it prejudiced his defense.  This Court should deny relief.

Acker raises three objections to counsel pre-trial performance. He contends first that should have challenged the fairness of the grand jury proceedings in his case because a family member and a friend of the victim served on the panel that indicted him. Second, he claims that counsel should have completed DNA testing of the victim's fingernail prior to trial. Finally, he argues that counsel failed to adequately prepare defense witnesses for trial. In particular, points to three punishment witnesses that he claims could have presented substantial mitigating evidence had they been properly interviewed and prepared by counsel to testify on his behalf.

This Court reviews Acker's Sixth Amendment claim under *Strickland's*[12] two-prong test for determining whether counsel was ineffective. *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009). Acker must demonstrate both prongs to succeed. The failure to prove either will defeat the claim. *Strickland*, 466 U.S. at 697; *Ramirez v. Dretke*, 398 F.3d 691, 697 (5th Cir. 2005). Under the first prong, Acker is required to demonstrate that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. That is, the challenged conduct must be shown to fall short of reasonable performance under prevailing professional norms. *Id.* at 688. Notably, great deference is given to counsel's performance. *Id.* at 690. "[C]ounsel is strongly presumed to have rendered adequate

---

[12]     *Strickland v. Washington*, 466 U.S. 668 (1984).

assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* The second prong compels Acker to establish that counsel's alleged error prejudiced his defense. *Id.* at 687. To prove prejudice, he must show a reasonable probability that, but for counsel's error, the results of the proceeding would have been different. *Id.* at 694.

A.   **Acker has not demonstrated that counsel was ineffective for failing to challenge the fairness of the grand jury proceedings.**

Initially, Acker provides no legal or factual support for his claim. He merely asserts that the grand jury proceedings were biased because one panel member, Carol Henderson, was related to the victim by marriage and the foreman, Clayton McGraw, was a personal friend to the victim. Aside from the alleged relationship between these two panel members and Markie Markie, Acker's points to no evidence to substantiate his claim of bias. Furthermore, Acker fails to cite authority holding that the relationship between the victim and these grand jurors, even if established, would support a motion to quash the indictment. This claim is conclusory and should be summarily dismissed by the Court. *See Barnard v. Collins*, 958 F.2d 634, 643 n.11 (5th Cir. 1992) (holding that "conclusory allegations" of ineffective assistance are without merit "[i]n the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial");

*Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (noting that claims which are "unsupported by specifics are subject to summary dismissal").

Even if this Court finds the facts alleged by Acker sufficient to avoid summary dismissal, they are nevertheless inadequate to support relief under *Strickland*. Acker fails to establish that either McGraw or Henderson acted unfairly against him in discharging their duties as grand jurors. Indeed, the record does not even support the fact Markie had a favorable relationship with McGraw or Henderson.

Although the prosecutor stated during a pre-trial hearing that Henderson was related by marriage to Markie, this is all the information provided concerning Henderson's relation to Markie. There are no details regarding exactly how they are related by marriage or the extent, if any, of the personal relationship between the two. Further, Acker cites only to his own testimony during the state habeas hearing to establish that McGraw was a close personal friend of the victim. When asked by counsel about the relationship between McGraw and Markie, Acker stated the following:

> I don't think he should have been the foreman of the grand jury, because he's a member of the VFW. I believe that he's something of a captain of – something to do with the VFW, Veteran of Foreign Wars. And all VFW members are friends, I would think; I may be wrong.

71

SHE 71.  Clearly, Acker has no personal knowledge that Markie and McGraw were friends, but merely supposes such because of McGraw's involvement with the VFW.

Without more, Acker cannot demonstrate that counsel was deficient for not objecting to the grand jury proceedings.  The record reflects that counsel diligently pursued multiple avenues in an effort to quash the indictment.  He filed two motions challenging the indictment, including a motion to set aside the indictment because the death penalty was unconstitutional and an exception to its form for failing to provide adequate notice of the offense.  1 CR 67-69, 70-74; *see also* 2 RR 27-28, 25-27 (defense argument in support of these motions). Counsel also filed numerous discovery motions relating to the grand jury proceedings, seeking evidence to undermine the validity of the indictment.  CR 12-13, 14-15, 54-55.

One of these pre-trial motions signals counsel's awareness of the fact that one of the grand jurors was potentially biased against Acker.  In the defense "Petition for Disclosure of Grand Jury Testimony," counsel asserted that his request was premised on the fact that "[d]efendant has reason to believe that a relative of the Deceased was a member of the grand jury sitting in this case and that said person's presence may have been prejudicial to the Defendant."  1 CR

12.  Later, when arguing his amended motion for inspection of the grand jury list, counsel told the court,

> ...[I]t's our understanding that there was a relative to the victim that may have been on the Grand Jury.  We need to know whether or not she was present in the jury room when the information was presented to the Grand Jury.  Whether or not she had any opportunity to talk to any of the other Grand Jury members about the case prior to its being presented to the Grand Jury.  And whether or not there could have been some taint by her being on the Grand Jury.

2 RR 41-42.  In response, the prosecutor informed counsel and the court that Carol Henderson, one of the grand jurors in Acker's case, was related by marriage to the victim.  2 RR 43.

Acker has wholly failed to provide this Court with facts indicating there was any basis for counsel to move to quash the indictment against him based on juror bias.  Because counsel was actively investigating potential bias in the grand jury,[13] and because this Court must presume that counsel "made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, the fact that counsel did not ultimately challenge

---

[13]     The absence in the record of any indication that counsel sought to challenge the indictment based on McGraw's service as grand jury foreman does not reflect poor performance by counsel, as suggested by Acker.  Aside from the fact that there is no real evidence that McGraw and Markie were friends, McGraw served as foreman of the grand jury that returned a true bill for Acker's original indictment, not the second indictment under which he was actually tried.

the fairness of the grand jury proceedings does not point to deficient performance. This is enough to defeat the present claim.

### B.   Acker similarly fails to establish that counsel should tested the victim's fingernails for DNA evidence prior to trial.

Like the allegation regarding grand jury bias, Acker's assertion that counsel was ineffective for failing to obtain a forensic analysis of the victim's fingernails before trial is wholly conclusory.  Acker cites the fact that counsel requested a continuance based on the fact that the fingernail clippings had not been tested by their DNA expert, that the court refused to grant the continuance, and that counsel opted not to make a bill of exceptions when given the opportunity. Petition at 165-66 (citing 19 RR 2-4).  But he fails to assert how these facts supported a violation of his Sixth Amendment right to counsel. Absent allegations regarding what these DNA tests would have revealed and how this would have been helpful to his defense, there is nothing for this Court to review.  The Fifth Circuit has made clear that conclusory claims, such as the one here, should be dismissed. *See Barnard*, 958 F.2d at 643 n.11 (holding that "conclusory allegations" of ineffective assistance are without merit "[i]n the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial").

Even so, this claim does not withstand scrutiny.  While counsel indicated to the trial court that he wanted to have the fingernail clippings tested for DNA

evidence, the failure to follow through with this request does not render counsel deficient nor did it prejudice Acker's defense.  As queried by the prosecutor in opposing the defense motion for continuance to conduct the testing, "...what relevance would it possibly have?  How would that somehow help their defense that she fought against him struggling?  How would it have been useful to them?"  19 RR 3.

Indeed, counsel was able to use the fact that DNA testing had *not* been done on the fingernail clipping to further the defense theory that the evidence presented by the State did not prove the victim was strangled.  In his closing argument counsel urged,

> Did he strangle her?  No.  You know why?  If somebody's going to strangle somebody . . . and use their hand, a rope, towel, whatever it is, manual ligature, you're going to try to get that off of you. You're going to get that off of your neck.  You're going to be tugging. You're going to be pulling.  And you're going to scratch yourself and you're also going to scratch his hands and the arms of whoever is doing the strangling.  Forensic science knows that.  And that's why the autopsy lady, without any request made of her, that's why she took clippings of Markie's fingernails.  They were never tested.  You know why?  Because Mr. Acker didn't have any scratches on his arms and Ms. Markie didn't have any scratches on her neck.

23 RR 13.

Acker could potentially argue that had the tests been conducted and no DNA evidence found, counsel would have had a stronger argument.  But, it is equally possible that Acker's DNA would have been found on the nail clippings,

75

thus severely hindering counsel's ability to undermine the prosecutor's theory that Acker strangled Markie.   Indeed, the State would no doubt have used the positive DNA results to strengthen their case.   On these facts, it is clear that counsel was neither deficient, nor was Acker's prejudiced by, the absence of DNA evidence.   This Court should deny relief.

