# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN  DISTRICT OF TEXAS
### SHERMAN  DIVISION

_____

|  |  |  |
|---|---|---|
| **DANIEL CLATE ACKER,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **No. 4:06-cv-00469** |
| | § | |
| **DIRECTOR,** | § | |
| | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | |
| **Respondent.** | § | |
| | § | |

_____

## PETITIONER'S REPLY TO RESPONDENT'S ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS (POST-EXHAUSTION)

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Petitioner, Daniel Clate Acker, and timely files this **Petitioner's Reply  to Respondent's Answer to Petition for Writ of Habeas Corpus.**   In support thereof, Petitioner would respectfully show the Court as follows:

## I.

## INTRODUCTION

As a reward to the State in return for appointing one of the most ineffective state post-conviction attorneys in Texas, who filed one of the most ludicrously incoherent petitions ever

filed in Texas history, Respondent (hereafter "the Director") asks that this Court preclude review of most of Mr. Acker's federal constitutional issues. The Director's argument ignores the fact that the defects in Mr. Acker's state post-conviction proceedings were a direct and entirely predictable result of this appointment.   In addition, even if the State was entitled to benefit from these sham state proceedings, the Director's arguments for dismissal with prejudice are contrary to well-settled precedent as Mr. Acker has shown "cause and prejudice" and a fundamental miscarriage of justice (his actual innocence) sufficient to excuse any procedural default.   Additionally, he also met the standards for the state courts to review his successive writ application on the unexhausted claims, although the Texas Court of Criminal Appeals ignored that fact in its denial. Finally, the State's blanket arguments for procedural default as to all claims ignores the fact that some claims were previously brought either on direct appeal or on state habeas and hence are not defaulted.

Mr. Acker's petition[1] alleges substantial and pervasive constitutional violations which rendered his trial, conviction and sentence of death fundamentally unfair. It also presents extensive and persuasive evidence of his actual innocence of this capital crime and hence the unreliability of his sentence of death.   These claims require this Court's careful and independent consideration of the facts and law. Mr. Acker hereby incorporates by reference all his prior pleadings in this matter, including his Petition for Writ of Habeas Corpus and all exhibits and motions previously filed in this matter.

---

[1]   References herein to Mr. Acker's "petition" refer to his post-exhaustion petition, timely filed in this Court on November 10, 2008 (Docket No. 30.)

On August 21, 2009,[2] the Director timely filed his "Respondent's Answer to Acker's Petition for Writ of Habeas Corpus" alleging that Acker's petition must be denied and summary judgment granted  "because Acker has not demonstrated that he is entitled to federal habeas corpus relief."  (Respondent's Answer, hereafter "Answer",  at 1). (Docket No. 43.)  Mr. Acker denies both the Director's  general and specific allegations that he is not entitled to relief.   The Director is not entitled to summary judgment, for the reasons demonstrated in this brief, and many of his claims have never been "adjudicated on the merits" in state court, a prerequisite to the applicability of the amended standard of review under 28 U.S.C. §2254(d).

There has never been a full, fair, and impartial review of Mr. Acker's  claims in state court.  Due to state action in appointing woefully  ineffective appellate and state habeas counsel, there has never been any meaningful review of many of Mr. Acker's federal constitutional claims, *nor any review at all of his claims and extensive showing of actual innocence of the crime* and hence of the death penalty.   The State court denied relief after state habeas counsel submitted a shockingly incoherent and nonsensical writ that was so comically bad that it became the subject of widespread media attention, incredulity,  and derision.[3]  No efforts were made by any state court to remedy the situation or appoint new

---

[2]  Not August 5, 2009 as stated in the Certificate of Service (Answer at 127.)

[3]  *See* Exhibit 9, Mr. Acker's state habeas petition filed by Mr. Wilkinson; Exhibit  21, newspaper articles on Mr. Acker's state post-conviction attorney Toby Wilkinson's writ. "Sloppy Lawyers Failing Clients On Death Row," by Chuck Lindell, Austin American-Statesman, October 29, 2006. ("Exhibit" refers to the exhibits filed with this court in support of Mr. Acker's

counsel even though a cursory glance at Mr. Acker's appeal brief and post-conviction writ would have alerted the state courts to the dire situation. Now, the Director seeks to preclude any review whatsoever by arguing that most of these claims are procedurally defaulted after this non-existent and sham State "review."  This standard, if accepted, would allow the state trial courts to ensure they will never be reversed and the State to completely insulate itself from any federal review  by deliberately and continually appointing ineffective appellate and state writ attorneys who fail to perform even the most minimal requirements of state post-conviction review.

Petitioner has presented a compelling claim of actual innocence of the murder and the death sentence, and other "gateway" claims sufficient to invoke the "fundamental miscarriage of justice" exception to the procedural default bar.[4]  The actual innocence claim was also sufficient to meet the state court exception to successive state petitions under Tex. Code Crim. Proc. 11.051 Sec. 5(a), which outlines the circumstances under which a Texas state court may consider a successive application.  It reads as follows:

> If a subsequent application for writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent or untimely initial application unless the application contains sufficient specific facts establishing that:

---

federal petition (Docket Nos. 18-20.)

[4]  These are Claim I (actual innocence of capital murder); Claim VII (ineffective appellate counsel); Claim VIII (ineffective assistance of state post-conviction counsel deprived Petitioner of meaningful access to the courts).  In addition to Claim I, Claims VI and VII are also "gateway" claims as they explain why Acker's claims,  including the actual innocence claim,  were not brought previously in state court.

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application...

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.
Tex. Code Crim. P. art. 11.071 sec. 5(a).[5]

Yet, when Petitioner returned to state court with his successor petition, it was denied in summary fashion.

Mr. Acker has shown in his Petition for Writ of Habeas Corpus that he is entitled to relief on the issues presented therein.  He has shown that the Director has not plead and proved a case for summary judgment. He has shown that the Texas statute that was the basis for the denial, Tex. Code Crim. P. art. 11.071 sec. 5(a), is not an "adequate and independent" state procedural bar for his claims.  He has also shown both "cause and prejudice" and a "fundamental miscarriage of justice," two exceptions to any procedural default caused by failure to bring his claims before the state courts.  To the extent that there are unresolved material issues of disputed fact, they can best be resolved through an evidentiary hearing[6].

---

[5]   Thus the "actual innocence" exception for state successive applications applies both to actual innocence of the crime itself *and* to innocence of the death penalty.

[6]   A motion for an evidentiary hearing will be submitted shortly.

## II.

## INCORPORATION BY REFERENCE AND DENIAL

Petitioner incorporates herein by reference all prior pleadings in this matter, including the facts and argument in his Petition for Writ of Habeas Corpus and the Exhibits in support of that Petition on file in this Court in this matter.

The Director's factual and legal allegations are denied in their totality except as to those that supported in fact or law in the record.  Any failure to deny a specific factual or legal allegation in the Director's Answer that is not discussed in this reply is not to be construed as an admission.

## III.

## RELEVANT PROCEDURAL HISTORY[7]

Daniel Clate Acker was indicted and in March of 2001 was convicted by a jury of the offense of capital murder in the 8th District Court of Hopkins County, Texas.[8]  The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure article

---

[7]  A full procedural history is given in Mr. Acker's petition, at 2-6.

[8]  *See* Exhibit 1 herein (indictment) and Exhibits 2, 3 and 4  (verdict and judgment). "Exhibits" refers to the exhibits accompanying this petition that were previously filed on November 14, 2007 (Docket Nos. 18, 19, and 20).  On November 5, 2008, this Court granted Petitioner's motion to designate these previously-filed exhibits as exhibits in this post-exhaustion petition. (Docket No. 29).

37.071, and the trial court set punishment at death.[9]

For purposes of this reply brief and the Court's task of ascertaining any procedural default, a recounting of the prior claims previously brought by Petitioner will be necessary. Petitioner's direct appeal brief was filed in the Texas Court of Criminal Appeals on September 9, 2002.[10]  In that  appeal, the following claims were presented:

> 1) The Texas capital punishment scheme is unconstitutional in that it limits the consideration of mitigating evidence, allows the prosecutor unfettered discretion as to whether to seek the death penalty, does not provide for a sentence of life without parole and allows the admission of unadjudicated extraneous offenses (Point of Error No.1);
> 2) The Court erred by  admitting the re-enactment by Mr. Young, which showed him driving by the scene of the crime viewing somebody removing a body from a pick-up (Point of Error No.2);
> 3) The Court erred in not admitting a defense exhibit of three pages from the autopsy file which contradicted the medical examiner's opinion that the decedent did not jump from the truck (Point of Error No. 3);
> 4) The Court erred in denying the defense's request for an instruction on the lesser included offenses of manslaughter and criminally negligent homicide (Point of Error No. 4);
> 5) The Court erred in excluding the testimony of the defense investigator as to the driver's inability to open the passenger side door and push someone out the passenger door (Point of Error No. 5);
> 6) The contemptuous conduct of the prosecutor towards defense counsel deprived Applicant of a fair trial.[11]

On November 26, 2003 the Texas Court of Criminal Appeals affirmed his conviction and sentence of death. *Acker v. State,* No. AP-74,109 (Tex. Crim. App. November 26,

---

[9]   *See* Exhibit 2 (jury instruction and verdict at guilt/innocence phase); Exhibit 3 (jury instructions and verdict at punishment phase).

[10]   *See* Exhibit 6 (Brief on Appeal filed by Mr. Beaty).

[11]   *See* Exhibit 6.

2003)(not designated for publication).[12]   Petitioner's counsel did not file a petition for *certiorari.*

Petitioner sought state post-conviction relief and filed an application through counsel Mr. Toby Wilkinson, who was also appointed by the trial court.[13]  The initial state petition for post-conviction relief was filed on July 18, 2003, while the direct appeal was still pending.[14]  *Ex parte Daniel Clate Acker,* No. WR-56,841-01.[15]  The following claims were presented on state habeas, as best as counsel can determine, given its incoherence:

1) Challenges to the constitutionality of the Texas death statute (Claims 1-4);
2) Ineffective assistance of counsel for:
    a) Attorney McDowell not talking with Applicant sufficiently;
    b)  misleading the jurors and Applicant in various ways;
    c) failure to object regarding the victim falling out of the truck;
    d) encouraging Applicant to lie;
    e) failure to call Applicant as a witness at the change of venue hearing;
    f) ineffective preparation of the accident reconstruction expert;
    g) various claims of failure to object and failure to investigate at both phases of the trial;
    h) ineffective seating arrangement at trial;
    I) failure to call mitigation witnesses;
    j) failure to point out inconsistencies and inaccuracies in a video recording offered at trial;
    k) various instances of ineffectiveness regarding the court-appointed expert Dr. Norton;
    l) failure to maintain order in the courtroom;

---

[12]   *See* Exhibit 8 (verdict on direct appeal).

[13]   *See* Exhibit 5 (trial court order appointing Mr. Wilkinson on state habeas).

[14]   Mr. Acker also filed a *pro se* application (*see* Exhibit 20) on December 31, 2003.

[15]   *See* Exhibit 9 (state habeas petition filed by Mr. Wilkinson).

m) failure to be present during preparation of the jury charge;

n) failure to properly question Applicant when he testified;

o) improper editing of the taped interview of Applicant;

p) failure to challenge suborning perjury of a witness by the prosecutor;

q) various claims of ineffectiveness due to failure to challenge false testimony by the medical examiner;

r) ineffectiveness claims concerning the autopsy, time and manner of death of the victim;

s) failure to investigate and present a conflict of interest on the part of the grand jury foreman; and

t) various claims regarding the victim's brother; failure to challenge false testimony of witness Brodie Young.   Additionally, various claims of prosecutorial misconduct, ineffective assistance of appellate counsel, failure to appoint and fund appropriate experts, and various claims of trial error were also brought.[16]

On November 15, 2006, the Texas Court of Criminal Appeals denied the state post-conviction application for writ of habeas corpus, along with a *pro se* application filed by Petitioner after the deadline provided for the filing of an initial application.  *Ex Parte Daniel Clate Acker,* No. WR-56,841-01 and WR-56,841-03 (Tex. Crim. App. November 15, 2006)(*per curiam*)(not designated for publication).[17]

On November 13, 2007, Mr. Acker timely filed his Petition for Writ of Habeas Corpus in this Court (Docket No. 17) along with accompanying exhibits (Docket Nos. 18-20.)  On December 11, 2007, this Court held Mr. Acker's federal petition for a writ of habeas corpus in abeyance in order to exhaust state remedies and equitably tolled the federal statute of

---

[16]   *See* Exhibit 9.

[17]   *See*  Exhibit 13 (order of Texas Court of Criminal Appeals ("CCA") denying state application for writ of habeas corpus).  In that Order, the CCA denied both the application filed by Mr. Wilkinson (Exhibit 9) and the *pro se* application (Exhibit 20).

limitations during the time Mr. Acker pursued state remedies. (Docket No. 25.)

Petitioner timely filed his state successor petition on or about February 7, 2008, in the

trial court and the Texas Court of Criminal Appeals, in accordance with this Court's order.

On September 10, 2008, the Texas Court of Criminal Appeals denied Mr. Acker's writ

application with the following Order (in its entirety):

> This is a subsequent application for writ of habeas corpus filed pursuant to Texas Code of Criminal Procedure, Article 11.071, Section 5.
> Applicant was convicted of murder on March 30, 2001.  We affirmed the conviction and sentence on direct appeal.  *Acker v. State,* No. AP-74,109 (Tex. Crim. App. November 26, 2003).  On July 18, 2003, applicant filed his initial application for writ of habeas corpus pursuant to Article 11.071.  When this Court received the record it included *pro se* claims raised by applicant.  We denied relief on the initial application and determined the *pro se* claims were untimely and did not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5, and dismissed them.  *Ex parte Acker,* No. WR-56,841-01 and WR-56,841-03 (Tex. Crim. App. November 15, 2006).  Applicant now brings fifteen more claims.  We have reviewed these claims and find that they do not meet the requirements of Article 11.071, Section 5 for consideration of subsequent claims.  This application is dismissed as an abuse of the writ.
> IT IS SO ORDERED THIS THE 10TH DAY OF SEPTEMBER, 2008.

> *Ex parte Daniel Clate Acker*, No. WR-56,841-04 (Tex. Crim. App. September 10, 2008)(*per curiam*)(not designated for publication).

On November 10, 2008, Petitioner timely re-filed his Post-Exhaustion Petition for

Writ of Habeas Corpus in this Court (Docket No. 30.)  The previously-ordered stay of the

proceedings was vacated and a pleading schedule was ordered.  (Docket No. 31.) On August

21, 2009, after several extensions of time, the Director timely filed his Answer.  (Docket No.

43.)  Petitioner was granted until February 20, 2010 to file his reply.  (Order of January 26,

2010, Docket No. 47).  Thus, this reply brief is timely filed.

# IV.

## THE DIRECTOR IS NOT ENTITLED TO SUMMARY JUDGMENT

### A) The Director has neither pled nor proved a case for summary judgment.

The Director's Answer includes a request that "[s]ummary judgment should be granted." (Answer at 1).  But nowhere in that 127-page document is there a Motion for Summary Judgment.  The Director has not presented this Court with any affidavits, depositions, answers to interrogatories, or other evidence which resolve or controvert the disputed factual issues.  Nor is there any discussion of the standards for entitlement to summary judgment in the Answer.  Accordingly, the Director has not met the requirements for summary judgment. Fed. R. Civ. P. 56, *and see* further argument  herein.  Thus, even without a consideration of Petitioner's pleadings, summary judgment would be unavailable to the Director, as he has failed to make a case for it in this matter.

Summary judgment is proper only if "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. If the proofs offered in favor of the motion fail to exclude all bases on which judgment might be rendered in favor of the person against whom the motion is made, summary judgment must be denied. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). *See also* James, Hazard and Leubsdorf, *Civil Procedure*, 4th ed., at 209 (Little, Brown & Co.,  Boston, 1992): "The device is not intended to resolve issues that are within the traditional province of the trier of fact, but rather to see whether there are such issues."

"The requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (emphasis in original). An issue is "genuine" if the supporting evidence, and all inferences drawn therefrom, would be sufficient to support a verdict in favor of the nonmoving party. *St. Amant v. Benoit*, 806 F.2d 1294 (5th Cir. 1987). A fact is material if it "affects the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial, *Id.* at 249, or in the habeas corpus context, for an evidentiary hearing. The inquiry is whether "there are genuine factual issues that properly can be resolved in favor of either party." *Id.* at 250.

**B) The Answer shows the existence of disputed issues of material fact.**

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the record which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Director's Answer actually demonstrates the exact opposite: that genuine issues of material fact do exist regarding Mr. Acker's factual allegations. *See, e.g.*, Answers to Claim I, Answer at 24-36 (lengthy, intensive fact-based discussion of the claim regarding actual innocence, Dr. Larkin's report and facts purporting to show Mr. Acker's guilt); Claim II, Answer at 39-60 (lengthy detailed discussion of factual disputes regarding 17 instances where Mr. Acker was deprived of a fair trial and the trial court showed bias against him);

Claim III, Answer at 63-68 (lengthy, fact-based discussion of the claim regarding the trial court's failure to change venue).  Many other claims have as their basis disputed issues of material fact.  Thus, as discussed *supra,* since summary judgment is available only if "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law" (Fed. R. Civ. P. 56©), the Director has neither pled nor proved a case for summary judgment.

 Nor did  the state court "evidentiary hearing" held in 2004 fairly resolve these issues and factual disputes, as Mr. Acker was basically left to fend for himself completely without the assistance of his attorneys. At that hearing, his woefully inept state habeas attorney was unwilling or unable to confront the defects of the woefully inept direct appeal attorney.  Both defense attorneys, knowing they had filed farcically inadequate briefs on behalf of their client, preferred to sweep the whole mess under the carpet.  The prosecutor certainly had no motive or incentive to do otherwise and neither did the judge who failed to raise an eyebrow regarding  their obvious shortcomings.[18]

Unless patently false, the facts alleged in the petition must be presumed to be true for summary  judgment  purposes.[19]    If  the  facts  alleged  "point  to  a  'real  possibility  of

---

[18]   Martin Braddy, the Hopkins County district attorney, has basically confirmed this when he commented on Mr. Wilkinson's writ by stating that "the court went out of its way to let Acker speak for himself during a hearing on his claims, even if, at that hearing, Acker 'just kind of rambled.'" *See* Exhibit 21.  The concept of assistance of counsel seems absent here.

[19]   *See, e.g., Blackledge v. Allison,* 431 U.S. 63, 76 (1977); *Cooper v. Pate,* 378 U.S. 546 (1964); *Machibroda v. United States,* 368 U.S. 487, 495-96 (1962); *Cave v. Singletary,* 971 F.2d 1513, 1516 (11th Cir. 1992); *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *Johnson v.*

constitutional error,'" summary dismissal is not appropriate.[20]   Controverting affidavits,
evidence and affidavits outside the context of the state court findings are absent.  But state
court findings are not a sufficient basis for summary dismissal unless they satisfy certain
prerequisites  to the presumption of correctness.[21]   Even if all these prerequisites are
satisfied, the presumption of correctness still affords no basis for summary judgment if the
record indicates or the petitioner pleads facts which, if true, establish that either the state
court proceedings that produced those findings were not "full and fair"[22] or the state court
fact-findings were clearly wrong.[23]

Thus, there never has been a proper resolution of the factual dispute regarding the
above issues.  Fact witnesses have never been subject to cross examination in an attempt to
discover who is telling the truth regarding these disputed issues of fact.

---

*Estelle,* 704 F.2d 232, 234-35, 239-40 (5ᵗʰ Cir. 1983), *cert. denied,* 465 U.S. 1009 (1984).

[20]   *Blackledge, supra,* 431 U.S. at 75 n.7 (quoting Advisory Committee Note to Rule 4 of the Rules Governing §2254 Cases).  *Accord, e.g., Fontaine v. United States,* 411 U.S. 213, 215 (1972) (*per curiam*).  *See also Wesson v. Oglesby,* 910 F.2d 287, 282 (5ᵗʰ Cir. 1990) (when frivolousness is test for dismissal, court may not summarily dismiss solely because it disbelieves prisoner's allegations and believes respondent's, unless prisoner's version of facts is inherently implausible or internally inconsistent).

[21]   The findings must be 1) made in writing or at a transcribed hearing, 2) by a court of competent jurisdiction, 3) in a proceeding to which the petitioner and state were parties, 4) following an evidentiary hearing on the merits of all the determinative factual issues, and 5) qualify as findings of historical fact rather than determinations of purely legal or mixed legal and factual issues. *Bundy v. Wainwright,* 808 F.2d 1410, 1416 (11ᵗʰ Cir. 1987).

[22]   *Townsend v. Sain,* 372 U.S. 293, 312-13 (1963); *Bundy v. Wainwright, supra,* 808 F.2d at 1416, 1418.

[23]   *See* 28 U.S.C.A. §2254(e)(1) (presumption of correctness may be rebutted "by clear and convincing evidence"); *Sumner v. Mata,* 449 U.S. 539, 550 (1981).

If, as here, the court cannot be certain on the basis of the state court fact-findings and record that the findings are reliable, that they were the result of full and fair proceedings, *and* that they are impervious to even extra-record proof that they are clearly wrong, summary judgment is not permissible.[24]  Instead, further fact development proceedings must take place to determine the appropriate disposition.[25]   A full evidentiary hearing is a necessary and logical culmination of this process. Thus, the Director's request for summary judgment must be denied.

## V.

## PROCEDURAL DEFAULT, "ADEQUATE AND INDEPENDENT" GROUNDS,"CAUSE AND PREJUDICE," AND "FUNDAMENTAL MISCARRIAGE OF JUSTICE."

In his petition, Mr. Acker dealt at length with issues of procedural default, "adequate and independent" grounds,  "cause and prejudice" and a "fundamental miscarriage of justice." Petition at 68-84.  Those arguments are incorporated herein by reference.  Petitioner here addresses the Director's arguments as to these procedural issues.

---

[24]  *See, e.g. Blackledge, supra,* 431 U.S. at 76-78 & n.16; *Machibroda v. United States,* 368 U.S. 487, 494-95 (1962).

[25]  *See O'Blasney v. Solem,* 774 F.2d 927 (8th Cir. 1985) ("Even though the final decision of a state court is entitled to great deference, it is not to be accepted conclusively by a federal court in a habeas corpus action without first determining that there is factual and legal support for that decision").

