IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DANIEL CLATE ACKER, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | NO. 4:06-cv-00469 |
| | § | Death Penalty Case |
| RICK THALER, | § | |
| Director, Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
|     Respondent. | § | |

**RESPONDENT THALER'S
POST-HEARING BRIEF**

Petitioner Daniel Clate Acker was properly convicted and sentenced to death for the brutal murder of his girlfriend Marquette George (Markie) committed during the course of a kidnaping. In the instant proceedings, Acker challenges his conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. An evidentiary hearing was recently held by this Court allowing Acker to develop facts in support of his gateway actual-innocence claim. But, as set out below, none of the evidence presented at that hearing is sufficient to demonstrate Acker's innocence.

**BRIEF**

Acker raised several claims in his federal habeas petition that are procedurally defaulted because they were dismissed by the state court on

1

independent and adequate state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-32 (1991) (a federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim). Nevertheless, in appropriate cases, the principles of comity and finality that form the basis of this bar, "must yield to the imperative of correcting a fundamentally unjust incarceration." *Schlup v. Delo*, 513 U.S. 298, 320 (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986)). This is not one of those cases.

I. **The Standard for Proving Innocence is An Onerous One that Requires Acker to Prove that it is More Likely Than Not that No Reasonable Juror Would Find Him Guilty Beyond a Reasonable Doubt.**

The standard for proving a "gateway" actual-innocence claim was first set out by the Supreme Court in *Schlup*, 513 U.S. at 327. It was most recently addressed by the Court in *House v. Bell*, where it reiterated:

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have a reasonable doubt.

547 U.S. 518, 538 (2006). To be credible, an actual innocence claim requires the petitioner to support his allegations with new, reliable evidence that was not presented at trial. *Id.* at 537 (citing *Schlup,* 513 U.S. at 324). Further,

> [T]he habeas court must consider all the evidence, old and new,

> incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

*House*, 547 U.S. at 537-38. Notably, "[i]f new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Id.* The Supreme Court has described this standard as "demanding" and stated that it "permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).

> **A.   Acker has to do more than simply establish that the new evidence could create a reasonable doubt in the mind of a single reasonable juror, or this Court.**

The inquiry here is not whether a reasonable juror, after hearing the new evidence, could have a reasonable doubt as to Acker's guilt. Removing the double negative from its articulated standard, the Supreme Court explained that a petitioner seeking to prove his innocence must demonstrate that *any* reasonable juror hearing the new evidence *would* find reasonable doubt. *House*, 547 U.S. at 538. More to the point,

> The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence. . . . [A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Schlup*, 513 U.S. at 329.

Indeed, establishing a probability that a single reasonable juror could find the petitioner "not guilty" is akin to the prejudice and materiality standard that applies to claims that counsel was ineffective or that the State suppressed evidence in violation of due process.[1] Indeed, *Schlup* makes clear that more is required. 513 U.S. at 327. In discussing the actual-innocence standard, the Court explicitly stated, "[t]he petitioner is . . . required to make a stronger showing than that needed to establish prejudice").[2]

Moreover, in assessing the validity of Acker's actual-innocence claim, this Court does simply sit as a reasonable juror and decide whether it finds a reasonable doubt based on the evidence. In *House*, the Supreme Court discussed the court's role is assessing the validity of an actual innocence claim. Specifically, the Court stated, ". . . it is not the district court's independent judgment as to whether a reasonable doubt exists that the standard addresses." 547 U.S. at 539-40 (internal citation and quotations omitted). Rather, the

---

[1] *See e.g. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (Finding prejudice resulting from counsel's failure to adequately present mitigating evidence during the punishment phase of a capital murder trial because, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance"); *see also Banks v. Thaler*, 583 F.3d 295, 311 (5th Cir.2009) (suppressed evidence is material if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different '").

[2] *See Id.*, n.45 (citing to prejudice standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984), and *United States v. Bagley*, 473 U.S. 667 (1985)).

standard is "predictive" and requires this Court to determine "whether reasonable jurors would have reasonable doubt." *Id.* at 540. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."

