**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN  DISTRICT OF TEXAS
SHERMAN  DIVISION**

| | | |
|---|---|---|
| **DANIEL CLATE ACKER,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **No. 4:06-cv-00469-RAS** |
| | § | |
| **DIRECTOR ,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | |
| **Respondent.** | § | |
| | § | |

**PETITIONER'S POST-HEARING BRIEF**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Comes now Petitioner, Daniel Clate Acker, through his counsel, and respectfully submits his "Post-Hearing Brief," as ordered by this Court on June 16, 2011.   The evidentiary hearing occurred on June 16, 2011, in the Plano, Texas courthouse of the United States District Court for the Eastern District of Texas, Sherman Division, Hon. Richard Schell presiding. The transcript of that hearing was filed on June 21, 2011.  Petitioner would show the following:

## I. INTRODUCTION AND PRIOR PROCEEDINGS.

Petitioner is currently incarcerated on death row at  the Polunsky  Unit of the Texas Department of Criminal Justice  at Livingston, Texas, in the custody of Respondent.  Mr. Acker filed his "Petition for Writ of Habeas Corpus" in this Court on November 14, 2007.  (Docket No. 17.)  On November 30, 2007, he filed a "Motion to Stay and Hold Proceedings in Abeyance." (Docket No. 21.) On December 12, 2007, this Court granted Petitioner's motion to hold proceedings in abeyance to allow Mr. Acker to exhaust his state remedies.  (Docket No. 25.)  After the state courts dismissed his subsequent state application, Mr. Acker filed his "Post-Exhaustion Petition for Writ of Habeas Corpus" in this Court on November 10, 2008.  (Docket No. 30.)  Respondent filed an answer and response in opposition to that petition on August 21, 2009.  (Docket No. 43.)  On February 19, 2010 Petitioner filed his reply to Respondent's answer (Docket No. 48) and a few days later, on March 1, 2010, Petitioner filed his "Motion for Evidentiary Hearing."  (Docket No. 50.)

This Court granted that motion in part on May 26, 2010, and ordered an evidentiary hearing on one of Petitioner's claims, Claim One, relating to actual innocence (Docket No. 56.)   The hearing was held on June 16, 2011.  On that date, this Court ordered that the parties submit post-hearing briefs by July 15, 2011.  Currently pending is Respondent's unopposed motion to extend the time for filing this brief to June 20, 2011, and this brief is submitted within the deadline requested by Respondent and  in accordance with the Court's order of June 16, 2011.

## II.  SUMMARY OF THE EVIDENTIARY HEARING.

Appearing for Respondent at the hearing were Tina Joann Miranda and Leslie Kuykendall of the Office of the Attorney General of Texas, and undersigned counsel A. Richard Ellis for Petitioner.

Petitioner's medical expert, Dr. Glenn Larkin, who was scheduled to testify via video-conference from North Carolina, suffered a heart attack on the morning of the hearing, and had to be transported to a hospital in Charlotte via ambulance**.**  (EH at 4-5, 117.)[1]  Hence, he was unable to testify.  However, a stipulation regarding his testimony was agreed to by the parties, which is detailed *infra.*

At the outset, the Court observed that "Dr. Larkin and Dr. Di Maio...both agree that strangulation was not the cause of death" of the victim, Ms. George.  (EH at 9.)  Respondent replied that "[t]he indictment in this case alleged three alternatives.  Strangulation was Part Two of them.  The third alternative was that Mr. Acker caused her death by blunt-force injuries."  (EH at 10.)[2]  The Respondent also admitted that "strangulation is not a viable theory here."  (EH at 11.)

The Court observed that "as I understand from the *House* [*v. Bell,* 547 U.S. 518 (2006)] case, I can hear any evidence whether it's admissible or not at trial.  So whether I agree or disagree with the trial judge's rulings on the evidence is sort of irrelevant here."  (EH at 12.)  Both counsel agreed

---

[1]  "EH" refers to the "Reporter's Transcript of Evidentiary Hearing," the June 16, 2011 hearing, filed in this Court on June 21, 2011.

[2]  This is incorrect. The indictment actually alleged "manual strangulation *and* ligature strangulation with an object, the exact nature of which is unknown to the grand jury, and blunt force injury resulting from causing her to impact a blunt object....(Petitioner's Evidentiary Hearing Exhibit 4)("Petitioner's Evidentiary Hearing Exhibit" refers to Petitioner's exhibits admitted at the June 16, 2011 evidentiary hearing.  For the convenience of the Court, these exhibits are submitted as an Appendix to Petitioner's Post-Hearing Brief.  "Exhibit" refers to the exhibits previously submitted in support of the petition for writ of habeas corpus.)

that "the court can consider all the evidence, even though it may not have been admissible at trial, such as hearsay."  (EH at 13.)[3]  Respondent opined that the Court was not "confined to the theory that the prosecution advanced at the trial" which was strangulation. (EH at 14-15.)  The Court also asked whether "the prosecution advanced either strangulation, blunt force, or both."  (EH at 14.)[4]  Counsel for Petitioner observed that

> there was no stand-alone theory of bunt-force injury.  The jury was asked to consider blunt-force injuries, but in the context of the theory of a prior strangulation....The jury charge was made in the context of the mounds of evidence, from the autopsy, to the indictment, to the testimony of Dr. Gonsoulin, the opening statements, the [trial] testimony, the cross-examination of Mr. Acker, the closing arguments.  They were all within the context of the victim was first strangled and [was] then dead at the time of the blunt-force injury.
> (EH at 16.)

The Court observed that "maybe I'm not even limited by the instructions that were given at that trial...that's my understanding....I'm looking at a hypothetical jury of reasonable people." (EH at 17-19.)  Counsel for Respondent  argued that "we're talking about a hypothetical reasonable juror and what they would think" (EH at 18) and

> a huge part of our rebuttal to the actual innocence is going to depend on arguments based on what the expert says.  Because our expert is going to come in and say you can't tell whether she was pushed or jumped.  So then it's going to be left up to the evidence at trial to determine whether it was accidental.
> (EH at 21.)

**Nancy Acker,** Petitioner's mother, testified that Mr. Acker was not violent as a child and

---

[3]   *See House*, 547 U.S. at 538 ("*Schlup* [*v. Delo,* 513 U.S. 298 (1995)] makes plain that the habeas court must consider 'all the evidence,' old and new, incriminatory and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.").

[4]   As shown herein, this statement pertains solely to the charge to the jury, and not in the broad sense of the prosecution's overall trial theory.  In virtually every other aspect of the trial, the State's position was that there was no "stand alone" theory of blunt force injuries.

did not get into fights frequently. (EH at 27.)  Ms. Acker remembered that Petitioner and the victim Ms. George met and began to live together in early 2000. (EH at 28.)  On the day of Ms. George's death, March 12, 2000, Ms. Acker learned that her son was looking for her.  (EH at 28.)  Petitioner's sister Dorcas had called her that morning.  (EH at 28.)  Mrs. Acker then went looking for him and she eventually found Petitioner at Bentley Electric in Sulphur Springs, his place of employment. (EH at 29.)  Mr. Acker told his mother that Ms. George had "jumped out of the truck and she was dead." (EH at 30.)  He was upset and "looked frantic."  (EH at 30.)  Mrs. Acker then went to search for Ms. George and told Daniel to go to his sister's house. (EH at 30.)

Mrs. Acker had heard that Ms. George had previously attempted to jump from a vehicle. (EH at 31.)  She did not see this herself, however.  (EH at 35.)

**Lewis Tatum** testified that he was a deputy on the night shift patrol of the Hopkins County Sheriff's Office in the year 2000.  (EH at 36.)  About two weeks prior to the victim's death, on February 26, 2000, Deputy Tatum was dispatched to a residence at 10:40 p.m.  in regard to an alleged assault. (EH at 36.)  The victim Ms. Markie George and Petitioner's mother Mrs. Nancy Acker were at that location. (EH at 39.)

Deputy Tatum's report was offered and admitted as <u>Petitioner's Evidentiary Hearing Exhibit 1</u>.  (EH at 40.) In that report, the witness took a statement from Markie George. Mr. Acker and Ms. George  had gotten into an argument while driving home from a local club called "Bustin Loose." (EH at 41.)  Deputy Tatum wrote that "Ms. George had tried to jump out of the pickup"  while it was being driven by Mr. Acker.  (EH at 39.)  Deputy Tatum  did not know who made that statement. (EH at 38.)[5]  The statement continued and said that "he caught her by the arm and pulled her back

---

[5]   However, the statement was that "Ms. George advised that she and Mr. Acker had been at "Bustin Loose" where they had gotten into an argument.  When they started to the

into the vehicle." (EH at 39.)  No charges were brought as a result of this incident.  (EH at 40.)

**Dr. Vincent J. M. Di Maio,** Respondent's medical expert,[6] first testified as to his background and education in the field of pathology, including a stint as chief medical examiner in San Antonio.  (EH at 45.) Petitioner stipulated to Dr. Di Maio as an expert. (EH at 46.) Dr. Di Maio reviewed the autopsy report, photographs of the body and the scene, Dr. Larkin's report and trial transcripts volumes 19 through 22. (EH at 46.)  Dr. Di Maio was asked to examine a limited question:  the cause and manner of the death of Ms. George. (EH at 47.)

Dr. Di Maio stated that forensic pathologists "get the history from police, from medical records, and from our own investigators...so what we want to know is the circumstances leading up to and surrounding the death."  (EH at 47.)  The autopsy follows, as well as possible laboratory studies, and then an opinion is rendered as to the cause of death. (EH at 47-48.)  Sometimes, the cause of death cannot be determined solely from the tests.  (EH at 48.)  But the circumstances have to be taken into consideration, for instance if a drowning victim was seen to have been pushed into a lake.  (EH at 48-49.)

His opinion was that "the young lady here died as a result of multiple blunt-force injuries. You can't make a diagnosis of strangulation."  (EH at 49.)  The reason was that "[y]ou don't have the signs."  (EH at 49.)  Although "she's got a few petechiae[7] in one eye," but "[t]hat's not typical

---

residence on County Road 2450, which was Mrs. Acker's residence, Ms. George had tried to jump out of the pickup." (EH at 42.)  As Mrs. Acker was not in the pickup at the time, this statement had to have been given by Ms. George.

[6] The prosecution's medical expert at trial was the coroner, Dr. Morna Gonsoulin.

[7] "Petechiae" are "small punctate hemorrhages....hemorrhages in the blood vessels in the eye." (EH at 49.)  These are "pulsations [which] literally blow out the blood vessel."  (EH at 50.)

strangulation.  Strangulations have multiple petechiae.  It's going to be in both eyes, and often in the skin."  (EH at 49.)

Dr. Di Maio said that "this person has been run over, their chest has been compressed, their brain has been squashed, and so you see a few petechiae.  You can't make the diagnosis [of strangulation]."  (EH at 51.)  He also testified that his "second opinion" was that the victim had been run over. (EH at 51.)  There were multiple fractures of the skull and facial fractures, parts of the brain were "torn apart" and "where the brain stem connects to the spinal column, it's also torn."  (EH at 51.)  The was also a fracture of the neck.  (EH at 51.)  These are the type of injuries "you get when the head is squashed."  (EH at 51.)  Dr. Di Maio thought the "tire had to go over [the victim]."  (EH at 52.)  There were also chest injuries and lacerations to the lung which indicated "violent compression of the chest."  (EH at 52.)  This is typical of a run-over by a vehicle.  (EH at 53.)  These injuries were consistent with being "ejected from a car or if you jump or you are pushed...you typically get a little head injury."  (EH at 53.)  People typically tumble "and so they generally tend not to get too many injuries below the neck."  (EH at 53.)  The whole body was not necessarily run over, for instance the abdomen may not have been, but he thought that the leg, chest and head were. (EH at 70.)

Dr. Di Maio also opined that the leg injury was due to a tire going over it.  (EH at 53.)  The tear almost completely around one of the legs "is very characteristic of tires going over the limb, pinning and tearing it."  (EH at 53.)  His conclusion was that "what you have is someone who died as a result of massive trauma to the head and chest.  And the only way you could have that is a tire going over."  (EH at 54.)[8]  The witness disagreed with Dr. Larkin's opinion about the cause of the

---

[8]   This testimony is consistent with what Mr. Acker testified to at his trial and at the state court hearing.  At trial, Mr. Acker stated that when Ms. George jumped from the truck, "I

leg wound.  (EH at 54.)  Dr. Di Maio thought that the tire grabbed the lower part of the skin and tore it.  (EH at 56.)  If the wound had happened inside the truck, he would have expected to see a lot of blood there.  (EH at 57, 59-60.)[9]

Dr. Di Maio also took issue with the part of Dr. Larkin's "plausible alternative scenario" that "concludes that Ms. George voluntarily jumped from the truck and thus sustained the injuries that we see in the autopsy report."  (EH at 60-61.)  He did not completely disagree with the conclusion of Dr. Larkin that the victim jumped, but said that he could not make this conclusion with certainty.  "You can't tell from the injuries whether the person was pushed or jumped."  (EH at 61.)  There were some variables—whether the truck was veering from right to left, how the victim left the truck, did she try to grab something—that meant that "you cannot say whether she jumped out or was pushed out."  (EH at 61.)  "Medically, there's just no way to say from the evidence.  It's just too

---

stomped the brake with my left foot [and] it throwed (sic) me down into the seat of the truck" (21 RR 242).  This jolt could have been the impact of the truck with the victim's body combined with the braking action.  Mr. Acker lost sight of the victim when she jumped, but thought he had not run over her.  (21 RR 253.)  However, as he testified at trial, "I'm not sure how everything happened after she jumped out of the pickup."  (21 RR 253.)  At the state court post-conviction hearing, Mr. Acker testified that he grabbed Ms. George, she turned to the left, her warm-ups caught on the door latch.  (HT 14.)( "HT" stands for the transcript of the state hearing on the writ of habeas corpus.)  Then the victim's  foot hit the road, the bottom corner of the utility bed caught her, she flipped upside down, and her head hit the road as the rest of her body came down, causing force on her head and neck.  (HT 16.)  Mr. Acker has denied intentionally running over the victim, after he stopped the truck and backed up, subsequent to the victim's jumping.  (21 RR 253.)

