**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

DANIEL CLATE ACKER                §
                                  §
*versus*                          §          CIVIL ACTION NO. 4:06-cv-469
                                  §
DIRECTOR, TDCJ-CID                §

## MEMORANDUM OPINION AND
## ORDER OF DISMISSAL

Petitioner Daniel Clate Acker, an inmate confined on death row in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is challenging his capital murder conviction and death sentence imposed by the 8th District Court of Hopkins County, Texas, in Cause Number 0016026, in a case styled *The State of Texas vs. Acker*. For reasons set forth below, the Court finds that the petition is procedurally barred in part and without merit otherwise, and that it will be denied.

## I.      PROCEDURAL HISTORY OF THE CASE

Petitioner was convicted and sentenced to death for the murder of his girlfriend, Marquette George, in the course of a kidnaping. The offense took place on March 12, 2000. Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, the trial court sentenced Petitioner to death on March 30, 2001. The Texas Court of Criminal Appeals affirmed the conviction. *Acker v. State*, No. AP-74109, 2003 WL 22855434 (Tex. Crim. App. Nov. 26, 2003). Petitioner did not file a petition for a writ of certiorari.

While the direct appeal was pending, Petitioner, by counsel, filed an application for a writ of habeas corpus in state court on July 18, 2003. Separately, and several months later, Petitioner filed a *pro se* petition for habeas relief on December 31, 2003. The trial court conducted an

evidentiary hearing on his ineffective assistance of counsel claims. On June 16, 2006, the trial

court issued findings of fact and conclusions of law. On November 15, 2006, the Texas Court of

Criminal Appeals denied the counseled application with the following statement:

> Applicant presents forty-six allegations in his application in which he challenges the
> validity of his conviction and resulting sentence. An evidentiary hearing was held and the
> trial judge entered findings of fact and conclusions of law. The trial court recommended
> that relief be denied.

> This Court has reviewed the record with respect to the allegations made by applicant. We
> adopt the trial judge's findings and conclusions. Based upon the trial court's findings and
> conclusions and our own review, the relief sought is denied.

*Ex parte Acker*, No. WR-56841-01 & 56841-02, 2006 WL 3308712, at *1 (Tex. Crim. App. Nov.

15, 2006). In addition,

> This Court has also reviewed a pro se application for writ of habeas corpus. Because this
> application was filed after the deadline provided for an initial application for habeas
> corpus, we find it to be a subsequent application. *See* Art. 11.071, § 4(a). We further find
> that the application fails to meet one of the exceptions provided for in Section 5 of Article
> 11.071 and, thus, dismiss this subsequent application as an abuse of the writ.

*Id*.

Petitioner filed his original federal petition for writ of habeas corpus (#17) on November

14, 2007. He moved to stay and hold proceedings in abeyance to allow him to exhaust claims in

the state court, which the court granted. On September 10, 2008, the Texas Court of Criminal

Appeals reviewed this third state habeas application and ruled, in its entirety,

> This is a subsequent application for writ of habeas corpus filed pursuant to Texas Code of
> Criminal Procedure, Article 11.071, Section 5.

> Applicant was convicted of capital murder on March 30, 2001. We affirmed the
> conviction and sentence on direct appeal. *Acker v. State*, No. AP-74,109 (Tex. Crim.
> App. November 26, 2003). On July 18, 2003, applicant filed his initial application for
> writ of habeas corpus pursuant to Article 11.071. When this Court received the record it
> included *pro se* claims raised by applicant. We denied relief on the initial application and
> determined the *pro se* claims were untimely and did not meet the requirements for

consideration of subsequent claims under Article 11.071, Section 5, and dismissed them. *Ex parte Acker*, No. WR-56,841-01 and WR-56, 841-03 (Tex. Crim. App. November 15, 2006). Applicant now brings fifteen more claims. We have reviewed these claims and find that they do not meet the requirements of Article 11.071, Section 5 for consideration of subsequent claims. This application is dismissed as an abuse of the writ.

*Ex parte Acker*, No. WR-56841-04, 2008 WL 4151807, at *1 (Tex. Crim. App. Sept. 10, 2008).

The present, post-exhaustion, petition (#30) (the operative "Petition") was filed on November 10, 2008. Petitioner presented the following grounds for relief, with numerous sub-claims, in his 282-page petition:

1.   Petitioner is actually innocent of capital murder;

2.   The trial court was biased against Petitioner and committed many errors which prevented him from presenting his case for innocence and deprived him of due process and a fair trial;

3.   The trial court erred in denying the defense motion for a change of venue and deprived Petitioner of his right to a fair trial;

4.   Trial counsel rendered ineffective assistance of counsel during the pre-trial portion of the proceedings;

5.   Trial counsel rendered ineffective assistance of counsel at the guilt/innocence portion of the trial;

6.   Trial counsel rendered ineffective assistance of counsel at the penalty phase of the trial;

7.   Appellate counsel rendered ineffective assistance of counsel;

8.   Petitioner was denied meaningful access to the courts and due process of law in state post-conviction proceedings by the appointment of ineffective state post-conviction counsel;

9.   The trial court erred in denying the defense confidential experts under *Ake v. Oklahoma*[1];

---

[1]   470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

10.     Petitioner was denied a fair trial and due process of law by the persistent misconduct of the prosecutor;

11.     Lethal injection - as it is currently administered in Texas - produces unnecessary pain, torture, and lingering death, and violates the Eighth Amendment;

12.     The second special issue is unconstitutional because it omits a burden of proof and makes impossible any meaningful appellate review of the jury's determination;

13.     The death penalty, at least as presently administered in Texas, is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution;

14.     Petitioner's death sentence violates international law, which is binding on this court, as well as the Eighth Amendment; and

15.     The cumulative effect of the errors at Petitioner's trial denied him of due process under the Fourteenth Amendment.

The Director filed an answer (#43) ("Answer") on August 21, 2009. Petitioner filed a reply (#48) ("Reply") on February 19, 2010. This Court[2] conducted an Evidentiary Hearing on the issue of the first claim, actual innocence, on June 16, 2011. (*See* #76 (minute entry) and #78 (hearing transcript).) On July 20, 2011, both the Director and Petitioner filed their respective post-hearing briefs (#82 and #83).

## II.    FACTUAL BACKGROUND OF THE CASE

The Texas Court of Criminal Appeals discussed the factual background of the case as follows:

The victim, Marquette ("Markie") George, was appellant's girlfriend, but they had a stormy relationship. On the evening of March 11, 2000, they were with friends and a

---

[2]    The Honorable Richard A. Schell, previously presiding over this case before it was transferred to the undersigned.

relative at the Bustin'[3] Loose nightclub. From a distance, Mary Peugh observed the two of them arguing. After the argument, appellant walked back to Peugh's table and remarked, "I'm going to kill that bitch." Pointing to the victim, appellant later told Timothy Mason to tell Markie that appellant was going to kill her. Dorcus Vititow,[4] appellant's older sister, testified that appellant acted very jealous and was eventually kicked out of the nightclub for his behavior. Appellant returned several times, inquiring about Markie's whereabouts, and at least one of those times Vititow told him to stay out of the club. Vititow and appellant left the premises together when the club closed at 1:00 in the morning.

Earlier that night, Vititow had taken a knife away from appellant, and appellant later asked for the knife to be returned. FN4 When appellant asked for the knife to be returned, Vititow claimed (falsely) that she did not have it. FN5 Holding up an axe, appellant responded, "I don't need that knife. If I find her with another man, they will pay." Later that morning, appellant was still looking for the victim. He believed that she had spent the night with another man, and he said that, when he found them, he would beat them and make an example out of them, because no one was going to make a fool out of him.

> FN4. During direct examination by the State, Vititow was reluctant to testify about the details of the incident, but the State treated her as a hostile witness and elicited those details with leading questions and the help of earlier statements.

> FN5. When asked by the State why she refused to give back the knife, Vititow claimed that she refused to do so because the knife actually belonged to Markie.

At around 9:15 a.m., appellant appeared at the victim's parents' house and asked about the victim's whereabouts. The victim's mother, Lila Seawright, told appellant that she had not seen her. Appellant told Seawright that he did not know what he was going to do without Markie. He further told her that, if Markie had stayed away by herself that night, then everything was fine, but "if I find out she was with anybody, I'm going to kill 'em." Shocked, Seawright replied that "there's not anybody worth killing and going to the

---

[3]  The Court of Criminal Appeals referred to the club as the "Bustin' Loose," with apostrophe. The club is referred to as the "Bustin Loose," without apostrophe, throughout the record. *See*, *e.g.*, Reporter's Record, Volume 19. The Court will use the name "Bustin Loose."

[4]  The Court of Criminal Appeals spelled the name as "Dorcus Vititow" in this instance. Alternative spellings of the name appear throughout the record. The trial transcript consistently spelled her name "Dorcas Vittatoe," as reflected several times in this Memorandum Opinion and Order. Additionally, she used the name "Dorcas Acker Dodd" during a hearing on a motion to change venue in the trial court. *See* Part VI.B. below (discussing Petitioner's Claim III).

pen for." Shrugging his shoulders, appellant responded, "Pen life ain't nothing. Ain't nothing to it."

Thomas Smiddy testified that the victim lived in a mobile home within a mobile home park. Smiddy was one of her neighbors. Between 10:45 and 11:00 a.m., the victim arrived at her home with a man who was not appellant. This man dropped her off and left. Appellant came out of the home to meet her, and the two went inside. Twenty to thirty minutes later, Markie ran out of the home and over to Smiddy's place. She hid behind Smiddy's wife and yelled for them to call the sheriff. Appellant followed and caught the victim. He picked her up, slung her over his shoulder, and carried her to his pickup truck. He then forced the victim into the truck - an episode Smiddy described as "like putting a cat in a bathtub." Appellant drove away, his truck swerving in and out of a ditch as he did so. Smiddy called the sheriff. FN6

> FN6. Smiddy's wife, Alicia Smiddy, subsequently gave similar testimony.

Sometime between 11:00 and 11:30 a.m., Brodie Young, a sixty-five-year-old man, was driving on County Road 3519, passing by Sedill Ferrell's dairy, when he saw a man pull a woman by her arms out of the passenger side of a pickup truck and place her on the ground. Young went to the sheriff's office to report the incident, but someone had already reported it.

Sedill Ferrell found the victim's body lying on the ground. He went to a phone, called law enforcement, came back to the body, and waited until the authorities arrived. Toney Hurley, the Chief Investigator for the Hopkins County Sheriff's Office, testified that appellant was found on a road about ten miles away from the victim's body's location.

Dr. Morna Gonsoulin, a medical examiner, conducted an autopsy. She testified that she found injuries around the neck that showed a significant hemorrhage of blood. The left eye contained petechiae - small hemorrhages in the capillaries lining the eye. Both injuries were a sign of strangulation. She also found blunt force injuries to the body: The head was crushed, with broken bones in the face. The base of the skull was shattered on all sides. There were rib fractures and a clavicle fracture, internal injuries to the trunk, lacerations and gaping wounds to the heart, lacerations of the lung and liver, and a deep laceration in the lower right leg. The sac around the heart was torn open, a segment of the main artery was torn in two pieces, and there was blood in the chest and abdominal cavities. There were also abrasions on the body, including the cheek and chin. This testimony was consistent with the autopsy report, FN7 which came to the following conclusion:

> FN7. Although Gonsoulin was in charge of conducting the autopsy, several other doctors also signed the report.

It is our opinion that Marquette George, a 33-year-old white woman, died as the result of homicidal violence including strangulation. Several of the injuries identified could be consistent with blunt force injury resulting from an impact with or being ejected from a motor vehicle. Some injuries (particularly those of the neck and the perineum) are not consistent with ejection from or impact with a vehicle; the injuries observed in the neck are more consistent with strangulation. Further, the dry parchment-like appearance of several abrasions, the lack of associated hemorrhage of the laceration of the right leg, the paucity of hemorrhage in the brain and the amount of body cavity hemorrhage in relation to the severity of the injuries indicate that these injuries were sustained postmortem or perimortem. Given these findings, it is likely that the decedent was strangled and probably dead or near death prior to being dumped from the vehicle.

On cross-examination, Gonsoulin admitted that crushing the brain stem - which occurred here - was an injury of the type that would cause instantaneous death by stopping the heart from beating, and thus could explain the lack of hemorrhaging in other parts of the body. The medical examiner also testified that it was possible for one to receive the neck injuries observed and survive. On redirect, however, the medical examiner testified that the neck injuries were so severe that a person suffering from them would have been incapacitated and might be brain dead, even if the heart were still beating. Gonsoulin also testified that the neck injuries occurred within hours of the victim's death.

Appellant testified at trial. He denied strangling the victim and denied squeezing or gripping her neck. He admitted that he carried the victim to the truck but claimed that she crawled in when he opened the driver's side door. He further testified that, when he started the truck and began to pull out, the victim attempted to jump out, but he pulled her back. Later, the victim attempted to jump out a second time but was prevented from doing so. Appellant testified that the victim finally succeeded on the third attempt to jump out:

Q.     What happened then?

A.     At the same time the car passed me she jumped from the pickup.

Q.     What happened? What did you do when she jumped?

A.     Well, I did three different things pretty much at the same time.

Q.     What were those things?

A.     I leaned way over and tried to grab her. I barely touched her. I never got a hold to her. I hollered her name. I hollered Markie as I was trying to grab her and I stomped the brake with my left foot. As I stomped the brake with my left foot it throwed me down into the seat of the truck. I raised back

> up. I took my left foot and pushed the clutch in and stopped as fast as I could stop.
>
> Q.     What happened then?
>
> A.     I had to come pretty much to a complete stop to get the truck in reverse.
>
> Q.     What happened then?
>
> A.     You know any car, I guess, you have to come to a complete stop to get in reverse.
>
> Q.     What did you do?
>
> A.     I backed up as fast as I could back up.
>
> Appellant further testified that he navigated back to where the victim lay and found her face down on the ground.  He testified that he did not run over her with his truck.

*Acker v. State*, 2003 WL 22855434, at *1-3.  Further details adduced at trial and during this Court's Evidentiary Hearing will be discussed below, as pertinent.

## III.     LEGAL STANDARD

The original petition was filed in 2007 and the post-exhaustion petition was filed in 2008; thus, review is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 327, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).

### A.     General

Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 733, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010) (citation and internal quotation marks omitted). With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (*en banc*) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003)).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). As such, "evidence later introduced in federal court is irrelevant." *Id.* at 1400. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (footnotes omitted), *cert. denied*, 133 S. Ct. 105, 184 L. Ed. 2d 49 (2012). With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation

9

and internal quotation marks omitted). Most recently, the Supreme Court stated that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quoting *Richter*, 562 U.S. at 101). The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). Federal habeas corpus relief is not available just because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Id.* at 694.

## B. Procedural Bar

"The general rule is that the federal habeas court will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural ground." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-32, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)), *cert. denied*, 541 U.S. 1087, 124 S. Ct. 2812, 159 L. Ed. 2d 249 (2004). The procedural default doctrine "has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392, 1245 S. Ct. 1847, 158 L. Ed. 2d 659 (2004). "[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default." *Id*. at 388.

In this case, the Texas Court of Criminal Appeals dismissed all of Petitioner's claims raised herein as an abuse of the writ pursuant to Tex. Code Crim. Proc. art. 11.071 § 5. Petitioner has argued at length that art. 11.071 § 5 does not provide adequate and independent grounds for a procedural bar, and that portions of § 5 are entangled with federal law, rendering it incapable of being an independent ground. Petition at 68-84; Reply at 15-38. Notwithstanding his repetitive argument, dismissal pursuant to abuse of writ principles has regularly been held to be a valid state procedural bar foreclosing federal habeas review. *See Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) ("Here, the [Texas Court of Criminal Appeals] explicitly dismissed Moore's successive application (where he first raised *Brady*) as an abuse of the writ, and 'Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review.'"); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239, 129 S. Ct. 2378, 173 L. Ed. 2d 1299 (2009); *Coleman v. Quarterman* 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343, 127 S. Ct. 2030, 167 L. Ed. 2d 772 (2007).

Under one narrow exception to the procedural bar rule, courts will review such a claim without a showing of cause and prejudice "when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense, or, in the capital sentencing context, of the aggravating circumstances rendering the inmate eligible for the death penalty." *Id*. The actual innocence exception is also discussed in terms of "a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Busby*, 359 F.3d at 718. This exception will be discussed in greater detail in the Court's analysis of Petitioner's Claim I, which is actual innocence.

Absent a claim of actual innocence, at least until recent years, Petitioner's claims would be subject to the procedural bar in light of the decision of the Texas Court of Criminal Appeals dismissing them as an abuse of the writ. However, the Supreme Court opened the door slightly for a showing of cause and prejudice to excuse the default in *Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013). Discussed in greater detail in Part V, below, *Martinez* and *Trevino* provide an exception to a procedural bar for review of claims of ineffective assistance of trial counsel in certain instances where such claims should have been raised in an initial-review collateral proceeding, if there was either no counsel representing the petitioner at such a proceeding or counsel was ineffective.

Unless Petitioner can demonstrate cause for the procedural bar under one or the other of these exceptions, his procedurally-barred claims cannot be heard on federal habeas review.

Petitioner also raises the potential for consideration of procedurally barred claims if failure to do so would result in a "fundamental miscarriage of justice." Petition at 82. However, as will be discussed below, there is no merit to his claim for actual innocence; furthermore, under the *Martinez/Trevino* analysis below, the Court has also found no merit to Petitioner's various claims of ineffective assistance of trial counsel. Accordingly, there is no "fundamental miscarriage of justice" justifying review of his remaining, procedurally barred claims.

## IV.     CLAIM I:     MR. ACKER IS ACTUALLY INNOCENT OF CAPITAL MURDER[5]

Petitioner presents several claims. Each is procedurally barred, but will be discussed in turn. Two categories of claims may be raised to enable a petitioner to avoid the procedural bar.

---

[5]     The Court will cite Petitioner's claims as he has stated them.

The first to be discussed is Petitioner's lead claim of actual innocence. The effect of *Martinez* and *Trevino* will be addressed in Part V, next.

In this claim, Petitioner asserts that he is actually innocent of the murder of Marquetta[6] George, and that she was actually killed when she attempted to jump from Petitioner's truck. This claim was presented to the Texas Court of Criminal Appeals for the first time in a subsequent application for state habeas relief. The Texas Court of Criminal Appeals reviewed the claim, as one of fifteen claims presented in that subsequent application, and found that it did not meet the requirements of the Texas Code of Criminal Procedure, art. 11.071, § 5, for consideration of subsequent claims. *Ex parte Acker*, 2008 WL 4151807, at *1. Accordingly, that Court dismissed the claim as an abuse of the writ. *Id*.

With regard to this claim, this Court again notes that a federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim. *Coleman*, 501 U.S. at 729-32. "[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default." *Dretke*, 541 U.S. at 388. Under a narrow exception to this rule, courts will review such a claim without a showing of cause and prejudice "when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense or, in the capital sentencing context, of the aggravating circumstances rendering the inmate eligible for the death penalty." *Id*. A claim of actual innocence is "'not

---

[6]   Spelled "Marquette" by the Texas Court of Criminal Appeals. *Acker v. State*, 2003 WL 22855434, at *1, but "Marquetta" elsewhere, such as in the indictment and jury instructions discussed below.

itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup v. Delo*, 513 U.S. 298, 315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (quoting *Herrera v. Collins*, 506 U.S. 390, 404, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)). *See also Rocha v. Thaler*, 626 F.3d 815, 824 (5th Cir. 2010), *cert. denied*, 132 S. Ct. 397, 181 L. Ed. 2d 255 (2011). The Supreme Court recently reaffirmed this basic principle in *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931, 185 L. Ed. 2d 1019 (2013). There, the Supreme Court noted that it "ha[s] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence,"[7] but recognized "that a prisoner 'otherwise subject to defenses of abusive or successive use of the writ [of habeas corpus] may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence.'" *Id*. (citing and quoting *Herrera*, 506 U.S. at 404). In both *McQuiggin* and *Rocha*, the petitioners were trying to overcome procedural problems by arguing actual innocence in order to have their ineffective assistance of counsel claims considered on the merits. In *Rocha*, the Fifth Circuit stressed that a petitioner must make a "sufficient gateway showing of actual innocence to justify having his federal habeas claim considered on the merits." 626 F.3d at 825 (citing *House v. Bell*, 547 U.S. 518, 522 & 553-54, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)).[8]

---

[7]     *See also Burton v. Stephens*, 543 F. App'x 451, 458 (5th Cir. 2013) ("The Supreme Court has not recognized actual innocence as an independent ground for federal habeas corpus relief," citing *McQuiggin*, 133 S. Ct. at 1931); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir.) (". . . our precedent precludes [a] freestanding actual innocence claim" . . . "[A]ctual-innocence is *not* an independently cognizable federal-habeas claim" (citations omitted, emphasis in original), *cert. denied*, 135 S. Ct. 435, 190 L. Ed. 2d 327 (2014).

[8]     As discussed above, prior to *Martinez/Trevino*, a "gateway" actual innocence claim was the primary path to consideration of a procedurally barred constitutional claim considered. Application of the *Martinez/Trevino* exception will be discussed with Petitioner's ineffective assistance of trial counsel claim, below.