### C.   Finally, counsel's investigation and preparation of witnesses was sufficient to satisfy Sixth Amendment standards.

Acker's accuses counsel of preforming deficiently based on the affidavits from his mother, Nancy Acker, and his sisters, Sherry Walker and Dorcas Vittatoe.   In their affidavits, each states that counsel failed to prepare them for their testimony at the punishment hearing and that, had counsel done so, they could have offered testimony that would have benefitted Acker's defense.   *See* Petitioner's Exhibits 22 -24.   However, the record reveals that counsel presented, or attempted to present, much of the mitigating evidence contained in these affidavits during trial.

Nancy Acker asserts that, if properly prepared by counsel, she could have testified that her son was not a future danger, that he was a loving son and brother, and that he loved animals.   Petitioner's Exhibit 22.   She also averred that she could have provided the jury with information that Acker was molested by a teacher, that she and her husband were divorced and he never supported the family financially, that Acker's dad was abusive and once broke Acker's jaw,

and that Acker had spent time at Glen Oaks Hospital for psychiatric problems arising from the sexual abuse.   Walker asserted similar allegations in her affidavit, adding that their dad was the town drunk and that the victim had a history of drugs and alcohol use.  Petitioner's Exhibit 23.  Vittatoe, Acker's other sister simply stated that she could have provided positive character evidence and testified that he was not a future danger to society.  Petitioner's Exhibit 24.

Initially, both Walker and Vittatoe testified at trial that the did not believe their brother constituted a future threat to society.  23 RR 128, 134.  They also testified that Acker was a good brother and son, and that he loved animals.  23 RR 123-25, 131-32.   Nancy Acker testified at trial that she had a good relationship with her son and that she was not afraid of him.  23 RR 142. Testimony regarding the fact that Acker's father was absent from the home, and never provided any financial support for the family was introduced through Nancy Acker and Vittatoe.   23 RR 130-31, 136-37.   Acker's mother also attempted to testify regarding the sexual abuse he suffered as a child, but that testimony was ruled inadmissible by the trial court.  139-41.  The fact that Acker's dad was abusive and an alcoholic came in through the testimony of Dr. Cicerello.  23 RR 100.  Dr. Cicerello also reference Acker's stay at Glen Oaks Hospital in her testimony.  23 RR 101.  Finally, the medical examiner testified

77

during guilt-innocence that the victim had a .07 blood alcohol content when she died.  20 RR 221-22.

Contrary to Acker's contention, counsel was aware of, and sought to introduce mitigating evidence during the punishment phase of his trial.  The assertions contained in the family members's affidavit regarding the fact that counsel failed to prepare them for their trial testimony is incredible in light of the fact that much of the evidence they claim could have presented if properly prepared by counsel was, in fact, presented.  This Court should deny relief.

## VI.   Acker is Not Entitled to Federal Habeas Relief on His Claim That Counsel was Ineffective During the Guilt-Innocence Phase of His Trial. (CLAIM FIVE)

This claim is procedurally barred because it was dismissed by the state court on independent and adequate state procedural grounds.  *See* section I, *supra*.  Even if it were not, Acker is not entitled to relief because he fails to demonstrate that counsel's representation during the guilt-innocence phase of his trial fell below constitutional standards.

Acker raised several challenges to counsel's conduct during the guilt-innocence phase of his trial.  He contends that counsel was ineffective for (1) failing prove his innocence by presenting testimony from a medical expert and accident recontructionist; (2) referring to one of the State's exhibits as a "lie;" (3) introducing what Acker labels "prejudicial" photos; (4) failing to object to

testimony by Officer Tony Hurley; and (5) presenting argument that contradicted his version of events.

### A. Counsel's failure to present testimony from a medical expert and an accident reconstructionist was reasonable trial strategy.

The trial court appointed Dr. Linda Norton, a medical examiner, and A.L. Pipkin, an accident reconstructionist to assist Acker in his defense.  2 RR 68, 6 RR 20.  Neither of these experts testified at Acker's trial.  Acker contends that counsel's failure to rebut the state's theory of the case with a medical expert and an accident reconstructionist was deficient performance by counsel that prejudiced his defense.

Counsel's decision in this instance was a sound, strategic choice that does not support a finding of deficient performance.  *Strickland's* test for deficiency is not easy to satisfy.  Counsel's representation is presumptively sound, and Acker bears the burden of proving otherwise.  *Strickland*, 466 U.S. at 687-88, 690. Moreover, reasonable trial strategies chosen after a reasonable investigation are "virtually unchallengeable," and tactical choices made subsequent to limited investigation are reasonable, where the decision to limit the investigation is supported by reasonable professional judgment. *Id.* at 690-91.  Counsel testified during the state habeas hearing that he decided against presenting these witnesses because their opinions were more consistent with the State's case than

with Acker's version of events.    SHR 209-211.  The accident reconstruction's ultimate opinion was that the front tire of Acker's truck had run over Markie's head.  SHR 210.  This directly contradicts Acker's testimony at trial that Markie died when she voluntarily jumped from the vehicle.  After reviewing the medical evidence, Dr. Norton concluded that Markie "had been throttled and was either dead or near death at the time she came out of the vehicle, . . . [and] that the throttling or choking, would have left her in a vegetative state for the rest of her life." SHR 211.  Clearly her testimony would not have helped Acker during trial.  Indeed, counsel would likely have been ineffective if he *had* allowed these experts to testify.

Furthermore, counsel is not constitutionally bound to shop around for a more helpful expert. *Smith v. Cockrell*, 311 F.3d 661, 676 (5th Cir. 2002) ("[T]his court has refused to find that counsel violated the *Strickland* standard by failing to locate a different expert . . .") (citing *Williams v. Cain,* 125 F.3d 269, 278 (5th Cir., 1997)); *Dowthitt*, 230 F.3d. at 748 ("Under the circumstances, trial counsel was [not required by *Strickland* to] canvass[] the field to find a more favorable defense expert."); *see also Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) (explaining that the Sixth Amendment does not require attorneys to "shop around" for more favorable expert testimony).  This Court should deny relief.

## B.    Counsel was not ineffective for referring to a State's exhibit as a "lie."

During the guilt-innocence phase of trial, DPS trooper Donnie Willingham, Jr. testified that he was called to the crime scene in this case to construct a computer assisted diagram ("CAD").  20 RR 138-39. This diagram was admitted into evidence.    20 RR 140-41.    On cross-examination, counsel questioned Willingham regarding the accuracy of the diagram.   After establishing that Willingham added the blood spot at the scene to the diagram without actually measuring the spot himself, counsel objected to the drawing stating, "The proper predicate that's been laid was a lie."  20 RR 149.  The prosecutor objected to counsel using the term "lie," and outside of the presence of the jury, the trial court admonished counsel to be careful using that term because "[t]he word lie in court is a serious, very serious, word."  20 RR 151-52.

Acker now argues that counsel's objection, using the term "lie", constitutes a violation of his Sixth Amendment right to counsel.     But, Acker offer no authority supporting his assertion that counsel's conduct was deficient.  At most, counsel might be accused of being over zealous in his representation of Acker. Even if counsel could be considered deficient, there is no prejudice here.  The trial court's admonition took place outside the presence of the jury so there is no reasonable likelihood that it had any effect of the jury's verdict.  Clearly, this

comment does not support Acker's receiving a whole new trial on the basis of ineffective assistance of counsel.  This Court should deny relief.

### C.   Acker's allegation that counsel was ineffective for introducing prejudicial photos is frivolous.

Acker contends that counsel was ineffective because many of the photographs introduced by the defense as defense exhibits were relied upon by the State to prove their case.  Specifically, he argues that the prosecutor used defense exhibits four through nine to show the location of the hair in the truck, the blood stain on the seat, the liquid spill, and the blood spot on the ground. These photographs were taken from the file of DPS chemist Natasha Bologna, and were used by counsel in his cross-examination of this, and other witnesses. 20 RR 86-89, 129.  It was defense counsel – not the prosecutor – who through these photographs pointed out the location of the hair in the truck, 20 RR 86, the blood stain on the back of the seat, 20 RR 87, and the liquid spill.  20 RR 87-88. Counsel then used this evidence in his closing argument to argue that the physical evidence found at the crime scene was consistent with Acker's version of events.   23 RR 11.   Thus, counsel's introduction of these photos does not constitute deficient performance and did not result in any prejudice to Acker. This court should deny relief.

### D.   Trial counsel was not ineffective for failing to object to testimony by Officer Tony Hurley regarding the location of the blood spot.