### A) Introduction.

Mr. Acker met the standards for subsequent habeas corpus applications under Tex.

Code Crim. Proc. Art. 11.071 § 5(a) which provides:

> If an initial application for a writ of habeas corpus is untimely or if a subsequent
> application is filed after filing an initial application, a court may not consider the
> merits of or grant relief based on the subsequent or untimely initial application unless
> the application contains specific facts establishing that:
> (1) the current claims and issues have not been and could not have been presented
> previously in a timely initial application or in a previously considered application filed
> under this article or Article 11.07 because the factual or legal basis for the claim was
> unavailable on the date the applicant filed the previous application;
> (2) by a preponderance of the evidence, but for a violation of the United States
> Constitution no rational juror could have found the applicant guilty beyond a
> reasonable doubt; or
> (3) by clear and convincing evidence, but for a violation of the United States
> Constitution no rational juror would have answered in the state's favor one or more
> of the special issues.

Questions of procedural default and cause and prejudice are not relevant until a

federal court first determines that the state procedural rule relied upon for the default is

adequate and independent. *See Coleman v. Thompson*, 501 U.S. 722 (1991).[26]

Acker has presented facts and arguments that provide the requisite "sufficient specific

facts establishing" (art. 11.071, sec. 5 (a)) his claims that 1) he is innocent of capital murder

because the death of Ms. George was due to her jumping from the truck and, thus, it was not

a homicide and 2) the State's theory that Petitioner strangled her while driving was multiply

---

[26]   Mr. Acker shows herein that his claims were denied on the merits by the CCA.
AEDPA standards do not apply, however, where a federal court reviews the denial of a claim on
procedural grounds because in such cases there has not been an "adjudication on the merits" by
the state court within the meaning of AEDPA with respect to such a claim. *Hughes v.
Quarterman,* 530 F.3d 336, 340 (5th Cir. 2008), *cert. denied,* 129 S. Ct. 2378 (2009).

and fatally flawed.  *See* Claim I.  In other words, Acker presented to the CCA facts and argument that prove (1) "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt," as required by art. 11.071 section 5(a)(2);  *and* (2) "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under  Article 37.071 or 37.0711" as required by art. 11.071, section 5 (a)(3).[27]

The primary underlying constitutional violation in the majority of Acker's constitutional claims is a Sixth Amendment violation due to the trial court's interference with the defense, false testimony presented at the trial,  and the resulting inability of his trial counsel to present his claim of actual innocence.[28]

**B.   The CCA's denial of Mr. Acker's claims was not based on "adequate and independent" state grounds.**

Mr. Acker has discussed "adequate and independent" state grounds at pages 69-70 and

---

[27]   Mr. Acker has also argued in his state writ and in Claim I that "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."  The evidence of actual innocence was unavailable earlier because of the false testimony presented by the prosecution, the efforts of the trial court to thwart the presentation of Mr. Acker's case for innocence, and ineffective assistance of trial and post-conviction counsel. Hence,  art. 11.071 section 5(a)(1) is also implicated here.

[28]   Claim I.

75-78 of his petition and that argument is incorporated herein.

The Director argues that all of Petitioner's claims are procedurally defaulted:

"[e]ach of the fifteen claims asserted here by Acker are procedurally barred from federal review. These claims were raised for the first time in a subsequent application for habeas relief in the state court and dismissed by the Court of Criminal Appeals as an abuse of the writ under Texas Code of Criminal Procedure article 11.071 § 5. Because this is an independent and adequate state procedural bar, Acker's claims are foreclosed here.
(Answer at 13.)

The Director then argues that "the Court of Criminal Appeals' dismissal of Acker's claims as an abuse of the writ constitutes an independent and adequate state procedural bar resulting in the default of these claims in federal court." Answer at 13-15. This is erroneous, as the order denying Mr. Acker's subsequent writ application was not based on "adequate and independent" state grounds.

*Wainwright v. Sykes*, 433 U.S. 72 (1977), requires a finding of procedural default before a habeas petitioner need present cause and prejudice arguments. Under *Sykes*, the interests of comity and federalism require that a federal court respect the "adequate and independent state ground" upon which a state court relied in rejecting a federal claim. *Id*. at 78-79. A procedural default occurs only if the state proves the default by asserting it in a timely manner, by establishing that the state actually has an "adequate" and "independent" procedural rule the prisoner violated, and by demonstrating that the state  courts actually relied upon the rule to deny the petitioner relief. *James v. Kentucky*, 466 U.S. 341, 348-351 (1984). Only then does a federal court consider whether a petitioner can prove cause and

prejudice for the procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)

### 1. The *Long* presumption.

To determine whether a state court's resolution of a claim is based on an adequate and independent state ground, a federal habeas court will look to the highest state reviewing court's decision disposing of the claim. To preclude federal review, a state court need only "clearly and expressly [indicate] that it is...based on bona fide separate, adequate, and independent [state law] grounds." *Michigan v. Long,* 463 U.S. 1032, 1041 (1983). However, if the state court decision is ambiguous about whether the decision was based on federal or state law, then a presumption applies that federal law was the basis of the decision and the federal court must review the claim:

> When...a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Long,* 463 U.S. at 1040-1041; *see also Harris v. Reed,* 489 U.S. 255, 257 (1989)(adopting *Long* presumption in habeas corpus context); *Coleman v. Thompson,* 501 U.S. 722, 733 (1991)(reaffirming the *Long* presumption where state court ground of decision is interwoven with federal law or primarily relied on federal law).

The *Long* presumption and "plain statement" rule are intended to provide a straightforward way for state courts to decide a case on state procedural grounds and to have those judgments respected by federal courts as well as a clear rule for federal courts to apply

-19-

when reviewing state court decisions. *See Harris,* 489 U.S. at 261 (*Long* presumption laid down by Supreme Court in order to avoid difficulties associated with ambiguity in state court decisions).  As the *Coleman* court explained:

> [F]ederal courts on habeas corpus review of state prisoner claims, like this Court on direct review of state court judgments, will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'  In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition. *Coleman,* 501 U.S. at 734-735 (citations omitted).[29]

Where state court decisions or procedural rules are interwoven with federal law, federal law accordingly places the burden on the state court to clearly and expressly show the state-law ground of the decision if federal  review of a claim is to be precluded.

**2.  State procedural rules that depend upon a predicate federal constitutional understanding are not independent.**

When the resolution of a state procedural law question depends upon a predicate federal constitutional understanding, the state-law prong of the court's holding is not independent of federal law, and a federal court may address the merits of the claim. *Ake v. Oklahoma,* 470 U.S. 68, 75 (1985); *Smith v. Texas,* 550 U.S. 297, 315 (2007)(a state court's predicate "error of federal law" in resolving a state procedural question does not preclude federal review); *Delaware v. Prouse,* 440 U.S. 648, 652-653 (1979)(state court decision is

---

[29]  As quoted in the decision cited by the Director, *Hughes v. Quarterman,* 530 F.3d 336, 341 (5th Cir. 2008).  Answer at 14.

-20-

not based on an independent state ground where the resolution of a state law question involves an interpretation of what federal law requires to state a claim for relief).  Under these circumstances, the federal court may review the claim because "[i]f the state court misapprehended federal law, '[i]t should be freed to decide...these suits according to its own local law,'" and not under a mistaken interpretation of federal law. *Prouse,* 440 U.S. at 653 (quoting *Missouri ex rel. Southern R. Co. v. Mayfield,* 340 U.S. 1, 5 (1950)).  *See also Long,* 463 U.S. at 1042 (*Long* presumption foreshadowed by *Prouse*).

**3.   The state court decision was interwoven with federal law and did not expressly state that it was based on an independent state law ground.**

The presumption in *Long* applies in this case because a) the CCA's decision is interwoven with federal law and b) it did not clearly state that it was based on an independent state law ground.

**a.   The CCA's incorporation and application of federal law in Tex. Code Crim. Proc. Art. 11.071 Sec. 5.**

Texas Code of Criminal Procedure Art. 11.071 Sec. 5 governs treatment of subsequent habeas applications filed by death-sentenced applicants in Texas.  Persons who seek to have the merits of their claims raised in a subsequent application considered by the CCA must either meet the procedural requirements of this section or avoid application of the statute altogether.  As we have seen *supra,* for a subsequent application to be considered, it must

contain[] specific facts establishing that:
(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was

unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues...

Tex. Code Crim. Proc. Art. 11.071 sec. 5(a).

Federal law is deeply interwoven both in the plain text of Section 5 and in the manner in which the CCA has recently interpreted and applied Section 5.   The text of Sections 5(a)(2) and 5(a)(3), for example, both expressly invoke the federal question of whether a federal constitutional violation has been alleged.  *See, e.g., Ex parte Blue,* 230 S.W.3d 151, 167-168 (Tex. Crim. App. 2007)("an adequate threshold showing of [a federal constitutional violation] would meet the criteria of [Section 5(a)(3)]").

On its face, Section 5(a)(1), the most commonly invoked exception to the bar on subsequent applications, does not reference or incorporate federal constitutional law. In recent cases, however, the CCA has announced the conditions under which Section 5(a)(1) can be met, importing a consideration of whether a "*prima facie*" showing of a federal constitutional violation has been alleged.  *See Ex parte Campbell,* 226 S.W.3d 418 (Tex. Crim. App. 2007)("We have interpreted [the language of Section 5] to mean that, to satisfy Art. 11.071 § 5(a),...the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence."); *Ex parte Brooks,* 219 S.W.3d 396, 400 (Tex. Crim. App. 2007)("While Article 11.071, section 5(a)(1) does not state that the application must include facts establishing that the applicant has a

-22-

prime facie *Atkins* claim, it would be absurd to consider applications in which the applicant does not show that the previously unavailable legal basis applies to his claim.").

At least two CCA judges consider the recent importation of this requirement into Section 5(a) "a judicial gloss we have *de facto* placed upon the statutory authorization of subsequent writs in capital cases, namely, that they must also 'make a *prima facie* showing of possible merit'" as to the federal claim. *See Ex parte Morris,* No. WR-43,550-03 (Tex. Crim. App. Mar. 4, 2009)(Price, J, dissenting). These requirements plainly weave federal law into the state court's Section 5(a) analysis.

Sections 5(a)(2) and 5(a)(3) both *explicitly* incorporate federal law:

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues...
Tex. Code Crim. Proc. Art. 11.071 sec. 5(a)

Both of these Section 5 provisions were in issue in Mr. Acker's successive application, as he presented both a claim of actual innocence (Claim I) and other claims relating to the ineffective assistance of counsel at various stages of the trial, including the punishment phase (Claim VI), which implicate both 5(a)(2) and 5(a)(3). In order for the CCA to determine whether Mr. Acker's claims met the standards for a successive application, it would have been impossible for the CCA to have made that determination without considering federal law and, in fact, basing that determination on federal law, as the

inquiry involves the possibility of "a violation of the United States constitution."

An example of the CCA's wholesale incorporation of federal law into the Section 5 analysis can be seen in practice in a recently decided case.  In *Ex parte Reed,* No. WR-50,961-06 (Tex. Crim. App. July 1, 2009)(unpublished), the CCA dismissed the applicant's subsequent application raising *Brady* claims as an "abuse of the writ", holding "[w]e find that this subsequent application fails to satisfy any of the exceptions provided in Article 11.071, § 5."  In the course of arriving at that legal conclusion, however, the CCA determined that "applicant has not shown that the State violated *Brady* by withholding favorable material evidence" and that "[t]his application...fails to show a *Brady* violation."  Because the applicant in *Reed* failed "to show a *Brady* violation," his application was dismissed pursuant to Section 5.  The CCA clearly considered the merits of Reed's federal claim as a reason to dismiss his application as an abuse of the writ.

In another recent case, *Ex parte Medellin,* 223 S.W.3d 315 (Tex. Crim. App. 2006), the CCA expressly resolved important and substantial federal constitutional questions—including a) whether a particular International Court of Justice decision was binding federal law under the Supremacy Clause, and b) whether a memorandum issued by the President of the United States violated federal constitutional separation of powers doctrine—in a lengthy order in the course of applying Section 5 to dismiss the application as an abuse of the writ.[30]  *Medellin,* 223 S.W.3d at 330-348.

---

[30]   Moreover, beginning in early 2007, the CCA issued a series of decisions that recognize equitable exceptions to Section 5 and suggest that dismissals could be based on the

**b.  The Fifth Circuit has held that Section 5, as interpreted and applied by the CCA, incorporates and is interwoven with federal law.**

In past years, many decisions of the Fifth Circuit recognized that Texas state court decisions applying Section 5 constituted dispositions on an adequate and independent state law ground, thereby precluding federal review unless cause and prejudice could be shown. *See, e.g., Aguilar v. Dretke,* 428 F.3d 526, 533 (5th Cir. 2005)(citing cases).  But in recent

---

Court's view of the merits where these exceptions are raised.  In *Ex parte Granados,* No. WR-51,135-01 (Tex. Crim. App. Jan. 10, 2007), a prisoner whose prior appointed counsel failed to raise a single cognizable claim made alternative requests that the judgment denying his previous application be vacated to facilitate the filing of a new application, or that the previous application be reheard with new claims added.  Although the CCA denied these requests, it did so not on the ground that Section 5 prohibits such relief, but on the ground that the applicant had failed to identify any new claims for habeas relief to be raised in a new or reopened application. *See Granados,* No. WR-51,135-01 at *5.

On July 6, 2007 the CCA was again confronted, in *Ex parte Ruiz,* No. WR-27,328-03 (Tex. Crim. App. 2007), with a request for relief from the consequences of habeas representation by incompetent appointed counsel.  Invoking the CCA's equitable authority and its powers under the Texas Constitution, Ruiz urged that Section 5 not be applied to his subsequent application for habeas relief because doing so would deprive him of a remedy for his trial counsel's ineffectiveness solely because of his previous habeas counsel's incompetence.
In a per curiam order, the CCA dismissed Ruiz's application as an "abuse of the writ" on the ground that his claims "d[id] not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5."  Order, *Ex parte Ruiz,* WR-27,328-03 (Tex. Crim. App. July 6, 2007)(per curiam).  Other judges, however, brought the equitable considerations reflected in *Granados* into sharper focus.  In a statement accompanying the order of dismissal, Judge Womack acknowledged Ruiz's argument that "the restriction on subsequent applications cannot be used to leave an applicant without a remedy" and called it "a serious and unresolved question," but found that deficiencies in Ruiz's merits allegations obviated the need to reach it in his case. *Ex parte Ruiz, supra,* (Womacj, J., statement regarding dismissal).

In a separate statement dissenting from the majority's order of dismissal, Judge Holcomb, joined by Judge Johnson, articulated the view that "this applicant should at least have been given a chance to be fairly heard at this, literally final, stage of his proceedings" and asserted that the majority had dismissed the application only because it had "misinterpreted the applicant's actual claim" and consequently found it meritorious. *Ex parte Ruiz, supra* (Holcomb, J., dissenting).

*Ex parte Ruiz* shows that equitable arguments to avoid application of Section 5 are considered by the CCA and may be rejected, as Judge Womack expressly did, on the ground that the *claim* is not meritorious.

years, and as the CCA's jurisprudence has evolved as discussed *supra,* the Fifth Circuit has

recognized that Section 5 is interwoven with federal law and that the state court's

interpretation and application of that provision is therefore not independent of federal law.

Instead, the Fifth Circuit has recognized that CCA decisions applying Section 5 are subject

to the *Long* presumption.

In *Rivera v. Quarterman,* 505 F.3d 349 (5th Cir. 2007), the Fifth Circuit examined how

the CCA applied Section 5(a)(1) in the "legal unavailability" context of *Atkins* claims.[31]  The

*Rivera* court held that the state court's consideration of whether a "*prima facie*" showing of

the federal legal claim had been alleged rendered its procedural dismissal not independent

of federal law.  505 F.3d. at 359.  This Section 5 requirement was "entangled in federal law

in much the same way as Oklahoma's waiver doctrine was in *Ake*; 'in the *Atkins* context,

Texas courts have imported an antecedent showing of "sufficient specific facts" to merit

further review, rendering dismissal of such claims [as abuses of the writ] a decision on the

merits.'" *Id.* (quoting *Morris v. Dretke,* 413 F.3d 484, 500 n.4 (5th Cir. 2005)(Higginbotham,

J., concurring)).  Accordingly, the *Rivera* court found that "where the threshold a state sets

turns on a merits determination of federal law or fails to make clear that it is procedural in

nature, that decision is reviewable."  *Id.* at 359-360.

In *Ruiz v. Quarterman,* 504 F.3d 523 (5th Cir. 2007), the Fifth Circuit examined a

boilerplate Section 5 dismissal, virtually identical to Mr. Acker's,  in the "factual

---

[31]   *Atkins v. Virginia,* 536 U.S. 304 (2002) held that the execution of the mentally
retarded violated the Eighth and Fourteenth Amendments.

unavailability" context and, in light of the CCA's recent decision in *Ex parte Campbell,* 226 S.W.3d 418 (Tex. Crim. App. 2007), drew the same conclusion that Section 5(a)(1), as currently interpreted and applied by the CCA, is interwoven with federal law. *Ruiz,* 504 F.3d at 527 (describing the "background legal standard" of Section 5 as "interwoven with federal law").  It found that the CCA's boilerplate order dismissing Ruiz's state application as an abuse of the writ failed to clearly and expressly indicate that it was based on an independent state ground.  As the *Ruiz* court explained:

> This settled principle [of adequate and independent state grounds] gives to state courts control over the federal review of their opinions...To the point, that the CCA did not make clear that its decision rested on an independent state ground opens the merits of Ruiz's *Wiggins* claim to federal review.  At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application.  As the CCA is keenly aware, its choice of langauge was made against a background legal standard—which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an abuse of the writ—that is interwoven with federal law.
>
> The Texas Code of Criminal procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) where the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence.  The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law.

*Ruiz,* 504 F.3d at 527 (internal citations omitted).  *See also In re Johnson,* No. 07-20546 (5th Cir. July 24, 2007)(unpublished)("Because we do not find that the Court of Criminal Appeals order [dismissing the claim pursuant to Section 5] contains such a clear

and express statement, we decline to find the claims procedurally barred").[32]

Indeed, the Supreme Court itself no longer invariably treats Section 5 as an independent and adequate state ground.  Following the CCA's Section 5 dismissal in *Ex parte Medellin,* discussed *supra,* the Supreme Court granted certiorari and decided the federal questions in the case without any comment on the Section 5 dismissal—showing clearly that the mere invocation of Section 5 does not place a state court decision on independent footing.  *See Medellin v. Texas,* 552 U.S. 491 (2008).  Had Section 5 been an adequate and independent state ground, the Supreme Court would have lacked jurisdiction to hear and decide *Medellin.*

### c. *Hughes v. Quarterman* is distinguishable and not applicable here.

Petitioner acknowledges that a case cited by the Director, *Hughes v. Quarterman,* 530 F.3d 336 (5th Cir. 2008)(Answer at 14-15)  has held that

> No application or interpretation of federal law is required to determine whether a claim has, or could have, been presented in a previous habeas application.  The Texas Court of Criminal Appeals did not need to consider or decide the merits of Hughes' constitutional claims in reaching its decision to dismiss those claims as an abuse of the writ pursuant to Article 11.071, Section 5.  Furthermore, there is nothing in its perfunctory dismissal of the claims that suggests that it actually considered or ruled on the merits.  Accordingly, its decision was independent of federal law for purposes of application of the procedural default doctrine.
> *Hughes,* 530 F.3d at 342.

However, *Hughes* can be distinguished from Mr. Acker's case in several ways.

---

[32]   As the Fifth Circuit has acknowledged the CCA's evolving interpretation of the text and application of Section 5, it has likewise acknowledged the CCA's carving out equitable exceptions to Section 5, as described *supra* in n.26,  where sufficiently meritorious claims have been presented. *See Ruiz,* 504 F.3d at 529.

First,  Mr. Hughes' successive writ in question was denied by the CCA in 2001, well prior to the CCA's evolution of its Section 5 doctrine as discussed *supra.  Hughes,* 530 F.3d at 340, *citing Ex parte Hughes,* No. 45,876-02 (Tex. Crim. App. Nov. 14, 2001).  In light of those decisions, particularly those handed down in 2007,  *Hughes* is not applicable.  Mr. Acker's successive writ was denied in 2009, well after the CCA's treatment of Section 5 had evolved as discussed *supra.[33]*

Second, the CCA's order denying Mr. Acker's writ specifically states "[w]e have reviewed these claims and find that they do not meet the requirements of Article 11.071, Section 5."   However, In the *Hughes* denial, the 5th Circuit stated that "there  is nothing in its perfunctory dismissal of the claims that suggests that it actually considered or ruled on the merits." *Hughes,* 530 F.3d at 342.  Here, however, there is.  A CCA "review" of Mr. Acker's claims would have to include at least some merits review in order to determine whether they met either exception two or three to Section 5(a):

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
> (3) by clear and convincing evidence, but for a violation of the United States

---

[33]  This argument applies even more strongly to all the other cases the Director has cited in support of the argument that Section 5(a) is an "adequate and independent" state law procedural bar.  Answer at 15.  *Fearance v. Scott,* 56, F.3d 633, 642 (5th Cir. 1995) held, as the Director points out, that the "Texas common law writ doctrine has been strictly and regularly applied since 1994)"(Answer at 15).  *Emery v. Johnson,* 139 F.3d 191, 195-196 (5th Cir. 1997) and *Fuller v. Johnson,* 158 F.3d 903, 906 (5th Cir. 1998), cited by the Director (Answer t 15) hold similarly.  As these cases date from 1995 to 1998 they are even less helpful to the Director than *Hughes* as they do not take into account the CCA's evolution of its treatment of Section 5(a).

Constitution no rational juror would have answered in the state's favor one or more of the special issues.
Tex. Code Crim. Proc Section 5(a).

The CCA could not have "reviewed" Mr. Acker's federal constitutional claim of actual innocence, as well as his other federal constitutional claims, without examining the merits to see whether "but for a violation of the United States Constitution, no rational juror could have found [him] guilty beyond a reasonable doubt" and whether "no "rational juror, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues." The language of both 5(a)(2) and 5(a)(3) explicitly invoke and require federal constitutional review of the successive petition's claims.