    **B.** **Furthermore, where reasonable jurists could disagree as to the significance or credibility of the evidence, actual innocence is not proven.**

Because the standard for establishing innocence requires proof that it is more likely than not that *no* reasonable juror would find Acker guilty of capital murder, it necessarily follows that if reasonable jurors could disagree regarding the significance or credibility of the new evidence, the standard has not been met. For instance, if the new evidence presented to support a claim of innocence is nothing more than a competing expert, or conflicting eyewitness account that jurors could reasonably accept or reject, it cannot be said that *no* reasonable juror would find the defendant guilty in light of this evidence. In the same way, new evidence presented to support an alternative theory of events that might just as easily be rejected as it is accepted also fails to satisfy the exacting standard set out in *Schlup*.

Consistently, the Fifth Circuit has held that to qualify under the miscarriage of justice exception, evidence must be "material, not merely cumulative or impeaching." *See. e.g. Foster v. Thaler*, 369 Fed.Appx. 598, (5th Cir. 2008) (holding that newly discovered evidence failed to meet the "high bar" imposed by *Schlup* because "one more contradictory story would not have

5

compelled jurors to find [petitioner] not guilty"); *see also Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998) (newly discovered evidence demonstrating actual innocence must be "material, not merely cumulative or impeaching") (citing *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir.1998)). Although impeachment evidence may call into question the significance or credibility of evidence, it can be rejected by reasonable jurors. If a reasonable juror can reject the impeachment evidence, then the defendant has not met his burden of proving that it is more likely than not that no reasonable juror would find him guilty.

Moreover, the Supreme Court described "new reliable evidence" sufficient to support an actual-innocence claim as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 865. The Court went on to note that "because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* Thus, it is axiomatic that evidence supporting a successful claim of innocence must be compelling and not subject to disagreement among reasonable jurors.

C. **Finally, the actual innocence inquiry is a holistic one that is not constrained by the evidence introduced at trial or the context in which it was presented.**

Acker has argued that this Court must consider the likely impact the new evidence presented in this case would have had on the jury that sat during his trial, but there is nothing to support his position. The Supreme Court has stated that, "[T]he *Schlup* inquiry . . . requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the reasonable-doubt

standard." Elsewhere, the Court stated, "*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exclupatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* at 538 (internal citations and quotations omitted) (emphasis added). The fact that the rules of evidence do not apply indicates that the actual-innocence inquiry is something different and more than a trial-error claim.

Additionally, accepting Acker's argument here cuts against the character and purpose of the fundamental miscarriage of justice exception. The "gateway" actual-innocence claim exists to provide habeas petitioner "a meaningful avenue by which to avoid a manifest injustice." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 327). Affording petitioners this opportunity to overcome a procedural default required the Court to balance "the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Id.* at 324. "The quintessential miscarriage of justice is the execution of a person who is entirely innocent." *Schlup*, 513 U.S. at 324-25. Applying this exception in a case where the petitioner was not truly innocent—but found so because of the manner in which the evidence is considered—would upset this delicate balance and undermine the purpose of the gateway claim.

Acker's position is also inconsistent with precedent that holds that actual innocence means "factual innocence" not "legal innocence." *See Bagwell v. Dretke*, 372 F.3d 748, 757 (5th Cir. 2004) (to meet the miscarriage of justice test, the petitioner must make a colorable showing of "factual innocence"); *see also*

*Callins v. Johnson,* 89 F.3d 210, 213–214 (5th Cir.1996) ("This miscarriage of justice exception is concerned with actual as compared with legal innocence[.]") As explained by the Fifth Circuit, "The term 'actual innocence' means factual, as opposed to legal, innocence-'legal' innocence, of course, would arise whenever a constitutional violation by itself requires reversal, whereas 'actual' innocence . . . means that the person did not commit the crime. *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Circuit 1997) (citing *Johnson v. Hargett*, 978 F.2d 855, 859-60 (5th Cir.1992)). The standard for proving innocence inquires into whether Acker actually committed capital murder, not whether the case originally presented against him at trial could survive in light of new evidence. If the totality of the evidence before this Court is sufficient to find that a reasonable juror could convict Acker of capital murder as alleged in the indictment, he has not proven his gateway innocence claim.