[9]  Dr. Larkin's reconstruction scenario of the victim's injuries were peripheral to his analysis and opinion that the victim was not strangled.  This analysis of the leg injury was contained in a section of his report entitled "A Plausible Alternative Scenario" on pages 19 to 21 of his 23-page report.  (*See* Exhibit 26 to Petitioner's writ; *see also* EH at 60.)  Although Respondent spends considerable space in the Reply to discrediting Dr. Larkin's scenario (Reply at 27-33), it is clear that the main point of his report was to discredit the strangulation opinion of Dr. Gonsoulin.  The two-page "plausible alternative scenario," while not discredited by Dr. Di Maio, except to the extent he himself could not make these conclusions with certainty, was not an essential part of Petitioner's actual innocence claim.

many variables." (EH at 61-62.)   Dr. Di Maio stated that Dr. Larkin "gave an alternative, and I

disagreed with it." (EH at 70.)

Petitioner introduced a letter that Dr. Di Maio sent to Respondent's counsel and the letter

was introduced as <u>Petitioner's Evidentiary Hearing Exhibit 2</u>.  In the letter, Dr. Di Maio stated

> Based on the aforementioned materials, it is my opinion that the diagnosis of strangulation of Marquette (sic) George is not supportable by the evidence.  The neck injuries and petechiae are non-specific and better explainable by the massive blunt force injuries incurred when Ms. George went out the moving truck and was run over. In addition, to strangle an individual one has to maintain continuous pressure on the neck, occluding both the carotid arteries, for 2-3 minutes.  I do not think it would be possible under the circumstances of this incident i.e., using one hand while driving a truck and the victim a healthy adult female.
>
> As to whether Ms. George jumped or was pushed from the truck, it is impossible to say from the injuries.  While Dr. Larkin gives a detailed explanation as to how each injury occurred and why she had to have jumped out the truck, in my opinion this is not possible, due to the many variables....With all these variables and possibilities, all that one can say from the autopsy is that she incurred her injuries from going out a moving vehicle and being run over by the vehicle.
>
> (<u>Petitioner's Evidentiary Hearing Exhibit 2</u>, Letter of Dr. Vincent Di Maio to Tina J. Miranda, May 27, 2011.)

Dr. Di Maio was aware that the trial testimony was that Ms. George had been first strangled

to death and then the blunt force injuries occurred.  (EH at 63.)  Dr. Di Maio "agreed completely"

with Dr. Larkin's opinion that the victim was not strangled.  (EH at 64.)  But he could not say with

certainty that the victim jumped out of the truck.  (EH at 64.)  The witness did not base his opinion

on any past history of the victim, for instance, that she attempted to jump from the truck in the past,

but stated that one could not tell "from the injuries themselves." (EH at 65.)[10]

This witness opined that the brain injuries were the main cause of death.  (EH at 66.)  They

were "so massive that that (sic) killed her." (EH at 66.)  It would have been difficult for the victim

---

[10]   Although he earlier testified that forensic pathologists "get the history from police...so what we want to know is the circumstances leading up to and surrounding the death." (EH at 47.)

to have been strangled while Mr. Acker was driving the truck.  (EH at 67.)  "But also there's no

evidence that you can say she was strangled.  So, I mean, it's just completely out."  (EH at 67.)[11]

Certain stipulations were made by the parties.  The indictment was admitted as Petitioner's

Evidentiary Hearing Exhibit 4, and it excused the testimony of subpoenaed witness Clayton

McGraw, the foreman of the grand jury that indicted Petitioner in 2000.    That indictment read in

part as follows:

> ...that Daniel Clate Acker, on or about the 12th day of March, 2000...did then and there,
> intentionally cause the death of an individual, namely, Marquetta Follis George, by
> homicidal violence, to wit: manual strangulation and ligature strangulation with an object,
> the exact nature of which is unknown to the grand jury, and blunt force injury resulting from
> causing her to impact a blunt object, the exact nature of which is unknown to the grand jury,
> and Daniel Clate Acker was then and there in the course of committing and attempting to
> commit the offense of kidnaping of Marquetta Follis George.

It was signed by the jury foreman Clayton McGraw. (Petitioner's Evidentiary Hearing

Exhibit 4.)

The second part of the stipulation was that the grand jury was unable to determine what

object was used to strangle the victim and was unable to determine whether it was done manually

or with a rope or ligature. (EH at 75.)

The next stipulation was as to subpoenaed witness William Brandon Anderson of the

Hopkins County Sheriff's Department.  It was received as Petitioner's Evidentiary Hearing Exhibit

5, and it was regarding an incident that occurred on February 26, 2000, about two weeks before Ms.

George's death. It read in part:

> Ms. George then advised officers that Mr. Acker and herself had been at 'Bustin Loose' and
> had gotten into an argument...Mrs. George also advised later in her conversation that while
> Mr. Acker and her were on the way back to the residence from the club, she had attempted

---

[11]  A photo of a side-view of the truck, showing how the utility bed stuck out past the cab
door, was introduced as Petitioner's Evidentiary Hearing Exhibit 3.

to jump from the truck and Mr. Acker had caught her by the arm and pulled her back into
the truck.
Statement of William Brandon Anderson, Hopkins County Sheriff's office, Feb. 26, 2000.

The third stipulation was to Walter Allen Story, of the same office, and it was regarding the
times of the calls to the police on March 12, 2000.  The 9-1-1 log recorded a call from Mr. Smiddy
at 11:45 a.m., a call from Mr. Ferrell at 11:47 a.m., and Officer Hill arrived at the scene of the body
at 11:51 a.m., and at 11:53 a.m., he called in to say that there was no pulse.  (EH at 78.)  This was
his trial testimony.  (EH at 80.)

The last stipulation was to Bill Reece, of the Hopkins County Sheriff's office, and it was that
Mr. Acker surrendered to Officer Reece after waving him down.  (EH at 81.)

**John Riley Sands**, the defense investigator at the 2001 trial, testified that he had been a
private investigator for 31 years. (EH at 82.)  As part of the defense investigation, he drove the
distance from Mr. Acker's residence to the crime scene, and it took about three to five minutes.  (EH
at 84-85.)  Mr. Sands also obtained a truck similar to the one used by Mr. Acker on March 12, 2000.
(EH at 85.)  The inside was wider than a conventional sedan.  (EH at 86.)  The witness sat in the
driver's seat and was unable to reach the driver's door while still being able to see the road and
drive.  (EH at 87.)  It would have been difficult to open the door and push someone out of the truck.
(EH at 87.)  This experiment was performed without anyone in the passenger seat who would have
made the reach to the door further or who may have been resisting.  (EH at 87.)  Mr. Acker was "a
little bit" taller than the witness.  (EH at 89.)  The presence of another person in the truck would
have made the opening of the door more difficult.  (EH at 92.)

**Ron Ferguson**, one of Mr. Acker's trial attorneys, was not allowed to testify as to the claim
under review at the hearing, actual innocence. (EH at 93-101.)  Attorney for Petitioner argued that
the State's case at trial depended on strangulation, and that their theory was that the victim was first

"strangled to death and then, and only then, blunt-force injuries occurred." (EH at 94.)  Attorney

for Respondent agreed that "I think it's impossible to say that it [the State's theory at trial] was not

strangulation. Obviously strangulation was a huge part of their case, it's something they asserted

throughout the evidence, it's something they argued." (EH at 100-101.)

    **Sabrina Ball** testified that she was a neighbor of Mr. Acker's mother in 2000 and lived two

doors from her. (EH at 102-103.)  In late February of the year 2000, two weeks before Ms. George's

death, she came to Ms. Ball's door late at night. (EH at 103.)  Ms. George was scared and crying

and said that she had an argument with Mr. Acker as they drove back from the club "Bustin Loose."

(EH at 104.)  Ms. George told Ms. Ball that she [Ms. George] had tried to jump out of the truck and

"he [Mr. Acker] grabbed her by the hair of the head and pulled her back in." (EH at 104.)  As a

result of this conversation, Ms. Ball called the police and gave them statement. This was introduced

as <u>Petitioner's Evidentiary Hearing Exhibit 6</u> (EH at 106), a three-page statement that she gave to

the police on February 26, 2000, two weeks prior to Ms. George's death. (EH at 106.)  It stated in

part:

> Daniel Acker, he lives a few houses down, we got in a fight, we were at 'Bustin
> Loose.'  We were in the truck and he was beating my head against the dash.  I tried
> to jump out but he pulled me back in.  My face was just a few inches from the
> pavement."
> Statement of Sabrina Ball to S.R. Scott of the Hopkins County Sheriff's Office, 1-6-
> 01.
> (<u>Petitioner's Evidentiary Hearing Exhibit 6</u>.)

Ms. Ball was not in the car at the time of this incident. (EH at 108.)

    Another stipulation was entered into regarding a report made by officer Christopher Hill.

(EH at 112-113.)  The report read in part, as enunciated by the Court:

> "In Mr. Hill's supplemental report he makes the statement—and Mr. Hill was a
> former employee of the Hopkins County Sheriff's Office—he makes the statement
> that dispatch advised him that complainant, being Mr. Smiddy, saw the male subject

force the female subject into a white truck and then drive off.  And while driving off, the female subject tried to exit the vehicle, and the male subject jerked her back in." (EH at 113.)

The report was admitted as Petitioner's Evidentiary Hearing Exhibit 7. (EH at 114.)

Petitioner's medical expert **Dr. Glenn Larkin** suffered a heart attack on the morning he was to testify via video-conference and he was unable to testify as he had been admitted to the emergency facilities of a hospital in Charlotte, North Carolina.   (EH at 117.)  As a result, two stipulations were entered into regarding his testimony.  The first was that it was a possibility that the victim Ms. George was run over by the truck.  (EH at 119.)  The second part of the stipulation was that "from the medical evidence alone it is impossible to say whether there was a pushing or a jumping of the victim from the vehicle."  (EH at 119.)

There was an additional stipulation entered into, a statement given by witness **Alicia Smiddy** on the day of Ms. George's death, March 12, 2000.  (EH at 120.) As enunciated by the Court, the statement, given to Officer Cosme of the Hopkins County Sheriff's Office, read as follows:

> Marquetta came running out of their house yelling for us to call the sheriff that he's not going to beat me!  She got behind me so he couldn't get her, my 1- yr.-old was in the stroller by me.  He came charging out of the house with no shirt with an evil mad look on his face, never saying anything, walked by my 1-yr.-old, picked Marquetta up over his shoulder, She was screaming, kicking, yelling No Daniel, No Daniel, trying her best to get loose.  She started crying, he shoved her into a white utility truck on the Driver Door (sic) side.  She was trying to get out.  He hit her, shoved her on in, holding her down, spun off through the ditch. She was trying to get out he was swerving all over the road turned and went towards Mahoney.  That was the last we saw.
> Petitioner's Evidentiary Hearing Exhibit 8. (EH at 120-121.)

All of the exhibits accompanying Petitioner's federal petition were received as part of the record of the hearing.  (EH at 121.)  Petitioner rested.  (EH at 121.)

**Toney Hurley** testified that he was an employee of the Hopkins County Sheriff's office both presently and in 2000.  (EH at 123.)  In that year, he was the chief investigator of the office.  (EH

at 123.)  Officer Hurley stated that there was a "small speck" of blood found inside the truck that was involved in this incident. (EH at 124.)  He also performed an investigation on a similar truck, a 1999 Ford F350 one-ton with a bench seat. (EH at 124.)  From window to window, the truck measured six feet and one-half inches. (EH at 125.)  From door handle to door handle it is sixty-seven inches.  (EH at 125.)  From the center of the steering wheel to the passenger side door latch the distance is fifty-two inches.  (EH at 125.)  This witness was two inches shorter than Mr. Acker. (EH at 126.)  He was able to lean over and open the passenger-side door.  (EH at 126.)

These tests were done while the truck was stationary, no one else was in the truck, no one was trying to resist, there was nothing on the seat.  (EH at 126-127.)  This witness was aware of the incident when she tried to jump out of the truck two weeks prior to her death.  (EH at 127.)

A statement signed by Mr. Hurley on April 3, 2000 was introduced as Petitioner's Evidentiary Hearing Exhibit 9. (EH at 130.)  In that statement, Mr. Hurley interviewed Mr. Acker on March 13, 2000, the day after the death of Ms. George.  Mr. Hurley was told by Judge Ronny Glossup that "the medical examiner's office had called him and stated that they believe that George was dead at the time she was run over.  Chester called the M.E. and spoke to Dr. Morna Gonslin (sic) and confirmed the information."  (Petitioner's Evidentiary Hearing Exhibit 9 at 1.)  Upon being told this, "Acker got very angry and stated "The medical examiner is lying."  "Acker continually stated that Markie jumped out of the truck."  (*Id.*)

Mr. Acker also stated that he felt responsible for the death of the victim, as

> Acker stated that George was trying to get out of the truck while he was driving. Acker stated that he was pulling George's hair to hold her in the truck.  Acker stated that he also hit George in the nose and mouth.  Acker told Hurley and Chester that he knew he was the cause of Markie's death because he placed her in the truck.  And then Acker continued to state that George jumped out of the truck."
> EH at 131; Petitioner's Evidentiary Hearing Exhibit 9.)

-14-

The Court indicated that "assuming the actual-innocence issue is not limited to the evidence used at trial, which apparently it is not, my question to you is whether it is limited in terms of the theory advanced by the prosecution at trial." (EH at 135.)  The Court also asked the briefing to address the question of whether it was "limited to the theory that was advanced by the prosecution at trial." (EH at 137.)  It also asked the parties to consider *Whiteside v. State,* 29 S.W.2d 399 (Tex. Crim. App. 1930) (EH at 137.)  The language of that case stated that "[a] person who, by actual assault or threat of violence, causes another, acting upon well-grounded or reasonable fear or apprehension, to do an act resulting in physical or corporal injury causing his death, is responsible for the homicide." (EH at 138.)