The Supreme Court has also stressed that the burden of showing actual innocence is extraordinary:

> To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable jury would have convicted him in light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under *Sawyer*. The *Carrier* standard thus ensures that petitioner's case is truly "extraordinary."

*Schlup*, 513 U.S. at 327.

The Supreme Court has further illuminated the standard enunciated in *Schlup*. "First, although '[t]o be credible' a gateway claim requires 'new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial,' [*Schlup*, 513 U.S.] at 324, 115 S. Ct. 851, the habeas court's analysis is not limited to such evidence." *House*, 547 U.S. at 537. The habeas court must consider "'"all the evidence,"' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *Id*. at 537-38 (quoting *Schlup*, 513 U.S. at 327-28). Then, "[b]ased on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id*. (quoting *Schlup*, 513 U.S. at 329).

Second, "the *Schlup* standard is demanding and permits review only in the '"extraordinary"' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327). Although "in the vast majority of cases, claims of actual innocence are rarely successful," *id*. (quoting 513 U.S. at 324), the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence. *Id*. Instead,

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt - or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*Id*. Finally, the Supreme Court explained that "the gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia*, 442 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979),' which governs claims of insufficient evidence." *Id*. (quoting *Jackson*, 442 U.S. at 330). Instead, "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id*. This may include consideration of "the credibility of the witnesses presented at trial." *Id*. at 537-38 (quoting *Jackson*, 442 U.S. at 330).

More recently, the Fifth Circuit further discussed the type of evidence that must be presented in order to satisfy the actual innocence standard:

> Proving such a claim is daunting indeed, requiring the petitioner to show, as a factual matter, that he did not commit the crime of conviction. The petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was more likely than not that no reasonable juror would have convicted him in the light of the new evidence. Such new, reliable evidence may include, by way of example, exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.

*McGowen v. Thaler*, 675 F.3d 482, 499-500 (5th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 133 S. Ct. 647, 184 L. Ed. 2d 482 (2012) *and cert. denied*, 133 S. Ct. 648, 184 L. Ed. 2d 465 (2012).

Here, Petitioner argues that he is actually innocent of his conviction for capital murder, based on evidence he submitted from an independent medical forensics expert, G.M. Larkin, M.D., in which Dr. Larkin opined, *inter alia*, that there was no credible evidence to support a determination of strangulation in connection with the victim's death and that there was no evidence

that the victim was run over by Petitioner's truck. Petition at 86-108, and Exhibit 26 to the Petition ("Medical Legal Report" by Dr. Larkin) (#20). The results of this evidence and Petitioner's argument derived therefrom are first presented in the Petition, above; the Director argues against it in his Answer and Petitioner rejoins in his Reply. However, on motion, the Court granted an Evidentiary Hearing limited to the subject of actual innocence, which was conducted on June 16, 2011.[9] During that hearing, both parties presented evidence, including the Director's testifying medical forensics expert, Vincent J.M. Di Maio, M.D.[10] Dr. Di Maio also testified that in his opinion, the victim was not killed by strangulation, but he opined contrary to Dr. Larkin that the victim was indeed run over by a vehicle. EH[11] at 51-54, 55, 61-62, 67, 69-70. The Court agreed to post-Evidentiary Hearing briefs by each of the parties, and Petitioner used the opportunity to expand his argument at length. (*See* #82 (Director's Brief) and #83 (Petitioner's Brief).)[12]

Petitioner also makes at least a *pro forma* attempt to argue that his actual innocence claim is not only a "gateway" claim to permit consideration of other, constitutional claims, but is a

---

[9]     *Pinholster*, *supra*, 131 S. Ct. at 1398, interprets 28 U.S.C. § 2254(d) to exclude the introduction of new evidence in federal court for claims that have been "adjudicated on the merits in State court proceedings." Here, Petitioner's actual innocence claim was not adjudicated on the merits in any State court proceeding. Moreover, the very structure of an actual innocence claim in a federal habeas proceeding requires this Court to consider evidence not presented at trial. *Schlup*, 513 U.S. at 324; *House*, 547 U.S. at 537. Accordingly, the Court conducted the Evidentiary Hearing discussed at length herein.

[10]    Dr. Larkin was also scheduled to testify via teleconference, but suffered a heart attack on the morning of the hearing and was transported to the hospital. His Medical Legal Report was entered as evidence in lieu of his testimony by the stipulation of the parties.

[11]    "EH" refers to the transcript of the Evidentiary Hearing (#78).

[12]    In particular, he used the additional briefing opportunity to expand his argument that because the prosecutor relied predominantly on the theory of strangulation at trial, no other theory of death should be considered in the actual innocence analysis, though the indictment and jury instructions also gave the jury the option to find guilt based on blunt force trauma alone. The Court discusses this argument in detail below.

"freestanding" claim entitling him to relief on its own merits. *See House*, 547 U.S. at 554-55.

However, as the Court has already discussed, above, neither the Supreme Court nor the Fifth

Circuit has recognized the existence of any such "freestanding" claim under a claim of actual

innocence. Furthermore, the Court will find that Petitioner's claim of actual innocence is without

merit. Therefore, there is no basis for any such "freestanding" claim in any case and it will not

be necessary to discuss the claim further.

### A.     The Indictment And Jury Instructions

First, the Court will examine the charges and jury instructions against Petitioner, which

will be an important base in each level of consideration. The indictment from the grand jury in

this case stated:

> The Grand Jurors for the County of Hopkins, State of Texas, duly selected, impaneled,
> sworn, charged and organized as such at the January Term, 2001, of the Eighth Judicial
> District Court of said County, upon their oaths present in and to said Court, that **DANIEL
> CLATE ACKER**, on or about the 12th day of March, 2000, and before the presentment
> of this indictment, in said County and State, did then and there, intentionally cause the
> death of an individual, namely, Marquetta Follis George, by homicidal violence, to wit:
> manual strangulation and ligature strangulation with an object, the exact nature of which
> is unknown to the grand jury, and blunt force injury resulting from causing her to impact
> a blunt object, the exact nature of which is unknown to the grand jury, and Daniel Clate
> Acker was then and there in the course of committing and attempting to commit the offense
> of kidnaping of Marquetta Follis George.

1 CR[13] at 1. The jury instructions at trial stated, in pertinent part:

> Before you would be warranted in convicting the defendant, DANIEL CLATE ACKER,
> of capital murder you must find from the evidence beyond a reasonable doubt not only that
> on the occasion in question the defendant was in the course of committing or attempting
> to commit the felony offense of kidnaping of Marquetta Follis George as defined in this
> charge, but also that during the commission of the kidnaping or attempted commission
> thereof, if any, the defendant caused the death of Marquetta Follis George by manual
> strangulation or ligature strangulation with an object, the exact nature of which is unknown

---

[13]     Clerk's Record, with volume number and page.

to the grand jury, or blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, or a combination of both manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury and blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury.

4 CR at 590-91 (preamble). The instructions continue:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of March, 2000, in Hopkins County, Texas, the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis George, intentionally caused the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

Id. at 591. The instructions continue in the alternative:

If you find from the evidence beyond a reasonable doubt that on or about the 12th day of March, 2000, in Hopkins County, Texas, the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis George, intentionally caused the death of Marquetta Follis George by blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

Id. The instructions continue in the alternative:

If you find from the evidence beyond a reasonable doubt that on or about the 12th day of March, 2000, in Hopkins County, Texas, the defendant did then and there, while in the course of committing or attempting to commit the kidnaping of Marquetta Follis George, intentionally caused the death of Marquetta Follis George by strangling Marquetta Follis George by manual strangulation or ligature strangulation with an object, the exact nature of which is unknown to the grand jury and blunt force injury resulting from causing her to impact a blunt object, the exact nature of which is unknown to the grand jury, then you will find the defendant guilty of capital murder as charged in the indictment, and so say by your verdict.

Id. at 592. The jury instructions then repeat the content of the instructions above, adding

Petitioner's name in each of the three alternatives as it was reflected in the preamble, recited

above.  *Id*. at 592-93.  However, the language of the jury instructions does not change and the same alternatives are presented to the jury.

As is seen from the recitals, the indictment is written in the conjunctive, but the jury instructions are written in the disjunctive, allowing for a combination of outcomes between strangulation or strangulation and blunt force injury or blunt force injury alone.  That practice is proper under Texas law.  *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).[14] Therefore, the jury was instructed that it could convict Petitioner under any of the three theories included in the jury instructions.

**B.**      **Petitioner's Claim That The Prosecution's Theory Limits This Court's Decision**

Against this backdrop, Petitioner argues that the primary basis on which the prosecution proceeded at trial, and on which evidence was presented, was that Petitioner had either solely strangled Ms. George or had strangled and then subjected her to blunt force injury by pushing her out of his truck.  Petitioner argues that he did not strangle Ms. George and that she had jumped voluntarily out of his truck; but, more to the point, he argues that because the prosecution proceeded on the theory just explained, that this Court cannot consider whether a reasonable juror would have found Petitioner guilty beyond a reasonable doubt solely on the remaining indictment and jury instruction alternative of blunt force injury alone.

Petitioner bases his argument on a series of cases that essentially hold that a conviction cannot be upheld on a theory that was not presented to the jury, citing, for example, *Dunn v. United States*, 442 U.S. 100, 106, 99 S. Ct. 2190, 60 L. Ed. 2d 743 (1979); *Cola v. Reardon*, 787

---

[14]      Although Petitioner makes a perfunctory attempt to argue that the two approaches are different, he does not seriously suggest that the practice creates a constitutional impediment in his habeas petition and, in fact, he admits that the practice in Texas is to indict in the conjunctive and instruct the jury in the disjunctive.  *See* Pet. Post-EH Brf at 40.

F.2d 681, 693 (1st Cir.), *cert. denied*, 479 U.S. 930, 107 S. Ct. 398, 93 L. Ed. 2d 351 (1986); *Chiarella v. United States*, 445 U.S. 222, 236 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980), among others. The holdings of those cases are clear within their context, but not clearly pertinent here. Each case Petitioner cites involves either a direct review on appeal of a conviction or a collateral, post-conviction review on a due process ground for relief. That is not the case here. This Court, in federal habeas review, is not a super-appellate court with direct review authority over a determination by a state court, *Cruz v. Johnson*, 159 F.3d 1355, 1998 WL 698291, at *2 (5th Cir. Sept. 15, 1998) (citing *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988); *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986)); further, while this is a collateral, post-conviction review, the issue here is not due process or some other constitutional claim, it is a claim of actual innocence, which is not itself a constitutional claim. *Schlup*, 513 U.S. at 315. As described above, an actual innocence claim is not a freestanding ground for relief of constitutional proportion, but only a gateway review to determine whether Petitioner's other, constitutional claims are entitled to a review on the merits. As such, the Court is tasked with reviewing all evidence, whether admissible at trial or newly-developed since the conviction, to make a probabilistic determination whether a reasonable juror would still convict the Petitioner. Moreover, the purpose of adjudicating an actual-innocence claim is fundamentally different from either affirming a conviction on direct appeal or determining whether a habeas petitioner has made a showing under 28 U.S.C. § 2244(d) on a constitutional claim. Instead, the Court's role in an actual-innocence claim is to make a *probabilistic determination* on *a totality of the evidence, including newly adduced evidence*, whether reasonable jurors would have found the Petitioner guilty beyond a reasonable doubt.

During the Evidentiary Hearing, the Court requested Petitioner in particular to brief the issue whether *on a review of a claim of actual innocence*, the Court necessarily had to restrict itself to the lens of the primary theory propounded by the State during trial. The Director has not addressed the point in his post-hearing brief and Petitioner has only presented the argument outlined above, with its focus on review of constitutional claims and the unsupported comment that "this makes no difference, as these cases make clear that ultimately a conviction cannot be upheld based on a theory, such as the one posited in *Whiteside*,[15] that was not presented at trial and argued and presented to the jury." Petitioner's Post-EH Brief at 29-30.

Here, the Court is not reviewing the actual innocence claim with an eye toward whether or not to uphold the conviction on a direct appeal or a collateral review; instead, it is only considering the validity of the actual innocence claim itself as a gateway to whether to consider Petitioner's other, constitutional, claims on their merits. The Court notes that it has found no case in any federal jurisdiction that has applied any of the authorities Petitioner cites to the actual innocence analysis, nor required the narrow view of trial proceedings that Petitioner espouses here. Instead, the very nature of the actual innocence inquiry requires the Court to view trial proceedings through a lens of "what-if?" "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Reed*, 739 F.3d at 767 (quoting *House*, 547 U.S. at 538 and *Schlup*, 513 U.S. at 329). "A district court, in making its assessment of a petitioner's showing, is not bound by the rules of evidence that

---

[15] During the Evidentiary Hearing, the Court requested the parties to consider the effect of *Whiteside v. State*, 29 S.W. 2d 399 (Tex. Crim. App. 1930), finding that a "person who, by actual assault or threat of violence, causes another, acting upon well-grounded or reasonable fear or apprehension, to do an act resulting in physical or corporal injury causing his death, is responsible for the homicide." *Id*. at 402. As Petitioner points out, regardless of any other argument, the modern Texas Penal Code requires specific intent, as opposed to the standard in *Whiteside*.

govern a trial: 'The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted . . . and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."'" *Bosley v. Cain*, 409 F.3d 657, 662 (5th Cir. 2005) (per curiam) (quoting *Schlup*, 513 U.S. at 328), *cert. denied*, 547 U.S. 1208, 126 S. Ct. 2887, 165 L. Ed. 2d 920, *and reh'g denied*, 548 U.S. 934, 127 S. Ct. 22, 165 L. Ed. 2d 1002 (2006).

Here, it is clear that one of the prosecution's theories - strangulation - is effectively negated by the evidence provided by both Petitioner's and the State's medical experts, post-conviction. The Court must consider that evidence in making its probabilistic determination.

However, both the indictment and the jury instructions included the alternative theory of blunt force trauma as the cause of death here. Although Petitioner argues that the Court is bound to consider only the primary theory propounded by the prosecution, as the Court discusses above, it is in fact not limited to that narrow view when making a determination on an actual innocence claim, but must consider *all* evidence in connection therewith. Accordingly, the Court finds no merit in Petitioner's unsupported argument that it must be bound by the prosecution's primary reliance on a theory of strangulation at trial. Instead, the Court will consider all of the pertinent evidence presented on the record and during the Evidentiary Hearing, in the light of the full range of counts in the indictment and the full range of options in the jury instructions, to arrive at its probabilistic determination of a juror verdict.

## C.     Record Evidence

The Court will first review pertinent evidence contained in the trial record.

Clayton McGraw was the Foreman of the Grand Jury for Hopkins County that voted to return an indictment on Petitioner. 19 RR at 127-28. Mr. McGraw testified before the trial jury that evidence was presented to the Grand Jury of (1) strangulation of Ms. George and (2) blunt force injury to Ms. George. *Id*. at 128-29. He further testified that the Grand Jury was unable to determine the exact nature or object used in either strangulation or the blunt force injury. *Id*. However, sufficient evidence was presented as to each scenario to return an indictment as to either strangulation or blunt force injury.

Mary Peugh was a patron at the Bustin Loose club the evening of March 11, 2000, the night before Ms. George died. She testified that she knew Ms. George in passing and had met the Petitioner once, that night at the club. 19 RR 22.[16] She testified that she and two friends were sitting at a table when Ms. George came to their table and sat talking with them. *Id*. at 24. Petitioner then approached the table a few minutes later; he and Ms. George got into an argument and Ms. George left the table to walk to a separate group of people. *Id*. at 24-25. Petitioner walked over to her and "they got into an argument over there and he came back to our table." *Id*. at 25. When he got back to the table, he said, "I'm going to kill that bitch." *Id*. Ms. Peugh testified she did not take the threat seriously at the time because she did not know Petitioner, but "it was pretty plainly spoken. Just blunt." *Id*. at 26.

Tim Mason was also at the Bustin Loose club the evening of March 11, 2000. *Id*. at 38. He testified that he had known Petitioner for 15 years at that point and identified him at trial as having been at the Bustin Loose that evening. *Id*. at 37-38. He and Petitioner recognized each other and talked. *Id*. at 39. Petitioner told Mr. Mason that his girlfriend was in the bar and

---

[16] Reporter's Record, with volume number and page.

pointed her out. *Id*. at 39-40. Mr. Mason identified Ms. George in a photograph at trial. *Id*. at

40. The prosecutor then asked,

> Q.   What did Mr. Acker tell you about her?
>
> A:   Well he said he was going to kill her.
>
> Q:   How did he say it?
>
> A:   He just said, that girl right there?  He asked did I know her?
>
> I said, no.
>
> Then he said, I'm going to kill her.
>
> Q:   Was he serious?
>
> A:   I took him to be.
>
> Q:   Did you go warn her?
>
> A:   Yes, sir, I did.
>
> He told me, he asked me, he said, go over and tell her I'm going to kill her.  And I did and I got the . . . out of there.
>
> Q:   In fact, he told you to go tell her that he was going to kill her?
>
> A:   Yes, sir, he did.
>
> Q:   How did she act when you told her that?
>
> A:   She didn't really say much of nothing.  Went on.  I left.
>
> Q:   Why did you leave?
>
> A:   I wanted to get away from there.

*Id*. at 41. Mr. Mason testified that he learned the next day that Ms. George was dead. *Id*. at 42.

Dorcas Vititow, Petitioner's sister, testified that she had refused to return a knife to

Petitioner at the Bustin Loose club.  Later, she drove him to where his truck was, parked at a

veterinarian's clinic. As she pulled away, Petitioner yelled to her that "If I was going to hurt someone I wouldn't need a knife." *Id*. at 71. She later agreed that the statement she made on March 13, 2000, stated that Petitioner said, "I don't need that knife. If I find her with another man they will pay." *Id*. at 72. He had an axe in his hands. *Id*. at 85.

Lila Seawright, Ms. George's mother, testified that after the evening at Bustin Loose, Petitioner came to her house looking for Ms. George at 9:15 the next morning. *Id*. at 89-90. He told her that he and Ms. George had "g[otten] into it" and she stayed at the Bustin Loose after the bouncers there made him leave for putting his hand on her shoulder. *Id*. at 92. He told Ms. Seawright that "he stayed up all night looking everywhere he thought he could look for her." *Id*. at 92-93. She testified that

> He made the statement again he just didn't know what he was going to do if he ever lost Markie. And he said, you know, he said, if she stayed away last night just to be by herself, everything will be all right. But, he said, if I find out she was with anybody, he said, I'm going to kill 'em.

*Id*. at 95. Ms. Seawright told Petitioner that "there's not anybody worth killing and going to the pen for." *Id*. She testified that his response was, "Pen life ain't nothing Ain't nothing to it. And shrugged his shoulders." *Id*. at 99. She later repeated her testimony that Petitioner told her that "he was going to kill them," and that she considered that to be a threat. *Id*. at 114-15.

Brodie Young testified that on the morning of March 12, 2000, between about 11:00 and 11:30 a.m., he was driving on county road 3519 north to Sulphur Springs, passing Sedill Ferrell's dairy farm. *Id*. at 196-99. He saw "a three quarter or either a one ton white utility truck parked part of the way in the road" ahead of him. *Id*. at 201. It is undisputed that it was Petitioner's truck. As he approached the truck, he initially did not see anyone in it and did not see any doors open. *Id*. at 202. He could see both sides of the truck and underneath it. *Id*. at 203. In response

to the question, "Did you ever see anything that looked like a person or a body on the road under the truck or beside the truck as you were approaching it?" Mr. Young responded, "No, sir." *Id*. However, as he passed the truck, he "saw one person on the driver's side." *Id*. He was about 50 feet from the truck when he first saw the person in the truck. *Id*. at 204. Mr. Young testified he had to slow down to go around the truck, stating, "I was doing about twenty and I slowed down to about ten or fifteen miles an hour. Had to pull over. The right of the truck was in the grass off of - - between the grass and the ditch to go around the truck." *Id*. at 204-05. The prosecutor asked,

> Q:    Now as you went past the truck and got closer to it than the fifty feet that you've already indicated, could you see what was going on inside as far as what the man was doing?
>
> A:    As I passed the truck I glanced over to my left and I seen someone sitting in the driver's seat just sitting there, you know, and he acted like - - he looked peculiar. Acted like maybe he was talking to himself. Seemed like his mouth, you know, his chin was moving or something another.

*Id*. at 205. The prosecutor then asked,

> Q:    Now, as you went past the truck did you continue to try to see what was going on?
>
> A:    After I got back in the road, after I passed the truck, I looked down. As I was steadily going up the road I was looking at my side mirror on the lefthand side, the driver's side, and I seen a person get out of the truck and rush around to the front of the truck and open the door on the passenger side and pull a lady out.
>
> Q:    Now, you say you saw somebody get out of the truck. Which side of the truck did they get out of?
>
> A:    The driver's side.
>
> Q:    The drivers side. [¶] And was that the first time that you noticed that the driver's door was open?
>
> A:    Right.

27

Q:      And this is by looking back in your mirror?

A:      Looking back in the mirror.

Q:      And once you saw somebody get out of the truck where did they go?

A:      They went around the front of the truck to the left side - - I mean the right side.

Q:      Did you observe the door come open on the truck or did you just see it open on the passenger side?

A:      On the passenger side, yes.

Q:      Did you see the door open up or was it just open?