During Hurley's testimony, he was asked by the prosecutor whether he had an opinion "as to whether or not the tire tracks . . . shown in State's Exhibit No. 21, that's also shown in State's Exhibit 12, is in line with the blood spot that is shown in State's Exhibit No. 21 that is just to the north of the body of Markie Markie."  20 RR 102-03.   Hurley responded, "My opinion is that the picture speaks louder than words and that's definitely in line with that blood spot." Acker contends here that counsel should have objected to this testimony because there was no evidence that the spot in the photographs was actually blood.

This spot of blood was, in fact, a large pool that was repeatedly referenced throughout the trial by both sides.  While an objection by counsel might have been technically correct, it might also have seemed trivial to both the judge and jury in light of the fact that there could be little question that the spot was blood. Counsel testified at the state habeas hearing that, he does not always object to everything that he could possibly object to at trial.  SHR 159.  Counsel reasoned, "One, it interferes with the flow of the trial; two, sometimes the jurors get angry if you object to minor things; three, its just unnecessary.  I mean, if I don't feel like it's hurting my client, I don't object."  SHR 159-60.

Counsel's decision not to object in this instance was clearly a sound, strategic choice that should not be disturbed on appeal.  *See Strickland, supra.* This Court should deny relief.

### E.   Counsel's argument did not contradict Acker's version of events.

During the closing arguments at guilt-innocence, counsel asserted the following:

> You may hear after the D.A. gets back up, because I'm not going to get the chance to respond, you may hear that the car hit her.  How do we know that the  car didn't hit her?  The forensic man came and said that they took samples of the paint of[f] the vehicle.  And then they inspected her clothes microscopically and they found no paint chips from the truck.  The truck did not hit her.  There would have been paint transfer.

23 RR 12.  According to Acker, this argument was ineffective because it contradicted the State's expert who testified that there wasn't always paint chip residue found when an individual impacts a vehicle.  20 RR 159.  Acker also claims that this argument was in conflict with his own testimony and theory of defense at trial.  Specifically, he states "...Acker's testimony regarding the victim jumping from the truck would have been fully consistent with her being hit by the door when she jumped, as the truck was going at a relatively fast speed, around forty miles an hour."

Admittedly, the Director is confused by this argument.   There was absolutely no testimony at trial from Acker, or anyone else, that Markie was hit

by the car door as she exited the vehicle.  Counsel's argument concerning the absence of paint chips in the victim's clothing is, in fact, wholly consistent with Acker's testimony that he did not hit Markie with this truck.  The fact that the expert stated that he does not always find paint chip transfers does not preclude counsel from arguing that their absence may signify that she was not hit by the vehicle.  Clearly counsel was not ineffective in the manner alleged, and this Court should deny relief.

## VII.  Acker is Not Entitled to Federal Habeas Relief on His Claim That Counsel was Ineffective During the Punishment Phase of His Trial. (CLAIM SIX)

As an initial matter, this claim is defaulted here because the Court of Criminal Appeals dismissed it as an abuse of the writ.  *See* section I, *supra*. Even so, it lack merit.  Acker fails to demonstrate, however, that counsel was deficient or that he was prejudiced by the alleged errors.

Acker complains that his counsel's representation during the punishment phase fell below constitutionally acceptable standards.  In particular, he submits that counsel was ineffective for failing to (1) present mitigating evidence; (2) present adequate evidence to refute a finding of future dangerousness; (3) present evidence of his low IQ; (4) present evidence of his drug and alcohol abuse; and (5) present an adequate closing argument.

## A.   Counsel's presentation of mitigating evidence was sufficient to meet constitutional standards for effective representation.

Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir. 2003) (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, counsel may be constitutionally ineffective for failing to exercise reasonable professional judgment in investigating a defendant's personal history that would be relevant to evaluating his moral culpability. *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510 (2003)).

However, counsel is not *per se* deficient for failing to present such evidence. *Wiggins*, 539 U.S. at 520; *Moore*, 194 F.3d at 615.   Counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 520.  This assessment is made by conducting an objective review of counsel's performance, measuring for "reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Id.* at 521 (internal citations and quotations omitted).   Further, in determining whether counsel's investigation and presentation of mitigating

evidence prejudiced the defense, a state court must "evaluate the totality of the available mitigating evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Riley*, 339 F.3d at 314 (citing *Williams,* 529 U.S. at 397-98.

As set out previously in section V(B)(3), *supra*, Acker's allegation that counsel failed to properly present mitigating evidence is without merit. The record reveals that counsel was aware of, and presented — or attempted to present — a vast majority of the evidence Acker claims counsel failed to put before the jury. Thus, this claim does not present a valid basis for relief.

### B.   Counsel's presentation of Dr. Cicerello's testimony does not constitute ineffective assistance of counsel.

Acker essentially claims that counsel should have anticipated that the trial court rule portions of Dr. Cicerello's testimony inadmissible. He claims, that counsel should have known better than to allow the expert to base her opinion on irrelevant studies. But there is no indication in the record before this Court that either counsel or Dr. Cicerello could have anticipated the trial court's ruling or were unreasonable for relying upon the studied challenged by the prosecutor. Acker claims that other studies were available, but he cites to none specifically.

Regardless, even if counsel were deficient, there is no prejudice. First, Dr. Cicerello's was able to provide favorable testimony for Acker. She testified that there was a very weak relationship between an individual's criminal history and

whether they commit violent offenses in prison.  23 RR 105.  She further informed the jury that the as an individual ages, they become less violent.  23 RR 106.

More importantly, the evidence introduced by the State to prove future dangerousness was very damaging.  Both of Acker's two ex-wives testified to the fact that he had been physically abusive to them.  24 RR 67-77, 79-84.  Shirley Sgore, Acker's second wife, also testified that Acker was abusive towards her oldest child and towards his mother.  23 RR 72, 76.  Considering this evidence, in conjunction with the facts of the instant offense, it is clear that Acker was continually abusive to the women in his life.  Furthermore, several police officers testified that Acker had a bad reputation for being peaceful and law abiding in the community.  23 RR 45, 53, 60, 64.  Sulphur Springs police officer Marcus Young testified that, on one occasion, Acker had assaulted him while Young was trying to place him under arrest.  23 RR 63.  Hopkins County Sheriff Deputy Charles Adam testified that while incarcerated in jail, Acker was found with contraband in his cell, including razor blades, papers clips, and lighters.  23 RR 45.  Clearly, even if Dr. Cicerello's had based her testimony on studies the Court found admissible, it would not have impacted the jury's determination that Acker was a future danger to society.  This Court should deny relief.

**C.    Counsel's failure to present evidence of Acker's low IQ did not deprive Acker of effective representation.**

Acker acknowledges that he does not fall within the class of offenders who are categorically excused from capital punishment under *Atkins v. Virginia*, 536 U.S. 304 (2002), but claims that under the rationale of *Atkins* his low IQ constitutes mitigating evidence that should have been presented to the jury. While it is true that evidence of diminished mental capacity may be mitigating, the Supreme Court has explicitly recognized that this evidence can also be aggravating.  *Penry v. Lynaugh*, 492 U.S. 302, 303-04 (1989).  The Fifth Circuit has consistently held that counsel is not obligated to present such double-edged evidence. *See, e.g., Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005) (reiterating that counsel may reasonably choose not to present double-edged evidence to the jury); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (noting that "any evidence about [the petitioner's] alleged brain injury, abusive childhood, and drug and alcohol problems is . . . 'double edged' . . . [so] it could all be read by the jury to support, rather than detract, from his future dangerousness").  Furthermore, The Court has further cited to the double-edged nature of evidence as contributing to its determination that prejudice did not result from the failure to present certain mitigating evidence to the jury. *Martinez*, 481 F.3d 249, 258 (5th Cir. 2007); *Harris v. Cockrell*, 313 F.3d 238, 244

(5th Cir. 2002); *Ransom v. Johnson*, 126 F.3d 716, 723-24 (5th Cir. 1997) ;

*Faulder v. Johnson*, 81 F.3d 515, 519-20 (5th Cir. 1996).