Third, unlike Mr. Acker's, Hughes's successive writ depended primarily on the Section 5(a)(1) exception, that "the claim could not have been presented in a previous application because the factual or legal basis of the claim was unavailable."[34] Indeed, the Fifth Circuit stated "[n]o application or interpretation of federal law is required to determine whether a claim has, or could have, been presented in a previous habeas application." *Hughes,* 530 F.3d at 342. Hughes failed to meet the 5(a)(2) and 5(a)(3) exceptions because "[h]e has not presented any evidence establishing that he did not commit the murders, and the evidence was more than sufficient to sustain the jury's answers to the special issues." *Hughes,* 530 F.3d at 343-344. Acker, however, *has* presented such evidence.

---

[34] His claim involved faulty penalty phase instructions under *Penry v. Lynaugh,* 492 U.S. 302 (1989). *Hughes,* 530 F.3d at 342-343.

-30-

Additionally, although Section 5(a)(2) and 5(a)(3) are primarily at issue here, a merits review would have been necessary in Acker's case to determine if the application met the requirements of Section 5(a)(1), whether or not the claim could have been brought at the time of the previous application.   That determination, even more directly than the determination in *Hughes* which was based on a *Penry* [*v. Lynaugh,* 492 U.S. 302 (1989)] claim involving faulty jury instructions, is inextricably interwoven with federal law questions, such as federal due process, actual innocence, the right to effective trial, appellate and post-conviction counsel, the interference of the trial court with Mr. Acker's attempts to show his actual innocence, and evidence that had been suppressed by the prosecution.

### d. The CCA failed to clearly and expressly indicate that its decision was based on a state law procedural component of Section 5.

As discussed *supra, Long* and *Coleman* require that, when interwoven with federal law, a state court must clearly and expressly indicate its reliance on a state-law component to preclude federal courts from reviewing the federal claims.  This the CCA did not do in its decision disposing of Mr. Acker's claims.

As shown *supra,* in an unsigned per curiam order, the CCA disposed of his claim by stating:

> Applicant now brings fifteen more claims.  We have reviewed these claims and find that they do not meet the requirements of Article 11.071, Section 5 for consideration of subsequent claims.  This application is dismissed as an abuse of the writ.
> IT IS SO ORDERED THIS THE 10TH DAY OF SEPTEMBER, 2008.
> *Ex parte Daniel Clate Acker*, No. WR-56,841-04 (Tex. Crim. App. September 10, 2008)(*per curiam*)(not designated for publication).

This dismissal does not rest on an adequate and independent state ground because 1) as discussed *supra,* the section of the state statute upon which the CCA's dismissal relied incorporates and is interwoven with federal constitutional law (the merits of petitioner's fifteen federal constitutional claims), raising the *Long* presumption, and 2) the language of dismissal does not unambiguously declare its independence from federal law, leaving the *Long* presumption intact.

As discussed *supra,* federal law places the burden on the state court to clearly and expressly show the state-law ground of decision if a federal court is to decline to review the merits of a federal claim. By issuing an order that simply stated that petitioner's claims "do not meet the requirements...of Section 5", the CCA did not "clearly and expressly" demonstrate that its decision was based on a state-law question rather than its consideration of any of the federal components of Section 5, described *supra.*

Because of the interwoven nature of the CCA's Section 5 analysis, the CCA could have relied upon federal constitutional law to dispose of Petitioner's claims. For example, the CCA could have dismissed because, pursuant to *Ex parte Campbell, supra,* it believed petitioner had not alleged "sufficient specific facts that, if proven, establish a federal constitutional violation sufficiently serious as to likely require relief from his conviction or sentence." *Campbell,* 226 S.W.3d at 422. Or, as in *Ruiz,* it could have dismissed because, although believing an equitable or constitutional exception was warranted, it nevertheless believed petitioner's federal claims lacked merit under federal constitutional law. *See Ex*

*parte Ruiz,* No. WR-27,328-03 (Tex. Crim. App. July 6, 2007)(Womack, J., concurring).

As the Fifth Circuit noted in *Ruiz,* the CCA could have clearly stated, if it so chose, that it was rejecting Mr. Acker's claims on an independent state law basis, for example, that the factual bases of his claims were available at the time he filed his previous state habeas application.  It did not, and merely issued a boilerplate order that failed to clearly and expressly indicate a state law reason for the dismissal.  Because Section 5 is necessarily interwoven with federal law, a federal court must presume that the dismissal is not independent and must therefore review the merits of the petitioner's claims.

**C) Petitioner has established "cause and prejudice" for any alleged procedural default because his state-appointed counsel was responsible for the default, if any, and counsel's actions may properly be "imputed to the state."**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

"Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails."

*Coleman v. Thompson,* 501 U.S. 722, 754 (1991)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

If the Court finds any of the claims to be procedurally defaulted, the inquiry then turns to the exceptions to excuse the default. Mr. Acker has discussed "cause and prejudice" in his petition at pages 70-74 and 79-82 of his petition and that is incorporated herein.

The Director argues that Petitioner has failed to establish "cause and prejudice" to

-33-

excuse the procedural default.  Answer at 15-18.  The Director's "cause and prejudice" arguments are based on Fifth Circuit holdings that the inadequacy of state habeas counsel cannot serve as "cause" to excuse the procedural bar.  Answer at 15-18.

Acker acknowledges that the Fifth Circuit has so held.  *See, e.g., Ries v. Quarterman*, 522 F.3d 517, 526 n.5 (5th Cir. 2008).   However, this is not the only reason cited by Acker as "cause and prejudice."

1) As discussed in Claim I, the trial court's actions to stifle Acker's  actual innocence evidence means that this federal habeas application is the first time any court has examined significant aspects of the crime and crucial questions regarding the fairness of his trial and sentence of death.  The trial court disallowed significant exculpatory evidence, including evidence that the victim had attempted to jump from Acker's truck a few days before her death and had refused to allow expert opinion regarding the implausibility of the State's "driving while strangling" theory.

2)  In *Coleman v. Thompson*, 501 U.S. 722 (1991)*,* a question presented by this case was specifically left undecided.  *Coleman* noted that (1) the Supreme  Court has guaranteed indigent appellants constitutionally effective counsel during the "one and only appeal" to which they were entitled by state law, even though the appeal itself was not required by the Federal Constitution, *Evitts v. Lacey*, 469 U.S.387, 396 (1985)(citing *Douglas v. California*, 372 U.S. 353, 357 (1963)); and   (2) Virginia allowed defendants to attack the effectiveness of their trial counsel only in post-conviction proceedings.  *Coleman v. Thompson*, 501 U.S.

722, 755 (1991).  Thus, *Coleman* asserted, there must be a guarantee of effective assistance

of counsel in "the first forum in which a federal claim can be raised" in state court.  *Id*.  The

Supreme Court found it unnecessary to "answer this question broadly, however, for one state

court has addressed Coleman's claims: the state habeas trial court."  *Id*.  Coleman

> has had his 'one and only appeal,' if that is what a state collateral proceeding
> may be considered; the Buchanan County Circuit Court, after a 2-day
> evidentiary hearing, addressed Coleman's claims of trial error, including his
> ineffective assistance of counsel claims.  What Coleman requires here is a
> right to counsel *on appeal* from that determination.  Our case law will not
> support it.

*Id*. at 756 (emphasis added).  Thus, it would "defy logic for us to hold that Coleman had a

right to counsel *to appeal* a state collateral determination of his claims of trial error."  *Id*. at

756-57 (emphasis added).

In any event, *Coleman* does not control this case.  Texas, like Virginia and virtually

all other jurisdictions, recognizes that claims of actual innocence that rely on extra-record

evidence and ineffective assistance of trial counsel claims such as the one pled in Acker's

petition usually cannot be adequately aired until post-conviction proceedings.  Another

distinction can be made: Coleman did not challenge the adequacy of his trial-court-level

habeas representation, *Coleman*, 501 U.S. at 755.  Mr. Acker presents this  challenge here.

In the Answer, the Director addresses this theory and asserts that this was addressed

in *Martinez v. Johnson,* 255 F.3d 229, 240 (5th Cir. 2001).  Answer at 17-18.  Petitioner

acknowledges this precedent but notes that the Fifth Circuit, as the Director points out, has

recognized that *Coleman* left this question unanswered and chose not to re-examine its

precedent.[35]

As for the question of prejudice, the Director asserts that "Acker has not established that a violation of his constitutional rights occurred in this case."  Answer at 18.  Mr. Acker has shown  the existence of the deprivation of "structural" constitutional rights that are so basic to a fair trial that their infraction can never be treated as harmless error, so that prejudice should be presumed.  Additionally, a strong showing on cause, such as here, has been held to go a long way toward establishing prejudice.  *See, e.g., Wainwright v. Sykes,* 433 U.S. 72, 95-96 (1977) (Stevens, J., concurring); *Clay v. Director,* 749 F.2d 427, 434 (7th Cir. 1984), *cert. denied,* 471 U.S. 1108 (1985) ("if prejudice is high, cause will be more easily found"); *Huffman v. Wainwright,* 651 F.2d 347, 351 (5th Cir. 1981) (reviewing court may "view cause...with an eye to the possible resulting prejudice"); *Bridge v. Lynaugh,* 856 F.2d 712, 714 (5th Cir. 1988)(procedural default overcome in part by "highly prejudicial" quality of petitioner's claim).

As the Director has raised procedural default issues, a hearing must be held on controlling and controverted factual issues surrounding the default and any excuses for it, as the state courts have not fully and fairly addressed the factual issues.  *See* 28 U.S.C.A. §2254(e); *Wainwright v. Sykes,* 433 U.S. 72, 80 (1977); *Townsend v. Sain,* 372 U.S. 293, 312-18 (1963); *Brown v. Allen,* 344 U.S. 443 (1953); *Williams v. Turpin,* 87 F.3d 1204, 1211 (11th Cir. 1996) (district court erred in refusing to hold evidentiary hearing to assess

---

[35]  An extensive discussion of *Martinez* and its inapplicability here is given in Claim VIII, *infra.*

-36-

sufficiency of petitioner's allegations of "cause" and "prejudice" for default).

The failure of the state court to address Acker's issues in either his first or subsequent applications emphasizes the need for a federal hearing to adjudicate these factual issues. *See, e.g., Jenkins v. Anderson,* 447 U.S. 231, 234-35 n.1 (1980) ("application of the 'cause' and 'prejudice' standard may turn on factual findings that should be made by a district court"); *Humphrey v. Cady,* 405 U.S. 504, 517 (1972); *Barnard v. Collins,* 13 F.3d 871, 878 (5th Cir. 1994)(district court's finding of absence of "cause" was "premature in the absence of an evidentiary hearing or other appropriate proceeding to determine exactly when Barnard's counsel could have discovered [the claim] through reasonable diligence and investigation"); *Ratliff v. United States,* 999 F.2d 1023, 1026 (6th Cir. 1993); *Preston v. Maggio,* 705 F.2d 113, 115 (5th Cir. 1983), *cert. denied,* 471 U.S. 1104 (1985); *Walton v. Stewart,* 1999 WL 57427, at *9-*11 (9th Cir. Feb. 5, 1999) (district court erred in denying petitioner's request for evidentiary hearing to prove "cause" and "prejudice"); *Holleman v. Duckworth,* 155 F.3d 906, 909-12 (7th Cir. 1998)(holding, in writ-abuse context, that district court erred in summarily rejecting petitioner's claim of "cause" based on newly acquired facts, and remanding to district court for evidentiary hearing on issue); *Porter v. Singletary,* 49 F.3d 1483, 1489-90 & n.13 (11th Cir. 1995)(*per curiam*) (petitioner was entitled to evidentiary hearing to show "cause" for procedural default on ground that he did not know and could not reasonably have known factual predicate for claim at time of default); *Huffamn v. Wainwright,* 651 F.2d 347, 353 (5th Cir. 1981).

**D)**   **Fundamental miscarriage of justice.**

Petitioner has discussed the "fundamental miscarriage of justice" exception to procedural default in his petition at pages 82-84 and that argument is incorporated herein.

The Director argues that Acker has not established a "fundamental miscarriage of justice" (Answer at 19-20) because "[t]he evidence Acker submits to prove his innocence is neither compelling nor exonerating...At most this evidence constitutes impeachment of the State's case against Acker at trial, but this is not enough to prove actual innocence."  Answer at 20.

In essence, the Director's argument against the "fundamental miscarriage of justice" exception to procedural default rests on the characterization of the actual innocence claim (Claim I) as "neither compelling nor exonerating."  The Director incorporates his argument from Section II(B) to arrive at this conclusion.  Answer at 20.   Similarly, Petitioner has shown he has met this standard in his discussion of Claim I, which follows, and is incorporated into his showing of a "fundamental miscarriage of justice."

Finally, the recent case of *In re Troy Anthony Davis,* 130 S. Ct. 1 (2009) shows the sensitivity of the Supreme Court to cases of actual innocence.  That Court, in an unprecedented exercise of its original habeas jurisdiction, remanded a capital habeas petition to the district court for an evidentiary hearing. The Court held that the substantial risk of executing an innocent man provides an adequate justification for a hearing and that AEDPA standards might not apply to actual innocence claims.

## VI.
## PETITIONER'S REPLY TO RESPONDENT'S ANSWER TO HIS CLAIMS FOR RELIEF

**CLAIM I**: MR. ACKER IS ACTUALLY INNOCENT OF CAPITAL MURDER.

The Director argues that "[f]ree standing claims of actual innocence do not state a valid basis upon which federal habeas corpus relief may be granted" (Answer, at 20) and "actual innocence, standing alone, does not state a valid basis for federal habeas relief." (Answer at 21-22.)  Petitioner has shown in Claim I that his conviction and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because he is actually innocent of the murder of Marquetta George. (*See* Petition at 85-108.)  Petitioner hereby incorporates by reference the statement of facts and legal argument from his petition.

**A) Contrary to the Director's argument, the procedural default doctrine does not apply to "gatekeeping" claims as opposed to "merit" claims. (Answer Sections II(A) and II(B)).**

The Director first argues in Section II(A) that "actual innocence, standing alone, does not state a valid basis for federal habeas relief" and in Section II(B) that "even if Acker's actual innocence claim was cognizable on federal habeas review, it is procedurally defaulted here."  Answer at 21-22.[36]

There are two types of claims advanced in federal habeas corpus proceedings.

---

[36]   Earlier in the Answer, however, the Director briefly discusses this claim as a "gateway" claim in the analysis of a fundamental miscarriage of justice.  Answer at 19-20.

"Merits" claims are those claims upon which a federal court may grant relief. "Gateway" claims are those claims which are used to explain why otherwise procedurally barred constitutional claims should be considered on the merits.

This claim of actual innocence is a gateway claim under *Schlup v. Delo,* 513 U.S. 298, 321 (1995). The procedural default doctrine is not applicable to gateway claims for two reasons. First, a federal court may not grant relief from a state court judgment based purely upon a gateway claim; the favorable resolution of a gateway claim merely permits a federal court to consider an otherwise defaulted merit claim. Thus, a state's interest in finality is not compelling at the gate-keeping stage because the petitioner is merely seeking authorization from the court to apply for the writ. Second, the question  of procedural default is a purely federal inquiry. Federal courts decide which merit claims should be reviewed, and while a state's disposition of a case on procedural grounds is a relevant consideration with respect to merit claims, a state may not preemptively determine the scope of a federal court's discretion.

In  *Herrera v. Collins*, 506 U.S. 390 (1993), and *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court defined the difference between merit claims and gateway claims. *Herrera* and *Schlup*  explain that merit claims and gateway claims serve distinct purposes.  In *Schlup,* the Supreme Court noted the fundamental distinction between gateway claims and merit claims. "Gateway" claims, that Court held, are procedural rather than substantive. 513 U.S. at 314. Because no relief can be granted on claims that are purely procedural, a state has no

interest in blocking a federal court's review of that claim; therefore, the federal courts were not restrained by the fact that much of Schlup's evidence of actual innocence was presented for the first time in a successor habeas petition. *Id.* Rather, the Supreme Court characterized Schlup's case as resting, in the final analysis, on his underlying merit claim, which could only be addressed if Schlup proved his gateway claim. *Id.* at 316.

More recently, in *House v. Bell,* 126 S. Ct. 2064 (2006), decided on June 12, 2006, the Supreme Court answered the following  two questions which are important in determining the question of procedural default in Mr. Acker's case:

> 1. Did the majority below err in applying this Court's decision in *Schlup v. Delo* [513 U.S. 298 (1995) to hold that Petitioner's compelling new evidence, though presenting at the very least a colorable claim of actual innocence, was as a matter of law insufficient to excuse his failure to present that evidence before the state courts–merely because he had failed to negate each and every item of circumstantial evidence that had been offered against him at the original trial?

> 2.  What constitutes a "truly persuasive showing of actual innocence" pursuant to *Herrera v. Collins* [506 U.S. 390 (1993)] sufficient to warrant freestanding habeas relief?

In *House,* the Supreme Court held that "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted..."  *House,* at 2077, *quoting Schlup* at 327-328.  The Court emphasized that

> the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence.  A petitioner's burden at the gateway stage is to demonstrate that, more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."

*House,* at 2077.

The *House* court added that "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House, id.* Although "deference" is given to the trial court's assessment of the evidence, "the *Schlup* inquiry, we repeat, requires a holistic judgment about 'all the evidence.'" *House, id.*[37]

While *Herrera*, *Schlup* and *House* all deal with the fundamental-miscarriage-of-justice exception to procedural default, they teach that all claims advanced in federal habeas proceedings and, indeed, all arguments advanced in support of them, need not be constrained by the doctrines of exhaustion and procedural default. *See Vasquez v. Hillery*, 474 U.S. 254, 257-58 (1986) ("We have never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts"); *House,* at 2068 ("In certain exceptional cases involving a compelling case of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition," *citing Schlup* at 319-322.

Federal courts unquestionably owe a great degree of respect to state-court judgments,

---

[37]   While House had an evidentiary hearing regarding his new evidence of innocence, including newly-discovered DNA evidence, Acker had a hearing that was merely a travesty, wherein both appellate and habeas counsel tried to insulate their own dismal performances from close scrutiny, the prosecutor and the trial court acquiesced in this, and Acker was left on his own.

but not at the expense of an Article III Court's discretion to determine, in the first instance, if merit claims should be reviewed. *See Reed v. Ross*, 468 U.S. 1, 15 (1984) ("This Court has never held, however, that finality, standing alone, provides a sufficient reason for federal courts to compromise their protection of constitutional rights under Sec. 2254"). Comity requires more than protecting the states' interests; those interests must be weighed against the federal courts' authority to remedy fundamental wrongs committed by the states. *See House v. Bell*  at 2076 ("the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration" *quoting Murray v. Carrier,* 477 U.S.. 478, 495 (1986).  Clearly, the Texas courts have never considered any of the new evidence that discredits the State's case against Mr. Acker.

**B) Contrary to the Director's argument, the Supreme Court has rarely applied procedural default to gateway claims. (Answer Section II(B)).**

Historically, the Supreme  Court has  applied the procedural default doctrine only to merit claims.[38]   Yet the Director seeks  to break away from twenty years of that Court's precedent by adding yet another layer of procedural default analysis to a process already fraught with complexity and confusion. In section II(B) he argues that "even if Acker's actual innocence claim was cognizable on federal habeas review, it is procedurally barred here."

---

[38]   In a rare exception,  in *Edwards v. Carpenter,* 120 S. Ct. 1587 (2000) the Court held that a procedurally-defaulted ineffective-assistance-of-counsel claim can not be considered by a federal court as cause for the default of a separate claim unless the petitioner is first able to overcome the procedural default of the ineffective assistance of counsel claim first. In *Carpenter,* the Court remanded for a determination of whether petitioner could overcome the procedural default of his ineffective assistance of counsel claim such that the claim could be considered as cause for the default of his underlying sufficiency of the evidence claim

(Answer at 22.)

For over twenty years, it has been the practice of the Supreme Court to apply the procedural default doctrine in the evaluation of merit claims alone. *See Coleman v. Thompson*, 501 U.S. 722 (1991); *Murray v. Carrier*, 477 U.S. 478 (1986); *Reed v. Ross*, 468 U.S. 1 (1984); *Engle v. Issac*, 456 U.S. 107 (1982); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Francis v. Henderson*, 425 U.S 536 (1976); and *McCleskey v. Zant*, 499 U.S. 467 (1991); *see also Keeney v. Tamayo-Reyes*, 504 U.S. 1, 19 (1992) (O'Connor J., dissenting) (noting that *Coleman, Murray, Reed, Engle, Sykes, Francis,* and *Zant*, all were only concerned with whether federal courts could consider the merits of a claim).

*Murray v. Carrier, supra,* stands for the proposition that a gateway claim may be asserted as cause for the procedural default of another merit claim even if the gateway claim is procedurally defaulted.   The *Carrier* Court did not implement a procedural default requirement for claims asserted as cause, and one should not be engrafted now.

The Supreme  Court has implicitly rejected a  "double procedural default analysis" argument in *Strickler v. Greene*, 119 S. Ct. 1936 (1999). In *Strickler*, the habeas petitioner discovered a valid *Brady v. Maryland*, 373 U.S. 83 (1963), claim while his case was pending in federal court. Strickler conceded that the claim was procedurally defaulted. The cause arguments advanced to excuse the default of the *Brady* claim were the same as the underlying facts of the *Brady* claim itself; therefore, Strickler's merit claim and his gateway claim were both procedurally defaulted.

Despite the "double default", the Supreme Court considered the facts of the *Brady* claim as cause for Strickler's merit claim. *Strickler*,119 S. Ct. at 1949. Because two of the three components of the *Brady* test mirror the traditional cause and prejudice test, the *Strickler* Court determined that it could consider the *Brady* elements as cause for the procedural default. *Id*. There was no need to engage in a separate analysis of the procedural default, the Court held, because the *Brady* claim itself accommodated all of the interests the cause and prejudice test is designed to protect. *Id*. at 1949.