II.   **The New Evidence Presented by Acker Does not Prove His Innocence.**

There is no question from the evidence that Acker threatened, assaulted, and kidnapped his girlfriend Markie in a jealous rage. It is also without dispute that minutes after Aker forced Markie into his work truck, she was dead and discarded on the side of the road. The question in this case is whether Acker can establish that no reasonable juror would find him guilty of intentionally causing her death. He cannot. Even after hearing the new evidence, reasonable jurors could conclude beyond a reasonable doubt that Acker was guilty of Markie's murder.

### A. Expert testimony refuting trial evidence suggesting that Markie was strangled to death does not establish Acker's innocence.

Two separate experts, Dr. Larkin and Dr. DiMaio, opined that the medical evidence does not support a diagnosis of strangulation as a possible cause of death. This is inconsistent with the findings asserted at trial by medical examiner Dr. Morna Gonsoulin, who testified that in her opinion, Markie died as a result of homicidal violence including strangulation. 23 RR 6-7.[3] Nevertheless, this new evidence does not prove that Acker is innocent of Markie's murder.

The indictment returned against Acker charged three alternative methods of capital murder. Specifically, the indictment alleged that Acker,

> "intentionally cause[d] the death of . . . Marquetta Follis George by homicidal violence to wit: manual strangulation and ligature strangulation with an objection, the exact nature of which is unknown to the grand jury, and blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury . . ."

CR 1. The jury instructions later submitted to the jury by the trial court charged multiple theories of the offense.[4] First the jury was instructed:

---

[3] "RR" refers to the Reporter's Record of transcribed trial proceedings, preceded by volume number and followed by page number; "CR" refers to the Clerk's Records of pleadings and documents filed with the court during trial, followed by page number; "EH" refers to the transcript of the evidentiary hearing that took place in this court on June 16, 2011.

[4] Under Texas law it is proper for the indictment to allege in the conjunctive differing methods of committing the offense, while the jury is

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of March 2000, in Hopkins County that the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis George, intentionally cause the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty or capital murder as changed in the indictment, and so say by your verdict.

CR 591. Alternatively, the jury was charged that it could find Acker guilty of capital murder if they found that he, while in the course of committing or attempting to commit kidnaping,

> intentionally caused the death of Marquetta Follis George by blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

CR 591. The jury was also given a third option, and instructed that it could return a verdict of capital murder if it found that Acker, while in the course of committing or attempting to commit kidnaping,

> intentionally caused the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury *and* blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

---

charged in the disjunctive. *Kitchen v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

10

CR 592 (emphasis added).

To prove his innocence Acker must demonstrate that it is more likely than not that no reasonable juror would convict him on any of the three methods of capital murder charged. As previously stated, actual innocence means factual, not legal innocence. *Bagwell, supra.* Factual innocence asks whether Acker is guilty of the crime charged against him. Thus, if a reasonable jury could find him guilty of killing Markie by blunt force injury, his actual innocence claim fails.

### B. Reasonable jurors could conclude that Acker intentionally caused the death of Markie by blunt force injury.

All three experts agree that Markie suffered severe blunt force injuries capable of causing her death. Dr. DiMaio testified that her injuries were consistent with being run over.[5] EH 51-55. The only point in contention is whether those injuries were the result of an accident or homicidal violence. Acker maintains that Markie deliberately jumped from the vehicle to her death. But reasonable jurors could find that Acker intentionally caused Markie to suffer these injuries, he cannot prove his actual innocence.

### 1. The circumstances leading up to Markie's kidnapping could lead a reasonable jury to infer that Acker intended to kill her.

---

[5] Counsel stipulated at the hearing that Dr. Larkin would concede that the injuries suffered were consistent with being run over.