### III.  THE STANDARD OF REVIEW.

The subject of the evidentiary hearing was Petitioner's claim of "actual innocence," Claim One in his petition.  The claim was presented to the Texas Court of Criminal Appeals ("CCA") in Mr. Acker's subsequent petition.  On September 10, 2008, that Court denied this claim, and all the others, on the procedural basis that it did not meet the requirements for a subsequent writ. There was no "merits" ruling on this claim.

#### A.  The *Schlup/House* standard of review.

In *Herrera v. Collins*, 506 U.S. 390 (1993), *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell,* 47 U.S. 518 (2006), the Supreme Court has outlined the standard of review for claims of "actual innocence."  *Herrera* and *Schlup* explain that freestanding merit claims of actual innocence and gateway claims serve distinct purposes.  In *Herrera,* the habeas petitioner alleged that he was actually innocent of the crime for which he was convicted and sentenced to death, but he did not allege a constitutional, trial error. Without an accompanying constitutional claim, a plurality of the

Supreme Court held, his claim of actual innocence was irrelevant. "A claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to  have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404.[12]

In *Herrera,* the petitioner did not seek to excuse  a procedural error so that he might bring an independent constitutional claim challenging his conviction or sentence. *Id.* The gateway claim of actual innocence would only be relevant if "the prisoner supplements his constitutional claim with a colorable showing of actual innocence." *Id*. at 404 (emphasis in original) citing *Kuhlman v. Wilson*, 477 U.S. 436, 454 (1986).  In other words, had Herrera presented a separate merit claim -- one amounting to a denial of a federal constitutional right -- Herrera could have asserted actual innocence as his gateway claim to excuse the default of his merit claim.

In *Schlup v. Delo*, 513 U.S. 298 (1995) the Supreme Court ruled that actual innocence is not a constitutional claim but a gateway claim to have otherwise barred claims considered on the merits.

> If a habeas petitioner....presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims. *Schlup* at 316.[13]

---

[12]   While *Herrera* was a plurality opinion, all nine Justices of the Supreme Court agreed that Herrera's actual innocence claim could serve as a gateway to another constitutional claim.

[13]   In *Schlup,* the petitioner had filed a second federal habeas corpus petition asserting that he was actually innocent and that he was denied the effective assistance of trial counsel. Schlup's ineffectiveness claim was procedurally defaulted; nevertheless, the Supreme Court remanded his case for further proceedings to determine if he could demonstrate sufficient evidence of his actual innocence so that the procedural default of his ineffectiveness claim could be excused. *Schlup*, 513 U.S. at 332.

The *Schlup* court held that the proper standard was the more lenient one of *Murray v. Carrier,* 477 U.S. 478 (1986), where a procedurally defaulted petitioner has to show that a constitutional violation has *probably* resulted in the conviction of one who is actually innocent, *Schlup* at 326, rather than the more stringent standard of *Sawyer v. Whitley,* 505 U.S. 333 (1992), which required a showing to show by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under state law. *Schlup,* 513 U.S. at 323-326.[14]  In other words, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup* at 327. *Schlup* emphasizes that the standard is *not* that of *Jackson v. Virginia,* 443 U.S. 307 (1979)("[N]o rational trier of fact *could* have found proof of guilt beyond a reasonable doubt.")(emphasis added) *Schlup* at 323 n. 38; 330.

As the Court pointed out at the hearing in this case, this is a "probabilistic determination about what reasonable, properly instructed jurors would do." (EH at 17; 99 (citing *House v. Bell,* 547 U.S. 518 (2006); EH at 100).   Respondent's citing at the hearing of the jury instructions as encompassing one possible theory of guilt (blunt force injuries alone) is relevant only insofar as the jury instruction did not completely foreclose the possibility that they *could have* found Mr. Acker guilty.   However, as *Schlup* pointed out, the *Jackson v. Virginia "could have"* standard is not the standard of review here on Mr. Acker's actual innocence claim. *Schlup* at 323 n. 38; 330.

Instead, *Schlup* holds that to satisfy the *Carrier* gateway standard, "a petitioner must show

---

[14]   "Accordingly, we hold that the *Carrier* "probably resulted" standard rather than the more stringent *Sawyer* standard [clear and convincing evidence] must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims." *Schlup* at 326-327.

that it is *more likely than not* that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt." *Schlup* at 327 (emphasis added). As *Schlup* points out,

> the line between innocence and guilt is drawn with reference to a reasonable
> doubt....even in *Sawyer,* with its emphasis on eligibility for the death penalty, the
> Court did not stray from the understanding that the eligibility determination must be
> made with reference to reasonable doubt.   Thus, whether a court is assessing
> eligibility for the death penalty under *Sawyer,* or is deciding whether a petitioner has
> made the requisite showing of innocence under Carter, the analysis must incorporate
> the understanding that proof beyond a reasonable doubt marks the legal boundary
> between guilt and innocence.
> *Schlup* at 328.

*Schlup* also instructs that "[i]t is not the district court's independent judgment as to whether

reasonable doubt exists that the standard addresses; rather, the standard requires the district court

to make a probabilistic determination about what reasonable, properly instructed jurors would do."

*Schlup* at 329; *see also House* at 540 (stressing the inquiry is not the independent judgment of the

district court, but "*Schlup*'s predictive standard regarding whether reasonable jurors would have

reasonable doubt").   *Schlup* also stressed that "[u]nder a proper application of either *Sawyer* or

*Carrier,* petitioner's showing of actual innocence is not insufficient solely because the trial record

contained sufficient evidence to support the jury's verdict." *Schlup* at 331.[15]

In a holding of great importance for Mr. Acker's case, the court also held that

> in assessing the adequacy of petitioner's showing, therefore, the district court is not
> bound by the rules of admissibility that would govern at trial.   Instead, the emphasis
> on 'actual innocence' allows the reviewing tribunal also to consider the probative
> force of relevant evidence that was either excluded or unavailable at trial.
> *Schlup* at 327-328.

Thus, this Court can consider all of the evidence adduced at the hearing and in Petitioner's

---

[15] This holding is particularly important here because of the state's repeated emphasis at
the evidentiary hearing on the fact that under one of the jury charges, the jury *could* have found
Mr. Acker guilty based on "blunt force" injuries alone.  Again, as discussed *supra,* the test is not
whether a reasonable juror "*could have*" found Mr. Acker guilty of capital murder.

exhibits introduced at the hearing, whether or not they contain hearsay.  The determination to be made by this Court is made in light of all the evidence, as the Court made clear at the hearing. (*E.g.,* EH at  12-13, 18, 19, 134-137.)

In *House v. Bell,* 547 U.S. 518 (2006)  the Supreme Court reaffirmed the analytical framework of the *Schlup* "actual innocence" exception to procedural default.  The Court emphasized that

> the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence.  A petitioner's burden at the gateway stage is to demonstrate that, more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."
> *House,* at 538.

The *House* court added that "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House, id*. Simply stated, the standard is "whether reasonable jurors would have reasonable doubt." *House* at 540.

 In *House,* the Supreme Court again made clear that "*Schlup* makes plain that the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial." *House* at 538, quoting *Schlup* at 327-328.   Based on the total record the court must make a "probabilistic determination about what reasonable, properly instructed jurors would do.'" *House* at 538, quoting *Schlup* at 329.  Here, *Schlup* and *House*'s reference to "properly instructed" jurors provides one guideline for this Court, as that rationale would rule out any reference to the strangulation options given to Mr. Acker's jury. The *House* court summarized the standard as follows:

A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, than, more likely than not, any reasonable juror would have reasonable doubt.

*House* at 538.

In other words, the *Schlup* actual innocence inquiry "requires a holistic judgment about 'all the evidence'...and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House* at 539.  Applying this standard, even though "some aspects of the State's evidence...still support an inference of guilt" and only part of that evidence had "been called into question," and although "the issue is close," the Supreme Court concluded that "it is more likely than not that no reasonable juror viewing the evidence as a whole would lack reasonable doubt." *House* at 554.

*House* once again emphasizes that "the gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia* (whether a rational juror could have found the defendant guilty).  *House* at 538.  As *House* held, "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House* at 538.

The *House* court also held that the AEDPA standard of review[16] does not apply in the "actual innocence" context. *House* at 539. That standard would require a petitioner to show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."(28 U.S.C. Sec. 2244(b)(2)(B)(ii) and Sec. 2254(e)(2)(threshold standard for obtaining an evidentiary hearing).

---

[16]   The AEDPA standard "permits consideration of successive, abusive, or defaulted sentencing-related claims only if the petitioner 'show[s] by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *House* at 539, citing *Sawyer,* 505 U.S. at 336.

### B. Respondent's prior arguments, based on the jury instruction, apply an incorrect standard of review.

Respondent has previously argued that "to prove his innocence Acker must establish no rational jury would find him guilty of killing Markie by strangulation, causing him blunt force injuries, or a combination of the two." Respondent's Reply Brief (Docket No. 43) at 24-27.) With the demise of the "strangulation" theory, the first and third options are no longer in issue. Respondent has also argued that "Acker's evidence is also insufficient to show that no rational juror would find him guilty of causing blunt force injuries that resulted in Markie's death." (*Id.* at 31-36.)[17]

These two related arguments of Respondent, repeated again at the hearing (*e. g.,* EH at 10), are that unless Acker shows that no rational juror would have convicted him of killing Markie by blunt-force injuries, he cannot prove his innocence.   Petitioner shows herein that he has met that standard, as his pushing the victim out is much less likely than her jumping.

First, this is an incorrect standard.  The correct one is that "it is more likely than not that no reasonable juror viewing the evidence as a whole would lack reasonable doubt."  *House* at 554. Additionally, in the application of that standard, Respondent's logic is seriously flawed.  Respondent has pointed to the jury instructions, which included one theory that still applies, that of blunt force injuries as the cause of death.  But simply because the jury was given two options out of five that death was caused by  blunt-force injuries does not show that the jury *would have* convicted him using that theory.   It shows only that the jury *could have* convicted him.  As discussed *supra,* this

---

[17]   The middle part of Respondent's reply to the actual innocence claim, that "Acker's evidence is insufficient to establish that no rational juror would find him guilty of strangling Markie" (Reply at 27-30) has now been rendered moot by the concession that there was "no strangulation."

is not the correct test for the actual innocence review. *Schlup* emphasizes that the standard is *not* that of *Jackson v. Virginia,* 443 U.S. 307 (1979)("[N]o rational trier of fact *could* have found proof of guilt beyond a reasonable doubt.")(emphasis added) *Schlup* at 323 n. 38; 330.  The totality of the evidence must be weighed, not just this one optional jury instruction.

What Respondent misses is while the jury, in their instructions, was given the option of finding Mr. Acker guilty based solely on a finding that Ms. George died from "blunt force" injuries, this theory was actually presented at trial as part of the wider "death by strangulation" theory. There was no "stand alone" theory of blunt-force injuries, but blunt-force injuries were alleged to have occurred only in the context of a prior fatal strangulation. The fact that the prosecution may have covered all their bases in the jury instructions does not equate to a coherent theory of "blunt force" injuries, standing alone.

Respondent's prior emphasis on the "blunt force"  jury instruction, standing alone, is also contrary to the *Schlup/House* admonition for the reviewing court to consider all the evidence as a totality.  *See Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) ("emphasis on 'actual innocence' allows the reviewing court to consider the probative force of relevant evidence that was either excluded or unavailable at trial").  *See also House v. Bell*, 547 U.S. 518, 538 (2006) ("*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial") (internal quotation marks and citations omitted).

**C. This case presents a much stronger and clearer inference of innocence than in** ***House.***

In *House,* where the Supreme Court held that House had "cast considerable doubt on his guilt" (*House* at 555) there still remained a fair amount of evidence that pointed to his guilt.  The

*House* court held that  "[t]his is not a case of conclusive exoneration" as "[s]ome aspects of the State's evidence—Lora Muncey's memory of a deep voice [suggesting House]; House's bizarre evening walk, his lie to law enforcement, his appearance near the body, and the blood on his pants—still support an inference of guilt." *House* at 553-554.  The "newly discovered" evidence was "forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put forward substantial evidence pointing to a different suspect." *House* at 554.

Here, Mr. Acker's showing is much stronger than House's and more conclusive.  The new evidence includes two medical examiners who now agree that there was no strangulation of the victim, the State's central theory at trial.  All that Mr. Acker's jury heard in terms of medical testimony was Dr. Gonsoulin's now-discredited theory that Ms. George was first strangled to death and then suffered blunt force injuries.

New evidence also points to the victim having jumped, i.e., that her death was accidental, rather than the State's conjecture that she was pushed.  First, the jury would have heard about Ms. George's prior attempt, just two weeks before her death, to jump from the very same truck into which she was placed by Mr. Acker on the day of her death.  Mr. Acker's jury did not hear this important testimony.  Neither did his jury hear that Mr. and Mrs. Smiddy's original statements to the police that Ms. George was trying to get out of the truck, i.e., to jump, as the truck drove away just minutes before her death.  The jury also did not hear the defense investigator's testimony about how it was virtually impossible for the driver to have pushed her out, given the width of the truck.  All of this as a totality presents a much stronger case for actual innocence than in *House,* as in that case there was still much evidence more pointing to House's guilt than there is pointing to Acker's. *House* was "not a case of conclusive exoneration," 547 U.S. at 553, so the standard to be applied

-23-

here must, of necessity, be less than certainty.

### D.  Due Process and False Testimony.

Although in the context of Mr. Acker's actual innocence claim and the *Schlup/House* standards, it may be unnecessary for this Court to consider any due process violations at this point, it should be pointed out that it can be a violation of the Due Process Clause of the Fourteenth Amendment when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly.  *Ex parte Neil Hampton Robbins,* No. AP-76,464 (Tex. Crim. App., June 28, 2011) at \*12.  In order to constitute a due process violation, the testimony used by the State must have been false and it must have been material to the defendant's conviction, meaning that 'there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Robbins, id.*; *Unites States v. Agurs,* 427 U.S. 97, 103-104 (1976); *Ex parte Ghahremani,* 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).  It is sufficient to show that the testimony was "false" and it is not necessary to show that it was the result of perjury. *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Robbins* at \*12.