A;      No, it wasn't open at first.  He opened the door.

Q:      Now, you say you saw him pulling a lady away from the truck?

A:      Out of the truck.

Q:      Out of the truck.  [¶]  Can you tell us what you could see of her, how she was dressed?

A:      Well, she had on some loud color like either a green or yellow jogging suit with some kind of pullover blouse or something like that, the best I can recollect.  It was loud colors, the jogging suit or whatever she had on.

Q:      So you remember anything about how the man was dressed from what you could see of him?

A:      Seemed like he had on a pair of faded blue jeans or some type like that.  Some type of shirt, you know, faded shirt.  It looked like it may have been a pullover shirt.  I'm not sure but I know he had on jeans.

Q:      You're sure about the jeans?

A:      Right.

Q:      Now, when you saw this lady being pulled away from the truck or out of the truck, can you tell us how the man had her?  Can you describe that for us?

A:      Yes, I can.  He had his arms up under her arms and he was going back with her.  After he pulled her out of the truck he was going back with her.  He made about

28

three or four steps backwards, which would be going south from where I was going. I was going north. Then it looked like he laid her on the side of the road and then got back in his truck.

Q:      Now as far as where he took her, did he go towards the back of the trunk [*sic*] or the front of the truck with the lady?

A:      As far as I could tell he was going towards the front of the truck.

Q:      Did you see what he did with her as far as where he put her down or did he put her down?

A:      He put her down and just put her down on the side of the road right off the edge of the grass and the blacktop.

Q:      And you said that he ran back around to the truck and took off?

A:      Uh-huh. That's when I took off and went to the police station.

*Id*. at 206-08. Mr. Young also testified that he sped up to head to the police station. *Id*. at 208.

He further testified that he saw the driver - who is undisputedly Petitioner - get back in the truck

and drive south until it turned on the next road and left his sight. *Id*. at 210. On cross-

examination, Mr. Young testified that when he saw Ms. George pulled out of the truck cab, her

head was down and she appeared to be asleep. *Id*. at 230.

        Finally, although it is not evidence, the Court finds it important to note that during the

prosecution's closing argument in the guilt/innocence phase, the prosecution explicitly pointed out

that the jury could convict on theories other than simply strangulation:

        When I get back up here I'm going to ask you folks to return a verdict of guilty of capital murder. There's different ways that you can find that he committed this offense: By strangulation; by the blunt force injuries, the trauma injuries; or, by a combination of both. It doesn't matter which one because the law covers all three.

23 RR 7. He later argued that Petitioner did run over Ms. George:

        He told four people he was going to kill her. I guess he was lying about that. He killed her. He didn't realize that Brodie Young was going to be driving down the road. He had

29

to wait until Brodie Young got past.  He then put her out.  And to cover up the strangulation, because he doesn't know about medical science, he thinks he can run over her and get away with it.  He puts her head in front of that wheel.  I don't know if it was the front or the back, but I believe it was the front wheel.  And he starts off and you can see the accelerations marks.  They are visible.  They are little short black marks.  In fact, they are visible right here, their picture.  The acceleration marks where he takes off where Brodie Young says he has to go around him on this side in the ditch.

\* \* \* [17]

Acceleration marks right here back north of the body right there.  [¶]  Brodie said he drug her out in front of the truck.  He had to go around him.  Those accelerations marks set right about in the middle of the road.  That's the left wheels; the driver's side wheels.  [¶] Y'all can look at the picture.  You've seen it.  You can see where the wheel comes right out over her and  right back onto the road.

*Id.* at 22-23.  Although the prosecution referred to strangulation in this argument, the same argument could easily apply to running over Ms. George after Petitioner laid her on the side of the road, whether or not she had been strangled.  At bottom, the prosecution argued the alternative possible bases for conviction to the jury and argued that Petitioner had run her over with the truck.

### D.      Evidentiary Hearing Evidence

In addition to the record witness testimony, above, Sabrina Ball testified during the Evidentiary Hearing.  She testified that Petitioner's mother lives "down the road two doors from me, so that's how I know the family.  Or know of them."  EH at 103.  She testified that in late February 2000, two weeks before Ms. George's death, Ms. George came to her door late at night. *Id.*  The direct examination by Petitioner's counsel included:

Counsel:        And what was she saying?

---

| Ms. Ball: | She was really scared and upset, or appeared to be scared and upset at the time, crying, and she told me that she was afraid that he was going to kill her and that she - - |
| Counsel: | Excuse me. Let me stop you there. Who is the "he" that you are referring to? |
| Ms. Ball: | Mr. Acker. During their fight, she was scared and was afraid that he was going to hurt her. |

*Id.* She also testified that Ms. George had told her she and Petitioner had been at the "Bustin

Loose," and:

That's what she had told me. She said that they had gotten in an argument, left, were going down the highway, and that he was beating her head against the dash; that she tried to jump out, and then he grabbed her by the hair of the head and pulled her back in.

*Id.* at 104.

Also during the Evidentiary Hearing, the parties stipulated to the expert status of the State's

forensic pathologist, Dr. Vincent J.M. Di Maio. EH at 45. Dr. Di Maio testified based on his

review of the autopsy report, photographs of the victim's body and the scene, the report of defense

expert Dr. Larkin and his opinion, and the trial transcripts volumes 19 through 22. *Id.* at 46. He

had specifically been asked to address the cause and manner of death in the case, the nature of the

injuries and what killed the deceased, Ms. George. *Id.* at 47. He testified that "the young lady

here died as a result of multiple blunt-force injuries." *Id.* at 49. Dr. Di Maio affirmed his opinion

that Ms. George did not die of strangulation, testifying:

[. . . ] And in this case, there's one eye - - and there's a few petechiae, but this person has been run over. Their chest has been compressed, their brain has been squashed, and so you see a few petechiae, you can't make the diagnosis. There's hemorrhage of the neck, but there are injuries there. So there's no way I could make the diagnosis that the person has been strangled based on the physical evidence.

*Id.* at 51. However, he went on to testify that

If you look at the head, there are multiple fractures of the skull, they're on the base of the skull, on the top of the skull; there are facial fractures; and the bones were movable, if you read the autopsy.

And then the brain itself is not hemorrhagic so much as torn up. Parts of the brain are literally torn apart. And where the brain stem connects to the spinal column, it's also torn.

And there's also a fracture of the neck.

Well, these are the type of injuries you get when the head is squashed.

If you go out, let's say, a vehicle or you fall off a building and you land on your head, you'll get a fracture or two and you'll get bleeding on the brain, you may get a little laceration. But there are too many lacerations and there are too many fractures. *So this had to have been, based on the circumstances, a tire going over. May have hit the ground and got a head injury, but also the tire had to go over.*

And then we go to the chest. You've got rib fractures in the front, you've got fractures in the back, you've got two of the chambers of the heart blown out, you've got the aorta - - major blood vessel coming in the heart - - transected, you've got lacerations of the one lung, and the other vessels have been kind of torn from the attachments to the lung, and then you've got injuries to the liver as well.

And with this type of extensive injury, again, these are bursting-type injuries, if you compress the heart hard enough that the blood is just compacted, it will blow out. And where it blows out is at what's called the auricular appendages, the atrium of the heart, because that's the thinnest areas of the heart.

And then compression of the chest also produces a laceration of the aorta. It's most commonly seen when you hit the steering wheel before they had airbags. But it's the same phenomena. If you have violent compression of the chest, you rupture the aorta because the blood is compressed and it just blows it out.

And then you have, you know, the injuries to the lung and then liver fractures in the front and the back. This is again something has gone over the chest and compressed, and it's typical of somebody has had a - - been run over by a vehicle.

*If you get ejected from a car or you jump or you are pushed or whatever, you typically get maybe a little head injury, commonly a broken neck, but what happens is you go tumbling. If you've ever seen anyone throw something out of a car, it goes tumbling across the highway and that's how it dissipates its force. And that's what happens if a person goes out, they tumble, and so they generally tend not to get too many injuries below the neck. And if they do, they're relatively minor.*

The third thing you know that a tire went over it is when you look one of the legs. *On the leg, there is a tear almost completely around one of the legs*. And this is due to a tire passing over. And what happens is, as the tire goes over the leg, or it could happen in the arm too, it pins that extremity to the ground, but the tire is still turning, so it grips the flesh. And so, even though it's pinning the bone down, it starts to turn, grips the flesh and tears it so that there's a tear straight across. This is very characteristic or tires going over the limb, pinning it and tearing it. So you get a tear. So, just looking at the tear, you know that's a tire going over.

The massive injuries to the head and chest are explainable. *So what you have is someone who died as a result of massive trauma to the head and chest. And the only way you could have got it is a tire going over*.

*Id*. at 51-54 (emphasis added). Dr. Di Maio also disagreed with Dr. Larkin's assessment "that there were no internal or deep injuries underneath the skin that are consistent with being run over[.]" *Id*. at 54. Even more importantly, counsel for the State asked Dr. Di Maio,

Now, in Mr. Larkin's report, he opined that that injury came from Ms. George catching her leg under the seat carriage as she voluntarily jumped from the truck. Can you tell us, in your opinion, what is wrong with that?

*Id*. Dr. Di Maio responded,

Well, the thing is it would be more of a ripping injury going down the leg. This one goes around. Okay? On top of which you would have had a lot of blood in the truck. It's my understanding there wasn't that much. And if you don't have it, this is a typical tire over an extremity. And you see - - I'm not gonna say you see it all the time, but when people get run over on the legs, even the arms occasionally, you'll see this is very typical, pressing down and then tearing. The tire rips the skin and muscle and just tears it. And it will tear it in a linear fashion because it's pinning down and then ripping.

*Id*. at 54-55. He then pointed out on a photograph that the leg wound "looks like it's just below the knee." *Id*. at 56. Referring to another photograph, Dr. Di Maio continued,

And if you look at that, you can see it's almost like a knife has cut it. What's happened is the tire grabbed the lower part of that skin. And you can see there's some scrape. Because what the tire did is it grabbed that, and it turned the skin and muscle, and it scraped across the ground, and it just tore it right across. You know, so that's where the tire went across.

33

*Id*. In response to the question, "Would you categorize this as a severe laceration," *id*., Dr. Di Maio responded,

> Oh, yeah, you can see that's muscle. I mean, it's all the way down to the muscle. You know and it's, I think, almost completely around the leg.

*Id*. Counsel for the State continued and asked Dr. Di Maio to review a portion of Dr. Larkin's report in which he opined that "While sitting on a bench seat in Acker's truck, George pushed off with the left hand and left foot, pivoting towards the right. [¶] . . . Her right leg, trapped under the seat, flexed and rotated into nearly totally circumferential laceration deep to the deep fascia and exposing the muscles of the popliteum space (photograph)." *Id*. at 59. Dr. Di Maio responded, "He's saying that the leg's trapped under the seat and, as her body rotates, it rips, there's a laceration, because it's being held in by the seat. So . . . ." *Id*. Counsel asked, " . . . as you interpret that, he's alleging that it happened inside the truck. Correct?" *Id*. at 59-60. Dr. Di Maio responded by "moving his head up and down." *Id*. at 60. Counsel asked, ". . . [w]ould that type of wound also leave behind any tissue?" *Id*. Dr. Di Maio responded, " . . . it might or it might not. You can't say for sure. [. . . ] You are tearing major blood vessels down there, so you would see blood." *Id*.

Counsel referred to that portion of Dr. Larkin's report as labeled a

> plausible alternative scenario in which he ultimately concludes that Ms. George voluntarily jumped from the truck and thus sustained the injuries that we see in the autopsy report. Can you tell us your opinion of that opinion?

*Id*. at 60-61. Dr. Di Maio responded,

> You can't make that opinion. The problem is the injuries that you've got are consistent with someone being run over Okay?

> Now, if you assume that the individual went out the truck while the truck was moving, you can't tell from the injuries whether the person was pushed or jumped. You don't know

whether the truck is going straight or veering to the left or right; you don't know if she - - say she didn't jump, she accidentally fell, the centrifugal force pushed her against the door and somehow it popped open and she fell out; you don't know if she went out face-forward or back or sideways; you don't know if she tried to stop by grabbing on to something, a belt or Mr. Acker; you don't know if she was pushed. And then, if she was pushed, when she went out, did she try to hold on to something to break herself from going out? You have all these variables.

All that you can say is that this is an individual who has been run over by a truck and that's about it. You cannot say whether she jumped out or was pushed out. Medically, there's just no way to say from the evidence. It's just - - too many variables and you can't say. It's just too many variables.

*Id*. at 61-62. On cross-examination, Dr. Di Maio testified,

Well, there's two points in the - - in [Dr. Larkin's] report:

One, that she's not strangled. And I agree completely.

And the other one was that the injuries are those of someone who jumped out of a vehicle. And that I disagree by saying that you can't tell. There's just too many variabilities, too many things you don't know. And it's not gonna look that much different whether you jump or somebody pushed. So I can't say whether - - either one.

*Id*. at 64-65. He further testified that it would make no difference to his opinion if he knew whether Ms. George had attempted to jump from that truck in the past. *Id*. at 65. In response to defense counsel's question as to the main cause of Ms. George's death, Dr. Di Maio responded,

I'd say the brain injuries, per se, were the main cause of death. I mean, there were massive brain injuries. The brain was shredded in areas. The head injury, I mean. I - - Okay. Will it kill immediately? The answer is: usually. But sometimes it doesn't you know. But she died - - her brain injuries were so massive that that killed her. But she also had ruptures of the heart and aorta. So it's kind of, you know, like one might have killed her in 30 seconds and the other one killed her in 60 seconds. I mean, it just - - she died as a result of all her injuries, but there's nothing you could have done. I mean, she has massive head injuries, she's got massive chest injuries. She's dead because of all of this.

*Id*. at 66. He agreed with Petitioner's counsel that "she either was pushed or jumped from the truck," but also, "And was run over. She had to have been run over. She was run over. Let's put it that way. That's what killed her, definitely." *Id*. at 67.

On re-direct, Dr. Di Maio elaborated on Dr. Larkin's report further. Counsel for the State pointed out that Dr. Larkin had "opined that [Ms. George] was not run over," and asked if Dr. Di Maio "vehemently disagree with that?" *Id*. at 67-68. Dr. Di Maio responded,

"Oh, yeah. I mean, the injuries are so massive, you can't get those injuries from just jumping from a truck. [. . .] Because, again, you tumble and that dissipates the energy." *Id*. at 68.

On re-cross examination, Petitioner's counsel referred to a photograph of the truck with a "utility bed sticking out past the cab." *Id*. at 69. He asked,

Now, is it possible that some of these injuries may have happened when Ms. George exited the vehicle and either hit the door or that protruding utility bed?

*Id*. Dr. Di Maio responded,

Not - - not the - - okay. You could have gotten some of the head injuries, but you can't get the chest injuries. The chest injuries are due to compression. I mean, essentially it's kind of like squashing a balloon or something. There are blowout injuries of the heart, there's a blowout of the aorta, there's crushing and tearing injuries of the lungs. So - - so that's due to a tire going over. [¶] And the other thing on the leg, the leg thing is a tire as well. You see that not uncommonly.

*Id*. at 69-70. Petitioner's counsel sought to clarify this testimony by asking, "And by being run over, you don't necessarily mean the whole body was run over, in other words, do you?" *Id*. at 70. Dr. Di Maio responded,

What I'm saying is run over was that part of the leg, the chest, and head. The abdomen, I can't say whether it was run over.

*Id*.

Counsel for the State also called witness Toney Hurley at the Evidentiary Hearing. At the time of Ms. George's death, he had been the Chief Investigator of the Sheriff's Office of Hopkins County. *Id*. at 123. On direct examination, counsel for the State asked, "Was there any blood

found inside [Petitioner's] truck" during the investigation after Ms. George's death. *Id*. at 124.

Mr. Hurley responded, "I believe there was a small speck of blood found near the driver's seat.

Towards the back of the seat." *Id*. That was all the blood that was found in the truck. *Id*. On

re-direct examination, he also testified as to a statement Petitioner made to him during the

investigation. Counsel for the State asked, "Mr. Hurley, during that same conversation with Mr.

Acker, did he indicate to you in any way that he was responsible for Ms. George's death?" *Id*.

at 131. Mr. Hurley responded,

> Yes, I believe it was as I was walking him back to his cell after the second interview. I remember him telling me that he really needed to go back and tell me some more about the rest of the truth, that he hadn't been truthful with me and he wanted to tell me some more things. [ . . . ] And so we went back and started to audio- and videotape over again.

*Id*. Counsel asked, "And what did he tell you? [ . . . ] Did he indicate to you that he was the

cause of Ms. George's death?" *Id*. Mr. Hurley responded,

> Yes. [reading from the report:] "Acker stated that George was trying to get out of the truck while he was driving. Acker stated that he was pulling George's hair to hold her in the truck. *Acker stated that he also hit George in the nose and mouth*. Acker told Hurley and Chester that he knew that he was the cause of Markie's death because he placed her in the truck. And then Acker continued to state that George jumped out of the truck."

*Id*. (emphasis added).

### E.     Analysis Of The Evidence And Conclusion

Petitioner argues that "this Court's determination of accidental or intentional death will rest

on whether it is more likely the victim's death was purposeful or accidental, i.e., whether she was

pushed or she jumped." Pet. Post-EH Brf at 46. Certainly, Petitioner produced at least some

evidence that Ms. George reportedly had previously attempted to leave Petitioner's truck while

it was being driven. However, there is no evidence, eyewitness or otherwise, that Ms. George

did in fact jump from Petitioner's truck to her death. He also provided testimony from private

investigator John Riley Sands that he had conducted an experiment in a truck that he thought was similar to Petitioner's - although he could not state whether it was in fact the same year, make, model or even size as Petitioner's pickup truck, and stated he could not remember - in which he sat in the driver's seat and tried to open the passenger side door while still seeing the road. However, on cross-examination, he admitted that he was only five feet, eight inches tall as opposed to Petitioner's six feet. On the other hand, counsel for the State presented Hopkins County Sheriff's Office Chief Investigator Toney Hurley, who testified that he had also conducted an experiment in a truck similar to Petitioner's (which he specified as a 1999 F-350 one-ton pickup with a bench seat) and was able to open the passenger side door from the driver's seat, though it was difficult, and that he was five feet, ten inches tall.

Petitioner asserts that the evidence of Ms. George's alleged past attempts to jump from the truck and the difficulty of someone like Petitioner to open the passenger door from the driver's seat to push Ms. George out tends to show the likelihood that she jumped to her death. The first problem with this argument is that (a) there was no actual evidence of Ms. George jumping from the truck to her death; and (b) Mr. Hurley admitted during the Evidentiary Hearing that he is not as tall as Petitioner but was still able to reach and open the passenger side door. EH at 125-26. Accordingly, none of Petitioner's evidence is credible for the purpose of demonstrating with any degree of reliability that it was more likely than not that Ms. George voluntarily jumped from the truck at the time of her death. Of course, Petitioner himself says that Ms. George jumped, but that claim alone is not reliable due to its self-serving nature.

The Court is mindful that this very jury already found Petitioner guilty of capital murder on an ostensible theory that he strangled Ms. George - certainly against her resistance, just as he

now contends that pushing her out of the truck would have been against her resistance - and pushed her out of the truck, whether dead or alive. In other words, this jury already found Petitioner's ability to do so credible and beyond reasonable doubt. That raises another point - although Petitioner now argues that Ms. George would have resisted his efforts to open the passenger side door to push her out, he simultaneously contends that she herself attempted to jump from the truck more than once and ultimately succeeded. That undercuts Petitioner's credibility even more because if Ms. George wanted out of the truck, why would she have resisted Petitioner while he was trying to open the passenger side door from which she purportedly wanted to jump?

Furthermore, the entire analysis must be framed in the incontrovertible fact that multiple witnesses, both on the trial record and later at the Evidentiary Hearing, testified that Petitioner explicitly threatened several times to kill Ms. George near the time of her death and that Ms. George stated that she believed Petitioner was going to kill her. Petitioner has offered nothing to mitigate that evidence or otherwise explain it. The jurors were either aware of this testimony or their awareness may be imputed for the purpose of the "totality of the evidence" analysis of this actual-innocence claim.

Moving on to the likelihood that reasonable jurors would have convicted Petitioner given all the evidence, the Court has already determined that it is not confined to the issue of strangulation as argued at trial. The parties have both agreed that, despite any argument at trial, strangulation was not the cause of Ms. George's death. The evidence of that, including the testimony and report of Dr. Di Maio, is convincing in the context of an actual-innocence claim. On the other hand, Petitioner's expert, Dr. Larkin, opined in his report that there was no evidence that Ms. George had been run over. However, toward the conclusion of the Evidentiary Hearing,

based virtually entirely on Dr. Di Maio's testimony and report, the parties entered into a two-part stipulation: first, that "if questioned, Dr. Larkin would [ ] concede that it's possible that Ms. George was run over" and, second, that "from the medical evidence alone it is impossible to say whether there was a pushing or a jumping of the victim from the vehicle." EH at 119. Based on the evidence submitted, the Court agrees with both parts of that stipulation. The Court also considers the stipulation to undercut the credibility of Dr. Larkin's report in chief. In fact, the evidence, especially that of Dr. Di Maio, is that while Ms. George *may* have sustained some injuries by exiting the moving truck, the injuries she sustained did not *have* to be inflicted that way at all.