### D. Counsel adequately presented evidence of Acker's history of substance and alcohol abuse.[14]

As Acker correctly points out in his petition, the record contains evidence

that Markie and Acker were drinking heavily prior to the murder and that Acker

had a long-standing problem with drugs and alcohol. Acker is not, however,

correct in his assertion that this evidence was not effectively presented to the

jury by counsel. Acker claims that counsel should have used this evidence during

the guilt-innocence phase to argue diminished capacity and to explain Markie's

impulsive jump from the truck. However, diminished capacity resulting from

voluntary intoxication does not constitute a defense to the commission of a crime

under Texas law. *Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000)

(citing Tex. Penal Code § 8.04(a)). Nor does evidence of voluntary intoxication

negate the element of specific intent required to prove capital murder. *Id.* (citing

*Raby v. State*, 970 S.W.2d 1,6 (Tex. Crim. App. 1998).

Furthermore, counsel actually argued during closing arguments at the

guilt-innocence phase that Markie's intoxication "affected her judgment" and

---

[14]    Acker raises this allegation as part of his claim that counsel was ineffective during the punishment phase of trial, yet his argument appears to pertain to counsel's representation during the guilt-innocence phase.

contributed to her jumping from the vehicle.  23 RR 13.  Clearly, counsel was not deficient in the manner alleged here.

To the extent that Acker argues that counsel should have asserted his drug and substance abuse as a mitigating factor during the punishment phase,  the allegation does not establish a Sixth Amendment violation.  First, this evidence was  already before the jury.  Acker's sister testified that Acker abused both drugs and alcohol, and this abuse caused him to act differently and "create[d] a lot of his problems."  23 RR 133-34.  During closing arguments, counsel cited Acker's alcohol problem to refute future dangerousness and establish mitigation. He told the jury that Acker would not constitute a future danger in prison because "he will never have access to alcohol or drug . . .."  23 RR 148.  He further urged, "There's good in Daniel Acker.  He loved his animals.  He loved his mother.  He cherished his mother.  But alcohol and drugs ate on him.  And under the influence of alcohol and drugs he was a different person."  23 RR 149.

Regardless, even if counsel had chosen not to present this evidence, that decision would not support relief.  Evidence of alcohol and substance abuse is double-edged, and counsel is under no obligation to present such evidence to the jury.  *See, e.g., Martinez*, 404 F.3d at 889 (reiterating that counsel may reasonably choose not to present double-edged evidence to the jury); *Johnson,* 306 F.3d at 253 (noting that "any evidence about [the petitioner's] alleged brain

91

injury, abusive childhood, and drug and alcohol problems is . . . 'double edged' .
. . [so] it could all be read by the jury to support, rather than detract, from his
future dangerousness").

### E.   Counsel presented adequate closing argument at the penalty phase of Acker's trial.

Contrary to Acker's description, counsel's closing argument during the
penalty phase was much more than "basically a plea for mercy."  Although short,
the argument provided the jury with numerous reasons to vote against the
imposition of the death penalty.  First, counsel asserted that Acker deserved a
life sentence because "[t]here's good in [him]."  23 RR 147.  Counsel pointed out
that despite the fact that Acker had mistreated both his ex-wives, they both still
loved him because they saw good in him.  23 RR 147-48.  Next counsel argued
that Acker would not constitute a future danger while in prison.  According to
counsel, prison provided the structure that Acker need to avoid being a danger
to society.  Counsel also noted that Acker would not have access to alcohol, drugs,
or females while in prison.  23 RR 148.  Counsel further cited to Dr. Cicerello's
testimony that people in Acker's position were considered low risk in prison.  23
RR 149.  In addition to the argument against a finding of future dangerousness,
counsel also brought mitigating factors to the jury's attention, including the fact
that he grew up in a home with a male figure, that he loved animals, and his
family.  Counsel additionally argued Acker's alcohol and drug use "ate at him"

and made him a different person. 23 RR 149. Finally, counsel argued that revenge was not a good reason to sentence someone to death. 23 RR 148 He also urged that life was a gift and should not be taken away from Acker. 23 RR 149-50. Regardless, even if counsel has simply appealed to the jury to have mercy on Acker, this would not have rendered counsel ineffective. *See Kitchen v. Johnson*, 190 F.3d 698, 704-05 (5th Cir. 1999) (rejecting petitioner's claim that counsel closing argument was deficient because it was no more than a plea for mercy based on the Bible). This allegation does not support relief.

## VIII. Acker is Not Entitled to Federal Habeas Relief on His Claim That He Was Deprived of His Sixth Amendment Right to Effective Representation by Appellate Counsel. (CLAIM SEVEN).

This claim is defaulted here because it was dismissed by the state court on independent and adequate state procedural grounds. *See* section I, *supra*. Regardless, it lacks merit. Acker cannot demonstrate that counsel was deficient, or that he was prejudiced by, the failure to assert the claims raised in this petition on direct appeal. This Court should deny relief.

The familiar *Strickland* standard applies to a petitioner's claim that appellate counsel was ineffective for failing to raise a certain issue on appeal. *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.), *cert. denied*, 551 U.S. 1087 (2004) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)). In considering whether counsel's performance was deficient

93

in this context, the Fifth Circuit has stated that, "counsel does not need to raise every nonfrivolous ground of appeal available.    Nonetheless, a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Busby*, 359 F.3d at 714 (quoting *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)). Further, in order to establish prejudice, there must exist a reasonable probability that the court would have afforded relief if the argument in question had been raised on appeal.   *United States v. Reinhart*, 357 F.3d 521, 530 (5th Cir.  2004) (citing *Williamson*, 183 F.3d at 463).

Acker maintains that his appellate attorney was ineffective because he failed to assert on direct appeal the claims raised here in his federal petition. Initially, several of the claims raised by Acker involve facts outside the record and are, thus, best presented in the state habeas proceeding.   *See e.g. Mitchell v. State*, 68 S.W.3d 640,642 (Tex. Crim. App. 2002) (Stating that a petition for writ of habeas corpus usually is the appropriate vehicle to investigate ineffective-assistance claims).   Even so, for the reasons set out in each section, individually, none of the claims presented by Acker in his federal habeas petition have merit. Consequently, counsel was not deficient, nor was Acker prejudiced by, the failure to assert these claims on direct appeal.   This Court should deny relief.

94

IX.   **Acker is Not Entitled to Federal Habeas Relief on His Claim That His State Habeas Attorney was Inadequate, Thus Depriving Him of His Right to Meaningful Access to Courts. (CLAIM EIGHT)**

This claim was dismissed by the state court as an abuse of the writ and is, therefore, procedurally barred here. *See* section I, *supra*. Even if it were not, circuit precedent forecloses relief. The Fifth Circuit has consistently held that ineffective representation by state habeas counsel does not provide a basis for relief.

Acker contends he was denied meaningful access to the courts as a result of the appointment of ineffective assistance of state habeas counsel. In particular, Acker faults counsel for not adequately investigating and presenting viable claims in his state application for habeas relief. According to Acker, the state court had an obligation under its own statute to appoint competent counsel, yet failed to do so.

This claim is foreclosed by circuit precedent. In *Martinez v. Johnson*, the Fifth Circuit rejected a claim similar to the one that Acker presents here:

> We are unpersuaded by this argument for the reason that 28 U.S.C. § 2254(I) bars a federal habeas claim solely grounded in "the ineffectiveness or incompetence of counsel during ... State collateral post-conviction proceedings." 28 U.S.C. § 2254(I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); see also *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir.2001). Martinez has not provided this court with any argument regarding why the due process argument rests on anything other than the incompetence of

[his attorney] during state post-conviction proceedings. Because there is no other constitutional violation to accompany this claim, it is foreclosed by § 2254(I).

...In similar fashion, because we interpret Martinez's argument that he has been denied meaningful access to the courts under the First and Fourteenth Amendments as a claim grounded solely in his ineffective assistance of state habeas counsel, § 2254(I) bars relief.

255 F.3d at 245 n. 22. Because Acker's claim is undistinguishable from the one raised in *Martinez*, it must suffer a similar fate.

## X.   Acker is Not Entitled to Federal Habeas Relief on His Claim That the Trial Court Violated His Constitutional Rights Under *Ake*. (CLAIM NINE)

Initially, this claim is procedurally barred because it was dismissed by the state court on independent and adequate state procedural ground. *See* section I, *supra.* Regardless, there is no basis to grant relief. Acker wholly fails to demonstrate that the trial court violated his rights under *Ake*. This Court should deny relief.

In Ake, the Supreme Court held that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a state provide access to a psychiatrist's assistance on that issue if the defendant cannot otherwise afford one. 470 U.S. at 83. The Court reasoned that,

[it]has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to

96

present his defense.... [A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system.

Id. at 76-77 (internal citations and quotation marks omitted).  In light of this decision, the Fifth Circuit has determined that "non-psychiatric experts ... should be provided only if the evidence is both critical to the conviction and subject to varying expert opinion."  *Moore v. Johnson*, 225 F.3d 495, 502 (5th Cir. 2000) (quoting  *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993)).