*Strickler* suggests that employing the "cause and prejudice" test twice with respect to a *Brady* claim (once to the defaulted merit claim and once to the gateway claim) to reach the merits of a procedurally defaulted claim is a redundant exercise. The same can be said when ineffectiveness is asserted as the cause for a procedurally defaulted merit claim. Even assuming that a state has  some compelling interest that is implicated at the gate-keeping stage, the extraordinarily high burden imposed by *Strickland v. Washington*, 466 U.S. 668 (1984), accommodates all of a state's interests that are traditionally protected by the procedural default doctrine. The Supreme Court  said as much in *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

In *Kimmelman*, the Supreme Court  held that only by meeting the extraordinarily high burden of *Strickland* can a habeas petitioner secure relief even though the ineffectiveness is predicated on a defaulted Fourth Amendment claim. In doing so, the Court specifically rejected the argument that state interests could not be adequately protected if federal courts

could consider defaulted Fourth Amendment claims in the context of attorney ineffectiveness. *Kimmelman*, 477 U.S. at 380-381.

Because *Strickland* is such a highly demanding test, the Court also rejected the notion that applying *Strickland* to reach the merits of an otherwise defaulted Fourth Amendment claim would disturb a great many state-court judgments. To the contrary, the *Kimmelman* Court held that the mere assertion of ineffective assistance of counsel does not automatically cure the procedural default of a merit claim:

> Petitioners [the Warden] predict that every Fourth Amendment claim that fails or is defaulted in state court will be fully litigated in federal habeas proceedings in Sixth Amendment guise, and that, as a result, many state-court judgments will be disturbed. They seem to believe that a prisoner need only allege ineffective assistance, and if he has an underlying meritorious Fourth Amendment claim, the writ will issue and the State will be obligated to retry him without the challenged evidence. Because it ignores the rigorous standard which Strickland erected for ineffective assistance claims, petitioners' forecast is simply incorrect.

*Kimmelman*, 477 U.S. at 381. "A criminal defendant who obtains relief under *Strickland* does not receive a windfall; on the contrary, reversal of such a conviction is necessary to ensure a fair and just result." *Id.* at 393 (Rehnquist, J., concurring in judgment).

This case demonstrates the inherent inequity in the Director's argument. Acker was denied the effective assistance of counsel on appeal and on habeas because many of his claims were not raised -- conduct that must be attributed to the State of Texas.[39] *Kimmelman*, 477 U.S. at 379; *Carrier,* 477 U.S. at 488. The Director argues that many of those claims

---

[39] *See* Exhibit 6 to Acker's petition (the direct appeal brief) and Exhibit 9 (his state habeas petition).

are procedurally defaulted. *See* Answer, Section I (at 13-20).   The Director wants to rely upon Texas' unfair refusal to remedy the problem as a means of restricting the federal courts from even entertaining the merits of Mr. Acker's claims.  If equitable considerations truly guide the use of the Great Writ, then Mr. Acker  should be permitted to divorce himself from the very state process that has caused his claims to go unreviewed until now.

### C) Whether a procedural default may be excused presents a question of pure federal, procedural law.

Aside from the conceptual difference between merit claims and gateway claims, there is another, and perhaps simpler, reason why gateway claims need not be subjected to a procedural default analysis. Whether a cognizable procedural default is excused is purely a question of federal procedural law. Unlike substantive, federal constitutional matters, state and federal courts do not have a concomitant obligation to apply federal procedural law. *See O'Sullivan v. Boerckel*, 119 S. Ct.  1728, 1732 (1999). Thus, the federal courts should not be constrained by state decisions when deciding the procedural question of whether to exercise their discretion and consider if a petitioner may apply for the writ of habeas corpus.

The Director  draws no distinction between merit claims and  gateway claims and believes that the states determine the scope of federal review.  *See* Answer at Section I(A) (at 13-15.)[40] But *Carrier* itself held that a state has no business deciding matters of federal procedural law:

---

[40]   The Director, in a subsequent section, argues that the "gateway" claim of actual innocence fails because it "fails to establish his innocence."  (Answer at 23-36.)

> [W]e think that the exhaustion doctrine, which is 'principally designed to protect the state courts' role in the enforcement of state judicial proceedings' generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. The question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal court can adjudicate the question of cause -- a question of federal law – without deciding an independent and unexhausted constitutional claim on the merits.

*Carrier,* 477 U.S. at 488-89 (citations omitted).

To hold otherwise would strip federal courts of the ability to determine how and when they should entertain the merits of a habeas corpus petition.

Because the claim of ineffective state habeas counsel is advanced here to explain the purported federal default of Mr. Acker's allegedly defaulted claims, Texas' interest in the finality of his conviction is not compelling.  Although Mr. Acker does seek relief based upon his gateway claim of ineffective assistance of state habeas counsel,  he also uses it to explain what happened with respect to  his other claims -- a question of pure, federal procedural law and one that does not impact Texas' interest in the finality of his conviction.

**D) The Director's allegations that the claim fails to establish Acker's innocence.**

Addressing the merits of this claim, the Director's argument is multiply flawed.  Much of Acker's evidence is either ignored, misconstrued, or seen in a light that is not compatible with the known facts.

The Director first attempts to show that the newly-presented evidence does not "establish [that] no rational jury would find him guilty of killing Markie by strangulation,

causing blunt force injuries, or a combination of the two." (Answer at 24.)  He attempts this by summarizing Dr. Gonsoulin's report the final argument and the jury instructions. (Answer at 24-27.)

### 1) The "blunt force" injuries.

The Director claims that "Acker spends a significant effort attempting to dispel the prosecutor's theory that Markie dies as a result of strangulation. But, even if the evidence he presents can refute this theory of how Markie was murdered, it does not conclusively rebut the other cause of death alleged in the indictment and charged to the jury." (Answer at 27). This is at best misleading.

Petitioner's indictment alleged that "on or about the 12th day of March, 2000 [Mr. Acker] then and there intentionally caused the death of ...Marquetta Follis George, by homicidal violence, to-wit, manual strangulation and ligature strangulation with an object, the exact nature of which is unknown to the Grand Jury, and blunt force injury...in the course of committing and attempting to commit the offense of kidnaping..." 7 RR 168-169.[41] However, Dr. Gonsoulin testified that the exterior blunt force injuries were caused either at or near death or postmortem and occurred *after* the strangulation injuries. 20 RR 219. Thus, the state never presented the argument that the victim's death was *solely* due to blunt force injuries.

Additionally, Dr. Larkin's report actually demolishes not only the strangulation theory,

---

[41]  *See* Exhibit 1.

but *also* the vague speculations regarding blunt force. He points out that blunt force injuries are noted in the autopsy report, with faint blue contusion of the lower half of the neck, prominent hemorrhage of the anterior, superficial and deep soft tissues of the neck.[42] But Dr. Larkin noted that the faint blue contusions are not seen in the photographs.[43]  In his report, he pointed out that there is misleading and vague testimony about the victim's skull being struck with "some blunt instrument" which is never specified. (20 RR 208).  Dr. Larkin shows how this was most likely the door, which would lend support to the victim jumping and being hit by the door.[44]  Dr. Larkin also points out that in discussing the blunt force injuries,  Dr. Gonsoulin fails to make the crucial distinction between peri- and post-mortem injuries.  20 RR 218. If the alleged "blunt force" injuries were post-mortem, then of course they were not the cause of the victim's death.  Acker has actually established that no rational juror, had it been presented with this evidence could have found that Acker either strangled Markie or that he "caused her to impact a blunt object resulting in blunt force injuries." (Answer at 27.)  When one adds to the equation the fact that Markie's past history of jumping from the truck was not heard by the jury, the case is even clearer.

### 2) Other aspects of the Director's alleged "undermining" of Dr. Larkin's report.

The Director has not undermined the credibility of Dr. Larkin's report as he claims.

---

[42]   Exhibit 32 at 2. *See also* Exhibit 26 at 28 (face shows asymmetry, lack of any signs of strangulation).

[43]   Exhibit 26 at 4, 28-29 (photos show pristine neck).

[44]   *Id.* .

None of these attempts seriously challenge the flaws in the State's theory of the case.

a) The Director first claims that

Dr. Larkin offers very little medical support for the basis of his opinion, urging only that the injuries sustained to Markie's neck 'are suggestive, but not pathogomonic for strangulation' and could have been caused by other factors....Instead, Dr. Larkin rests his opinion on his belief that it was physically impossible for Acker to strangle Markie while he was driving the truck in the time frame given."
Answer at 28.

In actuality, Dr. Larkin's analysis is well backed by numerous factors that have not been "undermined" by the Director. Dr. Larkin points out a long list of the errors and problems in the autopsy report, which need not be repeated here. Basically, these have not been specifically challenged by the Director in his answer.[45] Dr. Larkin points out 14 flaws in the conclusions drawn by Dr. Gonsoulin, virtually none of which are challenged in the Director's answer.[46] Dr. Larkin also points out 16 major flaws and errors in the trial testimony of Dr. Gonsoulin, virtually none of which are even challenged in the answer.[47] Finally, Dr. Larkin  presents a detailed analysis and a conclusion that Markie was not strangled which points out that the seven main injuries of the victim are not caused by strangulation.[48] Basically, the Director has failed to challenge many of these detailed, specific findings.

---

[45] *See* Dr. Larkin's report, Exhibit 26; Petition at 87-92.

[46] *See* Exhibit 26 and Petition at 92-96.

[47] *See* Exhibit 26 and Petition at 96-101.

[48] *See* Exhibit 26 and Petition at 101-103.

b) The next claim of "undermining" Dr. Larkin's report is that Dr. Larkin allegedly erroneously assumes that Markie was sitting up in the truck. (Answer at 28.)  However, the Director's argument falters, as the force required to strangle her would have been roughly the same whether she was sitting up or lying down.  Even if Markie was unconscious, her death would still have required the imposition of a considerable amount of one-handed force over a considerable length of time while the truck was being driven at a high rate of speed. In addition, there was testimony that fluorescent light bulbs were lying on the front seat, as Mr. Acker was an electrician, as the Director points out.  (21 RR 244, cited at Answer at 35.) If Markie was lying down, it is almost certain these long fluorescent bulbs would have been crushed or broken, but they were not.  Nor do Dr. Larkin's conclusions depend on whether or not Markie was sitting up or lying down, as strangulation in either position would have been virtually impossible.

While the Director points to Mr. Smiddy's statement that he heard something like a hit to infer that the victim may have been knocked out (Answer at 29, 32), this is undermined by Mrs. Smiddy's statement to the deputies on the day of the incident that "she was trying to get out of the car as it spun out through the ditch."  19 RR 186.  Significantly, she changed this statement at trial when it would have conflicted with the State's theory of the case, and her credibility and that of Mr. Smiddy is undermined as a result.  In fact, this changed testimony of Mrs. Smiddy is one more cause for concern and an indication that the "evidence" has been manipulated to fit the State's theory of the case.

c) The Director argues that "[t]here is absolutely no evidence supporting the fact that Acker used his used his hands. Indeed, the medical examiner at trial testified that it was impossible to determine what was used in the strangulation." (Answer at 29).  This argument is very puzzling.  Dr. Larkin's conclusion was that there was actually no strangulation as it would have been impossible, but he used the reasonable and most plausible assumption to discredit it, which is manual strangulation, the most common way in which people are strangled.  It is hard to imagine any strangulation scenario  not involving  the use of a person's hands.  The only other alternative, one's feet, is patently absurd.

d) The Director also argues that in order to discredit the State's theory, Dr. Larkin erroneously assumes that the victim was struggling when she was strangled.  (Answer at 29.) The testimony of the Smiddys is used to cast doubt on this assumption.  *Id.*  However, as discussed *supra,* the testimony of Mr. Smiddy was called into question by Mrs. Smiddy's statement to the deputies on the day of the incident that "she was trying to get out of the car as it spun out through the ditch."  19 RR 186.  Mr. Smiddy testified that after he heard what "sounded like a hit" (19 RR 148)  he then saw Mr. Acker's truck pulling out of the driveway and swerving from side to side in the road (19 RR 149),   going slowly (19 RR 176), and at one point, it veered into the ditch and came back onto the road.  19 RR 169.  There would likely have been no swerving and veering off the road had Markie been unconscious at this point.  Mrs. Smiddy also bolsters Dr. Larkin's conclusions as she testified that as they drove off swerving from side to side on the road (19 RR 179-180) he was leaning over towards the

middle of the seat (19 RR 182) and he could have been trying to keep her from jumping out. 19 RR 187. Additionally, if she was unconscious, there would have been no reason to strangle her while driving, as the purpose of the abduction was to confront the person she had spent the night with, not to murder her.

e) The Director claims that "Dr. Larkin claims in his report that Acker was driving 40 miles an hour when he left, when in fact Acker's speed was never determined. *See* 21 RR 131-133." (Answer at 30). Mr. Acker, however, testified at his trial that at times he was driving even faster than this, between fifty and sixty-five miles an hour. 21 RR 237. But we do not have to rely on Mr. Acker's testimony, as the high rate of speed can be deduced from the time of the 911 calls and the place where the body was found.[49] Even if it could not have been deduced, the 40 mile per hour estimation was not crucial to Dr. Larkin's analysis. But it is not correct to argue, in regard to this factor, that "Dr. Larkin's conclusion is further undermined by the fact that he relies upon facts not established at trial to prove it." (Answer at 29).

f) The Director also argues that Dr. Larkin's report is "cumulative evidence."

_____

[49] Walter Allen Story, a 9-1-1 communications supervisor in Hopkins County, testified that he received a call from Mr. Thomas Smiddy at 11:45 a. m. on March 12th. 21 RR 44. The first call that said a body had been found came in at 11:47 a.m., from Mr. Sedill Ferrell. 21 RR 51. Officer Hill arrived on the scene at 11:51 a.m. 21 RR 51. The call log showed that the first call actually came in at 11:40 a.m. 21 RR 56. The Slidell farm, where George jumped out, was about 1.64 miles away from his starting point. *See* Exhibit 26, Dr. Larkin's report at 17-18. Other testimony at the trial puts the distance at over 2 miles. In any case, the truck must have been traveling at a relatively high rate of speed to cover either of these distances in a matter of a few minutes.

-54-

(Answer at 30).  This is clearly untenable.  The evidence at trial completely failed to challenge the flaws of the autopsy report.  Trial evidence failed to cast doubt on the strangulation theory in any of the many ways Dr. Larkin's report did.  No expert testimony challenged the cause of death or the State's case.

The Director points only to the defense's final argument in an attempt to show that Dr. Larkin's report is "cumulative evidence." (Answer at 30.)  However, it is well-established that the attorneys' arguments are not evidence and, in fact, Acker's jury was so instructed as are all juries.  Additionally, the defense argument quoted by the Director (Answer at 30, citing 23 RR 15) only sought to discredit the State's theory due to a lack of time to strangle and the difficulty of driving while strangling, while Dr. Larkin's report goes well beyond this argument, with facts to back it up.  In no way can Dr. Larkin's report be seen as merely "cumulative."  Nor is it simply "impeachment" evidence. (Answer at 30.)

g) The Director points out several instances where Mr. Acker "stated his violent intention prior to Markie's death." (Answer at 34.)  It is undisputed that when Markie returned and Mr. Acker found out she had spent the night with another man ("Calico"), there was a physical confrontation.  Mr. Acker admitted to shaking and hitting her in their trailer. (21 RR 225).  However, Acker did *not* kill Markie when he learned where she had spent the night.  Instead, he asked her where Calico lived and then got dressed with the intention of driving to Calico's house.  21 RR 225-226.  When Markie ran out of their trailer, Acker caught her and placed her in the truck, carrying through with his intention of driving to

Calico's house.  At this time, it is clear that his intent was not to kill her, which he could have done earlier in the trailer had he been so inclined, but rather to forcibly transport Markie with him in order to find and confront Calico.  As the Director  puts it, "they got into a verbal and physical altercation, during which he forced her into his truck and drove off." (Answer at 35.) This is much more suggestive of an impending confrontation with the other man, and Acker's anger and rage being directed toward him, than a lead-up to murdering Markie after driving off with her in full sight of the Smiddys.

h) Nor are Acker's actions following Markie's death "[e]ven more damning" for him. (Answer at 35-36.)   He recounted his own actions what he testified at trial.  The Director first points to Acker's "[leaving] her on the ground after he realized there were fluorescent light bulbs on the seat" (Answer at 35.)  However, he did not place her in the car because he did not want to break the bulbs, but because when he picked her up her head fell back and he realized that she was dead.  21 RR 244.  By his own admission  he then laid her back down, ran around to the front of the truck and left.  21 RR 244.  Acker admitted that he panicked and went into shock at this point.  21 RR 244.  These actions are consistent with a person in shock, not someone acting rationally.

The Director then recounts Acker's actions in passing a fire station and the sheriff's office without seeking help.  (Answer at 25.)  However, Acker, still in shock, did not attempt to flee.  Mr. Acker went to Bentley Electric to use the phone.  21 RR 245; 22 RR 80-81. When he arrived, his mother pulled up and he walked over to her and told her what had

happened.  21 RR 245.  The Director points to Acker's actions at this point: "instead of calling someone [at Bentley Electric], he drove to his sister's house as she [his mother] directed." (Answer at 35.)  Acker testified similarly, that when he arrived at Bentley, he told his mother that Ms. George was dead and she told him to go to his sister's house.  21 RR 246; 22 RR 84.  This again is consistent with the actions of a person in shock, not someone who is trying to conceal a murder.  One has to remember that at this point, Acker had committed assault and battery, kidnaping or abduction by force, and possibly DWI, all serious offenses.

When Acker arrived at his sister's house, no one was there and he then went to his mother's house.  21 RR 247.  Then he became scared and went to his friend Kenny Baxter's house.  21 RR 248; 22 RR 86.  Mr. Acker then went to his mother's house.  21 RR 249. When he was there, a highway petrol car passed by, and Mr. Acker went out and waived his arms and told the officer what had happened.  21 RR 250.  These frantic, confused and illogical actions are very consistent with the actions of a person in shock who is not thinking rationally, and who ultimately surrenders to a police officer knowing that he has played a part in his girlfriend's death.

The Director hypothesizes that "[a] reasonable juror could believe that these were not the actions of a man whose girlfriend just died an accidental death by jumping from his truck." (Answer at 35-36.)  However, the "reasonable juror" in question is a reasonable juror in possession of all the facts presented in Acker's petition.  *House v. Bell,* 126 S. Ct. 2064,

2077 (2006).[50]  This juror would have known that Markie had in the past attempted to jump from the very same truck she was abducted in.  This juror would have been presented with an expert's opinion regarding the flaws in the autopsy, the flaws in Dr. Gonsoulin's analysis of it, the flaws in the state's strangulation theory, and the virtual impossibility of the strangling-while-driving theory.

Mr. Acker's actions were actually less indicative of the actions of a person who had just committed murder than they are of a man who had just abducted his girlfriend who then jumped from his truck and who then goes into shock and acts irrationally.  Most importantly, he did not attempt to flee or conceal himself from the authorities, an almost universal reaction on the part of murderers.  It is clear that the purpose of Markie's abduction was a confrontation with the person who had spent the night with Markie.  If Mr. Acker had intended to murder her, he could and would have done it in their residence, when she first told him where and with whom she had spent the night, when his rage was at its height.  Instead, by his own admission, he shook and slapped  her and then got dressed.  21 RR 225-226.  Markie then ran out of the trailer to the Smiddy's and said "He's not going to whup me this time." 19 RR 163.  The Director's analysis assumes Mr. Acker's total innocence in the matter, an assumption he himself has never made.

---

[50]   "the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence.  A petitioner's burden at the gateway stage is to demonstrate that, more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House,* at 2077.

**CLAIM II:** THE TRIAL COURT WAS BIASED AGAINST PETITIONER AND COMMITTED MANY ERRORS WHICH PREVENTED HIM FROM PRESENTING HIS CASE FOR INNOCENCE AND DEPRIVED HIM OF DUE PROCESS AND A FAIR TRIAL.

Mr. Acker's arguments are at pages 108 to 136 of the petition and are incorporated herein.

The Director first argues that this claim is procedurally defaulted "because it was dismissed by the state court...as an abuse of the writ, an independent and adequate state ground." Answer at 36. For the reasons discussed *infra,* procedural default is not appropriate as to any of petitioner's claims and the dismissal of the successive petition was not based on an "adequate and independent" state ground.

The Director also argues that "[a] vast majority of the rulings complained of here by Acker are evidentiary matters that do not implicate his federal constitutional rights and under state law are left to the sound discretion of the trial court." Answer at 38. However, this claim is grounded in Acker's federal due process rights to a fair trial. All the authorities cited by Petitioner relate to federal due process. *See Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir. 1995) (evidence that "the judge had a fixed predisposition to sentence this particular defendant to death if he were convicted" warrants relief); *see also Arizona v. Fulminante,* 111 S. Ct. 1246, 1265 (1991); *Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980); *Faretta v. California*, 422 U.S. 806, 818 (1975) (the protections in the Bill of Rights are "basic to our adversary system of criminal justice [and thus] part of 'due process of law' [as] guaranteed by the Fourteenth Amendment"). Two key elements in such an adversarial system are the

-59-

firm neutrality of an "unbiased judge," *cf. Johnson v. Mississippi*, 403 U.S. 212, 216 (1971), and the minimal requirements of procedural due process, namely, "notice and opportunity to be heard." *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). *See also Cupit v. Whitley,* 28 F.3d 532, 536 (5th Cir. 1994)("A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair (in which case sustaining the conviction would violate Petitioner's Fourteenth Amendment right to due process)"

Next, the Director argues that "there is a notable absence of legal citations and authorities to support a finding of error...As such this claim should be deemed waived in these proceedings for failure to adequately brief." Answer at 39. The legal authorities are set forth in the petition at the beginning of the claim, pages 108 to 109 and at the end of the claim, pages 133 to 136, discussing harmless error. As discussed in the prior paragraph, this claim does not concern individual instances of trial court error as much as overall judicial bias that deprived Petitioner of his federal due process rights to a fair trial. The abundant legal citations and authorities in this claim support that overall premise, the basis of this claim.

**Claim II(a): The trial court erroneously allowed the jury to hear evidence that Mr. Acker had been in the penitentiary.**

The Director claims that the prejudicial information "did not reveal that Acker has previously served time in the penitentiary [and therefore it] did not outweigh its probative value." (Answer at 40.) However, the comment could only have signaled to the jury that

-60-

Acker had served time in the penitentiary because the witness testified that Acker said "pen life ain't nothing.  Ain't nothing to it."  19 RR 99.  The unnecessary and irrelevant mention of the prior penitentiary sentence prejudiced the jury against Mr. Acker.