11

Initially, several different people testified that Acker stated his violent intention prior to Markie's death. Mary Peugh testified that she heard Acker state that he was "going to kill that bitch." 19 RR 25. The same night, in a separate incident, Acker told Tim Mason that he was going to kill Markie. 19 RR 41. That same evening, Acker told his sister that he would make her "pay" if he found her with another man. 19 RR 71. He made this statement while holding up an axe. 19 RR 71. Acker made a similar comment to Markie's mother the next morning. He told her that if he found out that Markie had spent the night with someone, he was going to kill them. 19 RR 95. Acker spent the night sneaking back into a club more than once, and then visiting every motel in the area to find Markie. 21 RR 195. Acker's mother testified that she was so concerned about what might happen when Acker found Markie that she spent two hours that morning looking for her son. 21 RR 112-13, 115. When he finally caught up with her the next morning, and learned that another man had dropped her off at their home, they got into a verbal and physical altercation, during which he forced her into his truck and drove off, swerving dramatically. 21 RR 221-231.

### 2. Brodie Young's testimony at trial is further evidence that Acker intentionally caused Markie's death.

Brodie Young was driving down County Road 3519 on the morning that Markie was killed. He testified that as he drove by Sedill Ferrell's dairy farm

he saw a man pull a woman by her arms out of the passenger side of a pick up truck and place her on the ground. After that, the man got back into the pick up truck. This is incredibly damning evidence for Acker. Although Acker, in his testimony, attempted to explain that he picked up Markie and set her down after she jumped from the truck, his explanation is easily discredited. Young claimed that the man he saw was pulling a young woman *out of* the truck. Acker claimed that he picked Markie up *after* she jumped from the truck. Not only that, jurors could easily reject Acker's explanation that he picked Markie up to put her in the truck, but ultimately left her by the side of the road when he discovered she was dead and there were light bulbs in the way. *See* 21 RR 244.

> 3. **Acker's action following Markie's death are even more incriminating and could easily lead reasonable jurors to conclude that he was guilty of her murder.**

Acker testified that after Markie "jumped" from the truck, he stopped, picked her up and carried her back to the truck, but left her on the ground after he realized there were fluorescent light bulbs on the seat. 21 RR 244. He did not attempt to wave down passing cars, to seek aid. 22 RR 80. Instead, he deliberately left her laying by the side of the road. 21 RR 244. After leaving the scene, Acker claims that he drove to Bentley Electric to use the phone. 21 RR 245. On his way there, he passed by the fire station and the sheriff's office. According to Acker, it didn't occur to him to stop by the fire station to seek help,

13

and though he thought of the sheriff's office, he decided against it because he didn't want to be arrested for DWI. 22 RR 83. When he arrived at Bentley Electric his mother was there, and instead of calling someone, he drove to his sister's house as she directed. 21 RR 246, 22 RR 84. When he saw that his sister wasn't home, Acker headed to his mother's house, stopping by a convenience store to purchase cigarette's on the way. 22 RR 84-85. Once he arrived at his mother's house, he packed some clothes and drove to the home of his friend Kenny Baxter. 22 RR 85-86. After talking to Baxter about the incident, Acker returned to his mother's house, where he finally waived down a police officer to tell them what happened. 21 RR 249-251. A reasonable juror could believe that these were not the actions of a man whose girlfriend just died an accidental death by jumping from his truck.

### 4. Dr. Larkin's opinion regarding how Markie died is simply not plausible, and could easily be rejected by reasonable jurors.

Dr. Larkin concludes in his report that Markie's "manner of death is accident," and "[t]he mechanism of death is her voluntarily jumping out of Acker's truck. The jump went awry." Petitioner's Exhibit 26 at 22. Dr. Larkin has no actual medical evidence to support his theory. Instead, he offers what he terms "a plausible alternate scenario" wherein Markie "was sitting on the bench seat in Acker's truck when she attempted to jump out of the moving truck at an

14

estimated 40 miles per hour." Petitioner's Exhibit 26 at 19. "Markie pushed off with her left hand and left foot, pivoting to the right," but "her right leg, trapped under the seat...gets a nearly total circumferential laceration." Petitioner's Exhibit 26 at 19. As she continues her jump from the truck, Markie jumps out with her head down and receives the trauma to her left eye when it "impacted against door handle at 40 mph." Petitioner's Exhibit 26 at 19. Next, "[t]he partially rotated head then struck the door, causing the contusion-abrasion on the left cheek." The chest and rib injuries are also sustained from an impact with the truck door. Petitioner's Exhibit 26 at 19. Finally, as she exits the vehicle, her body strikes the truck's protruding extension, whereupon her brain stem is torn and instantaneous death results.