### I.  *Ex parte Robbins*.

The Court of Criminal Appeals' recent *Robbins* decision has relevance for Mr. Acker's case. *Ex parte Neal Hampton Robbins,* No. AP-76,464 (Tex. Crim. App., June 28, 2011).  In that case, the coroner, Dr. Patricia Moore, re-evaluated her original opinion and stated that she now felt that the cause of death was not necessarily death by asphyxiation, which she testified to at trial,  but, rather, in her opinion, the cause of death was now "undetermined."  In other words, "the record does not support that Moore's trial testimony has been proved to be false," *Robbins* at \*14, whereas here the State itself, through its own expert Dr. Di Maio, has explicitly disavowed their trial expert's theory of death by strangulation. In *Robbins,* "Moore's trial testimony is not just false just because

her re-evaluation of the evidence has resulted in a different 'undetermined' opinion, especially when neither she nor any other medical expert can exclude her original opinion as the possible cause and manner of death." *Id.*   Here, however, two experts, one of them the State's,  excluded and discredited Dr. Gonsoulin's "strangulation" opinion as the cause of death.   Her testimony is now acknowledged as false by the State. Two well-known and respected experts, Dr. Glenn Larkin and Dr. Vincent Di Maio, have both shown that strangulation was not the cause of death.   There is no controverting expert evidence supporting strangulation, aside from the now-disavowed trial testimony of Dr. Gonsoulin,  in contrast to *Robbins,* where "at least one well-qualified pathologist, Dr. Norton, has concluded that the child was a victim of homicide by asphyxiation."  *Robbins* at *14.  In *Robbins,* "none of the experts have stated that [the victim] could not have been intentionally asphyxiated" in contrast to Dr. Larkin's report and Dr. Di Maio's testimony which both exclude strangulation, both as a result of the autopsy photos and the lack of time and ability of Mr. Acker to strangle the victim while he was driving.

Additionally, in *Robbins,* the CCA stressed the importance, in the actual innocence inquiry, of whether the trial testimony created a "false impression" for the jury.  *Robbins* at *15.  However, in *Robbins,* "Moore's trial testimony did not result in a false impression of the facts" (*Robbins* at *15) and "Moore's trial testimony has not been proven false" (*Id.* at *16), unlike the situation here, where Dr. Gonsoulin's testimony created a very false impression that the victim was strangled to death and it has been shown to be false by the State's own expert and their admission at the hearing.

### ii. *Ex parte Ghahremani.*

In *Ex parte Ghahremani,* 332 S.W.3d 470 (Tex. Crim. App. 2011) the Texas Court of Criminal Appeals also considered the standard of review for actual innocence claims.  In this case, the State presented false testimony and failed to disclose favorable evidence.  The CCA held that

"[a] conviction procured through the use of false testimony is a denial of the due process guaranteed by the Federal Constitution." *Ghahremani* at 477.   Obviously, if the "witness's testimony created a misleading impression of the facts" (*Id.*), then it is more likely the testimony will be held to be material." *Ghahremani* at  478.  In fact, in *Ghahremani,* the CCA held that "[i]t is sufficient if the witness's testimony gives the trier of fact a false impression." *Ghahremani,* at 477-478.  There is no requirement that the false testimony be shown to be "criminally perjurious."  *Id.* at 477.

## IV.  THE COURT IS LIMITED TO THE THEORY ADVANCED BY THE PROSECUTION AT TRIAL.

### A. Alternative theories.

This Court has asked the parties to brief the question of whether "there is some limitation on the habeas court in looking at this case through the lens of the theory advanced by the prosecution at trial....am I limited to the theory that was advanced by the prosecution at trial?" (EH at 137.)

The answer to this question must be "yes."[18] As the Supreme Court has repeatedly held,  "we cannot affirm a criminal conviction on the basis of a theory not submitted to the jury." *Chiarella v. United States*, 435 U.S. 222, 236 (1980).  The new theory posited by the Court,  *Whiteside v. State,* 29 S.W.2d 399 (Tex. Crim. App. 1930), was that "[a] person who, by actual assault or threat of violence, causes another, acting upon well-grounded or reasonable fear or apprehension, to do an act resulting in physical or corporal injury causing his death, is responsible for the homicide." *Whiteside,* 29 S.W.2d at 402.  (cited by the Court at EH 138.)  As that theory was never submitted to the jury, Mr. Acker's conviction cannot be upheld based on that theory.

---

[18]   Of course, Petitioner is not arguing that this Court is limited to the *evidence* presented at trial, as *Schlup* and *House* make clear that a "holistic" view of all the evidence, that presented at trial and in the habeas proceedings, is under consideration.  *House* 547 U.S. at 539.

In *Dunn v. United States,* 442 U.S. 100, 106 (1979) the Supreme Court held that "[t]o uphold a conviction on a charge that was neither alleged in an indictment nor presented at trial offends the most basic notions of due process."  This is because "[f]ew constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." *Dunn* at 106  (Citing *Eaton v. Tulsa,* 415 U.S. 697, 698-699 (1974); *Garner v. Louisiana,* 368 U.S. 157, 163-164 (1961); *Cole v. Arkansas,* 333 U.S. 196, 201 (1948); *De Jonge v. Oregon,* 299 U.S. 353, 362 (1937)). Even though in *Dunn* there was "no glaring distinction between the Government's theory at trial and the Tenth Circuit's analysis on appeal," and the jury "may very well have reached the same verdict" had the changed testimony been presented, "[i]t is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." *Id.,* citing *Cole v. Arkansas, supra,* 333 U.S. at 201.

*Dunn* focuses on "the theory on which the case was tried and submitted to the jury." *Dunn,* 442 U.S. at 106.  The *Dunn* court "regarded tangential references to [the alternative theory] as insufficient because, in the Court's view, the prosecution did not 'build its case' on such evidence." *Cola v. Reardon,* 787 F.2d 681, 693 (1st Cir. 1986), quoting *Dunn,* 333 U.S. at 106.

Similarly, in *Chiarella v. United States,* 445 U.S. 222, 236 (1980), the Supreme Court held that  "We cannot affirm a criminal conviction on the basis of a theory not presented to the jury." In *Chiarella,* the defendant was convicted because of his failure to disclose "material, nonpublic information to sellers from whom he bought the stock of target corporations" and the conviction was based on a "misappropriation" theory. The Court held the jury was not instructed on this theory. *Id.* Even though the jury in that case was given some words, such as that the defendant occupied a "confidential position" at his employer, from which the jury could have inferred that he owed a duty,

the Supreme Court held that "[t]he few words...do not explain to the jury the nature and scope of the petitioner's duty to his employer..." *Id.* Thus, as here, the inclusion in the jury instructions of words sufficient to include the conviction may be insufficient if they fail to convey the "nature and scope" of the charged offense.   In *Chiarella,* "the Supreme Court regarded isolated phrases or side-references to the appellate theory as also constitutionally insufficient." *Cola, supra,* 787 F.2d at 693, citing *Chiarella* at 237 n. 21. As the *Cola* court put it, in language that has special relevance for this Court's inquiry:

> Thus, we believe that, in order for any appellate theory to withstand scrutiny under *Dunn,* it must be shown to be not merely before the jury due to an incidental reference, but as a part of a coherent theory of guilt that, upon reviewing the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense.
> Accordingly, while we concede that evidence supporting the dual representation theory was before the jury, we cannot find any basis for concluding that the prosecution 'built its case' on such evidence.  In short, no meaningful attempt was made to *relate* the evidence to the theory adopted on appeal.  Thus, the evidence supporting the appellate theory, as well as the appellate theory itself, were at best incidentally present, or better put, not coherently present at all....
> Mere side-references by the prosecutor do not suffice to place a theory before the jury...
> An isolated phrase in the instructions, which arguably implies the appellate theory, does not suffice to present the appellate theory to the jury...
> *Cola,* 787 F.2d at 693-694 (emphasis in original).

As was held in *Cola, "Dunn* requires the appellate theory to be present in the indictment *and* the proof at trial [because] a fundamental sixth amendment concern [is] that guilt be initially adjudicated before a jury based on the government's cases as presented at trial." *Cola,* 787 F.2d at 697.  That court held that the appellate theory had to be "set forth in both the indictment and the proof at trial." *Id.*  Because the references to that theory were "at best incidental" the conviction was reversed. *Id.*  As that court put it, "where the prosecution's case at trial does not meaningfully reflect the appellate theory, due process cannot be reinstated through implicit references in the indictment."

-28-

*Id.*

Similarly, in *Rewis v. United States,* 401 U.S. 808 (1971), the Supreme Court held the conviction invalid where the government offered an interpretation of the criminal statute upon which the defendant was not convicted. *Rewis* at 813-814. Even though there may have been "occasional situations" where the charged conduct may have violated the act in question, the conviction was reversed because the jury was not charged with this theory. *Id.*

In *McCormick v. United States,* 442 U.S. 100 (1979) the court of appeals interpreted the criminal statute at issue in that case contrary to the jury instructions and then affirmed the defendant's conviction based on that statutory interpretation. *McCormick,* 500 U.S. at 268-270. The Supreme Court held that this resulted in the defendant's conviction being affirmed on "legal and factual grounds that were never submitted to the jury." *Id.* As the Supreme Court held, "even assuming the Court of Appeals was correct on the law, the conviction should not have been affirmed on that basis but should have been set aside and a new trial ordered." *Id.* As the Court further stated:

> This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.
> *McCormick,* 500 U.S. at 270 n.8.

These cases discuss the due process violation when an appellate court upholds a conviction based on a theory that was not submitted to the jury, whereas this Court will be making a determination based on the *Schlup/House* standard for actual innocence gateway claims. However, this makes no difference, as these cases make clear that ultimately a conviction cannot be upheld based on a theory, such as the one posited in *Whiteside,* that was not presented at trial and argued

-29-

and presented to the jury.  As will be shown in Section V,  neither did the prosecution present a theory of "stand-alone blunt force injuries"to the jury as the cause of death.

**B.  This is not an evidentiary sufficiency case.**

It should be noted that the *Schlup/House* standard and the due process rule as enunciated in *Dunn* and *Chiarella* "is not, and should not be confused with, an evidentiary sufficiency rule." *Wooley v. State,* 273 S.W.3d 260, 269  (Tex. Crim. App. 2008).  Respondent may cite *Santellan v. Cockrell,* 271 F.3d 190 (5th Cir. 2001) for the holding that a defendant "must defeat all of the theories of attempted kidnaping in order to obtain relief" and "where a jury is given the option of choosing between factually adequate and factually inadequate theories of guilt, jurors 'are well equipped to analyze the evidence' and can be counted upon to base their verdict upon the factually adequate theory." *Santellan* at 196, quoting *Griffin v. United States,* 502 U.S. 46, 59 (1991).

However,  *Santellan* is irrelevant here, as that case explicitly and separately addressed an evidentiary sufficiency claim that the evidence was insufficient to support any of the theories of attempted kidnaping.  The Fifth Circuit applied the *Jackson v. Virginia,* 443 U.S. 307 (1979)  test, that "no rational trier of fact *could have found* the essential elements of the crime beyond a reasonable doubt." *Santellan* at 193-196 (emphasis added).  As the Court of Criminal Appeals held in *Wooley,* "[r]eversing a conviction under this due-process rule is not the same as reversing a conviction based on an appellate finding of evidentiary insufficiency to support the conviction." *Wooley,* 273 S.W.3d at 269 n.13.  In *Santellan,* the Fifth Circuit held that an alternative theory was factually adequate.  *Santellan,* 271 F.3d at 196.  Nor did the Court of Criminal Appeals "disavow" that theory in denying relief, as the federal district court held.  *Id.; Wooley,* 273 S.W.2d at 271.

Similarly, *Griffin v. United States, supra,* is also irrelevant as that case also involved a sufficiency of proof standard under *Jackson v. Virginia. Griffin,* 502 U.S. at 58-59. *Dretke v. Haley,*

-30-

541 U.S. 386 (2004) involved the Supreme Court's refusal to extend the "actual innocence" exception under review here to the non-capital context, and hence it too is irrelevant for the Court's decision.

## V.  THE STATE'S THEORY AT TRIAL WAS THAT THE VICTIM WAS STRANGLED AND THERE WAS NO "STAND-ALONE BLUNT FORCE" THEORY OF THE CAUSE OF DEATH.

The State's case was built virtually entirely around evidence and allegations that Daniel Acker strangled the victim Markie George, a theory which has now been shown to be false and which has been acknowledged as false by the State.   All facets of Mr. Acker's conviction and death sentence, the indictment, the victim's autopsy, the grand jury indictment, the opening statements, trial testimony, closing arguments and jury deliberations, the appeal and state habeas, were all based on the theory that the victim had been first strangled by Mr. Acker, and then the blunt force injuries occurred post-mortem.

As will be shown in this section, although the jury was given the option of finding Mr. Acker guilty by infliction of "blunt force injuries" alone, there was never any coherent theory of stand-alone blunt force injuries as the cause of death.  Petitioner shows herein that the mere submission to the jury of a "blunt force injuries alone" option is meaningless when the evidence submitted to the jury was in massive variance with that theory.  In fact, that theory was massively contradicted by the totality of the State's case against Mr. Acker.

The following summary of eleven vital stages of the case shows the centrality of the "strangulation" theory used to convict Mr. Acker and sentence him to death.[19]

---

[19]   This Court's task is to put itself in the shoes of hypothetical reasonable jurors who would consider all the evidence.  As hypothetical reasonable jurors would not or should not have

**1) The Autopsy.**

 The autopsy on the victim was performed on March 13, 2000 at the Southwestern Institute

of Forensic Sciences in Dallas, Texas.   The "conclusions" part of that autopsy report, in its entirety,

read as follows:

> It is our opinion that Marquette (sic) George, a 33-year old white woman,
> died as a result of homicidal violence, including strangulation.   Several of the
> injuries identified could be consistent with blunt force injury resulting from an
> impact with or being ejected from a motor vehicle.  *Some injuries (particularly those*
> *of the neck and perineum) are not consistent with ejection from or impact with a*
> *vehicle; the injuries observed in the neck are more consistent with strangulation.*
> Further, the dry parchment-like appearance of several abrasions, the lack of
> associated hemorrhage of the laceration of the right leg, the paucity of hemorrhage
> in the brain and the amount of body cavity hemorrhage in relation to the severity of
> the injuries indicate that these injuries were sustained postmortem or perimortem.
> *Given these findings, it is likely that the decedent was strangled and probably dead*
> *or near death prior to being dumped from the vehicle.*
> (Exhibit 32 at 8.)(emphasis added).