Dr. Di Maio's testimony, in short, was that at one end of her body, Ms. George's head was "squashed" resulting in a shredded brain and a severed brain stem; and her chest was crushed involving fractures in the back and front, two chambers of the heart "blown out" (described as resulting from a compressed heart), a transected aorta, and lacerations and other injuries to the lungs and the liver. EH at 52. Dr. Di Maio found no similar injuries to her abdomen. In fact, the next significant injury consistent with being run over was to her leg below the knee, which showed tearing of the muscle across the leg when it was pinned down to the ground but the turning tire gripped the flesh and tore it straight across. *Id*. at 53. He testified, "So what you have is someone who died as a result of massive trauma to the head and chest. And the only way you could have got it is a tire going over." EH at 54. In other words, the cause of death was being run over at the head and chest and the resultant shredding of brain tissue and compression and blow-out of the heart. *Id*. at 66 (explaining that the brain injury was the probable cause of death but that it could have been the heart blow-out).

Dr. Di Maio also testified that these injuries could not have occurred simply by being ejected (either jumping or being pushed) from the truck. Ms. George would have "tumbled" and the energy of the fall dissipated without injuries of that nature. In fact, Dr. Di Maio, an expert forensic pathologist, testified that she would have tumbled across the highway if she had exited the truck while it was moving. *Id*. at 53. Nothing to which Dr. Di Maio testified indicated a likelihood of jumping or being pushed from the truck and immediately falling *under* the truck to receive the diverse injuries at the extremes of her body. Furthermore, Petitioner has submitted no evidence at all that any such event happened or could have happened. In fact, as he points out, Petitioner testified at trial that he had not run over Ms. George, Pet. Post-EH Brf at 8 n.8 (citing 21 RR 253), though he now stipulates the possibility that Ms. George "was run over by the truck" he was driving. *Id*. at 47 n.22.

Petitioner also admitted in testimony that in the events leading up to Ms. George's death, he was angry at her. 21 RR 227. During that time, and during the ensuing drive, he struck her at least twice, drawing blood. *Id*. at 225, 240. He was angry enough to manhandle her into the truck in front of their neighbors, the Smiddys. *Id*. at 228. He also admitted to Chief Inspector Toney Hurley that he had hit Ms. George in the nose and mouth while she was in the truck before her death.

In addition to his testimony that Ms. George had jumped from the truck, Petitioner further contends that he went back to find her and he found her by the side of the road. He allegedly picked her up and tried to put her back in his truck, but stopped when he found light bulbs lying on the seat of the truck. At some point, he decided Ms. George was dead. He testified that he put her back on the ground, got back in his truck and left the scene. He made several stops,

including one to buy cigarettes, initially deciding all that time not to call the police. Eventually, after visiting a friend and finding his mother, he flagged down an officer and made a statement as to what had happened.

On the other hand, Brodie Young testified that he drove by Sedill Ferrell's dairy farm the morning of Ms. George's death and passed what was undisputedly Petitioner's truck. He observed a man inside the truck as he approached it - again, undisputedly Petitioner - who appeared to be talking. Mr. Young could see around and under the truck and there was no body lying there. As soon as he was past the truck, Mr. Young could see in his driver's-side rear-view mirror that Petitioner got out of the truck, went around to the passenger side, opened the door and pulled a woman out of the truck. He was clear that Petitioner was pulling the woman, whose head was down and who appeared to be asleep, out of the truck and then laid her on the ground. As Mr. Young departed the area, he could see Petitioner get back into the truck and drive off. That directly contradicts Petitioner's testimony of retrieving Ms. George from the road and trying to put her back in the cab of the truck.

Combining the elements of Petitioner's threats to kill Ms. George; his admitted anger at her shortly before her death; the fact that he hit her during the events leading up to her death (also admittedly, not for the first time); Mr. Young's testimony that contradicts and virtually destroys Petitioner's story of picking Ms. George up off of the road, but instead has Petitioner pulling Ms. George out of the truck and laying her along the road in front of the truck before getting back in the truck and driving off; Dr. Di Maio's testimony that someone jumping or being pushed from a moving vehicle would "tumble" across the highway, dissipating the energy of the fall, and yet in Ms. George's case it was clear that she had been run over and the massive injuries of being run

over were the cause of her death; and the fact that the prosecution did include the possibility of death by blunt force trauma alone during presentation of evidence and in closing arguments, the Court arrives at the conclusion that a reasonable jury would be more likely than not to convict Petitioner of capital murder. Specifically, that if a reasonable jury were presented with this evidence, rather than the predominant evidence of strangulation previously presented, that jury would more likely than not convict Petitioner of intentionally running Ms. George over with his truck and killing her.

The Court keeps in mind that there is no presumption of innocence at a habeas proceeding, and a petitioner "comes before the habeas court with a strong - and in the vast majority of the cases conclusive - presumption of guilt." *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) (quoting *Schlup*, 513 U.S. at 326 n.42), *cert. denied*, 547 U.S. 1208, 126 S. Ct. 2887, 165 L. Ed. 2d 920 (2006), *and reh'g denied*, 548 U.S. 934, 127 S. Ct. 22, 165 L. Ed. 2d 1002 (2006). Petitioner bears the burden of establishing that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id.* ("The *Schlup* standard 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." (quoting *Schlup*, 513 U.S. at 329)). In making a determination on a claim of actual innocence, a court may consider how the "likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* (quoting *Schlup*, 513 U.S. at 332). Here, Petitioner has not carried his burden. His testimony of Ms. George's jumping and his attempt to retrieve her body from the road, in particular, is not credible in the light of Mr. Young's testimony. Instead, the totality of the evidence, if presented to a reasonable jury, overwhelmingly supports the strong inference that Ms. George was unconscious

or incapacitated when Mr. Young saw Petitioner pull her from the truck and lay her along the road in front of the truck, that Petitioner subsequently ran over Ms. George with his truck, and that event was the cause of her death. Accordingly, the Court makes a probabilistic finding that a reasonable jury, presented with the totality of this evidence, *House*, 547 U.S. at 537-38, *would* convict Petitioner of the charge of capital murder, on the theory of the indictment and as presented to the jury in its instructions, of death by blunt force trauma intentionally caused by Petitioner.

Therefore, Petitioner's actual innocence claim is without merit and he is not entitled to review of his procedurally barred claims because he has not successfully passed through this gateway. *Schlup*, 513 U.S. at 315.

However, the Court will next examine the alternative approach to showing cause and prejudice for the purpose of reviewing the merits of otherwise procedurally barred ineffective assistance of trial counsel claims under *Martinez* and *Trevino*.

## V. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS UNDER *MARTINEZ* AND *TREVINO*

Even though the Court has found that the actual innocence claim is without merit, he may be entitled to review of his otherwise-procedurally-barred ineffective assistance of trial counsel claims under *Martinez* and *Trevino*, as discussed briefly above.

In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 132 S. Ct. at 1315. These proceedings were referred to as "initial-review collateral proceedings." *Id*. The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the

initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id*. at 1320.  The standards of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 86 L. Ed. 2d 674 (1984), apply in assessing whether initial-review habeas counsel was ineffective, as they govern all questions of ineffective assistance of counsel.  132 S. Ct. at 1318.

*Strickland* provides a two-pronged standard, and a petitioner bears the burden of proving both prongs.  466 U.S. at 687.  Under the first prong, he must show that counsel's performance was deficient.  *Id*.  To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance.  *Id*. at 688.  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, . . ."  *Id*. at 689 (citations omitted).  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id*. (internal quotation marks omitted).

Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice.  *Id*. at 687.  To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

Most recently, the Supreme Court discussed the difficulties associated with proving ineffective assistance of counsel claims as follows:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. [356], [371], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S., at 689–690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.,* at 689, 104 S. Ct. 2052; see also *Bell v. Cone,* 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, *supra*, 131 S. Ct. at 788 (bracketed terms added). In a separate opinion issued on the same day, the Court reiterated that the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Premo v. Moore*, 131 S. Ct. 733, 740, 178 L. Ed. 2d 649 (2011) (citing *Strickland*, 466 U.S. at 690).

The Supreme Court extended *Martinez* to Texas in *Trevino*. Although Texas does not preclude prisoners from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter

of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial or whether his initial state habeas attorney was ineffective. *Id.*

> The Fifth Circuit has summarized *Martinez* and *Trevino* as follows:
>
> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013) (per curiam), *cert. denied*, 134 S. Ct. 2821, 189 L. Ed. 2d 788 (2014); *see also Chanthakoummane v. Stephens*, 816 F.3d 62, 72 (5th Cir. 2016) (same, quoting *Preyor*), *petition for cert. filed*, No. 15-9536 (May 24, 2016). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786, 188 L. Ed. 2d 612 (2014). The Fifth Circuit recently reiterated that a federal court is barred from reviewing a procedurally defaulted claim unless a petitioner shows both cause and actual prejudice. *Hernandez v. Stephens*, 537 F. App'x 531, 541 (5th Cir. 2013) (per curiam), *cert. denied*, 134 S. Ct. 1760, 188 L. Ed. 2d 597 (2014). To show actual prejudice, a petitioner "must establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (citations omitted) (emphasis in original).

Here, all briefing was completed before the Supreme Court issued the first of the cases, *Martinez*, on March 20, 2012.[18] However, Petitioner in this instance has filed one claim in which he contends that his state post-conviction counsel was ineffective (Claim VIII) and three claims asserting the ineffectiveness of trial counsel in the pre-trial, guilt/innocence, and penalty phases, respectively (Claims IV, V and VI). Accordingly, and having already reviewed the standards for ineffective assistance of counsel and for the *Martinez/Trevino* analysis, the Court will first consider Petitioner's contentions against his state post-conviction, or state habeas, counsel.

A.    Claim VIII:    Mr. Acker Was Denied Meaningful Access To The Courts And Due Process Of Law In State Post-Conviction Proceedings By The Appointment Of Ineffective State Post-Conviction Counsel.

Petitioner contends that his state habeas counsel, Toby Wilkinson, filed a state habeas application that:

> . . . is shocking in its shoddiness and virtual incomprehensibility. This application shows that Mr. Wilkinson failed to research issues outside the record, failed to research the applicable law, and committed a fraud on the court by plagiarizing and copying his own client's letters and memos virtually verbatim, even though they contained rambling, incomprehensible statements, are in the first person, and cite virtually no applicable legal precedents. As reporter Chuck Lindell of the *Austin American-Statesman* comments, this writ application "reads as if it were written by someone with an eighth grade education. In fact most of it was." The document itself is the best evidence that Mr. Acker in fact received no state post-conviction review worthy of the name and that in fact Mr. Wilkinson so abdicated his responsibilities to his client that Mr. Acker actually had no counsel acting on his behalf, through no fault of his own and against his wishes.

Petition at 188-89.

---

[18]    The final briefs in the case at the time of this Memorandum Opinion and Order, the Director's and Petitioner's Post-Evidentiary Hearing Briefs (#82 and #83), were filed on July 20, 2011. Petitioner, by counsel, mailed an inquiry to the Court dated November 18, 2013, referring to those briefs and stating, "It is my understanding that this completes the briefing in this matter. However, if any further briefing is required, particularly in regard to the impact of the recent cases of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) on this matter, I would be glad to supply it." The Court has not required additional briefing.

Notwithstanding this harsh contention, state habeas counsel submitted an initial application raising four claims attacking the structural constitutionality of Tex. Code Crim. Proc. art. 11.071; 40 numbered claims of ineffective assistance of trial counsel (but omitted a claim numbered "13," meaning that there were 39 actual claims); and three claims of ineffective assistance of appellate counsel. *See generally* State Habeas Application (Ex. 9 of Petitioner's federal habeas exhibits). However, the issue for consideration under the *Martinez/Trevino* analysis is not whether the state habeas counsel was ineffective with regard to the claims for relief that he actually submitted to the State court, but whether he was ineffective for failing to argue the ineffective assistance of trial counsel grounds for relief presented to the federal court. As stated above, Petitioner "must show that (1) his underlying claims of ineffective assistance of trial counsel are 'substantial,' meaning that he 'must demonstrate that the claim[s] ha[ve] some merit,' . . . and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application." *Preyor*, 537 F. App'x at 421 (citations omitted). Nonetheless, the Court recognizes that Petitioner - whose petition and argument therein was filed prior to *Martinez* - has challenged the effectiveness of state habeas counsel, and has included claims of ineffective assistance of trial counsel claims in his federal petition, which were not included in his original state habeas application. Although he later filed a third state habeas application containing these claims for exhaustion, the Texas Court of Criminal Appeals dismissed the application as an abuse of the writ.

This Court has accordingly reviewed the ineffective assistance of trial counsel claims contained in Petitioner's federal petition in the light of *Martinez* in the interests of justice. As discussed in the immediately following sections V.B. through V.D. (including various subclaims), none has merit; therefore, none of these claims presented on federal habeas review is "substantial"

for the purposes of the *Martinez/Trevino* analysis. *Preyor*, 537 F. App'x at 421. Accordingly, it is not necessary for the Court to determine whether Petitioner's state habeas counsel was ineffective for failing to present those claims in his state habeas application. The *Martinez* analysis only applies to claims of ineffective assistance of trial counsel, not Petitioner's other, procedurally-barred claims, and not the claims presented to the State courts but not the federal court. Consequently, this claim is without merit.

**B.** **Claim IV:** **Trial Counsel Rendered Ineffective Assistance Of Counsel During The Pre-Trial Portion Of The Proceedings.**

Petitioner asserts three subclaims under the heading of pre-trial proceedings:

**1.** **Claim IV(a): Ineffective Assistance Of Counsel For Failure to Challenge Biased Grand Jury Proceedings**

In Claim IV(a), Petitioner contends that a member of the grand jury that indicted him, Carol Henderson, was related by marriage to Ms. George; also, the foreman of the grand jury, Clayton McGraw, was a friend of Ms. George's. Petitioner asserts that trial counsel failed to challenge the grand jury proceedings on these grounds.

The Fifth Circuit has held that "unless the defendant makes a factual showing that the grand jury was biased, the indictment will not be invalidated." *United States v. Fuentes*, 432 F.2d 405, 407 (5th Cir. 1970) (citing *Estes v. United States*, 335 F.2d 609, 613 (5th Cir. 1964)). This holding may have been in a direct appeal case within the federal system, but its precept applies here, where Petitioner has made no factual showing whatsoever of any bias in the grand jury's deliberations. In fact, his only citations with regard to these relationships were (1) an admission by the prosecutor that Ms. Henderson was related by marriage to the victim, made during a pre-trial hearing on a motion *in limine* for review of the list of members of the grand jury (Petition at

165 citing 2 RR 43) and (2) Petitioner's testimony during a hearing on his state habeas application

in which he referred to Mr. McGraw and stated,

> I don't think he should have been the foreman of the grand jury, because he's a member of the VFW, I believe he's something like a captain - - something to do with the VFW, Veterans of Foreign Wars. And all VFW members are friends, I would think: I may be wrong. But I believe - -

1 RRHC[19] 71. There is nothing inherent in either statement showing bias in the grand jury's

indictment of Petitioner. Moreover, Petitioner makes no argument that there is.

More to the point, Petitioner has admitted that there is no showing of prejudice: "While

admittedly Petitioner can point to no specific harm, these facts would have been a basis for defense

counsel to challenge the grand jury." Reply at 84-85. Under *Strickland*, however, Petitioner must

show prejudice from defense counsel's action in order to show ineffective assistance. *Strickland*,

466 U.S. at 687. If he "can point to no specific harm," he cannot point to prejudice. Therefore,

this issue has no merit.

### 2. Claim IV(b): Ineffective Assistance Of Counsel For Failure To Complete DNA Testing Prior To Trial

In Claim IV(b), Petitioner contends that trial counsel requested a continuance on the first

day of trial to complete DNA testing on fingernail clippings; a DNA expert had allegedly been

provided a month earlier, but defense counsel failed to request additional testing. The continuance

was denied. Petition at 165-66, citing 19 RR 2, 4.

Here, Petitioner has wholly failed to make any showing, or even an allegation, as to what

such DNA testing would have revealed or how it would have been helpful to his case. In fact, the

fingernail clippings were those of the victim. 19 RR 2. As the prosecutor argued at trial, against

---

[19] State Habeas Corpus Reporter's Record.

the motion for continuance, "what relevance would it possibly have? How would that somehow help their defense that she fought against him struggling? How would it be useful to them?" 19 RR 3. Just as counsel could not answer that question at trial, Petitioner does not answer at all in his petition, nor make any showing how DNA testing would have changed the outcome of his case. Therefore, he cannot show prejudice, *Strickland*, 466 U.S. at 687, and this claim is without merit.

### 3.     Claim IV(c):   Failure To Investigate And Prepare Defense Witnesses Properly.

In Claim IV(c), Petitioner argues that "[d]efense counsel failed to properly prepare their witnesses for trial." Petition at 166. He goes on to identify three witnesses: Nancy Acker, Petitioner's mother; Sherry Walker, Petitioner's sister; and Dorcas Vittatoe, Petitioner's other sister. He also provides a declaration for each witness. Exs. 22-24. In each declaration, the respective witness attests that defense counsel failed to prepare her for her testimony and that, if proper preparation had been done, she could have offered testimony benefitting Petitioner. *Id.*

#### (a)     Dorcas Vittatoe

In Ms. Vittatoe's case, she attested in her declaration that, "Had I been prepared I would have stated that Daniel was a wonderful person, wonderful son, and brother. Had I been asked I would have stated that Daniel in no way would have been a future threat to society." Petitioner's Ex. 24 at 1. That is the total of her declaration.

However, in her actual testimony under trial counsel Fergurson's[20] direct examination, Ms. Vittatoe stated that she was Petitioner's elder sister by eight years. 23 RR 129. She further

---

[20]     Petitioner was represented by two attorneys at trial: Roland M. Fergurson, Jr., and William Howard McDowell.

testified that when they were young, their father was not in the home very often and that because their mother had to work, she was left alone with Petitioner and their sister. *Id*. at 130. She helped raise both Petitioner and their sister. *Id*. at 131. When in her care, Petitioner behaved himself. *Id*. He was not a problem child, never hurt Ms. Vittatoe and never fought her. *Id*. Ms. Vittatoe testified she never saw Petitioner hurt their mother. *Id*. In fact, she testified, Petitioner "worships the ground she walks on." *Id*. She further testified that she felt that Petitioner would not be a danger to society in the future and, separately, would not be a danger in prison. *Id*. Ms. Vittatoe stated in testimony that Petitioner is "very good with animals" and trains them. *Id*. at 132. The animals "loved him," followed him around and did what he said. *Id*. Additionally, children loved him and he would have been close to his own children if he had been around them. *Id*. He wanted to be around them but was only allowed to be near the older children. *Id*. Ms. Vittatoe also testified that Petitioner has an alcohol problem, which creates "a lot of his problems," and has a drug problem also; she thought it was "crank or crack," but did not know that much about drugs. *Id*. at 133. The drug problem caused some problems between Petitioner and Ms. Vittatoe, especially when he and his former wife lived with her. *Id*. He behaved differently when he was drinking or involved with drugs. *Id*. at 133-34. She testified that since his last release from prison, to her knowledge Petitioner had not had a drug problem. *Id*. at 134. However, she did feel that he had an alcohol problem since his last release. *Id*. She repeated her belief that Petitioner would not be a continuing threat to society in the future and would not be dangerous to other people in prison. *Id*.

**(b)      Sherry Walker**

In Ms. Walker's case, she attested in her declaration that "If I would have been asked if Daniel would have been a future threat to society my answer would have been no," followed by a handwritten "one hundred times no." Petitioner's Ex. 23 at 1. She went on in her declaration to state that their father, Clate Acker, was a town drunk and abusive to Petitioner. *Id*. The father broke Petitioner's jaw at one point. *Id*. Their parents divorced when Petitioner was about six and the father did not financially support the children despite court orders to do so. *Id*. Their mother is of the United Pentecostal religion, which has strict standards. *Id*. As a result, she and Petitioner were allowed to do church activities and outside school functions; their mother instilled morals and values in her children and they were a close knit family. *Id*. Ms. Walker is aware that Petitioner had some mental problems and he used to sleep walk and have panic attacks. *Id*. He spent 70-80 days at Glen Oaks Hospital. *Id*. Some of the problems arose following sexual abuse by Petitioner's teacher, Mrs. Grant, when he was in sixth grade. *Id*. Their mother told Ms. Walker about the sexual abuse, which was devastating to Petitioner and their mother. *Id*. Ms. Walker is aware that their mother took Petitioner to school to confront Mrs. Grant, who kneeled down and took their mother's hands and begged forgiveness. *Id*. Their mother forgave Mrs. Grant and did not file an official police report. *Id*. At that time, the family was renting a house owned by Mrs. Grant's father-in-law, and Mrs. Grant's husband was an attorney. *Id*. Petitioner was an outdoor type and a loner who loved animals and cared for many of them, especially if the animal was sick. *Id*. Ms. Walker remembered Petitioner cutting the hooves down off a horse so it could walk properly because the horse was clearly in pain. *Id*. She went on to attest that she knew Marky George and her reputation. *Id*. She stated that Ms. George was very wild and Ms.