Prior to trial, Acker filed a motion requesting the appointment of a crime scene expert, alleging that "[n]either Defendant nor counsel is sufficiently knowledgeable about the crime scene evidence to determine and assess the significance of the results obtained by the state's expert in this case." 3 CR 416. At the hearing on this motion, the trial court asked counsel to justify Acker's request in light of the fact that he had already been appointed a private investigator, who the state stipulated was a crime scene expert, and a accident reconstructionist, who defense counsel agreed was "an expert in crime scene investigation." 6 RR 18-19.  Counsel responded, "we feel that using one expert in two areas, two expert areas, would substantially harm the defendant and

would not give a fair trial . . . I think several witnesses would give him a fair trial." 6 RR 19-20.   The trial court ultimately denied the motion stating, "The Court's going to make a finding that I've already provided you with what the Court believes are two experts as crime scene experts . . . the record had already reflected Mr. Sands, as well as Mr. Pipkin.   I'm going to have to deny that motion."

Acker maintains that the trial court violated the rule announced in *Ake* by refusing to grant his request for the appointment of a crime scene expert.  He further contends that the trial court breeched the confidentiality of his experts by allowing the prosecutor to elicit testimony regarding the amount of money his mental health expert was paid and regarding the fact that his medical expert did not testify.  The claim, however, does not support federal habeas relief.

### A.   Acker cannot demonstrate that the trial court violated *Ake* in denying his motion for appointment of a crime scene expert.

Notably, the Court did not actually deny Acker's request for a crime scene expert. The Court merely refused to appoint a *third* expert after finding that two of the previously appointed experts were qualified crime scene investigators.  6 RR 20-21.  The prosecution stipulated that John Sands, the private investigator appointed to assist Acker, was "a crime scene expert," and the defense acknowledge that A.L.Pipkin, the accident reconstructionist, was also "an expert in crime scene investigation."  6 RR 19.

98

Furthermore, Acker's assertion that additional expert assistance was required because offering testimony from one expert in two separate areas of expertise would cause substantial harm is unfounded. No legal authority or support of any kind was offered to substantiate this position. The trial court was not obligated by the Constitution to grant Acker's request for a third expert where he failed to demonstrate a reasonable basis for such a request. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) (noting that no deprivation of due process resulted from the trial court's failure to appoint a criminal investigator, fingerprint expert, and ballistics expert where the defendant offered "little more that undeveloped assertions that the requested assistance would be beneficial").

Moreover, the Supreme Court plainly stated that *Ake* does not entitle a defendant to the "most-sophisticated defense," but requires only that a defendant be provided "access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77. The trial court in this case furnished Acker with ample access to the experts necessary for his defense. In addition to the two previously mentioned experts, Acker was also appointed a medical examiner, and DNA expert, and a psychologist. 6 RR 18-22. Acker cannot credibly claim that

he was denied due process as a result of the trial court's refusal to grant a third, separate crime scene expert.  This Court should deny relief.[15]

### C.   Acker is also unable to demonstrate that the trial court violated his attorney-client privilege by allowed testimony regarding confidential matters concerning his experts.

The Court of Criminal Appeals goes beyond the literal requirements of *Ake* and has held that "an indigent defendant is entitled, upon proper request, to make his *Ake* motion *ex parte.*" *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). However, nothing in this holding creates a constitutional right requiring that appointed experts under *Ake* remain confidential. The trial judge allowed questioning concerning Acker's medical expert because her appointment was already public record.  22 RR 7-11.  *Ake*, as interpreted by the Texas court, merely requires confidential *ex parte* procedures for requesting the appointment of experts for an indigent defendant. The reason for this is so that the defense does not have to tip its hand and divulge work-product in supporting their request with sworn argument. Nothing in *Ake* requires complete confidentiality of expert witnesses appointed to indigent defendants. Once appointed, they are

---

[15]    The fact that the trial court later refused to allow private investigator Sands to testify regarding his "experiment" has no bearing on this analysis.  Sands testimony was not excluded on the basis of expert qualification, but rather because it was irrelevant, *see* Section II, *supra.*

treated as any other expert. Therefore, the court did not violate Acker's constitutional rights under Ake to *ex parte* application for expert assistance.

## XI.   Acker is Not Entitled to Federal Habeas Relief on His Prosecutorial Error Claim.  (CLAIM TEN)

Acker procedurally defaulted this claim in federal court.  *See* section I, *supra*.  Nevertheless, he fails to prove its merits.  He cannot demonstrate that the challenged conduct substantially affected his right to a fair trial.  This Court should deny relief.

In his tenth claim, Acker asserts that the prosecutor, through numerous and repeated improper and prejudicial statement, infected both the guilt-innocence and punishment phases of his trial to the extent the proceedings were rendered fundamentally unfair.  Specifically, Acker accuses the prosecutor of (1) inflaming the passions of the jury; (2) asking obviously improper questions; (3) making prejudicial remarks in front of the jury; (4) violating attorney-client confidentiality; (5) asking the jury to speculate about the absence of a defense expert; (6) misstating the evidence; (7) asking defense witness how much they were paid for their testimony; (8) commenting on the veracity of a witness in front of the jury; (9) limiting mitigating evidence; and (10) commenting on the defendant's right to remain silent.

Generally, prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair.

*Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002).  "Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred. *Id.* (internal citations and quotations omitted).  Acker's claim fails here because he cannot show that any of the challenged remarks by the prosecutor, either separately or together, deprived him of his right to a fair trial.

## A.   The prosecutor's questioning of the victim's mother did not prejudicially inflame the jury against the defendant.

Markie's mother, Lila Seawright, testified during the guilt-innocence phase of trial regarding the events that happened leading up to Markie's death. As part of her testimony, she stated that she and her daughter had an argument earlier that week.  19 RR 90.  As a follow-up, the prosecutor asked whether she had "ever [got] a chance to make up for that."  19 RR 90.  Acker objected, asserting that "there was no purpose for that question other than to inflame the jury." 19 RR 90.  The trial court sustained the objection, and instructed the jury to disregard the statement and not to consider it for any purpose.  19 RR 90.

In determining whether the prosecutor's remarks so affected the substantial rights of the defendant this Court should consider three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the

evidence supporting the conviction." *United States v. Williams*, 343 F.3d 423, 437-38 (5th Cir. 2003) (citing *United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000)).

Acker fails to demonstrate that any of these three factors favor relief. First, there is no argument from him concerning the prejudicial nature of the prosecutor's inquiry, merely the conclusory assertion that it is prejudicial. As stated previously, conclusory allegations are insufficient to support federal habeas relief. *See e.g. Barnard ,* 958 F.2d at 643 n.11 (holding that "conclusory allegations" of ineffective assistance are without merit "[i]n the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial"). Acker similarly fails offer argument as to why the trial court's instruction to the jury would not be sufficient to cure any error in the prosecutor's inquiry. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (holding that jurors are presumed to follow their jury instructions).

Most importantly, however, the evidence in this case overwhelming pointed to Acker's guilt. Several witnesses testified that Acker stated the night before the murder that he would kill Markie if he found her with another man. There were also witnesses who described the verbal and physical altercation that took place the next morning after Markie returned home and admitted to having

spent the night with another man.  Those same witnesses saw Acker forceably

put Markie into his truck and drive away.  A few minutes later, another witness

saw Acker dragging a body outside his truck.  The medical examiner testified

that Markie died as a result of homicidal violence.  Acker did not deny being

present when Markie died, but claimed that her death was an accident.

However, his action following her death suggest otherwise.  Given this evidence,

there is no probability that the prosecutor's question to Markie's mother

rendered Acker's trial fundamentally unfair.  This Court should deny relief.

### B.    The prosecutor did not prejudice Acker by asking Natasha Bologna whether people bleed when they are strangled.

Bologna, a DPS chemist was asked by the prosecutor whether she had ever

investigated a case where someone was strangled.  20 RR 90.  Bologna responded

that, to her knowledge, she had not.  20 RR 90.  She stated that they often did

not know what type of case they were investigating.  20 RR 90.  The prosecutor

then asked, "People don't bleed when they are strangled, do they?"  20 RR 90.

The defense lodged an objection that was sustained by the trial court.

Again Acker fails to adequately brief this claim.  He asserts nothing to

support a finding that this question by the prosecutor was prejudicial in his case.