**Claim II(b):  The trial court stifled the defense's case for actual innocence by erroneously disallowing impeachment testimony.**

The Director claims the trial court did not abuse its discretion in excluding statements that a key witness, Thomas Smiddy had stated in his 9-1-1 call that the victim tried to jump from the vehicle and the defendant pulled her back in.  (Answer at 40-42.)  However, this incident would have been crucial to the defense as impeachment, as at trial both Mr. And Mrs. Smiddy denied having seeing this.  10 RR 173, 191.  Acker's defense was that she had later jumped from the truck.  The prejudice was obvious.  The probative value of an on-the-scene report that the victim had been trying to jump for the truck only moments before her death, which was the defense's theory of the case, would have been enormous.  The fact that the jury was not allowed to hear this evidence substantially contributed to the unfairness of his trial.

**Claim II(c):  Trial court error in denying a mistrial.**

Hopkins County Sheriff's Officer investigator Tony Hurley was being questioned about a crime scene photograph and testified that "And I'm assuming whatever vehicle run over this body made these tracks."  20 RR 101.  It was non-responsive to the question, and it was stricken, but the court denied the defense's motion for a mistrial.  20 RR 101.

The Director argues that there was other evidence that the victim's body was run over,

-61-

citing testimony from the medical examiner.   Answer at 43.   However, that unreliable testimony is the only instance the Director can identify and as shown in Claim I, that testimony was erroneous.   The other evidence cited by the Director, relating to Acker's alleged guilt,  does not relate to this claim.  Answer at 43.

**Claim II(d):   Trial error in disallowing crucial testimony from the medical examiner.**

The court did not allow a hypothetical question to be asked of the medical examiner Morna Gonsoulin  regarding injuries that would be sustained if a person had jumped from a moving vehicle.  20 RR 257-258.

The Director argues that it is allowable for an expert to give testimony based on hypothetical questions but this question was based on facts not in evidence.   Answer at 44. However, the question was actually based on a reasonable conjecture about the evidence and could not have been any more "based" on it than it was.   The question was a reasonable inference from evidence that had been presented through the medical examiner and the question was proper.   As this was the defense's theory of the case, it greatly hindered and prejudiced the defendant.   Again, the trial court showed a disturbing propensity to exclude any evidence that would have bolstered the defense's case for actual innocence.

**Claim II(e)**:  **The trial court erroneously excluded testimony that was highly probative of petitioner's actual innocence.**

**i) Erroneous exclusion of witness Sabrina Ball's testimony.**

Ms. Ball, who lived near petitioner's mother Nancy Acker, testified that she met Markie George one time, on the night of February 26, 2000, only a few weeks before her

death.  21 RR 8.[51]  Outside the presence of the jury, Ms. Ball stated that Ms. George came

to her door at about 10:30 p.m. 21 RR 10.  Ms. George said that she had been at "Bustin

Loose" with Mr. Acker and a fight had started and they had left. 21 RR 13.  In the truck, Mr.

Acker took her head and tried to beat it against the dash and she tried to jump out  and he

grabbed her by the hair and dragged her back in.  21 RR 13.

It is hard to overstate the importance of evidence that the victim, a couple of weeks

prior to her death, had tried to jump from the very same truck that Mr. Acker later used to

abduct her on the day of her death.  The Director argues this was not an excited utterance and

properly excluded.  Answer at 46-47.

However, there are a number of disturbing factors about this argument and the trial

court's reasoning upon which it is based as well as the absurd lengths to keep out this

important evidence of prior jumping by the victim.  The court first ruled that a spontaneous

utterance must be a spontaneous reaction to an exciting event.  21 RR 29.  It then analyzed

whether the entire statement was an excited utterance:

> The Court: Then she said five minutes had passed by then.  And that's my question
> is we've gone probably five to seven minutes so far.  There reaches a point where the
> excited utterance is no more and then it becomes hearsay.
> 21 RR 28.

Even though the court itself held that "this is a close call", it then ruled that only the

"first" part of the victim's statement, about Mr. Acker being crazy and threatening to kill her,

would be admissible, and the "latter" part about jumping out of the truck was not because it

---

[51]   *See also* Exhibit 31, Ms. Ball's original statement to the police investigators.

was not an excited utterance, because she was being questioned about the events.  21 RR 30.

Thus, the court adopted a strained definition of "excited utterance" to keep out any part of

the conversation that would have been probative to the petitioner's actual innocence and

allowed in only remarks that would have been harmful.  The court's ruling flew in the face

of the actual testimony as the witness had testified that Ms. George at first was more

concerned with the fight in the truck, when she had attempted to jump, than with the later

fight at the house, where the alleged threats were made by Mr. Acker.  21 RR 25.  There was

also no clear indication that although some later statements were made about the truck

incident under questioning, that these were not also made spontaneously at first.[52]  The

bifurcation of this conversation into "excited" and "non excited" was clearly erroneous and

shows the lengths the court went to in order to suppress the defense claims of actual

innocence.  The prejudice suffered by petitioner was considerable, as the jury was unable to

hear that the victim had previously jumped from the truck just a few weeks before the

incident that led to her death.  The Director's analysis does not consider these facts.

**ii) Erroneous exclusion of witness William Brandon Anderson and Lewis Tatum's testimony.**

Mr. Anderson, of the Hopkins County Sheriff's Office, testified *in camera* that he was

working on the night of the incident observed by Ms. Ball, February 26, 2000.  21 RR 37.

That night he responded to a call at Mrs. Ball's home.  21 RR 37.  Markie George was there

---

[52]   *See also* Exhibit 31.

and she was shaking and crying.  21 RR 38.  She said that she had been in a verbal argument

with Mr. Acker.  21 RR 38.  She said she was at "Bustin Loose" and left and during an

argument in the truck, she had attempted to exit the vehicle while it was driving down the

road, and Mr. Acker had grabbed her by the arm to keep her from getting out.  21 RR 39.

Mr. Lewis Tatum, also of the Hopkins County Sheriff's office, had been issued a

subpoena but was not called as a witness.  21 RR 41.  His testimony would have been the

same as Mr. Anderson's and the court ruled that it too would be excluded.  21 RR 41.

The defense offered this evidence and the Court sustained an objection to it.  21 RR

41. Again, the court excluded very probative testimony that the victim had attempted to jump

from the truck just a few weeks before her death. The exclusion of this testimony on hearsay

grounds was clearly erroneous, as the victim was no longer available, her utterances were

excited and spontaneous, and would have established prior consistent conduct.

**iii) Erroneous exclusion of the testimony of defense investigator John Riley Sands.**

This claim is exhausted as it was brought as Point of Error No. 5 on direct appeal.  Mr.

Sand, the defense investigator  testified *in camera* regarding driving times and distances and

also that he was not able to open the door from the driver's seat without extending himself

quite a bit so that he could still see above the dashboard.  21 RR 142.  He told the court that

he could not have opened the door and pushed someone out of the vehicle while driving on

the road.  21 RR 142.  An objection to this evidence was sustained.  21 RR 143.

The Director argues that this was properly excluded because Acker offered no

evidence "comparing the height, weight, arm length, strength, age, and physical condition of the investigator and appellant."  Answer at 47 citing *Acker v. State,* No 74,109 at 13-14. However, this ignores the fact that the defense had tried to do just that through a forensics expert.  The trial court had earlier denied funds for a defense forensic expert because they had this investigator, but then refused to let him testify as to these forensic matters.  As Mr. Ferguson testified at the trial court habeas hearing,  "we asked for a criminologist; we were told to use Mr. Sands.  We tried to use Mr. Sands, and we were unable to get that [the truck tests]  in."  HT 173.

The first test simply  involved driving times and distance, which could have been performed by anyone,  and the second a casual empirical observation about the width of the truck that could have been accurately conveyed by a lay witness, let alone a trained investigator.  Additionally, seemingly forgotten by the trial court and the Texas Court of Criminal Appeals was the fact that the prosecution had previously stipulated that Mr. Sands was a crime scene expert. 6 RR 19. As such, the ruling was erroneous and highly prejudicial.

**Claim II(f): The court erred in forcing petitioner to make a prejudicial and irrelevant demonstration in front of the jury.**

The trial court committed very serious prejudicial error in forcing petitioner to perform an utterly irrelevant and prejudicial demonstration that bore no relation to the facts of the case, the prior testimony, or the evidence in front of the jury. 22 RR 52-53.  The Director argues that this demonstration was proper, citing *Moore v. State,* 154 S.W.3d 703, 708-709 (Tex. App.-Fort Worth 2004).  Answer at 48.  However, in *Moore,* the defendant

was asked to show the jury how hard he shook a baby with the use of a doll.  Here however, the prosecutor  attempted to analogize hitting a table to shaking someone on a couch and forcing the defendant to demonstrate it when he said he could not.  The petitioner was being asked to perform a nonsensical task that did not relate to shaking.

Again, this incident should not be seen in isolation, but in comparison with the Court's extreme willingness to exclude any evidence favorable to the defense where the evidentiary foundations were far more solid.   Claim II(d), *supra*, discussed the court's exclusion of a highly probative and proper hypothetical cross-examination question of the medical examiner that was more fact-based than the prosecutor's table-banging spectacle.   No leeway was given despite the nature of the question as a hypothetical.  In Claim II(e), *supra,* we saw that the court went to great lengths to exclude statements that allegedly were not an "excited utterance" yet allowed statements from the very same conversation that were harmful to petitioner.  The table-banging demonstration should have been terminated immediately when Mr. Acker told the court that he was incapable of showing what was asked of him.   The table-hitting theatrics were clearly designed to inflame the prejudices of the jury who would not in all likelihood have been able to discern its total lack of evidentiary value.


**Claim II(g)**: **Trial court error in admitting prior extraneous offenses.**

The Director argues that this evidence was properly admitted under Texas law, citing *Winegarner v. State,* 235 S.W.3d 787 (Tex. Crim. App. 2007).  Answer at 49.  This case is

based on the proposition that if a witness makes "a blanket assertion of fact, and thereby leaves a false impression with respect to his prior behavior or the extent of his prior troubles with the law, he opens the door to his otherwise irrelevant past criminal history and opposing counsel may impeach him by exposing the falsehood." *Winegarner* at 790-791, cited at Answer at 49.

Here however, the prosecution went well beyond *Winegarner*'s limits. The prosecution asked Mr. Acker about his history of violence with past wives. 22 RR 91-92. It then proposed to offer Mr. Acker's 1990 arrest for family violence; two 1991 arrests for family violence and a 1992 arrest with his wife at the time, Susan Acker Terry. 22 RR 95. The prosecution admitted that "its very clear" that prior extraneous offenses are generally not admissible. 22 RR 95. But they claimed an exception to rebut a false impression that Mr. Acker had given the jury. 22 RR 96. The Court ruled that the prosecution could only "repair or correct a false impression but I don't think you can go much further than that." 22 RR 100. However, Mr. Acker's testimony was that he had never been formally charged, but he did admit to being arrested. 22 RR 98.

Mr. Acker was then asked whether, on December 24, 1990, more than ten years prior to the offense he was on trial for, he was charged with the offense of assault by his then-wife, Susan Acker. 22 RR 104. Mr. Acker did not recall the charge. He was also asked whether he was also charged with assault on May 5, 1991 against Susan Acker. 22 RR 104. Mr. Acker said he could not recall but he may have been sent to jail for it but was not found

guilty.  22 RR 104.  Mr. Acker admitted that he was charged on August 6, 1991 and August 7, 1992, with family violence/assault against Susan Acker.  22 RR 105.  He was in prison from October of 1992 to October of 1995 on a burglary charge.  22 RR 106.

Thus, these prior offenses were admitted and they were clearly beyond the agreed scope of their reception, which was to clear up a false impression or to impeach Mr. Acker. It also violated *Winegarner* and, more importantly for our purposes, was evidence of bias that deprived him of his right to a fair trial.

**Claim II(h)**: Trial court bias at jury deliberations.

The Director argues that there was no error in sending all the evidence to the jury, characterizing it as "Acker's suggestion."  Answer at 50.  This is not the claim. The defense did originally request that the exhibits be sent back to them and the prosecutor objected. 23 RR 31.  However,  despite the jury's later request for a photo, Defense Exhibit No. 1, the prosecution then baldly stated that the jury was actually asking only for the prosecution's video of the crime scene. 23 RR 32.  After more discussion, the Court was still eager to do the prosecution's bidding, despite it having no relation whatsoever to the jury's request: "How can we send in the video?"  23 RR 36.  The defense pointed out the obvious, that the jury "clearly did not ask for a video." 23 RR 36.  Once more, however, the Court stated "I'm going to send it all in." 23 RR 37.   Apparently, all of the exhibits were eventually sent in to the jury, with an instruction as to the photo. 23 RR 36-37.   This exchange, among many others, shows how the Court bent over backward to accommodate even the flimsiest of the

prosecution's interpretations of the evidence, even when they lacked any basis in fact or logic.  Petitioner was prejudiced because the jury was sent all the exhibits, not the only one they had requested,  a defense exhibit.


**Claim II(i): Trial error in denying adequate funding to the defense and refusing to appoint a criminologist.**

The Director argues that the defense had John Sands, the defense investigator and an accident reconstructionist, A. L. Pipkin and there was no error in refusing to appoint another expert.  Answer at 50. This argument misses the point of this claim. The defense tried to put Mr. Sands on for the results of his experiments, one as to driving times between locations and two, as to whether the driver could reach across the truck and open the door, both tests that should have been performed by a criminologist.  21 RR 137.  The court denied the offer to put Mr. Sands on, as it would be "putting facts in evidence that the jury doesn't have before it." 21 RR 139.[53]  The court also ruled that it would be irrelevant.  21 RR 140.  As to the second issue, that of reaching across the truck, Mr. Sands also performed tests on the truck. He obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that he was not able to open the door from the driver's seat without extending himself quite a bit so that he could still see above the dashboard.  21 RR 142.  He could not have opened the door and pushed someone out of the vehicle while driving on the road.  21 RR 142.  The prosecution

---

[53]   As any expert demonstration would have the effect of putting "new facts" in evidence, this statement was in essence nonsensical.

argued that as the defense had an accident reconstructionist, a Mr. Pickton,  appointed, and

that person could have tested the vehicle.  21 RR 143.  An objection to this evidence was

sustained.  21 RR 143.

Thus, by refusing to appoint a criminologist as the defense requested, and then

excluding the testimony that would have been offered by this criminologist, the court denied

Mr. Acker due process in stifling his case for actual innocence.


**Claim II(j):  Trial court error in excluding petitioner's testimony regarding the victim's past act in attempting to jump from the truck.**

The Director argues that there was no error in excluding the evidence of the victim's

prior attempts to jump from the truck.  Answer at 51.  To bolster this argument, the Director

points to Tex. R. Evid. 404(b) which provides that "evidence of other crimes, wrongs, or acts

is not admissible to prove the character of a person in order to show action in conformity

therewith."  Answer at 51.  The prior jumping was hardly a "crime" or a "wrong" and it was

not an "act...to prove the character of a person in order to show action in conformity

therewith."  It did not go to character as much as it went to evidence of her propensity to

jump.  Nor was its probative value outweighed by the danger of undue prejudice under Tex.

R. Evid. 403.  Answer at 51.  Much evidence of Mr. Acker's past actions was allowed in, but

when the court was confronted with more direct, relevant evidence of the victim's past, it

was excluded.   Here again, the defense was prevented from presenting any evidence as to

the victim's past propensities to jump from the truck.

-71-

**Claim II(k)**:  **Trial error in refusing to give an instruction that they must acquit if they believed the victim had jumped from the truck.**

The Director argues that there was no need to instruct on an "alibi defense" citing *Walters v. State,* 247 S.W.3d 204, 212 (Tex. Crim. App. 2007).  However, this instruction was not an alibi defense as it did not "merely negate[] an element of the offense that must be proven by the State..."  Answer at 52.

At the end of the guilt/innocence phase, the defense offered as Defendant's requested Instruction No. 1 the following:

> If you find from the evidence that the deceased,  Marquette Follis George, came to her death from an injury inflicted by her own action, jumping from a moving vehicle, or if you have a reasonable doubt thereof, you will acquit the defendant.
> 22 RR 112.

The Prosecutor objected to this instruction, stating "It's a comment on the evidence.  It's asking the jury to consider something that is not allowed by the law, accident.  There is included in the charge a charge on voluntariness, which is what the law of the State of Texas is regarding actions as far as accident.  There is no charge or no law of accident."  22 RR 112-113.  The court, without any discussion,  refused to grant Instruction No. 1.  22 RR 113.

This was erroneous because the so-called "charge on voluntariness" did not cover the accident situation and could have been misunderstood by the jury.  The voluntariness charge was as follows:

> You are instructed that a person commits an offense only if he voluntarily engages in conduct,  including  an  act,  omission,  or  possession.   Conduct  is  not  rendered involuntary merely because the person did not intend the results of his conduct.
> 4 CT 593.

Actually, this language did not cover the accidental death situation at all and only increased the chance that the jury misunderstood that Mr. Acker could  be convicted of capital murder for an accidental death.   The first sentence speaks only to "voluntary conduct", which could have been interpreted as the abduction of the victim.  Language in the charge immediately preceding the "charge on voluntariness" concentrated on the kidnaping, heightening this possibility.  The second sentence only made matters worse, as the jury could well have interpreted it to mean that even if Mr. Acker did not intend that the victim die, he was still responsible for capital murder.   The jury would have seen the death of the victim as the "results of his conduct" referred to in this sentence, thereby interpreting his "conduct" as voluntary.   There was nothing in the wording of this charge that would address an accidental death.

The likelihood of such an error was magnified because of an additional factor.  Prior language in the charge stated that:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it his (sic) conscious objective or desire to cause the result.
> The following definition of "intentionally or knowingly" applies to the portion of the application paragraph that requires you to determine whether the defendant was acting in the course of committing or attempting to commit the offense of kidnaping when he committed the murder of the complainant, if he did:
> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

-73-

4 CT 590.

The Director's argument fails to deal with these essentials.  Thus, the trial court erred in not giving the jury an explicit instruction that Mr. Acker was not guilty of capital murder if the victim jumped, as the defense had requested.  (4 CT 587).

**Claim II(l)**:   **Trial error in refusing to extract language in the guilt/innocence instruction that conflicted with the definition of intentional acts.**

Petitioner refers the court to his arguments at pages 127-128 of his petition.

**Claim II(m):  Trial error in refusing  the defense request for instruction on lesser included offenses.**

The Director argues that "Acker wholly fails to brief the basis for his claim that a lesser-included offense instruction on attempted kidnaping, unlawful restraint, or criminally negligent homicide was justified." Answer at 55.  Petitioner refers the court to his arguments at page 128 of his petition.   This claim is exhausted as it was brought as Point of Error No. 4 on direct appeal.

**Claim II(n):  Trial error in commenting on the evidence.**

The Director argues that the court's comment regarding the prosecutor's assertion that there were acceleration marks at the scene of the accident were a "reasonable deduction" was not impermissible and did not prejudice petitioner.  Answer at 56-57.   But by this comment, the court characterized the prosecution's theory as a  "reasonable deduction" and hence put its seal of approval on the prosecution's argument.  This would have had great influence on the jury, as they could well have taken it to mean that they were bound to accept the

-74-

prosecution's argument that Mr. Acker placed the victim beneath the truck and that the marks were acceleration marks.

**Claim II(o): Trial court error in limiting mitigating evidence.**

The Director argues that "the trial court did not preclude Acker from presenting evidence concerning the nature of his relationship with hi sister...his sexual abuse...[and] the court simply sustained the prosecutor's objection to the hearsay statements contained in the testimony of Acker's mother concerning abuse."  Answer at 58-59.

However, the U.S. Supreme Court has held, in *Green v. Georgia*, 442 U.S. 95 (1979), that the exclusion of hearsay evidence relevant to the issue of punishment in a state sentencing proceeding, resulting in the imposition of the death penalty, was violative of due process.  *See also Chambers v. Mississippi*, 410 U.S. 284 (1973).  This evidence was clearly mitigating.  Nevertheless, the jury that sentenced Mr. Acker to death was precluded from giving mitigating effect to this evidence by the trial court's mechanistic application of the hearsay rule in violation of *Green.*  This preclusion violated Mr. Acker's rights under the Sixth, Eighth and Fourteenth Amendments to the U. S. Constitution. *See Penry v. Lynaugh*, 492 U.S. 302 (1989);  *Franklin v. Lynaugh*, 487 U.S. 164 (1988).

**Claim II(p): Trial error in forcing disclosure of privileged attorney-client information.**

The Director argues (in Section X C, that "[n]othing in *Ake* [*v. Oklahoma*] requires complete confidentiality of expert witnesses appointed to indigent defendants."  Answer at 100.

This is incorrect.  When counsel requests the assistance of an expert under *Ake v. Oklahoma,* 470 U.S. 68 (1985), he does not lose his "opportunity to prepare the defense in secret." *Brooks v. State,* 385 S.E.2d 81, 84 (Ga. 1989)(citing *Ake*).  An indigent defendant has a constitutional right to file his *Ake* motion *ex parte*, exclude the prosecutor from a hearing on the motion and seal that part of the record in case it is needed for an appeal[54] because it would thwart the Supreme Court's attempt to give him equality with his wealthier counterparts if he had to disclose any facts or work product to the state in order to obtain a basic tool that he needs for his defense. *McGregor v. State,* 733 P.2d 416 (Okla. Crim. App. 1987).

Art. 26.052(f) V.A.C.C.P. may also give the indigent defendant the right to seek the assistance of an expert in an *ex parte* proceeding.  The statute allows counsel to make an *ex parte* application for "advance payment to investigate potential defenses" by making a particularized showing of need.  If the application is denied, the court must state the reasons in writing and seal all of the records pertaining to it for appellate review.

The confidentiality of an *Ake* expert is not just limited to the application and appointment process.  An *Ake v. Oklahoma* expert's work product and communications with the defendant and his attorney are covered by the same rules of confidentiality that apply to an expert who was retained with the defendant's own money. *Smith v. McCormick,* 914 F.2d

---

[54]    *See Ake, supra,* 470 U.S. at 82; *Brooks v. State,* 385 S.E.2d 81 (Ga. 1989); *State v. Poulson*, 726 P.2d 416 (Okla. Crim. App. 1987); *State v. Hickey,* 346 S.E.2d 646, 654 (N.C. 1986); *Wall v. State,* 715 S.W.2d 208, 209 (Ark. 1986).