    This opinion by Dr. Larkin is little more than conjecture wholly unsupported by facts actually in evidence in this case. Dr. Larkin's report offers no insight as to how Markie's leg got caught under the seat or why such an unlikely scenario is even plausible considering the circumstances. It is absolutely incredible to believe that Markie's leg was caught under the seat to such an extent that it cut her leg to the bone, yet she continued to try to jump out of the truck and suffered the majority of her blunt force injuries from impacting the car door on her way out. Even more incredible is that Markie could suffer a wound this sever in the truck yet leave no blood behind. *See* EH

15

124 (Tony Hurley testifying that he inspected the truck following the incident and the only blood found in the trucks was a tiny drop on the back of driver's seat). A reasonable juror would likely reject such an implausible explanation for Markie's injuries, finding the State's assertion that Markie received her blunt force injuries as a result of being pushed from the truck or run over by it, more credible.

This is especially true considering that Acker's own testimony at trial conflicts with his expert's report. In relaying his version of the incident to the jury, Acker simply stated that Markie "jumped from the pickup" at the same time that a car passed by. 21 RR 241. There was no mention of her leg getting stuck under the seat or the devastating injury that Dr. Larkin's claims ensued. Acker also did not mention the fact that while jumping out, Markie was hit twice by the door. The absence of these details from his testimony is compelling impeachment of Dr. Larkin's opinion regarding how Markie received her blunt force injuries.

### 5. Reasonable jurors could also reject Acker's remaining evidence.

Furthermore, despite Acker's contention, the testimony excluded by the trial court would have made little difference. First, John Sands's testimony regarding his "experiment" was entirely irrelevant as a result of Acker's failure

to demonstrate relevant similarities between himself and Sands.[6] Indeed, he admitted such during his testimony at the evidentiary hearing. EH 88-92. The fact that Sands could not reach the passenger side door while driving does not mean that Acker could not do so. There is no evidence in the record showing that the two were of similar height or had similar arm length. Sands reported that he could not reach the passenger door and open it while driving on the road. The testimony at trial indicates that Acker was not driving "on the road," but was "swerving back and forth across the road" and into the ditch. 19 RR 149, 179.

Finally, hearsay testimony from witnesses recounting a separate occasion wherein Markie allegedly jumped from the truck to escape Acker's violence is does not affirmatively establish his innocence in this situation. None of these witnesses were present in the truck when Markie was killed. Evidence showing that Markie may have jumped from Acker's truck in the past does not prove that she did so in this instance. At most, this evidence is weak impeachment evidence, and is insufficient to prove actual innocence. *See Vega*, *supra*.

## CONCLUSION

For the reasons set out above, the Director respectfully requests that this

---

[6] Acker attempted to introduce testimony from Sands that he had rented a truck similar to the defendants in order to determine whether he could open the door while driving down the road. 21 RR 134.

Court deny Acker's gateway actual innocence claim, and thus find no exception to excuse the procedural default of his claims.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division

_/s/ Tina J. Miranda_
*TINA J. MIRANDA
Assistant Attorney General
Postconviction Litigation Division
Texas Bar No. 24026139

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
Fax: (512) 320-8132

ATTORNEYS FOR RESPONDENT

* Attorney-in-charge

## CERTIFICATE OF SERVICE

I do hereby certify that on July 20, 2011, I electronically filed the above and foregoing pleading with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic:

A. Richard Ellis
75 Magee Avenue
Mill Valley, CA 94941
a.r.ellis@worldnet.att.net

                                                         TINA J. MIRANDA
                                                         Assistant Attorney General