 Thus, the "blunt force" injuries were not seen as a stand-alone cause of death, but as injuries

that followed the strangulation and occurred when the victim was "probably dead or near death prior

to being dumped from the vehicle."   The possibility that the victim jumped, rather than being

"dumped" from the vehicle was not even considered.

**2) The Indictment**.

 The indictment  stated

> "that Daniel Clate Acker, on or about the 12th day of March, 2000...did then and
> there, intentionally cause the death of an individual, namely, Marquetta Follis
> George, by homicidal violence, to wit: manual strangulation and ligature
> strangulation with an object, the exact nature of which is unknown to the grand jury,

heard the now-discredited strangulation evidence and arguments, this section could also be
entitled "**What A Reasonable Juror Would NOT Have Heard.**" In other words, the
strangulation evidence and arguments must be subtracted from the State's case at trial when this
Court makes a probabilistic judgment as to whether a hypothetical reasonable juror would have
found Mr. Acker guilty.

and blunt force injury resulting from causing her to impact a blunt object....
   (Exhibit 1)

The indictment states "strangulation....*and* blunt force injury," not "or blunt force injury."

**3) The Grand Jury.**

Petitioner was indicted by a grand jury and Clayton McGraw was the Foreman of that Grand

Jury.  Mr. McGraw testified as follows at Petitioner's trial in front of the jury:

> Q. Can you tell us was the Grand Jury able to determine what object was used in the course of the strangulation of Markie George?
> A. No, sir.
> Q. So it would be a true statement to say that it is unknown to the Grand Jury what object was used?
> A. Yes, sir.
> Q. Was the Grand Jury able to determine whether it was manual strangulation, that is, with somebody's hands, or ligature strangulation with an object such as a rope or a cord?
> A. No, sir.
> (19 RR 128.)

**4) Opening Statements.**

In the State's opening statement, the prosecutor told the jury as follows:

> and the doctors tell us she died from strangulation as well as from blunt force trauma.  Blunt force injuries.  They cannot say which caused her death exactly, but both of her injuries were capable of causing her death.  They cannot tell you that she was alive or dead at a particular time when she was run over.  But they can tell you that she was strangled first, and I believe they will, because of the way the body reacts after strangulation.
> (19 RR 19.)

The defense, in their opening statement,  stated that Ms. George had on previous occasions

twice tried to jump from the truck when Mr. Acker was driving it, but had been pulled back by him.

19 RR 20.  They told the jury that tragically she succeeded in jumping from the truck on the day of

her death. 19 RR 21. Yet various evidentiary rulings prevented the jury from hearing this central

theory of the case.

As the CCA held on direct appeal, "[t]he State's theory of the case, as expressed in the

opening statement... was that the defendant strangled the victim, pulled her out of his truck, and then ran over her body with the truck."   *Acker v. State,* No. 74,109 at *14.  Thus, from the outset, the State's theory was that the victim had first been strangled and the "blunt force" trauma occurred only after that "strangulation."

**5) Testimony of the Medical Examiner.**

The medical examiner/pathologist Dr. Morna Gonsoulin told the jury that:

a) "the [the "blunt force" head injuries] were most likely perimortem or postmortem"
(20 RR 207.)

This shows that the "head injuries" were never put forward by the state as the sole cause of death and, more importantly, that these injuries were subsequent to the "strangulation."


b) "These injuries indicate that there was a significant amount of pressure around the neck, usually constriction, that was introduced while the decedent is still alive."
(20 RR 209.)

Thus, here again, the state's theory was that the head injuries were subsequent to the "strangulation."

c) "A.[Gonsoulin]   This is a closer view of that left side.  You can actually see a single small hemorrhage there and some more down here, which the more striking red-purple hemorrhage is in the fascia and around the great vessels on the side.
Q. [Prosecutor] It requires some type of force or pressure to be placed upon a person's neck to cause that type of bleeding; is that correct?
A. Yes."
(20 RR 213.)

This testimony shows the error of the medical examiner in positing "strangulation."

d) "Here, this is the right I believe, is the thyroid.  And there is an actual contusion in this area of hemorrhage there from local pressure being applied to it.
20 RR 214.)

Similar to the above.

e) "The parchment-like abrasions or the pattern of abrasions that we saw on the external examine (sic) was consistent with the kind of blunt force injuries you see in motor vehicle accidents or accidents where people fall out of cars or just the body scraping against something with a significant amount of force.  However, the neck injuries that we saw, also the dried nature suggested perimortem or around the time of death.  The injuries that we saw on the neck, the hemorrhages and the fact that the hemorrhages were in very specific places, indicates that there was a significant amount of force applied around the neck and that it occurred while she was still alive.  It was not consistent with falling or being hit.  It was more of being constricted rather than blunt force received from falling from a vehicle. (20 RR 215-216.)

f) "Q. Now when this case came in you weren't told that it was a strangulation or to look for strangulation or any particular cause of death, were you?
A. No.
Q.  You just examined the body and then make (sic) a determination as to what you find?
A. Yes.
Q. I mean, you weren't particularly looking to find somebody who had been strangled; that's what you found when you cut the body open and did your examination?
A. Correct."
(20 RR 216.)

g) "A.  Well, when we opened up the eye to look at what we call the conjunctive or the lining of the eye, we saw what we call petechiae which were small hemorrhages that occur when very delicate blood vessels in the lining of the eye are ruptured.  And a variety of different conditions can cause that, but they are frequently associated with strangulation injuries.
(20 RR 216-217.)

h) "Q.  Did you arrive at a conclusion or an opinion as to the cause of death?
A. Yes.
Q.  Now, in looking at the injuries that you described as far as the strangulation or the hemorrhage to the neck, would that be consistent in your opinion with strangulation?
A. Yes.
Q. Was it sufficient or were there sufficient details there for you to tell whether it was manual strangulation or ligature strangulation?
A.  No.
Q. Can you tell the jury what the difference is between manual strangulation and ligature strangulation?
A. Manual strangulation is to strangle the person by the hand or manually, as opposed to ligature which is a rope or cord or something tied around the neck to constrict either the blood flow or breathing.
Q.  And most people when they think of ligature think of something thin like a rope or cord. It could actually be something like a towel?
A. Yes.
Q.  But in this case you weren't able to determine which manner of strangulation occurred

-35-

but that strangulation did occur, in your opinion?
A. Correct."
(20 RR 219.)

I) Q. Now with regard to the blunt force injuries, did you form a conclusion or opinion about whether or not they could have caused the death or (sic) Marquetta George?
A. Our opinion was that most of the blunt force injury that we observed was either perimortem or postmortem.
Q. Now perimortem being at or near death; is that correct?
A. Yes."
(20 RR 219.)

j) "Q. Would the strangulation have been sufficient [to cause death] in and of itself?
A. Yes."
(20 RR 220.)

k) "Q. In the particular case of Marquetta George, were you able to determine from the autopsy, from your examination of her externally as well as internally, what particular object was used to cause the strangulation?
A. No."
(20 RR 220.)

l) "A. Did you make a determination as to whether or not she had died as a result of a homicide?
A. Yes.
Q. And did you form a conclusion as to—let me ask you this: Tell what your opinion was as to what caused her death.
A. My opinion was that Marquatta George died as a result of homicidal violence including strangulation, and that the manner of death was homicide.
Q. Manual strangulation as well as possibly ligature strangulation?
A. Yes.
Q. Blunt force trauma or impacting with a blunt object in some fashion?
A. Yes.
Q. You can tell which one occurred first but you can't determine which one she may actually have died from; is that correct?
A. Yes."
(20 RR 220-221.)

m) "Q. In reaching your conclusion, doctor, as to the final results, are you given other information other than just looking at the body?
A. Yes.
Q. And those came from supplemental reports, talking to law enforcement officers?
A. Yes.
Q. Yes.
Q. You use those in reaching your conclusions?

-36-

A.  Yes, in association with the findings."
(20 RR 228.)

n)  "She was strangled as a result of her injuries and she had blunt force injuries.  That's what I told the jury."
(20 RR 233.)

o) "Q. In other words, she was not strangled to death?
A. Sufficiently strangled before she died? I can't say whether that was an injury that would have ultimately resulted in her death..."
(20 RR 233.)

p)   The medical examiner erased all doubt as to whether the "strangulation" could have

occurred earlier when the victim and Mr. Acker were in the trailer:


Q.  "The strangulation, you indicated you can't say the exact time that the strangulation occurred.  What position would a person be in after a strangulation had occurred such as you observed in Marquetta George?  I mean, physical condition.  Would she be up running around after that type of strangulation had occurred?
A.  It's unlikely because she would have a brain injury where the brain utilizes all the oxygen it has from the blood that it has in its reserve, which is very small.  And, there is irreversible brain damage so she might have been pretty much brain dead but still maintain basic functions of heartbeat and breathing.
Q.  She probably wouldn't have been able to have physically fought someone after having been strangled immediately?
A.  No.  The injuries sustained to the deep tissues would probably result in the kind of compression that would have incapacitated her.
Q. By incapacitated I assume you mean she would be limp?
A. Yes.
Q.  So someone who is limp can't jump out of a truck, can they?
A.  I would assume if they had an injury they wouldn't."
(20 RR 268-269.)

q) The state also attempted to bolster Dr. Gonsoulin's testimony by commenting on the other

doctors at the Dallas County Medical Examiner's office who also signed the report:


Q. "Doctor, I notice on the last page of State's Exhibit No. 54 not only is your signature on there but there are one, two, three, four, five, six, seven, eight other doctors' signatures on that page; is that correct?
A. Correct."
(20 RR 270.)

r)  Q.  "Did you consider all these other possibilities that might have happened?
A.  Yes.
Q.  And you determined medically that the cause of death was strangulation, either manual
or ligature, or possibly both?  Is that fair?  As well as blunt force injury resulting from her
being caused to impact a blunt object?
A.  Yes.
Q.  You were never able to determine exactly what was used to strangle her?
A.  Correct."
(20 RR 272.)

s)  A.  "I couldn't say for sure whether she was dead or whether she was near death at the
time that she was dumped from the vehicle according to my decision.  And I used the word
likely that the decedent was strangled and probably dead to connect the two concepts."
(20 RR 273-274.)

t)  "MR. LONG [the prosecutor]: But it's your opinion she was strangled either manually or
with a ligature and that she died from that and the blunt force injuries from impacting with
something?
A.  THE WITNESS: Yes.
MR. LONG: No other questions.
THE COURT: Mr. McDowell.
MR. MCDOWELL: Nothing further, your Honor.
THE COURT: All right. You may step down.  Thank you very much.
Folks, we got our money's worth today."
(20 RR 274.)

The Court's last statement that day,  "we got our money's worth today,"  immediately after

the 80-page testimony of the medical examiner,  could hardly have been taken by the jury as

anything but the Court's comment on the evidential value of the testimony of Dr. Gonsoulin, and

an improper (if perhaps unintentional) bolstering of that testimony.[20]

---

[20]   Inexplicably in a case of alleged strangulation,  there was no testing of a crucial piece
of evidence. Dr. Tim Kalafut, a forensic DNA analyst at the Southwestern Institute of Forensic
Sciences, testified, in camera, that fingernail clippings had been submitted but no testing had
been done on them.  20 RR 186.  This expert stated that if a person were being strangled, one
would expect them to try to pull the hands off.  20 RR 187.  This witness was never asked to test
the fingernail clippings 20 RR 191.  The fingernail clippings might have indicated whether or
not there was a struggle at the time of the alleged strangulation.  20 RR 191.

**6) The Cross-Examination of the Petitioner.**

The state cross-examined Petitioner on "strangulation" when he took the stand.

Q.  "Did you know?
A.  Did I know what?
Q.  About strangulation.
A.  Strangulation never took place.  Markie was never strangled.
Q.  The Medical Examiners are just lying?
A.  They are incorrect.
Q. They are incorrect.
A.  Their opinions are wrong.
q.  All those doctors are wrong?
A.  Yes, sir."
(22 RR 7.)

Q.  "Now, the doctor's testimony was that she was strangled but you disagree with that?
A.  Yes, sir.
Q.  The doctor's lying about that?
A.  Yes, sir.
Q. These photographs are lying about the blood in her throat?
A. The blood could have got there any kind of way.
Q.  Oh, really.
A.  Not necessarily—strangulation not the only thing that causes blood in your throat."
(22 RR 90-91.)

**7)  The Jury Charge on Guilt.**

The jury was charged as follows at the guilt phase of the trial:

Now, if you find rom the evidence beyond a reasonable doubt that on or about the 12th day of March, 2000, in Hopkins County, Texas, the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis George, intentionally caused the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury, then you shall find the defendant guilty of capital murder as charged in the indictment....

OR

...the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis George, intentionally caused the death of Marquetta Follis George by blunt force injury resulting from causing her

-39-

to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment....

OR

   ...the defendant...did then and there intentionally or knowingly cause the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation, the exact nature of which is unknown to the grand jury...

OR

   ...the defendant did then and there intentionally or knowingly cause the death of Marquetta Follis George by blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury...

OR

   ...the defendant...did then and there intentionally or knowingly cause the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation, the exact nature of which is unknown to the grand jury, and blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of murder...
(CR 590-593; Exhibit 2 at 2-5.)

   Thus of five theories, three involved the now-discredited strangulation theory. The use of "strangulation" *and* "blunt force injury" in the indictment is pleading in the conjunctive, as the Court pointed out at the hearing. (EH at 95-96.)   Unlike the indictment, which was pled in the conjunctive, the jury charge was in the disjunctive (using "or"). Many Texas case hold that it is proper for the State to plead in the conjunctive in the indictment and prove in the disjunctive. *Moreno v. State,* 872 S.W.2d 1 (Tex.App.-Houston-[1st Dist.]1993); *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex. Crim. App. 1991); *Alva v. State,* 797 S.W.2d 957, 958 (Tex.App.-Houston [14th Dist.] 1990. However, in the circumstances here, we do not know whether Mr. Acker was actually convicted on one of the three now-discredited theories.  The first one was strangulation alone, and the jury could well have

-40-

convicted on that false theory without even considering the others.