Walker could remember an occasion when she got on a table in a restaurant, caused a commotion and was forced to leave. *Id*. Ms. Walker also stated she was aware that Ms. George had attempted to jump out of moving vehicles in the past when she was angry or upset. *Id*. She also used drugs and alcohol. *Id*. Petitioner told Ms. Walker that he felt sorry for Ms. George and wanted to try and help her. *Id*. During one incident, Petitioner had to take a knife away form Ms. George while they were at the Bustin Loose, because Ms. George and a girl named Annalisa were in a fight. *Id*. Ms. Walker stated that during Petitioner's trial, the trial judge called him "Clatey" several times and she stated it "was clear that he was making reference to my father" because that was what he was called and most people were aware of her father's reputation. *Id*. Finally, Ms. Walker stated she had been told - but did not say by whom - that Ms. George was recovering from a gunshot wound supposedly caused by the daughter of "someone in law enforcement" to her torso, and that there is a police record of it. *Id*.

Under direct examination by trial counsel Fergurson, Ms. Walker testified that she is Petitioner's sister and lived with him since birth; she is a year and nine months the elder. 23 RR 123. They spent a lot of time together as children. *Id*. She testified that when they were growing up, Petitioner was never aggressive with her and never hit her. *Id*. In response to the question, "Now did he take care of you or did you take care of him?," she responded, "Kind of both." 23 RR 123-24. She also testified that they played together a lot. 23 RR 124. In response to the question, "And can you tell me something that was good that happened to you when you were children?," Ms. Walker responded, "Well everything was good with me and my brother. We played out in the yard. We played wherever we went. We took baths together." *Id*. She testified that she and Petitioner were "[j]ust children" together. *Id*. She further testified that Petitioner

was never cruel to animals but was an animal lover who had many pets. *Id*. She and Petitioner

had chickens, horses and dogs; Petitioner "loved turtles" and brought one home every time he saw

one in the road. *Id*. He would bring crawfish home, put them in a tub and watch them reproduce.

*Id*. He always took care of the pets and never ignored them; they were all his. *Id*. Ms. Walker

testified that, growing up, she and Petitioner did not have disagreements, though she remembered

one time when she was nine and he was eight that they "just squabbled a little bit" over "normal

kids stuff." 23 RR 125.

In response to the question, "Did Mr. Acker ever hit you?," Ms. Walker responded, "No.

I walloped him once," and repeated the statement. *Id*. That prompted the prosecutor to interject

without making an objection and spoke directly to Ms. Walker, stating, "Ma'am, I don't

remember anybody asking you if you hit him." *Id*. Defense counsel then objected that the

prosecutor was "talking directly to the witness and he hasn't objected." *Id*. The prosecutor then

stated, "My objection is it's non-responsive." The trial court's "Sustained" was unclear as to

which objection it addressed. *Id*. The trial court did instruct the witness to "just respond to the

question." 23 RR 126. Defense counsel then asked the court, "Your Honor, I'd ask you to have

the prosecutor to address the Court and not the witness," which the court sustained. *Id*. Mr.

Fergurson also asked the trial court "to instruct the jury to disregard the last remark made by the

prosecutor before he addressed the Court, your Honor." *Id*. The trial court agreed and did so.

*Id*. Notably, defense counsel Fergurson then moved for a mistrial. *Id*. The court denied the

motion. *Id*.[21]

---

[21] While not constituting a part of Ms. Walker's testimony, the exchange illustrates a trial counsel proactively performing effectively and consciously on behalf of his client.

Counsel returned to his direct examination of Ms. Walker and asked, "the last statement I heard was something about you walloped him; is that right?" 23 RR 127. Ms. Walker responded, "Yes, sir." *Id*. Counsel asked, "Did he hit you back?" *Id*. Her response was, "No, sir." *Id*. She further testified that Petitioner had never hit her and never hit their sister, Dorcas Vittatoe. *Id*. Ms. Walker also testified that Petitioner had once moved into her house with his first wife and used his food stamps to "contribute to being in my home." *Id*. Ms. Walker and Petitioner's first wife, Mrs. Ball, got along. *Id*.

Defense counsel Fergurson then asked, "Mrs. Walker, do you believe that your brother is a danger to society? *Id*. She responded, "No, I do not." 23 RR 128. She testified that she had been in the courtroom while most of the testimony went on, but that it did not change her opinion about her testimony. *Id*. Mr. Fergurson asked, "Do you feel like your brother should be executed for what happened?" *Id*. Ms. Walker responded, "No." *Id*. On cross examination, the prosecutor asked, "Do you believe your brother killed her?" *Id*. She responded, "No." *Id*.

**(c)    Nancy Acker**

In Ms. Acker's case, she attested in her declaration that she is Petitioner's mother and that:

> Before the trial of my son I was not prepared by either of Daniel's trial attorneys. I believe that had I been prepared my testimony would have been benificial [*sic*] for Daniel. If asked I would have certainly said that Daniel would not be a future threat to society, as Daniel has always been a very loving wonderful son, and brother to his sisters, and loved animals very much. My children and I are all very close.

Petitioner's Ex. 22, at 1. The declaration goes on to describe at length Ms. Acker's knowledge of Petitioner's sexual abuse by school teacher Mrs. Grant. *Id*. She stated that she would receive calls from the school to pick up Petitioner because of complaints of being sick. *Id*. These calls came during the time Petitioner would be getting ready for Mrs. Grant's class. *Id*. One day, Ms.

Acker found a pack of cigarettes in Petitioner's pocket and he said Mrs. Grant had bought them for him. *Id*. He told Ms. Acker that Mrs. Grant had been picking him up from the recreation center and taking him to the lake and putting her hands down his pants. *Id*. Ms. Acker took Petitioner to school and confronted Mrs. Grant, who started crying and got on her knees begging Ms. Acker's forgiveness. *Id*. Ms. Acker forgave her and never filed a report to avoid traumatizing Petitioner. Mrs. Grant called Ms. Acker and told her Petitioner would be promoted in school despite not having been in her class and stated he would not be in her class anymore because she "fixed" his report cards to reflect better grades than he actually received. *Id*.

Ms. Acker further declared that she and Petitioner's father divorced when Petitioner was six. *Id*. The father received a check from the Veterans Administration and was under a judicial order to have the check sent to Ms. Acker for child support. *Id*. When the check was overdue, Ms. Acker learned that the father had taken the check from her mailbox. *Id*. She never received financial support from the father for the care of the children. *Id*.

Next, Ms. Acker declared that Petitioner's father had broken Petitioner's jaw as a child and it had to be wired for approximately six weeks, during which time Petitioner could only drink through a straw. *Id*. She stated it was a painful experience for Petitioner and she was shocked that the father did it, though he had been "somewhat abusive in the past especially if he was drinking." *Id*. at 1-2.

Ms. Acker went on to declare that Petitioner started having panic attacks after the sexual abuse by Mrs. Grant, and had a "previous problem with sleep walking." *Id*. at 2. He spent 69 days at a mental hospital at Glen Oaks Hospital in Greenville, Texas. *Id*. After the sexual abuse incident, Ms. Acker moved the family to Cooper, Texas, so Petitioner could go to school and

58

"escape" Mrs. Grant. *Id*. It was difficult for Petitioner in school, which Ms. Acker attributed to Mrs. Grant having promoted Petitioner in school when he "probably should have been held back." *Id*.

Once, Ms. Acker related, Petitioner had a very high fever and she took care of him but had to go to work. *Id*. Petitioner woke up and left the house barefooted and ran in the snow and ice, which was one incident of his sleepwalking. *Id*. He would get up and walk, run, move about without knowing he was asleep. *Id*.

On direct examination by defense counsel Fergurson, Ms. Acker testified that Petitioner's father was not in the home very often. 23 RR 136. An attempt to examine Ms. Acker on the father's whereabouts during that time drew a relevance objection. Counsel replied that he was attempting to determine the "father figure" in the house and that "the lack of a father figure could have an influence on what the jury does in this case." 23 RR 136-37. The trial court responded, "She answered that question." 23 RR 137. Following colloquy between defense counsel, prosecution and the trial court, counsel moved on and asked if the father "provide[d] support for his children?," to which Ms. Acker responded, "Never." *Id*. She had to work to support the family, working from one to three jobs at a time. *Id*.

When the children were small, they lived in Cooper, Texas. *Id*. Ms. Acker testified that they never went hungry. 23 RR 138. Counsel asked, "growing up were you able to supervise Daniel closely because of your work?" *Id*. She responded, "I had to be at work so when I wasn't at work I wasn't able to be with him." *Id*. However, while he was growing up and under the age of five, she did not consider Petitioner to be a problem child. *Id*. In response to the question, "What about when he started school? Did he become a problem in school in the early grades?,"

she testified, "No, sir." *Id*. She further testified that, as a child, Petitioner liked to go fishing; play with his dog; and ride a little Shetland pony he had. *Id*. Counsel inquired, "What does Mr. Acker like to do now?" *Id*. Ms. Acker responded, "If he could he likes to train horses, train dogs, being outside." *Id*. She considered him a "very outdoor person." *Id*.

Defense counsel Ferguson then asked, "Now, did there come a time when Daniel stopped wanting to go to school?" *Id*. As reflected in the transcript, the following colloquy took place:

A.      Yes, sir.

Q.      About what time was this?

A.      Well, when he was in sixth grade.

Q.      Did something happen in the sixth grade that made him stop wanting to go to school?

A.      Yes, sir.  He was sexually - -

MR. LONG [prosecutor]:      The school records are in, your Honor.  Anything else would be hearsay.

THE COURT:      Sustained, unless she has personal knowledge.

MR. FERGURSON: I believe she has personal knowledge, your Honor, and I'll ask her.

MR. LONG:      I really find that hard to believe, Judge.  I think we need to talk about that at the bench.

THE COURT:      Yes.  Come on up.

(PROCEEDINGS HAD AT THE BENCH ON THE RECORD.)

THE COURT:      I don't even know what the answer is.

MR. LONG:      Well, the question is - - she started to say he was sexually abused.

MR. FERGURSON: My question was - -

THE COURT:      How could she have personal knowledge?

| | |
|---|---|
| MR. FERGURSON: | My question was: Do you know why he wanted to quit going to school? |
| MR. LONG: | No, your question was: Did something happen at school, which is a leading question which I didn't object to. |
| THE COURT: | Unless she has personal knowledge and I assume no. |
| MR. FERGURSON: | Your Honor, the perpetrator apologized for the act. |
| MR. LONG: | It's still hearsay. |
| THE COURT: | It's still hearsay. Personal knowledge is the key. |
| MR. LONG: | The school records are in. |
| MR. FERGURSON: | You're not going to find sexual abuse in school records, your Honor. And you have to remember at this point - - |
| THE COURT: | I don't know. I'm just trying to go by the rules. Okay. |
| (JURY PROCEEDINGS) | |
| THE COURT: | Sustained. |

23 RR 139-40. Accordingly, defense counsel's attempt to have the alleged sexual abuse by Petitioner's sixth grade school teacher presented to the jury was blocked by the prosecutor and the trial judge. Counsel went on to ask Ms. Acker, "[W]hat did you do in response to Daniel not wanting to go to school?" 23 RR 140. She responded that she asked a juvenile probation officer to talk to Petitioner about not wanting to go to school because she did not understand why he didn't want to go. *Id*. She changed his school. *Id*. She further testified that "[h]e did go back to school after I moved to another town to get away from the child abuser." 23 RR 141. That drew another prosecution objection, which he then retracted and the trial court allowed testimony to proceed. *Id*.

Defense counsel Fergurson then stated that there had been some testimony about Petitioner hurting or assaulting Ms. Acker and asked, "Did that occur?" *Id*. Ms. Acker testified, "My son has not assaulted me." *Id*. She further testified that "[o]nce I remember he pushed me." *Id*. When counsel asked, "How did that occur?," she responded, "He set me down on the couch." 23 RR 142. Ms. Acker went on to testify that she had "[a] good relationship" with Petitioner and would allow him to move home with her now. *Id*. Counsel Fergurson asked her, "Mrs. Acker, are you afraid for your safety today?" *Id*. She responded, "No, I am not a bit afraid for my safety today or any other day." *Id*. In response to counsel question, "what are you asking the jury to do today?," she answered, "To not give him the death sentence. He's not a mean person." 23 RR 143.

In sum, between the testimony of the three women, nearly everything that they stated in their respective declarations that they would have said if "prepared" properly was in fact presented to the jury through their testimony. Testimony was presented that Petitioner's father was not in the home, did not provide financial support to his children and there was no father figure; Petitioner's mother had to work and Petitioner was often left alone or with his sisters; Petitioner was largely raised by his sister Dorcas Vittatoe who was only eight years older than he; but Petitioner took care of his sisters as much as they took care of him; Petitioner was close with his sisters and they lived together from birth, played together and he and his sister Sherry Walker bathed together as children; Petitioner behaved himself as a child; he was not cruel; Petitioner worshiped the ground his mother walked on; when Petitioner wanted to stop going to school in the sixth grade, his mother changed his school and he did return to school after his mother moved the family to another town "to get away from the child abuser"; Petitioner loves animals, kept

many pets, trains animals and animals love him; children also love him and he would have been close to his own children if they were around each other; Petitioner has had drug ("crank or crack") and alcohol problems that make him behave differently and he has continued to have an alcohol problem since his last release from prison; Petitioner never hit or assaulted his sisters or his mother and even if he pushed his mother once to "set [her] down on the couch," his sister Ms. Walker "walloped" him once and he never hit her back; and when Petitioner moved into Ms. Walker's house with his wife, he contributed to the household with his food stamps.

Under defense counsel's direct examination, both Dorcas Vittatoe and Sherry Walker explicitly testified that Petitioner would not be a future danger to society or a danger to persons in prison. His mother, Nancy Acker, testified that she was "not a bit afraid for my safety today or any other day" with regard to Petitioner. This testimony, as well as the testimony summarized above, directly contradicts the declarations of the three women that they were not "prepared" or asked about these subjects and "would have" testified to that effect if they had been asked. Therefore, the veracity of their entire declarations is questionable. The fact that defense counsel undeniably *did* ask a combination of these questions, even if not to each woman individually, makes it obvious that counsel was prepared for the examination of these three witnesses and had a plan to present the testimony to the jury. Accordingly, Petitioner cannot have been prejudiced, *Strickland*, 466 U.S. at 694, and counsel was not ineffective.

As to Ms. Acker's complaint that counsel failed to ask her about the sexual abuse incident with Mrs. Grant, the portion of the transcript quoted in full above demonstrates that defense counsel Ferguson was clearly aware of the incident, was attempting to bring the story out via direct examination, and was forestalled by objection from the prosecution with a sustaining order

from the trial court. To the extent that the entire story, beyond Ms. Acker's reference to getting away from "the child abuser" by changing schools and moving, was not allowed to come in, it was not through the ineffectiveness of counsel.

The remaining item is Petitioner's father allegedly breaking his son's jaw. However, as noted above, counsel had already adduced testimony that Petitioner's father was absent, provided no financial support to his children and was not a "father figure." Petitioner has not demonstrated how the omission of the single episode prejudiced him. *Id.*

Furthermore, the trial court findings of fact on Petitioner's state habeas application include that Petitioner's "attorneys conducted as thorough an investigation as they believed was necessary to represent Applicant"; "Attorney Roland Fergurson personally conducted interviews with most of the State's witnesses that agreed to speak [to] the defense team"; and "If either Roland Fergurson or William Howard McDowell did not engage in a particular piece of investigation, it was due to the fact that neither attorney believed that such an investigation was necessary to the preparation of their case." 1 CR Supp. at 34. As is discussed elsewhere in this Memorandum Opinion, Petitioner's instant ineffective assistance of counsel claims were not raised before the state courts and are otherwise procedurally barred. However, the Court finds it probative that the state trial court found that both defense counsel generally conducted a complete investigation as was necessary to prepare their case. Accordingly, the Court cannot find that either was ineffective on this claim. *Bower v. Quarterman*, 497 F.3d 459, 476 (5th Cir. 2007) (assistance of counsel is not ineffective where counsel conducted reasonable investigation in preparation for penalty phase), *cert. denied*, 553 U.S. 1006, 128 S. Ct. 2051, 170 L. Ed. 2d 797 (2008).

**C.     Claim V:     Trial Counsel Rendered Ineffective Assistance Of Counsel At The Guilt/Innocence Portion Of The Trial**

Petitioner asserts five subclaims under the heading of "guilt/innocence" proceedings.

**1.     Claim V(a):     Trial Counsel Rendered Ineffective Assistance Of Counsel In Failing To Present Petitioner's Case For Actual Innocence Through Expert Testimony**

In this claim, Petitioner asserts there were two ways in which trial counsel was ineffective presenting his case for actual innocence at trial:  first, that he failed to present expert medical testimony refuting the theory of strangulation; second, that trial counsel failed to present an accident reconstructionist.

However, the Court has already determined that Petitioner's claim of actual innocence is without merit.  *See* Part IV, *supra*.  Accordingly, trial counsel could not have been ineffective with regard to its presentation at trial.  This claim is without merit.

**2.     Claim V(b):     Ineffective Assistance Of Counsel For Overreaching And Labeling An Exhibit A "Lie"**

Here, Petitioner contends that trial counsel was ineffective because, when it was revealed during witness Sgt. Willingham's testimony that he had added a blood spot to a diagram that was otherwise the product of a computer-aided design machine without actually measuring the blood spot's location, trial counsel objected to the drawing being admitted into evidence because "[t]he proper predicate that's been laid was a lie."  Petition at 170 (citing 20 RR 149).  The trial court then admonished trial counsel outside the presence of the jury for use of the word "lie."  20 RR 150-51.  Petitioner initially contended that the admonition was prejudicial and constituted ineffective assistance; further, the prosecutor then apologized to the witness before the jury for defense counsel's reference to a "lie."  Petition at 170-71.

The transcript of the proceedings are clear that the admonition took place at sidebar, outside the presence of the jury. 20 RR 150-51. Nothing was placed before the jury to make them aware of the trial judge's comments. As to the comments of the prosecutor, he said, "Sergeant, I want to apologize for you being called a liar here or that this was a lie." 20 RR 153. There is nothing in that statement implicating a deficiency of defense counsel, particularly in the absence of comment by the trial judge before the jury. In fact, in his Reply, Petitioner himself admits that "[s]tanding alone, this claim does not show deficient performance. . . ." Reply at 89. Accordingly, he has not shown that had defense counsel acted differently, the outcome of the trial would have been any different. *Strickland*, 466 U.S. at 694. This claim is without merit.

### 3.     Claim V(c):   Ineffective Assistance Of Counsel For Introducing Prejudicial Evidence

Petitioner's entire argument as to this contention is that "[m]any of the photographs introduced by the defense as defendants exhibits were relied upon by the prosecution to prove their case," Petition at 171, followed by a single sentence containing a few examples of photographs introduced by defense counsel that were also used by the prosecutor to show where hair, blood and a liquid spill had been found. The Director contends that the claim is frivolous and that the photographs introduced were helpful to the defense. Response at 82. In Reply, Petitioner admits that the photographs were helpful to defense counsel's case, but repeats the same brief sentence referenced immediately above. He offers no other argument.

The photographs in question originated from the file of a Texas Department of Public Safety chemist, Natasha Bologna. 20 RR 83-84. Defense counsel used them during his cross-examination of Ms. Bologna. *Id*. Counsel offered them as exhibits 4, 5, 6, 7, 8 and 9, and the trial court admitted them. *Id*. at 85-86. The prosecutor also had copies of, or access to, Ms.

Bologna's photographs. In fact, the prosecutor advised the trial court, "Your Honor, I don't have any objections to these photographs being offered, but we'll just offer all the photographs that she has in her case file." *Id*. at 84. In other words, there was nothing that defense counsel offered into evidence from Ms. Bologna's photographs that the prosecutor did not also offer; furthermore, defense counsel was well aware that the prosecutor had done so. *Id*. Petitioner must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Bell*, *supra*, 535 U.S. at 698 (quoting *Strickland*, 466 U.S. at 689). Given that defense counsel clearly knew that the prosecutor had the same evidentiary photographs that he wished to introduce into evidence for the purposes of defense, Petitioner has not overcome the presumption that defense counsel was proceeding under a sound trial strategy. That is particularly so when Petitioner has made no showing whatsoever that the outcome of the trial would have been any different had counsel chosen not to introduce the photographic evidence. *Strickland*, 466 U.S. at 694. Therefore, this claim is without merit.

**4.      Claim V(d):   Ineffective Assistance Of Counsel For Failing To Object To The Testimony By Tony[22] Hurley**

In his next contention, Petitioner again offers a cursory claim without argument in support. He asserts,

> At the guilt/innocence phase, witness Tony Hurley testified that there were tire marks in the grass and a tire mark north and a little east of the body. 20 RR 100. The witness's opinion was that the tire marks were in line with a blood spot that was jut north of the victim's body. 20 RR 103. However, there was no testimony that the spot was actually blood. The defense's failure to object prejudiced petitioner.

---

[22]    As spelled in the Petition. Some sources in the record of this case report Mr. Hurley's first name as spelled "Toney."

Petition at 171-72. The Petition does not explain the prejudice to which Petitioner refers. In Reply, he does offer a brief explanation that "the testimony regarding the 'blood' spot north of the body prejudiced petitioner because the tire tracks were in line with this spot, which could have been inferred to support the persecution's [*sic*] theory." Reply at 90.