As set out above, the facts overwhelmingly pointed to his guilt.  Consequently,

even if this were an improper question, it is not likely to have had any impact on

the jury's verdict.

## C. The prosecutor's comments and questioning during trial did not prejudice Acker.

Here, Acker set out several instances where the prosecutor asked questions that he urged were improper and the trial court sustained his objection. Other than re-urging the basis for the objection lodged at trial, Acker offers nothing to support his claim that these remarks were substantially affected his right to a fair trial. The fact that his objections were sustained by the trial court does not signal that the prosecutor's questions were constitutionally improper. Furthermore, as set out previously, because the facts against Acker were so overwhelming, there is no reasonable probability that the prosecutor's remarks and questioning during trial impacted the jury's verdict. This Court should deny relief.

## D. The prosecutor did not violate Acker's attorney-client confidentiality.

Acker's claim that his right to attorney-client privilege was violated by the prosecutor's questions regarding his knowledge of Dr. Norton was previously discussed in section X, *supra*. As was pointed out there, the questions the prosecutor asked concerned matters of public record and thus did not violate any attorney-client privilege. This Court should deny relief.

**E.     The prosecutor did not err is pointing out the absence of a defense expert in closing arguments.**

Dr. Norton, the medical expert appointed to assist Acker in his defense did not testify at trial, nor did the accident reconstructionist A.L. Pipkin.   During closing arguments at the guilt-innocence phase, the prosecutor asserted,

> I asked ya'll to think about where Dr. Norton was.  He didn't answer that, did he?   Because Dr. Norton's opinion is the same. . .It's reasonable to assume that if his doctor had a difference of opinion she would have been here telling you about it.

> It's reasonable to believe that if it was an accident that there would have been an accident reconstructionist get on that stand and tell you how it happened.  But there wasn't.  Why?  Because there's no accident here.

23 RR 21-22.   Acker contends that the prosecutor erred in commenting on the fact that his experts did not testify at trial.

Circuit precedent does not, however, support his position.   The Fifth Circuit has held that while the prosecutor may not directly or indirectly comment on defendant's decision not to testify, it may call to the jury's attention the fact that the defense did not rebut evidence offered by the state. *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999).   The Court has also recognized that, under Texas law, the State may comment on the defendant's failure to produce a material witness, and may infer from that failure the testimony would have been unfavorable.   *Nichols v. Scott*, 69 F.3d 1255, 1284 (5th Cir. 1995).   The trial court's comments here were proper, and this Court should deny relief.

106

**F.    The prosecutor did not err by misstating the evidence during closing arguments.**

Here, Acker cites to two different portions of the prosecutor's closing argument wherein he claims that the prosecutor misstated the evidence.   *See* 23 RR 26, 29.  In both instances, Acker objected on that basis and the trial court overruled both objections.  23 RR 26, 29.  Acker offers nothing here to dispute the trial court's ruling on his objection.   Nor does he argue how the prosecutor's argument, even assuming it was a misstatement of the evidence, so infected the trial with unfairness that there is a reasonable probability that the result would have been different.  *See Jackson*, supra*.*  This Court should deny relief.

**G.    The prosecutor did not improperly question Acker's expert regarding her compensation.**

The defense hired Dr. Antoinette Cicerello, a forensic psychologist to perform a risk assessment of Acker in an effort to prove that he would not be a future danger to society.  23 RR 95, 96.  During the State's cross-examination of Dr. Cicerello, he asked her how much she had been paid for her opinion in this case.  23 RR 118-19.  Acker maintains that this information was confidential and was protected under the Sixth Amendment.

Initially, this claim fails because Acker himself introduced evidence regarding Dr. Cicerello's hourly rate on direct examination.    23 RR 96.  Regardless, an expert's compensation is not privileged information.  Under Texas

107

law, an expert witness may be cross-examined regarding their payment for testifying in order to establish bias or prejudice. *Russell v. Young*, 452 S.W.2d 434, 435 (Tex.1970) ("It is true that in order to show bias and prejudice an expert medical witness may be cross-examined regarding the number of times he has testified in lawsuits, payments for such testifying and related questions."). Consequently, it was entirely permissible for the prosecutor to question Dr. Cicerello regarding the compensation she received for her work in this case. This Court should deny relief.

### H. The prosecutor did not improperly comment on the veracity of a witness in front of the jury.

In this instance, Acker apparently misreads the prosecutor's statement, attributing error where none exists. Acker's mother attempted to testify at the punishment hearing regarding the sexual abuse he suffered at the hands of a teacher at school. 23 RR 139. The prosecutor objected to this testimony as inadmissible hearsay, and the trial court sustained the objection, unless his mother had personal knowledge of the abuse. 23 RR 139. Counsel replied that he believed Nancy Acker did, in fact, have personal knowledge of the abuse. 23 RR 139. The prosecutor responded, "I really find that hard to believe, Judge." 23 RR 139.

Acker characterizes this statement by the prosecutor as a comment on the veracity of Nancy Acker's testimony. The context of this statement, however,

refutes this assertion.  The prosecutor objected to Nancy Acker's testimony

concerning the abuse because it was based purely on what she had been told by

Acker.  The trial court agreed that this was hearsay and ruled the testimony

inadmissible unless he had personal knowledge, meaning knowledge other than

what she had learned through what Acker had told her.  The prosecutor's

comment was simply and expression of his belief that it was unlikely that Nancy

Acker had personal knowledge of the incident because the only way that would

be possible would be for her to have witnessed the sexual abuse first hand.  There

is no error here, and this Court should deny relief.

I.    **The prosecutor did not limit the jury's consideration of Acker's mitigating evidence.**

During the State's closing argument at the penalty phase, the prosecutor

urged the jury not to be swayed by sympathy.  Specifically, the prosecutor stated,

". . .[Defense counsel] wants to get up here and beg you, don't take his life.  It's

a play on your sympathy.  You read this charge here and see if it says anything

about sympathy in it." 23 RR 154.   This is not error.

The Supreme Court has generally approved instructions which limit the

jury's consideration of "sympathy" in the penalty phase of capital cases.

*California v. Brown*, 479 U.S. 538, 52-43(1987).  Specifically, the Court found

that the Eighth Amendment was not offended by an instruction to the jury that

it should not be swayed by "mere sentiment, conjecture, sympathy, passion,

prejudice, public opinion or public feeling." *Id.* at 542.  In her concurring opinion,

Justice O'Connor explained that,

> *Lockett* and *Eddings*[16] reflect the belief that punishment should be
> directly related to the personal culpability of the criminal defendant.
> Thus, the sentence imposed at the penalty stage should reflect a
> reasoned moral response to the defendant's background, character,
> and crime rather than mere sympathy or emotion.

*Id.* at 545 (O'Connor, J., concurring).  This rationale is clearly applicable here,

and contrary to Acker's assertion, there is nothing improper about the

prosecutor's argument.  This Court should deny relief.

### J. The prosecutor did not improperly comment on Acker's failure to testify.

During the State's closing argument at the punishment phase, the

prosecutor argued,

> Have ya'll seen any remorse in this case?  Any remorse for Markie?
> I didn't hear it in the punishment phase.  I didn't hear his mother
> say, I'm sorry about Markie.  I didn't hear his sister say, I'm sorry
> about Markie.  I didn't hear his other sister say it.  I didn't hear it
> at the guilt-innocence part of trial, I'm sorry about Markie.  There
> is no remorse here.  There's stopping and buying cigarettes as you're
> making your getaway.  That's cold.  That's cold blooded murder and
> that's cold at the end of it.

23 RR 124.

---

16      *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify. *Cotton v. Cockrell*, 343 F.3d 746, 751 (2003) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965). In *Griffin*, the Supreme Court reasoned that a comment on the defendant's silence punishes the defendant for exercising a constitutional privilege. 380 U.S. at 614. That is, "[i]t cuts down on the privilege by making its assertion costly." *Id.* Here, Acker did not exercise his right to remain silent. He elected to testify in his own behalf, telling the jury his version of the events that happened the night Markie died. Consequently, the prosecutor's comments were not improper. This Court should deny relief.

## XII. Acker is Not Entitled to Federal Habeas Relief on His Claim that Texas' Lethal Injection Protocol Violates the Eighth Amendment Prohibition Against Cruel and Unusual Punishment. (CLAIM ELEVEN)

Initially, relief is unavailable on this claim because it is procedurally barred. *See* section I*, supra*. Regardless, Because the Supreme Court has already decided this issue, Acker's cannot demonstrate his execution by lethal injection violates Eighth Amendment principles. This Court should deny relief.