1153, 1158-59 (9th Cir. 1990).  In Texas, an *Ake* expert is considered to be an agent of

counsel.  *DeFreece v. State,* 848 S.W.2d 150, 161 n.8 (Tex. Crim. App. 1993).  This means

that counsel can invoke the attorney-client privilege and the work-product doctrine to keep

the expert's opinions, report, notes and mental impressions secret unless he waives the right

to do so. *Taylor v. State*, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996); *DeFreece v. State,*

848 S.W.2d at 161 n.8; *see also Burnett v. State,* 642 S.W.2d 765, 769 (Tex. Crim. App.

1982) (attorney-client privilege applies to defendant's statements to hypnotist who was

retained to assist counsel); *Ballew v. State,* 640 S.W.2d 237 (Tex. Crim. App. 1980) (on

rehearing) (attorney-client privilege applies to report of defense psychiatrist who was

retained to assist counsel).  The test for a waiver of the work product doctrine in Texas is

stricter than in any other jurisdiction.  If the expert takes the stand, his work product remains

confidential unless: 1) the expert's opinion was based on the work product; 2) the expert used

the work product to prepare his testimony or refresh his memory on the stand; or 3) the

expert's work product was used in some manner before the jury. *Skinner v. State,* 956 S.W.2d

532, 539 (Tex. Crim. App. 1997). The defense expert can still be cross-examined about any

document that he used to form his opinion, prepare his testimony or refresh his memory on

the stand,[55] but his report to counsel and written communications to counsel are confidential

---

[55]   *Ballew v. State,* 640 S.W.2d at 242-44 (on rehearing) (when defense expert completes his testimony on direct examination, prosecutor is entitled to any document that he used to prepare his testimony or refresh his recollection on the stand); Tex. R. Crim. Evid. 705(a) (expert must answer questions on cross-examination about any underlying facts or data that he relied upon to form his opinion).

work product even if they contain opinions that directly contradict his testimony. *Skinner v. State,* 956 S.W.2d at 538.[56]  The prosecutor cannot call an *Ake* expert to testify for the state because he is an agent of counsel.  *See DeFreece v. State,* 848 S.W.2d at 159 (*Ake* gives counsel the option of deciding whether to offer his own expert's "diagnosis at trial *if it is favorable to the defense)* (emphasis added).  .

If Mr. Acker had the funds to hire a private expert, these disclosures would not have been made, and it was error for the court to go as far as it did before cutting off the inquiry, the sole purpose of which was to generate speculation as to why this defense expert did not testify.

### Claim II(q): Trial court error in appointing ineffective appellate and post-conviction attorneys.

The Director argues that "Acker contends that the trial court deliberately appointed two incompetent attorneys to represent him on direct appeal" and that this "baseless allegation is totally unsupported by the record."  Answer at 59-60.   Petitioner does not contend this and he has not used the word "deliberately" in this claim.  He does contend that the end result of these appointments, whether intentional or non-intentional, operated to insulate the court from scrutiny of the numerous trial errors and the chances of a reversal were minimized to virtually nothing. The trial court's motives cannot be shown or proven

---

[56]   Of course, the prosecutor can question a defense expert about a subject that the expert discussed in his report to counsel as long as the expert's report and communications with counsel remain confidential.

and hence should not and are not imputed, but the end result of these appointments was disastrously prejudicial for Mr. Acker.

**Claim II(r): Cumulative trial error.**

The Director argues that there is no cumulative error because there was no individual error.  Answer at 61. Here again, the claim is treated as individual instances of trial error rather than a cumulative claim of trial court bias that deprived Mr. Acker of a fair trial.  Even if no single one of these many errors deprived Mr. Acker of a fair trial, their cumulative impact was devastating.  His only defense was completely removed from the table, his expert evidence was disallowed, and virtually every crucial evidentiary ruling went against the defense.  The bias of the trial judge and its rulings deprived Mr. Acker of his constitutional rights to due process and a fair trial.


**CLAIM III: THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION FOR A CHANGE OF VENUE AND DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR TRIAL.**

Facts and argument relating to this claim are at pages 137 to 143 of Mr. Acker's petition. The Director argues that this claim is procedurally barred as it was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ.  (Answer at 62.)  For the reasons stated *supra,* procedural default is not applicable to any of Petitioner's claims.  In addition, as this was a record-based claim, any failure to bring it earlier is due to ineffective assistance of appellate counsel. (Claim VII herein.)

As to the merits of the claim, the Director claims that the facts presented at the hearing on the change of venue motion do not establish that Petitioner was denied a fair trial by the Court's refusal to grant the motion.  (Answer at 63-68.)

The Director's argument downplays or ignores several important facts revealed at that hearing. The change of venue motion was heard by the trial court on September 13, 2000. 3 RR 2.[57]  The defense called **Neva Shook,** a local resident, who testified that she did not feel that Mr. Acker could have a fair trial in Hopkins County, because the newspaper stories rehashed the autopsy reports to make it appear as if Mr. Acker was guilty.  3 RR 43, 48. People in the town had "already sentenced him." 3 RR 44.  She thought it would be hard to find people in the county who had not heard about the case.  3 RR 56. [58]  **Cecil Dodd,** a resident of Hopkins County since 1959, and a teacher in the Sulphur Springs school system and a pastor, testified similarly that it would be difficult to find jurors in the county who could be fair and impartial.  3 RR 59.[59]  Based on what he had heard at different locales in the county, including a restaurant, the barber shop and a church, he felt that it would be hard to find an impartial jury in the county.  3 RR 72.  Various members of his church had also signed affidavits stating that they believed Mr. Acker could not have a fair trial in Hopkins County. 3 RR 65.  Although Mr. Dodd could set aside what he had read in the paper and

---

[57]  *See* Exhibit 18, Motion for Change of Venue.

[58]  *See* Exhibit 18 for her affidavit in support.

[59]  *Id.*

heard on the local media, he felt that it might not be easy to find others in the community who could do likewise.  3 RR 69.

**Nathaniel Dodd,** a resident of Kilgore who grew up in Sulphur Springs, testified he had seen about three newspaper articles on the case and he felt that Mr Acker could not have a fair trial in Hopkins County.  3 RR 74-75. On one occasion he had heard people talking as if Mr. Acker had already been found guilty.  3 RR 77.  There were recent murders in Longview that were on peoples' minds.  3 RR 79.   Mr. Dodd talked to people who had made up their mind about the case and believed Mr. Acker was guilty.  3 RR 85.[60]

**Dorcas Dodd,** Mr. Acker's sister, testified that she lived in Sulphur Springs and she too believed that he could not have a fair trial in the county. 3 RR 93.[61]  She had also talked to other people about the case who had already made up their minds.  3 RR 94. The newspaper articles also made it appear as if Mr. Acker was guilty.  3 RR 100.

The State called no witnesses.  3 RR 102.  Yet the court denied the motion for change of venue without citing any reasons for so doing and without any countervailing evidence by the State.  3 RR 102.

The Director's argument is a lengthy summary of this hearing. (Answer at 63-68.) But that summary and the argument ignores that fact that at voir dire, the court questioned the prospective jurors about how many had heard of the case, and the court observed, "quite a

---

[60]  *Id.*

[61]  *Id.*

few of you have." 7 RR 139.  "Quite a few people" on the panel knew the district attorney and the defense attorney 7 RR 145-150.  Many of the prospective jurors also knew family members of the defendant and the accused.  7 RR 150-160.  This information, direct from the jury pool from which Mr. Acker's jury was chosen, actually confirmed the widespread knowledge of the case in the community.

*Bridges v. State of California,* 314 U.S. 252, 271 (1941) held that a defendant is entitled to a fair trial "in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Id.*  In *Estes v. State of Texas,* 381 U.S. 532 (1965), the Supreme Court set aside a conviction despite the absence of any showing of prejudice.  As the Court said in *Estes:*

> [i]t is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused.  Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process. *Id.,* at 542-43.

The procedure in question in *Estes,* as in Mr. Acker's case, was the denial of a change of venue "to a locale away from where the publicity originated..." *Sheppard,* at 352-53.

The Director argues at length that the circumstances in Mr. Acker's case do not approach those of the leading case of *Rideau v. Louisiana*, 373 U.S. 723 (1963) which dealt with the trial court's refusal to grant a change of venue motion.  (Answer at 63-68.)  But in *Rideau,* there was a single broadcast of a videotaped confession.  The Supreme Court held that, "for anyone who has ever watched television the conclusion cannot be avoided that this

spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was

Rideau's trial...Any subsequent court proceedings in a community so pervasively exposed

to such a spectacle could be but a hollow formality." *Rideau,* at 726.  Due process of law,

the Court held, "required a trial before a jury drawn from a community of people who had

not seen and  heard" [the interview].  *Id.* at 727, and this same due process, "preserved for

all by our Constitution, commands that no such practice as that disclosed by this record shall

send any accused to his death."  *Rideau, id.,* quoting *Chambers v. Florida,* 309 U.S. 227

(1940).

Normally, a showing of either actual or inherent prejudice is required in order to

prevail on a claim of denial of a fair trial.  *Holbrook v. Flynn,* 475 U.S. 560 (1986); *Irvin v.

Dowd,* 366 U.S. 717 (1961); *Woods v. Dugger,* 923 F.2d 1454, 1457 (11th Cir. 1991).  The

test for inherent prejudice is "not whether jurors actually articulated a consciousness of some

prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible

factors coming into play.'" *Holbrook v. Flynn,* 475 U.S. at 570, quoting *Estelle v. Williams,*

425 U.S. 501 (1976).

As argued in his petition, the record in Mr. Acker's case shows that the relevant

community, the small town of Sulphur Springs and Hopkins County, had seen highly

prejudicial and inflammatory publicity that assumed his guilt and served to create a hostile

atmosphere in which a fair trial was impossible.  Thus, "prejudice is presumed, and there is

no further duty to establish bias."  *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980).

The Director's argument fails to note that the prosecution presented absolutely no evidence at all to rebut the presumption of unfairness created by the defense's presentation at the hearing on the motion.  Nor did they even deign to argue their position.  As such, the defense's evidence was uncontroverted and the trial court erred in denying the motion.

Thus, even if a showing of bias were required in Mr. Acker's case, he can meet that burden.


## CLAIM  IV: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PRE-TRIAL PORTION OF THE PROCEEDINGS.

Facts and argument relating to this claim can be found at pages 143 to 167 of Mr. Acker's petition. The Director asserts that this claim is :procedurally barred as a result of the state court's decision to dismiss these claims as an abuse of the writ." (Answer at 68.)  For the reasons discussed *infra,* procedural default is not appropriate as to any of petitioner's claims.

### Claim IV(a): Ineffective assistance of counsel for failure to challenge biased grand jury proceedings.

The Director asserts that this claim "is conclusory and should be summarily dismissed by the Court."  (Answer at 70.)  Petitioner pointed out that a  member of  the grand jury that indicted petitioner, Carol Henderson, was related by marriage to the victim Ms. Markie George, as the prosecutor himself admitted. 2 RR 43.  Additionally, the foreman of the grand jury, Clayton McGraw,  was a friend of the victim. HT 71-72.  While admittedly Petitioner

can point to no specific harm, these facts would have been a basis for defense counsel to challenge the grand jury.

**Claim IV(b): Ineffective assistance of counsel for failure to complete DNA testing prior to trial.**

The Director likewise argues that this sub-claim is "conclusory" and that a Sixth Amendment violation has not been shown. (Answer at 74-76.)

On the first day of trial, March 26, 2001, the defense requested a continuance based on the fact that there were fingernail clippings that had not been tested by their DNA expert. 19 RR2. The DNA expert had been provided a month prior, but the defense failed to request additional testing. 19 RR 3. The motion for a continuance was denied. *Id.* When given the opportunity to make a bill of exception, they did not, and hence waived the issue. 19 RR 4. The Director asserts that "Acker could potentially argue that had the tests been conducted and no DNA evidence found, counsel would have had a stronger argument." (Answer at 75.) This is true. However, the claim involves ineffective assistance of counsel for failing to ask for the further testing.

**Claim IV(c)**: **Failure to properly investigate and prepare defense witnesses**.

The Director argues that the witnesses were properly prepared, as "the record reveals that counsel presented, or attempted to present, much of the mitigating evidence contained in those affidavits at trial." (Answer at 76.)

However, not presented at trial was the following:

1) Ms. Acker's testimony that "I would have certainly said that Daniel would not be

a future threat to society, as Daniel has always been a very loving wonderful son, and brother to his sisters, and loved animals very much."[62]

2) Testimony from Mrs. Acker regarding Petitioner's father.  Ms. Acker could have related personally that petitioner's mother divorced his father when he was six years old and his father never financially supported his son or the family; that petitioner's father was physically abusive to petitioner and had broken his jaw on one occasion; that due to the sexual abuse, petitioner spent 69 days at the Glen oaks Hospital for panic attacks and other problems; and that petitioner had a history of sleepwalking, one instance of which landed him in trouble.[63]

3) Sherry Walker states that she could have testified that Petitioner's father was the town drunk; that he was abusive to petitioner and once broke his jaw; that petitioner's mother and father divorced when he was six and his father never supported the family financially; that they were a very close-knit religious family; that Daniel was sexually molested and as a result had some mental problems, such as sleep walking and panic attacks; that petitioner was kind to animals; that the victim Markie George had attempted to jump out of moving vehicles in the past when she became upset; and that the victim used drugs and alcohol.[64]

4) Dorcas Vittatoe, petitioner's sister, could have provided much positive character

---

[62]   Exhibit 22, declaration of Nancy Acker.

[63]   *Id.*

[64]   Exhibit 23, declaration of Sherry Walker.

-86-

evidence and told the jury that he would not have been a future threat to society.[65]

All of this evidence, taken as a whole, would certainly have changed the picture of Mr. Acker for the jury.

## CLAIM V: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT/INNOCENCE PORTION OF THE TRIAL.

Facts and argument as to this claim are at pages 167 to 172 of Mr. Acker's petition. Petitioner also incorporates by reference the legal analysis of ineffective assistance of counsel claims, presented *supra* in Claim IV.

The Director first argues that this claim is procedurally barred because it was dismissed by the state court on independent and adequate state grounds." Answer at 78. As shown *supra,* procedural default is not appropriate for any of Mr. Acker's claims and the statute under which they were dismissed is not "adequate and independent."

## Claim V(a): Trial counsel rendered ineffective assistance of counsel in failing to effectively present petitioner's case for actual innocence through expert testimony.

The Director argues that counsel's decision was "a sound strategic choice that does not support a finding of deficient performance." Answer at 79. To develop this argument, the Director points to the testimony of counsel at the state habeas hearing which purportedly shows that "he decided against presenting these witnesses because their opinions were more consistent with the State's case than with Acker's version of events." Answer at 79-80.

---

[65] Exhibit 24, declaration of Dorcas Vittatoe.

While trial counsel Mr. McDowell did state at the habeas hearing that he did not call Dr.

Norton because he felt her findings were not helpful (HT 210-211), the actual reason for her

not testifying was that the prosecution attempted to thwart the defense's case when they

issued subpoenas for all the defense's witnesses.  This was actually what caused Dr. Norton

to back out of the case, as she would have been required to sit throughout the trial. *See, e.g.,*

HT 37-38, 50, 213.  In any case, regardless of the cause of this failure regarding Dr. Norton,

the defense had an obligation to at least present some expert medial evidence to discredit the

State's case.

### ii) Ineffective assistance for failure to present an accident reconstructionist.

Here too, the Director argues that the accident reconstructionist, Mr. Pipkin, did not

testify because his opinions tended to support the State, pointing to the habeas hearing

testimony of trial counsel.  Answer at 79-80.  However, trial counsel testified that he did not

call the accident reconstructionist at trial because his conclusion was that the front tire ran

over her head. HT 210.  Here too, all defense witnesses were issued subpoenas by the State,

so it is possible that he too was "scared off" by this tactic, although the record does not

indicate the reason for the failure of either of these witnesses to testify.

There was also unpresented evidence from Mr. Sands who performed tests on the

truck.  He obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that

he was not able to open the door from the driver's seat without extending himself quite a bit

so that he could still see above the dashboard.  21 RR 142.  He could not have opened the

-88-

door and pushed someone out of the vehicle while driving on the road.  21 RR 142.  An

objection to this evidence was sustained.  21 RR 143.  But, seemingly forgotten by the trial

court and defense counsel, was the fact that the prosecution had previously stipulated that

Mr. Sands was a crime scene expert. 6 RR 19. The trial court had earlier denied funds for a

defense forensic expert because they had this investigator, but then refused to let him testify

as to these forensic matters.  The defense was doubly ineffective: for failing to have this

testimony presented by their appointed expert and for failing to point out that the prosecution

had previously stipulated that Mr. Sands was a crime scene expert.  Had that stipulation been

noted, the court would hardly have been in a position to rule out this evidence.


**Claim V(b)**: **Ineffective assistance of counsel for overreaching and labeling an exhibit a "lie."**

The Director argues that "Acker offers no authority supporting his assertion that

counsel's conduct was deficient."  Answer at 81.  Standing alone, this claim does not show

deficient performance, but it does not stand alone, but in conjunction with the other claims

of defense counsel ineffectiveness at the guilt/innocence phase of the trial.

**Claim V(c)**: **Ineffective assistance of counsel for introducing prejudicial evidence**.

The Director argues that the photographs were actually helpful to the defense.

Answer at 82.  While this is partially true, many of these photographs were also relied upon

by the prosecution to prove their case.  *E.g.*, 20 RR 129, Defendant's Exhibit 4 through 9,

offered and Defendant's 4 used to show where the hair was found (20 RR 86); Defendant's

6 and 7 used by the prosecutor to show where they found the blood stain in the seat back (20

RR 87); Defendant's 9, used by the prosecutor to show liquid spill in the truck (20 RR 87-

88); Defendant's Exhibit  3, (20 RR 129) used to show location of the blood spot.

**Claim V(d): Ineffective assistance of counsel for failing to object  to the testimony by Tony Hurley.**

The Director argues that "[w]hile an objection might have been technically correct,

it might also have seemed trivial to both the judge and the jury in light of the fact that there

could be little question that the spot was blood."  Answer at 83.  However, the testimony

regarding the "blood" spot north of the body prejudiced petitioner because the tire tracks

were in line with this spot, which could have been inferred to support the persecution's

theory.

**Claim V(e): Ineffective assistance of counsel at argument for contradicting his client's version of events.**

The Director argues that "[t]here was absolutely no testimony at trial from Acker, or

anyone else, that Markie was hit by the car door as she exited the vehicle."  Answer at 84-85.

However, this is not relevant to the claim. The State forensic expert David Spence testified

that when  a victim has made impact with a vehicle, sometimes there are paint chip residue

and other times there are not. 20 RR 159.  Defense counsel Mr. McDowell verified this on

cross-examination: "Q. [by Mr. McDowell] You don't always have paint chips transfer to

clothing, is that right?   A.   That is correct, yes." *Id.*   Yet at final arguments in the

guilt/innocence phase, the same counsel Mr. McDowell argued as follows:

You may hear after the D.A. the gets (sic) back up...that the car hit her.  How do we know that the car didn't hit her?  The forensic man came and said they took samples of the paint of the vehicle.  And then they inspected her clothes microscopically and they found no paint chips from the truck.  The truck did not hit her.  There would have been paint transfer.
23 RR 12.

This seriously undermined the defendant's testimony and his case.   First, it contradicted the State's expert who said exactly the opposite, that the victim could well have been hit by the door without any paint chips adhering to her clothing.  Secondly, Mr. Acker's testimony regarding the victim jumping from the truck would have been fully consistent with her being hit by the door when she jumped, as the truck was going at a relatively fast speed, around forty miles an hour.  Defense counsel thus undermined his own case by failing to have his facts straight.

## CLAIM VI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF THE TRIAL.

Facts and argument as to this claim are at pages 173 to 181 of Mr. Acker's petition. Petitioner herein incorporates by reference the legal analysis of ineffective assistance of counsel claims, presented *supra* in Claim IV.  The Director initially argues that "this claim is defaulted here because the Court of Criminal Appeals dismissed it as an abuse of the writ." Answer at 85.  As shown *supra,* procedural default is not appropriate for any of Mr. Acker's claims and the statute under which they were dismissed is not "adequate and independent."

**Claim VI(a): Ineffective assistance for failure to present mitigating evidence.**

The Director argues that '[t]he record reveals that counsel was aware of, and presented—or attempted to present—a vast majority of the evidence Acker claims counsel failed to put before the jury."  Answer at 87.

However, not presented at trial was the following:

1)  Ms. Acker's testimony that "I would have certainly said that Daniel would not be a future threat to society, as Daniel has always been a very loving wonderful son, and brother to his sisters, and loved animals very much."[66]

2) Testimony from Mrs. Acker regarding Petitioner's father.  Ms. Acker could have related personally that petitioner's mother divorced his father when he was six years old and his father never financially supported his son or the family; that petitioner's father was physically abusive to petitioner and had broken his jaw on one occasion; that due to the sexual abuse, petitioner spent 69 days at the Glen oaks Hospital for panic attacks and other problems; and that petitioner had a history of sleepwalking, one instance of which landed him in trouble.[67]

3)  Sherry Walker states that she could have testified that Petitioner's father was the town drunk; that he was abusive to petitioner and once broke his jaw; that petitioner's mother and father divorced when he was six and his father never supported the family financially;

---

[66]   Exhibit 22, declaration of Nancy Acker.

[67]   *Id.*

that they were a very close-knit religious family; that Daniel was sexually molested and as a result had some mental problems, such as sleep walking and panic attacks; that petitioner was kind to animals; that the victim Markie George had attempted to jump out of moving vehicles in the past when she became upset; and that the victim used drugs and alcohol.[68]

4) Dorcas Vittatoe, petitioner's sister, could have provided much positive character evidence and told the jury that he would not have been a future threat to society.[69]

All of this evidence, taken as a whole, would certainly have changed the picture of Mr. Acker for the jury.