**8)  The Prosecution's Final Argument.**

Similarly, the prosecution's final argument was focused on "strangulation."  In a very short final argument comprising a little more than 17 pages of transcript (23 RR 3-7, 17-30),[21] the prosecutor repeatedly emphasized "strangulation":

a)      "You heard a lot of long questions about instantaneous death, breaking a rent in a particular part of the body.  The important part of that is right here.  All these doctors that worked for the Medical Examiner's office in Dallas County, not Hopkins County, Dallas County, people who do this everyday all over the State say: It is our opinion that Marquetta George died as a result of homicidal violence including strangulation.  They then go on to say that she had blunt force injuries capable of causing her death.  At the very end of that they say, it is likely she was strangled and at or near death at the time she received the blunt force injury.
        The doctor told you that in her opinion the strangulation could have caused death.  The doctor told you that in her opinion after she was strangled she would have been incapacitated, unable to move.  Brain dead, I believe, is the testimony she gave.  She could not have jumped out of that vehicle.
        All these doctors signed off on that opinion.  They all knew that they can be called to testify about it.  Give their reasons.
        And then we went on and on about all these other possible causes.  Y'all remember the last thing I asked the doctor?  You do this for a living, doctor.  You consider all these possibilities, possibilities.  You have to make your decision based upon medical science.  What is your opinion and what are these other doctors' opinion?  She died from strangulation and blunt force trauma.
        We don't know the particular object.  The reason for that, they can't say if it was fingers, a towel, a shirt or whatever.  That's the reason for manual compression or a ligature."
(23 RR 5-6.)

b)      "He doesn't want to show you these pictures of her neck.  You know, I don't like doing it either.  Here's the chin.  Here's the hemorrhage, these dark areas.  Here's the ribs where he was showing you....He want to point to the word down here that it's likely.  These doctors gave their medical opinion on cases that are tried everyday.  It is our opinion that Marquetta George died as a result of homicidal violence including strangulation."
(23 RR 20-21.)

c)      "But yet when he's pulling out of that driveway he's leaning over down into the

_____

[21]   The defense final argument was even shorter, at only ten pages (23 RR 7-17.)

floorboard doing something.  And he can't stay on the road.  Just like Mr. McDowell says, you can't drive down the road straight and strangle somebody.  That's why he was all over the ditch because he had her right then strangling her."
(23 RR 26-27.)

d)      "Now he gets arrested by the officers.  He's brought down to the Sheriff's office for an interview.  What did he tell y'all yesterday?  Nobody at this point knows anything's happened to Markie regarding the strangulation but him.  Nobody knows.  The doctors haven't looked at her yet.  You an look at the outside of her body and you can't tell she's been strangled.  There's no fingerprints there.  There's no cord cut in her neck."
(23 RR 28.)

e)    "He starts lying right then when nobody is asking questions about her being strangled.  He lies and he lies and he lies."
(23 RR 29.)

f)      "The doctor says she was strangled.  There I no controversy of that.  Nobody controverted that.  She was alive and well when she left the house.  She was physically exerting herself to fight against being taken, kidnaped.  She was strangled in the course of continuing that kidnaping.  She died from it.  Capital murder.  He's guilty.  You know it....
         I know you're going to work hard, but folks, I know what the evidence is, and believe me, based on this evidence, he is guilty."
(23 RR 29-30.)

As the CCA held on direct appeal, "[t]he State's theory of the case, as expressed in the...closing argument,  was that the defendant strangled the victim, pulled her out of his truck, and then ran over her body with the truck."  *Acker v. State,* No. 74,109 at *14.  Thus, "strangulation" was not only central to the State's case at final argument, it *was* their case, and this is what the jury last heard before they retired to deliberate.

**9)  Jury Deliberations.**

During jury deliberations, the jury sent a note to the Court asking for three items, one of which was "pictures of neck from autopsy where layers of skin were peeled away and four sets of pictures at scene where victim was laying on ground at scene."  (23 RR 32.)

This indicates that the jury was focused on "strangulation" as that is what the pictures of the victim's neck purported to depict.

-42-

**10) The Case On Appeal**.

The Texas Court of Criminal Appeals, in its opinion on direct appeal, also highlighted the fact that the State's case was "strangulation," and it figured heavily in the opinion denying Mr. Acker's appeal as to several points of error.  The CCA first summarized Dr. Gonsoulin's findings in detail and then stated that "[t]his testimony was consistent with the autopsy report, which came to the following conclusion" and then quoted verbatim that section of the autopsy report (given above):

> It is our opinion that Marquette (sic) George, a 33-year old white woman, died as a result of homicidal violence, including strangulation.  Several of the injuries identified could be consistent with blunt force injury resulting from an impact with or being ejected from a motor vehicle.  *Some injuries (particularly those of the neck and perineum) are not consistent with ejection from or impact with a vehicle; the injuries observed in the neck are more consistent with strangulation.* Further, the dry parchment-like appearance of several abrasions, the lack of associated hemorrhage of the laceration of the right leg, the paucity of hemorrhage in the brain and the amount of body cavity hemorrhage in relation to the severity of the injuries indicate that these injuries were sustained postmortem or perimortem.  *Given these findings, it is likely that the decedent was strangled and probably dead or near death prior to being dumped from the vehicle.*
> *Acker v. State,* No. 74,109 at *4- *5.  (Exhibit 8.)

The CCA then added more detail on the "neck injuries" of the victim:

> On cross-examination, Gonsoulin admitted that crushing the brain stem—which occurred here—was an injury of the type that would cause instantaneous death by stopping the heart from beating, and thus could explain the lack of hemorrhaging in other parts of the body.  The medical examiner also testified that it was possible for one to receive the neck injuries observed and survive.  On redirect, however, the medical examiner testified that the neck injuries were so severe that a person suffering from them would have been incapacitated and might be brain dead, even if the heart were still beating.  Gonsoulin also testified that the neck injuries occurred within hours of the victim's death.
> Appellant testified at trial.  He denied strangling the victim and denied squeezing or gripping her neck.
> *Id.* at *5.

"Strangulation" was also central to the CCA's denial of Mr. Acker's third point of error, that

-43-

the "trial court erred in refusing to admit notes from the medical examiner's files." *Id.* at *8.  The

main reason the CCA found no error as to this point was that "the defendant's assertion that she

jumped [does] not change the nature of the injuries the victim sustained. *Id.* at *10.  The CCA added

that "[m]oreover, appellant's contention on appeal that the statements 'could easily be read to

contradict Dr. Gonsoulin's statement in her autopsy report that the injuries were not consistent 'with

ejection from impact with a vehicle' is somewhat misleading.  The medical examiner found that

some injuries were consistent with ejection and some were not." *Id.*

Point of error number three was ultimately rejected by the CCA with the finding that

"[w]hile appellant's self-serving statement [that the victim jumped] was at odds with the conclusions

in the autopsy report, evidence does not become admissible...simply because it may lead to a

different conclusion than other, admitted evidence." *Id.*

The CCA's rejection of point of error number four is also rendered entirely erroneous.  That

point was that "the trial court erred in refusing to submit requested lesser-included charges on

manslaughter and criminally negligent homicide." *Id.*   The error was based on the trial court's

rejection of the evidence that the victim had tried to jump from the moving truck two weeks prior

to her death. *Id.*   The CCA "assum[ed], without deciding, that there was error in denying the

requested instructions and in excluding the evidence." *Id.* at *11.  However, the CCA found this

error harmless largely based on the other evidence of strangulation:

> This case is complicated by the claim that there was some evidence germane
> to the lesser offense that the jury was not permitted to hear.  However, even
> assuming the full probative force of all evidence, whether admitted or not, tending
> to show that the victim jumped from a moving motor vehicle, such evidence was far
> outweighed by evidence pointing to an intentional murder.  Extremely damaging
> evidence came from the medical examiner's testimony and her autopsy.  As we have
> summarized above, the medical evidence showed that the victim was strangled to the
> point of death or near-death before she received any blunt-force injuries.  After
> strangulation, she was in no condition to move, much less jump out of a vehicle.

-44-

> Even if we assumed that defense counsel's cross-examination of the medical
> examiner raised the possibility that someone could suffer the victim's neck injuries,
> survive, and later recover, there was not enough time for such a recovery process to
> take place.
> *Id.* at *12.

Thus, "strangulation" was the only reason the CCA found this to be harmless error. Without

"strangulation," the error is no longer harmless.

The CCA's denial of point of error number five is also now rendered erroneous.  That point

was that "the trial court erred in excluding testimony from a defense investigator.  The investigator

would have testified that he determined, through personal experimentation on a truck similar to the

one driven by appellant, that he could not reach the passenger door and open it while driving. The

CCA ruled as follows:

> Moreover, even if there were error, it would be harmless.  The State's theory
> of the case, as expressed in the opening statement and closing argument, was that the
> defendant strangled the victim, pulled her out of his truck, and then ran over her
> body with the truck.  The extensiveness of the victim's blunt force injuries suggests
> that she did not incur them simply by falling or being pushed out of a moving truck.
> Young's testimony also bolstered the theory that the victim was never pushed out of
> the truck but was strangled and then later pulled out of the truck from the passenger
> side onto the ground.  Confirmation from a defense investigator that the victim could
> not have been pushed out of the truck would have done nothing to answer the State's
> case, and, in fact, could have been viewed as supporting Young's testimony and the
> State's theory that the victim was pulled out of the truck after being strangled.
> (*Id.* at *14.)

### 11) The State Habeas.

Similarly, the state habeas proceedings, such as they were given the disgraceful and

incoherent writ filed on Mr. Acker's behalf,  are now rendered erroneous by the false "strangulation"

testimony.  The "State's Proposed Findings of Fact and Conclusions of Law" (Exhibit 12), adopted

by the trial court and the CCA, contained many references where the absence of "strangulation"

would have made a difference:

-45-

1) As to Claim No. 2, the trial court held that "[t]estimony by Dr. Morna Gonsoulin indicated that the victim could not have jumped out of the vehicle due to her being incapacitated." *Id.* at 3.

2) As to Claim No. 14, the Court held that "Applicant has failed to show that had Mr. Sands testified as a criminologist, there is a reasonable probability that the outcome of the trial would have been different." *Id.* at 8.  This finding is not now tenable in that "strangulation" has been ruled out.

3) As to Claim No. 27, the Court held that "[t]he medical expert appointed to the defense gave Mr. McDowell the opinion that the lack of blood at the cut site was due to the fact that the victim's heart had stopped beating the moment she suffered a tear in her brain stem." *Id.* at 15-16.

**12) Federal habeas.**

In federal habeas proceedings, Respondent has also stressed the centrality of strangulation to Petitioner's guilty verdict and sentence of death in the reply brief.  Reply Brief at

## VI. THE TOTALITY OF THE EVIDENCE POINTS TO AN ACCIDENTAL DEATH BY JUMPING.

### A. The totality of the evidence.

"Because our expert is going to come in and say you can't tell whether she was pushed or jumped.  So then it's going to be left up to the evidence at trial to determine whether it was accidental." (EH at 21.)
(Counsel for Respondent).

Petitioner agrees with Respondent that this Court's determination of accidental or intentional death will rest on whether it is more likely the victim's death was purposeful or accidental, i.e., whether she was pushed or she jumped.  Petitioner has presented highly credible new evidence in his petition and at the evidentiary hearing that not only heightens the case for an accidental death, but also throws doubt on the credibility of those trial witnesses who were presented by the State in

support of their case.

1) Dr. Di Maio's report and testimony, along with Dr. Larkin's report, have completely demolished Dr. Gonsoulin's "strangulation" theory, which is no longer in play.   With "strangulation" now off the table, it is clear that "jumping" is a much more likely scenario than being pushed.  Dr. Larkin and Dr. Di Maio differ only in that Dr. Di Maio cannot support Dr. Larkin's "plausible alternative scenario" as to the sequence of events that occurred leading up to the victim jumping from the truck.  Even Dr. Di Maio did not completely disagree with the conclusion of Dr. Larkin that the victim jumped, but said that he could not make this conclusion with certainty. (EH at 61.)[22]

2) Officer Lewis Tatum's hearing testimony and report (Petitioner's Evidentiary Hearing Exhibit 1; EH at 36-41) have shown that Ms. George attempted to jump from the truck on February 26, 2000, two weeks prior to her death on March 12, 2000.  A prior jumping attempt, from the same truck that was used on March 12, shows that  I) she had a propensity to jump out of a moving truck, a very dangerous feat that few people would ever attempt; and ii) that, in remarkably similar circumstances on February 26, she made this attempt when she got into a fight with Mr. Acker. This evidence was not heard by Mr. Acker's jury.

3) Evidentiary hearing testimony showed that, a very short time after the tragic occurrence, Mr. Acker told his mother that Ms. George jumped, at a time when he was still upset and "looked

---

[22]   One stipulation was that it was a possibility that the victim Ms. George was run over by the truck.  (EH at 119.)  This is not inconsistent with her jumping nor with Mr. Acker's prior testimony. Another stipulation was that "from the medical evidence alone it is impossible to say whether there was a pushing or a jumping of the victim from the vehicle."  (EH at 119.)  Dr. Larkin's "plausible alternative scenario" has never been an  essential part of Petitioner's case. Petitioner submits that the additional non-medical evidence presented in the petition and at the hearing and summarized herein lead to the inevitable conclusion that it is not only "more likely than not" but very highly probable that the victim jumped.

frantic." (EH at 30.)  It strains credulity to think that Mr. Acker made up this story on the spur of

the moment and lied to his mother.  Evidence also shows that he turned himself in to the police, and

while in custody he also told the police that Ms. George had jumped. (EH at 131; Petitioner's

Evidentiary Hearing Exhibit 9.)    Investigator Toney Hurley's report shows that when Acker was

confronted with information that the medical examiner Dr. Gonsoulin opined that the victim was

strangled and "was dead at the time she was run over," Petitioner waived his *Miranda* rights and

"got very angry and stated, '[t]he medical examiner is lying' and that he "continually stated that

Markie jumped out of the truck." (*Id.*)  Petitioner's statements are entirely consistent in that he has

always claimed, even before he turned himself in, that the victim was run over.