As the Director argues, during the evidentiary hearing on Petitioner's state habeas application, defense counsel[23] testified on the general subject of raising objections. State habeas counsel asked during the evidentiary hearing whether defense counsel objected to everything he could:

> Q.   Okay. Let me just ask you, generally: Do you always object to everything that you think you could possibly object to at trial?
>
> A.   No.
>
> Q.   Why not?
>
> A.   One, it interferes with the flow of the trial; two, sometimes the jurors get angry if you object to minor things; three, it's just unnecessary. I mean, if I don't feel like it's hurting my client, I don't object.

SHRR at 159-60. Although this statement was not specifically with regard to an objection to Officer Hurley's testimony, defense counsel clearly articulated his trial strategy regarding objections in general. To the extent that he believed his client was not disadvantaged absent a technical objection, he preferred not to interfere with the flow of the trial or potentially anger the jurors with unnecessary objections. Here, Petitioner's claim that Officer Hurley's unobjected-to testimony "could have been inferred to support the persecution's [*sic*] theory," Reply at 90, is both conclusory and speculative, unsupported by any other argument or citation to obvious consequence

---

[23] In this case, Mr. Fergurson. Mr. Fergurson testified in part that he "requested that Mr. McDowell handle the expert witnesses, and I tried to handle the fact witnesses and the investigation." State Habeas Reporter's Record ("SHRR") at 154.

in the record.  He has not overcome the presumption that defense counsel employed a sound trial strategy.  *Bell*, 535 U.S. at 698.  Moreover, a failure to make meritless objections does not result in the ineffective assistance of counsel.  *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.) (the "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."), *cert. denied*, 513 U.S. 966, 115 S. Ct. 432, 130 L .Ed. 2d 344, *and reh'g denied*, 513 U.S. 1036, 115 S. Ct. 628, 130 L .Ed. 2d 535 (1994).  Petitioner also has not shown that the outcome of trial would have been any different had counsel objected, and therefore has failed to show that he was prejudiced by the lack of objection.  *Strickland*,  466 U.S. at 694.  This claim is without merit.

### 5. Claim V(e): Ineffective Assistance Of Counsel At Argument For Contradicting His Client's Version Of Events

In this claim, Petitioner refers to his trial testimony that the victim had jumped from his truck.  Here, he contends that counsel was ineffective for arguing at closing that:

> You may hear after the D.A. the [*sic*] gets back up, because I'm not going to get a chance to respond, you may hear that the car hit her.  How do we know that the car didn't hit her?  The forensic man came and said they took samples of the paint of the vehicle.  And then they inspected her clothes microscopically and they found no paint chips from the truck.  The truck did not hit her.  There would have been paint transfer.

23 RR 12; Petition at 172.  Petitioner contends that this argument contradicted the State's forensic expert and that it contradicted Petitioner's version of events.  Petition at 172.

First, the forensic expert, David Walker Spence, the supervisor of the Trace Evidence Section at the Southwestern Institute of Forensic Sciences (20 RR 155), testified that "impact between the vehicle and a victim's clothing will cause paint chips to transfer from the vehicle to the victim's clothing."  20 RR 158.  He also testified that he "did not identify or detect any paint chips on the clothing" of the victim in this case, Ms. George.  20 RR 159.  On cross-examination, Mr. Spence agreed that in that circumstance, paint chips do not always transfer to clothing.  *Id*.

Second, an examination of Petitioner's trial testimony reveals that he only testified that Ms. George ultimately jumped from his truck on the third attempt to do so on the day of her death. He did not testify that he had hit her with his truck. *See, e.g.*, 21 RR 241-42.

Accordingly, counsel's closing argument quoted above did not contradict either the forensics expert's testimony or Petitioner's own testimony. Instead, it appears that counsel was addressing the comments the prosecutor made in his initial closing argument. Addressing the likelihood of death by blunt force injury aside from the strangulation argument, the prosecutor argued, "We don't know whether a tire ran over her head or she bounced up underneath the truck or she hit the road because the road mashed her into the road." 23 RR 6. The prosecutor made this argument immediately before defense counsel gave his closing argument, including the quote above. He also argued that "There's different ways that you can find that he committed this offense: By strangulation; by the blunt force injuries, the trauma injuries; or, by a combination of both." 23 RR 7. While Petitioner claims that counsel's remarks contradict his testimony, it appears that defense counsel simply acted to forestall the prosecutor's argument of blunt force by Petitioner's truck as one of the alternative means of homicide. As such, it was within defense counsel's purview of trial strategy. *Bell*, 535 U.S. at 698. Moreover, Petitioner has not shown how the outcome of trial would have been any different absent counsel's argument; accordingly, he cannot show prejudice. *Strickland*, 466 U.S. at 694. This claim is also without merit.

**D.     Claim VI:     Trial Counsel Rendered Ineffective Assistance Of Counsel At The Penalty Phase Of The Trial.**

Petitioner asserts five subclaims under the heading of "penalty phase" proceedings. The first two subclaims address counsel's presentation of witnesses on the issue of mitigating evidence

and the special issue of future dangerousness. Petitioner overlaps his argument on these points, and the Court will address them together.

1. **Claim VI(a): Ineffective Assistance For Failure To Present Mitigating Evidence.**

2. **Claim VI(b): Ineffective Assistance Regarding The Future Dangerousness Special Issue.**

In the first part of subclaim VI(a), Petitioner returns to the argument that defense counsel failed to prepare his mother and two sisters properly for their testimony, as he previously raised in his claim number IV(c), addressed above. Additionally, he asserts that counsel was ineffective in preparing and examining forensic psychologist Antoinette Cicerello for presentation of mitigating evidence and testimony on the subject of future dangerousness to the jury.

First, as to the preparation of family witnesses, the Court has already addressed this point above in regard to Petitioner's Claim IV(c). Both there and here, this claim is without merit.

Second, with regard to Dr. Cicerello, whose testimony and report are the focus of the remainder of subclaim VI(a) and the entirety of subclaim VI(b), Petitioner first contends that her testimony adduced by trial counsel did not provide adequate mitigating evidence during the penalty phase. However, much of what Petitioner complains was missing was introduced through trial counsel's examination of Petitioner's mother and sisters. For example, Petitioner complains that the fact that he has a "strong and supportive family" was not mentioned, Petition at 175; but the testimony of his mother and sisters expressed this far more effectively. He also complains that "[t]he fact of alcohol abuse and long-time substance abuse by both petitioner and the victim" was not mentioned. *Id*. However, as discussed above, trial counsel introduced those very points through the testimony of family members. His sister, Dorcas Vittatoe, testified that Petitioner

abused alcohol and took drugs including "crank or crack." 23 RR 133. She also testified that the alcohol and drugs created problems between Petitioner and Ms. George; that she did not think Petitioner had a drug problem since his last incarceration; but she did think he had an alcohol problem since his last incarceration. *Id*. at 133-34. Petitioner points out that Dr. Cicerello mentioned the drug and alcohol use in her report. Petition at 175 n.210 (citing Petitioner's Exhibit 28 at 7). That is true; however, the report is also quite clear that he initially participated in a Gateway Foundation treatment program while incarcerated. Nonetheless, "he was discharged to a general prison unit on February 2, 1993, for program noncompliance." Ex. 28 at 5. The report also notes that after his convictions for theft by deception and burglary of a habitation in 1992, he was "ordered to a substance abuse felony punishment facility (which he refused participation) and sentenced to 10 years in prison." *Id*. Questioning Dr. Cicerello on her findings as to Petitioner's alcohol and drug use would certainly have resulted in the prosecution's cross-examining her as to Petitioner's refusal to participate in the drug programs, with its strong negative inferences. The Court must presume that counsel had a strategy in his representation at trial, which includes avoiding the introduction of such negative evidence. *Strickland*, 466 U.S. at 689. There is no evidence of ineffectiveness when proceeding under this presumption, which Petitioner has not rebutted.

Petitioner also argues that trial counsel did not adduce testimony from Dr. Cicerello regarding his stay at the Glen Oaks Hospital as a child and its records regarding his sleep walking and panic attacks, which he links to "a triggering event over which he had no control: his molestation by a teacher." Petition at 176 & n.212. However, in the first instance, he has not shown how any evidence connects the two issues. Further, there is nothing in Dr. Cicerello's

report upon which to base such an argument, meaning that there would be no foundation upon which trial counsel could attempt to make any such connection. That is particularly true in the face of the prosecution's aggressive practice of objections, which would certainly have come into play in that event. Moreover, proving the point, the prosecution objected to trial counsel's attempt to introduce Petitioner's mother's testimony of sexual molestation by a teacher on the grounds that it was hearsay, which the trial judge sustained. *See supra* and 23 RR 139-40. There would have been no basis for examining Dr. Cicerello on this issue; her report also makes clear that her only knowledge of the event was based on Petitioner's and his mother's reports to her during her interviews, Exhibit 27 at 3, which would also have drawn a hearsay objection.

In short, Petitioner has not made any credible showing of ineffective assistance of counsel in introducing mitigating evidence during the penalty phase. That portion of his claim is without merit.

Third, regarding Petitioner's claim that trial counsel erred by "allow[ing] [Dr. Cicerello] to use base rates for the prediction of future violence that were based on a 1996 study of the rate of violence in Missouri State Prisons; a base rate for assaults in the Texas Department of Criminal Justice for 1997 and 1998," leading to a prosecution objection that the data in the base rates "did not necessarily pertain to capital murder inmates," Petition at 177, misstates the trial record. Although he attempts to suggest that the trial court sustained the prosecutor's objection, leading to the exclusion of all of the relevant testimony, that is incorrect.

On direct examination, trial counsel asked Dr. Cicerello, "What was your opinion as to Mr. Acker's risk level?" 23 RR 101. Dr. Cicerello responded,

> I was looking at two contexts primarily. The first context would be the level of risk that Mr. Acker posed while in prison. And I looked at the level of risk that Mr. Acker posed

with regard to violence should he be released after forty years of confinement. And for both of those contexts the level of risk that Mr. Acker poses is low.

*Id*. at 101-02. Trial counsel then asked, "What base rates did you use to determine [Petitioner's] risk level?" *Id*. at 102. Dr. Cicerello responded,

> I relied upon base rates of inmates, capital inmates, whether they are in prison for execution on death row or whether they are there for life in prison. Looking at those rates in state prisons, particularly in the State of Texas, and also federal inmates as well. Looking at the base rate of how often violent offenses occur in prison. And following several years of - -

*Id*. At that point, the prosecutor interrupted Dr. Cicerello's testimony to ask a question on voir dire, whether she used the "rates for capital murder inmates since the statutes have been changed so that only people who have committed murder go to capital punishment or are you considering rates back when people who were sentenced for capital punishment for other offenses, such as sexual assault?" *Id*. She responded, "I'm talking after, post. So just looking at murder rates," *id*., satisfying the question. Trial counsel then asked Dr. Cicerello to give an example of the base rates she used. She responded,

> Sure. Just for example, in 1996 a study was conducted regarding the rate of violence in the Missouri State Prisons from 1977 to 1992. In looking at assault rates, over seventy-eight percent of inmates, capital inmates, whether they were life without parole or death row, seventy-eight percent committed no assaults whatsoever. A third of them committed minor assaults. There was a very low percentage of inmate homicides. Just one percent. That's one example.

*Id*. at 103. Then, trial counsel asked if Dr. Cicerello had "a base rate for assaults in the Texas Department of Criminal Justice for 1997 and 1998?" *Id*. She responded, "I do. I have data regarding rates of assault from the Texas Department of Criminal Justice in 1997." *Id*. The prosecutor asked, "Is this relating to capital murder offenses?" *Id*. Dr. Cicerello responded, "It's just the rate for assaults, not specifically with regards to capital murder." *Id*. The prosecutor then

objected, "since only the rates that would involve capital murder inmates would be relevant as the other inmates are in a different type of population." *Id*. These proceedings took place before the jury, as did a brief colloquy afterward, followed by a sidebar outside the jury. At the end of the sidebar, the trial judge simply said, "Sustained." *Id*. at 105. Trial counsel then went on to ask additional questions. The trial judge did not qualify what he sustained, nor did he give the jury any limiting instruction as to the prior testimony. Furthermore, the prosecutor did not ask for any limiting instruction. Moreover, the prosecutor's objection related only to Dr. Cicerello's use of TDCJ general population base rates in 1997. Nonetheless, she also relied on capital punishment inmate base rates from a different study entirely as to which no objection was voiced.

Accordingly, Petitioner's contention as to the ineffectiveness of Dr. Cicerello's testimony of future dangerousness, and the related ineffectiveness of trial counsel, is overreaching, does not reflect the record proceedings, and consequently is without merit.

Furthermore and finally, the prosecution adduced aggravating testimony that was seriously harmful to Petitioner regarding his future dangerousness. Although he now characterizes the aggravating evidence as "noticeably weak" because it "only" consisted of the testimony of "four law enforcement officers" and "two ex-wives who testified that petitioner had been violent with them," Petition at 178, Petitioner again ignores the actual proceedings.

The prosecutor first examined Sheriff Charles "Butch" Adams of Hopkins County, who testified he had known Petitioner for "[p]robably ten, eleven years." 23 RR 45. Sheriff Adams testified that Petitioner had a bad reputation in general. More specifically, since March 12, 2000, following Ms. George's death, Petitioner had been in custody at the Hopkins County Jail under Sheriff Adams. *Id*. at 46. He validated a number of jailhouse records documenting that Petitioner

had been found with several items of dangerous contraband, uncovered by searches of his cell. *Id*. These items included razor blades (i.e., blades that had been taken out of razors), paper clips, pens with the cartridges removed and lighters. *Id*. at 47. On cross-examination, Sheriff Adams testified that these items were "of a violent nature." *Id*. Although trial counsel adduced testimony that Petitioner had not struck an officer or another inmate while in the Hopkins County Jail, *id*. at 48, on re-direct, the Sheriff also testified that one of his officers found Petitioner to be aggressive, felt threatened by it and wrote a disciplinary report on him. *Id*. at 49-50. He also testified that although prisoners were issued shaving razors, they were required to turn them in when finished shaving. *Id*. at 50. Nonetheless, Petitioner had been found with four razors in his cell, including two that had been taken out of the protective cover. *Id*. He also testified that a person would want razor blades in a cell "[s]o they could cut something." *Id*. at 51. Finally, he testified that when Petitioner was moved between cells, jail personnel searched the new cell into which he was to be placed to ensure no contraband was present from a former inhabitant. *Id*. Therefore, the inference was that any items of contraband found during searches of Petitioner's cells were present because Petitioner had managed to obtain and secrete them.

Before proceeding to the next prosecution witness in this area, it is important to note that the prosecutor also adduced testimony from Dr. Cicerello on cross-examination that during one of her interviews of Petitioner, a razor blade fell out of the accordion folder Petitioner used to hold his legal records. *Id*. at 109. Although he told her that he used it for cutting slits in papers in which to insert photographs and she testified she did not feel threatened and continued the interview, she also knew it was improper for him to possess and reported it (with a filed affidavit) to jail authorities. *Id*. at 110. The information that Petitioner would bring a razor blade to an

interview with part of his defense team, along with Sheriff Adams' testimony, could only have bolstered the jury's determination of Petitioner's future dangerousness.

Next, the prosecutor examined Sheriff Benny Fisher of Delta County, 22 miles away. *Id.* at 52. He testified he had known Petitioner "[a]ll of [Petitioner's] life." *Id.* at 53. Sheriff Fisher testified that Petitioner's reputation was "certainly not law abiding." *Id.* He testified on cross-examination that he had not heard reports of any good things about Petitioner because he only received reports about the "bad parts." *Id.* at 57. On re-direct, the prosecutor then asked, "You've heard a lot about Mr. Acker, haven't you." *Id.* at 58. Sheriff Fisher responded, "Yes, sir." *Id.*

The prosecutor then called Lieutenant Russell Stillwagoner of the Criminal Investigation Division, Sulphur Springs Police Department. *Id.* Lt. Stillwagoner testified he knew Petitioner and had arrested him. *Id.* at 59. He further testified that Petitioner's reputation was bad. *Id.* at 60. The incident for which Lt. Stillwagoner arrested Petitioner was a family violence assault situation involving Petitioner's then-wife, Shirley. *Id.*

The last law enforcement officer the prosecutor called was Officer Marcus Antwone Young of the Sulphur Springs Police Department. *Id.* at 63. Officer Young testified he was familiar with Petitioner through his duties as a patrol officer for the City of Sulphur Springs. *Id.* As with the first three law enforcement officers, Officer Young testified that Petitioner had a bad reputation. *Id.* at 64. He also testified that he had attempted to arrest Petitioner on one occasion. *Id.* During the attempted arrest, Petitioner had hit Officer Young in the mouth, resulting in a "bloody mouth, busted lip." *Id.* He filed charges of assault on a peace officer against Petitioner. *Id.* In fact,

Petitioner "got away for a little while" after assaulting Officer Young. *Id*. at 66. Officer Young

had to have the assistance of three officers to take Petitioner into custody. *Id*.

Following the law enforcement testimony, the prosecutor called Shirley Acker Sgroe, one

of Petitioner's former wives. *Id*. at 68. She testified she had been married to Petitioner for "[a]

little over a year" and had dated him for a year before that. *Id*. Petitioner was in the Hopkins

County Jail when they married and he was either in jail or the penitentiary when they divorced.

*Id*. at 68-69. She testified that he had been violent toward her on one occasion. *Id*. at 69. She

described the incident:

> I had went out with his sister. I didn't tell him where I was going. He come and found
> me at a friend of mine. And he was angry because he couldn't find me. He jerked me up
> off the couch. I ripped my shirt. I fell back on a bush. He grabbed me by the hair and
> put me in the car in the front seat. And he reached over and slapped me up side the head
> a couple of times.

*Id*. She also described Petitioner's obsessive behavior toward her, including that "[h]e put a tape[24]

in [the phone wire] underneath the table and whenever someone would call it would record the

conversation just to see if I was faithful to him," *id*. at 70; he told her he was going out to play

pool but hid in the trunk of the car while she went to the Pitt Grill for coffee; *id*. at 70-71; on

another occasion, he climbed onto the roof to watch her while she had an argument with her first

husband about their children because "he said [ ] he thought that I might be having an affair still

with my first husband," *id*. at 71; and she found that he had "done something to the speakers in

the car, in the radio, where it would be picked up in the trunk, I guess," so he could hear her

conversations with others. *Id*. at 71-72. She testified that Petitioner was "[v]ery jealous,

---

[24] Ms. Sgroe used the word "tape" in her testimony. Whether she meant a tape recorder or intended to say a "tap" cannot be discerned on the cold record, but the Court takes the meaning of the testimony to be the same either way.

obsessive." *Id*. at 72. Ms. Sgroe also testified that she had observed him being violent against his mother and saw him "throw his mom on the floor by grabbing her arm a couple of times." *Id*. The prosecutor asked her, "Based on your personal observations of him and living with him and what he did while you were there do you believe he would be dangerous to people?" *Id*. at 73. Ms. Sgroe responded, "Yes." *Id*. On cross-examination she testified that he would sometimes be good and gentle with her and that she loved him and tried to be a "good wife," *id*. at 74-75, but that he was also not good to her children. *Id*. at 75. She explained on re-direct that Petitioner was abusive to her oldest son, who was seven at the time. *Id*. at 76-77. She further testified that Petitioner would talk to her about his first wife and "tell [her] that he used to think of ways to kill her[.]" *Id*. at 77. She agreed to the prosecutor's question that she was "scared of him right now, aren't you?" *Id*.

Finally, the prosecutor called Petitioner's first wife, Susan Ball. *Id*. at 78. She testified she had been married to Petitioner for "[g]oing on four years." *Id*. at 79. She further testified that he had been "assaultive" to her and physically abused her "[o]n several occasions" during their marriage and that she had filed charges against him. *Id*. He would strike her with his hands. *Id*. She did not know how many times she had filed charges against him. *Id*. at 79-80. He was not abusive to her when they were dating, but it started "[s]hortly after we were married." *Id*. at 80. "All kinds of different stuff" caused him to become upset or physically abusive. *Id*. He was very jealous of where she was and what she was doing, and believed she was having affairs, which she testified she was not. *Id*. at 80-81. She was pregnant with their first child when they married. *Id*. at 81. They fought weekly. *Id*. One of her children was hurt during their last fight, when she decided it was time to go. *Id*. The child he hit was five months old and in her arms.

*Id*. at 82.  On that occasion, Petitioner "wanted to take me out to the lake."  *Id*. at 83.  Petitioner's

mother was driving the car and Ms. Ball was sitting in the front seat; Petitioner was in the back

seat holding her left arm and holding her to the back of the seat.  *Id*.  She continued,

> And I asked him if he would please let go so I could shut the door because I had seen a cop
> sitting on the corner right up here at a stop sign.  He let go.  I glanced back.  Seen the cop
> behind us.  I reached over and opened the door and shut it with Misty laying in my arm.
> And when I shut the door I come around and hit his mom between the eyes and she
> swerved all over the road and we got pulled over.  And I got out of the car.