Acker maintains that the method of his execution – lethal injection – constitutes cruel and unusual punishment in violation of the Eighth Amendment. Specifically, he argues that the combination of the chemical used in Texas creates a strong possibility of unnecessary suffering, a risk greatly increased by

111

the lack of physician involvement in the execution process.  He also asserts that Texas protocol violates evolving standards of decency.

Notably, the merits of this claim have already been rejected by the Supreme Court.   Any allegation regarding the constitutionality of the Texas lethal-injection protocol is foreclosed by the Supreme Court's decision in *Baze v. Rees*, 128 S. Ct. 1520 (2008).   There, the Court defined the constitutional boundaries for lethal-injection executions.  In doing so, the  Court not only upheld the constitutionality of Kentucky's protocol but also made clear its holding applies equally to all "substantially similar" protocols used in other states:

> A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain.  He must show that the risk is substantial when compared to the known and available alternatives.  A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.

*Id.* at 1537.

Thus, the only issue before this Court is whether the Texas execution protocol is "substantially similar" to that of Kentucky.  Although this Court could readily determine from the TDCJ-CID written protocol—either prior to or after the May 30, 2008 revisions—that this is indeed the case, the Texas Court of Criminal Appeals has already done so.  *Ex parte Chi,* 256 S.W.3d 702, 703-04 and

112

n. 3 ([Kentucky's lethal-injection protocol]. . . ."is materially indistinguishable from Texas's lethal-injection protocol," citing in footnote 3 to Chi's assertion of that fact); *see also Id.* at 704-705 (concurring opinion by J. Cochran, joined by J. Womack)(TDCJ-CID has "graphically demonstrated the similarities between the Texas lethal-injection protocol and that of Kentucky's which was upheld by the United States Supreme Court in *Baze.*") and n. 5 (comparing two protocols and noting chief distinction is the lack of "practice sessions" but noting that Kentucky has used protocol only once while Texas has executed over 400 inmates).

Moreover, Acker's evidence and assertions of practice variance and "botched" executions amounts to nothing more than difficulty in inserting the IV catheter on a handful of inmates, most who were IV drug addicts, and all before 1998.  This evidence is over ten-years old and more than 250 inmates have been executed since.  This fails to rise to the level of a "demonstrated risk of severe pain," as required by this Court and Acker still fails to offer any alternatives, as required by *Baze*.  Thus, Acker fails to establish that Texas lethal-injection protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment, and this Court should deny relief.

**XIII. Acker is Not Entitled to Federal Habeas Relief on His Claim that the Texas Capital Punishment Statute is Unconstitutional For Failing to Assign a Burden of Proof to the Mitigation Special Issue.  (CLAIM TWELVE)**

This claim is procedurally barred because it was dismissed by the state court based on independent and adequate state procedural grounds. *See* section I, *supra*.. Regardless, the Fifth Circuit has repeatedly rejected claims from Texas capital defendants alleging that their death sentence is unconstitutional under the Eight Amendment because the absence of a burden of proof for the mitigation special issues denied him the right to meaningful appellate review.   This Court should deny relief.

During the punishment phase of Acker's trial, the jury was presented with three special issues, the third being the mitigation special issue.  4 CR 598-603; *See also* Tex. Code. Crim. Proc. Art. 37.071 § 2.  Pursuant to Texas law, the jury was instructed that State had the burden of proving the first and second special issue beyond a reasonable doubt, but the law does not require, and the jury was not instructed,  that the State had to prove the mitigation special issue beyond a reasonable doubt.  CR 598-603.

Acker is indeed entitled to meaningful appellate review of his death sentence under the Eighth and Fourteenth Amendments. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991) (emphasizing that "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or

irrationally"); *Clemons v. Mississippi*, 494 U.S. 738, 748-50 (stating that "...meaningful appellate review of death sentences promotes reliability and consistency"). The Fifth Circuit, however, has held that a state appellate court satisfies this constitutional requirement if it provides meaningful review of the evidence of future dangerousness. *See Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir. 2001) (concluding that, "regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, 'meaningful appellate review' has been afforded"). Claims alleging constitutional error as a result of Texas' failure to review the mitigation special issue have consistently been rejected. *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002); *Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 621-23 (5th Cir.1999).

In *Woods v. Cockrell*, the Court explained why appellate review of the mitigation special issue is not constitutionally mandated:

> We held in *Moore* that Texas is within the ambit of federal law as interpreted by the United States Supreme Court. *Moore [ ]*, 225 F.3d [at] 507 [ ]. We did so in view of *Tuilaepa v. California*, 512 U.S. 967 [ ] (1994), in which the Supreme Court distinguished between the jury's "eligibility decision" and its "selection decision." It is the eligibility decision that must be made with maximum transparency to "make rationally reviewable the process for imposing a sentence of death." *Moore*, 225 F.3d at 506 (quoting *Tuilaepa*, 512 U.S. at 973 [ ]). On the other hand, a jury is free to consider a "myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty

115

should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." 225 F.3d at 506 (quoting 512 U.S. at 979-80 [ ] ). It is the jury's subjective and "narrowly cabined but unbridled discretion to consider any mitigating factors," 225 F.3d at 507, that Texas refrains from independently reviewing. We continue to hold that Texas may correctly do so.

307 F.3d. 353, 359 (5th Cir. 2002).

Acker fails to point to any Supreme Court precedent calling into question the soundness of circuit law on this issue. Accordingly, he cannot demonstrate that the state court's decision here is contrary to, or an unreasonable application of, clearly established federal law. Even if he could, relief on this claim is foreclosed under *Teague's* non-retroactivity principle. *See Teague v. Lane*, 489 U.S. 288 (1989). This Court should deny relief.

## XIV. Acker is Not Entitled to Federal Habeas Relief on His Claim that the Texas Death Penalty Is Cruel and Unusual Punishment Under the Eighth and Fourteenth Amendments. (CLAIM THIRTEEN)

The state court's dismissal of this claim as an abuse of the writ bars it from review here. *See* section I, *supra.* Even so, this claim lacks merit. Acker wholly fails to demonstrate that his death sentence violates evolving standards of decency or is arbitrary in light of the discretion afforded his jury in considering the mitigation special issue. This Court should deny relief.

Acker raises two separate Eighth Amendment violations in his thirteenth claim. First, he argues that the 1997 resolution passed by the American Bar Association calling for a moratorium of the death penalty, as well as the Section

116

Optional Protocol to the International Convention on Civil and Political Rights

("ICCPR") adopted by the United Nations General Assembly, obligating treaty

members to take all necessary steps to abolish the death penalty in their

jurisdictions, indicates that contemporary standards have evolved such that the

death penalty is cruel and unusual punishment that violates the Eighth

Amendment.  Second, he submits that it is impossible to comply with the "dual

requirements" of the Eighth Amendment, which prohibits the arbitrary

imposition of the death penalty on one hand and requires individualized

sentencing on the other.

### C.   Regardless, evolving standards of decency do not dictate that capital punishment violates the Eighth Amendment.

To determine whether a particular punishment offends the Eighth

Amendment, a reviewing court must refer to "the evolving standards of decency

that mark the progress of a maturing society" to determine which punishments

are so disproportionate as to be cruel and unusual. *Roper v. Simmons*, 543 U.S.

551, 560-61 (2005) (citing *Trop v. Dulles*, 356 U.S. 86, 100-101(1958) (plurality

opinion)).  To the maximum extent possible, proportionality review under those

evolving standards should be informed by "objective factors." *Atkins v. Virginia*,

536 U.S. 304, 312 (2002).  The Supreme Court has  pinpointed that the "clearest

and most reliable objective evidence of contemporary values is the legislation

enacted by the country's legislatures."   *Id.*

Currently, thirty five of the fifty states, as well as the United States Government and Military, have statutes authorizing capital punishment. Stated differently, seventy percent of the states continue to endorse the death penalty as an appropriate punishment for certain crimes. Although, the American Bar Association resolution and the Section Optional Protocol to the ICCPR adopted by the United Nations General Assembly may be relevant, these factors are not dispositive. *See Atkins*, 536 U.S. at 316, n. 21 ( Noting that additional evidence may clarify that legislative judgment reflects a broader social and professional consensus, but "these factors are by no means dispositive.") Considering the importance placed upon legislative enactments by the Supreme Court, the fact that a significant majority of the states endorse capital punishment precludes this Court from finding that capital punishment violates evolving standards of decency. This Court should deny relief.