## Claim VI(b): Ineffective assistance regarding the future dangerousness special issue.

The Director argues that "Acker essentially claims that counsel should have anticipated that the trial court rule portions of Dr. Cicerello's testimony inadmissible...there is no indication in the record before this Court that either counsel or Dr. Cicarello could have anticipated the trial court's ruling or were unreasonable for relying upon the studied (sic) challenged by the prosecutor."  Answer at 87.  Here, the problem was with the witness's reliance only on general base rates for predictions of future violence, which were ultimately ruled inadmissible.   While the Director sees this as unpredictable, had defense counsel at least tried to tie in the specifics of Mr. Acker's mitigating evidence, as discussed in Claim

---

[68]   Exhibit 23, declaration of Sherry Walker.

[69]   Exhibit 24, declaration of Dorcas Vittatoe.

VI(a) *supra,* to the issue of future dangerousness, they would have had a good chance of a

having the evidence admitted and of a different result at the punishment phase.

As to prejudice, while the Director characterizes the evidence to prove future

dangerousness as "very damaging" (Answer at 88), it was actually quite weak.  It consisted

only of four law enforcement officers in the Hopkins County area who briefly stated that

petitioner's reputation as a peaceful and law-abiding citizen was "bad", two ex-wives who

testified that petitioner had been violent with them, and contraband being found in his cell.

In comparison with other capital cases, this was not an overwhelming showing of future

dangerousness. Thus it cannot be said that the error in failing to present this testimony was

harmless. Mr. Acker was prejudiced as a result.

### <u>Claim VI(c)</u>: Ineffective assistance for failure to present evidence of petitioner's low intelligence.

The Director argues that this evidence would have been "double-edged."  Answer at

89.   However, it is difficult to see the downside to presenting this evidence and it is hard to

see how it can be termed as "double-edged."  More importantly, the Director does not point

to any strategic evaluation and consideration of this evidence by trial counsel upon which

they based their determination that it was "double-edged."

Counsel has a duty to make a reasonable investigation into available mitigating

evidence or to make a reasonable decision that makes particular investigations unnecessary.

*Williams v. Cain,* 125 F.3d 269, 277 (5th Cir. 1997).  Once counsel becomes aware of the

possible existence of potentially mitigating evidence, they are obligated to conduct an

independent investigation, beyond merely communicating with their client.  *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997), *cert. denied,* 118 S. Ct. 361 (1997).[70]  An attorney's strategic choices are held to be reasonable only if they are based on a thorough investigation of the relevant facts and the law.  *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 361 (1997).  Thus, for the mitigating evidence to be rejected as "double-edged" there must be both an investigation and analysis of that evidence by the defense attorneys.

Even if that strategic decision had been done, it is hard to see it as reasonable given the nature of the evidence.  Here, there were multiple record available indicating that petitioner is borderline mentally retarded.  Petitioner dropped out of school in 1987, in the ninth grade, at the age of 16, after receiving poor grades.[71]  In 1987, petitioner was sent to Glen Oaks Hospital for a psychiatric evaluation as a result of an incident when he was sleep walking and went to a neighbor's house and dragged a women out of her house.[72]   In a January 30, 1987 "Confidential Report" by Dr. Steven E. Ball, Ph.D., at Glen Oaks Hospital, Mr. Acker's full scale IQ is measured at 79.[73]  In Dr. Cicerello's "Psychological Evaluation

---

[70] *See also Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983), *cert. denied*, 467 U.S. 1220 (1984) (unless counsel undertakes "a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived," he cannot provide effective assistance).

[71] Exhibit 31, selected school records of petitioner, showing withdrawal from school in the ninth grade.

[72] *See* Exhibit 27, Glen Oaks Hospital records.

[73] *Id.*

and Risk Assessment" of March 16, 2001, at page 7, his intellectual functioning is estimated to be in "the borderline range...His ability to abstract and engage in problem solving falls in the low average range, while his verbal skills fall in the moderately impaired range."[74]   A Texas Department of Criminal Justice "Case Summary" report, with an interview date of May 12, 1993, indicates that Mr. Acker's IQ is 80.[75]   The Director has not shown any "downside" to presenting this evidence.  Thus, it cannot fairly be termed as "double-edged."

**Claim VI(d):** **Ineffective assistance for failure to present petitioner's history of drug and alcohol abuse.**

The Director argues that counsel adequately presented Acker's history of substance and alcohol abuse.  Answer at 90-91.  However, the Director points mainly to counsel's arguments regarding Markie's intoxication.  Answer at 90-91, citing 23 RR 13, 23 RR 148. Of course, argument is not evidence.   Testimony from Acker's sister (Answer at 91) was not as effective as the actual records, which show  that Mr. Acker had long-standing problems with alcohol and drug addiction.[76]   Markie too had problems with alcohol addiction.  However, this evidence was never effectively presented at trial. This would also have been useful at the guilt/innocence phase, in terms of diminished capacity on the part of

---

[74]   Exhibit 28 at 7.

[75]   Exhibit 29 at 1.

[76]   *See* Exhibit 27 (Glen Oaks Hospital records); Exhibit 28 (Dr. Cicerello's evaluation); Exhibit 29 (TDCJ records, at 3)("Subject admits to inhaling and smoking cocaine at age 20 until present incarceration.  Subject admits to inhaling and smoking an unknown amount of powder and rock cocaine daily.  Subject admits to being addicted to cocaine at age 20.  Subject admits to supporting his drug habits through employment." Acker also admitted spending over  $100 per week on cocaine (at 6)).

Mr. Acker and a propensity on the part of Markie to jump if she was still under the influence of alcohol.  Although the Director argues that "diminished capacity does not amount to a defense to the commission of a crime under Texas law" (Answer at 90), because the victim's level of alcohol was detectable and relatively high even the next morning, long after she had stopped drinking,[77] this would have gone a long way toward explaining her impulsive jump from the truck.

The Director also argues that the evidence was "double-edged" (Answer at 91-92) but, as with the prior sub-claim, there is no evidence that trial counsel considered and evaluated it and made a strategic decision to exclude it as such.  They were in no position to term it "double-edged" without such an evaluation.

**Claim VI(e): Ineffective assistance at penalty phase argument**.

The Director argues the argument was "adequate."  Answer at 92.  But, strikingly, it is less than three pages of transcript, probably less than three minutes in length. 23 RR 147-150.  All of the Director's cites to the argument are from those three pages.  Answer at 92-93, citing 23 RR 147-150. An examination of this strikingly short argument shows it was sketchy on the facts, and was basically a plea for mercy.  23 RR 147-150.  The jury would have concluded that if that was all that could be said for Mr. Acker,  that death was the proper penalty.  In a capital case, a three-minute argument is shockingly inadequate per se.

---

[77]   Exhibit 32 at 7 (blood alcohol .04% ethanol; vitreous, .07% ethanol)

## CLAIM VII: APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.

Facts and argument relating to this claim are at pages 181 to 188 of Mr. Acker's petition. The Director argues that this claim is defaulted here because it was "dismissed by the state court on independent and adequate state procedural grounds." Answer at 93. As shown *supra,* procedural default is not appropriate for any of Mr. Acker's claims and the statute under which they were dismissed is not "adequate and independent."

Basically, the Director characterizes an appeal brief that consisted of four-and-a-half pages of argument as adequate. Answer at 93-94.[78] The dismaying details of that brief are given in Mr. Acker's petition and need not be repeated here.[79] The Texas Court of Criminal Appeals held that the issues were inadequately briefed, including Point of Error No. 6, a long list of numbers which purport to be places in the transcript where error occurred, without any details of what the error might have been.[80]

Although the Director argues that "Acker maintains that his appellate attorney was ineffective because he failed to assert on direct appeal the claims raised here in his federal petition" and some of the claims raised here are not record-based. (Answer at 94)  But Acker has limited this claim only to the record-based claims. Petition at 185. The record based claims not involving ineffective assistance of counsel are: 2, 3, 9, 10, 11, 12, 13, 14,

---

[78]  The brief is Exhibit 6.

[79]  Petition at 181-184.

[80]  Exhibit 8.

15. The facts and argument relating to these claims are incorporated herein. These omissions

are the  prejudice suffered by petitioner.


**CLAIM VIII:**  **MR. ACKER  WAS DENIED MEANINGFUL ACCESS TO THE COURTS AND DUE PROCESS OF LAW IN STATE POST-CONVICTION PROCEEDINGS BY THE APPOINTMENT OF INEFFECTIVE STATE POST-CONVICTION COUNSEL.**

Facts and argument as to this claim are to be found at pages 188 to 222 of Mr. Acker's

federal petition.  In his answer, the Director contends that this claim is foreclosed by the Fifth

Circuit's decision in *Martinez v. Johnson,* 255 F.3d 229  at 245 n.22 (5th Cir. 2001).  Answer

at 95-96.  However, Acker's claim is distinguishable from the one in *Martinez,* as was

pointed out in the petition.  In *Martinez,* the petitioner

> has not provided this court with any argument regarding why the due process
> argument rests on anything other than the incompetence of [the attorney] during state
> post-conviction proceedings.  Because  there is no other constitutional violation to
> accompany this claim, it is foreclosed by § 2254(I)....In similar fashion, because we
> interpret Martinez's argument that he has been denied meaningful access to the courts
> under the First and Fourteenth Amendments as a claim grounded solely in his
> ineffective assistance of state habeas counsel, § 2254(I) bars relief.
> *Martinez,* 255 F.3d at 245 n.22 (quoted in the Director's Answer at 95-96).

However, Mr. Acker's claim is based on more than just ineffective assistance of state

habeas counsel:

**1) The "miscarriage of justice" exception to procedural default**.

First, Mr. Acker relies not only on the "cause and prejudice" exception, as in

*Martinez,*  but also on the "miscarriage of justice" exception.  Should this Court find that

Acker has failed to establish "cause and prejudice" to excuse any procedural default, this Court may nonetheless consider the merits of any defaulted claims if failure to do so would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  As with cause and prejudice, the Supreme Court has not defined precisely what constitutes a fundamental miscarriage of justice.  At the very least, the incarceration of one who is actually innocent of the crime for which he was committed would constitute a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995).  Thus, a petitioner who shows that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt absent the constitutional violation demonstrates a fundamental miscarriage of justice sufficient to overcome a procedural default.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  Mr. Acker has made such a showing here.

As discussed *supra,* the "miscarriage of justice" exception for actual innocence has been given  additional meaning in light of *In re Troy Anthony Davis,* 130 S. Ct. 1 (2009). A concurring opinion by Justice Stephens, joined by Justices Ginsberg and Breyer, states that "[t]he substantial risk of putting an innocent man to death clearly provides an adequate justification for holding an evidentiary hearing;" AEDPA standards might not apply to actual innocence claims; and denial of a meritorious actual innocence claim might be unreasonable within the meaning of AEDPA because "decisions of this Court clearly support the proposition that it 'would be an atrocious violation of our Constitution and the principles upon which it is based' to execute an innocent person." (quoting 11th Circuit dissent).

**2) The Texas Court of Criminal Appeals has clarified the standards for the appointment of "competent" counsel subsequent to the Fifth Circuit's holding in *Martinez*.**

As discussed in Mr. Acker's petition, Tex. Code of Crim. Pro. Art. 11.071 created a right to counsel in initial capital habeas corpus matters.  In 2002, the Texas Court of Criminal Appeals considered the question of whether an applicant under art. 11.071 had the right to effective assistance of state post-conviction counsel.  *Ex parte Graves,* 70 S.W.3d 103 (Tex. Crim.App. 2002).  In *Graves,* the CCA held that art. 11.071, sec. 2(a)'s provision that "[a]n applicant shall be represented by competent counsel" does not mean effective counsel within the meaning of *Strickland, supra,* but is only entitled to "qualified" counsel.  *Graves,* 70 S.W.3d at 114.  *Graves* concentrated on the phrase "competent counsel" and held that "competent counsel" only means an attorney who is competent at the time they are appointed.

*Graves* seems to hold that there is no constitutional right to effective assistance of counsel on habeas corpus.  However, there is also no constitutional right to appeal.  *McKane v. Durston,* 153 U.S. 684 (1894).  The courts have long held that if the state provides a convicted person with a right to appeal, "the procedures used in deciding appeals must comport with the demands of the Due process and Equal Protection Clauses of the Constitution." *Evitts v. Lucy,* 469 U.S. 387 (1985).  In reaching its conclusion in *Evitts,* the Supreme Court rejected the state's argument that the Due Process Clause did not apply to state appeals because the state did not have to grant appeals as of right at all.  The Court stated, "[i]n short, when a State opts to act in a field where its action has significant

discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts,* at 401. *See also Goeke v. Branch,* 514 U.S. 115, 119-20 (1995).    In other words, one a state has provided the right to counsel on appeal, a state has to provide "effective" counsel.[81]

As the Supreme Court stated in *Evitts* and *Avery v. Alabama,* 308 U.S. 444 (1940), "the guarantee of counsel cannot be satisfied by mere formal appointment." When there is a right to counsel, there is a right to effective assistance of that counsel. 'The special value of the right to the assistance to counsel explains why 'it has long been recognized that the right to counsel is the right to effective assistance of counsel.' *McMann v. Richardson,* 379 U.S. 759, 771, n. 14 (1970); *United States v. Cronic,* 466 U.S. 648, 654 (1984).

**3) The appointment of Mr. Wilkinson and the courts' refusal to remedy the situation deprived Mr. Acker of due process.**

The appointment of incompetent counsel violated Mr. Acker's right to due process under the law as guaranteed by Fourteenth Amendment of the United States Constitution. The federal courts have long recognized a right to due process in Texas post-conviction proceedings.  In *Welch v. Beto*, the Fifth Circuit plainly stated this right, holding, "Having invoked Texas statutes granting post- conviction hearings, Welch had the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment." *Welch v. Beto,* 355 F.2d 1016, 1020 (5th Cir. 1966).

The United States Supreme Court has also stated that the right to due process extends

---

[81]   *See also* discussion at Claim VII *infra.*

to state post-conviction proceedings such as Mr. Acker's.  In *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998), the Supreme Court discussed a post-conviction right to due process in the context of clemency proceedings.  A plurality of the Court held that there is, at least, a minimal right to due process of law in executive clemency proceedings.[82]  *Id*. at 289.  Last year, the Supreme Court held that a habeas petitioner had a right to appointed federal counsel, and that counsel had a right to compensation, in state clemency proceedings. *Harbison v. Bell,* 556 U.S.____, 129 S. Ct. 1481 (2009).  These cases demonstrates the courts' longstanding recognition of a robust right to due process in state post-conviction proceedings.

In Mr. Acker's case, as in *Welch*, the violation of due process is clear. The application filed on Mr. Acker's  behalf by his appointed counsel was totally  inadequate.  For Texas now to deny him adequate state habeas review  violates his Fourteenth Amendment right to due process under the law.  *See Evitts*, 469 U.S. at 401; *Welch*, 355 F.2d at 1018.

**4) Unlike the situation in *Martinez,* state post-conviction counsel committed a fraud on the courts and his client.**

Whereas in *Martinez,* the allegations were that state post-conviction counsel was merely ineffective, here Mr. Acker's post-conviction was both ineffective *and* committed a fraud upon the Court. Mr. Wilkinson charged the state $22,270 for copying his client's

---

[82] Five justices of the United States Supreme Court held that a right to due process in clemency proceedings exists.  *See Id*. (J. O'Connor concurring joined by J. Souter, J. Ginsberg, and J. Breyer) (J. Stevens dissenting).

letters.[83]  Clearly this charge did not reflect the amount of actual work done on the writ.  Mr.

Wilkinson committed a fraud on the courts, the public and his own client.  This action

cheated not only Petitioner, but the judicial system and the failure of the state courts to

uncover or remedy this fraud cannot be blamed solely on Petitioner.  The significance of this

is that the justice system was subverted in a manner that goes well beyond mere ineffective

assistance—the state courts were cheated out of the assistance they had funded and provided

for Mr. Acker and Mr. Acker was the person who was most harmed by this.

   **5) The right to effective assistance of counsel applies to the "trial court" phase
of state post-conviction proceedings, and was violated in this case, thus prejudicing the
petitioner.**

   *Coleman v. Thompson*, 501 U.S. 722 (1991) held that, because an inmate has no right

to the effective assistance of counsel in post-conviction proceedings, counsel's ineffective

performance in such proceedings could not constitute "cause and prejudice" for procedural

defaults caused by a post-conviction attorney's late filing of an appeal from a habeas corpus

trial-court disposition.  *Id*. at 750.  However, in *Coleman,* one question -- a question

presented by this case -- was specifically left undecided.  Coleman noted that (1) this Court

had guaranteed indigent appellants constitutionally effective counsel during the "one and

only appeal" to which they were entitled by state law, even though the appeal itself was not

---

[83]  Exhibit 21, newspaper articles on Mr. Wilkinson's writ, Chuck Lindell, *"Attorney cuts, pastes client's letter,"* Austin American-Statesman, October 29, 2006, at A11(discussing Mr. Acker's state petition);  "*Sloppy lawyers failing clients on death row*," Austin American-Statesman, by Chuck Lindell, Oct. 29, 2006.

required by the Federal Constitution, *Evitts*, 469 U.S. at 396 (citing *Douglas v. California*, 372 U.S. 353, 357 (1963)); and that (2) Virginia allowed defendants to attack the effectiveness of their trial counsel only in postconviction proceedings.  *Coleman*, 501 U.S. at 755.  Thus, *Coleman* asserted, there must be a guarantee of effective assistance of counsel in "the first forum in which a federal claim can be raised" in state court.  *Id*.

Texas, like Virginia and virtually all other jurisdictions, recognizes that ineffective assistance of trial counsel claims such as the ones pled in this petition usually cannot be adequately aired until post-conviction proceedings.[84]   This case presents the question left open by *Coleman*.  Another distinction can be made: Coleman did not challenge the adequacy of his trial-court-level representation, *Coleman*, 501 U.S. at 755.   Mr. Acker  presents this challenge here. *See* Claims III, IV, V, *supra.*  Here, the State's own conduct undermined its ability to claim respect for its judgments in federal court.

## CLAIM IX: THE TRIAL COURT ERRED IN DENYING THE DEFENSE CONFIDENTIAL EXPERTS UNDER *AKE V. OKLAHOMA*.[85]

Facts and argument as to this claim can be found at pages 222 to 229 of Mr. Acker's petition.  The Director argues that this claim is "procedurally barred because it was dismissed by the state court on independent and adequate state procedural ground (sic)".  (Answer at 96.)  Additionally, for the reasons discussed above, procedural default  is not appropriate for

---

[84] *Ex Parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) ("In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim.").

[85]   470 U.S. 71 (1985).

any of Mr. Acker's claims.

**Claim IX(a): The trial court failed to provide confidential crime scene investigator for the defense.**

The Director argues that "the trial court was not obligated by the Constitution to grant Acker's request for a third expert where he failed to demonstrate a reasonable basis for such a request." (Answer at 99.)   However, the Director's  argument is based on the assertion that investigator John Sands and accident reconstructionist A.L. Pipkin were the first two experts appointed and they were sufficient.  (Answer at 98-100.)

Clearly, they were not.  The trial court had earlier denied funds for a defense forensic expert because this investigator had been appointed, but then refused to let Mr. Sands testify as to the forensic matters.  As Mr. Ferguson testified at the trial court habeas hearing,  "we asked for a criminologist; we were told to use Mr. Sands.  We tried to use Mr. Sands, and we were unable to get that [the truck tests]  in."[86]  HT 173.  Additionally, seemingly forgotten by the trial court, was the fact that the prosecution had previously stipulated that Mr. Sands was a crime scene expert. 6 RR 19. As such, the ruling was erroneous and highly prejudicial.

---

[86]   Mr. Sands, the defense investigator, testified *in camera* that he had conducted some experiments relating to the distance from the petitioner's home to the crime scene and the time it took to drive there.  21 RR 129.  Mr. Sands stated that he obtained the times by driving within the posted speed limits.  21 RR 130-132. Mr. Sands was also asked to see if he could open the door from the driver's seat of the truck.  21 RR 134.

Mr. Sands also performed tests on the truck.  He obtained a similar truck, a Ford 350 one-ton truck, and he testified *in camera* that he was not able to open the door from the driver's seat without extending himself quite a bit so that he could still see above the dashboard.  21 RR 142. He told the court that he could not have opened the door and pushed someone out of the vehicle while driving on the road.  21 RR 142.  An objection to this evidence was sustained.  21 RR 143. .

**Claim IX(b):** The trial court violated the confidentiality of the defense experts by allowing the prosecutor to comment on their fees and their absence from the trial.

As discussed *supra* in Claim II(p) and in Claim X *infra*, the trial court erred in admitting extensive testimony regarding the fact that the defense had a medical examiner expert appointed (Dr. Norton).   The Director argues that the information regarding the defense expert was not confidential, as

> [n]othing in *Ake* requires complete confidentiality of expert witnesses appointed to indigent defendants.  Once appointed, they are treated as any other expert.  Therefore, the court did not violate Acker's constitutional rights under *Ake* to *ex parte* application for expert assistance.
> (Answer at 100-101.)

This misses the point as under *Ake v. Oklahoma,* 470 U.S. 68 (1985), the defense is entitled to the appointment of an "adversarial" expert.   The Ninth Circuit, in *Smith v. McCormick,* 914 F.2d 1153 (9th  Cir. 1990), has given a detailed explanation of the difference between a neutral psychiatrist, whose reports would not be privileged or confidential, and the kind of "adversarial" expert that a defendant is entitled to under *Ake.* A neutral psychiatrist only performs the scientific test or examination that the court ordered, while an adversarial psychiatrist discloses her opinion to defense counsel only and refuses to discuss the case with the prosecutor outside of the courtroom.  914 F.2d at 1157. If Mr. Acker had sufficient funds, he could have hired such an expert to render a confidential report.  The prosecutor's conduct in delving into this area was improper.  The records should never have been public and available to the prosecution as they were entitled to a confidential expert under *Ake.*

**CLAIM X: MR. ACKER WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW BY THE PERSISTENT MISCONDUCT OF THE PROSECUTOR.**

Facts and argument in support of this claim can be found at pages 229 to 239 of Mr. Acker's petition. The Director argues that this claim is procedurally defaulted. (Answer at 101.) Claim 6 on direct appeal dealt with the contemptuous conduct of the prosecutor toward the trial attorneys. (Exhibit 6.) As best as counsel can determine, there were numerous instances of prosecutorial conduct alleged in the state writ, albeit in a confused and nonsensical manner. (Exhibit 9.) Most of the sub-claims, however, were not properly developed in state court. As this claim is completely record-based, it should have been brought on direct appeal. (Claim VII.) Additionally, for the reasons discussed above, procedural default is not appropriate for any of Mr. Acker's claims.