    4) Officer Brandon Anderson's report lends additional credibility to Mr. Acker's claim that

the death was accidental.  It states that on February 26, 2000, that Ms. George "attempted to jump

from the truck and Mr. Acker caught her by the arm and pulled her back into the truck." Petitioner's

Evidentiary Hearing Exhibit 5.  Mr. Acker's jury never heard about this incident, which would have

been crucial evidence to show an accidental death.  Jumping from a moving vehicle is  uncommon,

because of its obvious danger, and hence few people would attempt it.  The fact that Ms. George had

previously attempted just that should  weigh very heavily in this Court's probabilistic determination.

    5) Sabrina Ball's testimony, summarized above,  and her police report regarding what she

knew about the February 26, 2000 incident also lend additional evidential support to an accidental

death of Ms. George as a result of jumping.  Petitioner's Evidentiary Hearing Exhibit 6.  Ms. Ball's

report to the police stated that Ms. George told her

> We got in a fight, we were at Bustin' Loose..We were in the truck and he was
> beating my head against the dash.  I tried to jump out, but he pulled me back in.  My
> face was just a few inches from the pavement."
> Petitioner's Evidentiary Hearing Exhibit 6 at 1.

Significantly, Mr. Acker's jury was not allowed to hear anything about this prior attempt to jump by the victim from the same truck only two weeks prior to her death.

6) Deputy Chris Hill's statement regarding Mr. Smiddy's original statement to the police.

Petitioner's Evidentiary Hearing Exhibit 7.  In that statement, Deputy Hill wrote that

> Dispatch advised that a Mr. Smiddy called 9-1-1 and advised that his neighbors were involved in a disturbance in his yard.  Comp. [complainant] advised that he wanted to press charges for trespassing on them.  Dispatch also advised that the subjects left in a white utility truck headed toward Mahoney.  Dispatch stated that the comp. Saw the male subject force the female subject into the white truck and then drive off, and while driving off female subject tried to exit the vehicle and the male subject 'jerked' her back in.
> Petitioner's Evidentiary Hearing Exhibit 7.

This report is especially important for a number of reasons.  First, it is contrary to Mr. Smiddy's trial testimony where he said nothing about the victim attempting to jump from the truck just minutes before her death.  Under both *Schlup* (513 U.S. at 330) and *House* (547 U.S. at 539), "the habeas court may well have to make some credibility assessments."  Under the *Schlup/House* gateway standard*, the credibility assessment "may indeed call into question the credibility of the witnesses presented at trial." *Schlup,* 513 U.S. at 330; *House,* 547 U.S. at 539.

This report would have been dramatic impeachment of one of the prosecution's most important witnesses.  At trial, Mr. Smiddy testified that Mr. Acker  placed the victim in the driver's side of the truck.  19 RR 147, 151.  Mr. Smiddy said only that it appeared that she was resisting (19 RR 175) but nothing was said about the attempt to exit and Mr. Acker "jerking" her back in.   At trial, Mr. Smiddy also said he heard something that sounded like someone being hit (19 RR 165, 175); and he testified that he  looked away for an instant and then Ms. George was not visible in the truck. (19 RR 148.)   Significantly, nothing about this was in Deputy Hill's report.  Mr. Smiddy's testimony was used by the prosecution to bolster their theory that the victim was first knocked

unconscious.

Second, it is important evidence that, just minutes before her death, the victim was attempting to jump.  It is reasonable to believe that, as the truck went out of sight, that Ms. George continued in her attempts to jump and, as Mr. Acker has said all along, she tragically eventually succeeded.

7) Alicia's Smiddy's statement to the Hopkins County Sheriff's Office on May 12, 2000.

Petitioner's Evidentiary Hearing Exhibit 8.  In that report, Ms. Smiddy stated:

> Marquetta came running out of their house yelling for us to call the sheriff that he's not going to beat me!  She got behind me so he couldn't get her, my 1- yr.-old was in the stroller by me.  He came charging out of the house with no shirt with an evil mad look on his face, never saying anything, walked by my 1-yr.-old, picked Marquetta up over his shoulder, She was screaming, kicking, yelling No Daniel, No Daniel, trying her best to get loose.  She started crying, he shoved her into a white utility truck on the Driver Door (sic) side.  She was trying to get out.  He hit her, shoved her on in, holding her down, spun off through the ditch.  She was trying to get out he was swerving all over the road turned and went towards Mahoney.  That was the last we saw.
> Petitioner's Evidentiary Hearing Exhibit 8. (EH at 120-121.)

This report was never seen by Mr. Acker's jury.  Like Deputy Hill's statement, it is extremely important in a number of ways. First, it would have been powerful impeachment of Alicia Smiddy's trial testimony.  At trial, Mrs. Smiddy testified that Mr. Acker carried Ms. George to a truck where he tried to put her in it. (19 RR 179.)  Mrs. Smiddy testified she heard a slap sound and then the victim went in the truck.  (19 RR 181.)  She testified that they drove off swerving from side to side on the road (19 RR 179-180) and it seemed as if he was leaning over towards the middle of the seat.  (19 RR 182.)  Mrs. Smiddy said nothing about her "trying to get out" as they drove away, only that  Mr. Acker could have been trying to keep her from jumping out.  (19 RR 187.)  As discussed above, this should cause the Court to make

Secondly, it corroborates Deputy Hill's report.  Third, it is powerful evidence that, just

minuted prior to her death, she was trying to jump from the truck.

8) Mr. Acker's jury was not allowed to hear the testimony of defense investigator John Riley Sands about the difficulty of Mr. Acker opening the driver's side door while still being able to drive. Officer Hurley's testimony was that he was able to do that, but only while the car was stationary and there was no one resisting him in the passenger seat.  Mr. Sands' testimony, excluded at trial, is additional important evidence that the victim jumped and was not pushed.

However,  one must add to the equation the fact that 1) Mr. Acker would have had to reach around Ms. George to open the door; 2) even if he was able to open the door while driving, there is no indication that he would have then been able to shove Ms. George out while holding the door open while driving at a fairly high speed, as that would have required an even longer reach than merely opening the door, in addition to a sustained force required to keep the door open ; 3) that Ms. George would not be sitting idly by while this was happening and would have resisted or grabbed the door or seat or fought back to prevent her ejection; and  4) that Mr. Acker would have been attempting this one-handed, while Ms. George had both hands free to thwart it.  The trial testimony was that Ms. George was so resistant that Mr. Acker had difficulty in placing her in the car while he had both hands free.

It is unreasonable, approaching the realm of the near-impossible, to seriously credit the possibility that Mr. Acker pushed her out one-handed while driving.  Any reasonable juror with a driver's license (and that would include almost all jurors) would well know how difficult it would be to even open or close a car door from the driver's seat while driving, let alone keep the door open against wind resistance while at the same time, with one hand, attempting to eject a resisting passenger from a truck cab that was wider than an ordinary sedan.  Nor is there any credible evidence that Ms. George was dead or unconscious before she exited the truck.  The undisputed

testimony from the Smiddys was that the truck was swerving as it drove away, indicating that Ms. George was alive and resisting, and the State has abandoned the theory that she was strangled prior to the blunt force injuries.  This analysis alone should be more than sufficient for this Court to find that Mr. Acker has easily met the *Schlup/House* standard.

9) Mr. Acker turned himself in to the Sheriff, which is not the typical action of someone who has just committed murder.  A stipulation was received at the hearing as to Bill Reece, of the Hopkins County Sheriff's office, and it was that Mr. Acker surrendered to Officer Reece after waving him down.  (EH at 81.)

**B. Motive and Mr. Acker's actions point to the victim's jumping, not being pushed.**

Although of course it is not a required component of the State's burden of proof, motive almost always looms large in the State's explanation of a capital murder and it should enter into this Court's probabilistic determination. In capital crimes, an explanation of the perpetrator's rationale for the commission of the horrific act is almost always an integral part of the State's presentation to the jury, as it is their theory of the "why" of  the crime.  Yet a coherent theory of motivation has never been presented by the prosecution, even prior to the change in the theory of the cause of death, nor has it been presented since the trial.

If it was Mr. Acker's  intent to kill Ms. George because of his rage that she had spent the night with another man ("Calico"), he would have killed her when he was first told about it in the trailer.  It is undisputed that when Ms. George returned and Mr. Acker found out, there was a physical confrontation.  Mr. Acker admitted to shaking and hitting her in their trailer. (21 RR 225.) However, he did *not* kill Ms. George when she told him where she spent the night.  Instead, he asked her where Calico lived and then got dressed with the intention of driving to Calico's house.  (21 RR 225-226.)  When Ms. George ran out of their trailer, Acker caught her and placed her in the truck,

carrying through with his intention of taking her to Calico's house.  It is clear that Ms. George did not want to take this trip.  It is also clear that Mr. Acker's intent was not to kill her, which he could have done earlier in the privacy of the trailer,  had he been so inclined, but rather to forcibly transport  her with him in order to find and confront Calico about whether they had sexual relations.

The Court has before it evidence, unheard by Mr. Acker's jury, that Mr. and Mrs. Smiddy's first statements to the police indicated that she was trying to get out of the truck as they saw it drive away.  Ms. George was found dead only a few minutes later.  Why would Mr. Acker, in the space of a few minutes, change from trying to keep her in the truck to pushing her out?  As strangulation is now ruled out, there are only two possibilities as to how Ms. George died: either she jumped out of the truck or she was pushed.

The totality of the evidence is much more suggestive of Mr. Acker wanting to transport Markie to a face-to-face meeting with Calico, to find out what they did that night, than him murdering Markie after driving off with her in full sight of the Smiddys.  Mr. Acker's overwhelming need was to try to find out whether Ms. George and Calico had been intimate, not to kill her.[23]

The statements from trial witnesses who said that Mr. Acker threatened to kill Markie (or the person she may have been with) when he found her (statements which Mr. Acker has denied making) must be seen in this light.  The fact is that he did *not* kill her when she returned and he found out who she spent the night with.

Mr. Acker's actions after Markie's death are not indicative of the actions of a person who had just committed murder.  Rather, they suggest a man who had just abducted his girlfriend, who then jumps from his truck and is killed, and who then goes into shock and acts irrationally.  Most

---

[23]   Mr. Acker's fears that Ms. George had been intimate with another man are shown by his visiting every motel in the area the night before in an attempt to find her.  (21 RR 195.)

importantly, he did not attempt to flee or conceal himself from the authorities, an almost universal reaction on the part of murderers.  It is clear that the purpose of Markie's abduction was a face-to-face with the person who had spent the night with her in an attempt  to ascertain whether they had sexual relations.  If Mr. Acker had intended to murder her, he could and would have done it in their residence, when she first told him where and with whom she had spent the night, when his rage was at its height.  Instead, by his own admission, he shook and slapped  her and then got dressed.  (21 RR 225-226.)  This is simply not a prelude to murder by any reasonable interpretation.

### C. Credibility of the trial witnesses.

This Court must also consider the effect of the new evidence, because, as mentioned *supra,* under both *Schlup* (513 U.S. at 330) and *House* (547 U.S. at 539),  "the habeas court may well have to make some credibility assessments."  Under the *Schlup/House* gateway standard*,* the credibility assessment "may indeed call into question the credibility of the witnesses presented at trial." *Schlup,* 513 U.S. at 330; *House,* 547 U.S. at 539.

The discrediting of the strangulation theory means that much of the testimony used to sentence Mr. Acker to death now comes under new scrutiny.  At trial, **Brodie Young** testified that he gave three different conflicting statements and hence his testimony would be greeted skeptically by a reasonable juror.  Even if he was believed, his trial version is compatible with Mr. Acker's account of an accidental death.  At trial, he testified that as he approached the truck, driving fairly slowly, he saw one person on the driver's side.  (19 RR 204.)  Mr. Young slowed down as he came up to the truck, and went into the ditch as the truck was partly blocking the road, and as he passed it he saw a person who looked like he was talking to himself.  (19 RR 205, 220.)

When he passed it, he looked in the rearview mirror and saw a person get out of the truck

and open the passenger door and pull a lady out.  (19 RR 206-207.)[24]  He pulled her out of the truck

and took a few steps backward and then laid her on the side of the road and got back in his truck and

took off.  19 RR 208.  The truck headed south until it turned on Road 3504.  (19 RR 210.)  *It did not*

*run over the woman.*  (19 RR 231.)[25]   At trial, Mr. Acker testified that after Markie was run over,

he picked her up, opened the door to the truck to put her in, and then saw the light bulbs and placed

her back on the road.  (22 RR 243-244.)  Given Mr. Young's inconsistent versions, this could well

have been what he saw.

　　　Mr. Young admitted that on the day of the incident, he talked to Officer Wright and told him

that he saw a man and a lady fighting in the truck.  (19 RR 225-226.)  "I retracted that later on

because I realized that was a false statement...after I thought about it."  (19 RR 226.)[26]  He admitted

retracting the statement after talking to Officer Wright, and that he didn't see a man and a woman

fighting in the truck, but he initially told the officer that he did.  (19 RR 226.)  In all, he gave three

---

[24]　Additionally, the witness testified that he looked back when he was about twenty-five
to seventy-five feet past the truck.  (19 RR 215, 222.)  Mr. Young said he was watching the truck
while he drove about fifty feet.  (19 RR 223.)  He claimed to be driving about ten to fifteen miles
an hour at the time, and during the time he drove the fifty feet, the man had come around to the
other side and pulled the lady out, closed the door and stepped back and laid her by the road (19
RR 223-225. )  This is impossible because fifteen miles per hour is the equivalent of 22 feet per
second, and his observation time would have been a little more than two seconds.

[25]　Thus, there is no evidence that supports an inference that Mr. Acker ran over the
victim after she had exited the truck.