*Id*. at 83-84.  The prosecutor asked, "In your own mind do you believe that saved your life?"  *Id*.

at 84.  Ms. Ball responded, "Yes, I do."  *Id*.  On cross-examination, she testified that Petitioner

went to jail after they were pulled over.  *Id*. at 86.  They divorced while he was in prison.  *Id*. at

91.  On re-direct, she testified that when it came time for Petitioner to be paroled, she made a

request to the parole board "[t]hat he would be banned from the State of Oklahoma."  *Id*. at 92.

She did that "[b]ecause of my children and myself.  I know what he's capable of doing."  *Id*.

Continuing on re-direct, the prosecution inquired:

Q:      Are you scared of him?

A:      I used to be very terrified of him.

Q:      Do you think he's violent?

A:      Yes, he is.

Q:      Is he dangerous?

A:      Yes, he is.

Q:      Will he hurt somebody in the future?

MR. FERGURSON:  Objection, your Honor.  That calls for speculation.

THE COURT:          Sustained.

Q:      Do you believe he might based on what you saw of him?

A:      Yes.

*Id*. at 93-94.  The prosecutor rested on that testimony.  *Id*. at 94.

Petitioner attempts to marginalize this combined testimony by referring to it as "only" that of four law enforcement officers and two ex-wives, therefore meaning his claim of ineffective assistance of counsel on the issue of future dangerousness "cannot be said . . . [to be] . . . harmless."  Petition at 178.  That is not the case.  The Court has found, *supra*, that trial counsel was not ineffective on the issue of future dangerousness.  However, even if that were not the case, the testimony of two sheriffs, including information regarding Petitioner's possession of four razors and other contraband in jail after his arrest in this case, a lieutenant and a patrol officer regarding Petitioner's reputation and his actual assaultive conduct toward family and against one of the peace officers, along with the detailed testimony of two former spouses who described his assaults on them and their children, their fear and their belief that he would be dangerous in the future means that Petitioner could not show prejudice from the supposed ineffectiveness in any event.  *Strickland*, 466 U.S. at 689.

Petitioner's claims VI(a) and VI(b) are without merit.

**3.      Claim VI(c): Ineffective Assistance For Failure To Present Evidence Of Petitioner's Low Intelligence.**

Here, Petitioner argues that trial counsel was ineffective for failing to present evidence of his "low intelligence" during the penalty phase to mitigate or avoid the death penalty. Specifically, he asserts, with little supporting authority, that "[m]ental retardation and sub-average intellectual functioning have been widely recognized as mitigating evidence."  Petition at 179. He does not support this assertion with citation; he does cite *Atkins v. Virginia*, 536 U.S. 304, 122

81

S. Ct. 2242, 153 L. Ed. 2d 335 (2002), in which "the United States Supreme Court declared that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation." Petition at 179. However, none of the factual material he cites - reports from Petitioner's stay at the Glen Oaks Hospital related to his childhood sleepwalking episodes and Dr. Cicerello's "Psychological Evaluation and Risk Assessment" of March 16, 2001 - establishes that Petitioner is mentally retarded. At most, the evaluations reflect a "borderline" capacity. As Petitioner admits in his argument, Dr. Cicerello's evaluation found him to be in the "low average range" in problem solving and "moderately impaired range" in verbal skills, neither of which establishes or supports a finding of mental retardation. Accordingly, *Atkins* is inapplicable here for Petitioner's purposes.

Aside from that point, the Director argues that counsel's investigation was adequate and presentation of evidence of "low intelligence" is a double-edged sword. That is precisely the approach taken by another District Court in the Fifth Circuit, with detailed analysis supporting its conclusion:

> Maldonado also claims that trial counsel should have presented his mental retardation in the penalty phase as a means of mitigating against a death sentence. "Mental retardation as a mitigator and mental retardation under *Atkins* . . . are discrete legal issues." *Bobby v. Bies*, 556 U.S. 825, 129 S. Ct. 2145, 2153, 173 L. Ed. 2d 1173 (2009); *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir.2004) ("Borderline retardation is not always viewed as a mitigating circumstance."). The decision a trial attorney faces when considering whether to present evidence of mental retardation in the penalty phase is difficult. *Atkins* recognized that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321, 122 S. Ct. 2242; *Penry v. Lynaugh*, 492 U.S. 302, 324, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) ("Penry's mental retardation . . . is a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The Fifth Circuit has found that a trial attorney's decision not to present evidence of mental retardation as mitigating evidence can be reasonable in order to prevent a negative jury finding on issue of future dangerousness. *See Riley*, 362 F.3d at 306. Because Maldonado did not present

this issue properly in state court, trial counsel has never given an affidavit or testimony that would show if the circumstances were such that they should have performed additional investigation into his mental capacity.

Nonetheless, no reasonable probability of a different result would flow from trial counsel's failure to argue during the punishment phase that Maldonado is mentally retarded. As the Court fully discussed with respect to the *Atkins* claim, Maldonado has not shown by a preponderance of the evidence that he is retarded. *See Boyd v. Johnson*, 167 F.3d 907, 910 (5th Cir. 1999) (finding no *Strickland* prejudice for failing to present a mitigating defense of mental retardation because of the conflicted nature of the evidence). The Fifth Circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ because "'the upper borderline of mild retardation' does not amount to 'any significant organic damage or mental illness.'" *Riley*, 362 F.3d at 307 (quoting *Smith v. Black*, 904 F.2d 950, 977–78 (5th Cir. 1990)). Also, *Strickland*'s prejudice prong requires the Court to place the evidence suggesting, though not conclusively proving, mental retardation in the context of Maldonado's trial. As will be discussed more fully in the section that follows, Maldonado had a violent and lawless history. While low intelligence may have allowed the jury to find that Maldonado was (as suggested by the facts of the murder) a follower, that evidence also could have shown him to be a future danger when again encouraged by others to be violent. The double-edged nature of the mitigating evidence would make it not reasonably probable that the jury would answer the special issues differently had trial counsel emphasized low intelligence in the punishment phase. Even if not procedurally barred, this claim would not merit habeas relief.

*Maldonado v. Thaler*, 662 F. Supp. 2d 684, 752-53 (S.D. Tex. 2009). In his reply brief, Petitioner contends that the "double-edged sword" argument is unwarranted because he sees no "downside" to presenting the evidence and, he contends, the Director does not point to any evidence to support that defense counsel carried out an investigation. Reply at 95-96.

The reasoning of the *Maldonado* court is persuasive as to the first point, where evidence of "low intelligence" "could have shown [a petitioner] to be a future danger. . . ." On the second point, the adequacy of trial counsel's investigation is represented at the very least in Dr. Cicerello's report and conclusions following her interviews and review of Petitioner's records. She reported that Petitioner's "overall intellectual functioning, based on objective testing [ ], is estimated to fall in the borderline range." Ex. 27 at 7. His "vocabulary, general fund of

information, sentence structure and grammar appeared average." *Id*. In summary, she concluded

that Petitioner "is an individual of borderline to low average intellectual functioning who presents

with no evidence of major mental illness and no significant deficits in mental status." *Id*. Based

on these results, the Court cannot say that trial counsel was ineffective for failure to investigate

Petitioner's "low intelligence" adequately.

### 4. Claim VI(d): Ineffective Assistance For Failure To Present Petitioner's History Of Drug And Alcohol Abuse.

The Court has already addressed this issue above. As the Court has determined, trial

counsel adduced testimony from Petitioner's family members as to his alcohol and drug abuse;

further, additional questioning at trial of Dr. Cicerello could easily have resulted in cross-

examination revealing Petitioner's refusal to participate in an in-prison drug program and his

resulting release to general population. Trial counsel cannot be faulted for any strategic decision

to avoid that outcome. *Strickland*, 466 U.S. at 689. This subclaim is without merit.

### 5. Claim VI(e): Ineffective Assistance At Penalty Phase Argument.

Here, Petitioner makes a cursory and conclusory argument that trial counsel's closing

argument in the penalty phase was too brief and did not adequately present mitigating evidence to

the jury. Petition at 180-81; Reply at 97. He concludes that the brief closing argument was

"shockingly inadequate per se." Reply at 97. He has provided no citation to authority for that

conclusion, nor did he make any developed argument at all as to this claim, other than to repeat

that trial counsel's closing argument was essentially too short and was a "plea for mercy."

As with every other portion of Petitioner's ineffective assistance of trial counsel claims,

to prevail he "must show both that 'counsel's representation fell below an objective standard of

reasonableness,' *Strickland*, 466 U.S., at 688, 104 S. Ct. 2052, and that there is a 'reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' *id.*, at 694, 104 S. Ct. 2052." *Smith v. Spisak*, 558 U.S. 139, 149, 130 S. Ct. 676, 175 L. Ed. 2d 595 (2010).

Here, Defendant characterizes trial counsel's closing argument as essentially a "plea for mercy." Even if it contained elements of an argument aimed at the sympathy of the jury - which could have been a strategic effort - in fact, trial counsel addressed considerably more. He pointed out that Petitioner's first wife testified she was still in love with him and wanted him to be a good father, 23 RR 147; that his second wife, Shirley Sgroe, still loved him because there was good in him, *id.* at 148; that rehabilitation is hard in prison, but in prison, Petitioner had the structure he needed and was not a danger to anyone else and never got in any trouble, *id.*; he had not been aggressive while in the county jail and although he had a razor blade with which to cut holes in paper, he never approached a deputy with it, *id.*; that while in prison, Petitioner would never have access to alcohol or drugs or females again, *id.*; that the revenge value of execution would not bring Ms. George back, *id.* at 148-49; that his mother testified he grew up without a male figure in his life and his mother worked constantly, *id.* at 149; that Petitioner loved animals and loved his mother, *id.*; that alcohol and drugs "ate on him" and under their influence, he was a different person, *id.*; that Dr. Cicerello's evidence was that people in Petitioner's position in prison were at "low risk of hurting other people," *id.*; and ultimately, that there was no reason to execute the Petitioner. *Id.* at 149-50. Therefore, contrary to Petitioner's argument, trial counsel summarized significant points brought out in the penalty phase testimony and argued their value for not imposing the death penalty.

To the extent trial counsel's closing argument also made a plea to the jurors' sympathies for Petitioner's life, Petitioner has not shown that it did not constitute sound trial strategy, *Bell*, 535 U.S. at 698, especially given his four-sentence argument, Petition at 180-81, and his reply that merely repeated his basic argument. Reply at 97.

Accordingly, this claim is without merit.

Having addressed each of the ineffective assistance of trial counsel claims, and having found them without merit, the Court concludes that none of the claims is "substantial" for the purposes of *Martinez*. *See Preyor*, 537 F. App'x at 421. Therefore, as noted in section V.A., *supra*, Petitioner has not demonstrated ineffective assistance of state habeas counsel, either. Accordingly, Petitioner is not entitled to relief pursuant to the *Martinez/Trevino* analysis.

The Court will next review Petitioner's remaining, procedurally-barred, claims.

## VI.    PROCEDURALLY BARRED CLAIMS NOT SUBJECT TO AN EXCEPTION

Aside from the claims discussed above, Petitioner has urged several other claims, all of which are similarly procedurally barred. None fall under the exception of *Martinez*/*Trevino*, and Petitioner has not demonstrated cause for their default. Each will be discussed in order.

### A.    Claim II:    The Trial Court Was Biased Against Petitioner And Committed Many Errors Which Prevented Him From Presenting His Case For Innocence And Deprived Him Of Due Process And A Fair Trial.

Under this banner heading, Petitioner asserts 18 sub-claims relating to alleged bias, some of which are duplicative of other claims he raises elsewhere in his petition. These sub-claims include: that the trial court (a) erroneously allowed the jury to hear evidence that Petitioner had been in the penitentiary; (b) stifled the defense's case for actual innocence by erroneously disallowing impeachment testimony; (c) erred in denying a mistrial; (d) erred in disallowing

crucial testimony from the medical examiner; (e) erroneously excluded testimony that was highly probative of petitioner's actual innocence (i.e., Petitioner asserts that the testimonies of Sabrina Bell, William Brandon Anderson, Lewis Tatum, and investigator John Riley Sands were all erroneously excluded); (f) erred in forcing Petitioner to make a prejudicial and irrelevant demonstration in front of the jury; (g) erred in admitting prior extraneous offenses; (h) exhibited bias at jury deliberations; (i) erred in denying adequate funding to the defense and refusing to appoint a criminologist; (j) erred in excluding Petitioner's testimony regarding the victim's past act in attempting to jump from the truck; (k) erred in refusing to give an instruction that they must acquit if they believed the victim had jumped from the truck; (l) erred in refusing to extract language in the guilt/innocence instruction that conflicted with the definition of intentional acts; (m) erred in refusing the defense request for instruction on lesser included offenses; (n) erred in commenting on the evidence; (o) erred in limiting mitigating evidence; (p) erred in forcing disclosure of privileged attorney-client information; (q) erred in appointing ineffective appellate and post-conviction attorneys; and (r) cumulative trial error.

A number of these sub-claims directly relate to Petitioner's lead claim of actual innocence, including at a minimum sub-claims (b), (c), (d), (e), (i), (j) and (k). All such claims relating to the actual innocence claim have either been directly addressed during the Court's Evidentiary Hearing or in this decision. Even if there are some points not explicitly addressed otherwise herein, the Court has found that Petitioner's claim of actual innocence is without merit.

All other sub-claims must be rejected because they are procedurally barred. These claims were raised for the first time in Petitioner's third state habeas application and dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. Petitioner has not shown cause and

prejudice for the default or that a fundamental miscarriage of justice would occur if this Court does not consider these sub-claims on their merits.[25]  Accordingly, he has not satisfied his burden to overcome the procedural bar.

With regard to Petitioner's final sub-claim, the Fifth Circuit rejected a similar cumulative error claim, stating:

> Coble claims that cumulative error merits habeas relief.  Federal habeas relief is only available for cumulative errors that are of a constitutional dimension.  *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey*, 985 F.2d at 229.[26]  As previously discussed, none of Coble's ineffective assistance claims establish ineffective assistance under *Strickland*.[27]  Coble has not identified errors of constitutional dimension.  Accordingly, we cannot say that the state habeas court's rejection of Coble's cumulative error claim was objectively unreasonable.

*Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007).  Here, Petitioner likewise has not identified any errors of constitutional dimension.  Further, the Fifth Circuit has held that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Darden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 960, 113 S. Ct. 2928, 124 L. Ed. 2d 679 (1993)), *reh'g and reh'g en banc denied*, 95 F.3d 56 (5th Cir. 1996), *and cert. denied*, 519 U.S. 1094, 117 S. Ct. 773, 136 L. Ed. 2d 718 (1997).

Consequently, Petitioner's Claim II, including its various sub-claims, is without merit.

---

[25]    Moreover, the Court notes that most of these claims are barely briefed, if at all.

[26]    *Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993).

[27]    *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**B.      Claim III:      The Trial Court Erred In Denying The Defense Motion For A Change Of Venue And Deprived Petitioner Of His Right To A Fair Trial**

Here, Petitioner contends that the trial court improperly denied his motion for a change of venue following a hearing on the motion on September 13, 2000.  At the hearing, Petitioner presented the testimony of the news directors for two different local radio and/or television stations and the city editor of the local newspaper, along with four local residents, all of whom were either related to or had known Petitioner for a substantial time.

In the first instance, the ground for relief must be rejected because it is procedurally barred.  It was raised for the first time in Petitioner's third state habeas application and dismissed by the Texas Court of Criminal Appeals as an abuse of the writ.  Petitioner has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if this Court does not consider his claim on the merits.  Accordingly, he has not satisfied his burden to overcome the procedural bar.

Even if the claim were not procedurally barred, however, it would be without merit.  As the Fifth Circuit has observed,

> The leading case in which the Supreme Court found that a change of venue was necessary without any showing as to the jurors' biases is *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963).  There, a local television station broadcast on three straight days a twenty-minute film of the defendant's jailhouse interrogation, in which he admitted in detail to the bank robbery, kidnapping, and murder with which he was charged.  The parish had a population of 150,000, and the three broadcasts were seen by 24,000, 53,000, and 29,000 of the parish's residents, respectively.  *Id*. at 724, 83 S. Ct. 1417.  Under those circumstances, the Court reversed the conviction "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury."  *Id*. at 727, 83 S. Ct. 1417.

*Busby*, *supra*, 359 F.3d at 725.  However, the Fifth Circuit distinguished *Rideau* in *Busby*.  The testimony during the hearing on the *Busby* change of venue motion revealed that the atmosphere

in that locale - Cherokee County, Texas, in the Eastern District of Texas - was not "utterly corrupted" by unfavorable publicity so as to deny that petitioner a fair trial. *Id*. at 726. There, some defense witnesses testified that the case had been a major topic of conversation and that the petitioner could not have received a fair trial; however, on cross-examination, those witnesses were revealed to have had connections to the petitioner's family. *Id*. Other witnesses testified that the case had *not* provoked a great deal of community discussion since the period immediately following the killings in that case; some witnesses testified they read newspapers from other locales, indicating that the news they read was not saturated with the killings in that case. *Id*.

The same is true here. Jimmy Rogers, News Director for KSST Radio and Channel 18 Television, testified he had run about six stories about the victim's death; he had no idea how many times those stories were broadcast on his television and radio stations, but local news aired about three times a day on television and eight times on radio. 3 RR 8. He had not had any conversations with people in the community about the case other than the Sheriff's Office and District Attorney's Office. *Id*. at 9. On cross-examination, he testified that he attempts to "report only the facts, no opinions, and have [*sic*] been commended for having done that." *Id*. at 10. He also testified that he had no personal prejudice regarding the case. *Id*. His approximately six-to-eight stories ran from when the case first arose in "March or April" until September of 2000. *Id*. He stated,

> Basically all that we did when it first happened we ran a story regarding the incident. We ran a story regarding the arrest. We ran a story regarding the indictment. We ran a story regarding this change of venue. And probably a couple of stories that came in around the arrest also. We did not do anything in the interim.

*Id*. at 11. During his visits to public events in the community in his role in the news, the subject of Petitioner's case "hasn't been a predominant thing that I've heard and I don't pay that much

90

attention to it." *Id*. at 13. He had "no opinion" as far as whether Petitioner would receive a fair

trial. *Id*. He also testified that, "No one has attempted to bribe me nor told me to do a particular

story in a particular way." *Id*.

David Kirkpatrick, News Director for East Texas Broadcasting, including Star County

Radio and K-LAKE Radio, testified that he ran between eight and ten stories about the case. *Id*.

at 15. Mr. Kirkpatrick estimated each story ran about four or five times a day, for about 50 story

transmissions. *Id*. at 16-17. The stories were based on reports from the Sheriff's Office and the

District Attorney's Office, primarily. *Id*. at 18. On cross-examination, he testified that his stories

were fair and factual in their basis. *Id*. at 20. He broadcast "not only the allegations of someone

dying by homicidal means but also the fact that the defendant maintained that it was an accident[.]"

*Id*. Under the prosecutor's cross-examination, he testified:

> Q:    That this occurred back in March of this year?
>
> A:    Yes.
>
> Q:    So over the last six months you've presented something in the neighborhood of
>       eight to ten stories and those stories may have been presented a total of about forty
>       to fifty times?
>
> A:    That is possible. I'm not saying for sure it was eight to ten different stories. It
>       may not have been that many stories.
>
> Q:    It may have been the same story; just changed some or portions deleted or added
>       to?
>
> A:    Right. In other words, it was reported on the news when there was a development,
>       not just over and over the same thing everyday.

*Id*. at 21-22. He was not "aware of any dangerous combinations against the defendant instigated

by influential persons by reason of which he couldn't expect to get a fair trial in this county[.]"

*Id*. at 22. In his day-to-day experience in the community, he had not heard the "case talked about

some." *Id*. He had no opinion as to whether a prejudice existed in the county such that Petitioner could not receive a fair trial. *Id*. at 23. On re-direct, Mr, Kirkpatrick also testified that "[o]ur newscasts are a minute and twenty seconds long. We're a music intensive radio station. We try to make them as brief as possible with giving the essential information broadcast." *Id*. On re-cross, he testified that he believed a jury of "twelve fair and impartial people" could be impaneled in the county. *Id*. at 24.

Robert Bruce Alsobrook, the City Editor for the Sulphur Springs News-Telegram, testified that his newspaper had run "at least ten" articles about the case. *Id*. at 25. The information in the articles came from the Hopkins County Sheriff's Office, the District Attorney's Office and from defense counsel. *Id*. at 26. He testified that the newspaper's circulation was approximately 6,000 through subscription or rack sales. *Id*. at 30. On information from Sheriff's Office investigators, the newspaper printed an article that an autopsy had found Ms. George's death to be a homicide and that Petitioner had been charged with it. *Id*. at 33. Later stories repeated that fact. *Id*. at 34. He could not recall if he had had any conversations with people in the general public about the case. *Id*. at 39. On cross-examination, Mr. Alsobrook agreed that nearly every article included a paragraph indicating that Petitioner "told the investigators that [Ms.] George attempted to jump out of the pickup while it was moving and he grabbed her leg and tried to stop her but she fell out and was run over by the vehicle." *Id*. He tries to present facts as to both sides. *Id*. at 40. Nobody had tried to get him "to do something to cause this defendant not to receive a fair trial in this county[.]" *Id*.