**B.     Furthermore, the discretion afforded to jury in considering the mitigation special issue does not violate the Eighth Amendment prohibition against arbitrary death sentences.**

Acker argues that the Texas death penalty scheme is unconstitutional because the mitigation special issue permits the sentencing jury open ended discretion in violation of the Eighth and Fourteenth Amendments. Acker relies upon Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141 (1994), to argue that the Texas capital punishment scheme should be declared

unconstitutional because, in its current form, the death penalty is not fairly administered with reasonable consistency.  Specifically, he contends that the mitigation special issue allows the jury unfettered discretion to determine whether a death sentence is appropriate in a particular case.  According to Acker, the arbitrary and capricious imposition of the death penalty that results from such open-ended discretion violates the Eighth and Fourteenth Amendments.

Importantly, the Supreme Court has repeatedly held that the Texas capital sentencing scheme is constitutionally sound.  *Jurek v. Texas*, 428 U.S. 262 (1976); *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Johnson v. Texas*, 509 U.S. 350, 373 (1993).  Specifically, the Court  has stated that "we have previously recognized that the Texas Special Issues adequately 'allo[w] the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion.'" *Franklin*, 487 U.S. at 182 (quoting *Lowenfield v. Phelps*, 484 U.S. 231 (1988)).  The Texas scheme ensures that the sentencer will have adequate guidance when determining sentencing because it authorizes the defense to present to the jury, in a separate hearing, any relevant mitigating circumstance related to the defendant. *Johnson*, 509 U.S. at 363.  The Texas special issues system therefore guides "the jury's consideration of the mitigating evidence while still providing for sufficient jury discretion." *Id.* at 364.

Under the Texas scheme, a capital defendant is considered death eligible once convicted of capital murder during the guilt-innocence phase. *See Woods*, 307 F.3d at 359. The discretion that exists during the punishment phase under the mitigation special issue was designed to give the jury "open-ended" discretion to *not* impose the death sentence. The jury in the present case was instructed under the revised Article 37.071 (2)(e)(1),which now requires the jury to decide whether, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." CR 176-68. This instruction was crafted pursuant to legislative changes resulting from the Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*"Penry I"*), *see Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996), and was approved, at least implicitly, by the Supreme Court in *Penry v. Johnson*, when the Court noted that

> [a] clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.* Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. ... Penry's counsel, while not conceding the issue, admitted  that he "would have a tough time saying that [Penry I] was not complied with under the new Texas  procedure."

532 U.S. 782, 803 (2001).  It is odd that Acker complains about discretion in the Texas system that is aimed and designed to work entirely to his benefit.

Furthermore, even if this Court were inclined to accept Acker's argument, federal habeas relief on this claim is foreclosed under the principles of *Teague*, *supra*. For this reason, and those stated above, Acker is not entitled to federal habeas relief on this claim.

## XV. Acker is Not Entitled to Federal Habeas Relief on His Claim that His Death Sentence Violates International Law and the Eighth Amendment. (CLAIM FOURTEEN)

This claim is procedurally barred. *See* section I, supra. Even if it were not, it lacks merit. Even assuming a violation of international law, such an infraction does not entitle Acker to relief from his death sentence. This Court should deny relief.

Acker maintains that his death sentence violates of the International Covenant of Civil and Political Rights ("ICCPR"). Specifically, he claims that the "improprieties of the capital sentencing process challenging in this appeal" constitute "cruel, inhuman or degrading treatment or punishment" in violation of Article VII. According to Acker, once the United States ratified this treaty in 1992, the Supreme Clause of the Constitution compels compliance with the ICCPR's provisions. Acker further contends that the Eighth Amendment prohibits his execution because "[n]ations in the Western world no longer accept the death penalty, and the Eighth Amendment does not permit jurisdictions in this nation to lag so far behind.

121

### A.   The ICCPR does not create an individually enforceable right entitling Acker to relief.

Contrary to Acker's assertion, federal courts are not bound to give effect to the provisions of Articles 1 through 27 of the ICCPR. When the Senate ratified the treaty in 1992, it did so with the following reservation: "That the United States declares that the provisions of Articles 1 through 27 of the [ICCPR] are not self-executing." 138 CONG. REC. S4781-01, *S4783-84 (daily ed. April 2, 1992) (statement of presiding officer of resolution of ratification).  Because Articles 1 through 27 are non-self-executing, absent further action by Congress incorporating those clauses of the treaty into domestic law, courts may not enforce them.  *Beazley,* 242 F.3d at 267; *Buell v. Mitchell,* 274 F.3d 337, 371-72 (6th Cir. 2001).  Specifically, the Fifth Circuit has stated, "[T]he [United States] Senate has declared Articles 1-27 of the ICCPR not self-executing, meaning that they cannot be in effect as law in the United States without action by Congress incorporating the provisions into domestic law."  *Lagrone v. Cockrell,* No. 02-10976, 2003 WL 22327519, *13 (5th Cir. 2003) (citing *Beazley,* 242 F.3d at, 267-68) (unpublished opinion).

The Fifth Circuit's position is reinforced by the Supreme Court's recent decision in *Medellin v. Texas,* 128 S. Ct. 1346.  There, the petitioner urged that the decision by the International Court of Justice in the Case Concerning Avena and Other Mexican Nationals ( Mex.v.U.S.), 2004 I.C.J. 12 (Judgment of Mar. 31)

finding a violation of Medellin's rights under the Vienna Convention on Consular Relations (Vienna Convention or Convention), Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820 was enforceable domestic law. The Court rejected this contention, in part because, "while treaties "may comprise international commitments ... they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." 128 S. Ct. at 1356.

Consequently, even if Acker's death sentence violated articles of the ICCPR, this Court has no authority to grant habeas relief. This Court should deny relief.

### B. Furthermore, international sentiment opposing capital punishment does not render Acker's death sentence invalid.

It is true that the Supreme Court has consistently referred to foreign and international law as relevant to its assessment of evolving standards of decency. *Atkins*, 536 U.S. at 317, n. 21; *Thompson v. Oklahoma*, 487 U.S. 815, 830-831, and n. 31(1988) (plurality opinion); *Enmund v. Florida*, 458 U.S. 782, 796-797, n. 22 (1982); *Coker v. Georgia*, 484,433 U.S. 596, n. 10, (1977) (plurality opinion); *Trop v. Dulles*, 356 U.S. 86, 102-103 (1958) (plurality opinion). But, the Court has never found international law dispositive in determining whether a punishment violates evolving standards of decency. *See Atkins*, 536 U.S. at 317 n.21(nothing that factors — including opinion within the "world community" —

are "by no means dispositive," but "lend further support" the court's determination that the execution of the mentally retarded violates evolving standards of decency).   Thus, Acker's claim that the opinion of the world community compels this Court to find that his death sentence constitutes cruel and unusual punishment is not persuasive.  This Court should deny relief.

## XVI. Acker is Not Entitled to Federal Habeas Relief on His Cumulative Error Claim. (CLAIM FIFTEEN)

Acker's final claim is that the cumulative effect of the above alleged errors denied him a fair trial.  This claim is unexhausted and procedurally barred because Acker did not present it to the state courts.  *See* Section I(A), *supra*. Aside from the procedural bar, however, the claim has no merit.

In general, the cumulative error doctrine presupposes that error, whether reversible or harmless, must first be found before considering any aggregate impact of improper State conduct.  *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir.1998).  The Fifth Circuit Court of Appeals entertains such analysis only when three factors exist:  (1) The individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process or fundamental fairness.  *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).

Meritless claims such as Acker's cannot be cumulated, regardless of their number, so there is nothing for this Court to cumulate here. *See Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997) (reiterating that cumulative errors must be of a "constitutional dimension"); *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero"). This Court should deny relief.

## CONCLUSION

For the reasons stated above, the Director respectfully requests that this Court dismiss Acker's petition for writ of habeas corpus with prejudice, and deny relief. The Director further requests that no certificate of appealability issue with regarding to any of the claims raised here by Acker.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

125

ERIC J.R. NICHOLS
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division

*TINA J. MIRANDA
Assistant Attorney General
Postconviction Litigation Division
Texas Bar No. 24026139

* Attorney-in-charge

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Tel:  (512) 936-1400
Fax: (512) 320-8132

ATTORNEYS FOR RESPONDENT

126

## CERTIFICATE OF SERVICE

I do hereby certify that on August 5, 2009, I electronically filed the above and foregoing pleading with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic:

A. Richard Ellis
75 Magee Avenue
Mill Valley, CA 94941
a.r.ellis@worldnet.att.net

TINA J. MIRANDA
Assistant Attorney General