As to the merits, the Director alleges that any improper remarks did not render the trial fundamentally unfair and that Petitioner cannot show that he was deprived of the right to a fair trial. (Answer at 101-111.) This was actually addressed in the individual claims but, mainly, in Claim X(k), which argues that the cumulative impact of the misconduct deprived Petitioner of a fair trial.

**Claim X(a): Prosecutorial misconduct in prejudicially inflaming the passions of the jury.**

The prosecutor deliberately inflamed the passions of the jury by asking the victim's mother, after she testified that she and the victim had an argument shortly before her death, "By the way, did you ever get a chance to make up for that?" 19 RR 90. Objected to by the defense, the court sustained the objection and instructed the jury to ignore it. 19 RR 91. A

-108-

mistrial was denied.  *Id.*

The Director first states that there is no statement as to the prejudicial nature of the prosecutor's inquiry. (Answer at 103.)  While this is true, the nature of the prejudice inheres in the question itself: the jury was being asked to consider the extremely prejudicial nature of the victim and her mother's last words, for an entirely improper purpose.  Additionally, these were not mere "conclusory allegations" (Answer at 103) as legal argument was given at the end of the claim in section X(B).  Lastly, the Director points to allegedly "overwhelming" evidence as "to Acker's guilt." (*Id.*)  However, this evidence was hardly overwhelming and has since been refuted herein.  The murder was not viewed by the witnesses, there was no reason for Acker to first abduct the victim then

**Claim X(b)**:  **Prosecutorial misconduct in asking obviously improper questions.**

The Director argues that witness Natasha Bologna, a chemist, was not asked an improper question (Q.  People don't bleed when they are strangled, do they? (20 RR 90.)). Answer at 104.  The Director claims this claim was inadequately briefed. (*Id.*)  However, Petitioner did argue that there was no evidence of a strangling at this point and it was obviously outside of this witness's area of expertise, as she was a chemist who was collecting evidence at the crime scene and she had testified that she had never investigated a case where the victim had been strangled.  (Petition at 229-230.)  However, here again, the prejudice inheres in the question itself and the legal argument was given in section X(B).

**Claim X(c):   Prosecutorial misconduct in making prejudicial remarks in front of the jury.**

The Director argues that several sustained objections did not render the trial unfair and "the facts against Acker were so overwhelming" that there was no reasonable probability that the prosecutor's remarks "impacted the jury's verdict."   (Answer at 105.)   Here,  the prejudice is mainly in the cumulative impact rather than the individual questions. (Claim X(k).)

**Claim X(d):   Prosecutorial misconduct in violation of attorney-client confidentiality.**

As to this sub-claim, the Director argues that the prosecutor did not violate Mr. Acker's attorney-client confidentiality by asking him questions about his knowledge of the findings of a defense medical examiner expert (Dr. Norton) as the question "concerned matters of public record."  (Answer at 105.)

This misses the point that this was a confidential defense expert and hence her opinion, payments and what she did on the case should have been kept confidential under *Ake v. Oklahoma,* 470 U.S. 68 (1985).   The records should never have been public and available to the defense as they were entitled to a confidential expert under *Ake.*    If Mr. Acker had sufficient funds, he could have hired such an expert to render a confidential report.  The prosecutor's conduct in delving into this area was improper.

**Claim X(e):   Prosecutorial misconduct in deliberately prejudicing the jury by asking them to improperly speculate as to the reasons for the absence of a defense expert.**

As to this sub-claim, the Director argues that there was no error in the prosecutor

pointing out, in final argument, the lack of a report from Dr. Norton.  (Answer at 106.)  The Director cites *Jackson v. Johnson,* 194 F.3d 641, 653 (5th Cir. 1999) for the proposition that "the State may comment on the defendant's failure to produce a material witness, and may infer from that failure the testimony would have been unfavorable." (*Id.*)  *Jackson* concerned the absence of a rebuttal witness, which was proper argument, but Dr. Norton was not a rebuttal witness here.  On the contrary, the jury was being asked to speculate that she did not appear because her opinion would have been detrimental to the defense. ("I asked y'all to think about where Dr. Norton was.  He didn't answer that, did he?  Because Dr. Norton's opinion is the same.  Don't you know that Dr. Norton..." 23 RR 21; and  "It's reasonable to assume that if his doctor had a difference of opinion she would have been here telling you about it.  I forgot to see her, I guess, because I missed her testimony.  She's not here." 23 RR 21-22.)

The *Ake* argument discussed in the previous sub-claim also has relevance here. The information that Dr. Norton had been consulted should not have been divulged.  But this argument raised the prejudice to a higher level, as now the jury was being asked to speculate as to the reasons for her absence.  Had the court acted properly and disallowed all references to this uncalled witness, as *Ake* dictates, the defendant would have received the truly confidential expert to whom he was entitled. He would not have suffered this prejudice if he had the funds to hire such a confidential expert.

**Claim X (f):  Prosecutorial misconduct for misstating the evidence.**

The Director argues that the trial court's ruling was correct.  (Answer at 107.) Petitioner respectfully refers the Court to his arguments as to this sub-claim in the petition (at 235.)

**Claim X(g):  Prosecutorial misconduct in asking defense witnesses how much they were paid.**

The Director argues that defense expert Dr. Cicerello was not improperly questioned regarding her payments because "Acker himself introduced evidence regarding Dr. Cicerello's hourly rate on direct examination. (23 RR 96)(Answer at 107.)  This is correct, however, the defense did not introduce her total compensation ($6300), which was divulged on cross-examination (23 RR 118-119.)   This should have been confidential, as it would have been had Mr. Acker the funds to hire a confidential expert. This was a Sixth Amendment violation.

**Claim X(h):  Prosecutorial misconduct for commenting on the veracity of a witness in front of the jury.**

The Director argues that "Acker apparently misreads the prosecutor's statement." (Answer at 109).   The Director's interpretation is that [t]he prosecutor's comment was simply and (sic) expression of his belief that it was unlikely that Nancy Acker had personal knowledge of the incident..." (Answer at 109.)  Petitioner refers the Court to his petition (at 236).  Whatever interpretation is put on this comment, the effects were minor compared to the other incidents detailed in this claim.

-112-

**Claim X(i):   Prosecutorial misconduct in limiting mitigating evidence.**

Here, the Director argues that the argument not to take sympathy into account was not

erroneous, citing *California v. Brown,* 479 U.S. 538, 542-543 (1987)(Answer at 109-110.)

However, the holding in *Brown* that the jury was not to be swayed by "mere sentiment,

conjecture, sympathy, passion, prejudice public opinion, or public feeling" (*Id.* at 542, quoted

in Answer at 109-110) is far different than the prosecutor's argument here.  In *Brown,* the

Supreme Court held that it was proper to tell the jury that they were not to be swayed by

"mere sentiment," not that they could not consider it,  but here the prosecutor told them it

didn't count at all:

> But yet we want to sit here and Mr. Ferguson wants to get up here and beg you, don't
> take his life.  It's a play on your sympathy.  You read this charge here and see if it
> says anything about sympathy in it.
> (23 RR 154.)

Thus, *Brown* is not applicable here.

**Claim X(j): Prosecutorial misconduct for commenting on petitioner's right to remain silent.**

The Director argues that as Petitioner took the stand himself, he waived his right to

remain silent.  (Answer at 110-111.)   The prosecutor's comments appear more directed to

the lack of remorse on the part of Petitioner's testifying family members than to Petitioner

himself.

**Claim X(k):   The cumulative effect of these errors "infected the trial with unfairness."**

The Director does not seem to address this claim of cumulative error.   Petitioner

-113-

concedes that some of these sub-claims, in and of themselves, were rather minor instances, but their cumulative impact was substantial.   The Director has not addressed the argument that these instances of prosecutorial misconduct do not individually have to have risen to the standard of a denial of due process or an unfair trial, but they should be seen in the aggregate as having "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). The improper questioning here was particularly prejudicial because it played to the atmosphere of hostility to petitioner that permeated his trial.  The trial court did nothing to rein in the prosecutor and prevent his egregious comments.  Thus, if this Court holds that any one of the errors alone was not sufficient to create this fundamental unfairness, the proper framework for the analysis is to examine the argument as a whole, as the jury heard it, and not simply to test the individual claims separately.

## CLAIM XI:  LETHAL INJECTION – AS IT IS CURRENTLY ADMINISTERED IN TEXAS –  PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.

Facts and argument as to this claim can be found at pages 239 to 253 of Mr. Acker's petition. The Director argues that this claim is unexhausted and hence procedurally barred. (Answer at 111-113.)  To the extent that this claim is record based, it should have been brought on direct appeal.  (Claim VII.)  For the reasons discussed above, procedural default is not appropriate.

As to the merits, the Director argues that the claim is foreclosed by  precedent.

(Answer at 112-113.)  Mr. Acker respectfully refers the Court to his arguments in the petition as to this claim.

**CLAIM XII**: **THE SECOND SPECIAL ISSUE IS UNCONSTITUTIONAL BECAUSE IT OMITS A BURDEN OF PROOF AND MAKES IMPOSSIBLE ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S DETERMINATION.**

Facts and argument as to this claim can be found at pages 253 to 267 of Mr. Acker's petition.  The Director argues that this claim is procedurally barred. (Answer at 114.)  This is erroneous as this claim was brought both on direct appeal, as Claim I, and also in the state habeas petition.  Additionally, for the reasons discussed *supra,* procedural default is not appropriate as to any of Mr. Acker's claims.

As to the merits, the Director argues that Mr. Acker is not entitled to a sufficiency of the evidence review. (Answer at 114-116.)  Petitioner's argument is that the state courts have a federal constitutional duty to review for "sufficiency" the jury's negative answer to the mitigation special issue. What has become apparent is that the Texas death penalty scheme is functioning like the schemes in "weighing" states, even though on its face it is framed in "non-weighing" terms.   It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and

-115-

free from any possibility of review for sufficiency.

**CLAIM XIII: THE DEATH PENALTY, AT LEAST AS PRESENTLY ADMINISTERED IN TEXAS, IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Facts and argument as to this claim are at pages 268-272 of Mr. Acker's petition. The Director argues that this claim is procedurally barred. (Answer at 116.) This is erroneous as many claims regarding the Texas death penalty statute were brought on direct appeal as Claim I and also in state habeas. Additionally, for the reasons discussed *supra,* procedural default is not appropriate for any of Mr. Acker's claims.

As to the merits, the Director argues that the death penalty has been held constitutional. (Answer at 116-121.)

The Director offers only the doctrine of stare decisis for continuing to follow precedents that are fundamentally flawed. (*See Lawrence v. Texas* 539 U.S. 558, 577 (2003) ["The doctrine of stare decisis . . . is not . . . an inexorable command."]; *People v. Anderson*, 43 Cal.3d 1104, 1147 (1987)[although doctrine of stare decisis serves important values, it "should not shield court-created error from correction"].)  Due to the defects in the Texas death penalty scheme detailed in Mr. Acker's petition, this Court should hold that it violated his federal constitutional rights and reverse the death judgment.

**A.  Eighth and Fourteenth Amendment grounds.**

The Texas death penalty scheme, and the regular use of death in this state as a

punishment for murders of all kinds, also violates the Eighth and Fourteenth Amendments.[87]
The United States Supreme court in *Atkins v. Virginia*, 536 U.S. 304 (2002), held that the
Eighth and Fourteenth Amendments prohibited the execution of the mentally retarded.  In
the recent case of *Roper v. Simmons,* 125 S.Ct. 1183 (2005), the Court declared that the
imposition of the death penalty on juvenile offenders constitutes cruel and unusual
punishment in violation of the Eighth Amendment.

The Supreme court stated in *Atkins*, and reiterated in *Simmons* that capital
punishments "must be limited to those offenders who commit 'a narrow category of the most
serious crimes' and whose extreme culpability makes them 'the most deserving of
execution.'" (*Atkins v. Virginia*,  536 U.S. at 319; *Roper v. Simmons,* 125 S.Ct. 1194.)  The
Supreme Court also stated in *Simmons* that "[s]tates must give narrow and precise definition
to the aggravating factors that can result in a capital sentence."  (*Ibid*., citing *Godfrey v.
Georgia* (1980) 446 U.S. 420, 428-429 (plurality opinion). Texas's capital punishment
scheme does not constitutionally limit those subject to the death penalty to a "narrow
category" of offenders who have committed "the most serious crimes" and whose extreme
culpability makes them "the most deserving of execution."  Nor does Texas's capital
punishment scheme give "narrow and precise definition to the aggravating factors that can
result in a capital sentence."

Even assuming *arguendo*, that Texas's capital punishment scheme was not in

_____

[87]   The Director considers only the Eighth Amendment grounds in the Answer. (Answer
at 116-121.)

violation of the Eighth Amendment under existing interpretations of the federal constitution, the United States Supreme Court in *Simmons* once more affirmed "the propriety and . . .the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual."  (*Id.* at 1190, citing *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958) (plurality opinion).)  Those evolving standards of decency already put the execution of juveniles, mentally retarded persons and the insane outside the pale of civilized behavior.  In addition, it is now the law that a death sentence cannot be upheld if trial counsel did not conduct a thorough investigation into the social history of the defendant so counsel could effectively marshal all the mitigating evidence.  (*Wiggins v. Smith,* 123 S.Ct. 2527 (2003).  Clearly, the evolving standards of decency have strongly moved in recent years towards embracing the "culture  of life," and toward a questioning of the efficacy of using the death penalty in any circumstance.

The Supreme Court of the State of Missouri brought its independent judgment to bear in deciding that the execution of a juvenile violated the Eighth Amendment (*State ex rel. Simmons v. Roper* 112 S.W. 3d 3997 (Mo. 2003) (en banc)), as did the United States Supreme Court in reviewing and affirming the Missouri Supreme Court.  (*Simmons, supra*, 125 S.Ct. at  1191-1192.)  It is proper for this Court to bring its judgement to bear on this issue and  declare  that  capital  punishment  for  any  Texas  citizen  violates  the  Eighth Amendment.

Although  inter-case  proportionality  review  is  a  method  of  protection  against

arbitrariness in capital sentencing, the Supreme Court has refused to acknowledge that such review is constitutionally required.  (*See Pulley v Harris,* 465 U.S. 37, 51 (1984)).  But the minimal narrowing effected by the special issues coupled with the open-ended nature of the aggravating factors lead to flagrant arbitrariness.  The capital sentencing scheme in this state does not operate to ensure consistency in penalty-phase verdicts, and it does not operate in a manner that prevents arbitrariness in capital sentencing.

**CLAIM XIV: PETITIONER'S DEATH SENTENCE VIOLATES INTERNATIONAL LAW, WHICH IS BINDING ON THIS COURT, AS WELL AS THE EIGHTH AMENDMENT**

Facts and argument as to this claim are at pages 273-277 of Mr. Acker's petition and are incorporated herein.  The Director first argues that this claim is unexhausted and hence procedurally barred. (Answer at 121.)   To the extent that this claim is record-based, it should have been raised on direct appeal. (Claim VII.)  For the reasons discussed *supra,* procedural default is not appropriate for any of Mr. Acker's claims.

As to the merits, the Director argues that the Supreme Court has previously rejected such arguments and that the International Covenant of Civil and Political Rights ("ICCPR") does not create an individually enforceable right entitling Petitioner to relief.   (*See* Answer at 122-123.) Mr. Acker  respectfully requests this Court to reconsider and disapprove them.

As discussed in his petition, recent developments in Eighth Amendment jurisprudence support Mr. Acker's claims.  In *Roper v. Simmons* (2005) 543 U.S. 551, the United States Supreme Court struck down death as a constitutional penalty for juvenile offenders.  In

holding that the execution of juvenile criminals is cruel and unusual punishment, the Court

looked to international-law standards as informing the Eighth Amendment:

> "Our determination that the death penalty is disproportionate
> punishment for offenders under 18 finds confirmation in the stark reality that
> the United States is the only country in the world that continues to give official
> sanction to the juvenile death penalty.  This reality does not become
> controlling, for the task of interpreting the Eighth Amendment remains our
> responsibility.  Yet at least from the time of the Court's decision in *Trop*, the
> Court has referred to the laws of other countries and to international authorities
> as instructive for its interpretation of the Eighth Amendment's prohibition of
> 'cruel and unusual punishments.' 356 U.S., at 102-103, 78 S.Ct. 590 (plurality
> opinion) ('The civilized nations of the world are in virtual unanimity that
> statelessness is not to be imposed as punishment for crime'). . . ." (543 U.S.
> at ___ [125 S.Ct. at 1198].)

Similarly, in *Lawrence v. Texas* (2003) 539 U.S. 558, the United States Supreme

Court held unconstitutional a Texas law that made consensual, private, adult sexual behavior

between same-gender adults unlawful.  While this holding may seem to have little relevance

to this case, it does demonstrate the increasing degree to which the federal high court will

consider international norms in determining the constitutionality of our state penal laws.

Overturning *Bowers v. Hardwick,* 478 U.S. 186 (1986), in *Lawrence*, the U.S. Supreme Court

placed great emphasis on the fact that criminalization of private consensual homosexual

conduct was at odds with the European Convention on Human Rights, "[a]uthoritative in all

countries that are members of the Council of Europe . . . ." (*Id.*, at p. 573.)  The high court

recognized that, to the extent *Bowers* relied on values shared with a wider civilization, the

case's reasoning and holding had been rejected by the European Court of Human Rights, and

other nations had also affirmed the right of adult homosexuals to engage in intimate,

consensual conduct.

The Director further argues that international sentiment opposing capital punishment does not render Mr. Acker's sentence invalid.  (Answer at 123-124.)  Mr. Acker asks this Court to consider the lack of international support for the death penalty and accordingly, to reverse the death judgment. A few years ago, the Supreme Court of Canada placed the use of the death penalty in the United States for ordinary crimes into an international context:

> Amnesty International reports that in 1948, the year in which the Universal Declaration of Human Rights was adopted, only eight countries were abolitionist.  In January 1998, the Secretary-General of the United Nations, in a report submitted to the Commission on Human Rights (U.N. Doc. E/CN.4/1998/82), noted that 90 countries retained the death penalty, while 61 were totally abolitionist, 14 (including Canada at the time) were classified as abolitionist for ordinary crimes and 27 were considered to be abolitionist *de facto* (no executions for the past 10 years) for a total of 102 abolitionist countries.  At the present time, it appears that the death penalty is now abolished (apart from exceptional offences such as treason) in 108 countries.  These general statistics mask the important point that abolitionist states include all of the major democracies except some of the United States, India and Japan … According to statistics filed by Amnesty International on this appeal, 85 percent of the world's executions in 1999 were accounted for by only five countries:  the United States, China, the Congo, Saudi Arabia and Iran.

(*Minister of Justice v. Burns* (2001) 1 S.C.R. 283 [2001 SCC 7], ¶ 91.)  The Texas death penalty scheme violates the provisions of international treaties and the fundamental precepts of international human rights.  Because international treaties ratified by the United States are binding on state courts, the imposition of the death penalty is unlawful.  To the extent that international legal norms are incorporated into the Eighth Amendment determination of evolving standards of decency, Mr. Acker raises this argument under the Eighth Amendment as well.  (*See Atkins v. Virginia*, 536 U.S. 304, 316, fn. 21 (2002); *Stanford v. Kentucky*, 492 U.S. 361, 389-390 (1989) (Brennan, J., dissenting.).)

**<u>CLAIM XV</u>:   THE CUMULATIVE EFFECT OF THE ERRORS AT MR. ACKER'S TRIAL DENIED HIM OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.[88]**

Facts and argument as to this claim are at pages 277-279 of Mr. Acker's petition.  The Director argues that this claim is unexhausted and hence procedurally barred. (Answer at 124-125.)  For the reasons discussed *supra,* procedural default is not appropriate for any of Petitioner's claims.  Additionally, to the extent that this claim is record-based, it should have been raised on direct appeal. (Claim VII.)

The Director argues that there is no "cumulative error" because "cumulative error is only appropriate where there is error to cumulate...cumulative error doctrine provides habeas relief only where the constitutional errors committed in the state court so fatally infected the trial that they violate the trial's fundamental fairness." (Answer at 124.)   Mr. Acker has shown many instances where the federal constitutional violations deprived him of a fair trial, particularly with respect to the trial court's stifling of the presentation of his actual innocence.   However, there are also situations in which a petitioner alleges several constitutional errors or violations of federal  law, each of which is found harmless by the court, or none of which is found to be a constitutional violation, but which, in the aggregate, deny the petitioner  a fair trial.   Hence, this claim is presented in the alternative to the analysis of Mr. Acker's other  claims contained in this writ*,*  not as a comment on their individual merits.  The Court is respectfully referred to the arguments at pages 277 to 279 of

---

[88]  This claim is argued in the alternative to the above claims, each of which merits relief individually.

his petition.

# VII.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Acker  prays that this Honorable Court:

A.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

B. Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;[89]

C. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition;

D.  Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new trial and sentencing hearing,  and

E.  Grant such other relief as may be necessary and appropriate

---

[89]   Petitioner will be filing a motion for an evidentiary hearing shortly.

Respectfully submitted,

/s/ A. Richard Ellis

_____

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
Attorney for petitioner

Dated: February 19, 2010.

## CERTIFICATE OF SERVICE

I, A. Richard Ellis, counsel of record for Petitioner, do hereby certify that I electronically filed the above and foregoing pleading "Petitioner's Reply to Respondent's Answer to Petition for Writ of Habeas Corpus" with the Clerk of the Court for the United States District Court for the Eastern District of Texas, using the electronic case filing system of the Court on February 19, 2010.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

> Ms. Tina Joann Miranda
> Assistant Attorney General
> Postconviction Litigation Division
> Office of the Attorney General, State of Texas
> P.O. Box 12548, Capitol Station
>  Austin, Texas 78711
> tina.miranda@oag.state.tx.us

/s/ A. Richard Ellis
_____
 A.  RICHARD ELLIS
 COUNSEL FOR PETITIONER