[26]　This pattern of retracted statements is a very troubling theme in this case.  Mr.
Smiddy, Mrs. Smiddy and Mr. Young all gave prior statements of the events that pointed to an
accidental death or was closer to Mr. Acker's version, yet their stories mysteriously changed at
the trial.  Ms. Ball also told about the prior jump attempt, yet it too was never heard by the jury
as the court disallowed it.  The coroner Dr. Gonsoulin gave trial testimony that the victim was
first strangled, which was strong evidence against jumping, yet that too has now been
discredited.  The trial court disallowed Mr. Sands' testimony about the improbability that the
victim was pushed out of the truck.

statements about the incident.  (19 RR 227.)  In the initial statement given on March 12, he said he saw a parked truck and inside it, a man and a woman who appeared to be fighting. (19 RR 228.)  The witness admitted "exaggerating some." (19 RR 228.)    In a second statement given at Officer Wright's office,  he said the person in the truck appeared to be talking to himself.  (19 RR 229-230.)  In the statement he said that the man had her underneath her arms and pulled her *out of the truck*, holding her like someone who has gone to sleep.  (19 RR 230.)[27]

Mr. Young also gave a statement to defense counsel.  (19 RR 234.)  The witness claimed the only thing he "retracted out of the statement is the first time I said I saw a man arguing with a lady or fighting with a lady.  Later on, I retracted that and said I just saw a man sitting in the truck." (19 RR 237.)   On the first statement, "I was exaggerating on that and I changed it later." (19 RR 238.)  Mr. Young claimed that the only time he saw the lady is when she was pulled out of the truck.  (19 RR 238.)

Brodie Young's trial testimony was used to promote the theory that the victim had been strangled to death in the truck and then laid on the road.  Now, with the discrediting of this theory, Mr. Young's conflicting stories, even if he is granted some credibility, add little or nothing to the state's case against Mr. Acker.

Respondent has also pointed to trial witnesses Mary Peugh, Tim Mason and his sister and mother regarding statements that "if he found out that Markie had spent the night with someone, he was going to kill them." (19 RR 95)(Respondent's Reply at 34.)  However, it is undisputed that Mr. Acker *did* find out that Markie had spent the night with someone, but he did not kill her when he found this out.

---

[27]   If ths is to be believed, it points to the victim being post-mortem after she jumped, as Mr. Acker has testified.

**VII.  EVEN IF THE COURT IS PERMITTED TO CONSIDER ALTERNATIVE THEORIES OTHER THAN THOSE ARGUED AT TRIAL, *WHITESIDE V. STATE* DOES NOT PROVIDE A  THEORY UNDER WHICH MR. ACKER COULD HAVE BEEN CONVICTED OF CAPITAL MURDER.**

This Court has asked the parties to analyze whether, if the prosecution had argued at trial that Ms. George jumped from Mr. Acker's truck, it would have been possible for the jury to convict Mr. Acker of capital murder.  The Court directed the parties to *Whiteside v. State,* 29 S.W.2d 399 (Tex. Crim. App. 1930), which found that "[a] person who, by actual assault or threat of violence, causes another, acting upon well-grounded or reasonable fear or apprehension, to do an act resulting in physical or corporal injury causing his death, is responsible for the homicide." *Whiteside,* 29 S.W.2d at 402.  (cited by the Court at EH 138.)

Mr. Acker has shown that the Court is not permitted to consider theories other than the theory the prosecution argued at trial and presented to the jury.  *See supra,* Section IV.  However, if the Court does choose to consider alternative theories under which Mr. Acker could have been convicted, *Whiteside* does not provide such a theory. The 1925 statute under which the defendant in *Whiteside* was convicted is fundamentally different from the capital murder statute under which the jury convicted Mr. Acker. As opposed to the statute in *Whiteside*, the modern capital murder statute requires a specific intent to kill.

Furthermore, the evidence at the trial in *Whiteside* included extremely convincing evidence of the defendant's intent. Mr. Acker's case is distinguishable on this crucial point. Other than evidence of strangulation—evidence that the State now admits was incorrect—the record contains little evidence that Mr. Acker intended to kill Ms. George and abundant evidence that her death was accidental.  Without demonstrating intent to kill, the State could not convict Mr. Acker of murder, even under the Penal Code as it was written in 1925.

**A.**      **As opposed to the Penal Code of 1925, the modern Penal Code defines capital murder as a "result of conduct" offense requiring a specific intent to kill**

The Court in *Whiteside* was interpreting the offense of murder as it appeared in the Penal Code of 1925: "Whoever shall voluntarily kill any person within this State shall be guilty of murder. Murder shall be distinguished from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or which excuse or justify the killing." Tex. Penal Code art. 1256 (as amended by Acts 40th Leg. (1927)(Vernon's Ann. Penal Code art. 1256), cited in *Whiteside,* 29 S.W.2d at 403. As this provision did not define the culpable mental state for murder, the *Whiteside* Court relied heavily on common law and criminal law treatises to define the requisite intent as malice aforethought rather than specific intent:

> By exception to the charge appellant advanced the claim and here urges that . . . he would not be guilty of murder unless at the time of the assault he had a specific intent to kill the deceased. . . . A specific intent to kill is not in every case essential to support a conviction of murder. *See* Wharton on Homicide, 3d Ed., Sec. 87; *Walker v. State*, 28 Tex. Ct. App. 503. Many illustrative cases are cited in *Keaton v. State*, 41 Tex. Crim. 621, to which reference has already been made. If death result under certain conditions the law regards it as murder aside from the intent . . . .

29 S.W.2d at 403. Accordingly, the *Whiteside* Court held, "under our present murder statute," that a murder conviction was appropriate where the jury could "conclude on the facts that in what the accused did and said there was the intent that serious bodily harm or death should result." *Id.* Crucially, the common law requirement of malice aforethought permitted the jury to convict Whiteside of murder where he had intended to cause serious bodily harm, but not death. *See id.* To support this proposition, the *Whiteside* Court cited to *Walker v. State*, 13 S.W. 860, 861, 28 Tex. Ct. App. 503, 505 (Tx Ct. App. 1890), which held: "If a person intentionally inflicts serious bodily injury upon the person of another which may result in death, although the intent to kill may not exist, the law, if the act was prompted by malice and death ensues, holds him guilty of murder. Indeed there are a number of cases where a killing would amount to murder, and yet the party did

not intend to kill." (citing *White v. State*, 13 Tex. Ct. App. 259 (1882)). Clearly, murder under the

1925 Penal Code did not require a specific intent to kill.

The modern Penal Code provides a substantially different definition for capital murder.

Texas's present statutory scheme for capital punishment was enacted in response to *Furman v.*

*Georgia*, 408 U.S. 238 (1972). The basic concern in *Furman* was that the death penalty was

arbitrarily imposed because "sentencing authorities were not directed to give attention to the nature

or circumstances of the crime committed or to the character or record of the defendant." *Gregg v.*

*Georgia*, 428 U.S. 153, 206 (1976). In response to *Furman*, the Texas legislature enacted a new

statutory scheme for capital punishment. *See Texas Votes Death Penalty*, N.Y. TIMES, May 30, 1973.

One of the ways jurors' discretion was guided was to narrow the class of offenders eligible for the

death penalty by limiting capital punishment to those who had committed murder under sec.

19.02(b)(1) of the Penal Code. *See* Tex. Penal Code sec. 19.03(a). This subsection of sec. 19.02

requires that the accused "intentionally or knowingly cause the death of an individual."

The legislature specifically excluded other murders under sec. 19.02 from eligibility for the

death penalty, including murders where the offender "intends to cause serious bodily injury and

commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal

Code sec. 19.02(b)(2), 19.03(a). To comply with the Eighth Amendment's requirement to narrow

jurors' sentencing discretion, the state legislature deliberately chose to exclude offenders whose

intent rose only to intent to cause serious bodily injury. Thus, under the modern penal code, an

offense only qualifies as capital murder if the offender had a specific intent to cause the death of

another person.

The Court of Criminal Appeals has repeatedly, unequivocally held that capital murder

requires a specific intent to kill: "Capital murder is a result-of-conduct oriented offense; the crime

is defined in terms of one's objective . . . ." *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App.

2008); *see Black v. State*, 26 S.W.3d 895, 898 (Tex. Crim. App. 2000); *Medina v. State*, 7 S.W.3d

633, 639 (Tex. Crim. App. 1999); *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994);

*Alvarado v. State*, 704 S.W.2d 35, 36 (1985); *see also Schroeder v. State,* 123 S.W.3d 398, 400

(Tex. Crim. App. 2003) (reiterating that intentional murder under sec. 19.02(b)(1) is a "result of

conduct" offense); *Cook*, 884 S.W.2d at 490 ("We have long held that intentional murder is a 'result

of conduct' offense."); *Martinez v. State,* 763 S.W.2d 413, 419 (Tex. Crim. App. 1988) (same);

*Lugo-Lugo v. State*, 650 S.W.2d 72, 80, 88 (Tex. Crim. App. 1982) (same). As the Court of Criminal

Appeals has explained, a "result of conduct" offense is defined by specific intent to bring about a

prohibited result: "what matters is that the conduct (whatever it may be) is done with the required

culpability to effect the *result* the Legislature has specified." *Cook*, 884 S.W.2d at 490 (citing

*Alvarado*, 704 S.W.2d at 39)(emphasis in original). The "required culpability" for capital murder

is to intentionally or knowingly bring about the death of another person. Tex. Penal Code sec.

19.03(a). The Penal Code states that an offender acts intentionally "with respect to . . . a result of

his conduct when it is his conscious objective or desire to . . . cause the result." Tex. Penal Code sec.

6.03(a); *see also Martinez*, 763 S.W.2d at 419. Thus, capital murder "is defined in terms of one's

objective to produce a specified result. . . . [The offender] must have specifically intended that death

result from his conduct." *Kinnamon v. State*, 791 S.W.2d 84, 88 (Tex. Crim. App. 1990), *overruled*

*on other grounds*, *Cook*, 884 S.W.2d at 491; *see Morrow v. State*, 753 S.W.2d 372 (Tex. Crim. App.

1988).[28]

     The specific intent requirement of sec. 19.03(a) distinguishes capital murder from traditional,

common law murder as it appeared in the 1925 penal code. The authority that the *Whiteside* Court

cited, both prior cases and criminal law treatises, analyzed the historical malice aforethought

standard of intent required for a murder conviction. These authorities all explicitly stated that

specific intent to kill was *not* necessary to satisfy malice aforethought. *Keaton v. State*, 41 Tex.

---

[28]   As the prosecutor Mr. Long admitted at trial: "They have to find an intentional
murder [for the jury to convict Mr. Acker of capital murder]." 22 RR 114.

Crim. 621, 623–24 (Tex. Crim. App. 1900); *Walker*, 13 S.W. at 861, 28 Tex. Ct. App. at 505; *White*, 13 Tex. Ct. App. at 261; Francis Wharton, A TREATISE ON CRIMINAL LAW, Sec. 87 (3d Ed.). Section 19.03(a) is a departure from this tradition.

While the *Whiteside* Court correctly concluded, based on the 1925 penal code, that Mr. Whiteside could be convicted of murder absent a specific intent to kill, the same does not hold true for capital punishment under the modern penal code. *Whiteside*'s analysis rests on the premise that the accused can be convicted of murder if he intended to cause serious bodily harm. 29 S.W.2d at 403. Under the modern capital murder statute, this premise is false. The accused is innocent of capital murder if he intended anything other than the death of the victim. Thus, the analysis in *Whiteside* does little to illuminate possible theories the prosecution might have argued at Mr. Acker's capital murder trial.

**B.    There is no evidence that Mr. Acker intended to cause serious bodily injury,   nor that he intended to kill**.

Even if Mr. Acker had been charged with murder under sec. 19.02(b)(2), the prosecution failed to introduce sufficient evidence supporting a finding of intent to cause serious bodily injury. The prosecution relied heavily on evidence of strangulation at trial. The prosecution's reliance on the strangulation theory is discussed extensively in Section V *supra*.  The State now concedes that Ms. George was not strangled, also detailed in the hearing summary in Section II. Without the strangulation theory, there is insufficient evidence that Mr. Acker intended to cause even serious bodily injury, much less death, to Ms. George. Absent the false evidence of strangulation, the prosecution presented insufficient evidence that Mr. Acker intended to injure Ms. George in this way. In fact, the evidence indicates that Mr. Acker was taking Ms. George to a three-way confrontation with Robert McGee ("Calico") in order to find out what he and Ms. George had done when they spent the night together. To be sure, Mr. Acker was angry. He wanted answers. But a dead body wouldn't give Mr. Acker an answer—only Ms. George and Mr. McGee could do that.

The evidence does indicate that Mr. Acker took Ms. George in his truck and slapped her in the face. These offenses are not trivial. However, these offenses are not punishable by death. Mr. Acker's capital murder conviction can stand only if the evidence supports a finding that he in fact intended to kill Ms. George. Without intent to cause death, Mr. Acker did not commit capital murder.

## VIII. CONCLUSION.

Petitioner respectfully requests that this Court find that Petitioner has shown that "it is more likely than not that no reasonable juror viewing the evidence as a whole would lack reasonable doubt," *House* at 554; find that he has has met the *Schlup/House* gateway standard for the actual innocence exception to procedural default; and to grant relief on this actual innocence claim and/or to consider any otherwise procedurally defaulted claims on their merits.

Respectfully submitted,

/s/ A. Richard Ellis

_____

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
Attorney for Petitioner

Dated: July 20, 2011.

-62-

## CERTIFICATE OF SERVICE

I, A. Richard Ellis, counsel of record for Petitioner, do hereby certify that I electronically filed the above and foregoing pleading "Petitioner's Post-Hearing Brief " with the Clerk of the Court for the United States District Court for the Eastern District of Texas, using the electronic case filing system of the Court on July 20, 2011.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

> Ms. Tina Joann Miranda
> Assistant Attorney General
> Postconviction Litigation Division
> Office of the Attorney General, State of Texas
> P.O. Box 12548, Capitol Station
> Austin, Texas 78711
> tina.miranda@oag.state.tx.us

/s/ A. Richard Ellis

_____

A.  RICHARD ELLIS
COUNSEL FOR PETITIONER