Individual witness Neva Nell Shook testified that she had had conversations with people in the general community, although she only specifically identified one neighbor to whom she had

talked, and felt that Petitioner could not have a fair and impartial trial in Hopkins County. *Id*. at 44. On cross-examination, she testified that she had known Petitioner all of his life and that she knew his mother and his whole family. *Id*. at 46. She was approached about testifying by Petitioner's mother. Although her affidavit stated she had read the newspaper articles and heard radio and television stories about the case, she testified that she had not heard anything on the radio or television, but had only read a few articles. *Id*. at 51. She also testified that "maybe" Petitioner could have a fair trial in Hopkins County. *Id*. at 57.

Individual witness Cecil Dodd testified he was "somewhat" familiar with the case, having read about it in newspaper articles, heard about it "some" on the radio and having seen it "maybe once" on television. *Id*. at 60. He testified that he did not believe Petitioner could receive a fair and impartial trial in Hopkins County. *Id*. He had overheard some conversations at the Pitt Grill and the barber shop leading him to that conclusion, though he had not taken part in the conversations himself. *Id*. at 61. On cross-examination, he testified that Petitioner's mother attended his church and he had known Petitioner "since he was a small boy." *Id*. at 62. Several individuals named "Dodd" had signed affidavits on the motion for change of venue, and he was familiar with most of them. *Id*. As pastor of the church, Mr. Dodd had made a statement from the pulpit that members of the congregation could sign affidavits on Petitioner's behalf if they wanted to, but were under no obligation to do so. *Id*. at 63. In response to the question, "How did that happen?," he responded:

> Well Nancy, Daniel's mother, wanted me to - - wanted everyone that could sign it or go to Mr. Fergurson to try to get a change of venue. So, I didn't really want to present it because I don't want to - - I want to stay out of things like this or anything. Even a family feud I don't want to get into it. But, I did mention it but they know that I don't force them to do anything. Even when they take an offering it's up to them.

*Id*. at 64.  He also testified that Dorcas Dodd, Petitioner's sister, had been married to his brother at one time, though they had divorced.  *Id*. at 65.

Individual witness Nathaniel Lee Dodd, living in Kilgore, testified that he was aware of the case through having seen three editions of the Sulphur Springs newspaper given him by his mother and having heard it over television Channel 7 out of Tyler.  *Id*. at 74-75.  He did not believe Petitioner could receive a fair and impartial trial in Hopkins County.  *Id*. at 76.  He had a conversation with friends in the Mahoney area who did not know he knew Petitioner; they discussed murders in Longview and the conversation got around to Petitioner.  *Id*.  Based on what they said, Mr. Dodd did not believe Petitioner could have a fair trial.  *Id*.  On cross-examination, he identified his two friends with whom he discussed the case.  He stated he formed his opinion because Sulphur Springs is a small town where everyone knows everyone else and his conversation with the two friends led him to believe that a fair and impartial jury could not be impaneled in Hopkins County.  *Id*. at 84-85.  He testified that Cecil Dodd is his uncle.  *Id*. at 86.  He also testified that he did not have a personal opinion as to Petitioner's guilt based on what he had read or heard.  *Id*. at 91.

Individual witness Dorcas Acker Dodd testified that she did not believe Petitioner could receive a fair and impartial trial in Hopkins County.  *Id*. at 92-93.  She felt that "they are basically stating like he's guilty already."  *Id*. at 93.  She had conversations with people in the community that she had worked with, who did not know that she is related to Petitioner, which formed her opinion.  *Id*.  She had talked with "[a]nywhere from five to ten people, probably."  *Id*.  She could name some, but not all of them.  *Id*.  She believed they had already made their minds up.  *Id*. at 94.  On cross-examination, she admitted she had seen Petitioner the night before Ms. George's

94

death, had conversed with him, and saw him again the next day, and admitted that she might have to be a witness at the trial.  *Id*. at 94-95.  She also identified herself as Petitioner's sister.[28]  *Id*. at 97.

As in *Busby*, there was nothing adduced during the hearing to demonstrate that Hopkins County was entirely "corrupted" by the news reporting.  It consisted of about ten newspaper articles and a series of radio and television reports, spread sporadically over a six month period, containing factual reports from the Sheriff's Office and District Attorney's Office, but also including information from defense counsel and repeatedly reporting that Petitioner's side of the story was that Ms. George had jumped from the truck and that he had tried to stop her.  That simply does not add up to saturating the County with news reports aimed to inculcate the idea of Petitioner's guilt.  All of the individual witnesses admitted either a personal or familial relationship with Petitioner and his family.  Many had been asked by Petitioner's mother to involve themselves as witnesses or to obtain affidavits on behalf of Petitioner.  All were therefore personally interested in the outcome.  *Busby*, 359 F.3d at 726.  Accordingly, even if this claim were not procedurally barred, there is no merit to Petitioner's argument.

### C.    Claim VII:    Appellate Counsel Rendered Ineffective Assistance Of Counsel

Petitioner raised this ineffective assistance of appellate counsel claim for the first time in his third state application for a writ of habeas corpus, which was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ.  He did not show cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the Court did not consider the claim

---

[28]    As indicated in n.4 above, this is the same individual predominantly identified in the record as "Dorcas Vittatoe" and by the Texas Court of Criminal Appeals as "Dorcus Vititow."

on the merits.  Although Petitioner admits all of his claims are procedurally barred, he does not

directly address the procedural bar in his argument on ineffective assistance of appellate counsel.

Instead, he asserts that the record-based claims he raises in his petition could have been raised on

direct appeal because their basis was in the record itself.  Petition at 187-88.  He therefore simply

asserts that the claims are now properly before the Court solely because he raised them in his

petition, and to the extent the Director argues otherwise, Petitioner asserts that the ineffective

assistance of appellate counsel claim will cure the failure to raise the claims on direct appeal.  *Id*.

at 188.  The Director points out that the ineffective assistance of appellate counsel claim itself is

not properly before this Court because of the procedural bar.  Response at 93-94.  The Director

is correct.

Furthermore, *Martinez* and *Trevino* do not apply because they involve only underlying

claims of ineffective assistance of *trial* counsel, not *appellate* counsel.  Petitioner's excuse

therefore does not satisfy either *Martinez*/*Trevino* or any other recognized exception to the

procedural bar.  The claim is procedurally barred and therefore without merit.

**D.**     **Claim IX:**      **The Trial Court Erred In Denying The Defense Confidential Experts Under *Ake v. Oklahoma*[29]**

Petitioner asserts two subclaims under this heading: the trial court (a) failed to provide a

confidential crime scene investigator for the defense; and (b) violated the confidentiality of the

defense experts by allowing the prosecutor to comment on their fees and their absence from the

trial.   Addressing both subclaims together, Petitioner asserts that the trial court would not provide

a dedicated crime scene investigator, leaving the defense to use a non-specialized investigator

---

[29]     470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

whose report was later excluded by the trial court. He also asserts that the defense's medical examiner expert was revealed at trial over a motion *in limine* to exclude evidence of witnesses not called at trial. He contends that the trial court accordingly violated *Ake v. Oklahoma*.

The Supreme Court held in *Ake* that under the Criminal Justice Act, 18 U.S.C. § 3006A, "Congress has provided that indigent defendants shall receive the assistance of all experts 'necessary for an adequate defense.'" *Ake*, 470 U.S. at 79-80; *see also Woodward v. Epps*, 580 F.3d 318, 331 (5th Cir. 2009) ("In *Ake*, the Supreme Court held that, upon request, a trial court must appoint a psychiatrist for an indigent defendant if a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial and, in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness," citing *Ake*, 470 U.S. at 82-83), *cert. denied*, 559 U.S. 1071, 130 S. Ct. 2093, 176 L. Ed. 2d 729 (2010). Although *Ake* was a direct-review case, the Fifth Circuit subsequently applied its holding to the habeas context, as well. *Rocha*, *supra*, 626 F.3d at 827 n.54 (citing *Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007) and *Stewart v. Smith*, 536 U.S. 856, 860, 122 S. Ct. 2578, 153 L. Ed. 2d 762 (2002) (per curiam) (assuming without deciding that the rule announced in *Ake*, a direct-review case, also applies in habeas cases)), *cert. denied*, 132 S. Ct. 397, 181 L. Ed. 2d 255 (2011).

Petitioner's argument is not necessarily that the trial court did not appoint any experts for the defense; instead, it is "that the 'assistance' rendered by the court-appointed experts in this case was really no assistance at all, since they were unable or unwilling to convey to the jury the minimal assistance envisioned in *Ake*." Petition at 228-29. Essentially, in other words, he

contends that the assigned experts were either insufficient or inadequate to allow him to put on the defense he now asserts he should have been able to conduct.

The Director again points out that Petitioner did not raise this issue until his third state habeas application and that it was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. Further, the Director argues that the trial court did in fact appoint experts for defense use, including crime scene investigation, but that *Ake* does not require a trial court to enable the "most-sophisticated defense" but only to provide "access to the raw materials integral to the building of an effective defense." Response at 99 (quoting *Ake*, 470 U.S. at 77). The Fifth Circuit has agreed with that precept. *Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000) ("a defendant cannot expect the state to provide him a most-sophisticated defense; rather he is entitled to 'access to the raw materials integral to the building of an effective defense[,]'" citing *Ake*, 470 U.S. at 77), *cert. denied*, 532 U.S. 949, 121 S. Ct. 1420, 149 L. Ed. 2d 360 (2001); *see also Busby v. Cockrell*, 2003 WL 24292821, at *8 (E.D. Tex. Mar. 31) (same, quoting *Moore*, 225 F.3d at 503), *aff'd*, 73 F. App'x 49 (5th Cir. 2003). Petitioner has not demonstrated that he was not provided the "raw materials" with which to craft an "effective defense" at trial.

At bottom, however, Petitioner has not shown either cause and prejudice, nor a fundamental miscarriage of justice, to overcome the procedural bar with regard to this claim. It is therefore without merit.

### E.      Claim X:      Mr. Acker Was Denied A Fair Trial And Due Process Of Law By The Persistent Misconduct Of The Prosecutor.

Petitioner contends that he was denied a fair trial due to numerous alleged instances of prosecutorial misconduct, including: (a) prejudicially inflaming the passions of the jury; (b) asking obviously improper questions; (c) making prejudicial remarks in front of the jury; (d) violation

of attorney-client confidentiality; (e) deliberately prejudicing the jury by asking them to improperly speculate as to the reasons for the absence of a defense expert; (f) misstating the evidence; (g) asking defense witnesses how much they were paid; (h) commenting on the veracity of a witness in front of the jury; (i) limiting mitigating evidence; (j) commenting on Petitioner's right to remain silent; and (k) the cumulative effect of these errors "infected the trial with unfairness."

The standard for granting habeas corpus relief because of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). It is well established under Texas law that proper jury argument must fall within one of the following categories: (1) summary of the evidence, (2) reasonable deduction from the evidence, (3) in response to argument of opposing counsel, and (4) plea for law enforcement. *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). Improper remarks by a prosecutor "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair." *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008) (citations omitted). "Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Id.* "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Darden v. Wainwright*, 477 U.S. at 181).

Here, however, the relevant issue is that each of these sub-claims is procedurally barred as an abuse of the writ for having been raised in Petitioner's third state habeas application.

Petitioner has not shown either cause and prejudice, nor a fundamental miscarriage of justice, to overcome the procedural bar with regard to the claim (and dependent sub-claims) of prosecutorial misconduct. The claim and sub-claims are therefore without merit.

**F.      Claim XI:      Lethal Injection - As It Is Currently Administered In Texas - Produces Unnecessary Pain, Torture, And Lingering Death, And Violates The Eighth Amendment**

Petitioner next argues that the use of lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment. The Supreme Court has rejected that argument, stating:

> [a] stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives.

*Baze v. Rees*, 553 U.S. 35, 61, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). Petitioner has made no such showing here and, in fact, although his post-exhaustion petition was filed after the Supreme Court ruled in *Baze*, Petitioner wholly ignores the ruling in his argument. In addition, the Fifth Circuit has regularly rejected the argument. *Whitaker v. Livingston*, 732 F.3d 465, 469 (5th Cir.) (there must be some indication in the record that use of drug from non-FDA source is *very likely to cause* needless suffering (citing, *inter alia*, *Baze*)), *cert. denied*, 134 S. Ct. 417, 187 L. Ed. 2d 274 (2013); *Raby v. Livingston*, 600 F.3d 552, 561-62 (5th Cir. 2010); *Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988), *cert. denied*, 492 U.S. 925, 109 S. Ct. 362, 106 L. Ed. 2d 298 (1989); *Rivas v. Thaler*, 432 F. App'x 395, 404-05 (5th Cir.) (denying certificate of appealability on the issue and noting that, as here, the petitioner "fails to demonstrate that the State's lethal injection procedure creates a substantial risk of serious harm, nor has he offered an alternative drug protocol that would significantly reduce the risk, if any, of serious harm." (citing

100

*Baze*, 553 U.S. at 49-52)), *cert. denied*, 132 S. Ct. 850, 181 L. Ed. 2d 555 (2011). The claim itself lacks merit.

Wholly aside from the higher Courts' rejections, the ground for relief must be rejected in this instance because, again, it is procedurally barred. It was raised for the first time in Petitioner's third state habeas application and dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. Petitioner has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if this Court does not consider his claim on the merits. He has not satisfied his burden to overcome the procedural bar; therefore, on this basis independently from Supreme Court precedent in *Baze*, this claim has no merit.

### G. Claim XII: The Second Special Issue Is Unconstitutional Because It Omits A Burden Of Proof And Makes Impossible Any Meaningful Appellate Review Of The Jury's Determination

In this claim, Petitioner contends that "the state courts have a federal constitutional duty to review for 'sufficiency' the jury's negative answer to the mitigation special issue," Petition at 254, and that the second[30] special issue presented to the jury omits a burden of proof as to either party, which therefore makes meaningful appellate review of the jury's determination impossible. The special issue states:

#### SPECIAL ISSUE NUMBER THREE

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or

---

[30] Petitioner refers to this issue as the "second" special issue and purports to quote it in full. *See* Petition at 253, citing "2 CR 459." However, the special issue used in Petitioner's case was the third of three special issues and is located elsewhere in the Clerk's Record. *See* 4 CR 603. Also, whereas Petitioner purports to quote the special issue as specifically containing his name, the record clearly reflects that the third special issue does not, but merely refers to the "defendant." *Id.* However, in context and quote, there is no doubt that Petitioner refers to the same special issue.

circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

4 CR 603.  The Presiding Juror answered the question on behalf of the jury as "NO."  *Id.*

As the Director points out, however, the Fifth Circuit has ruled that a state appellate court has satisfied the constitutional requirement that is the basis of Petitioner's claim by providing meaningful review of the evidence of future dangerousness.  *Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir.) ("regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, 'meaningful appellate review' has been afforded."), *cert. denied*, 534 U.S. 945, 122 S. Ct. 329, 151 L. Ed. 2d 243 (2001); *Shamburger v. Cockrell*, 34 F. App'x 962, 2002 WL 663706, at *3 (5th Cir. Mar. 25) ("Although a defendant in a capital case is entitled to "meaningful appellate review" of a death sentence under the Eighth and Fourteenth Amendments, appellate courts are not required to conduct an independent review of the jury's mitigation finding.  Specifically, we have held that a state appellate court satisfies the requirements under the federal constitution if it provides a meaningful review of the evidence of future dangerousness," citing *Beazley*, 242 F.3d at 261) (footnote omitted), *cert. denied*, 536 U.S. 986, 123 S. Ct. 28, 153 L. Ed. 2d 888 (2002); *see also Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002); *Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir. 2000).  Petitioner does not address this point; accordingly, his argument that the special issue is unconstitutional because it ostensibly makes any meaningful appellate review impossible by omitting a burden of proof is unfounded and fails.

Moreover, as with Petitioner's other claims in this category, this claim must be rejected because it is procedurally barred.  It was raised for the first time in Petitioner's third state habeas application and was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ.

He does contend, in a brief and cursory argument without citation, that the issue was raised in his brief on direct appeal as Claim I "and also in state habeas." Reply at 116. However, none of the issues raised in Petitioner's direct appeal under his Point of Error No. 1 argues anything close to the issue raised before this Court. *See* Brief for Appellant at 8-9; *Acker*, *supra*, 2003 WL 22855434, at *8-9. As to his state habeas application, the Court has found nothing in Petitioner's initial application addressing the point. While he may have raised it in his subsequent petition in order to exhaust it for presentation in this Court, as noted, it was dismissed as an abuse of the writ. Petitioner has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if this Court does not consider his claim on the merits. He has not satisfied his burden to overcome the procedural bar.

### H. Claim XIII: The Death Penalty, At Least As Presently Administered In Texas, Is Cruel And Unusual Punishment Under The Eighth And Fourteenth Amendments To The United States Constitution.

Next, Petitioner claims that the death penalty constitutes cruel and unusual punishment, at least as applied in Texas. His argument is that "evolving standards of decency dictate that capital punishment violates the Eighth Amendment," Petition at 268, and that the death penalty is *per se* unconstitutional due to the competing requirements for considering relevant mitigating evidence while simultaneously maintaining a "structured discretion" in sentencing, *id*. at 269-70. He cites a number of reports, studies and case opinions from the 1990s and earlier, but none of his controlling authorities holds that the death penalty is unconstitutional, whether in Texas or elsewhere. More recent decisions by the Supreme Court and the Fifth Circuit have upheld capital punishment in Texas. *See*, *e.g.*, *Johnson v. Texas*, 509 U.S. 350, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (rejecting a similar

challenge as a request for a certificate of appealability), *cert. denied*, 546 U.S. 1177, 126 S. Ct. 1347, 164 L. Ed. 2d 60 (2006).

Moreover, as with his other grounds for relief, this claim was raised for the first time in his third state habeas application and was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. Petitioner has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if this Court did not consider the claim on its merits. He has not satisfied his burden to overcome the procedural bar; therefore, this claim has no merit.

I.     Claim XIV:   **Petitioner's Death Sentence Violates International Law, Which Is Binding On This Court, As Well As The Eighth Amendment.**

In his follow-on claim, Petitioner again asserts that the death penalty constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments, but places his argument in the context of a violation of international law and, specifically, the International Covenant of Civil and Political Rights ("ICCPR"). Fundamentally, he relates the historical setting of constitutional protections in this country to derivations of European law and the ICCPR. However, the only Supreme Court opinions relating the ICCPR to any issue involving the death penalty are limited to the imposition of capital punishment on persons under 18 at the time of their offense. *See*, *e.g.*, *Roper v. Simmons*, 543 U.S. 551, 567, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Stanford v. Kentucky*, 492 U.S. 361, 390 n.10, 106 L. Ed. 2d 306 (1989), *abrogated by*, *Roper*, 543 U.S. 551. Moreover, the Fifth Circuit has explicitly held that the ICCPR is not U.S. law because it is not self-executing and because Congress has not incorporated it into domestic law. *Roach v. Quarterman*, 220 F. App'x 270, 275 & n.2 (5th Cir. 2007) (citing *Beazley*, 242 F.3d at 267 and

out-of-Circuit cases). Accordingly, Petitioner's "appeal to its provisions fails." *Roach*, 220 F. App'x at 275.

Furthermore, as above, this claim also was raised for the first time in Petitioner's third state habeas application and was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. Petitioner has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if this Court did not consider the claim on its merits. He has not satisfied his burden to overcome the procedural bar; therefore, this claim has no merit.

**J.     Claim XV:     The Cumulative Effect Of The Errors At Mr. Acker's Trial Denied Him Of Due Process Under The Fourteenth Amendment.**

In this last claim, Petitioner asserts he is entitled to federal habeas relief due to cumulative errors. This is not the first time he has raised this argument in this petition. As already noted, the Fifth Circuit rejected a similar cumulative error claim, stating:

> Coble claims that cumulative error merits habeas relief. Federal habeas relief is only available for cumulative errors that are of a constitutional dimension. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey*, 985 F.2d at 229. As previously discussed, none of Coble's ineffective assistance claims establish ineffective assistance under *Strickland*. Coble has not identified errors of constitutional dimension. Accordingly, we cannot say that the state habeas court's rejection of Coble's cumulative error claim was objectively unreasonable.

*Coble*, *supra*, 496 F.3d at 440. Here, Petitioner likewise has not identified any errors of constitutional dimension. Further, the Fifth Circuit has held that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Darden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 960, 113 S. Ct. 2928, 124 L. Ed. 2d 679 (1993)), *reh'g and reh'g en banc denied*, 95 F.3d 56 (5th Cir. 1996), *and cert. denied*, 519 U.S. 1094, 117 S. Ct. 773, 136 L. Ed. 2d 718 (1997).

Additionally, as with Petitioner's other claims, this claim also was raised for the first time in his third state habeas application and was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. Petitioner has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if this Court did not consider the claim on its merits. He has not satisfied his burden to overcome the procedural bar; therefore, this claim has no merit.

In conclusion, Petitioner has not shown, either in his claim of actual innocence, those claims that are subject to a "cause and prejudice" review under *Martinez*, or in any of his procedurally barred and non-excused claims, that he is entitled to federal habeas corpus relief. The petition for a writ of habeas corpus should be denied.

## VII. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, the Court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully

explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, the Court finds that Petitioner is not entitled to a certificate of appealability as to his claims.

## VIII.  CONCLUSION

It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** that a certificate of appealability is **DENIED**.  It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

SIGNED at Beaumont, Texas, this 14th day of June, 2016.

_Marcia A. Crone_

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE